1  William B. Freeman (SBN 137276)
2  bill.freeman@katten.com
3  Christopher D. Beatty (SBN 266466)
   chris.beatty@katten.com
4  Ashley T. Brines (SBN 322988)
5  ashley.brines@katten.com
   KATTEN MUCHIN ROSENMAN LLP
6  2029 Century Park East, Suite 2600
7  Los Angeles, CA  90067-3012
   Telephone: 310.788.4400
8  Facsimile:  310.788.4471
9  Attorneys for Plaintiff City National Bank, as
10 Administrative Agent for City National Bank and
   Bridge Funding Group, Inc.
11

| **FILED** |
| CLERK, U.S. DISTRICT COURT |
| 1/18/2023 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____DL_____ DEPUTY |

12         UNITED STATES DISTRICT COURT FOR THE

13            CENTRAL DISTRICT OF CALIFORNIA

14

15  CITY NATIONAL BANK, AS            ) CASE NO. 2:23-cv-00099
    ADMINISTRATIVE AGENT FOR          )
16  CITY NATIONAL BANK AND            ) **VERIFIED COMPLAINT FOR:**
17  BRIDGE FUNDING GROUP, INC.,       )
                                      ) **1) BREACH OF CONTRACT**
18            Plaintiff,              ) **2) BREACH OF SECURITY**
                                      ) **AGREEMENT AND POSSESSION**
19        vs.                         ) **OF PERSONAL PROPERTY**
20  NKS RESTAURANTS, L.C., HR         ) **3) BREACH OF WRITTEN**
    RESTAURANTS, L.C., MR             ) **GUARANTY**
21  RESTAURANTS, L.C., C UTAH,        ) **4) BREACH OF WRITTEN**
22  L.C., AZM RESTAURANTS, L.C.,      ) **GUARANTY**
    NDM RESTAURANTS, L.C.,            ) **5) SPECIFIC PERFORMANCE**
23  MERIDIAN RESTAURANTS              ) **FOR APPOINTMENT OF**
24  UNLIMITED, L.C., LOVELOUD         ) **RECEIVER**
    RESTAURANTS, L.C.; and DOES 1     )
25  through 10, inclusive,            )
                                      )
26                                    )
27            Defendants.             )
                                        Amount demanded exceeds $75,000
28  _____

VERIFIED COMPLAINT

154582484

Plaintiff City National Bank ("Plaintiff"), as administrative agent for City National Bank and Bridge Funding Group, Inc. (together, "Lenders"), alleges on information and belief as follows:

<u>INTRODUCTION</u>

1.    Plaintiff files this action against Defendants NKS Restaurants, L.C., HR Restaurants, L.C., MR Restaurants, L.C., C Utah, L.C., AZM Restaurants, L.C., NDM Restaurants, L.C. (collectively, "Borrowers"), and Meridian Restaurants Unlimited, L.C. ("Meridian") and Loveloud Restaurants, L.C. ("Loveloud"; together with Meridian, "Guarantors"; collectively with Borrowers, "Loan Parties"), to recover more than $50,101,528.90 million that Lenders loaned to Borrowers ("Borrowers' Debt").

2.    To document the loans, Borrowers and Guarantors signed a credit agreement, dated as of February 26, 2018, as amended and modified by a first amendment to credit agreement, dated as of February 1, 2019, and a second amendment to credit agreement and waiver, dated as of March 13, 2019 (collectively, "Credit Agreement"), attached hereto as **<u>Exhibit 1</u>**, which contains a guaranty of all amounts loaned to Borrowers as a condition precedent to the loans.[1]

3.    Borrowers used the loans to fund the acquisitions and operations of multiple Burger King franchises across various states, including Utah, Idaho, North Dakota, Minnesota, Montana, Arizona, Kansas, Nebraska, and South Dakota (collectively, "Franchises"). In the past two and one-half years, Borrowers committed myriad defaults under the Credit Agreement and related forbearance agreement, dated as of June 1, 2020, as amended and

---

[1]    Pursuant to the Credit Agreement, at §§ 8.02 and 9.02, Plaintiff may exercise on behalf of Lenders all rights and remedies available to Lenders under the Credit Agreement, and Plaintiff has the same rights and powers in its capacity as a Lender.

Katten
Katten Muchin Rosenman LLP
515 South Flower Street, Suite 1000
Los Angeles, CA 90071-2212
213.443.9000 tel    213.443.9001 fax

modified by an amendment to forbearance agreement on August 17, 2020 and a second amendment to forbearance agreement on January 20, 2022 (collectively, "Forbearance Agreement"), attached hereto as **Exhibit 2**, including: (i) failure to timely pay principal payments on the Loan; (ii) failure to pay interest at the default rate ("Default Rate"); (iii) failure to pay the installment fees under the Forbearance Agreement; (iv) failure to timely pay interest at the contract rate; (v) failure to maintain minimum earnings, (vi) failure to maintain a sufficient fixed charge coverage ratio; (vii) failure to maintain a sufficient current ratio; (viii) permitting the leverage ratio to exceed the maximum allowable value; (ix) failure to deliver internal interim reports; (x) failure to deliver executed deposit account control agreements; (xi) failure to consistently engage a required advisor; (xii) permitting unacceptable accelerated obligations in member draws; and (xiii) making unauthorized restricted payments as member draws.

4.    Notably, by virtue of the Forbearance Agreement, on three (3) distinct occasions the Loan Parties: (i) acknowledged the debts owing to Agent and the Lenders; (ii) ratified the enforceability of all loan and collateral documents; (iii) acknowledged the existence and continuation of the "Ongoing Defaults"; (iv) acknowledged that Loan Parties have no claims, counterclaims, defenses or offsets to the obligations owing to Agent and the Lenders; and (v) released all claims and causes of action against Agent and the Lenders.

5.    At present, more than two (2) dozen Events of Default have occurred and are continuing under the Credit Agreement (collectively, the "Ongoing Defaults"). Several of the Ongoing Defaults have been continuing for more than twenty (20) months. The Ongoing Defaults consist of monetary defaults, financial covenant defaults, other covenant defaults and reporting defaults.

3

154582484

6. To document Loan Parties' multiple defaults under the Credit Agreement and Forbearance Agreement, Plaintiff provided to the Loan Parties multiple default letters (collectively, "Default Notice"), attached hereto as **Exhibit 3**.

7. Accordingly, Plaintiff seeks repayment of the funds loaned to Borrowers, and guaranteed by Guarantors, and all remedies available under the Credit Agreement and Forbearance Agreement, plus accrued interest and fees, and all other relief allowed by law.

## THE PARTIES

8. Plaintiff and Lenders are national banking associations, organized under the National Bank Act, and each operates pursuant to a certificate of authority issued by the Comptroller of the Currency. Plaintiff is headquartered in Los Angeles, California.

9. Plaintiff is informed and believes that Borrowers are each Utah limited liability companies, each member of which has diversity of citizenship with Plaintiff.

10. Plaintiff is informed and believes that Guarantors are each Utah limited liability companies, each member of which has diversity of citizenship with Plaintiff.

11. Plaintiff is currently unaware of the true names and capacities, whether individual, corporate, associate or otherwise, of defendants sued herein as Does 1 through 10 ("Doe Defendants"; collectively with Borrowers and Guarantors, "Defendants"), inclusive, and therefore sues these Doe Defendants by such fictitious names. Plaintiff will seek leave of this Court to amend its Complaint to allege the true names and capacities of the fictitiously named Doe Defendants when their identities have been ascertained. Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named Doe Defendants is responsible in some manner for the occurrences

1    herein alleged, and that Plaintiff's damages were proximately caused by such

2    Doe Defendants.

3         12.    Plaintiff is informed and believes, and on that basis alleges, that

4    at all times mentioned herein, each of the Defendants, including Borrowers,

5    Guarantors, and each of the Doe Defendants, was the agent, affiliate, servant,

6    employee, representative, partner, limited partner, principal, aider and

7    abettor, co-conspirator, or alter ego of the other Defendants, and, in doing the

8    things herein described, was acting within the course and scope of such

9    relationship, and with the permission and consent of each of the other

10   Defendants, and that each is responsible in some manner for the occurrences

11   herein alleged.

12   <h2 style="text-align:center">JURISDICTION AND VENUE</h2>

13        13.    This Court has subject matter jurisdiction over this action, under

14   28 U.S.C. § 1332(a)(1), because the amount in controversy exceeds $75,000,

15   exclusive of interest and costs, and Plaintiff is a citizen of California, while

16   Borrowers and Guarantors are comprised of citizens of Utah, and foreign

17   citizens that are not residents of the United States.

18        14.    This Court has personal jurisdiction over Borrowers and

19   Guarantors because each of them signed the Credit Agreement, irrevocably

20   and unconditionally submitting themselves and their property to the

21   jurisdiction of the United States District Court for the Central District of

22   California. (Exh. 1, § 11.13.)

23        15.    Additionally, subject to 28 U.S.C. § 1391(b)(3), this Court is the

24   proper venue for this action because Borrowers and Guarantors are subject

25   to this Court's personal jurisdiction with respect to this action. In the Credit

26   Agreement, at § 11.13(c), Borrowers and Guarantors agreed that this Court

27   would serve as the venue for any dispute related to the Credit Agreement,

28   and irrevocably and unconditionally waived any objection to such venue.

154582484

Katten
Katten Muchin Rosenman LLP
515 South Flower Street, Suite 1000
Los Angeles, CA 90071-2212
213.443.9000 tel   213.788.7316 fax

**FIRST CAUSE OF ACTION**

(Breach of Written Contract against Borrowers)

16.    Plaintiff realleges paragraphs 1 through 13 above, as though set forth fully herein.

17.    Pursuant to the Credit Agreement, Lenders agreed to provide loans and extensions of credit to Borrowers in an aggregate amount of up to $61,500,000, consisting of a Term Loan A-1 Facility in an aggregate principal amount of $40,500,000, a Term Loan A-2 Facility in an aggregate original principal amount of up to $18,000,000, a Term Loan A-3 Facility in an aggregate principal amount of $4,400,000, and a Revolving Facility in an aggregate original principal amount of up to $3,000,000 (collectively, the "Facilities").

18.    The Loans are further evidenced by the Revolving Note, the Term Loan A-1 Note, the Term Loan A-2 Note and the Term Loan A-3 Note (collectively and as amended, restated, supplemented and/or modified from time to time, the "Notes"), attached hereto as **Exhibit 4**.

19.    Plaintiff and Lenders each advanced funds to Borrowers pursuant to the Credit Agreement, the Notes and the other loan documents and said parties have performed all other terms and conditions of the Credit Agreement and the other loan documents on their part to be performed.

20.    By letters dated August 12, 2020, February 19, 2021, May 12, 2021, May 24, 2021, August 11, 2021, August 25, 2021, September 16, 2021, November 10, 2021, February 16, 2022, March 25, 2022, April 21, 2022, June 16, 2022, August 22, 2022, September 23, 2022 October 6, 2022, November 21, 2022, and December 15, 2022 (collectively, the "Default Letters"), Plaintiff provided formal notice to the Loan Parties that multiple events of default had occurred and were continuing under Section XII of the Forbearance

Katten
Katten Muchin Rosenman LLP
515 South Flower Street, Suite 1000
Los Angeles, CA 90071-2212
213.443.9000 tel    213.788.2385 fax

154582484

Agreement and Section 8.01 of the Credit Agreement (collectively, the "Ongoing Defaults").

21.     Pursuant to the Credit Agreement, Borrowers promised to pay all outstanding principal, plus accrued unpaid interest and other amounts owed in connection with the Facilities by February 26, 2021 with respect to the revolving facility and February 26, 2023 with respect to the term loan facilities.

22.     Additionally, Borrowers agreed to perform and comply with all terms, covenants, conditions, and obligations contained in the Credit Agreement.

23.     Pursuant to the Credit Agreement, Borrowers promised to reimburse Plaintiff and all Lenders for all costs and expenses, including attorneys' fees, incurred by Plaintiff to enforce the Credit Agreement and to collect all indebtedness owed to Plaintiff under the Credit Agreement.

24.     The Credit Agreement has not been revoked or superseded and remains in full force and effect in accordance with its terms.

25.     Plaintiff and the Lenders have advanced $46,434,767.30 to Borrowers pursuant to the Credit Agreement, and Plaintiff and the Lenders have each performed all other terms and conditions of the Credit Agreement on their part to be performed, other than those Plaintiff and the Lenders have been prevented or excused from performing because of Borrowers' conduct.

26.     Specifically, Borrowers breached the Credit Agreement by causing the following Ongoing Defaults (several amendments to the Credit Agreement can be found in the Forbearance Agreement. All references in this Complaint are either to the Credit Agreement or the Forbearance Agreement):

    a. Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(i) of the Credit

**Katten**
Katten Muchin Rosenman LLP
515 South Flower Street, Suite 1000
Los Angeles, CA 90071-2212
213.443.9000 tel    213.788.5900 fax

VERIFIED COMPLAINT

Agreement based on Borrowers' failure to timely pay any portion of the principal payments on the Loans for the months of March 2022, April 2022, May 2022, June 2022, July 2022, August 2022, or September, 2022;

b. Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(i) of the Credit Agreement based on Borrowers' failure to timely pay the full principal amount of the Loans after acceleration in October, 2022;

c. Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement based on Borrowers' failure to pay interest at the Default Rate for the months of September 2021, October 2021, November 2021, December 2021, March 2022, April 2022, May 2022, June 2022, July 2022, August 2022, September, 2022, October, 2022, November, 2022 and December 2022;

d. Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement due to Borrowers' failure to pay "Deferred Interest" for the months of May, 2022; June, 2022, July, 2022; August, 2022; and September, 2022, as required by Section VII(D) of the Forbearance Agreement;

e. Multiple Events of Default occurred under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement due to Borrowers' failure to timely pay the full amount of interest due on the Loans at the contractual interest rate on the June 1, 2022, September 1,

VERIFIED COMPLAINT

154582484

2022, November 1, 2022 and December 1, 2022 Interest Payment Dates.

f.  Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(a) of the Credit Agreement based on Borrowers' failure to timely pay a $950,000 installment of the Forbearance Fee due on or before July 1, 2022, in violation of Section IX(iv) of the Forbearance Agreement;

g.  Multiple Events of Default occurred under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement due to Borrowers' failure to timely pay the full amount of interest due on the Loans at the contractual interest rate on the June 1, 2022, and September 1, 2022 Interest Payment Dates; in particular, Borrowers "late paid" the contractual interest due on the Loans on both occasions;

h.  An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(i) of the Credit Agreement based on Borrowers' failure to <u>timely</u> pay principal payments on the Loans for the months of November 2021, and December 2021;

i.  Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement based on Borrowers' failure to maintain Minimum Trailing Twelve Months Consolidated EBITDA: (i) of at least $10,325,000 for the Fiscal Quarter ending June 30, 2021; (ii) of at least $11,235,000 for the Fiscal Quarter ending September 30, 2021; (iii) of at least $11,380,000 for

Katten
Katten Muchin Rosenman LLP
515 South Flower Street, Suite 1000
Los Angeles, CA 90071-2212
213.443.9000 tel    213.443.9001 fax

154582484

the Fiscal Quarter ending March 31, 2022; and (iv) of at least $12,000,000 for the Fiscal Quarter ending June 30, 2022 – each in violation of Section 7.11(f) of the Credit Agreement;

j. Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement because Borrowers permitted the Consolidated Pre-Compensation Fixed Charge Coverage Ratio to fall below 1.10 to 1.00, measured as of the Fiscal Quarters ending June 30, 2021, September 30, 2021, March 31, 2022, and June 30, 2022, in violation of Section 7.11(a) of the Credit Agreement;

k. An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement because Borrowers permitted the Consolidated Post-Distribution Fixed Charge Coverage Ratio to fall under 1.10 to 1.00, measured as of the Fiscal Quarters ending June 30, 2021, September 30, 2021, March 31, 2022, and June 30, 2022, in violation of Section 7.11(b) of the Credit Agreement;

l. Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement because Borrowers permitted the Current Ratio to fall under 0.50 to 1.00, measured as of the Fiscal Quarters ending September 30, 2021, March 31, 2022, and June 30, 2022, in violation of Section 7.11(c) of the Credit Agreement;

m. Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement because Borrowers allowed the Consolidated Lease Adjusted Leverage Ratio to exceed: (i) 6.25x,

Katten

Katten Muchin Rosenman LLP

515 South Flower Street, Suite 1000
Los Angeles, CA 90071-2212
213.443.9000 tel   213.788.7349 fax

10

VERIFIED COMPLAINT

1  measured as of the Fiscal Quarters ending June 30, 2021,

2  September 30, 2021, and March 31, 2022, in violation of

3  Section 7.11(d) of the Credit Agreement; and 6.00x,

4  measured as of the Fiscal Quarter ending June 30, 2022;

5  n. An Event of Default under Section XII of the Forbearance

6  Agreement and Section 8.01(b) of the Credit Agreement

7  because Borrowers failed to deliver their internal interim

8  reports, including store level reconciliations, for the month

9  ending March 31, 2021, by no later than April 30, 2021, in

10  violation of Section 6.01(e) of the Credit Agreement;

11  o. An Event of Default under Section XII of the Forbearance

12  Agreement because Borrowers failed to deliver executed

13  deposit account control agreements by no later than

14  October 1, 2020, in violation of Section VIII(E) of the

15  Forbearance Agreement;

16  p. An Event of Default under Section XII of the Forbearance

17  Agreement because Borrowers failed to consistently

18  engage an advisor in accordance with an agreed scope of

19  services between the months of August 2020 and March

20  2021—in violation of Sections VIII(F) and XII of the

21  Forbearance Agreement;

22  q. An Event of Default under Section XII of the Forbearance

23  Agreement and Section 8.01(b) of the Credit Agreement

24  because Borrowers created, incurred, and suffered to exist

25  accelerated obligations in the amount of $3,286,448 in

26  member draws in violation of Section 7.03 of the Credit

27  Agreement;

28

Katten
Katten Muchin Rosenman llp
515 South Flower Street, Suite 1000
Los Angeles, CA 90071-2212
213.443.9000 tel   213.443.9001 fax

154582484

1       r.  An Event of Default under Section XII of the Forbearance

2          Agreement and Section 8.01(b) of the Credit Agreement

3          because Borrowers declared and made, directly or

4          indirectly, restricted payments in the form of the

5          management fees, in violation of Section 7.06 of the Credit

6          Agreement;

7       s.  An Event of Default under Section XII of the Forbearance

8          Agreement and Section 8.01(b) of the Credit Agreement

9          because Borrowers created, incurred and suffered to exist

10         accelerated obligations in the form of $3,286,448 in member

11         draws in violation of Section 7.03 of the Credit Agreement;

12       t.  An Event of Default under Section XII of the Forbearance

13         Agreement and Section 8.01(b) of the Credit Agreement

14         because Borrowers failed to promptly deliver to

15         Administrative Agent copies of any and all correspondence

16         that references any breach, deviance or non-compliance

17         with any of the Franchise Agreements, in violation of

18         Section 6.02(g) of the Credit Agreement; and

19       u.  An Event of Default under Section XII of the Forbearance

20         Agreement and Section 8.01(b) of the Credit Agreement

21         due to the termination/cancellation of certain of

22         Borrowers' Franchise Agreements and/or Leases of

23         Restaurants located in Minnesota, prior to their stated

24         terms, in violation of Section 7.13 of the Credit Agreement.

25     27.    Borrowers have failed and refused to perform in accordance with

26 the terms and conditions of the Credit Agreement.

27

28

VERIFIED COMPLAINT

154582484

28. Pursuant to the Credit Agreement, as a result of the Ongoing Defaults, Plaintiff may exercise all rights and remedies permitted by law and the Credit Agreement.

29. Plaintiff has demanded, and hereby demands, that Borrowers honor the terms and provisions of the Credit Agreement, however, Borrowers have failed and refused to do so.

30. Pursuant to Section 8.02(b) of the Credit Agreement, on or about October 6, 2022, Plaintiff declared the unpaid principal amount of all outstanding Borrowers' Debt, all interest accrued and unpaid thereon, and all other amounts owing or payable under the Credit Agreement and other loan documents to be immediately due and payable in full ("Accelerated Obligations"). Borrowers and Guarantors did not pay the Accelerated Obligations.

31. Plaintiff has been damaged in an amount to be proved at trial as a result of Borrowers' breaches of the Credit Agreement and Forbearance Agreement. As of September 30, 2022, there is presently due, owing and unpaid from Borrowers to Lenders under the Credit Agreement, the outstanding principal balance of $46,434,767.30; together with outstanding interest thereon through October 6, 2022, in the amount of $2,073,169.32; together with interest accruing after October 6, 2022; together with termination charges, all other fees, costs and additional charges due to Lenders under the terms of the Credit Agreement, including but not limited to Lenders' costs and attorneys' fees (collectively, the "Borrowers' Indebtedness").

## SECOND CAUSE OF ACTION

[Breach of Security Agreement and Possession of Personal Property against Borrowers and Doe Defendants]

VERIFIED COMPLAINT

154582484

32.    Plaintiff realleges paragraphs 1 through 29 above, as though set forth fully herein.

33.    In order to collateralize their obligations under the Credit Agreement and Notes, Borrowers executed and delivered to Plaintiff a Security Agreement, dated as of February 26, 2018 (as amended, restated, supplemented or modified from time to time, the "Security Agreement"), attached hereto as **Exhibit 5**.

34.    Pursuant to the Security Agreement, Borrowers granted to Plaintiff a security interest in all collateral described in the Security Agreement, including, among other things, (i) all inventory, instruments, chattel paper, accounts, payment rights, licenses, and general intangibles (each as defined in the Security Agreement), together with all accessions, additions, replacements, and substitutions relating to any of the foregoing; (ii) all records of any kind relating to any of the foregoing; and (iii) all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds) (collectively, the "Collateral"). Plaintiff perfected its security interest in the Collateral by duly recording one or more UCC-1 Financing Statements with the Office of the Secretary of State of Utah (collectively, and as amended or continued from time to time, the "Financing Statements"), attached hereto as **Exhibit 6**.

35.    In order to further collateralize its obligations under the Credit Agreement and Notes, Meridian executed and delivered to Administrative Agent a pledge agreement dated as of February 26, 2018 (as amended, restated, supplemented and modified from time to time, the "Pledge Agreement"). Pursuant to the Pledge Agreement, Meridian pledged to Plaintiff a security interest in all capital stock, membership interests, partnership interests, and all other pledged collateral (as defined in the Pledge Agreement). Plaintiff perfected its security interest in the Collateral

154582484

by duly recording the Financing Statements and by taking possession of certain of the Collateral.

36. To secure all outstanding Borrowers' Debt owed to Plaintiff under the Credit Agreement, Borrowers granted to Plaintiff in the Credit Agreement a security interest in all of their Collateral.

37. Plaintiff has performed all terms and conditions of the Credit Agreement on its part to be performed.

38. Plaintiff has demanded, and hereby further demands, that Borrowers perform their obligations under the Credit Agreement and deliver possession of the Collateral to Plaintiff.

39. Borrowers have breached the Credit Agreement by, among other things, failing and refusing to deliver sole and exclusive possession of all Collateral to Plaintiff.

40. Pursuant to the terms of the Credit Agreement, Plaintiff is entitled to immediate and exclusive possession of the Collateral.

41. The Credit Agreement provides that Borrowers will pay all costs of collection, including reasonable attorneys' fees and legal expenses, incurred by Plaintiff to enforce the Credit Agreement and to pursue its rights as a secured party with respect to the Collateral.

42. Plaintiff is informed and believes, and on that basis alleges, that Does 1 through 10, and each of them claim some right, title, or interest in the Collateral, and that any such right, title, or interest is subordinate to and junior to Plaintiff's interest in the Collateral by virtue of the Credit Agreement.

## THIRD CAUSE OF ACTION

[Breach of Written Guaranty against Meridian]

43. Plaintiff realleges paragraphs 1 through 40 above, as though set forth fully herein.

VERIFIED COMPLAINT

154582484

44.    In order to guaranty Borrowers' indebtedness and obligations under the Credit Agreement and the Notes, Guarantors executed and delivered to Plaintiff a continuing guaranty contained in Article X of the Credit Agreement (as amended, restated, supplemented and modified from time to time, the "Guaranty"). Pursuant to the Guaranty, Guarantors jointly, severally, and unconditionally guaranteed and promised to pay Plaintiff, on demand, all obligations and indebtedness owed by Borrowers under the Credit Agreement, Notes, and all other loan documents, including, without limitation, the Borrowers' Debt.

45.    The Guaranty provides, among other things, that Meridian waives any right to require Plaintiff to: (i) make any presentment, protest, demand, or notice of any kind, including notice of change of any terms of repayment of Borrowers' Debt, default by Borrowers, or any other guarantor or surety, any action or nonaction by Borrowers, Plaintiff, or any other guarantor or surety of Borrowers, or the creation of new or additional indebtedness; (ii) proceed against any person, including Borrowers, before proceeding against Meridian; (iii) proceed against any collateral for Borrowers' Debt, including the Collateral, before proceeding against Meridian; and (iv) pursue any remedy or course of action in Plaintiff's power whatsoever.

46.    The Guaranty further provides, among other things, that (i) the Guaranty is a separate and independent contract between Meridian and Plaintiff and is enforceable on its own terms; (ii) Plaintiff's rights under all existing guaranties shall be cumulative; (iii) the Guaranty does not affect or invalidate any other guaranties; and (iv) any subsequent guaranty by Meridian shall not supersede or replace the Guaranty unless such subsequent guaranty so provides.

VERIFIED COMPLAINT

154582484

47.     Pursuant to the Guaranty, Meridian promised to reimburse Plaintiff on demand for all costs and expenses, including attorneys' fees, incurred by Plaintiff to enforce the Guaranty.

48.     The Guaranty has not been revoked or superseded and remains in full force and effect in accordance with its terms as set forth above.

49.     Plaintiff has performed all of the terms and conditions of the Credit Agreement on its part to be performed including, but not limited to, making and disbursing the Facilities as set forth in the Credit Agreement.

50.     Borrowers have defaulted under the terms of the Credit Agreement, and Plaintiff has demanded, and hereby further demands, that Meridian honor the terms and provisions of the Guaranty.

51.     Meridian has breached the Guaranty by, among other things, failing and refusing to repay Borrowers' Debt pursuant to the terms and conditions of the Credit Agreement and the Guaranty.

52.     As of September 30, 2022, there is presently due, owing and unpaid from Meridian to Plaintiff under the Guaranty, the outstanding principal balance of $46,434,767.30; together with outstanding interest thereon through October 6, 2022, in the amount of $2,073,169.32; together with interest accruing after October 6, 2022; together with termination charges, all other fees, costs and additional charges owed to Lender under the terms of the Guaranty, including but not limited to Plaintiff's costs and attorneys' fees (collectively, the "Meridian Debt ").

## FOURTH CAUSE OF ACTION

[Breach of Written Guaranty against Loveloud]

53.     Plaintiff realleges paragraphs 1 through 50 above, as though set forth fully herein.

54.     Pursuant to the Guaranty, Guarantors jointly, severally, and unconditionally guaranteed and promised to pay Plaintiff, on demand, all

17

154582484

1  obligations and indebtedness owed by Borrowers under the Credit

2  Agreement, Notes, and all other loan documents, including, without

3  limitation, the Borrowers' Debt.

4      55.    The Guaranty provides, among other things, that Loveloud

5  waives any right to require Plaintiff to: (i) make any presentment, protest,

6  demand, or notice of any kind, including notice of change of any terms of

7  repayment of the Borrowers' Debt, default by Borrowers or any other

8  guarantor or surety, any action or nonaction by Borrowers, Plaintiff, or any

9  other guarantor or surety of Borrowers, or the creation of new or additional

10 indebtedness; (ii) proceed against any person, including Borrowers, before

11 proceeding against Loveloud; (iii) proceed against any collateral for

12 Borrowers' Debt, including the Collateral, before proceeding against

13 Loveloud; and (iv) pursue any remedy or course of action in Plaintiff's power

14 whatsoever.

15     56.    The Guaranty further provides, among other things, that (i) the

16 Guaranty is a separate and independent contract between Loveloud and

17 Plaintiff and is enforceable on its own terms; (ii) Plaintiff's rights under all

18 existing guaranties shall be cumulative; (iii) the Guaranty does not affect or

19 invalidate other guaranties; and (iv) any subsequent guaranty by Loveloud

20 shall not supersede or replace the Guaranty unless such subsequent guaranty

21 so provides.

22     57.    Pursuant to the Guaranty, Loveloud promised to reimburse

23 Plaintiff on demand for all costs and expenses, including attorneys' fees,

24 incurred by Plaintiff to enforce the Guaranty.

25     58.    The Guaranty has not been revoked or superseded and remains

26 in full force and effect in accordance with its terms as set forth above.

27

28

VERIFIED COMPLAINT

154582484

59.    Plaintiff has performed all of the terms and conditions of the Credit Agreement on its part to be performed including, but not limited to, making and disbursing the Facilities as set forth in the Credit Agreement.

60.    Borrowers have defaulted under the terms of the Credit Agreement, and Plaintiff has demanded, and hereby further demands, that Loveloud honor the terms and provisions of the Guaranty.

61.    Loveloud has breached the Guaranty by, among other things, failing and refusing to repay Borrowers' Debt pursuant to the terms and conditions of the Credit Agreement and the Guaranty.

62.    As of September 30, 2022, there is presently due, owing and unpaid from Loveloud to Plaintiff under the Guaranty, the outstanding principal balance of $46,434,767.30; together with outstanding interest thereon through October 6, 2022, in the amount of $2,073,169.32; together with interest accruing after October 6, 2022; together with termination charges, all other fees, costs and additional charges owed to Plaintiff under the terms of the Guaranty, including, but not limited to, Plaintiff's costs and attorneys' fees (collectively, the "Loveloud Debt ").

**FIFTH CAUSE OF ACTION**

[Specific Performance for Appointment of Receiver against Borrowers and Doe Defendants]

63.    Plaintiff realleges paragraphs 1 through 60 above, as though set forth fully herein.

64.    The Security Agreement states: "Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent shall have the right to the appointment of a receiver for the properties and assets of any Debtor, and each Debtor hereby consents to such appointment and except as prohibited by law, hereby waives any objection it may have thereto and the right to have a bond or other security posted by the Administrative Agent or

19

154582484

1   any other Person in connection therewith.  Each Debtor agrees, after the

2   occurrence and during the continuation of an Event of Default, promptly to

3   take any action at such Debtor's sole cost and expense that the

4   Administrative Agent may request in order to enable the Administrative

5   Agent to obtain and enjoy the full rights and benefits granted to the

6   Administrative Agent under the Agreement and the other Loan Documents."

7      65.   The terms of the Credit Agreement, as described above, were

8   adequate, just, and reasonable.

9      66.   Plaintiff has performed all the promises, conditions, and

10  covenants that it agreed to perform pursuant to the terms of the Credit

11  Agreement, except for those promises, conditions, and covenants excused by

12  the acts and omissions of Borrowers.

13     67.   Plaintiff is informed and believes and, on that basis, alleges that

14  Borrowers are financially incapable of curing the Ongoing Defaults under the

15  Credit Agreement or of satisfying any monetary judgment that might be

16  entered against Borrowers.

17     68.   By the terms of the Credit Agreement, and for the purposes of

18  satisfying the obligations secured by it, Plaintiff is entitled to enter into and

19  upon the Franchises and the improvements situated thereon. In addition,

20  Plaintiff is entitled to take and hold possession and control of the Collateral

21  for the purpose of protecting and preserving the Collateral, and to collect the

22  revenues and profits of the Franchises and to apply those funds, or sell the

23  Franchises, pursuant to the terms of the Credit Agreement, or to have a

24  receiver appointed for that purpose. Further, Plaintiff is entitled to apply the

25  sums so collected, or to have the receiver apply the same, to the payment of

26  the Borrowers' Debt, in accordance with the terms of the Credit Agreement

27  and for such other purposes as specified in the Credit Agreement.

28

154582484

69.    Plaintiff has demanded that Borrowers pay Plaintiff the amount in default with respect to the Credit Agreement, but Borrowers have refused or failed to respond, and continue to refuse to comply with this demand.

70.    Plaintiff has no adequate remedy at law to enforce its rights in the Credit Agreement or to compensate Plaintiff for the damage caused by the failure and refusal of Borrowers to perform their obligations in the Credit Agreement. A receiver is necessary to oversee and control the maintenance and operation of the Franchises or to sell the Franchises to protect Plaintiff's interests and rights under the Credit Agreement. A receiver is also necessary to ensure security, pay taxes, ensure that insurance is maintained, and otherwise safeguard and maximize the value of the Franchises and Collateral. Unless and until this Court appoints a receiver, there is reasonable cause to believe that there is a substantial danger that the Collateral will be removed from the jurisdiction of the court, lost, concealed, materially injured or damaged, and the Franchises may be mismanaged.  Accordingly, the value of the Franchises and Collateral may deteriorate significantly.

71.    Plaintiff is informed and believes, and on that basis alleges, that the Doe Defendants, and each of them claim some right, title, or interest in the Franchises and Collateral, and that any such right, title, or interest is subordinate to and junior to Plaintiff's interests.

72.    By reason of these facts, Plaintiff prays that this Court appoint a receiver to take control of, protect, and preserve the Franchises and Collateral in accordance with the terms and provision of Federal Rules of Civil Procedure, Rule 66, 28 U.S.C. § 3103, and for equitable reasons. Plaintiff additionally prays that this Court issue an injunction to facilitate the receiver's appointment.

Katten
Katten Muchin Rosenman LLP
515 South Flower Street, Suite 1000
Los Angeles, CA 90071-2212
213.443.9000 tel   213.443.9001 fax

VERIFIED COMPLAINT

154582484

1

## PRAYER FOR RELIEF

2      WHEREFORE, Plaintiff prays for judgment as follows:

3      1.     On its First Cause of Action against Borrowers, the outstanding

4  principal balance of $46,434,767.30; together with outstanding interest

5  thereon through October 6, 2022, in the amount of $2,073,169.32; together

6  with interest accruing after October 6, 2022; together with all other fees, costs

7  and additional charges due, including but not limited to Plaintiff's costs and

8  attorneys' fees.

9      2.     On its Second Cause of Action against Borrowers and Doe

10  Defendants, for an Order providing Plaintiff with immediate and exclusive

11  possession of all of the Collateral.

12      3.     On its Third Cause of Action against Meridian, payment in full of

13  the Meridian Debt.

14      4.     On its Fourth Cause of Action against Loveloud, payment in full

15  of the Loveloud Debt.

16      5.     On its Fifth Cause of Action against Borrowers and Doe

17  Defendants, for an Order by this Court appointing a federal receiver with the

18  power to enter into and upon the Franchises and the improvements situated

19  thereon; take and hold possession and control of the Collateral for the

20  purpose of protecting and preserving the Collateral; collect the revenues and

21  profits of the Franchises and to apply those funds, or sell the Franchises,

22  pursuant to the terms of the Credit Agreement; apply the sums so collected

23  to the payment of Borrowers' Debt, in accordance with the terms of the Credit

24  Agreement and for such other purposes as specified in the Credit Agreement.

25      6.     On all causes of action against all Defendants, for costs of suit,

26  including reasonable attorneys' fees incurred herein, and for such other relief

27  as this Court deems just and proper.

28

Katten
Katten Muchin Rosenman LLP
515 South Flower Street, Suite 1000
Los Angeles, CA 90071-2212
213.788.7445 tel    213.788.7749 fax

154582484

Dated:  January 6, 2023

KATTEN MUCHIN ROSENMAN LLP

By: _____
William B. Freeman
Attorneys for Plaintiff CITY NATIONAL
BANK, as administrative agent for
Lenders

VERIFIED COMPLAINT

154582484

## VERIFICATION

1. I have read **CITY NATIONAL BANK'S VERIFIED COMPLAINT** and know its contents.

2. I am Senior Vice President, Special Assets Group, for City National Bank, the plaintiff in this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

3. If called on to testify, then I would competently testify as to the matters stated herein.

4. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: ___1/6/2023_____, 2022, in Los Angeles, California.

**RAY FORGETTE**

By: ___Raymond Forgette_____

154582484

# EXHIBIT 1

*EXECUTION VERSION*

---

# CREDIT AGREEMENT

among

**NKS RESTAURANTS, L.C.,**
**HR RESTAURANTS, L.C.,**
**MR RESTAURANTS, L.C.,**
**C UTAH, L.C.,**
**AZM RESTAURANTS, L.C.,** and
**NDM RESTAURANTS, L.C.,**
as the Borrowers,

**MERIDIAN RESTAURANTS UNLIMITED, LC** and
**LOVELOUD RESTAURANTS, L.C.,**
as the Guarantors,

**CITY NATIONAL BANK,**
as Administrative Agent,

and

**THE LENDERS PARTY HERETO**

Dated as of February 26, 2018

---

TABLE OF CONTENTS

Page

ARTICLE I        DEFINITIONS AND ACCOUNTING TERMS .............................................. 1

Section 1.01.    Defined Terms ................................................................................. 1
Section 1.02.    Other Interpretive Provisions .................................................... 33
Section 1.03.    Accounting Terms ........................................................................ 34
Section 1.04.    Rounding ...................................................................................... 34
Section 1.05.    Times of Day ................................................................................ 35

ARTICLE II       THE COMMITMENTS AND CREDIT EXTENSIONS ............................ 35

Section 2.01.    The Loans ...................................................................................... 35
Section 2.02.    Borrowings, Conversions, and Continuations of Loans ............ 36
Section 2.03.    Prepayments ................................................................................. 37
Section 2.04.    Termination or Reduction of Commitments ................................ 41
Section 2.05.    Repayment of Principal of Loans ................................................ 42
Section 2.06.    Interest and Default Rate ............................................................ 43
Section 2.07.    Fees ............................................................................................... 44
Section 2.08.    Computation of Interest and Fees ............................................... 45
Section 2.09.    Evidence of Debt .......................................................................... 45
Section 2.10.    Payments Generally; Administrative Agent's Clawback ............ 45
Section 2.11.    Sharing of Payments by Lenders ................................................ 47
Section 2.12.    Defaulting Lenders ...................................................................... 48

ARTICLE III      TAXES, YIELD PROTECTION AND ILLEGALITY ............................... 49

Section 3.01.    Taxes ............................................................................................. 49
Section 3.02.    Illegality ....................................................................................... 54
Section 3.03.    Inability to Determine Rates ...................................................... 54
Section 3.04.    Increased Costs; Reserves on Eurodollar Rate Loans .................. 55
Section 3.05.    Compensation for Losses ............................................................ 57
Section 3.06.    Mitigation Obligations ................................................................ 58
Section 3.07.    Survival ......................................................................................... 58

ARTICLE IV       CONDITIONS PRECEDENT .............................................................. 58

Section 4.01.    Conditions of Initial Borrowings ................................................ 58
Section 4.02.    Conditions to all Borrowings ..................................................... 62
Section 4.03.    Representations ............................................................................ 62

ARTICLE V        REPRESENTATIONS AND WARRANTIES .......................................... 63

Section 5.01.    Existence, Qualification and Power ............................................ 63
Section 5.02.    Authorization; No Contravention ............................................... 63
Section 5.03.    Governmental Authorization; Other Consents .......................... 63
Section 5.04.    Binding Effect .............................................................................. 63
Section 5.05.    Financial Statements; No Material Adverse Effect ...................... 64

Section 5.06.    Litigation ................................................................................................ 64
Section 5.07.    No Default ............................................................................................... 64
Section 5.08.    Ownership of Property; Liens .................................................................. 64
Section 5.09.    Environmental Compliance ..................................................................... 65
Section 5.10.    Insurance ................................................................................................. 65
Section 5.11.    Taxes ....................................................................................................... 65
Section 5.12.    ERISA Compliance ................................................................................. 65
Section 5.13.    Subsidiaries; Equity Interests .................................................................. 66
Section 5.14.    Margin Regulations; Investment Company Act ....................................... 66
Section 5.15.    Disclosure ............................................................................................... 66
Section 5.16.    Compliance with Laws ............................................................................ 67
Section 5.17.    Intellectual Property; Licenses, Etc ......................................................... 67
Section 5.18.    Location of Furniture, Fixtures and Equipment ....................................... 67
Section 5.19.    Corporate Information; Locations of the Loan Parties .............................. 67
Section 5.20.    Franchise Agreements and Leases ........................................................... 68
Section 5.21.    Security Interest ...................................................................................... 68
Section 5.22.    Solvency .................................................................................................. 68
Section 5.23.    Use of Proceeds ...................................................................................... 68
Section 5.24.    Term Loan A-1 Acquisition Documents ................................................... 68
Section 5.25.    OFAC ...................................................................................................... 69
Section 5.26.    Patriot Act ............................................................................................... 69
Section 5.27.    Anti-Corruption Laws and Sanctions ....................................................... 69
Section 5.28.    Required Equity Documents .................................................................... 70
Section 5.29.    Meridian and Loveloud as Holding Companies ....................................... 70

ARTICLE VI    AFFIRMATIVE COVENANTS ................................................................ 70

Section 6.01.    Financial Statements ............................................................................... 70
Section 6.02.    Certificates; Other Information ............................................................... 72
Section 6.03.    Notices .................................................................................................... 73
Section 6.04.    Payment of Obligations ........................................................................... 73
Section 6.05.    Preservation of Existence, Etc ................................................................. 74
Section 6.06.    Maintenance of Properties ....................................................................... 74
Section 6.07.    Maintenance of Insurance ....................................................................... 74
Section 6.08.    Compliance with Laws ............................................................................ 74
Section 6.09.    Books and Records .................................................................................. 74
Section 6.10.    Inspection Rights ..................................................................................... 75
Section 6.11.    Use of Proceeds ...................................................................................... 75
Section 6.12.    New Restaurants ...................................................................................... 75
Section 6.13.    Franchise Agreements, Leases and Material Contracts ............................. 75
Section 6.14.    Interest Rate Protection ........................................................................... 76
Section 6.15.    Further Assurances .................................................................................. 76
Section 6.16.    Formation or Acquisition of Subsidiaries ................................................ 77
Section 6.17.    Post-Closing Actions ............................................................................... 77

ARTICLE VII    NEGATIVE COVENANTS ...................................................................... 78

Section 7.01.    Liens ....................................................................................................... 78
Section 7.02.    Investments ............................................................................................. 79

Section 7.03.    Indebtedness......................................................................... 80
Section 7.04.    Fundamental Changes; No Subsidiaries ................................ 80
Section 7.05.    Dispositions........................................................................... 81
Section 7.06.    Restricted Payments .............................................................. 81
Section 7.07.    Change in Nature of Business ................................................ 82
Section 7.08.    Transactions with Affiliates .................................................. 82
Section 7.09.    Burdensome Agreements ....................................................... 82
Section 7.10.    Use of Proceeds..................................................................... 82
Section 7.11.    Financial Covenants .............................................................. 83
Section 7.12.    Operate as Restaurant ........................................................... 83
Section 7.13.    Franchise Agreements; Leases............................................... 84
Section 7.14.    General Partner ..................................................................... 84
Section 7.15.    Fiscal Year ............................................................................ 84
Section 7.16.    Organization Documents ....................................................... 84
Section 7.17.    Meridian and Loveloud as Holding Companies .................... 84

ARTICLE VIII    EVENTS OF DEFAULT AND REMEDIES ................................. 84

Section 8.01.    Events of Default ................................................................... 84
Section 8.02.    Remedies Upon Event of Default .......................................... 87
Section 8.03.    Application of Funds.............................................................. 87

ARTICLE IX    ADMINISTRATIVE AGENT .................................................... 88

Section 9.01.    Appointment and Authority ................................................... 88
Section 9.02.    Rights as a Lender.................................................................. 89
Section 9.03.    Exculpatory Provisions .......................................................... 89
Section 9.04.    Reliance by Administrative Agent ......................................... 90
Section 9.05.    Delegation of Duties .............................................................. 91
Section 9.06.    Resignation of Administrative Agent ..................................... 91
Section 9.07.    Non-Reliance on Administrative Agent and Other Lenders......................... 92
Section 9.08.    No Other Duties, Etc ............................................................. 92
Section 9.09.    Administrative Agent May File Proofs of Claim.................... 92
Section 9.10.    Collateral and Guaranty Matters ........................................... 94
Section 9.11.    Bank Product Agreements and Related Swap Contracts ............................. 94

ARTICLE X    CONTINUING GUARANTY ................................................... 95

Section 10.01.    Guaranty................................................................................ 95
Section 10.02.    Rights of Lenders .................................................................. 95
Section 10.03.    Certain Waivers ..................................................................... 96
Section 10.04.    Obligations Independent ........................................................ 96
Section 10.05.    Subrogation ........................................................................... 96
Section 10.06.    Termination; Reinstatement ................................................... 96
Section 10.07.    Stay of Acceleration .............................................................. 97
Section 10.08.    Condition of Borrowers ......................................................... 97
Section 10.09.    Right of Contribution ............................................................ 97
Section 10.10.    Additional Guarantor Waivers and Agreements.................... 97

ARTICLE XI    MISCELLANEOUS ................................................................. 98

Section 11.01.    Amendments, Etc ........................................................................ 98
Section 11.02.    Notices; Effectiveness; Electronic Communication ................... 101
Section 11.03.    No Waiver; Cumulative Remedies ............................................ 103
Section 11.04.    Expenses; Indemnity; Damage Waiver...................................... 103
Section 11.05.    Payments Set Aside................................................................... 105
Section 11.06.    Successors and Assigns.............................................................. 105
Section 11.07.    Treatment of Certain Information; Confidentiality.................... 110
Section 11.08.    Right of Setoff........................................................................... 111
Section 11.09.    Interest Rate Limitation ............................................................ 112
Section 11.10.    Counterparts; Integration; Effectiveness................................... 112
Section 11.11.    Survival of Representations and Warranties............................... 112
Section 11.12.    Severability ............................................................................... 112
Section 11.13.    Governing Law; Jurisdiction; Etc .............................................. 113
Section 11.14.    Waiver of Jury Trial .................................................................. 114
Section 11.15.    Arbitration................................................................................. 114
Section 11.16.    USA PATRIOT Act Notice ....................................................... 115
Section 11.17.    No Advisory or Fiduciary Responsibility................................... 115
Section 11.18.    Replacement of Lenders ............................................................ 116
Section 11.19.    Keep Well .................................................................................. 117
Section 11.20.    Acknowledgement and Consent to Bail-In of EEA Financial
                  Institutions.................................................................................. 117
Section 11.21.    Borrower Agent ......................................................................... 117
Section 11.22.    Joint and Several Liability ......................................................... 119

# CREDIT AGREEMENT

This **CREDIT AGREEMENT** is entered into as of February 26, 2018 (as it may be amended, restated, supplemented extended or renewed from time to time, this "Agreement") by and among **NKS RESTAURANTS, L.C.**, a Utah limited liability company ("NKS"), **HR RESTAURANTS, L.C.**, a Utah limited liability company ("HR"), **MR RESTAURANTS, L.C.**, a Utah limited liability company ("MR"), **C UTAH, L.C.**, a Utah limited liability company ("C Utah"), **AZM RESTAURANTS, L.C.**, a Utah limited liability company ("AZM"), **NDM RESTAURANTS, L.C.**, a Utah limited liability company ("NDM"), and those additional Persons that hereafter become parties hereto as Borrowers in accordance with the terms hereof (NKS, HR, MR, C Utah, AZM, NDM and such other Persons are sometimes individually referred to herein as a "Borrower" and collectively as the "Borrowers"), **MERIDIAN RESTAURANTS UNLIMITED, LC**, a Utah limited liability company ("Meridian"), **LOVELOUD RESTAURANTS, L.C.**, a Utah limited liability company ("Loveloud"), and those additional Persons that hereafter become parties hereto as Guarantors in accordance with the terms hereof, as Guarantors, each lender from time to time party hereto (collectively, "Lenders" and individually, a "Lender"), and **CITY NATIONAL BANK**, as Administrative Agent.

**WHEREAS**, the Borrowers have requested that Lenders make loans to the Borrowers in an aggregate amount of up to $61,500,000, consisting of the Term Loan A-1 Facility (as defined below) in an aggregate original principal amount of $40,500,000, the Term Loan A-2 Facility (as defined below) in an aggregate original principal amount of up to $18,000,000, and the Revolving Facility (as defined below) in an aggregate original principal amount of up to $3,000,000; and

**WHEREAS**, Lenders have agreed to make such loans available to the Borrowers on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing, and for other good and valuable consideration, the receipt, sufficiency and adequacy of which hereby are acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

**Section 1.01. Defined Terms.**  As used in this Agreement, the following terms shall have the meanings set forth below:

"*Acquisition*" means (a) the purchase or other acquisition by a Person or its Subsidiaries of all or substantially all of the assets of (or any division or business line of) any other Person, or (b) the purchase or other acquisition (whether by means of a merger, consolidation, or otherwise) by a Person or its Subsidiaries of all or substantially all of the Equity Interests of any other Person.

"*Administrative Agent*" means City National Bank in its capacity as sole administrative agent and collateral agent under any of the Loan Documents, or any successor administrative agent and collateral agent.

"*Administrative Agent's Office*" means Administrative Agent's address and, as appropriate, account as set forth on Schedule 11.02, or such other address or account as Administrative Agent may from time to time notify to the Borrowers and Lenders.

"*Administrative Questionnaire*" means an Administrative Questionnaire in a form supplied by Administrative Agent.

"*Affiliate*" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"*Aggregate Commitments*" means the Commitments of all Lenders.

"*Agreement*" has the meaning specified in the introductory paragraph hereto.

"*Annual Financial Statements*" means the audited combined balance sheet of the Pre-Closing Entities for the Fiscal Year ended on or about December 31, 2016 and the related statements of income or operations, owners' equity and cash flows for such Fiscal Year, including the notes thereto.

"*Anti-Corruption Laws*" means all laws, rules, and regulations of any jurisdiction applicable to any Loan Party or its Subsidiaries from time to time concerning or relating to bribery or corruption.

"*Applicable Margin*" means, for any date, with respect to any Loan, the applicable rate per annum set forth in the table below opposite the Consolidated Lease Adjusted Leverage Ratio, as determined as of the last day of the immediately preceding Fiscal Quarter.

| Pricing Level | Consolidated Lease Adjusted Leverage Ratio | Eurodollar Rate Loans | Base Rate Loans |
|---|---|---|---|
| I | ≥ 5.75:1.00 | 3.00% | 2.00% |
| II | ≥ 5.25:1.00 and < 5.75:1.00 | 2.75% | 1.75% |
| III | ≥ 4.50:1.00 and < 5.25:1.00 | 2.50% | 1.50% |
| IV | < 4.50:1.00 | 2.25% | 1.25% |

The initial Applicable Margin shall be determined based upon the Compliance Certificate delivered on the Closing Date. Any increase or decrease in the Applicable Margin resulting from a change in the Consolidated Lease Adjusted Leverage Ratio shall become effective as of the first Business Day immediately following the date a Compliance Certificate is delivered pursuant to Section 6.02(a); provided, however, that Pricing Level I shall apply (a) at any time that an Event of Default has occurred and is continuing or (b) if the Borrowers fail to deliver the

financial statements or Compliance Certificate required to be delivered pursuant to Section 6.01 and Section 6.02(a), as applicable, during the period from the expiration of the time for delivery thereof until such financial statements and Compliance Certificate are delivered.  In the event that a miscalculation of the Consolidated Lease Adjusted Leverage Ratio by the Borrowers results in the application of a lower Applicable Margin than the Applicable Margin that would otherwise have been applied given a correct calculation of the Consolidated Lease Adjusted Leverage Ratio, the Borrowers shall pay to the Administrative Agent, for the benefit of Lenders, the amount that is equal to the excess of (A) the amount due to the Administrative Agent after applying the correct Applicable Margin over (B) the amount paid to the Administrative Agent after applying the incorrect Applicable Margin.

"*Applicable Percentage*" means:

(a)    in respect of the Term Loan A-1 Facility, with respect to any Term Loan A-1 Lender at any time, the percentage (carried out to the ninth decimal place) of the Term Loan A-1 Facility represented by (i) on or prior to the Closing Date, such Term Loan A-1 Lender's Term Loan A-1 Commitment at such time, and (ii) thereafter, the outstanding principal amount of such Term Loan A-1 Lender's Term Loan A-1s at such time,

(b)    in respect of the Term Loan A-2 Facility, with respect to any Term Loan A-2 Lender at any time, the percentage (carried out to the ninth decimal place) of the Term Loan A-2 Facility represented by (i) at any time during the Availability Period in respect of the Term Loan A-2 Facility, such Term Loan A-2 Lender's Term Loan A-2 Commitment at such time and (ii) thereafter, the outstanding principal amount of such Term Loan A-2 Lender's Term Loan A-2s at such time,

(c)    in respect of the Revolving Facility, with respect to any Revolving Lender at any time, the percentage (carried out to the ninth decimal place) of the Revolving Facility represented by such Revolving Lender's Revolving Commitment at such time,

in each case, subject to adjustment as provided in Section 2.12.  If the Commitments of all of the Lenders to make Loans have been terminated pursuant to Section 8.02 or if the applicable Commitments have expired, then the Applicable Percentage of each Lender in respect of the applicable Facility shall be determined based on the Applicable Percentage of such Lender in respect of such Facility most recently in effect, giving effect to any subsequent assignments.  The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"*Applicable Revolving Percentage*" means with respect to any Revolving Lender at any time, such Revolving Lender's Applicable Percentage in respect of the Revolving Facility at such time.

"*Approved Fund*" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"*Assignee Group*" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"*Assignment and Assumption*" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.06(b)), and accepted by Administrative Agent, in substantially the form of Exhibit D or any other form approved by Administrative Agent.

"*Attributable Indebtedness*" means, on any date, (a) in respect of any capital lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

"*Availability Period*" means (a) in respect of the Revolving Facility, the period from and including the Closing Date to the earliest of (i) the Maturity Date for the Revolving Facility, (ii) the date of termination of the Revolving Commitments pursuant to Section 2.04, and (iii) the date of termination of the Commitment of each Revolving Lender to make Revolving Loans pursuant to Section 8.02 and (b) in respect of the Term Loan A-2 Facility, the period from and including the Closing Date to the earliest of (i) the date that falls twenty-four (24) months after the Closing Date, (ii) the Maturity Date for the Term Loan Facilities, and (iii) the date of termination of the commitments of the respective Term Loan A-2 Lenders to make Term Loan A-2s pursuant to Section 8.02.

"*AZM*" has the meaning specified in the introductory paragraph hereto.

"*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"*Bail-In Legislation*" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country as described in the EU Bail-In Legislation Schedule from time to time.

"*Bank Product Agreement*" means any agreement to provide cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer, and other cash management or depositary arrangements entered into between any Loan Party and any Lender or any of its Affiliates.

"*Base Rate*" means for any day a fluctuating rate per annum equal to the greatest of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the Prime Rate, and (c) the Eurodollar Rate (which rate shall be calculated based upon an Interest Period of one (1) month and shall be determined on a daily basis), plus 1.00%.

"*Base Rate Loan*" means a Loan that bears interest based on the Base Rate (but does not include a Eurodollar Rate Loan).

"*Borrower*" and *"Borrowers"* have the respective meanings specified in the introductory paragraph hereto.

*"Borrower Agent"* means MR.

"*Borrower Materials*" has the meaning specified in <u>Section 6.02</u>.

"*Borrowing*" means a Revolving Borrowing, a Term Loan A-1 Borrowing or a Term Loan A-2 Borrowing, as the context may require.

"*Business*" means, (a) with respect to the Loan Parties (other than Meridian and Loveloud), the ownership, operation, acquisition and development of Restaurants and those businesses which are incidental thereto and are conducted by such Loan Parties on the date hereof, and (b) with respect to Meridian and Loveloud, the business permitted to be engaged in by Meridian and Loveloud under <u>Section 7.17</u> and is conducted by Meridian and Loveloud on the date hereof.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of Utah or where Administrative Agent's Office is located and, if such day relates to any Loan based upon the Eurodollar Rate, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"*Change in Law*" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"*Change of Control*" means any of the following: (a) the Owners, collectively, cease to own or control, of record and beneficially, directly or indirectly, at least 67% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Meridian on a fully diluted basis (which for this purpose shall exclude all Equity Interests that have not yet vested), (b) the Owners shall cease to have the ability to elect (either through Equity Interest ownership or contractual voting rights) a majority of the board of directors or equivalent governing body of Meridian, (c) except as permitted pursuant to <u>Section 7.04</u>, Meridian shall cease to own and control, of record and beneficially, directly or indirectly, 100% of the Equity Interests of each other Loan Party, (d) a change in ownership of any Borrower that requires the consent of the Franchisor if such consent is not obtained, or (e) the failure of David Harper to maintain day-to-day operational control of each Loan Party.

"*City National Bank*" means City National Bank and its successors and assigns.

"*Closing Date*" means the first date all the conditions precedent in <u>Section 4.01</u> are satisfied or waived in accordance with <u>Section 11.01</u>.

"*Code*" means the Internal Revenue Code of 1986.

"*Collateral*" means, collectively, the assets and rights and interest in or to property of the Borrowers or any of the other Loan Parties, whether real or personal, tangible or intangible, in which a Lien is granted or purported to be granted pursuant to the Security Instruments.

"*Commitment*" means a Term Loan A-1 Commitment, a Term Loan A-2 Commitment, or a Revolving Commitment, as the context may require.

"*Commodity Exchange Act*" means the Commodity Exchange Act (<u>7 U.S.C. § 1</u> et seq.), as amended from time to time, and any successor statute.

"*Compliance Certificate*" means a certificate substantially in the form of <u>Exhibit C</u>.

"*Connection Income Taxes*" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"*Consolidated EBITDA*" means, for any period, for Loveloud and its Subsidiaries (excluding the Specified Subsidiaries) on a consolidated basis, an amount equal to Consolidated Net Income for such period <u>plus</u> (a) without duplication, the following to the extent deducted in calculating such Consolidated Net Income:  (i) Consolidated Interest Charges, (ii) the provision for Federal, state, local and foreign income taxes (and franchise tax in the nature of income tax) payable, (iii) depreciation and amortization expense in accordance with GAAP, (iv) non-recurring losses, including fees, costs, charges and other expenses incurred in connection with any discontinued operation, acquisition, reorganization, consolidation, restructuring or changes in accounting treatment under GAAP, in each case approved by Administrative Agent, (v) other non-cash items or charges, including, without limitation, any non-cash Rental Expense reducing Consolidated Net Income which do not represent a cash item in such period or any future period, and (vi) other non-recurring costs and expenses and/or extraordinary expenses approved by Administrative Agent, <u>minus</u> (b) without duplication, the following to the extent included in calculating such Consolidated Net Income: (i) all amounts representing non-recurring gains, including as a result of changes in accounting treatment under GAAP, and (ii) all amounts representing other non-cash gains; <u>provided</u>, <u>however</u>, the Consolidated EBITDA for the Term Loan A-1 Acquisition Restaurants measured as at the end of the following Fiscal Quarters shall be the corresponding amount set forth in the table below <u>plus</u> the actual Consolidated EBITDA for such Restaurants from the Closing Date through the end of such Fiscal Quarter:

| Term Loan A-1 Acquisition Restaurants | |
|---|---|
| **Fiscal Quarter** | **Consolidated EBITDA** |

| Fiscal Quarter ending on or about March 31, 2018 | $3,156,053 |
|---|---|
| Fiscal Quarter ending on or about June 30, 2018 | $2,295,312 |
| Fiscal Quarter ending on or about September 30, 2018 | $1,434,570 |
| Fiscal Quarter ending on or about December 31, 2018 | $573,828 |

"*Consolidated EBITDAR*" means, for any period, Consolidated EBITDA <u>plus</u> cash Rental Expense.

"*Consolidated Fixed Charges*" means, as of any date of determination, for Loveloud and its Subsidiaries (excluding the Specified Subsidiaries) on a consolidated basis, the sum (without duplication) of the aggregate amount of all actual payments due, whether or not payment was made, with respect to (a) Consolidated Interest Charges, (b) scheduled principal payments in respect of long term Indebtedness that are required to be paid (other than optional or mandatory prepayments), and (c) cash Rental Expense; <u>provided</u>, <u>however</u>, the Consolidated Fixed Charges for the Indebtedness incurred as a result of the Term Loan A-1 Acquisition Restaurants, measured as at the end of the following Fiscal Quarters shall be the corresponding amount set forth in the table below <u>plus</u> the actual Consolidated Fixed Charges for such Restaurants from the Closing Date through the end of such Fiscal Quarter:

| Term Loan A-1 Acquisition Restaurants | |
|---|---|
| **Fiscal Quarter** | **Consolidated Fixed Charges** |
| Fiscal Quarter ending on or about March 31, 2018 | $1,878,420 |
| Fiscal Quarter ending on or about June 30, 2018 | $1,366,124 |
| Fiscal Quarter ending on or about September 30, 2018 | $853,827 |
| Fiscal Quarter ending on or about December 31, 2018 | $341,531 |

"*Consolidated Funded Indebtedness*" means, as of any date of determination, for Loveloud and its Subsidiaries (excluding the Specified Subsidiaries) on a consolidated basis, the sum of (a) the outstanding principal amount of all obligations, whether current or long-term, for borrowed money (including Obligations hereunder) and all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (b) all purchase money Indebtedness, (c) all obligations to reimburse drawings under letters of credit (including standby and commercial) that remain unpaid for three (3) Business Days after they become due, and all direct obligations arising under bankers' acceptances, bank guaranties, surety bonds and similar

instruments, (d) all obligations in respect of the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and accrued expenses related to such trade accounts payable, prepaid interest and interest not yet due), (e) Attributable Indebtedness in respect of capital leases and Synthetic Lease Obligations, and (f) all Indebtedness of the types referred to in <u>clauses (a)</u> through <u>(e)</u> above of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which Loveloud or any of its Subsidiaries (excluding the Specified Subsidiaries) is a general partner or joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

"*Consolidated Interest Charges*" means, for any period, for Loveloud and its Subsidiaries (excluding the Specified Subsidiaries) on a consolidated basis, the sum of (a) all interest, premium payments, debt discount, fees, charges and related expenses in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, and (b) the portion of rent expense under capital leases that is treated as interest in accordance with GAAP.

"*Consolidated Lease Adjusted Leverage Ratio*" means, as of any date of determination, for Loveloud and its Subsidiaries (excluding the Specified Subsidiaries) on a consolidated basis, the ratio of (a) the sum of Consolidated Funded Indebtedness (less the New Restaurant Debt Adjustment) as of such date <u>plus</u> the product of eight (8) times cash Rental Expense for the period of the four prior Fiscal Quarters ending on such date, to (b) the sum of Consolidated EBITDAR for the period of the four prior Fiscal Quarters ending on or immediately prior to such date.

"*Consolidated Net Income*" means, for any period, for Loveloud and its Subsidiaries (excluding the Specified Subsidiaries) on a consolidated basis, net income as determined in accordance with GAAP.

"*Consolidated Post-Distribution Fixed Charge Coverage Ratio*" means, as of any date of determination, for the period of the four prior Fiscal Quarters ending on such date, for Loveloud and its Subsidiaries (excluding the Specified Subsidiaries) on a consolidated basis, the ratio of (a) the sum of (i) Consolidated EBITDAR <u>minus</u> (ii) the cash portion of income taxes paid, <u>minus</u> (iii) any Investments made in any Specified Subsidiary <u>minus</u> (iv) any Distributions, advances and/or loans made to any holder of Equity Interests <u>minus</u> (v) any amounts paid in repayment of principal or interest, without duplication, relating to any advances and/or loans received from any holder of Equity Interests, to (b) Consolidated Fixed Charges.

"*Consolidated Pre-Compensation Fixed Charge Coverage Ratio*" means, as of any date of determination, for the period of the four prior Fiscal Quarters ending on or immediately prior to such date, for Loveloud and its Subsidiaries (excluding the Specified Subsidiaries) on a consolidated basis, the ratio of (a) the sum of Consolidated EBITDAR <u>plus</u> Expensed Owners Compensation <u>minus</u> the cash portion of income taxes paid to (b) Consolidated Fixed Charges.

"*Contractual Obligation*" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*Current Assets*" means the total current assets of Loveloud and its Subsidiaries (excluding the Specified Subsidiaries) on a consolidated basis as of any date of determination determined in accordance with GAAP.

"*Current Liabilities*" means the total current liabilities of Loveloud and its Subsidiaries (excluding the Specified Subsidiaries) on a consolidated basis as of any date of determination determined in accordance with GAAP, minus the Current Portion of Long Term Debt of such Person.

"*Current Portion of Long Term Debt*" means, for Loveloud and its Subsidiaries (excluding the Specified Subsidiaries) on a consolidated basis, that portion of consolidated long term liabilities, determined in accordance with GAAP, which shall, by the terms thereof, become due and payable within one (1) year following the date of the balance sheet upon which such calculations are based (excluding any balloon payments).

"*Current Ratio*" means, as of any date of determination, the ratio of (a) Current Assets as of such date to (b) Current Liabilities as of such date.

"*C Utah*" has the meaning specified in the introductory paragraph hereto.

"*Debtor Relief Laws*" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"*Default*" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"*Default Rate*" means when used with respect to Obligations an interest rate equal to (i) with respect to Base Rate Loans or other Obligations, other than Eurodollar Rate Loans, (x) the Base Rate plus (y) the Applicable Margin applicable to Base Rate Loans plus (z) 2.0% per annum; and (ii) with respect to a Eurodollar Rate Loan, (x) the Eurodollar Rate plus (y) the Applicable Margin applicable to Eurodollar Rate Loans plus (z) 2.0% per annum.

"*Defaulting Lender*" means, subject to Section 2.12(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies Administrative Agent and Borrower Agent in writing that such failure is the result of such Lender's determination that one or more

conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified Borrower Agent or Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by Administrative Agent or Borrower Agent, to confirm in writing to Administrative Agent and Borrower Agent that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by Administrative Agent and Borrower Agent), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity, or (iii) has become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.12(b)) upon delivery of written notice of such determination to Borrower Agent and each Lender.

"*Disposition*" or "*Dispose*" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person, including any sale, assignment (other than a collateral assignment that constitutes the grant of a security interest), transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"*Distributions*" means any payments, distributions (including, without limitation, any tax distributions) or transfers of cash or other assets by any Loan Party constituting dividends, redemptions, or other repurchases of ownership interests, returns of capital, and any other payment to any holder of any Equity Interest in the payor in respect of such equity holder's Equity Interest.

"*Dollar*" and "$\underline{\$}$" mean lawful money of the United States.

"*EEA Financial Institution*" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity

established in an EEA Member Country which is a parent of an institution described in <u>clause (a)</u> of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in <u>clauses (a)</u> or <u>(b)</u> of this definition and is subject to consolidated supervision with its parent.

"*EEA Member Country*" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Eligible Assignee*" means any Person that meets the requirements to be an assignee under <u>Section 11.06(b)(iii)</u> and <u>(v)</u> (subject to such consents, if any, as may be required under <u>Section 11.06(b)(iii)</u>).

"*Environmental Laws*" means any and all Federal, state, local, and foreign statutes, laws, applicable regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements with any Governmental Authority or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"*Environmental Liability*" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*Equity Interests*" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"*ERISA*" means the Employee Retirement Income Security Act of 1974.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) under common control with any Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"*ERISA Event*" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (f) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Section 303, 304 and 305 of ERISA; or (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or any ERISA Affiliate.

"*Escrow Agreement*" means the Escrow Agreement, dated as of the Closing Date, by and among the Loan Parties, Administrative Agent, the Lenders and Nebraska Title Company, as escrow agent.

"*EU Bail-In Legislation Schedule*" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"*Eurodollar Base Rate*" means the annual rate of interest which is identified and normally published by Bloomberg LP (or another nationally-recognized rate reporting source acceptable to Administrative Agent) as the London Interbank Offered Rate for loans in United States dollars for the applicable Interest Period. The rate is set by the ICE Benchmark Association or any successor determining administrator as of 11:00 a.m. (London time) on the second Business Day preceding the first day of each Interest Period. If Bloomberg LP (or another nationally-recognized rate reporting source acceptable to Administrative Agent) no longer reports such rate or Administrative Agent determines in good faith that the rate so reported no longer accurately reflects the rate available to Administrative Agent in the London Interbank Market or if such index no longer exists or accurately reflects the rate available to Administrative Agent in the London Interbank Market, the "Eurodollar Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by Administrative Agent in its reasonable discretion. If the Eurodollar Base Rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement.

"*Eurodollar Rate*" means, with respect to any Interest Period, a rate per annum, rounded upwards, if necessary, to the nearest 1/16 of 1%, determined by Administrative Agent to be the quotient of (a) the Eurodollar Base Rate for such Interest Period divided by (b) one minus the Eurocurrency Reserve Requirement for such Interest Period; provided, however, with respect to any Term Loan subject to a Related Swap Contract, such rate per annum shall not be rounded as provided in this definition with respect to any Interest Period following the last day of the month in which the effective date of such Related Swap Contract occurs with respect to such Term Loan.

"*Eurodollar Rate Loan*" means a Loan that bears interest at a rate based on the Eurodollar Rate (other than pursuant to underline clause (c) of the definition of Base Rate).

"*Eurocurrency Reserve Requirement*" means the aggregate (without duplication) of the rates (expressed as a decimal) of reserves (including, without limitation, any basic, marginal, supplemental, or emergency reserves) that are required to be maintained by banks under any regulations of the Board of Governors of the Federal Reserve System, or any other governmental authority having jurisdiction with respect thereto, applicable to funding based on so-called "Eurocurrency Liabilities", including Regulation D (12 CFR 204).

"*Event of Default*" has the meaning specified in Section 8.01.

"*Excluded Lease Document*" means, with respect to any Lease, any assignment of such Lease entered into between former tenants under such Lease prior to the assignment of such Lease to a Borrower, so long as (i) such assignment is not available to such Borrower after diligent investigation, and (ii) such Borrower has delivered to Administrative Agent evidence that the landlord under such Lease has acknowledged such Borrower as the tenant under such Lease in writing.

"*Excluded Swap Obligation*" means, with respect to any Loan Party, any guarantee of (or joint obligations under) any Swap Obligations under a Related Swap Contract if, and only to the extent that and for so long as, all or a portion of the guarantee or obligation of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Swap Obligation under a Related Swap Contract (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the guarantee or obligation of such Loan Party or the grant of such security interest becomes effective with respect to such Swap Obligation under a Related Swap Contract.  If a Swap Obligation under a Related Swap Contract arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation under a Related Swap Contract that is attributable to swaps for which such guarantee or obligation or security interest is or becomes illegal.

"*Excluded Taxes*" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal  withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrowers under Section 11.18) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto

or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"*Expensed Owners Compensation*" means expensed salaries to the Equity Interest holders of any Person as shown on such Person's balance sheet.

"*Extraordinary Receipts*" means cash payments received by any of the Loan Parties or paid to or for the account of any of the Loan Parties in respect of any property or casualty insurance claim or any condemnation proceeding.

"*Facility*" means the Term Loan A-1 Facility, the Term Loan A-2 Facility, or the Revolving Facility, as the context may require.

"*FASB ASC*" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"*FATCA*" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any applicable intergovernmental agreements with respect thereto.

"*Federal Funds Rate*" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to City National Bank on such day on such transactions as determined by Administrative Agent.

"*Fee Letter*" has the meaning specified in Section 2.07(a).

"*First Anniversary Term Loan A-2*" means each Term Loan A-2 made on or after the Closing Date but on or prior to the first anniversary of the Closing Date.

"*Fiscal Quarter*" means each quarterly accounting period of the Loan Parties and their Subsidiaries ending on or about March 31, June 30, September 30, and December 31 of each Fiscal Year, consistent with the accounting and reporting practices of the Loan Parties and their Subsidiaries in effect on the Closing Date.

"*Fiscal Year*" means the fiscal year of the Loan Parties and their Subsidiaries ending on or about December 31 of each calendar year, consistent with the accounting and reporting practices of the Loan Parties and their Subsidiaries in effect on the Closing Date. Any reference to a Fiscal Year identified by reference to a calendar year number shall mean the Fiscal Year

ending in December of such calendar year. For example, the "2017 Fiscal Year" shall mean the Fiscal Year ending on or about December 31, 2017.

"*Foreign Lender*" means (a) if any Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if any Borrower is not a U.S. Person, a Lender that is a resident or organized under the laws of a jurisdiction other than that in which a Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"*Franchise Agreements*" means, collectively, all franchise agreements, development agreements, license agreements or related agreements by and between Franchisor, a Borrower, and such other franchisees a party thereto, which agreements relate to any of the Restaurants.

"*Franchisor*" means Burger King Corporation, a Florida corporation, or its respective successors and/or assigns under the Franchise Agreements.

"*Franchisor Certificate*" means a certificate provided by Franchisor, in form and substance satisfactory to Administrative Agent.

"*FRB*" means the Board of Governors of the Federal Reserve System of the United States.

"*Fund*" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities.

"*Funding Indemnity Letter*" means a funding indemnity letter, in form and substance satisfactory to Administrative Agent.

"*GAAP*" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"*Governmental Authority*" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"*Guarantee*" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such

Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the lower of (a) an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made and (b) the maximum amount for which such guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guarantee, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee shall be the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"*Guaranteed Obligations*" has the meaning set forth in Section 10.01.

"*Guarantor*" means Meridian, Loveloud or any other Person that Guarantees the Obligations.

"*Guaranty*" means each guaranty (including the continuing guaranty in Article X of this Agreement) executed by any Guarantor in favor of Administrative Agent and the Secured Parties, as the same may be amended, restated, supplemented, extended or renewed from time to time.

"*Hazardous Materials*" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes regulated pursuant to any Environmental Law.

"*HR*" has the meaning specified in the introductory paragraph hereto.

"*Indebtedness*" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the face amount of all letters of credit (including standby and commercial) issued for the account of such Person and, without duplication, all reimbursement and

other obligations of such Person, direct or indirect, thereunder, or payments under bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    net obligations of such Person under any Swap Contract;

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business), prepaid interest and interest not yet due);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse (but, in the event such indebtedness has not been assumed, limited to the lesser of (x) the principal amount of the indebtedness so secured and (y) the fair market value of the property so encumbered);

(f)    capital leases and Synthetic Lease Obligations;

(g)    all obligations of such Person to purchase, redeem, retire, defease or repay any Equity Interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; provided that a contingent obligation to purchase, redeem, retire, defease or repay any preferred stock shall constitute Indebtedness only when such contingency has occurred or has been waived or removed;

(h)    any other obligations or liabilities which are required by generally accepted accounting principles to be shown as debt on the balance sheet of such Person; and

(i)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of any capital lease or Synthetic Lease Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.

"*Indemnified Taxes*" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"*Indemnitees*" has the meaning specified in Section 11.04(b).

"*Information*" has the meaning specified in Section 11.07.

"*Initial Restaurants*" means, collectively, the 86 Burger King restaurants owned or leased and operated by the Borrowers as of the date hereof and described on <u>Schedule 1.01-A</u>.

"*Interest Payment Date*" means the first calendar day of each calendar month commencing on March 1, 2018, and the Maturity Date of the Facility under which such Loan was made (or in the event that any such date is not a Business Day, on the immediately following Business Day).

"*Interest Period*" means, as to each Eurodollar Rate Loan, the period from and including the Business Day such Loan is disbursed or converted, as applicable, to but excluding the first Interest Payment Date to occur after such date, and each one-month period thereafter ending but excluding the next Interest Payment Date; <u>provided</u>, <u>however</u>, no Interest Period shall extend beyond the Maturity Date of the Facility under which such Loan was made.

"*Interim Financial Statements*" means the combined balance sheet of the Pre-Closing Entities for the Fiscal Quarter ended on or about December 31, 2017 and the related statements of income or operations, for the Fiscal Quarter ended on or about that date, such statements to have been certified by a Responsible Officer of Borrower Agent as fairly presenting the financial condition, results of operations, owners' equity and cash flows of the Pre-Closing Entities in accordance with GAAP or income tax based accounting, subject only to normal year-end audit adjustments and the absence of footnotes.

"*Investment*" means, as to any Person, any direct or indirect acquisition or investment by such Person in, to or for another Person or business unit thereof, whether by means of (a) the purchase or other acquisition of capital stock or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor Guarantees Indebtedness of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment, but adjusted to give effect to (a) the aggregate amount of cash repayments of principal on Investments constituting loans or advances or (b) the Net Cash Proceeds from the sale of any such Investments.

"*IRS*" means the United States Internal Revenue Service.

"*Laws*" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"*Lease*" means each operating or capital lease of real property, or both real and personal property, related to a Restaurant or to the operations of the Business.

"*Lender*" has the meaning specified in the introductory paragraph hereto.

"*Lending Office*" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrowers and Administrative Agent.

"*Lien*" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"*Loan*" means an extension of credit by a Lender to the Borrowers under Article II, in the form of a Term Loan or a Revolving Loan.

"*Loan Documents*" means this Agreement, each Note, each Guaranty, each Security Instrument, the Fee Letter, the Escrow Agreement and any other documents entered into in connection herewith or therewith (but specifically excluding Bank Product Agreements and Related Swap Contracts).

"*Loan Notice*" means a written notice, substantially in the form of Exhibit A, delivered by the Responsible Officer of Borrower Agent in connection with (a) a Borrowing or (b) the conversion of a Loan from one Type to the other.

"*Loan Parties*" means, collectively, each Borrower, each Guarantor, and each Person granting a Lien on any Collateral to Administrative Agent.

"*Loveloud*" has the meaning specified in the introductory paragraph hereto.

"*Material Adverse Effect*" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), or condition (financial or otherwise) of the Loan Parties, taken as a whole; (b) a material adverse effect upon the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material adverse effect upon the rights and remedies of Administrative Agent or Lenders under any Loan Document.

"*Material Contract*" means, as to any Person, any supply, franchise, purchase, service, employment, management, tax, indemnity, shareholder or other agreement or contract for which the aggregate amount or value of services performed or to be performed for or by, or funds or other property transferred or to be transferred to or by, such Person pursuant to such agreement or contract (to which such Person is a party or by which any such Person or any of its properties is otherwise bound) during any Fiscal Year exceeds $500,000 (other than contracts that by their terms may be terminated by such Person in the ordinary course of its business upon less than 60

days' notice without penalty or premium), or any other agreement or contract the loss of which could reasonably be expected to result in a Material Adverse Effect.

"*Maturity Date*" means (a) with respect to the Revolving Facility, February 26, 2021, (b) with respect to each of the Term Loan Facilities, February 26, 2023; provided, however, that, in each case, if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"*Meridian*" has the meaning specified in the introductory paragraph hereto.

"*Mortgages*" means, collectively, the mortgages or deeds of trust, as the same may be amended, restated, supplemented, extended or renewed from time to time, including any amendments and restatements of such mortgages or deeds of trust, now or hereafter encumbering a Loan Party's fee interest in the Restaurants or other Real Property (or any interest in Real Property) and other property as described therein in favor of Administrative Agent.

"*MR*" has the meaning specified in the introductory paragraph hereto.

"*Multiemployer Plan*" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Borrower or any ERISA Affiliate make or is obligated to make contributions, or during the preceding five plan years, have made or been obligated to make contributions.

"*Multiple Employer Plan*" means a Plan which has two or more contributing sponsors (including any Borrower or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"*NDM*" has the meaning specified in the introductory paragraph hereto.

"*Net Cash Proceeds*" means the aggregate cash proceeds received by any of the Loan Parties in respect of (i) the sale or transfer of any property or assets, (ii) the issuance of any additional Equity Interests of any of the Loan Parties (including, without limitation, any cash received upon the sale or other disposition of any noncash consideration received in connection with (i) or (ii) above), net of the direct costs relating to (i) or (ii) above (including, without limitation legal, income tax, accounting and investment banking and other customary fees and expenses, and sales commissions), amounts required to be applied to the repayment of Indebtedness secured by a Lien permitted hereunder on any asset subject to such sale or transfer, taxes paid or payable as a result thereof, and any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP, or (iii) Extraordinary Receipts.  The parties hereto acknowledge and agree that Net Cash Proceeds shall not include any non-cash trade-in-credits or purchase price reductions received by any of the Loan Parties in connection with an exchange of equipment for replacement equipment that is the functional equivalent of such exchanged equipment.

"*New Restaurant Debt Adjustment*" means the outstanding principal balance of all Consolidated Funded Indebtedness incurred for a Restaurant that has been owned or operated by a Borrower for less than 12 months as of the date of determination multiplied by a fraction, the numerator of which is the number of months that such Restaurant was not in operation or not

owned by such Borrower for the full month, as applicable, within the twelve-month period ending on such date and the denominator of which is 12; provided, however, any Indebtedness attributable to the Term Loan A-1 Acquisition shall not be included in the calculation of New Restaurant Debt Adjustment.

"*NKS*" has the meaning specified in the introductory paragraph hereto.

"*Non-Consenting Lender*" means any Lender that does not approve any consent, waiver or amendment that (i) requires the approval of all affected Lenders in accordance with the terms of Section 11.01 and (ii) has been approved by the Required Lenders and, (x) during the Availability Period in respect of the Term Loan A-2 Facility, such other Term Loan A-2 Lenders as required pursuant to Section 11.01(c), and (y) during the Availability Period in respect of the Revolving Facility, such other Revolving Lenders as required pursuant to Section 11.01(d).

"*Non-Defaulting Lender*" means, at any time, each Lender that is not a Defaulting Lender at such time.

"*Note*" means a Term Loan A-1 Note, a Term Loan A-2 Note, or a Revolving Note, as the context may require.

"*Obligations*" means (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, Bank Product Agreement or Related Swap Contract, and (b) all costs and expenses incurred in connection with enforcement and collection of the foregoing, including the fees, charges and disbursements of counsel, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding provided, that Obligations of any Loan Party shall not include any Excluded Swap Obligations solely of such Loan Party.

"*OFAC*" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"*Organization Documents*" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"*Other Connection Taxes*" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing

such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"*Other Taxes*" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 11.18</u>).

"*Outstanding Amount*" means with respect to Term Loan A-1s, Term Loan A-2s and Revolving Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Term Loan A-1s, Term Loan A-2s or Revolving Loans, as the case may be, occurring on such date.

"*Owners*" means, collectively, (i) Polar Star Capital Partners LLC and (ii) David Harper or any trust established for estate planning purposes which are controlled by him.

"*Paradigm*" means Paradigm Restaurants, L.C., a Utah limited liability company.

"*Paradigm II*" means Paradigm II, L.C., a Utah limited liability company.

"*Partial Release Provisions*" means the provisions set forth on <u>Exhibit F</u> attached hereto.

"*Participant*" has the meaning specified in <u>Section 11.06(d)</u>.

"*Participant Register*" has the meaning specified in <u>Section 11.06(d)</u>.

"*PBGC*" means the Pension Benefit Guaranty Corporation.

"*Pension Funding Rules*" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"*Pension Plan*" means any employee pension benefit plan (including a Multiple Employer Plan or a Multiemployer Plan) that is maintained or is contributed to by any Borrower and any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"*Permitted Liens*" means those Liens permitted under <u>Section 7.01</u> hereof.

"*Permitted Restaurant Closure*" has the meaning specified in <u>Section 7.12</u>.

"*Permitted Restaurant Disposition*" has the meaning specified in <u>Section 7.05(e)</u>.

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"*Plan*" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of any Borrower or any ERISA Affiliate or any such Plan to which any Borrower or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"*Platform*" has the meaning specified in Section 6.02.

"*Pledge Agreement*" means that certain Pledge Agreement, dated as of the Closing Date, made by Meridian in favor of Administrative Agent for the benefit of the Secured Parties, as the same may be amended, restated, supplemented, extended or renewed from time to time.

"*PLM*" means PLM Restaurants, L.C., a Utah limited liability company.

"*Pre-Closing Entities*" means, collectively, Meridian, RJR, R&G, HR, MR, RNH, NDM, C Utah, AZM, Paradigm, Paradigm II and PLM.

"*Prime Rate*" means, as of any day of determination, the rate of interest in effect for such day as publicly announced from time to time by City National Bank as its "prime rate". The "prime rate" is a rate set by City National Bank based upon various factors including City National Bank's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such prime rate announced by City National Bank shall take effect at the opening of business on the day specified in the public announcement of such change.

"*Prior Indebtedness*" means the Indebtedness and any other obligations specified on Schedule 6.11 hereto.

"*Project*" means any relocation, remodel, re-image or development of, or purchase of equipment for, any Restaurant or the acquisition of a Restaurant, in each case, which shall be completed in accordance with Franchisor-mandated requirements, if applicable.

"*Public Lender*" has the meaning specified in Section 6.02.

"*Qualified ECP Guarantor*" means, in respect of any Swap Obligation under a Related Swap Contract, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant guarantee, joint obligation or grant of the relevant security interest becomes effective with respect to such Swap Obligation under a Secured Rate Contract or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"*R&G*" means R&G Restaurants, L.C., a Utah limited liability company.

"*Recipient*" means (a) Administrative Agent and (b) any Lender, as applicable.

"*Real Estate Support Documents*" means, with respect to any Restaurant or Real Property (or interest in Real Property) which is owned by a Loan Party and acquired with the proceeds of any Loan, (a) such flood hazard certification and evidence of flood insurance (if required), as Administrative Agent may reasonably request (in Administrative Agent's sole discretion), (b) a Mortgage covering such Restaurant or Real Property and (c) mortgagee title insurance policies (in amounts and in form and substance, together with endorsements, acceptable to Administrative Agent), appraisals, surveys, environmental reports and other mortgage-related documents, as Administrative Agent may reasonably request.

"*Real Property*" means all real property or interests therein wherever situated now, heretofore or hereafter owned or acquired by a Loan Party and pledged to Administrative Agent for the benefit of Lenders as Collateral under any of the Security Instruments.

"*Register*" has the meaning specified in Section 11.06(c).

"*Related Parties*" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"*Related Swap Contract*" means all Swap Contracts which are entered into or maintained by any Borrower with a Lender or an Affiliate of a Lender and which are not prohibited by the express terms of the Loan Documents.

"*Rental Expense*" means, for any period, all third party rental expense with respect to leased real property of Loveloud or any of its Subsidiaries (excluding the Specified Subsidiaries), to the extent, and only to the extent, such amounts were deducted as expenses in calculating Consolidated Net Income, all as determined on a consolidated basis in accordance with GAAP; provided, however, the Rental Expense for the Term Loan A-1 Acquisition Restaurants, measured as at the end of the following Fiscal Quarters shall be the corresponding amount set forth in the table below plus the actual Rental Expenses for such Restaurants from the Closing Date through the end of such Fiscal Quarter:

| Term Loan A-1 Acquisition Restaurants | |
| --- | --- |
| **Fiscal Quarter** | **Rental Expense** |
| Fiscal Quarter ending on or about March 31, 2018 | $2,613,417 |
| Fiscal Quarter ending on or about June 30, 2018 | $1,900,667 |
| Fiscal Quarter ending on or about September 30, 2018 | $1,187,917 |
| Fiscal Quarter ending on or about December 31, 2018 | $475,167 |

"*Reportable Event*" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.-

"*Required Equity*" means at least $30,000,000 in cash contributed by PSCP Meridian LLC, a Utah limited liability company, to the equity of Meridian, $16,248,187.25 of which

Meridian will immediately contribute to the equity of Loveloud and Loveloud will immediately contribute to the equity of NKS, on terms and conditions satisfactory to Administrative Agent.

"*Required Equity Documents*" means that certain Membership Interest Purchase Agreement dated as of February 23, 2018 by and among David A. Harper and Stephan L. Ralston, as sellers, and PSCP Meridian, LLC, a Utah limited liability company, as buyer, and any other instruments or agreements entered into in connection with the obtaining by Meridian and NKS of the Required Equity.

"*Required Lenders*" means, at any time, (a) if there are less than three Lenders, all Lenders, and (b) if there are three or more Lenders, at least two (2) Lenders having Total Credit Exposures representing more than 50% of the Total Credit Exposures of all Lenders.  The Total Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.  Lenders that are Affiliates or Approved Funds of one another shall be deemed to be one Lender for purposes of this definition.

"*Required Revolving Lenders*" means, at any time, (a) if there are less than three Revolving Lenders, all Revolving Lenders, and (b) if there are three or more Revolving Lenders, at least two (2) Revolving Lenders having Total Revolving Credit Exposures representing more than 50% of the Total Revolving Credit Exposures of all Revolving Lenders.  The Total Revolving Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Revolving Lenders at any time.  Revolving Lenders that are Affiliates or Approved Funds of one another shall be deemed to be one Revolving Lender for purposes of this definition.

"*Required Term Loan A-2 Lenders*" means, at any time, (a) if there are less than three Term Loan A-2 Lenders, all Term Loan A-2 Lenders, and (b) if there are three or more Term Loan A-2 Lenders, at least two (2) Term Loan A-2 Lenders having Total Term Loan A-2 Credit Exposures representing more than 50% of the Total Term Loan A-2 Credit Exposures of all Term Loan A-2 Lenders.  The Total Term Loan A-2 Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Term Loan A-2 Lenders at any time.  Term Loan A-2 Lenders that are Affiliates or Approved Funds of one another shall be deemed to be one Term Loan A-2 Lender for purposes of this definition.

"*Responsible Officer*" means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer, secretary or assistant secretary, a manager or managing member, or a general partner, of a Loan Party or Borrower Agent.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party or Borrower Agent shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of such Loan Party or Borrower Agent and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party or Borrower Agent.

"*Restaurant*" means (i) any restaurant now or hereafter owned or leased and operated by any Borrower, including, without limitation, the Initial Restaurants, (ii) effective upon the applicable Term Loan A-1 Acquisition, the corresponding Term Loan A-1 Acquisition Restaurants, and (iii) any restaurant acquired after the Term Loan A-1 Acquisition by any Borrower.

"*Restricted Payment*" means any compensation to any shareholder, member, partner or other equity holder of any Loan Party (other than salaries paid to employees and officers of such Loan Party in the ordinary course of business in accordance with past practices), any dividend or other distribution (including, without limitation, any tax distribution) or any management fee paid to any shareholder, member, partner or other equity holder of any Loan Party, or any Affiliate of any Loan Party (whether in cash, securities or other property), or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any capital stock or other Equity Interest of any Loan Party, or on account of any return of capital to any Loan Party's stockholders, members or partners (or the equivalent Person thereof).

"*Revolving Borrowing*" means a borrowing consisting of simultaneous Revolving Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period made by each of the Revolving Lenders pursuant to Section 2.01(c).

"*Revolving Commitment*" means, as to each Revolving Lender, its obligation to make Revolving Loans to the Borrowers pursuant to Section 2.01(c), in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 under the caption "Revolving Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The Revolving Commitment of all of the Revolving Lenders on the Closing Date shall be $3,000,000.

"*Revolving Exposure*" means, as to any Lender at any time, the aggregate principal amount at such time of its outstanding Revolving Loans at such time.

"*Revolving Facility*" means, at any time, the aggregate amount of the Revolving Lenders' Revolving Commitments at such time.

"*Revolving Lender*" means, at any time, (a) so long as any Revolving Commitment is in effect, any Lender that has a Revolving Commitment at such time or (b) if the Revolving Commitments have terminated or expired, any Lender that has a Revolving Loan at such time.

"*Revolving Loan*" has the meaning specified in Section 2.01(c).

"*Revolving Note*" means a promissory note made by the Borrowers in favor of a Revolving Lender evidencing Revolving Loans made by such Revolving Lender, substantially in the form of Exhibit B.

"*RJR*" means RJR Restaurants, L.C., a Utah limited liability company.

"*RNH*" means RNH Properties, L.C., a Utah limited liability company.

"*Sanctioned Country*" means, at any time, a country or territory which is the subject or target of any Sanctions.

"*Sanctioned Person*" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the or by the United Nations Security Council, the European Union or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

"*Sanctions*" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the OFAC or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"*SEC*" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"*Second Anniversary Term Loan A-2*" means each Term Loan A-2 made following the first anniversary of the Closing Date but on or prior to the last day of the Availability Period in respect of the Term Loan A-2 Facility.

"*Secured Parties*" means, collectively, with respect to each of the Security Instruments, Administrative Agent, Lenders, and each Affiliate of any Lender, which Affiliate is party to a Related Swap Contract or Bank Product Agreement.

"*Security Agreement*" means that certain Security Agreement, dated as of the Closing Date, made by the Borrowers and each other Loan Party (other than Meridian) in favor of Administrative Agent for the benefit of the Secured Parties, as the same may be amended, restated, supplemented, extended or renewed from time to time.

"*Security Instruments*" means, collectively or individually as the context may indicate, the Security Agreement, the Pledge Agreement, the Mortgages, and all other agreements, assignments, instruments and other documents, whether now existing or hereafter in effect, pursuant to which any of the Loan Parties shall grant or convey to Administrative Agent or Lenders a Lien in, or any other Person shall acknowledge any such Lien in, property as security for all or any portion of the Obligations, any other obligation under any Loan Document and any obligation or liability arising under any Related Swap Contract or Bank Product Agreement.

"*Seller Financial Statements*" means the consolidated statement of income or operations of Sellers for the period ending on or about December 31, 2017.

"*Sellers*" means, collectively, Horizon Holding, Inc., a Nebraska corporation, Horizon Food Service, Inc., a Nebraska corporation, Horizon Food Service of Nebraska, L.L.C., a Nebraska limited liability company, Horizon Food Service of Kansas, LLC, a Kansas limited liability company, and Nebraska TMT, L.L.C., a Nebraska limited liability company.

"*Solvent*" means, when used with respect to any Person, that at the time of determination:

(a)    the fair value of its assets (both at fair valuation and at present fair saleable value on an orderly basis) is in excess of the total amount of its liabilities, including contingent obligations; and

(b)        it is then able and expects to be able to pay its debts as they mature; and

(c)        it has capital sufficient to carry on its business as conducted and as proposed to be conducted.

*"Specified Subsidiary"* means (a) Stanger Restaurant Service, L.C., a Utah limited liability company, (b) Paradigm, (c) Paradigm II, (d) PLM, (e) RNH, (f) KBMH Restaurants, L.C., a Utah limited liability company, (g) MVP Restaurants, LC, an Idaho limited liability company, and (h) any future direct Subsidiary of Meridian or another Specified Subsidiary, in each case, so long as such Person satisfies each of the following criteria:  (i) none of Meridian, Loveloud or any of Loveloud's Subsidiaries is directly or indirectly liable for any Indebtedness of such Person, (ii) no default with respect to any Indebtedness of such Person would permit (upon notice, lapse of time or otherwise) any holder of any other Indebtedness of Meridian, Loveloud or any of Loveloud's Subsidiaries to declare a default on such other Indebtedness or cause the payment thereof to be accelerated or payable prior to its stated maturity, (iii) any Investment by Meridian, Loveloud or any of Loveloud's Subsidiaries in such Person will not violate any provision of the Agreement or any other Loan Document, (iv) neither Meridian, Loveloud nor any of Loveloud's Subsidiaries has a contract, agreement, arrangement, understanding or obligation of any kind (other than (A) solely in the case of Loveloud, in respect of its holding Equity Interests in such Specified Subsidiary and (B) other Investments permitted hereunder), whether written or oral, with such Person other than those that might reasonably be obtained at the time from Persons who are not Affiliates of Meridian, Loveloud or any of Loveloud's Subsidiaries, and (v) none of Meridian, Loveloud or any of Loveloud's Subsidiaries has any obligation to subscribe for additional Equity Interests in such Person, or to maintain or preserve such Person's financial condition or to cause such Person to achieve certain levels of operating results.

"*Subsidiary*" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

"*Swap Contract*" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the

International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"*Swap Obligation*" means, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"*Swap Termination Value*" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"*Synthetic Lease Obligation*" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"*Taxes*" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Term Lender*" means a Term Loan A-1 Lender or a Term Loan A-2 Lender, as the context may require.

"*Term Loan*" means a Term Loan A-1 or a Term Loan A-2, as the context may require.

"*Term Loan A-1*" means an advance made by any Term Loan A-1 Lender under the Term Loan A-1 Facility.

"*Term Loan A-1 Acquisition*" means the Acquisition by NKS of the Term Loan A-1 Acquisition Restaurants.

"*Term Loan A-1 Acquisition Agreement*" means that certain Amended and Restated Agreement of Purchase and Sale dated as of August 18, 2017, by and among the Sellers, Meridian and NKS, as amended by Amendment #1 to Amended and Restated Agreement of Purchase and Sale, dated as of October 31, 2017, and Amendment #2 to Amended and Restated Agreement of Purchase and Sale, dated as of January 11, 2018.

"*Term Loan A-1 Acquisition Documents*" means the Term Loan A-1 Acquisition Agreement and all other documents related thereto and executed in connection therewith.

"*Term Loan A-1 Acquisition Restaurants*" means the 25 Burger King restaurants described on Schedule 1.01-B being acquired by a Borrower, pursuant to the Term Loan A-1 Acquisition Documents. Effective upon the consummation of the Term Loan A-1 Acquisition, the Term Loan A-1 Acquisition Restaurants shall be Restaurants under and subject to the terms, covenants, conditions and provisions of the Loan Documents.

"*Term Loan A-1 Borrowing*" means a borrowing consisting of simultaneous Term Loan A-1s of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period made by each of the Term Loan A-1 Lenders pursuant to Section 2.01(a).

"*Term Loan A-1 Commitment*" means, as to each Term Loan A-1 Lender, its obligation to make Term Loan A-1s to the Borrowers pursuant to Section 2.01(a), in an aggregate principal at any one time outstanding not to exceed the amount set forth opposite such Term Loan A-1 Lender's name on Section 2.01 under the caption "Term Loan A-1 Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Term Loan A-1 Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The initial aggregate amount of the Term Loan A-1 Commitments is $40,500,000.

"*Term Loan A-1 Facility*" means, at any time, (a) on or prior to the Closing Date, the aggregate amount of the Term Loan A-1 Commitments at such time, and (b) thereafter, the aggregate principal amount of Term Loan A-1s of all Term Loan A-1 Lenders outstanding at such time.

"*Term Loan A-1 Lender*" means (a) at any time on or prior to the Closing Date, any Lender that has a Term Loan A-1 Commitment at such time, and (b) at any time after the Closing Date, any Lender that holds Term Loan A-1s at such time.

"*Term Loan A-1 Note*" means a promissory note made by the Borrowers in favor of a Term Loan A-1 Lender evidencing Term Loan A-1s made by such Term Loan A-1 Lender, substantially in the form of Exhibit B.

"*Term Loan A-2*" means an advance made by any Term Loan A-2 Lender under the Term Loan A-2 Facility.

"*Term Loan A-2 Advance Limitation*" means, with respect to any Term Loan A-2 Borrowing for any Restaurant, 75% of the cost associated with any Project for such Restaurant which are supported by invoices and receipts required to be delivered to Administrative Agent pursuant to the definition of Term Loan A-2 Borrowing Conditions.

"*Term Loan A-2 Borrowing*" means a borrowing consisting of simultaneous Term Loan A-2s of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period made by each of the Term Loan A-2 Lenders pursuant to Section 2.01(b).

"*Term Loan A-2 Borrowing Conditions*" means, with respect to any Term Loan A-2 Borrowing, that:

(a)    Administrative Agent shall have received a certificate of a Responsible Officer of Borrower Agent certifying that the amount of such Term Loan A-2 Borrowing does not exceed the Term Loan A-2 Advance Limitation;

(b)    The Borrowers shall have provided Administrative Agent with invoices, receipts and such other documentation as Administrative Agent may request to assure the amount of the requested Borrowing is to be used to reimburse the Borrowers or the applicable Loan Party for costs previously paid by the Borrowers or such Loan Party or to pay costs incurred by the Borrowers or such Loan Party for a Project;

(c)    Administrative Agent shall have received a certificate of a Responsible Officer of Borrower Agent certifying that, with respect to each Project: (i) all work performed is in substantial accordance with the construction plans and specifications; (ii) all licenses and permits required by any Governmental Authority have been obtained; (iii) the construction as then completed does not violate any applicable law, ordinance, rule or regulation; and (iv) the remaining undisbursed proceeds, together with the Borrowers' funds, are sufficient to pay for the completion of the applicable improvements;

(d)    The Borrowers shall have delivered lien waivers with respect to each Project (which shall be unconditional waivers, as to work previously paid for, and conditional waivers with the request for disbursement, and with full, unconditional lien waivers delivered upon receipt of the final payments covered by the funds) from the general contractor, and, at Administrative Agent's reasonable discretion, from all subcontractors for all labor performed and/or materials supplied in connection with the construction of the improvements;

(e)    Administrative Agent shall have been permitted to monitor the progress of the construction of the improvements and the Borrowers shall have submitted such other information and documents as Administrative Agent may reasonably require related to the applicable Loan Notice;

(f)    The Borrowers shall have delivered evidence that any licenses and permits or inspections required by any Governmental Authority as of such date have been completed with results satisfactory in all material respects to that Governmental Authority;

(g)    The Borrowers shall have delivered evidence reasonably satisfactory to Administrative Agent that Franchisor has approved the Project and Franchisor and the applicable Borrower or the applicable Loan Party either have entered into a Franchise Agreement for the Project, or will enter into a Franchise Agreement for the Project when the Project is finally completed, which Franchise Agreement shall be in form and substance reasonably satisfactory to Administrative Agent; and

(h)    The Borrowers shall have delivered to Administrative Agent a fully signed, complete copy of the Lease for the Project, if applicable, which Lease shall be in form and substance reasonably satisfactory to Administrative Agent.

"*Term Loan A-2 Commitment*" means, as to each Term Loan A-2 Lender, its obligation to make Term Loan A-2s to the Borrowers pursuant to Section 2.01(b), in an aggregate principal at any one time outstanding not to exceed the amount set forth opposite such Term Loan A-2 Lender's name on Section 2.01(b) under the caption "Term Loan A-2 Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Term Loan A-2 Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The initial aggregate amount of the Term Loan A-2 Commitments is equal to $18,000,000.

"*Term A-2 Facility*" means, at any time, (a) at any time during the Availability Period in respect of the Term Loan A-2 Facility, the sum of (i) the aggregate amount of the Term Loan A-2 Commitments at such time and (ii) the aggregate principal amount of the Term Loan A-2s of all Term Loan A-2 Lenders outstanding at such time, and (b) thereafter, the aggregate principal amount of the Term Loan A-2s of all Term Loan A-2 Lenders outstanding at such time.

"*Term Loan A-2 Lender*" means (a) at any time on or prior to the Closing Date, any Term Loan A-2 Lender that has a Term Loan A-2 Commitment at such time, (b) at any time during the Availability Period in respect of the Term Loan A-2 Facility, any Lender that has a Term Loan A-2 Commitment or that holds Term Loan A-2s at such time, and (c) at any time after the Availability Period in respect of the Term Loan A-2 Facility, any Lender that holds Term Loan A-2s at such time.

"*Term Loan A-2 Note*" means a promissory note made by the Borrowers in favor of a Term Loan A-2 Lender evidencing Term Loan A-2s made by such Term Loan A-2 Lender, substantially in the form of Exhibit B.

"*Term Loan Facilities*" means the Term Loan A-1 Facility and the Term Loan A-2 Facility.

"*Threshold Amount*" means $250,000.

"*Total Credit Exposure*" means, as to any Lender at any time, the unused Commitments, Revolving Exposure and Outstanding Amount of all Term Loans of such Lender at such time.

"*Total Revolving Credit Exposure*" means, as to any Revolving Lender at any time, the unused Commitments and Revolving Exposure of such Revolving Lender at such time.

"*Total Revolving Outstandings*" means the aggregate Outstanding Amount of all Revolving Loans.

"*Total Term Loan A-1 Credit Exposure*" means, as to any Term Loan A-1 Lender at any time, the Outstanding Amount of all Term Loan A-1s of such Term Loan A-1 Lender at such time.

"*Total Term Loan A-2 Credit Exposure*" means, as to any Term Loan A-2 Lender at any time, the Outstanding Amount of all Term Loan A-2s of such Term Loan A-2 Lender at such time.

"*Total Term Loan A-2 Outstandings*" means the aggregate Outstanding Amount of all Term Loan A-2s.

"*Type*" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"*United States*" and "*U.S.*" mean the United States of America.

"*Unused Term Loan A-2 Commitment Fee*" has the meaning specified in Section 2.07(b).

"*Unused Revolving Loan Commitment Fee*" has the meaning specified in Section 2.07(c).

"*U.S. Borrower*" means a Borrower that is a U.S. Person.

"*U.S. Person*" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"*U.S. Tax Compliance Certificate*" has the meaning assigned to such term in paragraph (g) of Section 3.01.

"*Withholding Agent*" means any Loan Party and Administrative Agent.

"*Write-Down and Conversion Powers*" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**Section 1.02.  Other Interpretive Provisions.**  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "hereto," "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending,

replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "<u>asset</u>" and "<u>property</u>" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "<u>from</u>" means "<u>from and including</u>;" the words "<u>to</u>" and "<u>until</u>" each mean "<u>to but excluding</u>;" and the word "<u>through</u>" means "<u>to and including</u>."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

**Section 1.03.  Accounting Terms**.

(a)    ***Generally***.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, <u>except</u> as otherwise specifically prescribed herein.  To the extent any defined term states that it is determined "on a consolidated basis", such consolidation shall be in accordance with GAAP applied on a consistent basis. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of any Loan Party or any of its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

(b)    ***Changes in GAAP***.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrowers or the Required Lenders shall so request, Administrative Agent, Lenders and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u> <u>that</u>, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrowers shall provide to Administrative Agent and Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**Section 1.04.  Rounding**.  Any financial ratios required to be maintained by Loveloud and its Subsidiaries (excluding the Specified Subsidiaries) pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**Section 1.05.  Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Los Angeles, California time (daylight or standard, as in effect from time to time).

**ARTICLE II**

**THE COMMITMENTS AND CREDIT EXTENSIONS**

**Section 2.01.  The Loans**.

(a)    ***Term Loan A-1 Borrowing***.  Subject to the terms and conditions set forth herein, each Term Loan A-1 Lender severally agrees to make a single loan to the Borrowers, in Dollars, on the Closing Date in an amount not to exceed such Term Loan A-1 Lender's Applicable Percentage of the Term Loan A-1 Facility.  The Term Loan A-1 Borrowing shall consist of Term Loan A-1s made simultaneously by the Term Loan A-1 Lenders in accordance with their respective Applicable Percentage of the Term Loan A-1 Facility.  Term Loan A-1 Borrowings repaid or prepaid may not be reborrowed.  Term Loan A-1s may be Base Rate Loans or Eurodollar Rate Loans, as further provided herein; provided, however, any Term Loan A-1 Borrowing made on the Closing Date or any of the three (3) Business Days following the Closing Date shall be made as Base Rate Loans unless the Borrower Agent delivers a Funding Indemnity Letter not less than three (3) Business Days prior to the date of such Term Loan A-1 Borrowing.

(b)    ***Term Loan A-2 Borrowings***.  Subject to the terms and conditions set forth herein, each Term Loan A-2 Lender severally agrees to make one or more loans to the Borrowers, in Dollars, from time to time, on any Business Day during the Availability Period in respect of the Term Loan A-2 Facility in an aggregate amount not to exceed such Term Loan A-2 Lender's Applicable Percentage of the Term Loan A-2 Facility; provided, however, that (i) the aggregate amount of all Term Loan A-2 Borrowings made prior to February 26, 2019 shall not exceed $12,600,000, and (ii) the aggregate amount of Term Loan A-2s advanced with respect to any Restaurant shall not exceed the Term Loan A-2 Advance Limitation.  Each Term Loan A-2 Borrowing shall consist of Term Loan A-2s made simultaneously by the Term Loan A-2 Lenders in accordance with their respective Applicable Percentage of the Term Loan A-2 Facility.  Term Loan A-2 Borrowings repaid or prepaid may not be reborrowed.  Term Loan A-2s may be Base Rate Loans or Eurodollar Rate Loans, as further provided herein; provided, however, any Term Loan A-2 Borrowing made on the Closing Date or any of the three (3) Business Days following the Closing Date shall be made as Base Rate Loans unless the Borrower Agent delivers a Funding Indemnity Letter not less than three (3) Business Days prior to the date of such Term Loan A-2 Borrowing.

(c)    ***Revolving Borrowings***.  Subject to the terms and conditions set forth herein, each Revolving Lender severally agrees to make loans (each such loan, a "Revolving Loan") to the Borrowers, in Dollars, from time to time, on any Business Day during the Availability Period in respect of the Revolving Facility, in an aggregate amount not to exceed at any time outstanding the amount of such Lender's Revolving Commitment; provided, however, that after giving effect to any Revolving Borrowing,

(i) the Total Revolving Outstandings shall not exceed the Revolving Facility, and (ii) the Revolving Exposure of any Lender shall not exceed such Revolving Lender's Revolving Commitment.  Within the limits of each Revolving Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow Revolving Loans, prepay under Section 2.03, and reborrow under this Section 2.01(c). Revolving Loans may be Base Rate Loans or Eurodollar Rate Loans, as further provided herein; provided, however, any Revolving Borrowings made on the Closing Date or any of the three (3) Business Days following the Closing Date shall be made as Base Rate Loans unless the Borrower Agent delivers a Funding Indemnity Letter not less than three (3) Business Days prior to the date of such Revolving Borrowing.

**Section 2.02.  Borrowings, Conversions, and Continuations of Loans**.

(a)  ***Notice of Borrowing***.  Except as otherwise set forth herein, each Borrowing, each conversion of Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Borrower Agent's irrevocable notice to the Administrative Agent, which may be given by a Loan Notice.  Each such Loan Notice must be received by the Administrative Agent not later than 12:00 noon at least (i) three (3) Business Days prior to the requested date of any Borrowing of, conversion to or continuation of Eurodollar Rate Loans or of any conversion of Eurodollar Rate Loans to Base Rate Loans, and (ii) one (1) Business Day prior to the requested date of any Borrowing of Base Rate Loans, but in each case, not more than five (5) Business Days prior to such requested date.  Each Borrowing of, conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $100,000 (or, in connection with any conversion or continuation of a Term Loan, if less, the entire principal thereof then outstanding).  Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of at least $100,000 (or, in connection with any conversion or continuation of a Term Loan, if less, the entire principal thereof then outstanding).  Each Loan Notice shall specify (A) the applicable Facility and whether the Borrower Agent is requesting a Borrowing, a conversion of Loans from one Type to the other, or a continuation of Loans, as the case may be, under such Facility, (B) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (C) the principal amount of Loans to be borrowed, converted or continued, (D) the Type of Loans to be borrowed or to which existing Loans are to be converted, and (E) if applicable, the duration of the Interest Period with respect thereto.  If the Borrower Agent fails to specify a Type of Loan in a Loan Notice or if the Borrower Agent fails to give a timely notice requesting a continuation of a Eurodollar Rate Loan, then such Loan (subject to Section 2.02(c), Section 3.02, and Section 3.03) shall be made or automatically continued, as the case may be, as a Eurodollar Rate Loan with an Interest Period of one (1) month, except if such Interest Period would extend beyond the Maturity Date of the Facility under which such Loan was made, in which case such Loan will be made as or automatically converted into, as the case may be, a Base Rate Loan.  Any such automatic continuation of a Eurodollar Rate Loan or automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans.

(b)     *Advances*.   Following receipt of a Loan Notice for a Facility, the Administrative Agent shall promptly notify each applicable Lender of the amount of its Applicable Percentage under such Facility of the applicable Loans.   In the case of a Borrowing, each applicable Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 11:00 a.m. on the Business Day specified in the applicable Loan Notice.   Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Loans, Section 4.01), the Administrative Agent shall make all funds so received available to the Borrowers in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrowers on the books of City National Bank with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower Agent.

(c)     *Eurodollar Rate Loans*.   Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan.   During the existence of a Default or Event of Default, no Loans may be requested as, converted to or continued as Eurodollar Rate Loans without the consent of the Required Lenders, and, notwithstanding any provision to the contrary in Section 2.02(a) above, unless the Required Lenders shall have otherwise consented, any Eurodollar Rate Loan shall be automatically converted into a Base Rate Loan at the end of the Interest Period applicable to such Eurodollar Rate Loan.

(d)     *Notice of Interest Rates*. The Administrative Agent shall promptly notify the Borrower Agent and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate. At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower Agent and the Lenders of any change in the Prime Rate used in determining the Base Rate promptly following the public announcement of such change.

(e)     *Interest Periods*.   After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than eight (8) Interest Periods in effect.

**Section 2.03.  Prepayments**.

(a)     *Optional Prepayments*.   In addition to the required payments of principal of the Loans as set forth in Section 2.05 and any mandatory prepayments of principal of the Loans effected pursuant to the Partial Release Provisions or pursuant to Section 2.03(b), the Borrowers may, upon irrevocable notice to Administrative Agent, voluntarily prepay the Loans in whole or in part from time to time on any Business Day; provided that (i) such notice must be received by Administrative Agent not later than 11:00 a.m., (A) three Business Days prior to any date of prepayment of Eurodollar Rate Loans and (B) on the date of prepayment of Base Rate Loans, (ii) any prepayment of Eurodollar Rate Loans shall be in a principal amount of at least $100,000 and integral multiples of $100,000 in excess thereof, (iii) any prepayment of Base Rate Loans shall be in a principal amount of at least $100,000 and integral multiples of $100,000 in excess

thereof or, in each case, if less, the entire principal amount thereof then outstanding, (iv) any prepayment of the Term Loans shall be permitted only to the extent that no Default or Event of Default is then existing or would arise therefrom, (v) each Related Swap Contract is terminated or modified as required by the counterparty to each Related Swap Contract, (vi) in the event of any refinancing of the Facilities by any Person other than City National Bank (or a syndicate of Lenders agented by City National Bank) (A) on or prior to the twelve (12) month anniversary of the Closing Date, such prepayment shall be accompanied by a prepayment fee in an amount equal to 2.0% of the amount of principal of the Facilities prepaid for the account of each Lender under the applicable Facilities in accordance with its Applicable Percentage, and (B) after the twelve (12) month anniversary of the Closing Date but on or prior to the twenty-four (24) month anniversary of the Closing Date, such prepayment shall be accompanied by a prepayment fee in an amount equal to 1.0% of the amount of principal of the Facilities prepaid for the account of each Lender under the applicable Facilities in accordance with its Applicable Percentage, and (vii) no prepayment of the Term Loans shall be permitted unless the Borrowers concurrently pays in full any termination payments arising from any prepayment of principal and required Related Swap Contract modifications. In determining whether a Default or Event of Default would arise from any such prepayment, the Borrowers shall demonstrate, to Administrative Agent's satisfaction, compliance with the financial covenants set forth in Section 7.11 on a pro forma basis after giving effect to such prepayment as of the end of the Fiscal Quarter most recently ended as to which financial statements were required to be delivered pursuant to this Agreement. Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if Eurodollar Rate Loans are to be prepaid, the Interest Period(s) of such Loans. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage in respect of the relevant Facility). If such notice is given by the Borrowers, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of principal shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05. Each prepayment of the outstanding Term Loans pursuant to this Section 2.03(a) shall be applied to the principal repayment installments thereof in inverse order of maturity such that the scheduled monthly principal payment amounts otherwise calculated do not change. Subject to Section 2.12, such prepayments shall be paid to the Lenders in accordance with their respective Applicable Percentages in respect of each of the relevant Facilities.

(b)     *Mandatory Prepayments*.

(i)     *Equity and Debt Issuances*. Upon receipt on or after the Closing Date by any Loan Party or any of its Subsidiaries (excluding the Specified Subsidiaries) of Net Cash Proceeds arising from (A) the issuance or Disposition by any Loan Party or its Subsidiaries (excluding the Specified Subsidiaries) of any Equity Interests of any Loan Party or its Subsidiaries (excluding the Specified Subsidiaries), the Borrowers shall immediately pay or cause to be paid to Administrative Agent an amount equal to 100% of such Net Cash Proceeds; or

(B) the incurrence by any Loan Party or any of its Subsidiaries or its Subsidiaries (excluding the Specified Subsidiaries) of Indebtedness of the type specified in clause (a) of the definition thereof, the Borrowers shall immediately pay or cause to be paid to Administrative Agent an amount equal to 100% of such Net Cash Proceeds.

(ii)    *Asset Sales*.    Subject to the terms and conditions of the Partial Release Provisions, upon receipt on or after the Closing Date by any Loan Party or any of its Subsidiaries or its Subsidiaries (excluding the Specified Subsidiaries) of Net Cash Proceeds arising from any Disposition (other than a Disposition permitted under Section 7.05(a), Section 7.05(b) and Section 7.05(d)) by any Loan Party or any of its Subsidiaries or its Subsidiaries (excluding the Specified Subsidiaries) of any of its property, the Borrowers shall immediately pay or cause to be paid to Administrative Agent an amount equal to 100% of such Net Cash Proceeds.

(iii)    *Casualty and Condemnation*.    Subject to the terms and conditions of the Partial Release Provisions, upon receipt on or after the Closing Date by any Loan Party or any of its Subsidiaries or its Subsidiaries (excluding the Specified Subsidiaries) of Net Cash Proceeds arising from any casualty or condemnation with respect to any property of any Loan Party or any of its Subsidiaries (excluding the Specified Subsidiaries), the Borrowers shall immediately pay or cause to be paid to Administrative Agent an amount equal to 100% of such Net Cash Proceeds; provided that, notwithstanding the foregoing, the Net Cash Proceeds from any casualty event or condemnation proceeding (other than a Restaurant that is closed due to a total loss as a result of a casualty or condemnation which shall be subject to the terms and conditions of the Partial Release Provisions) shall not be required to be used as a prepayment of the Loans to the extent such proceeds will be used to replace, restore, repair or rebuild property; provided that, if such Loan Party has not completed or entered into a binding agreement to complete such replacement, restoration, repair or rebuilding within one hundred eighty (180) days after receipt of such Net Cash Proceeds, Administrative Agent may apply such Net Cash Proceeds to the Obligations in accordance with this Section 2.03(b).

(iv)    *Sale-Leaseback Transactions*.    The Borrowers shall pay to Administrative Agent an amount equal to 100% of the Net Cash Proceeds received by any Loan Party from any sale-leaseback transaction (other than a sale-leaseback transaction solely between two or more Borrowers) permitted by the Loan Documents or consented to by the Required Lenders, which payment to Administrative Agent shall be made concurrent with the closing of such transaction.

(v)    *Application*.    All prepayments pursuant to the foregoing provisions of Section 2.03(b)(i) through (iv) shall be applied by the Administrative Agent, subject to Section 2.12, in the following order (except as otherwise provided in Section 2.03(a)):

First, to payment of that portion of the Obligations constituting unpaid principal of the Term Loans, in the inverse order of maturity as to the remaining scheduled payments of the Term Loans (including the payment due on the Maturity Date for the Term Loan Facilities), ratably among the Term Lenders in proportion to the respective amounts described in this clause First held by them;

Second, to payment of that portion of the Obligations constituting liabilities (other than any termination payments due and payable) under any Related Swap Contract with any Lender or any Affiliate of a Lender party to a Related Swap Contract and as to which the Administrative Agent has received notice of the amounts owed thereunder from the applicable Lender or any Affiliate of a Lender party to a Related Swap Contract, ratably among such Lenders or such Affiliates in proportion to the respective amounts described in this clause Second held by them;

Third, to payment of that portion of the Obligations constituting any termination payments due and payable under any Related Swap Contract with any Lender or any Affiliate of a Lender party to a Related Swap Contract and as to which the Administrative Agent has received notice of the amounts owed thereunder from the applicable Lender or any Affiliate of a Lender party to a Related Swap Contract, ratably among such Lenders or such Affiliates in proportion to the respective amounts described in this clause Third held by them;

Fourth, to the payment of that portion of the Obligations constituting unpaid principal of the Revolving Loans, ratably among the Revolving Lenders in proportion to the respective amounts described in this clause Fourth held by them; and

Last, to the payment of any other amounts constituting Obligations, ratably among the Administrative Agent, the Lenders and their Affiliates in proportion to the respective amounts described in this clause held by them.

(vi)    *Term Loan A-2 Outstandings.*  If for any reason the Total Term Loan A-2 Outstandings at any time exceed the initial aggregate amount of the Term Loan A-1 Commitments, the Borrowers shall immediately prepay Term Loan A-2s (together with all accrued but unpaid interest thereon) in an aggregate amount equal to such excess, which shall be applied by the Administrative Agent, subject to Section 2.12, in the inverse order of maturity as to the remaining scheduled payments of the Term Loan A-2s (including the payment due on the Maturity Date for the Term Loan A-2 Facility) ratably among the Term Loan A-2 Lenders in proportion to the respective amounts.

(vii)    *Revolving Outstandings.*  If for any reason the Total Revolving Outstandings at any time exceed the Revolving Facility at such time, the

Borrowers shall immediately prepay Revolving Loans (together with all accrued but unpaid interest thereon) in an aggregate amount equal to such excess.

(viii)   *Revolving Facility Clean-Down*.   The Borrowers shall, without permanent reduction of the Revolving Facility, repay the Total Revolving Outstandings in full on an Interest Payment Date selected by Borrower Agent in each consecutive twelve-month period following the Closing Date and cause the Total Revolving Outstandings to remain $0.00 for a period of 30 consecutive days thereafter.

Within the parameters of the applications set forth above, prepayments pursuant to this Section 2.03(b) shall be applied first to Base Rate Loans and then to Eurodollar Rate Loans.  All prepayments under this Section 2.03(b) shall be subject to Section 3.05, but otherwise without premium or penalty, and shall be accompanied by interest on the principal amount prepaid through the date of prepayment.

**Section 2.04.**   *Termination or Reduction of Commitments*.

(a)   *Optional*.   The Borrower Agent may, upon notice to the Administrative Agent, terminate the Revolving Facility or from time to time permanently reduce the Revolving Facility; provided that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. five (5) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $500,000 or any whole multiple of $100,000 in excess thereof and (iii) the Borrower Agent shall not terminate or reduce the Revolving Facility if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolving Outstandings would exceed the Revolving Facility.  In addition, during the Availability Period in respect of the Term Loan A-2 Facility, the Borrower Agent may, upon notice to the Administrative Agent as set forth above, from time to time terminate (in whole or in part) the unused portion of the aggregate Term Loan A-2 Commitments.

(b)   *Mandatory*.   (A) The aggregate Term Loan A-1 Commitments shall be automatically and permanently reduced to zero on the date of the Term Loan A-1 Borrowing, and (B) the aggregate Term Loan A-2 Commitments shall be automatically and permanently reduced (x) by the amount of each Term Loan A-2 Borrowing on the date of such Term Loan A-2 Borrowing, and (y) to zero on the last day of the Availability Period for the Term Loan A-2 Facility.

(c)   *Application of Commitment Reductions; Payment of Fees.*

(i)   The Administrative Agent will promptly notify the Lenders of any termination or reduction of the Revolving Commitment under this Section 2.04.  Upon any reduction of the Revolving Commitments, the Revolving Commitment of each Revolving Lender shall be reduced by such Lender's Applicable Revolving Percentage of such reduction amount.  All fees in respect of the Revolving Facility accrued until the effective date of any

termination of the Revolving Facility shall be paid on the effective date of such termination.

(ii)     The Administrative Agent will promptly notify the Lenders of any termination or reduction of the aggregate Term Loan A-2 Commitments under this Section 2.04.  Upon any reduction of the aggregate Term Loan A-2 Commitments, the Term Loan A-2 Commitment of each Term Loan A-2 Lender shall be reduced by such Term Loan A-2 Lender's ratable portion of such reduction amount.  All fees in respect of the Term Loan A-2 Facility accrued until the effective date of any termination of the Term Loan A-2 Facility shall be paid on the effective date of such termination.

**Section 2.05.  Repayment of Principal of Loans**.

(a)     *Term Loan A-1 Facility*.  Commencing on April 1, 2018, the Borrowers shall repay to the Term Loan A-1 Lenders the aggregate principal amount of all outstanding Term Loan A-1s on the dates and in the amounts set forth on the attached Schedule 2.05(a), which schedule has been determined by Administrative Agent based upon a 120 month modified "mortgage style" amortization utilizing a hypothetical flat interest rate equal to 5.0% per annum.  The remaining Outstanding Amount of all Term Loan A-1s shall be due and payable on the Maturity Date for the Term Loan Facilities. The Borrowers acknowledge and agree that a balloon payment of Term Loan A-1s will be due on the Maturity Date for the Term Loan Facilities (unless earlier prepaid).

(b)     *Term Loan A-2 Facility*.

(i)     Within 15 Business Days following the first anniversary of the Closing Date, Administrative Agent shall calculate and deliver to the Term Loan A-2 Lenders and the Borrowers an amortization schedule with respect to the First Anniversary Term Loan A-2s based upon (x) with respect to any portion of the First Anniversary Term Loan A-2s used to acquire Real Property, a 240 month modified "mortgage style" amortization utilizing a hypothetical flat interest rate equal to 5.0% per annum, and (y) with respect to any portion of the First Anniversary Term Loan A-2s not used to acquire Real Property, a 120 month modified "mortgage style" amortization utilizing a hypothetical flat interest rate equal to 5.0% per annum.  Commencing on April 1, 2019, the Borrowers shall repay to the Term Loan A-2 Lenders the aggregate principal amount of all outstanding First Anniversary Term Loan A-2s on the dates and in the amounts set forth on such amortization schedule.  The remaining Outstanding Amount of all First Anniversary Term Loan A-2s shall be due and payable on the Maturity Date for the Term Loan Facilities.  The Borrowers acknowledge and agree that a balloon payment of First Anniversary Term Loan A-2s will be due on the Maturity Date for the Term Loan Facilities (unless earlier prepaid).

(ii)     Within 15 Business Days following the second anniversary of the Closing Date, Administrative Agent shall calculate and deliver to the Term Loan A-2 Lenders and the Borrowers an amortization schedule with respect to the

Second Anniversary Term Loan A-2s based upon (x) with respect to any portion of the Second Anniversary Term Loan A-2s used to acquire Real Property, a 240 month modified "mortgage style" amortization utilizing a hypothetical flat interest rate equal to 5.0% per annum, and (y) with respect to any portion of the Second Anniversary Term Loan A-2s not used to acquire Real Property, a 120 month modified "mortgage style" amortization utilizing a hypothetical flat interest rate equal to 5.0% per annum. Commencing on April 1, 2020, the Borrowers shall repay to the Term Loan A-2 Lenders the aggregate principal amount of all outstanding Second Anniversary Term Loan A-2s on the dates and in the amounts set forth on such amortization schedule. The remaining Outstanding Amount of all Second Anniversary Term Loan A-2s shall be due and payable on the Maturity Date for the Term Loan Facilities. The Borrowers acknowledge and agrees that a balloon payment of Second Anniversary Term Loan A-2s will be due on the Maturity Date for the Term Loan Facilities (unless earlier prepaid).

(c)    *Revolving Loans*.    The remaining unpaid principal amount of the Revolving Loans and any interest, fees or other amounts relating to the Revolving Loans shall be due and payable in full, if not earlier in accordance with this Agreement, on the Maturity Date for the Revolving Facility.

(d)    *Final Maturity Date*.    Notwithstanding any provision to the contrary in any Loan Document, all interest, principal and other Obligations now or hereafter owing under the Loan Documents shall be due and payable in full, if not earlier in accordance with this Agreement, on the Maturity Date for the Term Loan Facilities.

**Section 2.06.   Interest and Default Rate**.

(a)    *Interest*.    Subject to the provisions of <u>Section 2.06(b)</u>, (i) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period from the applicable borrowing date at a rate per annum equal to the Eurodollar Rate for such Interest Period <u>plus</u> the Applicable Margin, and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate <u>plus</u> the Applicable Margin.

(b)    *Default Rate*.

(i)    If any amount of principal of any Loan is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    If any amount (other than principal of any Loan) payable by the Borrowers under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then upon the request of the Required Lenders such amount shall

thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iii)   Upon the request of the Required Lenders, while any Event of Default exists (including a payment default), all outstanding Obligations may accrue at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iv)   Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)   *Interest Payments*.  Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(d)   *Interest on Term Loans*.  Without limiting the generality of the foregoing, at the time of payment of each installment of principal under the Term Loans, the Borrowers shall pay interest accrued on such Term Loan, as applicable, at the actual rate of such interest and without regard to any "hypothetical rate of interest" that may have been used in calculating any principal amortization schedule.

**Section 2.07.  Fees.**

(a)   The Borrowers shall pay to Administrative Agent, for Administrative Agent's own account, fees in the amounts and at the times set forth in a letter agreement among the Borrowers and Administrative Agent dated of even date herewith (as amended from time to time, the "Fee Letter").

(b)   The Borrowers shall pay to Administrative Agent for the account of each Term Loan A-2 Lender in accordance with its Applicable Percentage a fee (the "Unused Term Loan A-2 Commitment Fee") equal to (i) commencing on the Closing Date through and including February 26, 2019, 0.15% times the actual daily amount of the aggregate Term Loan A-2 Commitments, and (ii) commencing on February 27, 2019 and continuing through the expiration of the Availability Period in respect of the Term Loan A-2 Facility, 0.25% times the actual daily amount of the aggregate Term Loan A-2 Commitments, in each case, subject to adjustment as provided in Section 2.12.  The Unused Term Loan A-2 Commitment Fee provided in this Section 2.07(b) shall accrue at all times from and after the date of this Agreement and shall be payable monthly in arrears on the first day of each calendar month following the date of this Agreement and on the last day of the Availability Period in respect of the Term Loan A-2 Facility.

(c)   The Borrowers shall pay to Administrative Agent for the account of each Revolving Lender in accordance with its Applicable Percentage, a fee (the "Unused Revolving Loan Commitment Fee") equal to, commencing on the Closing Date through the expiration of the Availability Period in respect of the Revolving Facility, 0.25% times the actual daily amount by which the Revolving Facility exceeds the Outstanding

Amount of Revolving Loans, subject to adjustment as provided in <u>Section 2.12</u>. The Unused Revolving Loan Commitment Fee provided in this <u>Section 2.07(c)</u> shall accrue at all times from and after the date of this Agreement and shall be payable monthly in arrears on the first day of each calendar month following the date of this Agreement and on the last day of the Availability Period in respect of the Revolving Facility.

**Section 2.08.    Computation of Interest and Fees**.  All computations of interest for Base Rate Loans shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, <u>provided</u> that any Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.10(a)</u>, bear interest for one day.  Each determination by Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**Section 2.09.    Evidence of Debt**.  The funding of each Borrowing made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by Administrative Agent in the ordinary course of business.  The accounts or records maintained by Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Borrowings made by Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of Administrative Agent in respect of such matters, the accounts and records of Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through Administrative Agent, the Borrowers shall execute and deliver to such Lender (through Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

**Section 2.10.    Payments Generally; Administrative Agent's Clawback**.

(a)    ***General***.  All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to Administrative Agent, for the account of the respective Lenders to which such payment is owed, at Administrative Agent's Office in Dollars and in immediately available funds not later than 12:00 noon on the respective dates specified herein.  The Administrative Agent will promptly distribute to each Lender its Applicable Percentage in respect of the relevant Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by Administrative Agent after 12:00 noon shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  Except as otherwise specifically provided for in this

Agreement, if any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be. Each Borrower hereby authorizes Administrative Agent and each Revolving Lender to make a Revolving Loan to pay interest, principal, and any fee or other amount payable by a Borrower hereunder or under the other Loan Documents.

(b)      (i)      *Funding by Lenders; Presumption by Administrative Agent*. Unless Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to Administrative Agent such Lender's share of such Borrowing, Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02, and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Base Rate Loans.  If the Borrowers and such Lender shall pay such interest to Administrative Agent for the same or an overlapping period, Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Lender pays its share of the applicable Borrowing to Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to Administrative Agent.

(ii)      *Payments by Borrowers; Presumptions by Administrative Agent*.  Unless Administrative Agent shall have received notice from Borrower Agent prior to the date on which any payment is due to Administrative Agent for the account of Lenders hereunder that the Borrowers will not make such payment, Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to Lenders, as the case may be, the amount due.  In such event, if the Borrowers have not in fact made such payment, then each Borrower, as the case may be, severally agrees to repay to Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of Administrative Agent to any Lender or the Borrowers with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)      ***Failure to Satisfy Conditions Precedent***.  If any Lender makes available to Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this <u>Article II</u>, and such funds are not made available to the Borrowers by Administrative Agent because the conditions to the applicable Borrowing set forth in <u>Article IV</u> are not satisfied or waived in accordance with the terms hereof, Administrative Agent shall, subject to the terms of the Escrow Agreement, return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)      ***Obligations of Lenders Several***.  The obligations of Lenders to make Loans and to make payments pursuant to <u>Section 11.04(c)</u> are several and not joint.  The failure of any Lender to make any Loan or to make any payment under <u>Section 11.04(c)</u> on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its payment under <u>Section 11.04(c)</u>.

(e)      ***Funding Source***.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**Section 2.11.  Sharing of Payments by Lenders.**  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations in respect of any of the Facilities due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) Obligations in respect of any of the Facilities owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time, then, in each case under <u>clauses (a)</u> and <u>(b)</u> above, the Lender receiving such greater proportion shall (A) notify Administrative Agent of such fact, and (B) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations in respect of the Facilities then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, <u>provided</u> that:

(i)      if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded

and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this Section shall not be construed to apply to (x) any payment made by or on behalf of the Borrowers pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than an assignment to any Loan Party or any Affiliate thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**Section 2.12.  Defaulting Lenders**.

(a)    ***Adjustments***.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    *Waivers and Amendments*.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders", "Required Revolving Lenders" and "Required Term Loan A-2 Lenders" and Section 11.01.

(ii)    *Defaulting Lender Waterfall*.  Any payment of principal, interest, fees or other amounts received by Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by Administrative Agent from a Defaulting Lender pursuant to Section 11.08 shall be applied at such time or times as may be determined by Administrative Agent as follows:  first, to the payment of any amounts owing by such Defaulting Lender to Administrative Agent hereunder; second, as the Borrowers may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by Administrative Agent; third, if so determined by Administrative Agent and the Borrowers, to be held in a non-interest bearing deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this

Agreement; <u>fifth</u>, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and <u>sixth</u>, to such Defaulting Lender or as otherwise as may be required under the Loan Documents in connection with any Lien conferred thereunder or directed by a court of competent jurisdiction; <u>provided</u> that if (1) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (2) such Loans were made at a time when the conditions set forth in <u>Section 4.02</u> were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments hereunder. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this <u>Section 2.12(a)(ii)</u> shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)       ***Defaulting Lender Cure***.  If the Borrowers and Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by Lenders in accordance with their Applicable Percentages, whereupon such Lender will cease to be a Defaulting Lender; <u>provided</u> that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and <u>provided</u>, <u>further</u>, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)       ***Certain Fees.***  No Defaulting Lender shall be entitled to receive any fee payable under <u>Section 2.07(b)</u> for any period during which that Lender is a Defaulting Lender (and the Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

## ARTICLE III

## TAXES, YIELD PROTECTION AND ILLEGALITY

**Section 3.01.  Taxes**.

(a)       ***Defined Terms***.  For purposes of this <u>Section 3.01</u>, the term "applicable law" includes FATCA.

(b)    *Payments Free of Taxes*.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)    *Payment of Other Taxes by the Loan Parties*.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)    *Indemnification by the Loan Parties*.  The Loan Parties shall jointly and severally  indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender (with a copy to Administrative Agent), or by Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    *Indemnification by Lenders*.  Each Lender shall severally indemnify Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.06(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by Administrative Agent to Lender from any other source against any amount due to Administrative Agent under this paragraph (e).

(f)    ***Evidence of Payments***.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section, such Loan Party shall deliver to Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Administrative Agent.

(g)    ***Status of Lenders***.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and Administrative Agent, at the time or times reasonably requested by the Borrowers or Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrowers or Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or Administrative Agent as will enable the Borrowers or Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(g)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in such Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that any Borrower is a U.S. Borrower,

(A)    any Lender that is a U.S. Person shall deliver to the Borrowers and Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN,

as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed copies of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrowers within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable); or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E (or W-8BEN, as applicable), a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers or Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or Administrative Agent as may be necessary for the Borrowers and Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and Administrative Agent in writing of its legal inability to do so.

(h)    *Treatment of Certain Refunds*.  Unless required by applicable laws, at no time shall Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of such Lender.  If the Administrative Agent or any Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by any Loan Party or with respect to which any Loan Party has paid additional amounts pursuant to this Section 3.01), it shall pay to such Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that each Loan Party, upon the request of Administrative Agent or such Lender, agrees to repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Administrative Agent or such Lender in the event Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection (h), in no event will Administrative Agent or any Lender be required to pay any amount to such Loan Party pursuant to this subsection (h) the payment of which would place Administrative Agent or such Lender in a less favorable net after-Tax position than such party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been

paid.  This subsection shall not be construed to require Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(i)      ***Survival***.  Each party's obligations under this <u>Section 3.01</u> shall survive the resignation or replacement of Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

**Section 3.02.  Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to perform any of its obligations hereunder or make, maintain or fund or charge interest with respect to any Loans, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrowers through Administrative Agent, (i) any obligation of such Lender to make, maintain, fund or charge interest with respect to any such Loan or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended, and (ii) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Eurodollar Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by Administrative Agent without reference to the Eurodollar Rate component of the Base Rate, in each case until such Lender notifies Administrative Agent and the Borrowers that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (x) the Borrowers shall, upon demand from such Lender (with a copy to Administrative Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by Administrative Agent without reference to the Eurodollar Rate component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurodollar Rate Loans, and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurodollar Rate, Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Eurodollar Rate component thereof until Administrative Agent is advised in writing by such Lender that it is no longer illegal  for such Lender to determine or charge interest rates based upon the Eurodollar Rate.  Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

**Section 3.03.  Inability to Determine Rates**.

(a)      If in connection with any request for or making of a Eurodollar Rate Loan or a conversion to or continuation thereof, (i)  Administrative Agent determines that (A) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Loan, or (B) adequate and reasonable means do not exist for determining the Eurodollar Rate for

any Interest Period with respect to a proposed Eurodollar Rate Loan or in connection with an existing or proposed Base Rate Loan (in each case with respect to <u>clause (i)</u>, "<u>Impacted Loans</u>"), or (ii) the Administrative Agent or the Required Lenders determine that for any reason the Eurodollar Rate for any Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrowers and each Lender.   Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended (to the extent of the affected Eurodollar Rate Loans or Interest Periods), and (y) in the event of a determination described in the preceding sentence with respect to the Eurodollar Rate component of the Base Rate, the utilization of the Eurodollar Rate component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.   Upon receipt of such notice, the Borrowers may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans (to the extent of the affected Eurodollar Rate Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

(b)    Notwithstanding the foregoing, if Administrative Agent has made the determination described in <u>clause (a)(i)</u> of this Section, Administrative Agent in consultation with the Borrowers and the Required Lenders, may establish an alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans until (1) the Administrative Agent revokes the notice delivered with respect to the Impacted Loans under <u>clause (a)(i)</u> of this Section, (2) Administrative Agent or the Required Lenders notify Administrative Agent and the Borrowers that such alternative interest rate does not adequately and fairly reflect the cost to such Lenders of funding the Impacted Loans, or (3) any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing and provides Administrative Agent and the Borrowers written notice thereof.

**Section 3.04.  Increased Costs; Reserves on Eurodollar Rate Loans**.

(a)    ***Increased Costs Generally***.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the Eurodollar Rate);

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in <u>clauses (b)</u> through <u>(d)</u> of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal,

letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or other Recipient, the Borrowers will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)    *Capital Requirements*.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    *Certificates for Reimbursement*.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrowers, shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    *Delay in Requests*.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)      *Reserves on Eurodollar Rate Loans*.  The Borrowers shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each Eurodollar Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of the Loans, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which in each case shall be due and payable on each date on which interest is payable on such Loan, provided the Borrowers shall have received at least 10 days' prior notice (with a copy to Administrative Agent) of such additional interest or costs from such Lender.  If a Lender fails to give notice 10 days prior to the relevant Interest Payment Date, such additional interest shall be due and payable 10 days from receipt of such notice.

**Section 3.05.  Compensation for Losses**.  Upon demand of any Lender (with a copy to Administrative Agent) from time to time, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)      any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)      any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrowers; or

(c)      any assignment of a Eurodollar Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrowers pursuant to Section 11.17;

excluding any loss of anticipated profits and including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrowers shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrowers to Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurodollar Rate Loan made by it at the Eurodollar Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.

**Section 3.06.  Mitigation Obligations.**   If any Lender requests compensation under Section 3.04, or requires the Borrowers to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, then such Lender shall (at the request of the Borrowers) use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or Section 3.04, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**Section 3.07.  Survival.**   All of Borrowers' obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder and resignation of Administrative Agent.

## ARTICLE IV

## CONDITIONS PRECEDENT

**Section 4.01.  Conditions of Initial Borrowings.**   The obligation of each Lender to fund its portion of the initial Borrowings hereunder on the Closing Date is subject to satisfaction of the following conditions precedent:

(a)    Administrative Agent's receipt of the following, each of which shall be originals or telecopies (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date), and each in form and substance satisfactory to Administrative Agent:

(i)    a Loan Notice as required pursuant to Section 2.02(a);

(ii)    executed counterparts of this Agreement, each Security Instrument, the Escrow Agreement and all other Loan Documents required by Administrative Agent or Lenders, sufficient in number for distribution to Administrative Agent, each Lender and the Borrower Agent;

(iii)    Notes executed by the Borrowers in favor of each Lender requesting Notes;

(iv)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of the Loan Parties as Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party;

(v)      certified Organization Documents of the Loan Parties, and such
other documents and certifications as Administrative Agent may require to
evidence that the Loan Parties are duly organized or formed, and that the Loan
Parties are validly existing, in good standing and qualified to engage in business
in each jurisdiction where its ownership, lease or operation of properties or the
conduct of its business requires such qualification, except to the extent that failure
to do so could not reasonably be expected to have a Material Adverse Effect;

(vi)      favorable opinions of counsel to the Loan Parties, including any
local counsel opinions required by Administrative Agent, addressed to
Administrative Agent and each Lender;

(vii)      a certificate of a Responsible Officer of each Loan Party either
(A) attaching copies of all consents, licenses and approvals required in connection
with the execution, delivery and performance by such Loan Party and the validity
against such Loan Party of the Loan Documents to which such Loan Party is a
party, and such consents, licenses and approvals shall be in full force and effect,
or (B) stating that no such consents, licenses or approvals are so required;

(viii)      a certificate signed by a Responsible Officer of each Borrower
certifying that (A) the conditions specified in Section 4.02(a) and (b) have been,
and (B) there has been no event or circumstance since the date of the Annual
Financial Statements that has had or could be reasonably expected to have, either
individually or in the aggregate, a Material Adverse Effect;

(ix)      a certificate signed by a Responsible Officer of each Loan Party
certifying that each Loan Party is and will be Solvent, after giving effect to this
Agreement, any Indebtedness incurred in connection herewith and the application
of the proceeds of Loans to be borrowed on the Closing Date;

(x)      (i) a fully signed, complete copy of each Franchise Agreement for
each Initial Restaurant, which Franchise Agreements shall be in form and
substance reasonably satisfactory to Administrative Agent, (ii) a fully signed,
complete copy of each Lease for each Initial Restaurant, which Leases shall be in
form and substance reasonably satisfactory to Administrative Agent, together
with, to the extent requested by Administrative Agent and to the extent required
by the applicable Lease, a consent of each landlord to any change in ownership in
respect of any Initial Restaurant;

(xi)      a copy of each Material Contract of each Loan Party, together with
any applicable assignments thereof to the applicable Loan Party;

(xii)      duly executed copies of payoff letters confirming that the Prior
Indebtedness will be repaid in full from the proceeds of Term Loan A-1, and duly
executed Lien releases with respect to all Liens securing the Prior Indebtedness
and any other Liens which are not Permitted Liens upon the Initial Restaurants or

other Collateral and, in each case, the Restaurants related thereto to be pledged as Collateral hereunder;

(xiii)   Uniform Commercial Code search results showing only Permitted Liens and those Liens as are acceptable to Administrative Agent;

(xiv)   Uniform Commercial Code financing statements (including amendments and continuations thereof) suitable in form and substance for filing in all places required by applicable Law to perfect the Liens of Administrative Agent under the Security Instruments as a first priority Lien (subject only to Permitted Liens) as to items of Collateral in which a security interest may be perfected by the filing of financing statements, and such other documents and/or evidence of other actions as may be necessary under applicable Law to perfect the Liens of Administrative Agent under the Security Instruments as a first priority Lien in and to such other Collateral as Administrative Agent may require;

(xv)   all filings, recordations and searches necessary or required by Administrative Agent in connection with the liens and security interests in the Collateral shall have been duly made;

(xvi)   evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect; and endorsements naming Administrative Agent (on behalf of Lenders and the other Secured Parties) as an additional insured and loss payee, as the case may be, on all such insurance policies maintained with respect to properties of the Loan Parties constituting part of the Collateral;

(xvii)   a duly executed Franchisor Certificate;

(xviii)   a Compliance Certificate; and

(xix)   such other assurances, certificates, documents, consents or opinions as Administrative Agent or the Required Lenders may require, including, without limitation, status certificates and/or estoppels from Franchisor.

(b)   Since the date of the Annual Financial Statements, there shall not have occurred any event that has resulted in or caused, or could reasonably be expected to result in or cause, a Material Adverse Effect.

(c)   There shall not exist any action, suit, investigation, litigation or proceeding, pending or threatened, in any court or before any arbitrator or Governmental Authority that has or could reasonably be expected to have a Material Adverse Effect or have a material adverse effect on the Loans, the Term Loan A-1 Acquisition or the Term Loan A-1 Acquisition Restaurants or that seeks to enjoin or prevent the transactions contemplated hereby and by the Loan Documents.

(d)   The Borrowers shall have delivered to Administrative Agent, with respect the Term Loan A-1 Acquisition Restaurants (i) a fully signed, complete copy of each

Franchise Agreement for each Term Loan A-1 Acquisition Restaurant, which Franchise Agreements shall be in form and substance reasonably satisfactory to Administrative Agent, (ii) a fully signed, complete copy of each Lease for such Term Loan A-1 Acquisition Restaurants, which Leases shall be in form and substance reasonably satisfactory to Administrative Agent, together with, to the extent requested by Administrative Agent and to the extent required by the applicable Lease, a consent of each landlord to any change in ownership in respect of any Term Loan A-1 Acquisition Restaurant, (iii) a summary of the finances and business operations of such Term Loan A-1 Acquisition Restaurants, including the Seller Financial Statements and/or sales history for such Term Loan A-1 Acquisition Restaurants, all in form and substance reasonably satisfactory to Administrative Agent, (iv) a copy of the executed Term Loan A-1 Acquisition Documents, in form and substance acceptable to Administrative Agent, duly executed by the parties thereto, and (v) duly executed Lien releases with respect to all Liens encumbering the Sellers' interest in the applicable Term Loan A-1 Acquisition Restaurants (and all related assets) and any other Liens which are not Permitted Liens upon the Term Loan A-1 Acquisition Restaurants or other Collateral.

(e)     The Administrative Agent and Lenders shall have received and reviewed (to their satisfaction) the Annual Financial Statements, the Interim Financial Statements, and the Seller Financial Statements.

(f)     Administrative Agent and each Lender shall have completed their credit underwriting and due diligence, with respect to Borrowers, the other Loan Parties, their Subsidiaries, the Collateral, the Term Loan A-1 Acquisition and the other transactions contemplated by this Agreement and the other Loan Documents as Administrative Agent and such Lender deems appropriate, and the results of such credit underwriting and due diligence are satisfactory to Administrative Agent and each Lender, in their sole discretion.

(g)     The Borrowers shall have paid all fees, charges and disbursements of counsel to Administrative Agent (directly to such counsel if requested by Administrative Agent) to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrowers and Administrative Agent).

(h)     The Borrowers shall have provided Administrative Agent with invoices, receipts and such other documentation as Administrative Agent may request to assure the amount of the requested Borrowing is to be used to reimburse the Borrowers for costs previously paid by the Borrowers or to pay costs incurred by the Borrowers for uses permitted under Section 6.11.

(i)     Administrative Agent shall have received evidence in form satisfactory to it that Meridian and NKS have received the Required Equity.

Without limiting the generality of the provisions of the last subsection of <u>Section 9.03</u>, for purposes of determining compliance with the conditions specified in this <u>Section 4.01</u>, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**Section 4.02.   Conditions to all Borrowings**.   The obligation of each Lender to honor any Loan Notice relating to each Borrowing is subject to the satisfaction of the following conditions precedent:

(a)   The representations and warranties of the Borrowers and each other Loan Party contained in <u>Article V</u> or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (except that any representation or warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the date of the applicable Borrowing, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (except that any representation or warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) as of such earlier date, and except that for purposes of this <u>Section 4.02(a)</u>, the representations and warranties contained in subsection <u>(a)</u> and <u>(b)</u> of <u>Section 5.05</u> shall be deemed to refer to the most recent statements furnished pursuant to clauses <u>(a)</u> and <u>(b)</u>, respectively, of <u>Section 6.01</u>;

(b)   No Default or Event of Default shall exist, or would result from such proposed Borrowing or from the application of the proceeds thereof;

(c)   No Material Adverse Effect shall have occurred, or shall be likely to occur;

(d)   Administrative Agent shall have received a Loan Notice in accordance with the requirements hereof;

(e)   With respect to any Revolving Borrowing and/or Term Loan A-2 Borrowing, the Consolidated Lease Adjusted Leverage Ratio, measured as of the end of the most recently ended Fiscal Quarter after giving pro forma effect to the proposed Revolving Borrowing and/or Term Loan A-2 Borrowing, is at least 0.25 to 1.00 less than the applicable level set forth in <u>Section 7.11(d)</u> at the time of the proposed Revolving Borrowing and/or Term Loan A-2 Borrowing, as applicable; and

(f)   With respect to any Term Loan A-2 Borrowing, the Term Loan A-2 Borrowing Conditions shall have been satisfied.

**Section 4.03.   Representations**.   Each Loan Notice relating to a Borrowing of a Loan submitted by Borrower Agent shall be deemed to be a representation and warranty that the

conditions specified in Section 4.01 and Section 4.02, as applicable, have been satisfied on and as of the date of the applicable Borrowing.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to Administrative Agent and Lenders that, as of the date made or deemed made, that:

**Section 5.01.  Existence, Qualification and Power**.  Each Loan Party (a) that is other than a natural person is duly organized or formed, validly existing and, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**Section 5.02.  Authorization;  No  Contravention**.    The  execution,  delivery  and performance by each Loan Party of each Loan Document to which such Person is party, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene in any material respect the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries  (excluding  the  Specified  Subsidiaries),  except  for  any  conflict,  breach  or contravention which could not reasonably be expected to have a Material Adverse Effect, or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate in any material respect any Law.  Each Loan Party which is a party to any Contractual Obligation referred to in clause (b)(i) is in compliance with all such Contractual Obligations, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**Section 5.03.  Governmental Authorization; Other Consents**.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document and as required for the Term Loan A-1 Acquisition pursuant to the Term Loan A-1 Acquisition Documents, except those approvals, consents, exemptions, authorizations or other actions, notices or filings previously obtained or made, or which the failure to so receive or perform could not reasonably be expected to have a Material Adverse Effect.

**Section 5.04.  Binding  Effect**.    This  Agreement  has  been,  and  each  other  Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan

Party that is party thereto.  This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

**Section 5.05.  Financial Statements; No Material Adverse Effect**.

(a)    The Annual Financial Statements and, to the best of Borrowers' knowledge, Seller Financial Statements (i) were each prepared in accordance with GAAP or income tax basis accounting, consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of Sellers or the Pre-Closing Entities, as applicable, as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP or income tax basis accounting, consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material indebtedness and other liabilities, direct or contingent, of Sellers or Pre-Closing Entities, as applicable, as of the date thereof, including liabilities for taxes and material commitments.

(b)    The Interim Financial Statements (i) were prepared in accordance with GAAP or income tax basis accounting, consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Pre-Closing Entities as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year end audit adjustments.

(c)    Since the date of the Annual Financial Statements, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

**Section 5.06.  Litigation**.  Except as set forth on Schedule 5.06, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Loan Party after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any of the Loan Parties or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, any of the transactions contemplated hereby, or (b) either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**Section 5.07.  No Default**.  None of the Loan Parties is in default under or with respect to any Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**Section 5.08.  Ownership of Property; Liens**.  Each Loan Party has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or

used in the ordinary conduct of its business, in each case that is owned or leased by it, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  The real and personal property of the Loan Parties is subject to no Liens, other than Liens permitted by <u>Section 7.01</u>.

**Section 5.09.  Environmental Compliance**.    The Loan Parties have reasonably concluded that existing Environmental Laws and claims alleging potential liability or responsibility for violation of any Environmental Law on its businesses, operations and properties, if any, could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 5.10.  Insurance**.  The properties of the Borrowers and each other Loan Party are insured with financially sound and reputable insurance companies not Affiliates of any Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties operate.

**Section 5.11.  Taxes**.  The Loan Parties have filed all Federal, state and other material tax returns and reports required to be filed, and have paid all Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.  There is no proposed tax assessment against the Loan Parties that would reasonably be expected to have a Material Adverse Effect.  None of the Loan Parties is party to any tax sharing agreement.

**Section 5.12.  ERISA Compliance**.

(a)      Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state laws.  Each Pension Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service.  To the best knowledge of the Loan Parties, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(b)      There are no pending or, to the best knowledge of the Loan Parties, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)      (i) No ERISA Event has occurred, and neither the Loan Parties nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be

expected to constitute or result in an ERISA Event with respect to any Pension Plan; (ii) the Loan Parties and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained; (iii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 60% or higher and neither the Loan Parties nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of the most recent valuation date; (iv) neither the Loan Parties nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid; (v) neither the Loan Parties nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; and (vi) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

**Section 5.13.  Subsidiaries; Equity Interests**.  The Loan Parties do not have any equity investments in any other corporation or entity other than those specifically disclosed in Part (a) of Schedule 5.13 (as such Schedule may be updated by the Borrowers from time to time to reflect new Subsidiaries formed or acquired after the date of this Agreement to the extent permitted under this Agreement).  All of the outstanding Equity Interests in each Loan Party have been validly issued, are fully paid and nonassessable and are owned in the amount specified on Part (b) of Schedule 5.13 (as such Schedule may be updated by the Borrowers from time to time to reflect new Subsidiaries formed or acquired after the date of this Agreement to the extent permitted under this Agreement) free and clear of all Liens.  No Person other than those Persons shown on Schedule 5.13 has any ownership interest in, or right of control, directly or indirectly, in any Loan Party.

**Section 5.14.  Margin Regulations; Investment Company Act**.

(a)    The Loan Parties are not engaged and will not engage, principally or as one of their important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB) or extending credit for the purpose of purchasing or carrying margin stock in violation of Regulation U issued by the FRB.

(b)    None of Loan Parties, any Person Controlling any Loan Party, or any Subsidiary, is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**Section 5.15.  Disclosure**.  The Loan Parties have disclosed to Administrative Agent and Lenders all agreements, instruments and corporate or other restrictions to which they are subject, and all other matters known to them, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to

Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time such projections were prepared.

**Section 5.16.  Compliance with Laws**.  The Loan Parties are in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to their properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**Section 5.17.  Intellectual Property; Licenses, Etc**.  The Loan Parties own, or possess the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights that are reasonably necessary for the operation of the Collateral and the Business, without conflict with the rights of any other Person.  To the best knowledge of the Loan Parties, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party infringes upon any rights held by any other Person in any material respect.  All certifications, permits, licenses and approvals, including certificates of completion and occupancy permits required for the legal use or legal, nonconforming use, as applicable, occupancy and operation of the Collateral and the Business (collectively, the "Licenses") have been obtained or are diligently being pursued by appropriate action and in accordance with applicable Law.  To the Loan Parties' knowledge, all Licenses obtained by the Loan Parties have been validly issued and are in full force and effect

**Section 5.18.  Location of Furniture, Fixtures and Equipment**.  Substantially all of the furniture, fixtures and equipment used in connection with the Business are located at the Restaurants.

**Section 5.19.  Corporate Information; Locations of the Loan Parties**.  As of the Closing Date, each Borrower's and each other Loan Party's correct legal name, type of organization, jurisdiction of organization, state organization number and federal employers identification number are set forth on Schedule 5.19.  Each Borrower's and each other Loan Party's chief executive office is located at the address set forth in Schedule 5.19.  The Borrowers shall, not less than thirty (30) days prior to any change in any of (a) any Borrower's or any other Loan Party's name, type of organization, state of organization or organization number, (b) the location of any Borrower's or any other Loan Party's chief executive office, or (c) the location of any material Collateral, notify Administrative Agent of such change and shall take or cause to be taken at Borrowers' sole expense all such actions, including the delivery of such documents, as may be reasonably requested by Administrative Agent to perfect or protect, or maintain the perfection and priority of, the Lien of Administrative Agent in the Collateral affected by such change.

**Section 5.20.  Franchise Agreements and Leases**.  Set forth on Schedule 5.20 to this Agreement (as such Schedule may be updated by the Borrowers from time to time to reflect Franchise Agreements and Leases entered into by the Borrowers after the date of this Agreement to the extent permitted under this Agreement), is a complete and accurate list of each Franchise Agreement and Lease entered into by any Loan Party with respect to each Restaurant, showing, among other things, the address of such Restaurant, the dates of any such Franchise Agreement and Lease, the names of the parties thereto, the expiration or termination dates thereof, any options to extend the term thereof, and any amendments, assignments, extensions, renewals, or any other modifications thereto.  The Loan Parties have delivered to Administrative Agent true and correct copies of each such Franchise Agreement and Lease, including all amendments, addenda, assignments and other material documents entered into in connection therewith, other than Excluded Lease Documents.  There is a Franchise Agreement and a Lease for each Restaurant, a Borrower is a party to each such Franchise Agreement and Lease, and each such Franchise Agreement and Lease is in full force and effect without amendment or modification from the form or copy delivered to Lenders except for amendments or modifications permitted hereunder.  No default or breach by a Borrower exists under any Franchise Agreement or Lease that could result in termination of such Franchise Agreement or Lease, nor has any event occurred which, with the passage of time or the giving of notice, or both, would constitute such a default or breach.

**Section 5.21.  Security Interest**.  The liens and security interests granted to Administrative Agent (for the benefit of the Secured Parties) are valid first priority liens and security interests in the Collateral (subject only to Permitted Liens), and each has been perfected in accordance with the requirements of all states in which any item of the Collateral is located to the extent that the filing of UCC financing statements or the recording of the Mortgages is sufficient to perfect such lien or security interest.

**Section 5.22.  Solvency**.  Both before and after giving effect to (a) the Loans hereunder, the disbursement of the proceeds of such Loans to Borrowers or as directed by Borrower Agent; (b) the consummation of the Term Loan A-1 Acquisition on the Closing Date pursuant to the Term Loan A-1 Acquisition Documents; and (c) the payment and accrual of all transaction costs in connection with the foregoing, each Loan Party is Solvent.

**Section 5.23.  Use of Proceeds**.  The proceeds of each Borrowing shall be used solely for the purposes specified in and in accordance with Section 6.11.

**Section 5.24.  Term Loan A-1 Acquisition Documents**.

(a)    The Loan Parties have delivered to Administrative Agent a complete and correct copy of the Term Loan A-1 Acquisition Documents, including all schedules and exhibits thereto. The execution, delivery and performance of each of the Term Loan A-1 Acquisition Documents has been duly authorized by all necessary action on the part of the Loan Parties.  Each Term Loan A-1 Acquisition Document is the legal, valid and binding obligation of the Loan Parties party thereto, enforceable against the Loan Parties party thereto in accordance with its terms, in each case, except (i) as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting generally the enforcement of creditors' rights and (ii) the availability of the remedy of specific performance or injunctive or other

equitable relief is subject to the discretion of the court before which any proceeding therefor may be brought.  The Loan Parties party thereto are not in default in the performance or compliance with any provisions thereof.  All representations and warranties made by the Loan Parties in the Term Loan A-1 Acquisition Documents and in the certificates delivered in connection therewith are true and correct in all material respects. To the Loan Parties' knowledge, none of the Sellers' representations or warranties in the Term Loan A-1 Acquisition Documents contain any untrue statement of a material fact or omit any fact necessary to make the statements therein not misleading, in any case that could reasonably be expected to result in a Material Adverse Effect.

(b)    As of the Closing Date, the Term Loan A-1 Acquisition pursuant to the Term Loan A-1 Acquisition Documents has been consummated in all material respects, in accordance with all applicable laws.  As of the Closing Date, all requisite approvals by Governmental Authorities having jurisdiction over the Loan Parties and, to the Loan Parties' knowledge, the Sellers, with respect to the Term Loan A-1 Acquisition pursuant to the Term Loan A-1 Acquisition Documents, have been obtained (including filings or approvals required under the Hart-Scott-Rodino Antitrust Improvements Act), except for any approval the failure to obtain could not reasonably be expected to be material to the interests of the Lenders.  As of the Closing Date, after giving effect to the transactions contemplated by the Term Loan A-1 Acquisition Documents, the Loan Parties will have good title to the assets acquired pursuant to the Term Loan A-1 Acquisition Agreement, free and clear of all Liens other than Permitted Liens.

**Section 5.25.  OFAC**.  No Loan Party (i) is a person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such person in any manner violative of Section 2, or (iii) is a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.

**Section 5.26.  Patriot Act**.  Each Loan Party is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the Uniting And Strengthening America By Providing Appropriate Tools Required To Intercept And Obstruct Terrorism (USA Patriot Act of 2001).  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**Section 5.27.  Anti-Corruption Laws and Sanctions**.    The Loan Parties have implemented and maintain in effect policies and procedures designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and Loan Parties and their Subsidiaries and their respective officers and employees and to the knowledge of the Loan

Parties, its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of (a) Loan Parties, their Subsidiaries or any of their respective directors, officers or employees, or (b) to the knowledge of the Loan Parties, any agent of Loan Parties or their Subsidiaries that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Borrowing, use of proceeds or other transaction contemplated by this Agreement or any other Loan Document will violate Anti-Corruption Laws or applicable Sanctions.

**Section 5.28. Required Equity Documents**. As of the Closing Date, the Loan Parties have delivered to Administrative Agent true and correct copies of any Required Equity Documents. No party thereto is in default in the performance or compliance with any provisions thereof and the Required Equity Documents comply in all material respects with all applicable laws. The Required Equity Documents are in full force and effect as of the Closing Date and have not been terminated, rescinded or withdrawn as of such date. The execution, delivery and performance of the Required Equity Documents do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than consents or approvals that have been obtained and that are still in full force and effect. To the Loan Parties' knowledge, none of the representations or warranties of any other Person in any Required Equity Document contains any untrue statement of a material fact or omits any fact necessary to make the statements therein not misleading. As of the Closing Date, the transactions contemplated by the Required Equity Documents have been consummated in all material respects, in accordance with all applicable laws.

**Section 5.29. Meridian and Loveloud as Holding Companies**. Each of Meridian and Loveloud is a holding company and does not have any material liabilities (other than liabilities arising under the Loan Documents), own any material assets (other than the Equity Interests of its Subsidiaries) or engage in any operations or business (other than in connection with (a) the ownership of its Subsidiaries, and (b) its rights and obligations under the Loan Documents).

## ARTICLE VI

## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than contingent indemnification obligations to which no claim has been made) hereunder shall remain unpaid or unsatisfied, the Loan Parties shall:

**Section 6.01. Financial Statements**. Deliver to Administrative Agent (and at Administrative Agent's request, provide adequate copies for Administrative Agent to deliver to Lenders) who shall deliver copies to each Lender, in form and detail satisfactory to Administrative Agent:

(a)    (i) as soon as available, but in any event within 180 days after the Closing Date, a consolidated and consolidating balance sheet of Meridian and its Subsidiaries for the Fiscal Year ending on or about December 31, 2017, and the related consolidated and consolidating statements of income or operations, owners' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous

Fiscal Year, all in reasonable detail and prepared in accordance with GAAP or income
tax basis accounting consistently applied, such consolidated statements to be audited and
accompanied by a report and opinion of an independent certified public accountant of
nationally recognized standing reasonably acceptable to Administrative Agent, which
report and opinion shall be prepared in accordance with generally accepted auditing
standards and shall not be subject to any "going concern" or like qualification or
exception or any qualification or exception as to the scope of such audit, and (ii) as soon
as available, but in any event within 120 days after the end of each Fiscal Year,
commencing with the Fiscal Year ending on or about December 31, 2018, a consolidated
and consolidating balance sheet of Meridian and its Subsidiaries as at the end of such
Fiscal Year, and the related consolidated and consolidating statements of income or
operations, owners' equity and cash flows for such Fiscal Year, setting forth in each case
in comparative form the figures for the previous Fiscal Year, all in reasonable detail and
prepared in accordance with GAAP or income tax basis accounting consistently applied,
such consolidated statements to be audited and accompanied by a report and opinion of
an independent certified public accountant of nationally recognized standing reasonably
acceptable to Administrative Agent, which report and opinion shall be prepared in
accordance with generally accepted auditing standards and shall not be subject to any
"going concern" or like qualification or exception or any qualification or exception as to
the scope of such audit;

      (b)     as soon as available, but in any event within 45 days after the end of each
of Fiscal Quarter of each Fiscal Year, commencing with the Fiscal Quarter ending on or
about March 31, 2018, a consolidated and consolidating balance sheet of Meridian and its
Subsidiaries as at the end of such Fiscal Quarter, and the related consolidated and
consolidating statements of income or operations for such Fiscal Quarter and for the
portion of the Fiscal Year then ended, setting forth in each case in comparative form the
figures for the corresponding Fiscal Quarter of the previous Fiscal Year and the
corresponding portion of the previous Fiscal Year, all in reasonable detail, such
consolidated statements to be certified by a Responsible Officer of the Borrower Agent as
fairly presenting the financial condition, results of operations, owner's equity and cash
flows of Meridian and its Subsidiaries in accordance with GAAP or income tax basis
accounting consistently applied, subject only to normal year-end audit adjustments and
the absence of footnotes, and such consolidating statements to be certified by a
Responsible Officer of Borrower Agent to the effect that such statements are fairly stated
in all material respects when considered in relation to the consolidated financial
statements of Meridian and its Subsidiaries;

      (c)     as soon as available, (i) but in any event within 45 days after the end of
each Fiscal Quarter of each Fiscal Year, commencing with the Fiscal Quarter ending on
or about March 31, 2018, a store-level income statement for each Restaurant for the
year-to-date period then ended, and (ii) but in any event within 120 days after end of each
Fiscal Year, commencing with the Fiscal Year ending on or about December 31, 2018, a
store-level income statement for each Restaurant of the Fiscal Year then ended, in each
case setting forth in comparative form the figures for the corresponding year-to-date
period of the previous Fiscal Year or the previous Fiscal Year (in the case of the Fiscal
Year income statements), all in reasonable detail, such store-level income statements to

be certified by a Responsible Officer of Borrower Agent as fairly presenting the results of operations of the Borrowers in accordance with GAAP or income tax basis accounting consistently applied, subject only to normal year-end audit adjustments and the absence of footnotes; and

(d)    as soon as available, but in any event no later than the date that is thirty (30) days after the end of each Fiscal Year, an annual business plan and budget (including Capital Expenditures) of the Borrowers, including forecasts prepared by management of the Borrowers, in form satisfactory to the Administrative Agent and the Required Lenders, of statements of income or operations and cash flows of the Borrowers on a monthly basis for the then current Fiscal Year (including the Fiscal Year in which any Maturity Date occurs).

**Section 6.02.  Certificates; Other Information**.  Deliver to Administrative Agent (and at Administrative Agent's request, provide adequate copies for Administrative Agent to deliver to Lenders) who shall deliver copies to each Lender, in form and detail satisfactory to Administrative Agent:

(a)    concurrently with the delivery of the financial statements referred to in Section 6.01(a) and (b), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower Agent;

(b)    promptly upon Administrative Agent's request, verifications of payment of all royalty payments (under Franchise Agreements or otherwise), sales tax payments, payroll tax payments (or tax withholding payments), and any other tax payments required to be paid by any Loan Party;

(c)    promptly, such additional information regarding the business, financial or corporate affairs of the Borrowers and other Loan Parties, or compliance with the terms of the Loan Documents, as Administrative Agent or any Lender may from time to time reasonably request; and

(d)    promptly, any notice of any material litigation, proceeding, environmental action or claim against, or liability of, any of the Loan Parties, or any ERISA Event or tax event or liability.

Except for such Compliance Certificates required by Section 6.02(a), Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

Each Loan Party hereby acknowledges that (a) Administrative Agent may, at the option of Administrative Agent, make available to Lenders and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "Borrower Materials") by posting Borrower Materials on IntraLinks, Syndtrak, ClearPar or a substantially similar electronic transmission system (the "Platform") and (b) certain of Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Loan Parties or

their Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Person's securities. Each Loan Party hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC", each Loan Party shall be deemed to have authorized Administrative Agent and Lenders to treat Borrower Materials as either publicly available information or not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of United States Federal and state securities laws (provided, however, that to the extent Borrower Materials constitute Information, they shall be treated as set forth in Section 11.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor". Notwithstanding the foregoing, the Loan Parties shall be under no obligation to mark any Borrower Materials "PUBLIC."

Section 6.03. **Notices**. Promptly, but in any event within 2 Business Days, notify Administrative Agent and each Lender:

        (a)    of the occurrence of any Default or Event of Default;

        (b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-performance of, or any default under, a Contractual Obligation of any of the Loan Parties; (ii) any dispute, litigation, investigation, proceeding or suspension between any of the Loan Parties and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting any of the Loan Parties, including pursuant to any applicable Environmental Laws;

        (c)    of the occurrence of any ERISA Event;

        (d)    of any material change in accounting policies or financial reporting practices by any of the Loan Parties; and

        (e)    of any material default or breach (or receipt of notice of any claimed default or breach) under any Franchise Agreement or any Lease.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Borrower Agent setting forth details of the occurrence referred to therein and stating what action the Loan Parties have taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

Section 6.04. **Payment of Obligations**. Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in

accordance with GAAP are being maintained by the Loan Parties; and (b) all lawful claims which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness.

**Section 6.05. Preservation of Existence, Etc.** (a) Except as permitted pursuant to Section 7.04, preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

**Section 6.06. Maintenance of Properties**. (a) Maintain, preserve and protect all of its properties and equipment necessary in the operation of its Business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof, in each case, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**Section 6.07. Maintenance of Insurance**. Maintain with financially sound and reputable insurance companies not Affiliates of the Loan Parties, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and providing for not less than 30 days' prior notice (or such shorter prior notice period, which period shall be not less than 10 days, set forth in the applicable insurance policy) to Administrative Agent of termination, lapse or cancellation of such insurance. All such required insurance policies shall include at all times endorsements naming Administrative Agent (on behalf of Lenders and the other Secured Parties) as an additional insured and loss payee, as the case may be.

**Section 6.08. Compliance with Laws**. Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property (including, without limitation, ERISA and Environmental Laws), except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect. The Loan Parties will maintain in effect and enforce policies and procedures designed to ensure compliance by the Loan Parties, their respective Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

**Section 6.09. Books and Records**. (a) Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP or income tax basis accounting consistently applied (subject to normal year-end adjustments) shall be made of all financial transactions and matters involving the assets and business of the Loan Parties, and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties.

**Section 6.10. Inspection Rights**.  Permit representatives and independent contractors of Administrative Agent and each Lender accompanying Administrative Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to Borrower Agent; provided, however, that, absent the continuance of an Event of Default, Borrowers shall be required to reimburse Administrative Agent and the Lenders for no more than one (1) such visitation and/or inspection per calendar year and, further, that when an Event of Default exists and is continuing, Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrowers at any time and any number of times during normal business hours and without advance notice to any Borrower.

**Section 6.11. Use of Proceeds**.  Use the proceeds of the Loans solely for the following purposes:  (a) with respect to the Term Loan A-1 Facility, on the Closing Date, (A) to refinance on the Closing Date the Prior Indebtedness set forth on Schedule 6.11 hereto, (B) to pay a portion of the consideration payable in connection with the consummation of the Term Loan A-1 Acquisition pursuant to the Term Loan A-1 Acquisition Documents and (C) to pay the fees, costs, and expenses incurred in connection with this Agreement, the other Loan Documents, the Term Loan A-1 Acquisition and the transactions contemplated hereby and thereby, (b) with respect to the Term Loan A-2 Facility, (A) to pay the costs and consideration payable in connection with any Project (subject to the limitations contained in this Agreement), and (B) to acquire Real Property, and (c) with respect to the Revolving Facility, to finance short term working capital and general corporate purposes not in contravention of any Law or any of the Loan Documents.

**Section 6.12. New Restaurants**.  Give Administrative Agent notice at least thirty (30) days prior to the acquisition or lease of any Restaurant by any Borrower or any of its Subsidiaries (excluding the Specified Subsidiaries) after the Closing Date and the formation of any Subsidiary in connection therewith, and no later than ten (10) days after the such Restaurant is acquired or opened for business (or such later date as permitted by Administrative Agent in its sole discretion), deliver to Administrative Agent a fully signed, complete copy of the Franchise Agreement and/or Lease, as applicable, related to such Restaurant.

**Section 6.13. Franchise Agreements, Leases and Material Contracts**.  At all times, comply in all material respects with the terms and provisions of the Franchise Agreements and Leases of the Restaurants and any other Material Contracts of the Loan Parties, and cause the Franchise Agreements, such Leases and other Material Contracts to be kept in full force and effect without termination, amendment or modification, except for (i) any modification or amendment of a Lease made in the ordinary course of business consistent with past practice and which amendment or modification is not materially adverse to any Loan Party, Administrative Agent or Lenders, (ii) renewals or extensions (A) on either substantially the same terms as the existing Franchise Agreement or Leases of such Restaurant, as applicable, or, with respect any Franchise Agreement, on substantially the standard terms then offered by the applicable Franchisor or (B) as otherwise approved by Administrative Agent in writing, or (iii) early terminations in accordance with Section 7.05(e) and the Partial Release Provisions.

**Section 6.14.    Interest Rate Protection.**    Within 90 days following the Closing Date, the Borrowers shall enter into and thereafter maintain Related Swap Contracts with respect to the Term Loan A-1 Facility, substantially in the forms attached hereto as <u>Exhibit E</u>, providing interest rate protection containing terms and conditions satisfactory to the Administrative Agent which limit the risk of interest rate fluctuations, which Related Swap Contracts (i) shall be in an aggregate notional amount of not less than $20,250,000, (ii) shall be for a term of not less than 3 years and (iii) shall not be amended or supplemented without the prior written consent of all Lenders.

**Section 6.15.    Further Assurances**.

(a)    Each Loan Party shall ensure that all written information, exhibits and reports furnished to Administrative Agent or Lenders do not and will not contain any untrue statement of a material fact and do not and will not omit to state any material fact or any fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, and will promptly disclose to Administrative Agent and Lenders and correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgement or recordation thereof.

(b)    Promptly upon request by Administrative Agent, the Loan Parties shall take such additional actions and execute such documents as Administrative Agent may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement or any other Loan Document, (ii) to subject the Restaurants and other Collateral to the Liens created by any of the Security Instruments, (iii) to perfect and maintain the validity, effectiveness and priority of any of the Security Instruments and the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document.    The Loan Parties shall deliver, or cause to be delivered, to Administrative Agent, appropriate resolutions, secretary certificates, certified Organization Documents and, if requested by Administrative Agent, legal opinions relating to the matters described in this <u>Section 6.15</u> (which opinions shall be in form and substance reasonably acceptable to Administrative Agent and, to the extent applicable, substantially similar to the opinions delivered on the Closing Date), in each instance with respect to each Loan Party formed or acquired after the Closing Date.    In the event any Loan Party acquires fee title to any Real Property, simultaneously with, or within thirty (30) days after (or such later date as may be agreed to by Administrative Agent in its sole discretion), such acquisition, such Person shall execute and/or deliver, or cause to be executed and/or delivered, to Administrative Agent, a fully executed Mortgage, together with each of the Real Estate Support Documents requested by Administrative Agent, each in form and substance satisfactory to Administrative Agent.

(c)    Without limiting the generality of the foregoing, to the extent reasonably necessary to maintain the continuing priority of the Lien of any Mortgages as security for the Obligations in connection with the funding of a Borrowing, as determined by Administrative Agent in its reasonable discretion, the applicable Loan Party to any Mortgages shall within thirty (30) days of such funding or incurrence (or such later date

as agreed by Administrative Agent) (i) enter into and deliver to Administrative Agent, at the direction and in the reasonable discretion of Administrative Agent, a mortgage modification or new Mortgage in proper form for recording in the relevant jurisdiction and in a form reasonably satisfactory to Administrative Agent, (ii) cause to be delivered to Administrative Agent for the benefit of the Secured Parties an endorsement to the title insurance policy, date down(s) or other evidence reasonably satisfactory to Administrative Agent insuring that the priority of the Lien of the Mortgages as security for the Obligations has not changed and confirming and/or insuring that since the issuance of the title insurance policy there has been no change in the condition of title and there are no intervening liens or encumbrances which may then or thereafter take priority over the Lien of the Mortgages (other than those expressly permitted by Section 7.01(c)) and (iii) deliver, at the request of Administrative Agent, to Administrative Agent and/or all other relevant third parties, all other items reasonably necessary to maintain the continuing priority of the Lien of the Mortgages as security for the Obligations.

**Section 6.16.  Formation or Acquisition of Subsidiaries**.  The Loan Parties will cause each of their Subsidiaries (other than Specified Subsidiaries), whether newly formed, after acquired or otherwise existing to promptly (and in any event within thirty (30) days after such Subsidiary is formed or acquired (or such longer period of time as agreed to by Administrative Agent in its sole discretion)) become a Borrower or Guarantor, as may be required by Administrative Agent, hereunder by way of execution of a joinder to this Agreement, the Security Agreement, or such other documents as Administrative Agent shall deem appropriate for such purposes, in each case in form and substance reasonably satisfactory to Administrative Agent.  In connection therewith, Borrower Agent shall give notice to Administrative Agent not less than ten (10) days prior to creating a Subsidiary (other than a Specified Subsidiary) (or such shorter period of time as agreed to by Administrative Agent in its reasonable discretion), or acquiring the Equity Interests of any other Person.  In connection with the foregoing, the Loan Parties shall deliver to the Administrative Agent, with respect to each new Borrower or Guarantor to the extent applicable, (a) a pledge agreement (or an addendum to the Pledge Agreement or Security Agreement, as appropriate) and appropriate certificates and powers or financing statements, pledging all of the direct or beneficial ownership interest in such new Subsidiary in form and substance reasonably satisfactory to Administrative Agent, and (b) provide to Administrative Agent all other documentation, including the Organization Documents of such Subsidiary and one or more opinions of counsel reasonably satisfactory to Administrative Agent, which, in its opinion, is appropriate with respect to the execution and delivery of the applicable documentation referred to above (including an Real Estate Support Documents).  Any document, agreement, or instrument executed or issued pursuant to this Section 6.16 shall constitute a Loan Document.

**Section 6.17.  Post-Closing Actions**.  The Loan Parties shall take each of the actions specified on Schedule 6.17 within the time periods provided therein (unless any such time period is extended by the Administrative Agent in the Administrative Agent's sole discretion).

## ARTICLE VII

## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than contingent indemnification obligations as to which no claim has been made) hereunder shall remain unpaid or unsatisfied, the Loan Parties shall not directly or indirectly:

**Section 7.01.  Liens**.  Create, incur, assume or suffer to exist any Lien upon any Loan Party's property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)      Liens pursuant to any Loan Document;

(b)      Liens existing on the date hereof and listed on Schedule 7.01 and any renewals or extensions thereof, provided that (i) the property covered thereby is not changed, (ii) the amount secured or benefited thereby is not increased, (iii) the direct or any contingent obligor with respect thereto is not changed, and (iv) any renewal or extension of the obligations secured or benefited thereby is permitted by Section 7.03(b);

(c)      Liens for taxes, assessments or other governmental charges or levies not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)      carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlord's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person; provided that, to the extent such Liens attach to any Collateral or portion thereof, such Lien shall be subordinate to the Lien of Administrative Agent or otherwise insured over to the satisfaction of Administrative Agent;

(e)      pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(f)      deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g)      easements, rights-of-way, restrictions and other similar non-monetary encumbrances affecting real property which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property

subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h)    Liens securing Indebtedness permitted under Section 7.03(e); provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (ii) the Indebtedness secured thereby does not exceed the cost or fair market value, whichever is lower, of the property being acquired on the date of acquisition;

(i)    any interest or title of (x) a licensor or licensee under any license or (y) a lessor, sublessor, lessee or sublessee, under lease agreements, in each case, entered into by the Loan Parties in the ordinary course of their business and covering only the assets so licensed; provided that, in the case of clause (y), such Liens shall be subordinate to the Lien of Administrative Agent;

(j)    Liens in favor of collecting banks having a right of setoff, revocation, refund or chargeback with respect to money or instruments of the Loan Parties on deposits with or in possession of such banks, other than relating to Indebtedness; and

(k)    Liens in respect of municipal and zoning ordinances which are not violated in any material respect by the existing improvements and the present use made by the Loan Parties.

**Section 7.02.  Investments**.  Make any Investments, except:

(a)    Investments held by the Loan Parties in the form of cash deposits, cash equivalents or short-term marketable securities;

(b)    advances to officers, directors and employees of the Loan Parties in an aggregate amount not to exceed $50,000 for each such Person and $100,000 for all such Persons, in each case at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes;

(c)    Related Swap Contracts and third party cap transactions permitted by Section 7.03;

(d)    Investments existing on the Closing Date and listed on Schedule 7.02, and any renewal or extension thereof; provided that the principal amount thereof is not increased;

(e)    the Term Loan A-1 Acquisition;

(f)    Investments by a Borrower in one or more Borrowers and Investments by Meridian or Loveloud in their respective Subsidiaries, so long as, with respect to any Investment made to a Specified Subsidiary, the Loan Parties are in compliance with the financial covenants set forth in Section 7.11 on a pro forma basis after giving effect to any such Investment as of the end of the Fiscal Quarter most recently ended as to which financial statements were required to be delivered pursuant to this Agreement;

(g)     Acquisition or lease of any Restaurant by any Borrower or any of its Subsidiaries made in accordance with Section 6.12; and

(h)     other Investments not exceeding $250,000 in the aggregate in any Fiscal Year.

**Section 7.03.  Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)     Indebtedness under the Loan Documents and Bank Product Agreements;

(b)     Indebtedness outstanding on the date hereof and listed on Schedule 7.03 and any refinancings, refundings, renewals or extensions thereof; provided that the principal amount of such Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder, and the maturity date and average life to maturity shall be not be shorter than the refinanced, refunded, or renewed Indebtedness;

(c)     obligations (contingent or otherwise) of the Borrowers or any Loan Party existing or arising under any Swap Contract, provided that (i) such obligations are (or were) entered into by such Person in the ordinary course of business for the purpose of directly mitigating risks associated with liabilities, commitments, investments, assets, or property held or reasonably anticipated by such Person, or changes in the value of securities issued by such Person, and not for purposes of speculation or taking a "market view;" and (ii) such Swap Contract does not contain any provision exonerating the non-defaulting party from its obligation to make payments on outstanding transactions to the defaulting party;

(d)     Indebtedness owed to a Borrower by one or more Borrowers;

(e)     Indebtedness in respect of capital leases and purchase money obligations for fixed or capital assets within the limitations set forth in Section 7.01(h); provided, however, that the aggregate outstanding amount of all such Indebtedness at any one time outstanding shall not exceed $2,500,000 for all Restaurants;

(f)     Guarantees by any Loan Party of any Borrower in respect of Indebtedness otherwise permitted hereunder of such Borrower; and

(g)     Guarantees of any Specified Subsidiary in respect of Indebtedness in an aggregate amount not to exceed $250,000 at any one time outstanding.

**Section 7.04.  Fundamental Changes; No Subsidiaries**.  Merge, dissolve, liquidate, consolidate with or into another Person (other than another Borrower), or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (other than another Borrower); provided that any Borrower may liquidate or dissolve (including to facilitate internal

reorganizations) if (i) such Borrower has no material assets, (ii) such Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrowers, and (iii) such liquidation or dissolution is not materially disadvantageous to Administrative Agent or the Lenders. Borrower Agent shall give notice to Administrative Agent not less than ten (10) days prior to taking any action permitted under this Section 7.04 (or such shorter period of time as agreed to by Administrative Agent in its sole discretion). The Loan Parties shall not form or acquire any Subsidiary other than in connection with the acquisition or development of one or more Restaurants in accordance with this Agreement.

**Section 7.05. Dispositions**. Make any Disposition or enter into any agreement to make any Disposition, except:

(a)    Dispositions of obsolete, surplus, damaged or worn out property, whether now owned or hereafter acquired, in the ordinary course of business;

(b)    Dispositions of inventory in the ordinary course of business;

(c)    Dispositions permitted under Section 7.04;

(d)    Dispositions by a Borrower to one or more Borrowers;

(e)    Subject to the Partial Release Provisions, Dispositions of Restaurants and assets related thereto ("Permitted Restaurant Dispositions"); provided that the aggregate number of Permitted Restaurant Dispositions, together with Permitted Restaurant Closures, shall not exceed five (5) during the term of this Agreement; or

(f)    Dispositions by Meridian of assets not constituting Collateral.

**Section 7.06. Restricted Payments**. Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests, except that (a) so long as no Default or Event of Default shall have occurred and be continuing at the time of any action described below or would result therefrom, the Loan Parties may (i) declare and make dividend payments or other distributions to holders of their Equity Interests, so long as the Loan Parties are in compliance with the financial covenants set forth in Section 7.11 on a pro forma basis after giving effect to any such distribution as of the end of the Fiscal Quarter most recently ended as to which financial statements were required to be delivered pursuant to this Agreement, and (ii) make Restricted Payments to pay customary salary, bonus, equity awards, severance and other benefits payable to members of management of the Loan Parties, and (b) if Borrowers are partnerships or disregarded entities for U.S. federal income tax purposes, they may make Restricted Payments or may declare and make dividend payments or other distributions to Loveloud, and Loveloud may make Restricted Payments or may declare and make dividend payments or other distributions to Meridian to permit Meridian to make tax distributions to its direct or indirect equity holders; provided, that the total amount distributed by Borrowers pursuant to this clause (b) for any quarterly period shall not exceed the amount of any such taxes that Meridian would have paid (taking into account any loss carryforwards) if Borrowers were a single corporation filing a consolidated return with its Subsidiaries (the "Tax Distribution Limitation Amount"). For purposes of calculating the Tax Distribution Limitation Amount in this clause (b), the effective tax rate will be deemed to be the

maximum combined federal and state tax rate applicable to a direct or indirect individual equity holder of Meridian, rather than the general corporate tax rate for a corporation, and shall be calculated by (i) taking into account any deduction that would be available to an individual under Section 199A of the Code, (ii) taking into account any depreciation or amortization deductions attributable to any basis step-up under Section 754 of the Code, and (iii) assuming that any interest deductions attributable to indebtedness of Loveloud or Meridian (or any other direct or indirect parent of Meridian) are deductible by Borrowers.   Notwithstanding the foregoing, if any of Loveloud, Meridian or any 80% direct or indirect owner of Meridian is a corporation, the tax rate used shall be the actual effective corporate tax rate of such entity.   At the end of each tax year, if the tax distributions paid to Meridian during such tax year exceed the Tax Distribution Limitation Amount for such tax year, any excess shall be credited to Borrowers and shall reduce any permitted subsequent tax distribution to Meridian in the following tax year.   For the avoidance of doubt, any tax distributions made under <u>clause (b)</u> above shall remain subject to testing under <u>Section 7.11(b)</u> as and when required to be tested under such Section.

Section 7.07.  **Change in Nature of Business**.  (a) Engage in any material line of business, except for the Business, or (b) permit any Borrower to own, operate, acquire or develop any Restaurant other than as a Burger King restaurant.

Section 7.08.  **Transactions with Affiliates**.  Enter into any transaction of any kind with any Affiliate of any Loan Party (other than transactions among Borrowers), whether or not in the ordinary course of business, other than (i) transactions that are expressly permitted by this Agreement, (ii) transactions no less favorable to the Loan Parties than would be obtainable by the Loan Parties at the time in a comparable arm's length transaction with a Person other than an Affiliate, and (iii) fees to, and indemnification of, partners or members of the Loan Parties on terms that are customary for the industry and geographic territory in which the Loan Parties operate.

Section 7.09.  **Burdensome Agreements**.  Enter into any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary (excluding the Specified Subsidiaries) to make Restricted Payments to any Loan Party or to otherwise transfer property to any Loan Party, (ii) of any Subsidiary (excluding the Specified Subsidiaries) to Guarantee the Indebtedness of any Loan Party, or (iii) of any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person; <u>provided</u>, <u>however</u>, that this <u>clause (iii)</u> shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under <u>Section 7.03(e)</u> solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness or any negative pledge set forth in the franchise agreements and leases (including the Franchise Agreements or Leases); or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

Section 7.10.  **Use of Proceeds**.  Use the proceeds of any Borrowing, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose in each case, in violation of Regulation U of the FRB.  The Borrowers will not request any Borrowing, and the Borrowers shall not use, and shall procure that their respective Subsidiaries and its or their respective directors, officers,

employees and agents shall not use, the proceeds of any Borrowing (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

**Section 7.11.   Financial Covenants**.

(a)   ***Consolidated Pre-Compensation Fixed Charge Coverage Ratio***.   Permit the Consolidated Pre-Compensation Fixed Charge Coverage Ratio, measured as of the end of each Fiscal Quarter, commencing with the Fiscal Quarter ending on or about March 31, 2018, to be less than 1.25 to 1.00.

(b)   ***Consolidated Post-Distribution Fixed Charge Coverage Ratio***.   Permit the Consolidated Post-Distribution Fixed Charge Coverage Ratio, measured as of the end of each Fiscal Quarter, commencing with the Fiscal Quarter ending on or about March 31, 2018, to be less than 1.10 to 1.00.

(c)   ***Current Ratio***.   Permit the Current Ratio, measured as of the end of each Fiscal Quarter, commencing with the Fiscal Quarter ending on or about March 31, 2018, to be less than 0.50 to 1.00.

(d)   ***Consolidated Lease Adjusted Leverage Ratio***.   Permit the Consolidated Lease Adjusted Leverage Ratio, measured as of the end of each Fiscal Quarter, commencing with the Fiscal Quarter ending on or about March 31, 2018, to exceed the following:

| Fiscal Periods Ending | Maximum Consolidated Lease Adjusted Leverage Ratio |
|---|---|
| Each Fiscal Quarter ending on or about March 31, 2018 through and including the Fiscal Quarter ending on or about December 31, 2018 | 6.00x |
| The Fiscal Quarter ending on or about March 31, 2019 and each Fiscal Quarter thereafter | 5.75x |

**Section 7.12.   Operate as Restaurant**.   (a) Subject to Section 7.05(e) and the Partial Release Provisions, cease operations at any Restaurant, except as a result of (i) a condemnation or casualty during the time that such Restaurant is being repaired, restored, replaced or rebuilt or during a Project in the ordinary course of business, in each case, to the extent that operations cannot reasonably be conducted during such time, and (ii) a closure of Restaurants due to underperformance or a total loss as a result of a condemnation or casualty (a "Permitted Restaurant Closure"); provided that the aggregate number of Permitted Restaurant Closures,

together with Permitted Restaurant Dispositions, shall not exceed five (5) during the term of this Agreement, or (b) convert any Restaurant or other Collateral to an alternative use without Administrative Agent's consent.

**Section 7.13.  Franchise Agreements; Leases**.   Subject to <u>Section 7.05(e)</u> and the Partial Release Provisions, cause or permit any Franchise Agreement or any Lease (a) to be terminated or cancelled prior to its stated term, or (b) to expire in accordance with its terms without a replacement Franchise Agreement or replacement Lease, as applicable, in form and substance satisfactory to Administrative Agent, being in full force and effect.

**Section 7.14.   General Partner**.  Become a general partner, either directly or indirectly, in any partnership.

**Section 7.15.   Fiscal Year**.  Modify or change its Fiscal Year.

**Section 7.16.   Organization Documents**.  Amend any of its Organization Documents.

**Section 7.17.   Meridian and Loveloud as Holding Companies**.  Neither Meridian nor Loveloud will incur any material liabilities (other than liabilities arising under the Loan Documents), own or acquire any material assets (other than the Equity Interests of its Subsidiaries) or engage in any operations or business (other than in connection with (a) the ownership of its Subsidiaries, and (b) its rights and obligations under the Loan Documents).

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

**Section 8.01.  Events of Default**.   Any of the following shall constitute an Event of Default:

(a)    ***Non-Payment***.  Any Loan Party fails (i) to pay any amount of principal of any Loan, including after maturity or acceleration of the Loans or (ii) to pay within three Business Days after the same shall become due, interest on any Loan, any fee or any other amount payable hereunder or under any other Loan Document; or

(b)    ***Specific Covenants***.  Any Loan Party fails to perform or observe any term, covenant or agreement contained in (i) any of <u>Section 6.01</u>, <u>Section 6.02</u>, <u>Section 6.03</u>, <u>Section 6.05</u>,   <u>Section 6.07</u>,   Section 6.10,   <u>Section 6.11</u>,   <u>Section 6.14</u>,   <u>Section 6.15</u>, <u>Section 6.16</u>, <u>Section 6.17</u>, or <u>Article VII</u>, (ii) the requirement to provide notice contained in <u>Section 6.12</u>, or (iii) the Fee Letter; or

(c)    ***Other Defaults***.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in <u>subsection (a)</u> or <u>(b)</u> above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after the earlier of (i) notice of such failure is delivered to the Borrowers or such Loan Party by Administrative Agent or any Lender, or (ii) the Borrowers or such Loan Party have actual knowledge of such failure; or

(d)    *Representations and Warranties*.    Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    *Cross-Default*.    (i) Any Loan Party (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which any Loan Party is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which any Loan Party is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by such Loan Party as a result thereof is greater than the Threshold Amount; or

(f)    *Insolvency Proceedings, Etc*.    Any Loan Party or any of its Subsidiaries (excluding the Specified Subsidiaries) institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for 60 calendar days, or an order for relief is entered in any such proceeding; or

(g)    *Inability to Pay Debts; Attachment*.    (i) Any Loan Party becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or

(ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within 30 days after its issue or levy; or

(h)     **Judgments**.   There is entered against any Loan Party (i) a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)     **ERISA**.   (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of the Threshold Amount, or (ii) any Loan Party or any ERISA Affiliate fail to pay when due, after the expiration of any applicable grace period, any installment payment with respect to their withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of the Threshold Amount; or

(j)     **Invalidity of Loan Documents**.   Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision, of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document; or

(k)     **Change of Control**.   There occurs any Change of Control; or

(l)     **Collateral**.   Administrative Agent (for the benefit of the Secured Parties) fails to have an enforceable first priority Lien (subject to Permitted Liens) on or security interest in the Collateral; or

(m)     **Franchise Agreements or Leases**.   There shall occur any default under any Franchise Agreement or any Lease with respect to any Restaurant and (i) such default is material and such default continues for (A) 30 days or (B) such longer period as the applicable Loan Party and Franchisor or lessor party to such Franchise Agreement or Lease are both working diligently to cure such default, as the same shall be adequately demonstrated to Administrative Agent in its sole discretion, or (ii) such default is reasonably expected to result in the termination of such Franchise Agreement or Lease; or

(n)     ***Specified Subsidiaries.***  If any Specified Subsidiary shall fail to satisfy any of the criteria set forth in <u>clauses (i)</u> through <u>(v)</u> of the definition of "Specified Subsidiary"; or

(o)     ***Term Loan A-1 Acquisition***.  The Term Loan A-1 Acquisition (including the funding of the purchase price thereunder) is not consummated pursuant to the Term Loan A-1 Acquisition Documents by 2:00 p.m. on the Closing Date.

**Section 8.02.  Remedies Upon Event of Default**.  If any Event of Default occurs and is continuing, Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)     declare the Commitment of each Lender to make Loans to be terminated, whereupon such Commitments and obligation shall be terminated;

(b)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers; and

(c)     exercise on behalf of itself and Lenders all rights and remedies available to it and Lenders under the Loan Documents;

<u>provided</u>, <u>however</u>, that upon the occurrence of an Event of Default under <u>Section 8.01(f)</u>, the obligation of each Lender to make Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable without further act of Administrative Agent or any Lender.

**Section 8.03.  Application of Funds**.  After the exercise of remedies provided for in <u>Section 8.02</u> (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall, subject to the provisions of <u>Section 2.12</u>, be applied by Administrative Agent in the following order:

FIRST, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to Administrative Agent and amounts payable under <u>Article III</u>) payable to Administrative Agent in its capacity as such;

SECOND, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest) payable to Lenders (including fees, charges and disbursements of counsel to the respective Lenders (including fees and time charges for attorneys who may be employees of any Lender) and amounts payable under <u>Article III</u>), ratably among them in proportion to the respective amounts described in this clause <u>Second</u> payable to them;

THIRD, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations, ratably among Lenders in proportion to the respective amounts described in this clause <u>Third</u> payable to them;

FOURTH, to payment of that portion of the Obligations constituting unpaid principal of the Loans, to payment of that portion of the Obligations constituting liabilities, including any termination payments, due and payable under any Related Swap Contract with any Lender or any Affiliate of a Lender party to a Related Swap Contract and as to which Administrative Agent has received notice of the amounts owed thereunder from the applicable Lender or any Affiliate of a Lender party to a Related Swap Contract, and to payment of that portion of the Obligations constituting liabilities under any Bank Product Agreements, ratably among Lenders or such Affiliates in proportion to the respective amounts described in this clause <u>Fourth</u> held by them;

FIFTH, to the payment of any remaining Obligations; and

LAST, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrowers or as otherwise required by Law.

Excluded Swap Obligations with respect to any Loan Party shall not be paid with amounts received from such Loan Party or its assets, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Obligations otherwise set forth above in this Section.

## ARTICLE IX

## ADMINISTRATIVE AGENT

### Section 9.01.  Appointment and Authority.

(a)    ***Appointment***.  Each of Lenders hereby irrevocably appoints, designates and authorizes City National Bank to act on its behalf as Administrative Agent hereunder and under the other Loan Documents and authorizes Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this <u>Article IX</u> are solely for the benefit of Administrative Agent and Lenders, and no Loan Party shall have any rights as a third party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)    ***Collateral Agent***.  Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (including in its capacities under any Bank Product Agreement or Related Swap Contract) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for

purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Instruments, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX and Article XI (including Section 11.04(c), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

**Section 9.02.  Rights as a Lender**.   The Person serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of banking, trust, financial, advisory, underwriting or other business with any Loan Party or any Subsidiary or other Affiliate thereof as if such Person were not Administrative Agent hereunder and without any duty to account therefor to the Lenders or to provide notice to or consent of the Lenders with respect thereto.

**Section 9.03.  Exculpatory Provisions**.  Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties shall be administrative in nature.   Without limiting the generality of the foregoing, Administrative Agent and its Related Parties:

(a)       shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)       shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Administrative Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)       shall not, except as expressly set forth herein and in the other Loan Documents, have any duty or responsibility to disclose, and shall not be liable for the failure to disclose, any information relating to any Loan Party or any of its Affiliates that

is communicated to or obtained by the Person serving as Administrative Agent or any of
its Affiliates in any capacity.

Neither Administrative Agent nor any of its Related Parties shall be liable for any action
taken or not taken by Administrative Agent under or in connection with this Agreement or any
other Loan Document or the transactions contemplated hereby or thereby (i) with the consent or
at the request of the Required Lenders (or such other number or percentage of Lenders as shall
be necessary), or as Administrative Agent shall believe in good faith shall be necessary, under
the circumstances as provided in Section 11.01 and Section 8.02 or (ii) in the absence of its own
gross negligence or willful misconduct as determined by a court of competent jurisdiction by
final and nonappealable judgment.  Any such action taken or failure to act pursuant to the
foregoing shall be binding on all Lenders. Administrative Agent shall be deemed not to have
knowledge of any Default or Event of Default unless and until notice describing such Default or
Event of Default is given in writing to Administrative Agent by a Borrower or a Lender.

Neither Administrative Agent nor any of its Related Parties have any duty or obligation
to any Lender or participant or any other Person to ascertain or inquire into (i) any statement,
warranty or representation made in or in connection with this Agreement or any other Loan
Document, (ii) the contents of any certificate, report or other document delivered hereunder or
thereunder or in connection herewith or therewith, (iii) the performance or observance of any of
the covenants, agreements or other terms or conditions set forth herein or therein or the
occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or
genuineness of this Agreement, any other Loan Document or any other agreement, instrument or
document, or the creation, perfection or priority of any Lien purported to be created by the
Security Instruments, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of
any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items
expressly required to be delivered to the Administrative Agent.

**Section 9.04. Reliance by Administrative Agent**.  Administrative Agent shall be
entitled to rely upon, and shall be fully protected in relying and shall not incur any liability for
relying upon, any notice, request, certificate, communication, consent, statement, instrument,
document or other writing (including any electronic message, Internet or intranet website posting
or other distribution) believed by it to be genuine and to have been signed, sent or otherwise
authenticated by the proper Person.  Administrative Agent also may rely upon any statement
made to it orally or by telephone and believed by it to have been made by the proper Person, and
shall be fully protected in relying and shall not incur any liability for relying thereon.  In
determining compliance with any condition hereunder to the making of a Loan that by its terms
must be fulfilled to the satisfaction of a Lender, Administrative Agent may presume that such
condition is satisfactory to such Lender unless Administrative Agent shall have received notice
to the contrary from such Lender prior to the making of such Loan.  Administrative Agent may
consult with legal counsel (who may be counsel for the Loan Parties), independent accountants
and other experts selected by it, and shall not be liable for any action taken or not taken by it in
accordance with the advice of any such counsel, accountants or experts.  For purposes of
determining compliance with the conditions specified in Section 4.01, each Lender that has
signed this Agreement shall be deemed to have consented to, approved or accepted or to be
satisfied with, each document or other matter required thereunder to be consented to or approved

by or acceptable or satisfactory to a Lender unless Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objections.

**Section 9.05.  Delegation of Duties**.  Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by Administrative Agent. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Facilities as well as activities as Administrative Agent.  Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**Section 9.06.  Resignation of Administrative Agent**.

(a)    Notice.  Administrative Agent may at any time resign as Administrative Agent upon thirty (30) days' notice to Lenders and the Borrowers.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with Borrower Agent, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment prior to the effective date of the resignation of the Administrative Agent gives (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; provided that if Administrative Agent shall notify Borrower Agent and Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective.

(b)    Defaulting Lender.  If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable Law, by notice in writing to the Borrower Agent and such Person remove such Person as Administrative Agent and, in consultation with the Borrower Agent, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)    Effect of Resignation or Removal.  With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security

until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Administrative Agent (other than as provided in Section 3.01(i) and other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor. After the retiring or removed Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 11.04 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

**Section 9.07. Non-Reliance on Administrative Agent and Other Lenders**. Each Lender acknowledges that it has, independently and without reliance upon Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**Section 9.08. No Other Duties, Etc**. Anything herein to the contrary notwithstanding, none of the titles listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender.

**Section 9.09. Administrative Agent May File Proofs of Claim**. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on any Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of Lenders, and Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of Lenders, and Administrative Agent and their respective agents and counsel and all other amounts due Lenders, and Administrative Agent under Section 11.04) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to Lenders, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent under Section 11.04.

Nothing contained herein shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

The Loan Parties and the Secured Parties hereby irrevocably authorize Administrative Agent, based upon the instruction of the Required Lenders, to (a) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Section 363 of the Bankruptcy Code of the United States or any similar Laws in any other jurisdictions to which a Loan Party is subject, or (b) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by (or with the consent or at the direction of) Administrative Agent (whether by judicial action or otherwise) in accordance with applicable Law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of Administrative Agent to credit bid and purchase at such sale or other disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of Administrative Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the Secured Parties whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the asset or assets so purchased (or in the Equity Interests of the acquisition vehicle or vehicles that are used to consummate such purchase).  Except as provided above and otherwise expressly provided for herein or in the other Security Instruments, Administrative Agent will not execute and deliver a release of any Lien on any Collateral.  Upon request by Administrative Agent or

Borrower Agent at any time, the Secured Parties will confirm in writing Administrative Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this Section 9.09.

Section 9.10. **Collateral and Guaranty Matters**.   The Lenders (including in its capacities under any Bank Product Agreement or Related Swap Contract) irrevocably authorize Administrative Agent, at its option and in its discretion:

(a)    to release any Lien on any property granted to or held by Administrative Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations and obligations under Bank Product Agreements and Related Swap Contracts as to which arrangements satisfactory to the applicable Lender or Affiliate of a Lender have been made), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, (iii) pursuant to the Partial Release Provisions, or (iv) if approved, authorized or ratified in writing by the requisite Lenders in accordance with Section 11.01;

(b)    to subordinate any Lien on any property granted to or held by Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01(i); and

(c)    to release any Guarantor from its obligations under the Guaranty Agreement (i) if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents or (ii) if approved, authorized or ratified in writing by the Secured Parties in accordance with Section 11.01.

Upon request by Administrative Agent at any time, the Required Lenders will confirm in writing Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty Agreement pursuant to this Section 9.10.   In each case as specified in this Section 9.10, Administrative Agent will, at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of the Collateral or portion thereof, or to release such Guarantor from its obligations under the Guaranty Agreement, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall Administrative Agent be responsible or liable to Lenders for any failure to monitor or maintain any portion of the Collateral.

Section 9.11. **Bank Product Agreements and Related Swap Contracts.**  No Secured Party that obtains the benefit of the provisions of Section 8.03, or any Collateral by virtue of the provisions hereof or of any Security Instrument shall have any right to notice of any action or to

consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.  Notwithstanding any other provision of this Article IX to the contrary, Administrative Agent shall be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Bank Product Agreements or Related Swap Contracts only if the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Lender or Affiliate; provided that if City National Bank is the Lender party to such Bank Product Agreement or Related Swap Contract, no notice from City National Bank to the Administrative Agent shall be required with respect to such Obligations.

## ARTICLE X

## CONTINUING GUARANTY

**Section 10.01. Guaranty.**  Each Guarantor hereby absolutely and unconditionally, jointly and severally guarantees, as primary obligor and as a guaranty of payment and performance and not merely as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, of any and all Obligations (for each Guarantor, subject to the proviso in this sentence, its "Guaranteed Obligations"); provided that (a) the Guaranteed Obligations of a Guarantor shall exclude any Excluded Swap Obligations with respect to such Guarantor and (b) the liability of each Guarantor individually with respect to this Guaranty shall be limited to an aggregate amount equal to the largest amount that would not render its obligations hereunder subject to avoidance under Section 548 of the Bankruptcy Code of the United States or any comparable provisions of any applicable state law.  The Administrative Agent's books and records showing the amount of the Obligations shall be admissible in evidence in any action or proceeding, and shall be binding upon each Guarantor, and conclusive for the purpose of establishing the amount of the Obligations.  This Guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the Obligations or any instrument or agreement evidencing any Obligations, or by the existence, validity, enforceability, perfection, non-perfection or extent of any collateral therefor, or by any fact or circumstance relating to the Obligations which might otherwise constitute a defense to the obligations of the Guarantors, or any of them, under this Guaranty, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing.

**Section 10.02. Rights of Lenders.**  Each Guarantor consents and agrees that the Secured Parties may, at any time and from time to time, without notice or demand, and without affecting the enforceability or continuing effectiveness hereof:  (a) amend, extend, renew, compromise, discharge, accelerate or otherwise change the time for payment or the terms of the Obligations or any part thereof; (b) take, hold, exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any security for the payment of this Guaranty or any Obligations; (c) apply such security and direct the order or manner of sale thereof as the Administrative Agent and the Lenders in their sole discretion may determine; and (d) release or substitute one or more of any endorsers or other guarantors of any of the Obligations.  Without limiting the generality of the

foregoing, each Guarantor consents to the taking of, or failure to take, any action which might in any manner or to any extent vary the risks of such Guarantor under this Guaranty or which, but for this provision, might operate as a discharge of such Guarantor.

Section 10.03. **Certain Waivers.** Each Guarantor waives (a) any defense arising by reason of any disability or other defense of the Borrowers or any other guarantor, or the cessation from any cause whatsoever (including any act or omission of any Secured Party) of the liability of the Borrowers or any other Loan Party; (b) any defense based on any claim that such Guarantor's obligations exceed or are more burdensome than those of the Borrowers or any other Loan Party; (c) the benefit of any statute of limitations affecting any Guarantor's liability hereunder; (d) any right to proceed against the Borrowers or any other Loan Party, proceed against or exhaust any security for the Obligations, or pursue any other remedy in the power of any Secured Party whatsoever; (e) any benefit of and any right to participate in any security now or hereafter held by any Secured Party; (f) to the fullest extent permitted by law, any and all other defenses or benefits that may be derived from or afforded by applicable Law limiting the liability of or exonerating guarantors or sureties, and (g) to the fullest extent permitted by law, any defense to its obligations under this Guaranty by reason of any other agreement, act or circumstance which might constitute a defense available to, or a discharge of, Guarantor or any other Loan Party in respect of the Obligations. Each Guarantor expressly waives all setoffs and counterclaims and all presentments, demands for payment or performance, notices of nonpayment or nonperformance, protests, notices of protest, notices of dishonor and all other notices or demands of any kind or nature whatsoever with respect to the Obligations, and all notices of acceptance of this Guaranty or of the existence, creation or incurrence of new or additional Obligations. Each Guarantor waives any rights and defenses that are or may become available to it by reason of §§ 2787 to 2855, inclusive, and §§ 2899 and 3433 of the California Civil Code.

Section 10.04. **Obligations Independent.** The obligations of each Guarantor hereunder are those of primary obligor, and not merely as surety, and are independent of the Obligations and the obligations of any other guarantor, and a separate action may be brought against each Guarantor to enforce this Guaranty whether or not the Borrowers or any other person or entity is joined as a party.

Section 10.05. **Subrogation**. No Guarantor shall exercise any right of subrogation, contribution, indemnity, reimbursement or similar rights with respect to any payments it makes under this Guaranty until all of the Obligations and any amounts payable under this Guaranty have been indefeasibly paid and performed in full and the Commitments and the Facilities are terminated. If any amounts are paid to a Guarantor in violation of the foregoing limitation, then such amounts shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to reduce the amount of the Obligations, whether matured or unmatured.

Section 10.06. **Termination; Reinstatement.** This Guaranty is a continuing and irrevocable guaranty of all Obligations now or hereafter existing and shall remain in full force and effect until the Maturity Date for the Term Loan Facilities. Notwithstanding the foregoing, this Guaranty shall continue in full force and effect or be revived, as the case may be, if any payment by or on behalf of a Borrower or a Guarantor is made, or any of the Secured Parties

exercises its right of setoff, in respect of the Obligations and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by any of the Secured Parties in their discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Laws or otherwise, all as if such payment had not been made or such setoff had not occurred and whether or not the Secured Parties are in possession of or have released this Guaranty and regardless of any prior revocation, rescission, termination or reduction.  The obligations of each Guarantor under this paragraph shall survive termination of this Guaranty.

      **Section 10.07. Stay of Acceleration.**  If acceleration of the time for payment of any of the Obligations is stayed, in connection with any case commenced by or against a Guarantor or any Borrower under any Debtor Relief Laws, or otherwise, all such amounts shall nonetheless be payable by each Guarantor, jointly and severally, immediately upon demand by the Secured Parties.

      **Section 10.08. Condition of Borrowers.**  Each Guarantor acknowledges and agrees that it has the sole responsibility for, and has adequate means of, obtaining from the Borrowers and any other guarantor such information concerning the financial condition, business and operations of the Borrowers and any such other guarantor as such Guarantor requires, and that none of the Secured Parties has any duty, and such Guarantor is not relying on the Secured Parties at any time, to disclose to it any information relating to the business, operations or financial condition of the Borrowers or any other guarantor (each Guarantor waiving any duty on the part of the Secured Parties to disclose such information and any defense relating to the failure to provide the same).

      **Section 10.09. Right of Contribution.**  The Guarantors agree among themselves that, in connection with payments made hereunder, each Guarantor shall have contribution rights against the other Guarantors as permitted under applicable Law.

      **Section 10.10. Additional Guarantor Waivers and Agreements**.

      (a)     Each Guarantor understands and acknowledges that if the Secured Parties foreclose judicially or nonjudicially against any real property security for the Obligations, that foreclosure could impair or destroy any ability that such Guarantor may have to seek reimbursement, contribution, or indemnification from the Borrower or others based on any right such Guarantor may have of subrogation, reimbursement, contribution, or indemnification for any amounts paid by such Guarantor under this Guaranty.  Each Guarantor further understands and acknowledges that in the absence of this paragraph, such potential impairment or destruction of such Guarantor's rights, if any, may entitle such Guarantor to assert a defense to this Guaranty based on Section 580d of the California Code of Civil Procedure as interpreted in Union Bank v. Gradsky, 265 Cal. App. 2d 40 (1968).  By executing this Guaranty, each Guarantor freely, irrevocably, and unconditionally:  (i) waives and relinquishes that defense and agrees that it will be fully liable under this Guaranty even though the Secured Parties may foreclose, either by judicial foreclosure or by exercise of power of sale, any deed of trust securing the Obligations; (ii) agrees that it will not assert that defense in any action or proceeding

which the Secured Parties may commence to enforce this Guaranty; (iii) acknowledges and agrees that the rights and defenses waived by such Guarantor in this Guaranty include any right or defense that it may have or be entitled to assert based upon or arising out of any one or more of §§ 580a, 580b, 580d, or 726 of the California Code of Civil Procedure or § 2848 of the California Civil Code; and (iv) acknowledges and agrees that the Secured Parties are relying on this waiver in creating the Obligations, and that this waiver is a material part of the consideration which the Secured Parties are receiving for creating the Obligations.

(b)      Each Guarantor waives all rights and defenses that it may have because any of the Obligations may be secured by real property.  This means, among other things: (i) the Secured Parties may collect from any Guarantor without first foreclosing on any real or personal property collateral pledged by the other Loan Parties; and (ii) if the Secured Parties foreclose on any real property collateral pledged by the other Loan Parties:  (A) the amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) the Secured Parties may collect from any Guarantor even if the Secured Parties, by foreclosing on the real property collateral, have destroyed any right such Guarantor may have to collect from the Borrower.  This is an unconditional and irrevocable waiver of any rights and defenses each Guarantor may have because any of the Obligations may be secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon § 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

(c)      Each Guarantor waives any right or defense it may have at law or equity, including California Code of Civil Procedure § 580a, to a fair market value hearing or action to determine a deficiency judgment after a foreclosure.

## ARTICLE XI

## MISCELLANEOUS

### Section 11.01. Amendments, Etc.

(a)      No amendment or waiver of any provision of this Agreement or any other Loan Document (other than the Fee Letter), and no consent to any departure by any Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrowers or the applicable Loan Party, as the case may be, and acknowledged by Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall (nor shall a settlement agreement be entered into with Borrowers or any Loan Party having the effect of clauses (vii), (ix) or (x) below):

(i)      waive any condition set forth in Section 4.01 or Section 4.02, without the written consent of each Lender;

(ii)      extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written consent of such Lender;

(iii)      postpone any date fixed by this Agreement or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts due to Lenders (or any of them) or any scheduled or mandatory reduction of any Facility hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby;

(iv)      reduce the principal of, or the rate of interest specified herein on any Loan or any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender entitled to such amount; provided, however, that only the consent of the Required Lenders shall be necessary to (i) amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate or (ii) to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or to reduce any fee payable hereunder;

(v)      change Section 2.11 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender;

(vi)      change (A) any provision of this Section or the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or thereunder or make any determination or grant any consent hereunder, without the written consent of each Lender, or (B) the definitions of "Required Revolving Lenders" or "Required Term Loan A-2 Lenders" as each relates to the related Facility (or the constituent definition therein relating to such Facility), without the written consent of each Lender under such Facility; or

(vii)      release any Guarantor from its Guaranty, in each case without the written consent of each Lender, except to the extent the release of any Guarantor from the Guaranty is permitted pursuant to Section 9.10 (in which case such release may be made by Administrative Agent acting alone);

(viii)      waive or amend any provision in any Swap Contract without the written consent of each Lender;

(ix)      release all or substantially all of the Collateral in any transaction or series of related transactions without the written consent of each Lender; or

(x)      release any Borrower or permit any Borrower to assign or transfer any of its rights or obligations under this Agreement or the other Loan Documents without the consent of each Lender.

(b)     No amendment, waiver or consent shall, unless in writing and signed by Administrative Agent in addition to Lenders required in this Section, affect the rights or duties of Administrative Agent under this Agreement or any other Loan Document.

(c)     During the Availability Period in respect of the Term Loan A-2 Facility, no amendment or waiver shall, unless signed by Administrative Agent and Required Term Loan A-2 Lenders (or by Administrative Agent with the consent of Required Term Loan A-2 Lenders) in addition to the Required Lenders (or by Administrative Agent with the consent of the Required Lenders): (i) amend or waive compliance with the conditions precedent to the obligations of Term Loan A-2 Lenders to make any Term Loan A-2 Borrowing; (ii) amend Section 4.02 or waive non-compliance with any provision of Section 4.02; (iii) waive any Default or Event of Default for the purpose of satisfying the conditions precedent in Section 4.02 to the obligations of Term Loan A-2 Lenders to make any Term Loan A-2 Borrowing; (iv) amend or waive this subsection or the definitions of the terms used in this subsection insofar as the definitions affect the substance of this subsection; or (v) amend or modify the definition Term Loan A-2 Commitment.  No amendment or waiver shall, unless signed by all Term Loan A-2 Lenders (or by Administrative Agent with the consent of all Term Loan A-2 Lenders) in addition to the Required Lenders (or by Administrative Agent with the consent of the Required Lenders), change the definition of (x) the term Required Term Loan A-2 Lenders, (y) the percentage of Lenders which shall be required for Term Loan A-2 Lenders to take any action hereunder or (z) any specific right of Required Term Loan A-2 Lenders to grant or withhold consent or take or omit to take any action hereunder.

(d)     During the Availability Period in respect of the Revolving Facility, no amendment or waiver shall, unless signed by Administrative Agent and Required Revolving Lenders (or by Administrative Agent with the consent of Required Revolving Lenders) in addition to the Required Lenders (or by Administrative Agent with the consent of the Required Lenders): (i) amend or waive compliance with the conditions precedent to the obligations of Revolving Lenders to make any Revolving Borrowing; (ii) amend Section 4.02 or waive non-compliance with any provision of Section 4.02; (iii) waive any Default or Event of Default for the purpose of satisfying the conditions precedent in Section 4.02 to the obligations of Revolving Lenders to make any Revolving Borrowing; (iv) amend or waive this subsection or the definitions of the terms used in this subsection insofar as the definitions affect the substance of this subsection; or (v) amend or modify the definition Revolving Commitment.  No amendment or waiver shall, unless signed by all Revolving Lenders (or by Administrative Agent with the consent of all Revolving Lenders) in addition to the Required Lenders (or by Administrative Agent with the consent of the Required Lenders), change the definition of (x) the term Required Revolving Lenders, (y) the percentage of Lenders which shall be required for Revolving Lenders to take any action hereunder or (z) any specific right of Required Revolving Lenders to grant or withhold consent or take or omit to take any action hereunder.

(e)     Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent

hereunder, except that no Commitment of such Lender may be increased or extended without the consent of such Lender.

(f)    Notwithstanding anything to the contrary contained in this Section 11.01, Administrative Agent and the Borrowers and/or the applicable Loan Party may amend or modify this Agreement and any other Loan Document to (1) cure any ambiguity, omission, defect or inconsistency therein and (2) grant a new Lien for the benefit of the Secured Parties, extend an existing Lien over additional Collateral for the benefit of the Secured Parties or join additional Persons as Loan Parties.

**Section 11.02. Notices; Effectiveness; Electronic Communication**.

(a)    ***Notices Generally***.    Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications to any party provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier to such party at the address, telecopier number, or electronic mail address specified for such party beneath its signature on the signature pages to this Agreement, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number specified for such party beneath its signature on the signature pages to this Agreement.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).    Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)    ***Electronic Communications***.    Notices and other communications to Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower Agent may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement),

provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     ***The Platform***.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM BORROWER MATERIALS.   NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH BORROWER MATERIALS OR THE PLATFORM.  In no event shall Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to any Loan Party, any Lender, or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any Loan Party's or Administrative Agent's transmission of Borrower Materials through the Internet.

(d)     ***Change of Address, Etc***.  The Loan Parties and Administrative Agent may change their address, telecopier, electronic mail address or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier, electronic mail address or telephone number for notices and other communications hereunder by notice to the Borrowers, and Administrative Agent.  In addition, each Lender agrees to notify Administrative Agent from time to time to ensure that Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to a Loan Party or its securities for purposes of United States Federal or state securities laws.

(e)     ***Reliance by Administrative Agent, and Lenders***.  The Administrative Agent, and Lenders shall be entitled to rely and act upon any notices (including telephonic Loan Notices) purportedly given by or on behalf of any Loan Party even if (i) such notices were not made in a manner specified herein, were incomplete or were not

preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Loan Parties shall indemnify Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of any Loan Party. All telephonic notices to and other telephonic communications with Administrative Agent may be recorded by Administrative Agent, and each of the parties hereto hereby consents to such recording.

**Section 11.03. No Waiver; Cumulative Remedies**. No failure by any Lender, or Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 11.08 (subject to the terms of Section 2.11), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law.

**Section 11.04. Expenses; Indemnity; Damage Waiver**.

(a)     ***Costs and Expenses***. The Borrowers shall pay (i) all out-of-pocket expenses incurred by Administrative Agent and its Affiliates (including the fees, charges and disbursements of counsel for Administrative Agent), in connection with the preparation, negotiation, syndication, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all out of pocket expenses incurred by Administrative Agent, or any Lender (including the fees, charges and disbursements of any counsel for Administrative Agent or any Lender), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with the Loans made hereunder, including all such out of pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    ***Indemnification by the Loan Parties***.  The Loan Parties shall indemnify Administrative Agent (and any sub-agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any Person (including any Borrower or any other Loan Party) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby or, in the case of Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by a Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to a Loan Party or any of its Subsidiaries, (iv) any liability arising out of the Term Loan A-1 Acquisition pursuant to the Term Loan A-1 Acquisition Documents, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party, any Loan Party or any other Person, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by any Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)    ***Reimbursement by Lenders***.  To the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to Administrative Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to Administrative Agent (or any such sub-agent), or such Related Party, as the case may be, such Lender's Applicable Percentage, as applicable (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against Administrative Agent (or any such sub-agent) or against any Related Party of any of the foregoing acting for Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of Lenders under this subsection (c) are subject to the provisions of Section 2.10(d).

(d)    ***Waiver of Consequential Damages, Etc***.    To the fullest extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, and acknowledges that no other Person shall have, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential, punitive damages or lost profits or revenue awarded as direct damages (as opposed to direct or actual damages other than lost profits or loss of revenue) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.    No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)    ***Payments***.    All amounts due under this Section shall be payable not later than ten Business Days after demand therefor.

(f)    ***Survival***.    The agreements in this Section shall survive the resignation of Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**Section 11.05.  Payments Set Aside**.    To the extent that any payment by or on behalf of any Borrower is made to Administrative Agent, or any Lender, or Administrative Agent, or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Administrative Agent, or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.    The obligations of Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**Section 11.06.  Successors and Assigns**.

(a)    ***Successors and Assigns Generally***.    The provisions of this Agreement and the other Loan Documents shall be binding upon and inure to the benefit of the parties hereto and thereto and their respective successors and assigns permitted hereby, except neither any Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of

subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of Administrative Agent, and Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     *Assignments by Lenders*.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including all or a portion of its Commitment and the Loans at the time owing to it); provided, that, in each case, any such assignment shall be subject to the following conditions:

(i)     *Minimum Amounts*.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment under any Facility and/or the Loans at the time owing to it, in each case with respect to any Facility, or contemporaneous assignments to related Approved Funds (determined after giving effect to such assignments) that equal at least the amount specified in subsection (b)(i)(B) of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in subsection (b)(i)(A) of this Section 11.06(b), the aggregate amount of the Commitment (which for this purpose includes Loans outstanding hereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000 unless each of Administrative Agent and, so long as no Event of Default has occurred and is continuing, Borrower Agent otherwise consents (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)     *Proportionate Amounts*.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and

obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)   *Required Consents*.   No consent shall be required for any assignment by a Lender except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)   the consent of Borrower Agent (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that Borrower Agent shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to Administrative Agent within five (5) Business Days after having received notice thereof; and

(B)   the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of (i) any unfunded Term Loan A-2 Commitment or any Revolving Commitment if such assignment is to a Person that is not a Lender with a Commitment in respect of the applicable Facility, an Affiliate of such Lender or an Approved Fund with respect to such Lender, or (ii) any Term Loans to a Person who is not a Lender, an Affiliate of a Lender or an Approved Fund.

(iv)   *Assignment and Assumption*.   The parties to each assignment shall execute and deliver to Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; provided, however, that Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.   The assignee, if it is not a Lender, shall deliver to Administrative Agent an Administrative Questionnaire.

(v)   *No Assignment to Certain Persons*.   No such assignment shall be made to (A) any of the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries, (B) any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B), or (C) to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person), each of the foregoing, an "Excluded Assignee."

(vi)   *Certain Additional Payments*.   In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of

participations or subparticipations, or other compensating actions, including funding, with the consent of Borrower Agent and Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this subsection, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 3.01, Section 3.04, Section 3.05, and Section 11.04 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

Upon request, the Borrowers shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)    *Register*. The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of Lenders, and the Commitments of, and principal amounts of Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, Administrative Agent and Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all

purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrowers at any reasonable time and from time to time upon reasonable prior notice. In addition, at any time that a request for a consent for a material or substantive change to the Loan Documents is pending, any Lender wishing to consult with other Lenders in connection therewith may request and receive from Administrative Agent a copy of the Register.

(d)     *Participations*.  Any Lender may at any time, without the consent of, or notice to, any Borrower or Administrative Agent, sell participations to any Person (other than an Excluded Assignee) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, Administrative Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 11.04(c) with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 11.01 that affects such Participant. The Borrowers agree that each Participant shall be entitled to the benefits of Section 3.01, Section 3.04 and Section 3.05 (subject to the requirements and limitations therein, including the requirements under Section 3.01(g) (it being understood that the documentation required under Section 3.01(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Section 3.06 and Section 11.18 as if it were an assignee under subsection (b) of this Section; and (B) shall not be entitled to receive any greater payment under Section 3.01 or Section 3.04, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 11.18 with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.18 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.11 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register");

provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)  *Certain Pledges*.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, a Federal Home Loan Bank or other Governmental Authority; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)  *Electronic Execution of Assignments*.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act or any other similar state laws based on the Uniform Electronic Transactions Act.

**Section 11.07. Treatment of Certain Information; Confidentiality**.  Each of Administrative Agent, and Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners); (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process; (d) to any other party hereto; (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement, or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrowers and their obligations, this Agreement or payments hereunder; (g) with the consent of Borrower

Agent; (h) on a confidential basis to (i) any rating agency in connection with rating any Borrower or its Subsidiaries or the Facilities or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Facilities; or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, or (y) becomes available to Administrative Agent or any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrowers.  In addition, Administrative Agent and Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to Agents and Lenders in connection with the administration of the Loan Documents.

For purposes of this Section, "Information" means all information received from the Loan Parties relating to the Loan Parties, the Loan Parties' Affiliates or Subsidiaries or any of their respective businesses, other than any such information that is available to Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Loan Parties or any of their Affiliates or Subsidiaries, provided that, in the case of information received from the Loan Parties or any of their Affiliates or Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of Administrative Agent, Lenders acknowledges that (a) the Information may include material non-public information concerning the Loan Parties, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

**Section 11.08. Right of Setoff**.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Borrower or any other Loan Party against any and all of the obligations of the Borrowers or the other Loan Parties now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or other Loan Parties may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to Administrative Agent for further application in accordance with the provisions of Section 2.12 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of Administrative Agent and Lenders, and (y) the Defaulting Lender shall provide promptly to Administrative Agent a statement describing in reasonable detail the

Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrowers and Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 11.09. **Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 11.10. **Counterparts; Integration; Effectiveness**.  This Agreement and the other Loan Documents may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement and the other Loan Documents shall become effective when they shall have been executed by Administrative Agent and when Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement and the other Loan Documents by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement and the other Loan Documents.

Section 11.11. **Survival of Representations and Warranties**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by Administrative Agent, each Lender and each other Secured Party, regardless of any investigation made by Administrative Agent, any Lender or any other Secured Party or on their behalf and notwithstanding that Administrative Agent, any Lender or any other Secured Party may have had notice or knowledge of any Default or Event of Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 11.12. **Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and

enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this <u>Section 11.12</u>, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

**Section 11.13. Governing Law; Jurisdiction; Etc.**

(a)    ***GOVERNING LAW***.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF CALIFORNIA.

(b)    ***SUBMISSION TO JURISDICTION***.    EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA SITTING IN LOS ANGELES COUNTY AND OF THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH CALIFORNIA STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR THEIR RESPECTIVE PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    ***WAIVER OF VENUE***.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES,

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    ***SERVICE OF PROCESS***.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN Section 11.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

**Section 11.14. Waiver of Jury Trial.**    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).    EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 11.15. Arbitration**.

(a)    At the request of any Loan Party, Administrative Agent or any Lender, any dispute, claim or controversy of any kind (whether in contract or tort, statutory or common law, legal or equitable) now existing or hereafter arising between Administrative Agent or any Lender, on the one hand, and any Loan Party, on the other hand, and in any way arising out of, pertaining to or in connection with:  (i) this Agreement, and/or any renewals, extensions, or amendments thereto; (ii) any of the Loan Documents; (iii) any violation of this Agreement or the Loan Documents; (iv) all past, present and future loans; (v) any incidents, omissions, acts, practices or occurrences arising out of or related to this Agreement or the Loan Documents causing injury to either party whereby the other party or its agents, employees or representatives may be liable, in whole or in part, or of any aspect of the past, present or future relationships of the parties, will be resolved through final and binding arbitration conducted at a location determined by the arbitrator in Los Angeles, California, and administered by the American Arbitration Association ("AAA") in accordance with the California Arbitration Act (Title 9, California Code of Civil Procedure Section 1280 et. seq.) and the then existing Commercial Rules of the AAA.  The arbitrator(s) will give effect to statutes of limitation, waiver and estoppel and other affirmative defenses in determining any claim.   Any controversy concerning whether an issue is arbitrable will be determined by the arbitrator(s).  The laws of the State of California will govern.  The arbitration award may include equitable and declaratory relief.  All arbitrator(s) selected will be required to be a

practicing attorney or retired judge licensed to practice law in the State of California and
will be required to be experienced and knowledgeable in the substantive laws applicable
to the subject matter of the controversy or claim at issue.  Judgment upon any award
rendered by the arbitrator(s) may be entered in any state or federal courts having
jurisdiction thereof.

(b)    No provision of this Agreement will limit the right of any party to:
(i) foreclose against any real property collateral by the exercise of a power of sale under a
deed of trust, mortgage or other security agreement or instrument, or applicable law,
(ii) exercise any rights or remedies as a secured party against any personal property
collateral pursuant to the terms of a security agreement or pledge agreement, or
applicable law, (iii) exercise self help remedies such as set off, or (iv) obtain provisional
or ancillary remedies such as injunctive relief or the appointment of a receiver from a
court having jurisdiction before, during or after the pendency of any arbitration or
referral.  The institution and maintenance of an action for judicial relief or pursuit of
provisional or ancillary remedies, or exercise of self help remedies will not constitute a
waiver of the right of any party, including the plaintiff, to submit any dispute to
arbitration or judicial reference.

**Section 11.16. USA PATRIOT Act Notice**.  Each Lender that is subject to the Act (as
hereinafter defined) and Administrative Agent (for itself and not on behalf of any Lender) hereby
notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of
Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify
and record information that identifies the Loan Parties, which information includes the name and
address of the Loan Parties and other information that will allow such Lender or Administrative
Agent, as applicable, to identify the Loan Parties in accordance with the Act.  The Loan Parties
shall, promptly following a request by Administrative Agent or any Lender, provide all
documentation and other information that Administrative Agent or such Lender requests in order
to comply with its ongoing obligations under applicable "know your customer" and anti-money
laundering rules and regulations, including the Act.

**Section 11.17. No Advisory or Fiduciary Responsibility**.  In connection with all aspects
of each transaction contemplated hereby (including in connection with any amendment, waiver
or other modification hereof or of any other Loan Document), each Loan Party acknowledges
and agrees that: (i) (A) the services regarding this Agreement provided by Administrative Agent
are arm's-length commercial transactions between the Loan Parties and their Affiliates, on the
one hand, and Administrative Agent on the other hand, (B) each Loan Party has consulted their
own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and
(C) each Loan Party is capable of evaluating, and understand and accept, the terms, risks and
conditions of the transactions contemplated hereby and by the other Loan Documents;
(ii) (A) Administrative Agent is and has been acting solely as a principal and, except as expressly
agreed in writing by the relevant parties, has not been, is not, and will not be acting as an
advisor, agent or fiduciary for any Loan Party or any of their Affiliates or any other Person and
(B) Administrative Agent has no obligations to each Loan Party or any of their Affiliates with
respect to the transactions contemplated hereby except those obligations expressly set forth
herein and in the other Loan Documents and (iii) Administrative Agent and its respective
Affiliates may be engaged in a board range of transactions that involve interests that differ from

those of the Loan Parties and their Affiliates, and Administrative Agent has no obligation to disclose any of such interests to the Loan Parties or its Affiliates.  To the fullest extent permitted by law, each Borrower and the other Loan Parties hereby waive and release any claims that it may have against Administrative Agent with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

      **Section 11.18. Replacement of Lenders**.  If any Lender requests compensation under Section 3.04, or if any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 and, in each case, such Lender has declined or is unable to designate a different Lending Office in accordance with Section 3.06, or if any Lender is a Defaulting Lender or if any Lender is a Non-Consenting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 11.06), all of its interests, rights (other than its existing rights to payments pursuant to Section 3.01 or Section 3.04) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

      (a)    the Borrowers shall have received the prior written consent of Administrative Agent, which consent shall not unreasonably be withheld;

      (b)    the Borrowers shall have paid to Administrative Agent the assignment fee specified in Section 11.06(b);

      (c)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loan, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

      (d)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

      (e)    in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, the assignee must have approved in writing the substance of the amendment, waiver or consent which caused the assignor to be a Non-Consenting Lender; and

      (f)    such assignment does not conflict with applicable Laws.

      A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

**Section 11.19. Keep Well**.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under any Guaranty in respect of Swap Obligations under any Related Swap Contract (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 11.19 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 11.19, or otherwise under such Guaranty, voidable under applicable Laws relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 11.19 shall remain in full force and effect until the guarantees in respect of Swap Obligations under each Related Swap Contract have been discharged, or otherwise released or terminated in accordance with the terms of this Agreement. Each Qualified ECP Guarantor intends that this Section 11.19 constitute, and this Section 11.19 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**Section 11.20. Acknowledgement and Consent to Bail-In of EEA Financial Institutions**.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

       (a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

       (b)     the effects of any Bail-In Action on any such liability, including, if applicable:

           (i)     a reduction in full or in part or cancellation of any such liability;

           (ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

           (iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**Section 11.21. Borrower Agent**.

       (a)     The Borrowers maintain an integrated cash management system reflecting their interdependence on one another and the mutual benefits shared among them as a result of their respective operations.  In order to efficiently fund and operate their

respective businesses and minimize the number of borrowings which they will make under this Agreement and thereby reduce the administrative costs and record keeping required in connection therewith, including the necessity to enter into and maintain separately identified and monitored borrowing facilities, the Borrowers have requested, and Lenders have agreed that the Term Loans and the Revolving Facility will be advanced to and for the account of the Borrowers on a joint and several basis in accordance with the other provisions hereof. Each Borrower hereby acknowledges that it will be receiving direct and indirect benefits from the Term Loans and the Revolving Facility made pursuant to this Agreement.

(b)    Each Loan Party hereby designates, appoints, authorizes and empowers Borrower Agent as its agent to act as specified in this Agreement and each of the other Loan Documents and Borrower Agent hereby acknowledges such designation, authorization and empowerment, and accepts such appointment. Each Loan Party hereby irrevocably authorizes and directs Borrower Agent to take such action on its behalf under the provisions of this Agreement and the other Loan Documents, and any other instruments, documents and agreements referred to herein or therein, and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Borrower Agent by the respective terms and provisions hereof and thereof, and such other powers as are reasonably incidental thereto, including, without limitation, to take the following actions for and on such Loan Party's behalf:

(i)    to submit on behalf of each Loan Party, Loan Notices and other notices and requests to Administrative Agent and Lenders, as the case may be, in accordance with the provisions of this Agreement;

(ii)    to receive on behalf of each Borrower the proceeds of the Term Loans and Revolving Loans in accordance with the provisions of this Agreement, such proceeds to be disbursed to or for the account of the applicable Borrower as soon as practicable after its receipt thereof; and

(iii)    to submit on behalf of each Loan Party, compliance certificates and all other certificates, notices and other communications given or required to be given hereunder.

Borrower Agent hereby further is authorized and directed by each Loan Party to take all such actions on behalf of such Loan Party necessary to exercise the specific power granted in clauses (i) through (iii) above and to perform such other duties hereunder and under the other Loan Documents, and deliver such agreements, documents, certificates and instruments as delegated to or required of Borrower Agent by the terms hereof or thereof.

(c)    The administration by Administrative Agent and Lenders of the credit facility under this Agreement as a co borrowing facility with a funds administrator in the manner set forth herein is solely as an accommodation to Borrowers and at their request, Administrative Agent and Lenders shall not incur any liability to any Borrower as a result thereof.

**Section 11.22. Joint and Several Liability.**

(a)    Each Borrower represents and warrants that, in consequence of the receipt and use of such proceeds and direct and indirect benefits by any particular Borrower, all the Borrowers shall be jointly and severally liable for all obligations and indebtedness so incurred hereunder by any Borrower.  Without limiting the provisions of <u>Section 11.04</u>, each Borrower covenants and agrees to assume joint and several liability for and to protect, indemnify and hold harmless Administrative Agent and the Lenders from any and all liabilities, obligations, damages, penalties, claims, causes of action, costs, charges and expenses (including without limitation, attorneys' fees), which may be incurred by, imposed or asserted against Administrative Agent or any Lender, howsoever arising or incurred because of, out of or in connection with the disbursements of the Loans in accordance with this <u>Section 11.22</u>; <u>provided</u>, <u>however</u>, the liability of the Borrowers pursuant to this indemnity shall not extend to any liability, obligation, damage, penalty, claim, cause of action, cost, charge or expense determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of Administrative Agent or the Lenders.  Each of the Borrowers shall maintain detailed accounting and records of all disbursements and payments made to each respective Borrower with respect to proceeds of Loans received by it.  Not in any way in limitation of any other provisions set forth herein, such books and records may be reviewed and copied by Administrative Agent at such Borrower's expense at reasonable intervals and upon reasonable notice given by Administrative Agent to such Borrower.

(b)    For the avoidance of doubt, each of the Borrowers agrees and understands that it shall be jointly and severally liable with each other Borrower for all Loans and all other Obligations, without regard to the identity of the Borrower in whose name any Loan is made.

(c)    The Obligations of each Borrower under this <u>Section 11.22</u> are those of primary obligor, and not merely as surety, and are independent of the Obligations and the obligations of any other Borrower or guarantor, and a separate action may be brought against each Borrower to enforce this Agreement whether or not any other Borrower or any other person or entity is joined as a party.

(d)    Each Borrower represents and warrants that the request for joint handling of the Loans and other Obligations made hereunder was made because the Borrowers are engaged in related operations and are interdependent.  Each Borrower expects to derive benefit, directly or indirectly, from such availability because the successful operation of Borrowers is dependent on the continued successful performance of the functions of the group.

(e)    Each Borrower acknowledges and agrees that it has the sole responsibility for, and has adequate means of, obtaining from the other Borrowers and any guarantor such information concerning the financial condition, business and operations of the other Borrowers and any such guarantor as such Borrower requires, and that none of the Secured Parties has any duty, and such Borrower is not relying on the Secured Parties at

any time, to disclose to it any information relating to the business, operations or financial condition of any other Borrower or any guarantor (each Borrower waiving any duty on the part of the Secured Parties to disclose such information and any defense relating to the failure to provide the same).

(f)    The Obligations of the Borrowers under this Agreement and the other Loan Documents shall be joint and several, absolute and unconditional irrespective of, and each Borrower hereby expressly waives, to the extent permitted by law, any defense to its Obligations under this Agreement and all the other Loan Documents to which it is a party by reason of:

(i)    any lack of legality, validity or enforceability of this Agreement, of any of the Notes, of any other Loan Document, or of any other agreement or instrument creating, providing security for, or otherwise relating to any of the Obligations (the Loan Documents and all such other agreements and instruments being collectively referred to as the "Related Agreements");

(ii)    any action taken under any of the Related Agreements, any exercise of any right or power therein conferred, any failure or omission to enforce any right conferred thereby, or any waiver of any covenant or condition therein provided;

(iii)    any acceleration of the maturity of any of the Obligations (whether of such Borrower or of any other Borrower) or of any other obligations or liabilities of any Person under any of the Related Agreements;

(iv)    any release, exchange, non-perfection, lapse in perfection, disposal, deterioration in value, or impairment of any security for any of the Obligations (whether of such Borrower or of any other Borrower) or for any other obligations or liabilities of any Person under any of the Related Agreements;

(v)    any dissolution of any Borrower or any Guarantor or any other party to a Related Agreement, or the combination or consolidation of any Borrower or any Guarantor or any other party to a Related Agreement into or with another entity or any transfer or disposition of any assets of any Borrower or any Guarantor or any other party to a Related Agreement;

(vi)    any extension (including without limitation extensions of time for payment), renewal, amendment, restructuring or restatement of, any acceptance of late or partial payments under, or any change in the amount of any borrowings or any credit facilities available under, this Agreement, any of the Notes or any other Loan Document or any other Related Agreement, in whole or in part;

(vii)    the existence, addition, modification, termination, reduction or impairment of value, or release of any other guaranty (or security therefor) of any of the Obligations (whether of such Borrower or of any other Borrower);

(viii)    any waiver of, forbearance or indulgence under, or other consent to any change in or departure from any term or provision contained in this Agreement, any other Loan Document or any other Related Agreement, including without limitation any term pertaining to the payment or performance of any of the Obligations (whether of such Borrower or of any other Borrower) or any of the obligations or liabilities of any party to any other Related Agreement; or

(ix)    any other act, agreement or circumstance whatsoever (with or without notice to or knowledge of any other Borrower) (other than the final and indefeasible payment in full of the Obligations) which may or might in any manner or to any extent vary the risks of such Borrower, or might otherwise constitute a legal or equitable defense available to, or discharge of, a surety or a guarantor, including without limitation any right to require or claim that resort be had to any Borrower or any other Loan Party or to any collateral in respect of the Obligations.

(g)    Each Borrower waives (a) any defense arising by reason of any disability or other defense of the other Borrowers or any guarantor, or the cessation from any cause whatsoever (including any act or omission of any Secured Party) of the liability of the other Borrowers or any other Loan Party; (b) any defense based on any claim that such Borrower's obligations exceed or are more burdensome than those of the other Borrowers or any other Loan Party; (c) the benefit of any statute of limitations affecting any Borrower's liability hereunder; (d) any right to proceed against the other Borrowers or any other Loan Party, proceed against or exhaust any security for the Obligations, or pursue any other remedy in the power of any Secured Party whatsoever; (e) any benefit of and any right to participate in any security now or hereafter held by any Secured Party; and (f) to the fullest extent permitted by law, any and all other defenses or benefits that may be derived from or afforded by applicable Law limiting the liability of or exonerating guarantors or sureties.  Each Borrower expressly waives all setoffs and counterclaims and all presentments, demands for payment or performance, notices of nonpayment or nonperformance, protests, notices of protest, notices of dishonor and all other notices or demands of any kind or nature whatsoever with respect to the Obligations, and all notices of acceptance or of the existence, creation or incurrence of new or additional Obligations.  Each Borrower waives any rights and defenses that are or may become available to it by reason of §§ 2787 to 2855, inclusive, and §§ 2899 and 3433 of the California Civil Code.

(h)    No Borrower shall exercise any right of subrogation, contribution, indemnity, reimbursement or similar rights with respect to any payments it makes under this Agreement until all of the Obligations and any amounts payable under this Agreement have been indefeasibly paid and performed in full and the Commitments and the Facilities are terminated.  If any amounts are paid to a Borrower in violation of the foregoing limitation, then such amounts shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to reduce the amount of the Obligations, whether matured or unmatured.

(i)      If acceleration of the time for payment of any of the Obligations is stayed, in connection with any case commenced by or against any Borrower or any Guarantor under any Debtor Relief Laws, or otherwise, all such amounts shall nonetheless be payable by each Borrower, jointly and severally, immediately upon demand by the Secured Parties.

(j)      The Borrowers agree among themselves that, in connection with payments made hereunder, each Borrower shall have contribution rights against the other Borrowers as permitted under applicable Law.

(k)      Each Borrower understands and acknowledges that if the Secured Parties foreclose judicially or nonjudicially against any real property security for the Obligations, that foreclosure could impair or destroy any ability that such Borrower may have to seek reimbursement, contribution, or indemnification from the other Borrowers or others based on any right such Borrower may have of subrogation, reimbursement, contribution, or indemnification for any amounts paid by such Borrower under this Agreement.  Each Borrower further understands and acknowledges that in the absence of this paragraph, such potential impairment or destruction of such Borrower's rights, if any, may entitle such Borrower to assert a defense based on Section 580d of the California Code of Civil Procedure as interpreted in Union Bank v. Gradsky, 265 Cal. App. 2d 40 (1968).  By executing this Agreement, each Borrower freely, irrevocably, and unconditionally: (i) waives and relinquishes that defense and agrees that it will be fully liable under this Agreement even though the Secured Parties may foreclose, either by judicial foreclosure or by exercise of power of sale, any deed of trust securing the Obligations; (ii) agrees that it will not assert that defense in any action or proceeding which the Secured Parties may commence to enforce any remedy; (iii) acknowledges and agrees that the rights and defenses waived by such Borrower include any right or defense that it may have or be entitled to assert based upon or arising out of any one or more of §§ 580a, 580b, 580d, or 726 of the California Code of Civil Procedure or § 2848 of the California Civil Code; and (iv) acknowledges and agrees that the Secured Parties are relying on this waiver in creating the Obligations, and that this waiver is a material part of the consideration which the Secured Parties are receiving for creating the Obligations.

(l)      Each Borrower waives all rights and defenses that it may have because any of the Obligations may be secured by real property.  This means, among other things: (i) the Secured Parties may collect from any Borrower without first foreclosing on any real or personal property collateral pledged by the other Loan Parties; and (ii) if the Secured Parties foreclose on any real property collateral pledged by the other Loan Parties:  (A) the amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) the Secured Parties may collect from any Borrower even if the Secured Parties, by foreclosing on the real property collateral, have destroyed any right such Borrower may have to collect from any other Person.  This is an unconditional and irrevocable waiver of any rights and defenses each Borrower may have because any of the Obligations may be secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon § 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

(m)     Each Borrower waives any right or defense it may have at law or equity, including California Code of Civil Procedure § 580a, to a fair market value hearing or action to determine a deficiency judgment after a foreclosure.


[REMAINDER OF PAGE INTENTIONALLY BLANK;
SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, each of the parties has duly executed this Credit Agreement as of the date first written above.

**BORROWERS:**

**NKS RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title:   Manager

**HR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title:   Manager

**MR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title:   Manager

**C UTAH, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title:   Manager

[Credit Agreement]

**AZM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper

Title:  Manager


**NDM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper

Title:   Manager

[Credit Agreement]

**GUARANTORS:**

**LOVELOUD RESTAURANTS, L.C.,**
a Utah limited liability company

By: Meridian Restaurants Unlimited, LC, its
    Manager

    By: _David Harper_____
    Name: David Harper
    Title: Manager


**MERIDIAN RESTAURANTS UNLIMITED, LC,**
a Utah limited liability company

By: _David Harper_____
Name: David Harper
Title: Manager


Address for notices for the Loan Parties:

5929 Fashion Point Dr., Suite 501
South Ogden, Utah 84403
Attention: David Harper
Telephone: 801-621-0905 ext. 3033
E-mail: david@mrulc.com

[Credit Agreement]

**ADMINISTRATIVE AGENT AND A LENDER**:

**CITY NATIONAL BANK**

By: _____
Name: Chris Poppe
Title:   Senior Vice President


Address for notices:

City National Bank
10900 NE 4th Street, Suite 1920
Bellevue, WA  98004
Attention:  Chris Poppe
Telephone:  (425) 468 2854
E mail:  chris.poppe@cnb.com

With a copy by email to:

agencyservices@cnb.com

[Credit Agreement]

A LENDER:

**BRIDGE FUNDING GROUP, INC.**

By: _____

Name: Gregory Fandry

Title: SVP

Bridge Funding Group, Inc.
215 Schilling Circle, Suite 100
Hunt Valley, MD 21031
Attention: Eileen Giovannzi
Telephone: 443-589-2168

**Schedule 1.01-A**

**Initial Restaurants**

1.   #14035 – Logan 1
     1080 N Main Street
     Logan, UT 84341-2216

2.   #10570 – Logan 2
     202 N Main Street
     Logan, UT 84321

3.   #9601 – Brigham City
     995 S Main Street
     Brigham City, UT 84302-3145

4.   #10706 – 12th Street
     368 E 12th Street
     Ogden, UT 84404-5713

5.   #10519 – Harrison
     4168 Harrison Blvd
     Ogden, UT 84403

6.   #10511 – Antelope
     2025 N Main Street
     Layton, UT 84041

7.   #7837 – Layton
     803 N Main Street
     Layton, UT 84041-2232

8.   #10625 – 72nd South
     705 E 7200 S
     Midvale, UT 84047-5113

9.   #10484 – 47th South
     3975 W 4700 S
     Salt Lake City, UT 84118

10.  #10457 – Park City
     1720 Park Ave
     Park City, UT 84060

11.  #9661 – Tremonton
     2267 West Main
     Tremonton, UT 84337-9333

12.   #20507 - AF Walmart
     949 W. Grassland Dr.

American Fork, UT 84003

13.    #22530 - Farr West
1655 West 2700 North
Farr West, UT 84404

14.    #20352 – Clearfield
729 N Main Street.
Clearfield, UT 84015

15.    #6138 – Farmington
1252 North Hwy 89
Farmington, UT 84025

16.    #6069 - North Temple
1660 W.- North Temple
Salt Lake City, UT 84116

17.    #3428 – Taylorsville
5682 S. Redwood Rd.
Salt Lake City, UT 84123

18.    #9752 – Fort Union
7810 S 1300 E
Sandy, UT  84094-0746

19.    #10339 – South Towne
10235 S. State St
Sandy, UT  84070

20.    #9949 - West Jordan
1590 West 9000 South
West Jordan, UT 84088

21.    #17146 – Draper
147 East Bangerter Highway
Draper, UT 84020

22.    #17878 – Lehi
1466 E SR 92
Lehi, UT 84043

23.    #17830 – Saratoga
119 E Crossroads Blvd.
Saratoga Springs, UT   84045-5556

24.    #7980 - American Fork
215 East State St.
American Fork, UT  84003

25.    #23274 – Heber

171 E Gateway Dr.
Heber, UT  84032

26.    #7233 – Provo
1080 S. University Ave.
Provo, UT 84601

27.    #24378 - West Haven
1888 W 2550 S
West Haven, UT 84401

28.    #22687 - Devils Lake
Gouldings Rd
Devils Lake, ND 58301

29.    #4290 - GATEWAY
3765 Gateway Drive.
Grand Forks, ND 58203

30.    #11142 - 32nd AVENUE
3151 32nd Ave. So.
Grand Forks, ND 58201

31.    #5684 - NORTH FARGO
1333 19th Ave. N.
Fargo, ND 58102

32.    #23092 - WEST FARGO
840 26th Ave. E
West Fargo, ND 58078

33.    #7961 - NORTH MOORHEAD
100 21st. St. N.,
Moorhead, MN 56560

34.    #22109 - SOUTH FARGO
5200 31st St.
So. Fargo, ND 58104

35.    #2209 - BISMARCK
315 South 3rd St
Bismarck, ND 58504-5520

36.    #8836 - DICKINSON
321 15th Street W
Dickinson, ND 58601-3017

37.    #12156 - EAST FERGUS
705 East Vernon Ave.,
Fergus Falls, MN 56537

38.  #12389 - LONG PRAIRIE
     205 Lake St.
     Long Prairie, MN 56347

39.  #11071 - NORTHSIDE
     209 Nokomis
     Alexandria, MN 56308

40.  #14060 - EASTGATE
     1611 E. Hwy. 12
     Willmar, MN 56201

41.  #11534 - REDWOOD FALLS
     516 E Bridge St.
     Redwood Falls, MN 56283

42.  #8196 - HUTCHINSON
     1185 Hwy. 7 W.
     Hutchinson, MN 55350

43.  #13377 - EAST GRAND FORKS
     926 Central Ave N.E.,
     East Grand Forks, MN 56721

44.  #1589 - SOUTH WASHINGTON
     1416 S. Washington St
     Grand Forks, ND 58201

45.  #10203 - HILLSBORO
     105 6th St. SW.,
     Hillsboro, ND 58045

46.  #1663 - WEST ACRES
     1212 36th St. S.
     Fargo, ND 58103

47.  #4934 - SOUTH MOORHEAD
     2412 8th St. So.
     Moorhead, MN 56560

48.  #1908 - SOUTH UNIVERSITY
     2253 University Dr. S.
     Fargo, ND 58103

49.  #9915 - JAMESTOWN
     2314 Highway 281 S.,
     Jamestown, ND 58401

50.  #11084 - MANDAN
     1400 East Main
     Mandan, ND 58554-3770

51.   #11345 - PARK RAPIDS
      310 First St. East
      Park Rapids, MN 56470

52.   #12139 - WEST FERGUS
      528 Western Ave. North
      Fergus Falls, MN 56537

53.   #3496 - SOUTHSIDE
      303 30th Ave.
      Alexandria, MN 56308

54.   #4167 - WILLMAR
      1201 S. 1st St.
      Willmar, MN 56201

55.   #12317 - LITCHFIELD
      21 W Depot St.
      Litchfield, MN 55355

56.   #10678 - MONTEVIDEO
      586 SW 1st St.
      Montevideo, MN 56265

57.   #14134 - NEW ULM
      1922 S. Broadway
      New Ulm, MN 56073

58.   #12473 - COLUMBIA FALLS
      1211 9th St. West
      Columbia Falls, MT 59912

59.   #9036 - RESERVE
      2601 North Reserve St.
      Missoula, MT 59808

60.   #22961 - HAMILTON
      1341 N 1st St
      Hamilton, MT 59840

61.   #13293 - NORTHWEST
      315 Northwest Bypass
      Great Falls, MT  59404

62.   #17433 - SANDERS
      3130 N. Sanders
      Helena, MT  59601

63.   #11413 - BELGRADE
      6915 Jackrabbit Lane

Belgrade, MT  59714

64.    #5165 - KING PARK
       790 King Park Drive
       Billings, MT 59102

65.    #8411 - HEIGHTS
       820 Main St.
       Billings, MT 59105

66.    #9084 - LOCKWOOD
       2813 Old Hardin Rd.
       Billings, MT 59101

67.    #9507 - RIVERTON
       2150 N Federal Blvd
       Riverton WY   82501-5206

68.    #2178 - LARAMIE
       3001 East Grand Ave
       Laramie WY  82070-5104

69.    #13158 - KALISPELL
       1363 US Hwy. 2 East
       Kalispell, MT 59901

70.    #7518 - BROADWAY
       701 East Broadway
       Missoula, MT 59802

71.    #1666 - GREAT FALLS
       1605 10th Ave. So.
       Great Falls, MT  59405

72.    #9257 - PROSPECT
       2820 Prospect Ave.
       Helena, MT  59601

73.    #6608 - BUTTE
       1955 Dewey Blvd.
       Butte, MT  59701

74.    #2195 - BOZEMAN
       1922 W Main St.
       Bozeman, MT  59718

75.    #11036 - SOUTH BILLINGS
       4780 King Ave. East
       Billings, MT 59102

76.    #7485 - DOWNTOWN

520 North 27th St.
Billings, MT 59101

77.  #6118- CODY
     1902 Mountainview Drive
     Cody, WY  82414-4931

78.  #17794 - RAWLINS
     2510 E Cedar Street
     Rawlins, WY  82301-6022

79.  #23819 - SAPPHIRE
     4002 Montana Sapphire Rd
     Billings, MT  59106

80.  #9644  - TUCSON
     3485 E. Ajo Way
     Tucson, AZ 85713

81.  #2982 - THATCHER
     2103 W. Hwy. 70
     Thatcher, AZ 85552

82.  #6879 - SIERRA VISTA
     415 Hwy. 90 Bypass
     Sierra Vista, AZ 85635

83.  #14184 - DOUGLAS
     99 E 5th St.
     Douglas, AZ 85607

84.  #6787 - WILLCOX
     1205 Rex Allen Dr.
     Willcox, AZ 85643

85.  #11383 - GREEN VALLEY
     19110 S I-19 Frontage Rd.
     Green Valley, AZ 85629

86.  #6315 - BISBEE
     101 Naco Hwy.
     Bisbee, AZ 85603

87.  #24915 – YORKTOWN
     3102 Yorktown Drive
     Bismarck, ND 58503

**Schedule 1.01-B**

**Term Loan A-1 Acquisition Restaurants**

1. #10218 – Holton
   403 Arizona Ave.
   Holton, KS 66436

2. #10415 – Lincoln
   5940 Havelock Ave.
   Lincoln, NE 68507

3. #10579 – Hastings
   927 West 14th Street
   Hastings, NE 68901

4. #10701 – Salina
   2650 South 9th Street
   Salina, KS 67401

5. #12128 – Lincoln
   3810 Old Cheney
   Lincoln, NE 68516

6. #13029 – Lincoln
   2504 O Street
   Lincoln, NE 68510

7. #14234 – Junction City
   1802 North Washington Street
   Junction City, KS 66441

8. #17904 – Lincoln
   201 North 84th Street
   Lincoln, NE 68505

9. #1988 – Aberdeen
   908 Sixth Ave., S.E.
   Aberdeen, SD 57401

10. #2082 – Mitchell
    1617 North Main Street
    Mitchell, SD 57301

11. #21514 – Manhattan
    401 McCall Rd.
    Manhattan, KS 66502

12. #23634 – McPherson
    2201 East Kansas
    McPherson, KS 67460

13. #3597 – Salina
    316 E. Iron Ave.
    Salina, KS 67401

14. #3909 – Lincoln
    1448 North 48th Street
    Lincoln, NE 68504

15. #4247 – Lincoln
    2500 North 11th Street
    Lincoln, NE 68521

16. #4582 – Topeka
    6002 S.W. 10th Street
    Topeka, KS 66615

17.  #4930 – Lincoln
    2805 South 48th Street
    Lincoln, NE 68506

18. #5167 – Beatrice
    501 North 6th Street
    Beatrice, NE 68310

19. #5492 – Topeka
    2817 S.E. California
    Topeka, KS 66605

20. #5880 – Topeka
    3690 S.W. Topeka Blvd.
    Topeka, KS 66611

21. #5957 – Manhattan
    1328 Laramie,
    Manhattan, KS 66502

22. #6677 – Lincoln
    2045 South 17th Street
    Lincoln, NE 68502

23. #7061 – Topeka
    1800 S.W. 10th Avenue
    Topeka, KS 66604

24. #7906 – York
    3627 South Lincoln Ave.
    York, NE 68467

25. #8511 - Lincoln
    4230 North 27th Street
    Lincoln, NE 68521

**Schedule 2.01**

**Commitments and Applicable Percentages**

| Lender | Term Loan A-1 Commitment | Applicable Percentage |
|---|---|---|
| City National Bank | $23,048,780.49 | 56.910569106% |
| Bridge Funding Group, Inc. | $17,451,219.51 | 43.089430894% |
| **Total** | $40,500,000.00 | 100.000000000% |

| Lender | Term Loan A-2 Commitment | Applicable Percentage |
|---|---|---|
| City National Bank | $10,243,902.44 | 56.910569106% |
| Bridge Funding Group, Inc. | $7,756,097.56 | 43.089430894% |
| **Total** | $18,000,000.00 | 100.000000000% |

| Lender | Revolving Commitment | Applicable Percentage |
|---|---|---|
| City National Bank | $1,707,317.07 | 56.910569106% |
| Bridge Funding Group, Inc. | $1,292,682.93 | 43.089430894% |
| **Total** | $3,000,000.00 | 100.000000000% |

**Schedule 2.05(a)**

**Repayment of Term Loan A-1 Facility**

| Payment Date | Principal Payment Amount | Principal Balance |
|---|---|---|
| 3/1/2018 | | 40,500,000.00 |
| 4/1/2018 | 266,039.60 | 40,233,960.40 |
| 5/1/2018 | 266,039.60 | 39,967,920.80 |
| 6/1/2018 | 266,039.60 | 39,701,881.19 |
| 7/1/2018 | 266,039.60 | 39,435,841.59 |
| 8/1/2018 | 266,039.60 | 39,169,801.99 |
| 9/1/2018 | 266,039.60 | 38,903,762.39 |
| 10/1/2018 | 266,039.60 | 38,637,722.78 |
| 11/1/2018 | 266,039.60 | 38,371,683.18 |
| 12/1/2018 | 266,039.60 | 38,105,643.58 |
| 1/1/2019 | 266,039.60 | 37,839,603.98 |
| 2/1/2019 | 266,039.60 | 37,573,564.37 |
| 3/1/2019 | 266,039.60 | 37,307,524.77 |
| 4/1/2019 | 279,447.75 | 37,028,077.03 |
| 5/1/2019 | 279,447.75 | 36,748,629.28 |
| 6/1/2019 | 279,447.75 | 36,469,181.53 |
| 7/1/2019 | 279,447.75 | 36,189,733.79 |
| 8/1/2019 | 279,447.75 | 35,910,286.04 |
| 9/1/2019 | 279,447.75 | 35,630,838.29 |
| 10/1/2019 | 279,447.75 | 35,351,390.55 |
| 11/1/2019 | 279,447.75 | 35,071,942.80 |
| 12/1/2019 | 279,447.75 | 34,792,495.06 |
| 1/1/2020 | 279,447.75 | 34,513,047.31 |
| 2/1/2020 | 279,447.75 | 34,233,599.56 |
| 3/1/2020 | 279,447.75 | 33,954,151.82 |
| 4/1/2020 | 294,344.39 | 33,659,807.43 |
| 5/1/2020 | 294,344.39 | 33,365,463.04 |
| 6/1/2020 | 294,344.39 | 33,071,118.66 |
| 7/1/2020 | 294,344.39 | 32,776,774.27 |
| 8/1/2020 | 294,344.39 | 32,482,429.89 |
| 9/1/2020 | 294,344.39 | 32,188,085.50 |
| 10/1/2020 | 294,344.39 | 31,893,741.11 |
| 11/1/2020 | 294,344.39 | 31,599,396.73 |
| 12/1/2020 | 294,344.39 | 31,305,052.34 |
| 1/1/2021 | 294,344.39 | 31,010,707.96 |
| 2/1/2021 | 294,344.39 | 30,716,363.57 |
| 3/1/2021 | 294,344.39 | 30,422,019.18 |
| 4/1/2021 | 309,617.62 | 30,112,401.57 |
| 5/1/2021 | 309,617.62 | 29,802,783.95 |

| | | |
|---|---|---|
| 6/1/2021 | 309,617.62 | 29,493,166.33 |
| 7/1/2021 | 309,617.62 | 29,183,548.71 |
| 8/1/2021 | 309,617.62 | 28,873,931.10 |
| 9/1/2021 | 309,617.62 | 28,564,313.48 |
| 10/1/2021 | 309,617.62 | 28,254,695.86 |
| 11/1/2021 | 309,617.62 | 27,945,078.25 |
| 12/1/2021 | 309,617.62 | 27,635,460.63 |
| 1/1/2022 | 309,617.62 | 27,325,843.01 |
| 2/1/2022 | 309,617.62 | 27,016,225.39 |
| 3/1/2022 | 309,617.62 | 26,706,607.78 |
| 4/1/2022 | 325,683.36 | 26,380,924.42 |
| 5/1/2022 | 325,683.36 | 26,055,241.06 |
| 6/1/2022 | 325,683.36 | 25,729,557.70 |
| 7/1/2022 | 325,683.36 | 25,403,874.34 |
| 8/1/2022 | 325,683.36 | 25,078,190.98 |
| 9/1/2022 | 325,683.36 | 24,752,507.62 |
| 10/1/2022 | 325,683.36 | 24,426,824.26 |
| 11/1/2022 | 325,683.36 | 24,101,140.90 |
| 12/1/2022 | 325,683.36 | 23,775,457.54 |
| 1/1/2023 | 325,683.36 | 23,449,774.18 |
| 2/1/2023 | 325,683.36 | 23,124,090.82 |
| 3/1/2023 | 23,124,090.82 | (0.00) |

**Schedule 5.06**

**Litigation**

None.

**Schedule 5.13**

**Subsidiaries; Equity Interests**

(a) <u>Subsidiaries</u>. Meridian Restaurants Unlimited, LC has equity investments in the following entities, in the amounts set forth below:

1. LOVELOUD Restaurants, L.C.

| <u>Member</u> | <u>Membership Interest (%)</u> |
|---|---|
| Meridian Restaurants Unlimited, LC | 100.0% |
| TOTAL | 100.0% |

2. Stanger Restaurants, L.C.

| <u>Member</u> | <u>Membership Interest (%)</u> |
|---|---|
| Meridian Restaurants Unlimited, LC | 100.0% |
| TOTAL | 100.0% |

3. RNH Properties, L.C.

| <u>Member</u> | <u>Membership Interest (%)</u> |
|---|---|
| Meridian Restaurants Unlimited, LC | 100.0% |
| TOTAL | 100.0% |

Per the Required Equity Documents, the following will be covered by a Management Agreement post-Closing and later become wholly-owned subsidiaries of Meridian Restaurants Unlimited, LC according to the terms of the Required Equity Documents:

- Paradigm Restaurants, L.C., a Utah limited liability company
- Paradigm II, L.C., a Utah limited liability company
- PLM Restaurants, L.C., a Utah limited liability company

Note that in connection with the closing of that certain Membership Interest Purchase Agreement dated February 23, 2018, by and among David A. Harper ("Harper") and Stephan L. Ralston ("Ralston"), as the sellers, and PSCP Meridian, LLC, a Utah limited liability company, as the buyer, all of the membership interested in the following entities' have been contributed to Loveloud Restaurants, L.C. by Harper and Ralston:

- AZM Restaurants, L.C., a Utah limited liability company
- C Utah, L.C., a Utah limited liability company
- HR Restaurants, L.C., a Utah limited liability company
- MR Restaurants, L.C., a Utah limited liability company
- NDM Restaurants, L.C., a Utah limited liability company
- NKS Restaurants, L.C., a Utah limited liability company

(b) <u>Equity Interests</u>. The outstanding Equity Interests in each Loan Party are set forth here:

1. AZM Restaurants, L.C.

| Member | Membership Interest (%) |
|---|---|
| LOVELOUD Restaurants, L.C. | 100.0% |
| TOTAL | 100.0% |

2. C Utah, L.C.

| Member | Membership Interest (%) |
|---|---|
| LOVELOUD Restaurants, L.C. | 100.0% |
| TOTAL | 100.0% |

3. HR Restaurants, L.C.

| Member | Membership Interest (%) |
|---|---|
| LOVELOUD Restaurants, L.C. | 100.0% |
| TOTAL | 100.0% |

4. MR Restaurants, L.C.

| Member | Membership Interest (%) |
|---|---|
| LOVELOUD Restaurants, L.C. | 100.0% |
| TOTAL | 100.0% |

5. NDM Restaurants, L.C.

| Member | Membership Interest (%) |
|---|---|
| LOVELOUD Restaurants, L.C. | 100.0% |
| TOTAL | 100.0% |

6. NKS Restaurants, L.C.

| Member | Membership Interest (%) |
|---|---|
| LOVELOUD Restaurants, L.C. | 100.0% |
| TOTAL | 100.0% |

7. Meridian Restaurants Unlimited, LC

| Member | Membership Interest (%) |
|---|---|
| PSCP Meridian, LLC | 75.0% |
| David Harper | 25.0% |
| TOTAL | 100.0% |

8. LOVELOUD Restaurants, L.C.

| Member | Membership Interest (%) |
|---|---|
| Meridian Restaurants | 100.0% |

Unlimited, LC
TOTAL                           100.0%

**Schedule 5.19**

**Corporate Information; Locations of Loan Parties**

| Borrower/Loan Party | Type of Organization | Jurisdiction | State Entity No. | EIN | CEO Name/Address |
|---|---|---|---|---|---|
| NKS Restaurants, L.C. | LLC | Utah | 10596260-0160 | 82-3393400 | David Harper<br>5929 S. Fashion Point Dr.<br>Suite 501<br>So. Ogden, UT 84403 |
| HR Restaurants, L.C. | LLC | Utah | 6934018-0160 | 26-2114591 | David Harper<br>5929 S. Fashion Point Dr.<br>Suite 501<br>So. Ogden, UT 84403 |
| MR Restaurants, L.C. | LLC | Utah | 7655455-0160 | 27-2405774 | David Harper<br>5929 S. Fashion Point Dr.<br>Suite 501<br>So. Ogden, UT 84403 |
| C Utah, L.C. | LLC | Utah | 7220306-0160 | 26-3908502 | David Harper<br>5929 S. Fashion Point Dr.<br>Suite 501<br>So. Ogden, UT 84403 |
| AZM Restaurants, L.C. | LLC | Utah | 9316272-0160 | 47-3131673 | David Harper<br>5929 S. Fashion Point Dr.<br>Suite 501<br>So. Ogden, UT 84403 |
| NDM Restaurants, L.C. | LLC | Utah | 9169076-0160 | 47-1791172 | David Harper<br>5929 S. Fashion Point Dr.<br>Suite 501<br>So. Ogden, UT 84403 |

| Meridian Restaurants Unlimited, LC | LLC | Utah | 5144821-0160 | 22-3863257 | David Harper<br>5929 S. Fashion Point Dr.<br>Suite 501<br>So. Ogden, UT 84403 |
|---|---|---|---|---|---|
| LOVELOUD Restaurants, L.C. | LLC | Utah | 10634887-0160 | 82-3720443 | David Harper<br>5929 S. Fashion Point Dr.<br>Suite 501<br>So. Ogden, UT 84403 |

**Schedule 5.20**

**Franchise Agreements and Leases**

**(See attached.)**

MR Restaurants, LC
FRANCHISE & LEASE TERMS

| ENTITY | RESTAURANT | ADDRESS | FRANCHISE START | FRANCHISE END | ORIGINAL LEASE INFORMATION IF APPLICABLE | LANDLORD | LEASE END | OPTION TO RENEW | BASE RENT |
|---|---|---|---|---|---|---|---|---|---|
| C UTAH | 20507 - AF Wal-Mart | 949 W. Grassland Dr. American Fork, UT 84003 (801) 980 9185 | 11/5/2014 | 11/4/2024 | | Wal-Mart | 1/31/2020 | | $ 1,000.00 |
| | 9661 - Tremonton | 2267 W Main St Tremonton, UT 84337 (435) 257 0438 | 2/12/1996 | 1/31/2021 | | R JASON MILLER PROPERTIES | 2/1/2021 | (2) 5 yr option* | $ 4,200.00 |
| | 14035 - Logan I | 1080 N Main St Logan, UT 84341 (435) 753 2788 | 10/22/2001 | 1/18/2032 | | BK CORP | 1/18/2032 | NONE | $ 6,186.72 |
| | 10570 - Logan II | 202 N Main Street Logan, UT 84321-3915 (435) 753 0322 | 2/7/1997 | 2/7/2017 | Original lease between Dee's & Scott Waldron started 8/3/82 and ends August 2012 & includes (2) 5-year options | TERRATRON | 8/13/2022 | NONE | $ 8,333.33 |
| | 9601 - Bngham | 995 S Main St Brigham City, UT 84302 (435) 734 0646 | 12/7/1995 | 12/31/2032 | | LOUIE IRREVOCABLE TRUST | 10/30/2032 | NONE | $ 5,500.00 |
| | 10706 - 12th Street | 368 East 12th St Ogden, UT 84404 (801) 334 8801 | 4/22/1997 | 4/22/2017 | | BJM PROPERTIES | 12/14/2036 | ***see below | $ 8,433.33 |
| | 10519 - Harrison | 4160 Harrison Blvd Ogden, UT 84403 (801) 214 1838 | 1/11/1997 | 5/31/2032 | | JERALYN T. WINDER | 5/31/2032 | NONE | $ 7,666.66 |
| | 10511 - Antelope | 2025 N Main St Layton, UT 84041 (801) 546 4280 | 2/28/2013 | 12/31/2033 | Original lease between Layton Country Village and Terratron started ? And ended in 2004 & includes (2) 5 year options | TERRATRON | 7/31/2029 | NONE | $ 7,916.67 |
| | 7837 - Layton | 803 N Main St Layton, UT 84041 (801) 965 9137 | 6/15/1993 | 12/31/2033 | | RJR PROPERTIES | 6/15/2033 | NONE | $ 11,384.75 |
| | 10484 - 47th South | 3975 W 4700 S Salt Lake City, UT 84129-3452 (801) 966 7826 | 7/1/2013 | 5/31/2028 | Original lease between RC Willey and Terratron started 3/24/89 and ends 3/24/2009 & includes (2) 5-year options | TERRATRON | 5/31/2028 | (3) 5 yr options | $ 12,000.00 |
| | 10625 - 72nd South | 705 E 7200 S Midvale, UT 84047-5113 (801) 565 9137 | 2/24/1997 | 2/28/2027 | Original lease between Union Point & Terratron started 3/01/1987 and ended 2/28/2007 & includes (2) 10-year options | TERRATRON | 2/28/2027 | (1) 5yr option | $ 5,416.67 |
| | 10457 - Park City | 1720 Park Ave Park City, UT 84060 (435) 658 1516 | 12/3/1996 | 12/31/2026 | | TERRATRON | 12/31/2026 | NONE | $ 10,000.00 |
| | 17830 - Saratoga | 119 E Crossroads Blvd Saratoga Springs, UT 84045 (801) 766 1425 | 12/16/2010 | 12/16/2030 | | Scott McClachlan | 12/16/2030 | (4) 5 yr option | $ 11,000.00 |
| | 9752 - Ft. Union | 7810 S 1300 E Sandy, UT 84094 (801) 256 0377 | 6/15/1996 | 5/31/2016 | | Highpoint Shopping Ctr. | 5/31/2021 | (3) 5 yr option | $ 3,781.25 |
| | 7980 - American Fork | 215 E State St American Fork, UT 84003 (801) 756 5722 | 4/1/2013 | 4/1/2033 | | S.K.E.E.W., Inc. | 6/29/2020 | (1) 20 yr option | $ 5,800.00 |
| | 10339 - South Towne | 10235 State St Sandy, UT 84070 (801) 553 1758 | 4/3/1997 | 4/2/2017 | | S.K.E E W., Inc. | 6/29/2020 | (1) 5 yr option | $ 7,400.00 |
| | 3428 - Taylorsville | 5682 S Redwood Rd Taylorsville, UT 84123 | 9/1/2005 | 8/31/2025 | Original Lease May 1982 between EKX Limited Partnership and Kevin B Hawkins - Now w/ S2 Properties | S2 Properties | 5/25/2025 | NONE | $ 6,294.00 |
| | 6069 - North Temple | 1650 W North Temple Salt Lake City, UT 84116 (801) 355 8539 | 11/1/2007 | 3/23/2028 | Original Lease 3/24/1986 between Elaine Craig Carlson and C&L 38 of Utah, Inc. | Wells Fargo Trust Dept. Attn: Pat Mize 299 S. Main St. 8th Floor Salt Lake City, UT 84111 | 3/31/2028 | (1) 10 yr option (2) 5 yr option | $ 4,055.63 |
| | 6138 - Farmington | 1252 North Highway 89 Farmington, UT 84025 (801) 451 0814 | 11/1/2007 | 8/31/2027 | Original Lease December 1987 Ammendment added (3) 5 year options Currently in 1st option | The Boyer Company 675 E 500 S Ste 600 Salt Lake City, UT 84102 | 8/31/2018 | (2) 5 year option | $ 7,163.98 |
| | 7233 - Provo | 1080 S University Ave Provo, UT 84601 (801) 373 2290 | 9/30/2011 | 9/30/2031 | Original Lease 10/1/1991 Ammendment attached thru 2041 | Cherng Family Trust 1025 N. Lawrence Avenue Rosemead, CA 91770 | 9/30/2021 | (2) 5 yr option | $ 7,577.50 |
| | 9949 - 90th | 1590 W 9000 S West Jordan, UT 84088 (801) 256 9546 | 10/29/1996 | 12/31/2034 | Original lease 8/18/2003 between Allen L. Dahle Trust and C&L Investment Corporation ****** | The Allen Dahle Trust 6576 S. Redwood Rd. Ste 100 Taylorsville, UT 84123 | 12/31/2034 | (4) 5 yr option | $ 8,000.00 |
| | 17148 - Draper | 147 East Bangerler Highway Draper, UT 84020 (801) 878 5981 | 7/2/2009 | 7/2/2029 | Original lease 9/29/2008 Between Bangerter Crossing and Blue Mountain Restaurant Services, Inc. | Bangerter Crossing, LLC | 7/31/2029 | (4) 5yr option | $ 12,380.00 |
| | 17878 - Lehi | 1466 E 3500 N. Lehi UT 84043 (801) 407 8061 | 3/15/2011 | 2/1/2031 | Original Lease 8/11/2009 between BV Centerpointe, LLC and Blue Mountain Restaurant Services, Inc. | BV Center Pointe c/o Raddon Brother's Construction 1111 E. Draper Pkwy, Ste 101 Draper, UT 84020 | 1/31/2031 | (4) 5 yr option | $ 10,416.67 |
| | 20352 - Clearfield | 729 N Main St Clearfield, UT 84015 (801) 825 2122 | 8/13/2014 | 8/13/2034 | Marc Edward Kurtzebom and Treesa T Kurtzebom | Marc Edward Kurtzebom and Treesa T. Kurtzebom 6218 West Fetlock Trail, Pheonix, AZ 85085 | 4/18/2034 | (4) 5 yr option | $ 8,458.00 |
| | 22530 - Farr West | 1655 W 2700 N Farr West,UT 84404 (801) 210 2555 | 6/1/2016 | 5/31/2034 | | Agree Limited Partnership | 2/29/2036 | (4) 5 yr option | $ 9,958.33 |
| | 23274 - Heber | 171 East Gateway Dr Heber City, UT 84032 (435) 315 0020 | 3/8/2017 | 3/8/2037 | | Wadsworth Development | 3/7/2037 | (4) 5 yr option | $ 10,625.00 |
| | 24378 - West Haven | 2540 S 1900 W West Haven, UT 84401 (801) 876 5075 | 12/8/2017 | 12/8/2037 | | Wadsworth Development | 12/8/2037 | (4) 5 yr option | $ 11,500.00 |

AZM Restaurants, LC
FRANCHISE & LEASE TERMS

| ENTITY | RESTAURANT | ADDRESS | FRANCHISE START | FRANCHISE END | ORIGINAL LEASE INFORMATION IF APPLICABLE | LANDLORD | LEASE END | OPTION TO RENEW | BASE RENT |
|---|---|---|---|---|---|---|---|---|---|
| AZM | 2962- Thatcher | 2103 W. Hwy. 70 Thatcher, AZ 85552 (928) 428 6171 | 3/20/2015 | 3/31/2035 | | Burger King Corp 17777 Old Cutler Rd Miami, FL 33157 | 3/31/2035 | NONE | $ 8,358.67 |
| | 6787 - Wilcox | 1205 Rex Allen Dr Willcox,AZ 85543 (520) 384 9254 | 4/1/2015 | 6/13/2030 | | Richard Gene Ellis & Charlotee Ellis | 5/11/2019 | (2) 5yr option | $ 5,500.00 |
| | 9644 - Tucson | 3485 E. Ajo Way Tucson, Az 85713 (520) 623 7201 | 4/1/2015 | 12/31/2033 | no FA extension, lease terms on 8/30/20? | Pontus BK Portfolio LLC | 8/31/2037 | (4) 5 yr option | $ 7,182.00 |
| | 11383 - Green Valley | 19110 S I-19 Frontage Rd. Green Valley, AZ 85629 | 4/1/2015 | 12/31/2033 | | Pontus BK Portfolio LLC | 4/30/2035 | (4) 5 yr option | $ 8,583.00 |
| | 6879 - Sierra Vista | 415 Hwy. 90 Bypass Sierra Vista, AZ 85635 (520) 458 6317 | 3/20/2015 | 5/31/2037 | | CNL Income Fund VII LTD Orlando Florida | 5/31/2027 | (2) 5yr option | $ 7,083.30 |
| | 6315 - Bisbee | 101 Naco Hwy. Bisbee, AZ 85103 (520) 432 3007 | 4/1/2015 | 2/5/2028 | no FA extension, lease terms on 8/30/20? | Pontus BK Portfolio LLC | 8/31/2037 | (4) 5 yr option | $ 7,208.00 |
| | 14184 - Douglas | 99 E 5th St. Douglas, AZ 85607 (520) 572 0010 | 3/20/2015 | 3/19/2035 | | Pontus BK Portfolio LLC | 8/31/2037 | (4) 5 yr option | $ 7,333.33 |

**NDM Restaurants, LC**
**FRANCHISE & LEASE TERMS**

| ENTITY | RESTAURANT | ADDRESS | FRANCHISE START | FRANCHISE END | ORIGINAL LEASE INFORMATION IF APPLICABLE | LANDLORD | LEASE END | OPTION TO RENEW | BASE RENT |
|---|---|---|---|---|---|---|---|---|---|
| NDM | 1589 - South Washington | 1416 S Washington St Grand Forks, ND 58201 (701) 772 3025 | 12/31/2012 | 12/31/2022 | | Agree Limited Partnership | 10/31/2034 | (4) 5 yr option | $ 8,606.00 |
| | 11142 - 32nd Ave | 3151 32nd Ave S Grand Forks, ND 58201 (701) 7872435 | 12/31/2012 | 12/31/2022 | | Agree Limited Partnership | 10/31/2034 | (4) 5 yr option | $ 8,788.00 |
| | 13377 - East Grand Forks | 926 Central Ave NW East Grand Forks, MN 56721 (218) 7734121 | 6/30/2000 | 6/30/2020 | | Agree Limited Partnership | 10/31/2034 | (4) 5 yr option | $ 8,070.00 |
| | 4290 - Gateway | 3765 Gateway Drive Grand Forks, ND 58203 (701) 772 0343 | 12/31/2012 | 12/31/2022 | | Agree Limited Partnership | 10/31/2034 | (4) 5 yr option | $ 7,889.00 |
| | 10203 - Hillsboro | 105 6th St. SW. Hillsboro, ND 58045 (701) 237 9090 | 12/11/2006 | 10/23/2036 | | CHS Inc | 12/10/2026 | (2) 5yr option | $ 3,500.00 |
| | 1663 - West Acres | 1212 36th St S Fargo, ND 58103 (701) 237-9090 | 12/1/2012 | 12/1/2032 | | Agree Limited Partnership | 10/31/2034 | (4) 5 yr option | $ 12,909.00 |
| | 5684 - 19th Ave | 1333 19th Ave. N. Fargo, ND 58102 (701) 232 5142 | 7/1/2007 | 7/1/2017 | | Agree Limited Partnership | 10/31/2034 | (4) 5 yr option | $ 8,247.00 |
| | 1908 - South University | 2253 University Dr. S. Fargo, ND 58103 (701) 235 4141 | 9/6/2011 | 10/31/2026 | In negotiations on new ground leasse | BSM A Minnesota Partnership | 12/31/2018 | Currently Negotiatin | $ 5,475.00 |
| | 4934 - South Moorhead | 2412 8th St. So Moorhead, MN 56560 (218) 236 815 | 3/16/2006 | 3/16/2016 | Question on remodel and LA amendment | GFI Dakota Development, LLC | 3/1/2021 | (5) 5 yr option | $ 6,605.00 |
| | 7961 - North Moorhead | 100 21st. St. N Moorhead, MN 56560 (218) 236 6221 | 12/31/2022 | 12/31/2022 | | Agree Limited Partnership | 10/31/2034 | (4) 5 yr option | $ 9,323.00 |
| | 12139 - West Fergus | 528 Wesram Ave. North Fergus Falls, MN 56470 (218) 739 9529 | 12/12/1998 | 12/12/2018 | | Agree Limited Partnership | 10/31/2034 | (4) 5 yr option | $ 6,497.00 |
| | 12156 - East Fergus | 705 East Vernon Ave. Fergus Falls, MN 56537 (218) 739 9330 | 12/26/1998 | 12/26/2018 | | Agree Limited Partnership | 10/31/2034 | (4) 5 yr option | $ 6,049.00 |
| | 11345 - Park Rapids | 310 First St. East Park Rapids, MN 56470 (218) 732 9529 | 12/29/1997 | 1/31/2018 | Temp Extension signed on 12/29/16 | Agree Limited Partnership | 10/31/2034 | (4) 5 yr option | $ 6,750.00 |
| | 9915 - Jamestown | 2314 Highway 281 S Jamestown, ND 58401 (701) 251 1217 | 10/17/1996 | 10/17/2016 | | Agree Limited Partnership | 10/31/2034 | (4) 5 yr option | $ 9,682.00 |
| | 6836 - Dickinson | 321 15th street W Dickinson. ND 58601-3017 (701) 225 1765 | 7/29/2015 | 7/28/2035 | | R.T. Development | 7/28/2035 | (4) 5 yr option | $ 7,500.00 |
| | 2209 - Bismarck | 315 south 3rd st Bismarck, ND 58504-5520 (701) 258 5032 | 3/20/2013 | 3/19/2033 | | Walsh Development | 11/29/2032 | (1) 10 yr option | $ 7,500.00 |
| | 11084 - Mandan | 1400 East Main Mandan, ND 58554-3770 (701) 663 3331 | 9/29/1997 | 9/28/2017 | | R.T. Properties | 7/28/2034 | (4) 5 yr option | $ 7,500.00 |
| | 3496 - So. Alexandria | 303 30 Ave. Alexandria, MN 56308 (320) 762 0530 | 6/30/2000 | 6/29/2020 | | Hens Developers | 7/31/2022 | 20-yr upon Remode | $ 2,825.19 |
| | 11071 - No. Alexandria | 209 Nokomis Alexandria, MN 56308 (320) 763 1675 | 10/20/1997 | 10/19/2017 | | Rabka Enterprises | 5/31/2027 | (2) 10 year option | $ 5,580.14 |
| | 4167 - Wilimar 1st St. | 1201 S. 1st St. Willmar, MN 56201 (302) 235 1379 | 1/1/2012 | 12/31/2032 | | F&S Burnside Inc. | 2/29/2036 | (4) 5 yr option | $ 10,110.50 |
| | 14060 - Willmar Eastgate | 1611 E.Hwy. 12 Willmar, MN 56201 (320) 235 6812 | 9/8/2001 | 9/7/2021 | | Vault BK Minnesota, LLC | 2/29/2036 | (4) 5 yr option | $ 7,581.33 |
| | 12317 - Litchfield | 21 W Depot St. Litchfield, MN 55355 (320) 269 5716 | 2/23/1999 | 2/22/2019 | | Vault BK Minnesota, LLC | 2/29/2036 | (4) 5 yr option | $ 6,600.08 |
| | 12389 - Long Prairie | 205 Lake St. Long Prairie, MN 56347 (320) 732 1979 | 3/17/1999 | 3/16/2019 | | Vault BK Minnesota, LLC | 2/29/2036 | (4) 5 yr option | $ 3,765.08 |
| | 11534 - Rewood Falls | 516 E Bridge St. Redwoods Falls, MN 56283 (507) 637 3169 | 4/1/1998 | 3/31/2018 | | Vault BK Minnesota, LLC | 2/29/2036 | (4) 5 yr option | $ 5,043.00 |
| | 10678 - Montevideo | 588 SW 1st St. Montevideo, MN 56265 (320) 269 5716 | 4/19/1997 | 4/18/2017 | | Vault BK Minnesota, LLC | 2/29/2036 | (4) 5 yr option | $ 6,552.75 |
| | 8196 - Hutchinson | 1185 Hwy. 7W. Hutchison, MN 55350 (320) 587 9225 | 1/1/2012 | 12/31/2032 | | Vault BK Minnesota, LLC | 2/29/2036 | (4) 5 yr option | $ 10,047.25 |
| | 14134 - New Ulm | 1922 S. Broadway New Ulm, MN 56037 (507) 354 1288 | 12/13/2001 | 12/12/2021 | | LEDO, LLC | 9/1/2021 | (2) 10 yr option | $ 31,200.00 |
| | 22109 - So. Fargo | 5200 31st. So. Fargo, ND 58104 (701) 491 7050 | 12/28/2035 | 12/30/2035 | | Prairie Grove, Inc. | 12/30/2035 | (4) 5 yr option | $ 9,000.00 |
| | 22687 - Devil's Lake | 1701 Hwy 2E Devil's Lake, ND 58301 (701) 203 8960 | 8/31/2016 | 8/31/2036 | | Agree Limited Partnership | 8/31/2036 | (4) 5 yr option | $ 9,166.66 |
| | 23092 - W. Fargo | 840 26th Ave. E West Fargo, ND 58078 (701) 491 7340 | 12/28/2016 | 12/28/2036 | | Agree Limited Partnership | 12/31/2036 | (4) 5 yr option | $ 10,175.00 |
| | 24915 - Yorktown | 3102 Yorktown Dr Bismarck, ND 58503 (701) 712 8550 | 12/30/2017 | 12/30/2037 | | Wadsworth Development | 12/31/2037 | (4) 5 yr option | $ 11,825.00 |

## HR Restaurants, LC
## FRANCHISE & LEASE TERMS

| ENTITY | RESTAURANT | ADDRESS | FRANCHISE START | FRANCHISE END | LANDLORD | LEASE END | OPTION TO RENEW | BASE RENT |
|---|---|---|---|---|---|---|---|---|
| HR | 6118 - Cody | 1920 Moutainview Dr.<br>Cody, Wy 82414-4931<br>(307) 587 6500 | 12/30/2014 | 12/31/2034 | Zurich Equity Holdings, LLC | 6/29/2034 | (4) 5 yr option | $ 7,916.17 |
| | 9507 - Riverton | 2150 N Federal Blvd<br>Riverton, Wy 82501-5206<br>(307) 856 8797 | 12/30/2014 | 12/31/2035 | H-3, LLC | 12/30/2025 | (3) 5 yr option | $ 6,000.00 |
| | 2178 - Laramie | 3001 East Grand Ave.<br>Laramie, Wy 82070-5140<br>(307) 742 8590 | 9/11/2007 | 11/29/2032 | Lukas Family Ltd Partnership | 12/17/2032 | (4) 5 yr option | $ 9,500.00 |
| | 17794 - Rawlins | 2510 E Cedar Street<br>Rawlins, Wy 82301-6022<br>(307) 324 3866 | 11/6/2013 | 11/29/2032 | RNH Properties, L.C. | 8/30/2030 | (4) 5 yr option | $ 10,000.00 |
| | 9036 - Reserve | 2601 North Reserve St.<br>Missoula, MT 59840<br>(406) 542 1638 | 5/19/2006 | 5/22/2035 | BK RE 9036 LLC | 5/22/2035 | (2) 5 yr option | $ 8,933.33 |
| | 12473 - Columbia Falls | 1211 9th St W<br>Columbia Falls, MT 59912<br>(406) 892 8885 | 5/19/2006 | 5/22/2019 | William O. Ryan and Beverly R Ryan | 5/22/2019 | (3) 5 yr option | $ 5,566.00 |
| | 7518 - Broadway | 701 E Broadway<br>Missoula, MT 59802<br>(406) 542 0223 | 3/1/2014 | 3/1/2034 | William O. Ryan and Beverly R Ryan | 3/1/2034 | (3) 5 yr option | $ 6,320.00 |
| | 13158 - Kalispell | 1363 US Hwy. 2 E<br>Kalispell, MT 59901<br>(406) 257 3945 | 5/31/2006 | 5/31/2026 | BOM 13158 LLC | 5/31/2025 | Exhausted Option | $ 6,565.00 |
| | 5165 - King Park | 790 King Park Drive<br>Billings, Mt 59102<br>(406) 656 6711 | 9/30/2014 | 12/31/2034 | BK RE 5165 LLC | 12/31/2034 | (2) 5 yr option | $ 8,738.00 |
| | 7485 - Downtown | 520N 27th St.<br>Billings, MT 59101<br>(406) 245 7911 | 3/17/2014 | 3/17/2034 | William O. Ryan and Beverly R Ryan | 3/17/2034 | (3) 5 yr option | $ 9,513.33 |
| | 8411 - Heights | 820 Main St.<br>Billings, Mt 59105<br>(406) 259 9569 | 10/27/2014 | 10/25/2035 | BK RE 8411 LLC | 10/25/2035 | (2) 5 yr option | $ 5,940.67 |
| | 9084 - Lockwood | 2813 Old HardinRd.<br>Billings, MT 59105<br>(406) 256 5642 | 5/19/2006 | 6/29/2035 | William O. Ryan and Beverly R Ryan | 6/29/2035 | (2) 5 yr option | $ 6,725.00 |
| | 11036 - South Billings | 4780 King Ave. E<br>Billings, MT 59102<br>(406) 252 1046 | 12/31/2014 | 12/31/2034 | BK RE 11036 LLC | 12/31/2034 | (2) 5 yr option | $ 8,738.00 |
| | 2195 - Bozeman | 1922 W Main St.<br>Bozeman, Mt 59718<br>(406) 587 0555 | | 9/25/2017 | Burger King Corp. | 9/25/2017 | upon remodel it will | $ 8,104.75 |
| | 6608 - Butte | 1955 Dewey Blvd.<br>Butte, MT 59701<br>(406) 587 1955 | 2/17/2010 | 2/16/2030 | GPKA Family Limited Partnership | 2/16/2030 | (4) 5 yr option | $ 9,498.12 |
| | 11413 - Belgrade | 6915 Jackrabbit Lane<br>Belgrade, MT 59714<br>(406) 656 6711 | 3/14/1998 | 3/13/2018 | BAK, Inc. | 3/13/2018 | (4) 5 yr option | $ 11,062.13 |
| | 1666 - Great Falls 10th | 1605 10th Ave. So.<br>Great Falls, MT 59405<br>(406) 452 2636 | | 1/30/2034 | Burger King Corp.* | 1/30/2034 | NONE | $ 8,854.17 |
| | 13293 - Great Falls NW | 315 Northwest Bypass<br>Great Falls, MT 59404<br>(406) 771 1329 | | 12/31/2032 | GPKA Family Limited Partnership | 12/31/2032 | (4) 5 yr option | $ 12,537.36 |
| | 9257 - Helena Prospect | 2820 Prospect Ave.<br>Helena, MT 59601<br>(406) 443 2636 | need new* | 12/31/2032 | GRO, LLC | 12/31/2032 | (4) 5 yr option | $ 12,665.59 |
| | 17433 - Helena Sanders | 3130 N.Sanders<br>Helena, MT 59601<br>(406) 442 0847 | 12/22/2009 | 12/21/2029 | Oakes Family Trust | 12/21/2029 | (4) 5 yr option | $ 9,684.58 |
| | 22961 - Hamilton | 1341 N 1st St<br>Hamilton, MT 59480<br>(406) 542 8103 | 11/21/2016 | 11/21/2036 | Agree Limited Partnership | 11/20/2036 | (5) 5 yr option | $ 9,250.00 |
| | 23819 - Sapphire | 4002 Montana Saphire Rd<br>Billings, MT 59106<br>(406) 272 8230 | 7/21/2017 | 7/21/2037 | Wadsworth Development | 3/1/2037 | (4) 5 yr option | $ 11,000.00 |

NKS Restaurants, LC

**FRANCHISE & LEASE TERMS**

| ENTITY | RESTAURANT | ADDRESS | FRANCHISE START | FRANCHISE END | | LANDLORD | LEASE END | OPTION TO RENEW | BASE RENT |
|---|---|---|---|---|---|---|---|---|---|
| **NKS** | 12128 - Old Cheney (Lincoln) | 3810 Old Cheney Lincoln, Ne 68516 (402) 420-9990 | | 12/7/2018 | | Ocho Properties, LLC - Bennie McCombs | 12/7/2018 | TBD | $ 9,639.42 |
| | 17904 - 84th St. (Lincoln) | 201 N. 84th St Lincoln, NE 68505 (402) 327-7022 | | 6/30/2036 | | JADELA NE, LLC - Dorothy/Jamie Brown | 8/30/2036 | (4) 5 yr option | $ 10,388.00 |
| | 3909 - 48th St. (Lincoln) | 1448 n. 48th St. Lincoln, NE 68504 (402) 466-6967 | | 6/30/2036 | | Ilan & Mika David | 6/30/2036 | (4) 5 yr option | $ 10,109.25 |
| | 4247 - 11th St. (Lincoln) | 2500 N. 11th St Lincoln, NE 68521 (402) 438-1663 | | 6/30/2036 | | Dean & Hali Rowen | 6/30/2036 | (4) 5 yr option | $ 10,827.00 |
| | 4930 - S. 48th St. (Lincoln) | 2805 S. 48th Lincoln, NE 68506 (402) 483-6088 | | 6/30/2036 | | McArthur Park Properties, Inc. | 6/30/2036 | (4) 5 yr option | $ 8,950.00 |
| | 5167 - Beatrice, NE | 501 N. 6th St Beatrice, NE 68310 (402) 223-4500 | | 6/29/2020 | | MALAVE Beatrice LLC - Henry Malave | 6/30/2036 | (4) 5 yr option | $ 9,594.58 |
| | 6677 - 17th St. (Lincoln) | 2045 S. 17th St Lincoln, NE 68502 (402) 476-7020 | | 6/29/2020 | | Sup Family, LLC - Layne Sup | 6/30/2020 | (1) 5 yr option | $ 5,750.00 |
| | 7906 - York, NE | 3627 S. Lincoln Ave York, NE 68467 (402) 362-2069 | | 6/29/2020 | | Richard B. Swinney, Trustee | 6/30/2036 | (4) 5 yr option | $ 8,414.00 |
| | 8511 - 27th St. (Lincoln) | 4230 N 27th St Lincoln, NE 68521 (402) 477-9979 | | 6/30/2036 | | Linda A. Hamer, Trustee | 6/30/2036 | (4) 5 yr option | $ 9,610.00 |
| | 10415 - Havelock Ave. (Lincoln) | 5940 Havelock Ave. Lincoln, NE 68507 (402) 467-2533 | | 12/31/2034 | | Huntington Partners - Bob & Vicki Rokeby | 12/31/2034 | (4) 5 yr option | $ 5,100.00 |
| | 10579 - Hastings, NE | 927 W. 14th St Hastings, NE 68901 (402) 463-1388 | | 6/30/2036 | | B. Crane, Inc. - Eva-Marie Ramirez | 6/30/2036 | (4) 5 yr option | $ 12,430.00 |
| | 13029 - O St. (Lincoln) | 2504 O St Lincoln, NE 68510 (402) 476-3050 | | 11/30/2019 | | BKC - BKL | 11/30/2019 | NONE | $ 6,633.33 |
| | 3597 - Iron St. (Salina, KS) | 318 E. Iron St Salina, KS 67401 (785) 823-1527 | | 6/30/2036 | | Barbara G. Zody, Trustee | 6/30/2036 | (4) 5 yr option | $ 8,695.00 |
| | 10701 - 9th St. (Salina, KS) | 2650 S. 9th St Salina, Ks 67401 (785) 827-1730 | | 5/28/2037 | | Alderwood Park, LLC - Whitney Pearce | 6/30/2036 | TBD | $ 10,096.00 |
| | 5957 - Laramie (Manhattan) | 1328 Laramie Manhattan, KS 66502 (785) 537-1045 | | 6/29/2020 | | Levin Properties - Jon Levin | 7/12/2018 | (2) 5 yr option | $ 6,260.50 |
| | 21514 - McCall (Manhattan) | 401 McCall Rd Manhattan, KS 66502 (785) 537-5170 | | 10/18/2035 | | BKMcCall, LLC - McCullough Dvpt, Inc | 10/18/2035 | (1) 10 yr & (2) 5 yr | $ 10,825.00 |
| | 23634 - McPherson, KS | 2201 E Kansas Ave McPherson, KS 67460 (866) 394-2493 | | 3/29/2027 | | Triplett, Inc. - Mark Augustine | 3/29/2027 | (3) 5 yr option | $ 5,270.00 |
| | 10218 - Holton, KS | 403 Arizona Holton, KS 66436 (785) 364-4800 | | 7/28/2036 | | 403 AZ Ave. Holton KS, LLC - Dr. Michael Rose | 7/28/2036 | (4) 5 yr option | $ 8,049.00 |
| | 14234 - Junction City, KS | 1802 N. Washington St. Junction City, KS 66441 (785) 238-4520 | | 2/22/2022 | | Shop Quik Stores, LLC - Greg Junghans | 2/22/2022 | (2) 10 yr option | $ 4,000.00 |
| | 4582 - 10th St. (Topeka) | 6002 SW 10th St Topeka, KS 66615 (785) 272 9566 | | 6/30/2020 | | BKC - BKL | 6/30/2020 | NONE | $ 8,684.58 |
| | 5492 - California (Topeka) | 2817 SE California Ave Topeka, KS 66605 (785) 267-5239 | | 6/30/2036 | | Calvane, LLC - Craig Cormack | 6/30/2036 | (4) 5 yr option | $ 8,005.75 |
| | 5880 - Topeka Blvd. (Topeka) | 3690 SW Topeka Blvd. Topeka, KS 66611 (785) 267-0190 | | 5/15/2037 | | StarWeather Realty Partners - Steve Levine | 5/15/2037 | ??????? | $ 12,500.00 |
| | 7061 - 10th Ave. (Topeka) | 1800 SW 10th St Topeka, KS 66604 (785) 232-6978 | | 6/30/2036 | | Calvane, LLC - Craig Cormack | 6/30/2036 | (4) 5 yr option | $ 7,961.08 |
| | 1988 - Aberdeen, SD | 908 6th Avenue SE Aberdeen, SD 57401 (605) 225-8891 | | 8/6/2032 | | Ed Rothfarb | 8/6/2032 | (4) 5 yr option | $ 9,487.17 |
| | 2082 - Mitchell, SD | 1617 North Main Mitchell, SD 57301 (605) 996-7011 | | 12/31/2032 | | Dragon 5 Mitchell Prop., LLC - Nathan Chow | 12/31/2032 | (4) 5 yr option | $ 9,748.75 |

**Schedule 6.11**

**Prior Indebtedness**

All Indebtedness owing to each of the following immediately prior to the Closing Date:

| Loan Parties | Secured Party |
| --- | --- |
| Meridian | Bridge Funding Group, Inc. |
|  | Can Capital |
|  | Webbank |
|  | Western Equipment Finance, Inc. |
| AZM | American Express Bank, FSB |
|  | City National Bank |
| C Utah | PNC Equipment Finance, LLC |
|  | Element Financial |
| HR | Bridge Funding Group, Inc. |
|  | Ally Auto |
|  | BFS Capital |
| MR | Bridge Funding Group, Inc. |
|  | Can Capital |
| NDM | City National Bank |

**Schedule 6.17**

**Post-Closing Actions**

1.      No later than 30 days after the Closing Date, the Borrowers shall deliver to Administrative Agent fully-executed copies of each of the following documents, each of which the Borrowers represent are effective as of the Closing Date:

    (a)    That certain Conditional Consent to Assignment of Franchise Agreements and Leases, by and among Burger King Corporation, Nebraska TMT, L.L.C., a Nebraska limited liability company, as assignor, NKS, as assignee, Loveloud and Meridian, as owners, Horizon Food Service, Inc., a Nebraska corporation and Craig Cormack, as guarantors, with respect to the assignment of the Restaurants previously owned by Nebraska TMT, L.L.C., a Nebraska limited liability company to NKS pursuant to the Term Loan A-1 Acquisition Agreement.

    (b)    That certain Conditional Consent to Assignment of Franchise Agreements and Leases, by and among Burger King Corporation, Horizon Food Service of Nebraska L.L.C., a Nebraska limited liability company, as assignor, NKS, as assignee, Loveloud and Meridian, as owners, Horizon Food Service, Inc., a Nebraska corporation and Craig Cormack, as guarantors, with respect to the assignment of the Restaurants previously owned by Horizon Food Service of Nebraska L.L.C., a Nebraska limited liability company to NKS pursuant to the Term Loan A-1 Acquisition Agreement.

    (c)    That certain Conditional Consent to Assignment of Franchise Agreements and Leases, by and among Burger King Corporation, Horizon Food Service of Kansas L.L.C., a Kansas limited liability company, as assignor, NKS, as assignee, Loveloud and Meridian, as owners, Horizon Food Service, Inc., a Nebraska corporation and Craig Cormack, as guarantors, with respect to the assignment of the Restaurants previously owned by Horizon Food Service of Kansas L.L.C., a Kansas limited liability company to NKS pursuant to the Term Loan A-1 Acquisition Agreement.

    (d)    That certain Conditional Consent to Transfer of Equity Interests, by and among Burger King Corporation, HR, as franchisee, Stephan Lynn Ralston and David A. Harper, as assignors, and Loveloud, Meridian, and David A. Harper, as assignees.

    (e)    That certain Conditional Consent to Transfer of Equity Interests, by and among Burger King Corporation, MR, as franchisee, Stephan Lynn Ralston and David A. Harper, as assignors, Loveloud, as assignee, and Loveloud, Meridian, and David A. Harper, as owners.

    (f)    That certain Conditional Consent to Transfer of Equity Interests, by and among Burger King Corporation, NDM, as franchisee, Stephan Lynn Ralston and David A. Harper, as assignors, and Loveloud, Meridian, and David A. Harper, as assignees.

(g)    That certain Conditional Consent to Assignment of Franchise Agreements and Leases, by and among Burger King Corporation, David A. Harper, as assignor, C Utah, as assignee, Loveloud, Meridian, and David A. Harper, as owners, and David A. Harper, as guarantor.

(h)    That certain Replacement Franchise Addendum Burger King Restaurant # 20507 by and among Burger King Corporation and C Utah, as franchisee.

(i)    That certain Franchise Agreement for Burger King Restaurant # 20507 by and among Burger King Corporation and C Utah, as franchisee.

(j)    That certain Non-Traditional Facility Addendum for Burger King Restaurant # 20507 by and among Burger King Corporation and C Utah, as franchisee.

(k)    That certain Conditional Consent to Merger by and among Burger King Corporation, R&G, RJR, and MR, as the merging corporations, MR, as the surviving corporation, Stephan Lynn Ralston and David A. Harper, as the guarantors, and Loveloud, Meridian, and David A. Harper, as the owners.

(l)    That certain Conditional Consent to Transfer of Equity Interests, by and among Burger King Corporation, AZM, as franchisee, Stephan Lynn Ralston and David A. Harper, as assignors, and Loveloud, as assignee.

**Schedule 7.01**

**Liens**

None.

**Schedule 7.02**

**Investments**

On the Closing Date, the capital contribution to be made by Meridian to Loveloud in the amount of $16,248,187.25, which in turn will be immediately contributed to the capital of NKS, pursuant to the terms of that certain Membership Interest Purchase Agreement dated as of February 23, 2018 by and among David A. Harper and Stephan L. Ralston, as sellers, and PSCP Meridian, LLC, as buyer.

**Schedule 7.03**

**Indebtedness**

None.

**Schedule 11.02**

**Notices**

Administrative Agent address:  555 South Flower Street, 25th Floor, Los Angeles, CA  90071

Administrative Agent's account:

| Bank Name and Address: | City National Bank, Los Angeles, N.A.<br>2100 Park Place<br>El Segundo, CA 90245 |
|---|---|
| ABA/Routing No.: | 122016066 |
| Account No.: | 101-306674 |
| Reference: | MR Restaurants, L.C. |
| Attention: | CLC Wire Transfer Bankcontrol |

**EXHIBIT A**

**FORM OF LOAN NOTICE**

Date: _____, _____

To:    City National Bank, as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement, dated as of February 26, 2018 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement;" the terms defined therein being used herein as therein defined), among NKS RESTAURANTS, L.C., a Utah limited liability company, HR RESTAURANTS, L.C., a Utah limited liability company, MR RESTAURANTS, L.C., a Utah limited liability company, C UTAH, L.C., a Utah limited liability company, AZM RESTAURANTS, L.C., a Utah limited liability company, and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, the "Borrowers"), Lenders from time to time party thereto, and CITY NATIONAL BANK, as Administrative Agent.

The undersigned Responsible Officer of Borrower Agent hereby requests (select one):

☐  A Borrowing of [Term Loan A-1s] [Term Loan A-2s] [Revolving Loans]

☐  A conversion or continuation of Loans

1.    On _____ (a Business Day).

2.    In the amount of $_____.

3.    Comprised of _____ (specify Eurodollar Rate Loan or Base Rate Loan).

**[IF THE LOAN NOTICE RELATES TO A BORROWING, INCLUDE THE FOLLOWING:]**

**[In connection with the requested Borrowing, Borrowers, by the undersigned Responsible Officer of Borrower Agent, hereby certifies to Administrative Agent and Lenders, in accordance with the Agreement and the other Loan Documents, that:**

**(a)    the certifications, representations and statements herein will be true and correct in all respects as of the date hereof and as of the date set forth in paragraph 1 above (the "Borrowing Date");**

**(b)    the representations and warranties of Borrower and each other Loan Party contained in the Agreement or any other Loan Document, or which are contained in any document furnished at any time under or in connection therewith, are true and correct on and as of the Borrowing Date, except to the extent that such**

representations and warranties specifically refer to an earlier date, in which case they are true and correct as of such earlier date;

(c)    no Default or Event of Default exists or would result from such proposed Borrowing or from the application of the proceeds thereof;

(d)    no Material Adverse Effect has occurred, or is likely to occur;

[(e)]    [IF THE LOAN NOTICE RELATES TO A REVOLVING BORROWING OR TERM LOAN A-2 BORROWING, INCLUDE THE FOLLOWING: the Consolidated Lease Adjusted Leverage Ratio, measured as of the end of the most recently ended Fiscal Quarter after giving pro forma effect to the proposed Borrowing, is _____ to 1.00, which is at least 0.25 to 1.00 less than the applicable level set forth in Section 7.11(d) of the Agreement (as demonstrated on Schedule A attached hereto);]

[(f)]    [IF THE LOAN NOTICE RELATES TO A TERM LOAN A-2 BORROWING, INCLUDE THE FOLLOWING: (i) the amount of the Borrowing does not exceed the Term Loan A-2 Advance Limitation, (ii) with respect to [DESCRIBE PROJECT]: (i) all work performed is in substantial accordance with the construction plans and specifications; (ii) all licenses and permits required by any Governmental Authority have been obtained; (iii) the construction as then completed does not violate any applicable law, ordinance, rule or regulation; (iv) the remaining undisbursed proceeds, together with the Borrowers' funds, are sufficient to pay for the completion of the applicable improvements, and (v) attached hereto as Schedule B is each other item required to be delivered pursuant to the Term Loan A-2 Borrowing Conditions;] and

(e)    all conditions and provisions of [Section 4.01] [Section 4.02] [Section 4.03] of the Agreement are as of the date hereof, and will be as of the Borrowing Date, fully satisfied.

[_____],
a Utah limited liability company


By:_____
Name:_____
Title:_____

Schedule A

Schedule B

**EXHIBIT B**

**FORM OF [TERM LOAN A-___][REVOLVING] NOTE**

$_____                                                    _____, 2018

  FOR VALUE RECEIVED, the undersigned (collectively, the "Borrowers"), hereby promises to pay, jointly and severally, to _____ or registered assigns (the "Lender"), in accordance with the provisions of the Agreement (as hereinafter defined), the principal amount of the [Term Loan A-___s] [Revolving Loans] from time to time made by Lender to Borrowers (or acquired by Lender) under that certain Credit Agreement, dated as of February 26, 2018 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement;" the terms defined therein being used herein as therein defined), among the Borrowers, the Guarantors party thereto, Lenders from time to time party thereto, and City National Bank, as Administrative Agent.

  Each Borrower promises to pay, jointly and severally, interest on the unpaid principal amount of the [Term Loan A-___] [the Revolving Loans] from the date of such Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Agreement.  All payments of principal and interest with respect to the [Term Loan A-___s] [Revolving Loans] shall be made to Administrative Agent for the account of Lender in Dollars in immediately available funds at Administrative Agent's Office.  If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Agreement.

  This Note is one of the Notes referred to in the Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein.  This Note is also entitled to the benefits of the Guaranty and is secured by the Collateral.  Upon the occurrence and continuation of one or more of the Events of Default specified in the Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as provided in the Agreement.  The [Term Loan A-___s] [Revolving Loans] made by Lender shall be evidenced by one or more loan accounts or records maintained by Lender in the ordinary course of business.  The Lender may also attach schedules to this Note and endorse thereon the date, amount and maturity of its [Term Loan A-___s] [Revolving Loans] and payments with respect thereto.

  Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.  Any person that is an accommodation party, co-maker, guarantor or other surety and each endorser of this Note hereby (i) waives all suretyship defenses, (ii) consents to any and all future releases of the Borrowers and other guarantors, releases of Collateral and amendments, modifications, extensions, renewals, restatements and supplements of Loan Documents, and (iii) agrees to make payment and that Lender may realize upon Collateral granted by the person without prior action by Lender against any other Loan Party or any Collateral granted by any other Loan Party.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA.

**NKS RESTAURANTS, L.C.,**
a Utah limited liability company

By:_____
Name:
Title:

**HR RESTAURANTS, L.C.,**
a Utah limited liability company

By:_____
Name:
Title:

**MR RESTAURANTS, L.C.,**
a Utah limited liability company

By:_____
Name:
Title:

**C UTAH, L.C.,**
a Utah limited liability company

By:_____
Name:
Title:

**AZM RESTAURANTS, L.C.,**
a Utah limited liability company

By:_____
Name:
Title:

**NDM RESTAURANTS, L.C.,**
a Utah limited liability company


By:_____
Name:
Title:

**EXHIBIT C**

**FORM OF COMPLIANCE CERTIFICATE**

Financial Statement Date: _____, ____

To:    City National Bank, as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement, dated as of February 26, 2018 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement;" the terms defined therein being used herein as therein defined), among NKS RESTAURANTS, L.C., a Utah limited liability company, HR RESTAURANTS, L.C., a Utah limited liability company, MR RESTAURANTS, L.C., a Utah limited liability company, C UTAH, L.C., a Utah limited liability company, AZM RESTAURANTS, L.C., a Utah limited liability company, and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, "Borrower"), the Guarantors party thereto, the Lenders from time to time party thereto, and CITY NATIONAL BANK, as Administrative Agent.

The undersigned Responsible Officer of Borrower Agent hereby certifies as of the date hereof that he/she is the _____ of Borrower Agent, and that, as such, he/she is authorized to execute and deliver this Certificate to Administrative Agent on the behalf of the Borrowers, and that:

*[Use following paragraph 1 for Fiscal **Year-end** financial statements]*

1.    The Borrowers have delivered the year-end audited financial statements required by Section 6.01(a) of the Agreement for the Fiscal Year ended as of the above date and such financial statements fairly present the financial condition, results of operations and cash flows of Meridian and its Subsidiaries in accordance with GAAP or income tax basis accounting as at such date and for such period.

*[Use following paragraph 1 for Fiscal **Quarter-end** financial statements]*

1.    The Borrowers have delivered the unaudited financial statements required by Section 6.01(b) of the Agreement for the Fiscal Quarter ended as of the above date.  Such financial statements fairly present the financial condition, results of operations and cash flows of Meridian and its Subsidiaries in accordance with GAAP or income tax basis accounting as at such date and for such period, subject only to normal year-end audit adjustments and the absence of footnotes.

2.    The Borrowers have delivered the store-level income statement for each Restaurant required by Section 6.01(c) of the Agreement for the period ended as of the above date.

3.    The undersigned has reviewed and is familiar with the terms of the Agreement and has made, or has caused to be made under his/her supervision, a detailed review of the transactions and condition (financial or otherwise) of the Loan Parties during the accounting period covered by such financial statements.

DB2/ 32700409.4

4.      A review of the activities of the Loan Parties during such fiscal period has been made under the supervision of the undersigned with a view to determining whether during such fiscal period the Loan Parties performed and observed all their Obligations under the Loan Documents, and

*[select one:]*

**[to the best knowledge of the undersigned, during such fiscal period the Loan Parties performed and observed each covenant and condition of the Loan Documents applicable to it, and no Default or Event of Default has occurred and is continuing.]**

***--or--***

**[to the best knowledge of the undersigned, during such fiscal period the following covenants or conditions have not been performed or observed and the following is a list of each such Default or Event of Default and its nature and status:]**

5.      The representations and warranties of the Loan Parties contained in Article V of the Agreement, and any representations and warranties of any Loan Party that are contained in any document furnished at any time under or in connection with the Loan Documents, are true and correct on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct as of such earlier date, and except that for purposes of this Compliance Certificate, the representations and warranties contained in subsections (a) and (b) of Section 5.05 of the Agreement shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01 of the Agreement, including the statements in connection with which this Compliance Certificate is delivered.

6.      The financial covenant analyses and information set forth on Schedule 1 attached hereto are true and accurate on and as of the date of this Certificate.

[Signatures are on the Following Page]

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of _____, 20\_\_\_.

MR RESTAURANTS, L.C.,
a Utah limited liability company


By:_____

Name:_____

Title:_____

For the Quarter/Year ended _____ ("Statement Date")

**SCHEDULE 1**
to the Compliance Certificate
($ in 000's)

**I.      Section 7.11(a) – Consolidated Pre-Compensation Fixed Charge Coverage Ratio.**

  A.      Consolidated EBITDA for four consecutive Fiscal Quarters ending on the Statement Date ("Subject Period"):

        1.      Consolidated Net Income for Subject Period:                                $_____

        2.      Consolidated Interest Charges for Subject Period:                          $_____

        3.      Provision for income taxes for Subject Period:                             $_____

        4.      Depreciation and amortization expenses for Subject Period:                 $_____

        6.      Non-recurring losses for Subject Period:                                   $_____

        7.      Non-cash items for Subject Period (incl. non-cash rent):                   $_____

        8.      Non-recurring costs and expenses for Subject Period:                       $_____

        8.      Non-recurring gains for Subject Period:                                    $(_____)

        9.      Non-cash gains for Subject Period:                                         $(_____)

        10.     For the following periods, the below corresponding
                pro forma amount:

| Fiscal Periods Ending | Acquisition Restaurants EBITDA |
|---|---|
| Fiscal Quarter ending on or about March 31, 2018 | $3,156,053 |
| Fiscal Quarter ending on or about June 30, 2018 | $2,295,312 |
| Fiscal Quarter ending on or about September 30, 2018 | $1,434,570 |
| Fiscal Quarter ending on or about December 31, 2018 | $573,828 |

        11.     Consolidated EBITDA (Lines I.A.1 + 2 + 3 + 4 + 5 +
                6 + 7 – 8 – 9+10):                                                         $_____

  B.      Rental Expense for Subject Period:

        1.      Rental Expense paid in cash                                                $_____

        2.      For the following periods, the below corresponding
                pro forma amount:

| Fiscal Periods Ending | Acquisition Restaurants Rental Expense |
|---|---|
| Fiscal Quarter ending on or about March 31, 2018 | $2,613,417 |
| Fiscal Quarter ending on or about June 30, 2018 | $1,900,667 |
| Fiscal Quarter ending on or about September 30, 2018 | $1,187,917 |
| Fiscal Quarter ending on or about December 31, 2018 | $475,167 |

3.      Line I.B.1 + I.B.2       $_____

C.      Consolidated EBITDAR (Line I.A.11 + I.B.3)       $_____

D.      Expensed Owner's Compensation       $_____

E.      Cash portion of taxes for Subject Period:       $(_____)

F.      Line I.C + I.D – I.E       $_____

G.      Consolidated Fixed Charges for the Subject Period:

1.      Consolidated Interest Charges for Subject Period:       $_____

2.      Scheduled principal payments for Subject Period:       $_____

3.      Cash Rental Expense for Subject Period (Line I.B.3 above):       $_____

4.      For the following periods, the below corresponding pro forma amount:

| Fiscal Periods Ending | Acquisition Restaurants Fixed Charges |
|---|---|
| Fiscal Quarter ending on or about March 31, 2018 | $1,878,420 |
| Fiscal Quarter ending on or about June 30, 2018 | $1,366,124 |
| Fiscal Quarter ending on or about September 30, 2018 | $853,827 |
| Fiscal Quarter ending on or about December 31, 2018 | $341,531 |

5.      Consolidated Fixed Charges (Lines I.G.1 + 2 + 3 + 4):       $_____

H.      Consolidated Pre-Compensation Fixed Charge Coverage Ratio (Line I.F ÷ Line I.G.5):       \_\_\_\_ to 1.00

*Minimum required:*       *1.25 to 1.00*

**II.      Section 7.11(b) – Consolidated Post-Distribution Fixed Charge Coverage Ratio.**

A.      Line I.C above       $_____

B.      Cash portion of taxes       $(_____)

C.      Investments in any Specified Subsidiary           $(_____)

D.      Distributions, advances, etc. to holders of Equity Interests
for Subject Period           $(_____)

E.      Repayment of principal or interest to holders of Equity
Interests for Subject Period           $(_____)

F.      Consolidated Fixed Charges for the Subject Period
(Line I.G.5 above):           $_____

G.      Consolidated Post-Distribution Fixed Charge Coverage Ratio
((Line II.A– II.B – II.C – II.D – II.E) ÷ Line II.F):       ____ to 1.00

        *Minimum required:*           *1.10 to 1.00*

**III.**    **Section 7.11(c) – Current Ratio.**

A.      Current Assets at Statement Date:           $_____

B.      Current Liabilities at Statement Date:           $_____

C.      Current Ratio (Line III.A ÷ Line III.B):       ____ to 1.00

        *Minimum required:*           *0.50 to 1.00*

**IV.**    **Section 7.11(d) – Consolidated Lease Adjusted Leverage Ratio.**

A.      Consolidated Funded Indebtedness at Statement Date:       $_____

B.      New Restaurant Debt Adjustment           $(_____)

C.      Eight (8) times Rental Expense for Subject Period (8 x Line I.B.3 above):       $_____

D.      Consolidated EBITDAR for Subject Period (Line I.C
above):           $_____

E.      Consolidated Lease Adjusted Leverage Ratio ((Line IV.A - Line
IV.B + Line IV.C) ÷ (Line IV.D)):       ____ to 1.00

        *Maximum permitted:*       6.00 to 1.00
(5.75 to 1.00
beginning
March 31, 2019)

**SCHEDULE 2**
to the Compliance Certificate

## EXHIBIT D

## FORM OF ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (this "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between [the][each][1] Assignor identified in item 1 below ([the][each, an] "<u>Assignor</u>") and [the][each][2] Assignee identified in item 2 below ([the][each, an] "<u>Assignee</u>").  [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4]  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (a) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Credit Agreement and any other Loan Documents in the amount[s] and equal to the percentage interest[s] identified below of all the outstanding rights and obligations under the respective facilities identified below and (b) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other Loan Documents or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (a) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (a) and (b) above being referred to herein collectively as [the][an] "<u>Assigned Interest</u>").  Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.

1.      Assignor[s]: _____

                           _____

---

[1]      For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language.  If the assignment is from multiple Assignors, choose the second bracketed language.

[2]      For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language.  If the assignment is to multiple Assignees, choose the second bracketed language.

[3]      Select as appropriate.

[4]      Include bracketed language if there are either multiple Assignors or multiple Assignees.

2.      Assignee[s]:    _____

        _____

        [for each Assignee, indicate [Affiliate][Approved Fund] of [*identify Lender*]]

3.      <u>Borrowers</u>:    NKS RESTAURANTS, L.C., a Utah limited liability company, HR RESTAURANTS, L.C., a Utah limited liability company, MR RESTAURANTS, L.C., a Utah limited liability company, C UTAH, L.C., a Utah limited liability company, AZM RESTAURANTS, L.C., a Utah limited liability company, and NDM RESTAURANTS, L.C., a Utah limited liability company

4.      <u>Administrative Agent</u>:  City National Bank, as the administrative agent under the Credit Agreement.

5.      <u>Credit Agreement</u>:    Credit Agreement, dated as of February 26, 2018, among Borrowers (described above), the Guarantors party thereto, the Lenders from time to time party thereto, and City National Bank, as Administrative Agent.

6.      <u>Assigned Interest[s]</u>:

| <u>Assignor[s]</u>[5] | <u>Assignee[s]</u>[6] | Facility <u>Assigned</u>[7] | Aggregate Amount of Commitment/ Loans <u>for all Lenders</u>[8] | Amount of Commit-ment/Loans <u>Assigned</u> | Percentage Assigned of Commitment/ <u>Loans</u>[9] | CUSIP <u>Number</u> |
|---|---|---|---|---|---|---|
| | | | $ | $ | % | |
| | | | $ | $ | % | |
| | | | $ | $ | % | |

[7.    <u>Trade Date</u>:    _____ ][10]

        Effective  Date:  _____, 20___  [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

---

[5]      List each Assignor, as appropriate.

[6]      List each Assignee, as appropriate.

[7]      Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment (e.g. "Revolving Commitment", "Term Loan A-2 Commitment", etc.).

[8]      Amounts in this column and in the column immediately to the right are to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[9]      Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[10]      To be completed if the Assignor and the Assignee intend that the minimum assignment amount is to be determined as of the Trade Date.

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]


By _____
Name _____
Title _____


ASSIGNEE
[NAME OF ASSIGNEE]


By _____
Name _____
Title _____


[Consented to and][11] Accepted:

CITY NATIONAL BANK, as
Administrative Agent


By _____
Name _____
Title _____


[Consented to:][12]

MR RESTAURANTS, L.C.,
a Utah limited liability company


By _____
Name _____
Title _____

_____

[11]     To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.
[12]     To be added only if the consent of Borrower Agent is required by the terms of the Credit Agreement.

<u>ANNEX 1 TO ASSIGNMENT AND ASSUMPTION</u>

**Standard Terms and Conditions for Assignment and Assumption**

1.    <u>Representations and Warranties</u>.

1.1.    <u>Assignor</u>.  [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of any Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by any Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    <u>Assignee</u>.  [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under the terms of the Credit Agreement (subject to such consents, if any, as may be required under the terms of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and the other Loan Documents as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by [the][such] Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire [the][such] Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to the terms of the Credit Agreement, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, and (vii) if it is a Foreign Lender, attached hereto is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by [the][such] Assignee; and (b) agrees that (i) it will, independently and without reliance upon the Administrative Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      <u>Payments</u>.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective Date.

3.      <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.   This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.   Delivery of an executed counterpart of a signature page of this Assignment and Assumption by fax transmission or other electronic mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of California.

**EXHIBIT E**

## **FORM OF SWAP CONTRACTS**

[See attached]

# ISDA®

International Swaps and Derivatives Association, Inc.

# 2002 MASTER AGREEMENT

dated as of    February 26, 2018

**CITY NATIONAL BANK**    and    **HR RESTAURANTS, L.C.,** a Utah limited liability company, and **NDM RESTAURANTS, L.C.,** a Utah limited liability company

have entered and/or anticipate entering into one or more transactions (each a "*Transaction*") that are or will be governed by this 2002 Master Agreement, which includes the schedule (the "*Schedule*"), and the documents and other confirming evidence (each a "*Confirmation*") exchanged between the parties or otherwise effective for the purpose of confirming or evidencing those Transactions.  This 2002 Master Agreement and the Schedule are together referred to as this "*Master Agreement*".

Accordingly, the parties agree as follows:—

**1.**      **Interpretation**

(a)      *Definitions.*   The terms defined in Section 14 and elsewhere in this Master Agreement will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.*   In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement, such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement.*   All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "*Agreement*"), and the parties would not otherwise enter into any Transactions.

**2.**      **Obligations**

(a)      *General Conditions.*

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be

1

made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other condition specified in this Agreement to be a condition precedent for the purpose of this Section 2(a)(iii).

(b)    ***Change of Account.***  Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the Scheduled Settlement Date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    ***Netting of Payments.***  If on any date amounts would otherwise be payable:-

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by which the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount and payment obligation will be determined in respect of all amounts payable on the same date in the same currency in respect of those Transactions, regardless of whether such amounts are payable in respect of the same Transaction.  The election may be made in the Schedule or any Confirmation by specifying that "Multiple Transaction Payment Netting" applies to the Transactions identified as being subject to the election (in which case clause (ii) above will not apply to such Transactions).  If Multiple Transaction Payment Netting is applicable to Transactions, it will apply to those Transactions with effect from the starting date specified in the Schedule or such Confirmation, or, if a starting date is not specified in the Schedule or such Confirmation, the starting date otherwise agreed by the parties in writing.  This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    ***Deduction or Withholding for Tax.***

(i)    ***Gross-Up***.  All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect.  If a party is so required to deduct or withhold, then that party ("X") will:-

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of

2

determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required.  However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)    *Liability.*  If:-

(1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)    X does not so deduct or withhold; and

(3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

**3.**    **Representations**

Each party makes the representations contained in Sections 3(a), 3(b), 3(c), 3(d), 3(e) and 3(f) and, if specified in the Schedule as applying, 3(g) to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement).  If any "Additional Representation" is specified in the Schedule or any Confirmation as applying, the party or parties specified for such Additional Representation will make and, if applicable, be deemed to repeat such Additional Representation at the time or times specified for such Additional Representation.

3

(a)    **Basic Representations.**

    (i)    ***Status.***  It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

    (ii)    ***Powers.***  It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance;

    (iii)    ***No Violation or Conflict.***  Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)    ***Consents.***  All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)    ***Obligations Binding.***  Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)    ***Absence of Certain Events.***  No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    ***Absence of Litigation.***  There is not pending or, to its knowledge, threatened against it, any of its Credit Support Providers or any of its applicable Specified Entities any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    ***Accuracy of Specified Information.***  All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    ***Payer Tax Representation.***  Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    ***Payee Tax Representations.***  Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4

(g)     **No Agency.**  It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

**4.       Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:-

(a)     **Furnish Specified Information**.  It will deliver to the other party or, in certain cases under clause (iii) below, to such government or taxing authority as the other party reasonably directs:-

(i)     any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)     any other documents specified in the Schedule or any Confirmation; and

(iii)     upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     **Maintain Authorizations.**  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     **Comply With Laws.**  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)     **Tax Agreement.**  It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)     **Payment of Stamp Tax.**  Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organized, managed and controlled or considered to have its seat, or where an Office through which it is acting for the purpose of this Agreement is located ("**Stamp Tax Jurisdiction**"), and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.       Events of Default and Termination Events**

5

(a)        *Events of Default.*  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes (subject to Sections 5(c) and 6(e)(iv)) an event of default (an "*Event of Default*") with respect to such party:-

(i)        *Failure to Pay or Deliver.*  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it if such failure is not remedied on or before the first Local Business Day in the case of any such payment or the first Local Delivery Day in the case of any such delivery after, in each case, notice of such failure is given to the party;

(ii)       *Breach of Agreement; Repudiation of Agreement.*

(1)        Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied within 30 days after notice of such failure is given to the party; or

(2)        the party disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, this Master Agreement, any Confirmation executed and delivered by that party or any Transaction evidenced by such a Confirmation (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iii)      *Credit Support Default.*

(1)        Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)        the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document, or any security interest granted by such party or such Credit Support Provider to the other party pursuant to any such Credit Support Document, to be in full force and effect for the purpose of this Agreement (in each case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)        the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iv)      *Misrepresentation.*  A representation (other than a representation under Section 3(e) or 3(f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

6

DB2/ 32752879

(v)    ***Default Under Specified Transaction.***  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:-

(1)    defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

(2)    defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

(3)    defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

(4)    disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    ***Cross-Default.***  If "Cross-Default" is specified in the Schedule as applying to the party, the occurrence or existence of:-

(1)    a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of any of them (individually or collectively) under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) where the aggregate principal amount of such agreements or instruments, either alone or together with the amount, if any, referred to in clause (2) below, is not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments before it would otherwise have been due and payable; or

(2)    a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments under such agreements or instruments on the due date for payment (after giving effect to any applicable notice requirement or grace period) in an aggregate amount, either alone or together with the amount, if any, referred to in clause (1) above, of not less than the applicable Threshold Amount;

(vii)    ***Bankruptcy***.  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:-

7

(1)    is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4)(A) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organization or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above and either (I) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (II) is not dismissed, discharged, stayed or restrained in each case within 15 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 15 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) above (inclusive); or (9) takes any action in furtherance of, or indicating its consent, approval of, or acquiescence in, any of the foregoing acts; or

(viii)    *Merger Without Assumption.*    The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganizes, reincorporates or reconstitutes into or as, another entity and, at the time of such consolidation, amalgamation, merger, transfer, reorganization, reincorporation or reconstitution:—

(1)    the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party; or

(2)    the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events.*    The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes (subject to Section 5(c)) an Illegality if the event is specified in clause (i) below, a Force Majeure Event if the event is specified in clause (ii) below, a Tax Event if the event is specified in clause (iii) below, a Tax Event Upon Merger if the event is specified in clause (iv) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to clause (v) below or an Additional Termination Event if the event is specified pursuant to clause (vi) below:-

8

DB2/ 32752879

(i)      *Illegality.*  After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, due to an event or circumstance (other than any action taken by a party or, if applicable, any Credit Support Provider of such party) occurring after a Transaction is entered into, it becomes unlawful under any applicable law (including without limitation the laws of any country in which payment, delivery or compliance is required by either party or any Credit Support Provider, as the case may be), on any day, or it would be unlawful if the relevant payment, delivery or compliance were required on that day (in each case, other than as a result of a breach by the party of Section 4(b)):-

(1)      for the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction to perform any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)      for such party or any Credit Support Provider of such party (which will be the Affected Party) to perform any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, to receive a payment or delivery under such Credit Support Document or to comply with any other material provision of such Credit Support Document;

(ii)     *Force Majeure Event.*  After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, by reason of force majeure or act of state occurring after a Transaction is entered into, on any day:-

(1)      the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction is prevented from performing any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, from receiving a payment or delivery in respect of such Transaction or from complying with any other material provision of this Agreement relating to such Transaction (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or impracticable for such Office so to perform, receive or comply (or it would be impossible or impracticable for such Office so to perform, receive or comply if such payment, delivery or compliance were required on that day); or

(2)      such party or any Credit Support Provider of such party (which will be the Affected Party) is prevented from performing any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, from receiving a payment or delivery under such Credit Support Document or from complying with any other material provision of such Credit Support Document (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply (or it would be impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply if such payment, delivery or compliance were required on that day),

so long as the force majeure or act of state is beyond the control of such Office, such party or such Credit Support Provider, as appropriate, and such Office, party or Credit Support Provider could not, after using

9

DB2/ 32752879

all reasonable efforts (which will not require such party or Credit Support Provider to incur a loss, other than immaterial, incidental expenses), overcome such prevention, impossibility or impracticability;

(iii)     *Tax Event.*   Due to (1) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (2) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Settlement Date (A) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (B) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 9(h)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iv)     *Tax Event Upon Merger.*   The party (the "***Burdened Party***") on the next succeeding Scheduled Settlement Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets (or any substantial part of the assets comprising the business conducted by it as of the date of this Master Agreement) to, or reorganizing, reincorporating or reconstituting into or as, another entity (which will be the Affected Party) where such action does not constitute a Merger Without Assumption;

(v)     *Credit Event Upon Merger.*   If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, a Designated Event (as defined below) occurs with respect to such party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case, "X") and such Designated Event does not constitute a Merger Without Assumption, and the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X, after taking into account any applicable Credit Support Document, is materially weaker immediately after the occurrence of such Designated Event than that of X immediately prior to the occurrence of such Designated Event (and, in any such event, such party or its successor, surviving or transferee entity, as appropriate, will be the Affected Party).  A "***Designated Event***" with respect to X means that:

(1)     X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the date of this Master Agreement) to, or reorganizes, reincorporates or reconstitutes into or as, another entity;

(2)     any person, related group of persons or entity acquires directly or indirectly the beneficial ownership of (A) equity securities having the power to elect a majority of the board of directors (or its equivalent) of X or (B) any other ownership interest enabling it to exercise control of X; or

(3)     X effects any substantial change in its capital structure by means of the issuance, incurrence or guarantee of debt or the issuance of (A) preferred stock or other securities convertible into or exchangeable for debt or preferred stock or (B) in the case of entities other than corporations, any other form of ownership interest; or

10

      (vi)     ***Additional Termination Event.***  If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties will be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)     ***Hierarchy of Events.***

      (i)     An event or circumstance that constitutes or gives rise to an Illegality or a Force Majeure Event will not, for so long as that is the case, also constitute or give rise to an Event of Default under Section 5(a)(i), 5(a)(ii)(l) or 5(a)(iii)(1) insofar as such event or circumstance relates to the failure to make any payment or delivery or a failure to comply with any other material provision of this Agreement or a Credit Support Document, as the case may be.

      (ii)     Except in circumstances contemplated by clause (i) above, if an event or circumstance which would otherwise constitute or give rise to an Illegality or a Force Majeure Event also constitutes an Event of Default or any other Termination Event, it will be treated as an Event of Default or such other Termination Event, as the case may be, and will not constitute or give rise to an Illegality or a Force Majeure Event.

      (iii)     If an event or circumstance which would otherwise constitute or give rise to a Force Majeure Event also constitutes an Illegality, it will be treated as an Illegality, except as described in clause (ii) above, and not a Force Majeure Event.

(d)     ***Deferral of Payments and Deliveries During Waiting Period.***  If an Illegality or a Force Majeure Event has occurred and is continuing with respect to a Transaction, each payment or delivery which would otherwise be required to be made under that Transaction will be deferred to, and will not be due until:-

      (i)     the first Local Business Day or, in the case of a delivery, the first Local Delivery Day (or the first day that would have been a Local Business Day or Local Delivery Day, as appropriate, but for the occurrence of the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event) following the end of any applicable Waiting Period in respect of that Illegality or Force Majeure Event, as the case may be; or

      (ii)     if earlier, the date on which the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event ceases to exist or, if such date is not a Local Business Day or, in the case of a delivery, a Local Delivery Day, the first following day that is a Local Business Day or Local Delivery Day, as appropriate.

(e)     ***Inability of Head or Home Office to Perform Obligations of Branch.***  If (i) an Illegality or a Force Majeure Event occurs under Section 5(b)(i)(l) or 5(b)(ii)(1) and the relevant Office is not the Affected Party's head or home office, (ii) Section 10(a) applies, (iii) the other party seeks performance of the relevant obligation or compliance with the relevant provision by the Affected Party's head or home office and (iv) the Affected Party's head or home office fails so to perform or comply due to the occurrence of an event or circumstance which would, if that head or home office were the Office through which the Affected Party makes and receives payments and deliveries with respect to the relevant Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and such failure would otherwise constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(l) with respect to such party, then, for so long as the relevant event or circumstance continues to exist with respect to both the Office referred to in Section 5(b)(i)(1) or 5(b)(ii)(1), as the case may be, and the Affected Party's head or home office, such failure will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1).

**6.**     **Early Termination; Close-Out Netting**

11

DB2/ 32752879

(a)    ***Right to Terminate Following Event of Default.***  If at any time an Event of Default with respect to a party (the "***Defaulting Party***") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions.  If, however, "***Automatic Early Termination***" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    ***Right to Terminate Following Termination Event.***

    (i)    ***Notice.***  If a Termination Event other than a Force Majeure Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction, and will also give the other party such other information about that Termination Event as the other party may reasonably require.  If a Force Majeure Event occurs, each party will, promptly upon becoming aware of it, use all reasonable efforts to notify the other party, specifying the nature of that Force Majeure Event, and will also give the other party such other information about that Force Majeure Event as the other party may reasonably require.

    (ii)    ***Transfer to Avoid Termination Event.***  If a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, other than immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

    (iii)    ***Two Affected Parties.***  If a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice of such occurrence is given under Section 6(b)(i) to avoid that Termination Event.

    (iv)    ***Right to Terminate.***

        (1)    If:-

            (A)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i): or

12

(B)    a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there are two Affected Parties, or the Non-affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, if the relevant Termination Event is then continuing, by not more than 20 days notice to the other party, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(1)    If at any time an Illegality or a Force Majeure Event has occurred and is then continuing and any applicable Waiting Period has expired:-

(A)    Subject to clause (B) below, either party may, by not more than 20 days notice to the other party, designate (I) a day not earlier than the day on which such notice becomes effective as an Early Termination Date in respect of all Affected Transactions or (II) by specifying in that notice the Affected Transactions in respect of which it is designating the relevant day as an Early Termination Date, a day not earlier than two Local Business Days following the day on which such notice becomes effective as an Early Termination Date in respect of less than all Affected Transactions.   Upon receipt of a notice designating an Early Termination Date in respect of less than all Affected Transactions, the other party may, by notice to the designating party, if such notice is effective on or before the day so designated, designate that same day as an Early Termination Date in respect of any or all other Affected Transactions.

(B)    An Affected Party (if the Illegality or Force Majeure Event relates to performance by such party or any Credit Support Provider of such party of an obligation to make any payment or delivery under, or to compliance with any other material provision of, the relevant Credit Support Document) will only have the right to designate an Early Termination Date under Section 6(b)(iv)(2)(A) as a result of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2) following the prior designation by the other party of an Early Termination Date, pursuant to Section 6(b)(iv)(2)(A), in respect of less than all Affected Transactions.

(c)    ***Effect of Designation.***

(i)    If notice designating an Early Termination Date is given under Section 6(a) or 6(b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 9(h)(i) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement.   The amount, if any, payable in respect of an Early Termination Date will be determined pursuant to Sections 6(e) and 9(h)(ii).

(d)    ***Calculations; Payment Date.***

13

(i)      *Statement.*  On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including any quotations, market data or information from internal sources used in making such calculations), (2) specifying (except where there are two Affected Parties) any Early Termination Amount payable and (3) giving details of the relevant account to which any amount payable to it is to be paid.  In the absence of written confirmation from the source of a quotation or market data obtained in determining a Close-out Amount, the records of the party obtaining such quotation or market data will be conclusive evidence of the existence and accuracy of such quotation or market data.

(ii)      *Payment Date.*  An Early Termination Amount due in respect of any Early Termination Date will, together with any amount of interest payable pursuant to Section 9(h)(ii)(2), be payable (1) on the day on which notice of the amount payable is effective in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default and (2) on the day which is two Local Business Days after the day on which notice of the amount payable is effective (or, if there are two Affected Parties, after the day on which the statement provided pursuant to clause (1) above by the second party to provide such a statement is effective) in the case of an Early Termination Date which is designated as a result of a Termination Event.

(e)      *Payments on Early Termination.*  If an Early Termination Date occurs, the amount, if any, payable in respect of that Early Termination Date (the "*Early Termination Amount*") will be determined pursuant to this Section 6(e) and will be subject to Section 6(f).

(i)      *Events of Default.*  If the Early Termination Date results from an Event of Default, the Early Termination Amount will be an amount equal to (1) the sum of (A) the Termination Currency Equivalent of the Close-out Amount or Close-out Amounts (whether positive or negative) determined by the Non-defaulting Party for each Terminated Transaction or group of Terminated Transactions, as the case may be, and (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (2) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.  If the Early Termination Amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of the Early Termination Amount to the Defaulting Party.

(ii)      *Termination Events.*  If the Early Termination Date results from a Termination Event:-

(1)      *One Affected Party.*  Subject to clause (3) below, if there is one Affected Party, the Early Termination Amount will be determined in accordance with Section 6(e)(i), except that references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and to the Non-affected Party, respectively.

(2)      *Two Affected Parties.*  Subject to clause (3) below, if there are two Affected Parties, each party will determine an amount equal to the Termination Currency Equivalent of the sum of the Close-out Amount or Close-out Amounts (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions, as the case may be, and the Early Termination Amount will be an amount equal to (A) the sum of (I) one-half of the difference between the higher amount so determined (by party "X") and the lower amount so determined (by party "Y") and (II) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to Y.  If the Early Termination Amount is a

14

positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of the Early Termination Amount to Y.

    (3)    *Mid-Market Events.*  If that Termination Event is an Illegality or a Force Majeure Event, then the Early Termination Amount will be determined in accordance with clause (1) or (2) above, as appropriate, except that, for the purpose of determining a Close-out Amount or Close-out Amounts, the Determining Party will:-

        (A)    if obtaining quotations from one or more third parties (or from any of the Determining Party's Affiliates), ask each third party or Affiliate (I) not to take account of the current creditworthiness of the Determining Party or any existing Credit Support Document and (II) to provide mid-market quotations; and

        (B)    in any other case, use mid-market values without regard to the creditworthiness of the Determining Party.

    (iii)    *Adjustment for Bankruptcy.*  In circumstances where an Early Termination Date occurs because Automatic Early Termination applies in respect of a party, the Early Termination Amount will be subject to such adjustments as are appropriate and permitted by applicable law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

    (iv)    *Adjustment for Illegality or Force Majeure Event.*  The failure by a party or any Credit Support Provider of such party to pay, when due, any Early Termination Amount will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(l) if such failure is due to the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event.  Such amount will (1) accrue interest and otherwise be treated as an Unpaid Amount owing to the other party if subsequently an Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions and (2) otherwise accrue interest in accordance with Section 9(h)(ii)(2).

    (v)    *Pre-Estimate.*  The parties agree that an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty.  Such amount is payable for the loss of bargain and the loss of protection against future risks, and, except as otherwise provided in this Agreement, neither party will be entitled to recover any additional damages as a consequence of the termination of the Terminated Transactions.

(f)    *Set-Off.*  Any Early Termination Amount payable to one party (the "*Payee*") by the other party (the "*Payer*"), in circumstances where there is a Defaulting Party or where there is one Affected Party in the case where either a Credit Event Upon Merger has occurred or any other Termination Event in respect of which all outstanding Transactions are Affected Transactions has occurred, will, at the option of the Non-defaulting Party or the Non-affected Party, as the case may be ("X") (and without prior notice to the Defaulting Party or the Affected Party, as the case may be), be reduced by its set-off against any other amounts ("*Other Amounts*") payable by the Payee to the Payer (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation).  To the extent that any Other Amounts are so set off, those Other Amounts will be discharged promptly and in all respects.  X will give notice to the other party of any set-off effected under this Section 6(f).

15

For this purpose, either the Early Termination Amount or the Other Amounts (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) will be effective to create a charge or other security interest.  This Section 6(f) will be without prejudice and in addition to any right of set-off, offset, combination of accounts, lien, right of retention or withholding or similar right or requirement to which any party is at any time otherwise entitled or subject (whether by operation of law, contract or otherwise).

## 7.    Transfer

Subject to Section 6(b)(ii) and to the extent permitted by applicable law, neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:-

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any Early Termination Amount payable to it by a Defaulting Party, together with any amounts payable on or with respect to that interest and any other rights associated with that interest pursuant to Sections 8, 9(h) and 11.

Any purported transfer that is not in compliance with this Section 7 will be void.

## 8.    Contractual Currency

(a)    ***Payment in the Contractual Currency.***  Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "***Contractual Currency***").  To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in good faith and using commercially reasonable procedures in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement.  If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall.  If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess

(b)    ***Judgments.***  To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in clause (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive

16

immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purpose of such judgment or order and the rate of exchange at which such party is able, acting in good faith and using commercially reasonable procedures in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party.

(b)    *Separate Indemnities.*  To the extent permitted by applicable law, the indemnities in this Section 8 constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(c)    *Evidence of Loss.*  For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

9.    **Miscellaneous**

(a)    *Entire Agreement.*  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter.  Each of the parties acknowledges that in entering into this Agreement it has not relied on any oral or written representation, warranty or other assurance (except as provided for or referred to in this Agreement) and waives all rights and remedies which might otherwise be available to it in respect thereof, except that nothing in this Agreement will limit or exclude any liability of a party for fraud.

(b)    *Amendments.*  An amendment, modification or waiver in respect of this Agreement will only be effective if writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.*  Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.*  Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission and by electronic messaging system), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise).  A Confirmation will be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes, by an exchange of electronic messages on an electronic messaging system or by an exchange of e-mails, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement.  The parties will

17

specify therein or through another effective means that any such counterpart, telex, electronic message or e-mail constitutes a Confirmation.

(f)      **No Waiver of Rights.**  A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)      **Headings.**  The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

(h)      **Interest and Compensation.**

(i)      **Prior to Early Termination.**  Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction: --

(1)      *Interest on Defaulted Payments.*  If a party defaults in the performance of any payment obligation, it will, to the extent permitted by applicable law and subject to Section 6(c), pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (3)(B) or (C) below), at the Default Rate.

(2)      *Compensation for Defaulted Deliveries.*  If a party defaults in the performance of any obligation required to be settled by delivery, it will on demand (A) compensate the other party to the extent provided for in the relevant Confirmation or elsewhere in this Agreement and (B) unless otherwise provided in the relevant Confirmation or elsewhere in this Agreement, to the extent permitted by applicable law and subject to Section 6(c), pay to the other party interest (before as well as after judgment) on an amount equal to the fair market value of that which was required to be delivered in the same currency as that amount, for the period from (and including) the originally scheduled date for delivery to (but excluding) the date of actual delivery (and excluding any period in respect of which interest or compensation in respect of that amount is due pursuant to clause (4) below), at the Default Rate.  The fair market value of any obligation referred to above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party that was entitled to take delivery.

(3)      *Interest on Deferred Payments.*  If:-

(A)      a party does not pay any amount that, but for Section 2(a)(iii), would have been payable, it will, to the extent permitted by applicable law and subject to Section 6(c) and clauses (B) and (C) below, pay interest (before as well as after judgment) on that amount to the other party on demand (after such amount becomes payable) in the same currency as that amount, for the period from (and including) the date the amount would, but for Section 2(a)(iii), have been payable to (but excluding) the date the amount actually becomes payable, at the Applicable Deferral Rate;

(B)      a payment is deferred pursuant to Section 5(d), the party which would otherwise have been required to make that payment will, to the extent permitted

18

DB2/ 32752879

by applicable law, subject to Section 6(c) and for so long as no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the amount of the deferred payment to the other party on demand (after such amount becomes payable) in the same currency as the deferred payment, for the period from (and including) the date the amount would, but for Section 5(d), have been payable to (but excluding) the earlier of the date the payment is no longer deferred pursuant to Section 5(d) and the date during the deferral period upon which an Event of Default or Potential Event of Default with respect to that party occurs, at the Applicable Deferral Rate; or

(C)      a party fails to make any payment due to the occurrence of an Illegality or a Force Majeure Event (after giving effect to any deferral period contemplated by clause (B) above), it will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as the event or circumstance giving rise to that Illegality or Force Majeure Event continues and no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the date the party fails to make the payment due to the occurrence of the relevant Illegality or Force Majeure Event (or, if later, the date the payment is no longer deferred pursuant to Section 5(d)) to (but excluding) the earlier of the date the event or circumstance giving rise to that Illegality or Force Majeure Event ceases to exist and the date during the period upon which an Event of Default or Potential Event of Default with respect to that party occurs (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (B) above), at the Applicable Deferral Rate.

(4)      *Compensation for Deferred Deliveries.*  If:-

(A)      a party does not perform any obligation that, but for Section 2(a)(iii), would have been required to be settled by delivery;

(B)      a delivery is deferred pursuant to Section 5(d); or

(C)      a party fails to make a delivery due to the occurrence of an Illegality or a Force Majeure Event at a time when any applicable Waiting Period has expired,

the party required (or that would otherwise have been required) to make the delivery will, to the extent permitted by applicable law and subject to Section 6(c), compensate and pay interest to the other party on demand (after, in the case of clauses (A) and (B) above, such delivery is required) if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

(ii)      ***Early Termination.***    Upon the occurrence or effective designation of an Early Termination Date in respect of a Transaction:-

(1)      *Unpaid Amounts*.  For the purpose of determining an Unpaid Amount in respect of the relevant Transaction, and to the extent permitted by applicable law, interest will accrue on the amount of any payment obligation or the amount equal to the fair market

19

value of any obligation required to be settled by delivery included in such determination in the same currency as that amount, for the period from (and including) the date the relevant obligation was (or would have been but for Section 2(a)(iii) or 5(d)) required to have been performed to (but excluding) the relevant Early Termination Date, at the Applicable Close-out Rate.

(2)    *Interest on Early Termination Amounts*.  If an Early Termination Amount is due in respect of such Early Termination Date, that amount will, to the extent permitted by applicable law, be paid together with interest (before as well as after judgment) on that amount in the Termination Currency, for the period from (and including) such Early Termination Date to (but excluding) the date the amount is paid, at the Applicable Close-out Rate.

(iii)    **Interest Calculation**.  Any interest pursuant to this Section 9(h) will be calculated on the basis of daily compounding and the actual number of days elapsed.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to and agrees with the other party that, notwithstanding the place of booking or its jurisdiction of incorporation or organization, its obligations are the same in terms of recourse against it as if it had entered into the Transaction through its head or home office, except that a party will not have recourse to the head or borne office of the other party in respect of any payment or delivery deferred pursuant to Section 5(d) for so long as the payment or delivery is so deferred.  This representation and agreement will be deemed to be repeated by each party on each date on which the parties enter into a Transaction.

(b)    If a party is specified as a Multibranch Party in the Schedule, such party may, subject to clause (c) below, enter into a Transaction through, book a Transaction in and make and receive payments and deliveries with respect to a Transaction through any Office listed in respect of that party in the Schedule (but not any other Office unless otherwise agreed by the parties in writing).

(c)    The Office through which a party enters into a Transaction will be the Office specified for that party in the relevant Confirmation or as otherwise agreed by the parties in writing, and, if an Office for that party is not specified in the Confirmation or otherwise agreed by the parties in writing, its head or home office.  Unless the parties otherwise agree in writing, the Office through which a party enters into a Transaction will also be the Office in which it books the Transaction and the Office through which it makes and receives payments and deliveries with respect to the Transaction.  Subject to Section 6(b)(ii), neither party may change the Office in which it books the Transaction or the Office through which it makes and receives payments or deliveries with respect to a Transaction without the prior written consent of the other party.

**11.    Expenses**

A Defaulting Party will on demand indemnity and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, execution fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

20

(a)      *Effectiveness.*  Any notice or other communication in respect of this Agreement may be given in any manner described below (except that a notice or other communication under Section 5 or 6 may not be given by electronic messaging system or e-mail) to the address or number or in accordance with the electronic messaging system or e-mail details provided (see the Schedule) and will be deemed effective as indicated:-

   (i)      if in writing and delivered in person or by courier, on the date it is delivered;

   (ii)      if sent by telex, on the date the recipient's answerback is received;

   (iii)      if sent by facsimile transmission, on the date it is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

   (iv)      if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date it is delivered or its delivery is attempted;

   (v)      if sent by electronic messaging system, on the date it is received; or

   (iv)      if sent by e-mail on the date it is delivered,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication will be deemed given and effective on the first following day that is a Local Business Day.

(b)      *Change of Details.*  Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system or e-mail details at which notices or other communications are to be given to it.

**13.      Governing Law and Jurisdiction**

(a)      *Governing Law.*  This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)      *Jurisdiction.*  With respect to any suit, action or proceedings relating to any dispute arising out of or in connection with this Agreement ("***Proceedings***"), each party irrevocably:-

   (i)      submits:-

      (1)      if this Agreement is expressed to be governed by English law, to (A) the non-exclusive jurisdiction of the English courts if the Proceedings do not involve a Convention Court and (B) the exclusive jurisdiction of the English courts if the Proceedings do involve a Convention Court; or

      (2)      if this Agreement is expressed to be governed by the laws of the State of New York, to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City;

   (ii)      waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought

21

in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party; and

(iii)     agrees, to the extent permitted by applicable law, that the bringing of Proceedings in any one or more jurisdictions will not preclude the bringing of Proceedings in any other jurisdiction.

(c)     **Service of Process.**  Each party irrevocably appoints the Process Agent, if any, specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings.  If for any reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party.  The parties irrevocably consent to service of process given in the manner provided for notices in Section l2(a)(i), l2(a)(iii) or l2(a)(iv).  Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by applicable law.

(d)     **Waiver of Immunities.**  Each party irrevocably waives, to the extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction or order for specific performance or recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

### 14.     Definitions

As used in this Agreement:-

"*Additional Representation*" has the meaning specified in Section 3.

"*Additional Termination Event*" has the meaning specified in Section 5(b).

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, Force Majeure Event, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event (which, in the case of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2), means all Transactions unless the relevant Credit Support Document references only certain Transactions, in which case those Transactions and, if the relevant Credit Support Document constitutes a Confirmation for a Transaction, that Transaction) and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person.  For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Agreement*" has the meaning specified in Section 1(c).

"*Applicable Close-out Rate*" means:-

(a)     in respect of the determination of an Unpaid Amount:-

22

(i)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(ii)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate;

(iii)    in respect of obligations deferred pursuant to Section 5(d), if there is no Defaulting Party and for so long as the deferral period continues, the Applicable Deferral Rate; and

(iv)    in all other cases following the occurrence of a Termination Event (except where interest accrues pursuant to clause (iii) above), the Applicable Deferral Rate; and

(b)    in respect of an Early Termination Amount:-

(i)    for the period from (and including) the relevant Early Termination Date to (but excluding) the date (determined in accordance with Section 6(d)(ii) on which that amount is payable:—

(1)    if the Early Termination Amount is payable by a Defaulting Party, the Default Rate;

(2)    if the Early Termination Amount is payable by a Non-defaulting Party, the Non-default Rate; and

(3)    in all other cases, the Applicable Deferral Rate; and

(ii)    for the period from (and including) the date (determined in accordance with Section 6(d)(ii) on which that amount is payable to (but excluding) the date of actual payment:-

(1)    if a party fails to pay the Early Termination Amount due to the occurrence of an event or circumstance which would, if it occurred with respect to a payment or delivery under a Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and for so long as the Early Termination Amount remains unpaid due to the continuing existence of such event or circumstance, the Applicable Deferral Rate;

(2)    if the Early Termination Amount is payable by a Defaulting Party (but excluding any period in respect of which clause (1) above applies), the Default Rate;

(3)    if the Early Termination Amount is payable by a Non-defaulting Party (but excluding any period in respect of which clause (1) above applies), the Non-default Rate; and

(4)    in all other cases, the Termination Rate.

*"Applicable Deferral Rate"* means:-

(a)    for the purpose of Section 9(h)(i)(3)(A), the rate certified by the relevant payer to be a rate offered to the payer by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market;

23

(b)      for purposes of Section 9(h)(i)(3)(B) and clause (a)(iii) of the definition of Applicable Close-out Rate, the rate certified by the relevant payer to be a rate offered to prime banks by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer after consultation with the other party, if practicable, for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market; and

(c)      for purposes of Section 9(h)(i)(3)(C) and clauses (a)(iv), (b)(i)(3) and (b)(ii)(l) of the definition of Applicable Close-out Rate, a rate equal to the arithmetic mean of the rate determined pursuant to clause (a) above and a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of finding the relevant amount.

*"**Automatic Early Termination**"* has the meaning specified in Section 6(a).

*"**Burdened Party**"* has the meaning specified in Section 5(b)(iv).

*"**Change in Tax Law**"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs after the parties enter into the relevant Transaction.

*"**Close-out Amount**"* means, with respect to each Terminated Transaction or each group of Terminated Transactions and a Determining Party, the amount of the losses or costs of the Determining Party that are or would be incurred under then prevailing circumstances (expressed as a positive number) or gains of the Determining Party that are or would be incurred under then prevailing circumstances (expressed as a negative number) in replacing, or in providing for the Determining Party the economic equivalent of, (a) the material terms of that Terminated Transaction or group of Terminated Transactions, including the payments and deliveries by the parties under Section 2(a)(i) in respect of that Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date (assuming satisfaction of the conditions precedent in Section 2(a)(iii)) and (b) the option rights of the parties in respect of that Terminated Transaction or group of Terminated Transactions.

Any Close-out Amount will be determined by the Determining Party (or its agent), which will act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result. The Determining Party may determine a Close-out Amount for any group of Terminated Transactions or any individual Terminated Transaction but, in the aggregate, for not less than all Terminated Transactions. Each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable.

Unpaid Amounts in respect of a Terminated Transaction or group of Terminated Transactions and legal fees and out-of-pocket expenses referred to in Section 11 are to be excluded in all determinations of Close-out Amounts.

In determining a Close-out Amount, the Determining Party may consider any relevant information, including, without limitation, one or more of the following types of information:-

(i)      quotations (either firm or indicative) for replacement transactions supplied by one or more third parties that may take into account the creditworthiness of the Determining Party at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Determining Party and the third party providing the quotation;

24

(ii)    information consisting of relevant market data in the relevant market supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads, correlations or other relevant market data in the relevant market; or

(ii)    information of the types described in clause (i) or (ii) above from internal sources (including any of the Determining Party's Affiliates) if that information is of the same type used by the Determining Party in the regular course of its business for the valuation of similar transactions.

The Determining Party will consider, taking into account the standards and procedures described in this definition, quotations pursuant to clause (i) above or relevant market data pursuant to clause (ii) above unless the Determining Party reasonably believes in good faith that such quotations or relevant market data are not readily available or would produce a result that would not satisfy those standards.  When considering information described in clause (i), (ii) or (iii) above, the Determining Party may include costs of funding, to the extent costs of funding are not and would not be a component of the other information being utilized.  Third parties supplying quotations pursuant to clause (i) above or market data pursuant to clause (ii) above may include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors, brokers and other sources of market information.

Without duplication of amounts calculated based on information described in clause (i), (ii) or (iii) above, or other relevant information, and when it is commercially reasonable to do so, the Determining Party may in addition consider in calculating a Close-out Amount any loss or cost incurred in connection with its terminating, liquidating or re-establishing any hedge related to a Terminated Transaction or group of Terminated Transactions (or any gain resulting from any of them).

Commercially reasonable procedures used in determining a Close-out Amount may include the following:-

(1)    application to relevant market data from third parties pursuant to clause (ii) above or information from internal sources pursuant to clause (iii) above of pricing or other valuation models that are, at the time of the determination of the Close-out Amount, used by the Determining Party in the regular course of its business in pricing or valuing transactions between the Determining Party and unrelated third parties that are similar to the Terminated Transaction or group of Terminated Transactions; and

(2)    application of different valuation methods to Terminated Transactions or groups of Terminated Transactions depending on the type, complexity, size or number of the Terminated Transactions or group of Terminated Transactions.

*"Confirmation"* has the meaning specified in the preamble.

*"Consent"* includes a consent, approval, action, authorization, exemption, notice, filing, registration or exchange control consent.

*"Contractual Currency"* has the meaning specified in Section 8(a).

*"Convention court"* means any court which is bound to apply to the Proceedings either Article 17 of the 1968 Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters or Article 17 of the 1988 Lugano Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

25

DB2/ 32752879

***"Credit Support Document"*** means any agreement or instrument that is specified as such in this Agreement.

***"Credit Support Provider"*** has the meaning specified in the Schedule.

***"Cross-Default"*** means the event specified in Section 5(a)(vi).

***"Default Rate"*** means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

***"Defaulting Party"*** has the meaning specified in Section 6(a).

***"Designated Event"*** has the meaning specified in Section 5(b)(v).

***"Determining Party"*** means the party determining a Close-out Amount.

***"Early Termination Amount"*** has the meaning specified in Section 6(e).

***"Early Termination Date"*** means the date determined in accordance with Section 6(a) or 6(b)(iv).

***"Electronic messages"*** does not include e-mails but does include documents expressed in markup languages, and ***"electronic messaging system"*** will be construed accordingly.

***"English law"*** means the law of England and Wales, and ***"English"*** will be construed accordingly.

***"Event of Default"*** has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

***"Force Majeure Event"*** has the meaning specified in Section 5(b).

***"General Business Day"*** means a day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits).

***"Illegality"*** has the meaning specified in Section 5(b).

***"Indemnifiable Tax"*** means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organized, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

***"Law"*** includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority), and "unlawful" will be construed accordingly.

***"Local Business Day"*** means (a) in relation to any obligation under Section 2(a)(i), a General Business Day in the place or places specified in the relevant Confirmation and a day on which a relevant settlement system is open or operating as specified in the relevant Confirmation or, if a place or a settlement system is not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) for the purpose of determining when a

26

Waiting Period expires, a General Business Day in the place where the event or circumstance that constitutes or gives rise to the Illegality or Force Majeure Event, as the case may be, occurs, (c) in relation to any other payment, a General Business Day in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment and, if that currency does not have a single recognized principal financial centre, a day on which the settlement system necessary to accomplish such payment is open, (d) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), a General Business Day (or a day that would have been a General Business Day but for the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event) in the place specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (e) in relation to Section 5(a)(v)(2), a General Business Day in the relevant locations for performance with respect to such Specified Transaction.

*"Local Delivery Day"* means, for purposes of Sections 5(a)(i) and 5(d) a day on which settlement systems necessary to accomplish the relevant delivery are generally open for business so that the delivery is capable of being accomplished in accordance with customary market practice, in the place specified in the relevant Confirmation or, if not so specified, in a location as determined in accordance with customary market practice for the relevant delivery.

*"Master Agreement"* has the meaning specified in the preamble.

*"Merger Without Assumption"* means the event specified in Section 5(a)(viii).

*"Multiple Transaction Payment Netting"* has the meaning specified in Section 2(c).

*"Non-affected Party"* means, so long as there is only one Affected Party, the other party.

*"Non-default Rate"* means the rate certified by the Non-defaulting Party to be a rate offered to the Non-defaulting Party by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the Non-defaulting Party for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Other Amounts"* has the meaning specified in Section 6(f).

*"Payer"* has the meaning specified in Section 6(f).
*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Proceedings"* has the meaning specified in Section 13(b).

*"Process Agent"* has the meaning specified in the Schedule.

*"Rate of Exchange"* includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organized, managed and controlled or considered to have its seat, (b) where an Office through

27

which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Schedule"* has the meaning specified in the preamble.

*"Scheduled Settlement Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (1) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Stamp Tax Jurisdiction"* has the meaning specified in Section 4(e).

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means, with respect to any Early Termination Date, (a) if resulting from an Illegality or a Force Majeure Event, all Affected Transactions specified in the notice given pursuant to Section 6(b)(iv), (b) if resulting from any other Termination Event, all Affected Transactions and (c) if resulting from an Event of Default, all Transactions in effect either immediately before the effectiveness of the notice designating that Early Termination Date or, if Automatic Early Termination applies, immediately before that Early Termination Date.

28

***"Termination Currency"*** means (a) if a Termination Currency is specified in the Schedule and that currency is freely available, that currency, and (b) otherwise, euro if this Agreement is expressed to be governed by English law or United States Dollars if this Agreement is expressed to be governed by the laws of the State of New York.

***"Termination Currency Equivalent"*** means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Close-out Amount is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

***"Termination Event"*** means an Illegality, a Force Majeure Event, a Tax Event, a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

***"Termination Rare"*** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

***"Threshold Amount"*** means the amount, if any, specified as such in the Schedule.

***"Transaction"*** has the meaning specified in the preamble.

***"Unpaid Amounts"*** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii) or due but for Section 5(d)) to such party under Section 2(a)(i) or 2(d)(i)(4) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date, (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii) or 5(d)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered and (c) if the Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions, any Early Termination Amount due prior to such Early Termination Date and which remains unpaid as of such Early Termination Date, in each case together with any amount of interest accrued or other compensation in respect of that obligation or deferred obligation, as the case may be, pursuant to Section 9(h)(ii)(1) or (2), as appropriate. The fair market value of any obligation referred to in clause (b) above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it will be the average of the Termination Currency Equivalents of the fair market values so determined by both parties.

***"Waiting Period"*** means:

(a)        in respect of an event or circumstance under Section 5(b)(i), other than in the case of Section 5(b)(i)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in

29

which case no Waiting Period will apply), a period of three Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance; and

(b)        in respect of an event or circumstance under Section 5(b)(ii), other than in the case of Section 5(b)(ii)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of eight Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

30

IN WITNESS WHEREOF the parties have executed this document on the date specified below with effect from the date specified on the first page of this document.

**PARTY A:**                                    **PARTY B:**

**CITY NATIONAL BANK**, a National Banking      **HR RESTAURANTS, L.C.,**
Association                                     a Utah limited liability company

By: _____             By: _____
Printed Name:  Bernard Tsui                     Name:  David Harper
Its:  Senior Vice President                     Title:  Manager

                                                **NDM RESTAURANTS, L.C.,**
                                                a Utah limited liability company

                                                By: _____
                                                Name:  David Harper
                                                Title:  Manager

Date: _____, 2018

                                                                    **ISDA® 2002**

DB2/ 32752879

IN WITNESS WHEREOF the parties have executed this document on the date specified below with effect from the date specified on the first page of this document.

**PARTY A:**

**CITY NATIONAL BANK**, a National Banking Association

By: _____
Printed Name: Bernard Tsui
Its: Senior Vice President

Date: _____, 2018

**PARTY B:**

**HR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name:   David Harper
Title:   Manager

**NDM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name:   David Harper
Title:   Manager

**ISDA® 2002**

DB2/ 32752879

## EXHIBIT F

## PARTIAL RELEASE

In the event that: (i) any Borrower shall sell a Restaurant and any of the Collateral associated therewith; or (ii) any Borrower closes any Restaurant due to underperformance or a total loss as a result of a condemnation or casualty, Administrative Agent shall reasonably cooperate with such Borrower in connection with the release of the applicable Collateral associated with up to five (5) of such Restaurants, in the aggregate, provided that: (i) no Event of Default exists hereunder or under any other Loan Document at the time of the release or after giving effect thereto; (ii) such Borrower shall pay to Lenders the "Release Price" (as defined below), which shall be applied to the prepayment of Loans, which, subject to Section 2.12, shall be applied to the Loans of the Lenders in accordance with Section 2.03(b)(v); (iii) after the release of the applicable Collateral, the remaining Loans shall continue to comply with Administrative Agent's then applicable underwriting standards for loans of a similar nature for borrowers similar to Borrowers, as determined by Administrative Agent in its sole discretion (including, but not limited to any loan to value ratio requirements); and (iv) if applicable, such Borrower shall concurrently pay in full any fees or costs relating to required Related Swap Contract modifications.  As used herein, "Release Price" shall mean a price determined by Administrative Agent and calculated as the higher of: (i) proceeds received in conjunction with the sale or closing of the subject Restaurant(s) (less any reasonable and customary closing costs) and (ii) a dollar amount equal to the subject Restaurant(s)' Consolidated EBITDA as a percent of the aggregate Consolidated EBITDA of all Restaurants (in which the Administrative Agent, on behalf of the Secured Parties, has a first priority Lien) as measured for the most recently ended twelve-month period multiplied by the Outstanding Amount of the Loans, immediately prior to the release.

**EXHIBIT G-1**

**[Form of]**
**U.S. Tax Compliance Certificate**

(For Foreign Lenders That Are Not Partnerships
For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement, dated as of February 26, 2018, by and among NKS RESTAURANTS, L.C., a Utah limited liability company, HR RESTAURANTS, L.C., a Utah limited liability company, MR RESTAURANTS, L.C., a Utah limited liability company, C UTAH, L.C., a Utah limited liability company, AZM RESTAURANTS, L.C., a Utah limited liability company, and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, the "Borrowers"), the Guarantors, the Lenders, City National Bank, as Administrative Agent (as amended, modified, extended, restated, replaced, or supplemented from time to time, the "Credit Agreement"). Pursuant to the provisions of Section 3.01 of the Credit Agreement, the undersigned hereby certifies that (a) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (b) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (c) it is not a ten percent shareholder of the Borrowers within the meaning of Section 871(h)(3)(B) of the Code, and (d) it is not a controlled foreign corporation related to the Borrowers as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrowers with a certificate of its non-U.S. Person status on IRS Form W-8BEN. By executing this certificate, the undersigned agrees that (a) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrowers and the Administrative Agent, and (b) the undersigned shall have at all times furnished the Borrowers and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF FOREIGN LENDER]


By:_____
Name:_____
Title:_____

Date: _____ \_\_, \_\_\_

**EXHIBIT G-2**

**[Form of]**
**U.S. Tax Compliance Certificate**

(For Foreign Participants That Are Not Partnerships
For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement, dated as of February 26, 2018, by and among NKS RESTAURANTS, L.C., a Utah limited liability company, HR RESTAURANTS, L.C., a Utah limited liability company, MR RESTAURANTS, L.C., a Utah limited liability company, C UTAH, L.C., a Utah limited liability company, AZM RESTAURANTS, L.C., a Utah limited liability company, and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, the "Borrowers"), the Guarantors, the Lenders, City National Bank, as Administrative Agent (as amended, modified, extended, restated, replaced, or supplemented from time to time, the "Credit Agreement").  Pursuant to the provisions of Section 3.01 of the Credit Agreement, the undersigned hereby certifies that (a) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (b) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (c) it is not a ten percent shareholder of the Borrowers within the meaning of Section 871(h)(3)(B) of the Code, and (d) it is not a controlled foreign corporation related to the Borrowers as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN. By executing this certificate, the undersigned agrees that (a) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (b) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By:_____
Name:_____
Title:_____

Date: _____ __, ____

**EXHIBIT G-3**

**[Form of]**
**U.S. Tax Compliance Certificate**

(For Foreign Participants That Are Partnerships
For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement, dated as of February 26, 2018, by and among NKS RESTAURANTS, L.C., a Utah limited liability company, HR RESTAURANTS, L.C., a Utah limited liability company, MR RESTAURANTS, L.C., a Utah limited liability company, C UTAH, L.C., a Utah limited liability company, AZM RESTAURANTS, L.C., a Utah limited liability company, and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, the "Borrowers"), the Guarantors, the Lenders, City National Bank, as Administrative Agent (as amended, modified, extended, restated, replaced, or supplemented from time to time, the "Credit Agreement").  Pursuant to the provisions of Section 3.01 of the Credit Agreement, the undersigned hereby certifies that (a) it is the sole record owner of the participation in respect of which it is providing this certificate, (b) its direct or indirect partners/members are the sole beneficial owners of such participation, (c) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (d) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower swithin the meaning of Section 871(h)(3)(B) of the Code, and (e) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrowers as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (a) an IRS Form W-8BEN or (b) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (i) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (ii) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By:_____
Name:_____
Title:_____

Date: _____ __, ____

**EXHIBIT G-4**

**[Form of]**
**U.S. Tax Compliance Certificate**

(For Foreign Lenders That Are Partnerships
For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement, dated as of February 26, 2018, by and among NKS RESTAURANTS, L.C., a Utah limited liability company, HR RESTAURANTS, L.C., a Utah limited liability company, MR RESTAURANTS, L.C., a Utah limited liability company, C UTAH, L.C., a Utah limited liability company, AZM RESTAURANTS, L.C., a Utah limited liability company, and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, the "Borrowers"), the Guarantors, the Lenders, City National Bank, as Administrative Agent (as amended, modified, extended, restated, replaced, or supplemented from time to time, the "Credit Agreement").  Pursuant to the provisions of Section 3.01 of the Credit Agreement, the undersigned hereby certifies that (a) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (b) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (c) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (d) none of its direct or indirect partners/members is a ten percent shareholder of the Borrowers within the meaning of Section 871(h)(3)(B) of the Code and (e) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrowers as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrowers with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (a) an IRS Form W-8BEN or (b) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (i) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrowers and the Administrative Agent, and (ii) the undersigned shall have at all times furnished the Borrowers and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]


By:_____
Name:_____
Title:_____

Date: _____ __, ___

# FIRST AMENDMENT TO CREDIT AGREEMENT

This First Amendment to Credit Agreement (this "<u>Amendment</u>") is entered into as of February 1, 2019, by and among **NKS RESTAURANTS, L.C.,** a Utah limited liability company ("<u>NKS</u>"), **HR RESTAURANTS, L.C.,** a Utah limited liability company ("<u>HR</u>"), **MR RESTAURANTS, L.C.,** a Utah limited liability company ("<u>MR</u>"), **C UTAH, L.C.,** a Utah limited liability company ("<u>C Utah</u>"), **AZM RESTAURANTS, L.C.,** a Utah limited liability company ("<u>AZM</u>"), **NDM RESTAURANTS, L.C.,** a Utah limited liability company ("<u>NDM</u>"; NKS, HR, MR, C Utah, AZM, and NDM are sometimes individually referred to herein as a "<u>Borrower</u>" and collectively as "<u>Borrowers</u>"), **MERIDIAN RESTAURANTS UNLIMITED, LC,** a Utah limited liability company ("<u>Meridian</u>"), and **LOVELOUD RESTAURANTS, L.C.,** a Utah limited liability company ("<u>Loveloud</u>"; Meridian and Loveloud are sometimes individually referred to herein as a "<u>Guarantor</u>" and collectively as "<u>Guarantors</u>"), **CITY NATIONAL BANK**, as administrative agent (in such capacity, "<u>Administrative Agent</u>"), and the Lenders party hereto.

## RECITALS

A.    Borrowers, Guarantors, Administrative Agent and lenders from time to time party thereto (the "<u>Lenders</u>") are parties to that certain Credit Agreement, dated as of February 26, 2018 (as heretofore amended, supplemented or otherwise modified, the "<u>Credit Agreement</u>").

B.    As of the date hereof (prior to receipt of any payment on the date hereof), the aggregate outstanding principal balance of (i) Term Loan A-1s was $37,839,604.00, (ii) Term Loan A-2s was $12,600,000.00, and (iii) Revolving Loans was $2,595,291.49.

C.    Borrowers, Administrative Agent and Lenders have agreed, subject to the terms and conditions set forth in this Amendment, to amend the Credit Agreement as hereinafter set forth.

**NOW, THEREFORE**, in consideration of the premises and the other mutual covenants contained herein, the receipt and sufficiency of which hereby are acknowledged, the parties hereto agree as follows:

1.    <u>**Definitions**</u>.  Capitalized terms used in this Amendment without definition shall have the meanings set forth in the Credit Agreement.

2.    <u>**Amendment to Credit Agreement**</u>.  In reliance upon the representations and warranties set forth in <u>Section 6</u> below and subject to the satisfaction of the conditions to effectiveness set forth in <u>Section 3</u> below, the Credit Agreement is hereby amended as follows:

(a)    <u>Section 2.01(b)</u> of the Credit Agreement is hereby amended to read in its entirety as follows:

"(b)    ***Term Loan A-2 Borrowings***.  Subject to the terms and conditions set forth herein, each Term Loan A-2 Lender severally agrees to make one or more loans to the Borrowers, in Dollars, from time to time, on any Business Day during the Availability Period in respect of the Term Loan A-2 Facility in an aggregate amount

not to exceed such Term Loan A-2 Lender's Applicable Percentage of the Term Loan A-2 Facility; provided, however, that the aggregate amount of Term Loan A-2s advanced with respect to any Restaurant shall not exceed the Term Loan A-2 Advance Limitation.  Each Term Loan A-2 Borrowing shall consist of Term Loan A-2s made simultaneously by the Term Loan A-2 Lenders in accordance with their respective Applicable Percentage of the Term Loan A-2 Facility.  Term Loan A-2 Borrowings repaid or prepaid may not be reborrowed.  Term Loan A-2s may be Base Rate Loans or Eurodollar Rate Loans, as further provided herein; provided, however, any Term Loan A-2 Borrowing made on the Closing Date or any of the three (3) Business Days following the Closing Date shall be made as Base Rate Loans unless the Borrower Agent delivers a Funding Indemnity Letter not less than three (3) Business Days prior to the date of such Term Loan A-2 Borrowing."

3.   **Conditions Precedent**.  This Amendment shall become effective upon the fulfillment of all of the following conditions to Administrative Agent's satisfaction:

(a)   Administrative Agent shall have received this Amendment duly executed by Borrowers, Guarantors and Lenders;

(b)   Administrative Agent shall have received a Manager's Certificate of each Loan Party executed by the manager of such Loan Party and certifying as to (i) the resolutions of the managers and managing members, as applicable, of such Loan Party approving the execution and delivery of this Amendment, (ii) the Organization Documents of such Loan Party, and (iii) the incumbency of the managers of such Loan Party; and

(c)   All other documents and legal matters in connection with this Amendment shall be satisfactory in form and substance to Administrative Agent and its counsel.

4.   **Existing Agreements**.  Except as expressly amended herein, the Credit Agreement and the other Loan Documents shall remain in full force and effect, and in all other respects are affirmed.

5.   **General Amendments**.  This Amendment shall be deemed to be a "Loan Document."  All references to "Credit Agreement" in any of the Loan Documents shall mean the Credit Agreement as amended by this Amendment.  All references to "Loan Document" or "Loan Documents" in any of the Loan Documents shall mean the Loan Documents as amended by this Amendment.

6.   **Representations and Warranties**.  Each Loan Party hereby represents and warrants to Administrative Agent and Lenders that as of the date hereof, both before and after giving effect to this Amendment and the transactions contemplated hereby that:

(a)   The execution, delivery and performance by each Loan Party of this Amendment have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene in any material respect the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or

contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries (excluding the Specified Subsidiaries), except for any conflict, breach or contravention which could not reasonably be expected to have a Material Adverse Effect, or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate in any material respect any Law;

(b)     No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Amendment;

(c)     This Amendment has been duly executed and delivered by each Loan Party that is party thereto.  This Amendment constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law);

(d)     No Default or Event of Default under, and as defined in, each Loan Document is in existence immediately after giving effect to this Amendment or shall be caused by the transactions contemplated by this Amendment; and

(e)     The representations and warranties set forth in each Loan Document are true and correct in all material respects as of the date hereof (without duplication of any materiality qualifier set forth in such representation or warranty), except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date (without duplication of any materiality qualifier set forth in such representation or warranty).

7.     **General Release**.  A Borrower or Guarantor (each, a "Releasing Party", and collectively, the "Releasing Parties") may have certain Claims against the Released Parties, as those terms are defined below, regarding or relating to loans made or alleged to be promised to be made to a Releasing Party by Administrative Agent and/or a Lender or otherwise related to the Credit Agreement, the other Loan Documents, and the transactions related thereto.  Administrative Agent, Lenders, and the Releasing Parties desire to resolve each and every one of such Claims in conjunction with the execution of this Amendment and thus each Releasing Party makes the general release set forth herein ("General Release").  In consideration of Administrative Agent and the Lenders entering into this Amendment, effective immediately, each Releasing Party hereby releases and discharges Administrative Agent and Lenders and each of their respective directors, officers, employees, parent companies, subsidiaries and affiliates, attorneys, agents, representatives, successors and assigns, and each of them

(collectively, the "Released Parties"), of and from any and all claims, causes of action, costs or demands and liabilities, of whatever kind or nature, whether known or unknown, liquidated or unliquidated, suspected or unsuspected, whether anticipated or unanticipated, which any Releasing Party has, claims to have or hereafter claims to have against the Released Parties by reason of any act or omission on the part of the Released Parties, or any of them, occurring prior to the effective date of this Amendment (collectively, "Claims").

(a)    <u>Extinguish Claims</u>.  Each Releasing Party agrees that the release by such Person is voluntarily and knowingly given with the express intention of effecting the legal consequences provided in section 1541 of the California Civil Code, which provides as follows:

> An obligation is extinguished by a release therefrom given to the debtor by the creditor, upon a new consideration, or in writing, with or without new consideration.

(b)    <u>Unknown and Future Claims</u>.  Each Releasing Party understands and acknowledges that there is a risk that after the execution of this Amendment, including this General Release:  (i) that the facts with respect to this General Release may be found to be other than or different from the facts now believed to be true; (ii) a Releasing Party may incur or sustain damages or losses that are in some way caused by the occurrences referred to above, including the Claims, but which are unknown and unanticipated at the time the parties sign this Amendment, including this General Release; (iii) that damages or losses presently known, if any, may be or may become more serious than any Releasing Party now anticipates.  Each Releasing Party agrees to release the Released Parties and assume all risks for releasing all Claims that may hereafter arise.  Each Releasing Party has read the entire section 1542 of the California Civil Code set forth below and, having had the opportunity to consult with legal counsel, such Releasing Party hereby expressly waives and relinquishes any and all rights and benefits available to such Person by section 1542 which provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

8.    **Counterparts**.  This Amendment may be executed in any number of counterparts, and all such counterparts taken together shall be deemed to constitute one and the same instrument.

9.    **Governing Law**.  This Amendment and the rights and obligations of the parties hereto shall be construed in accordance with, and governed by the laws of the State of California.

[Signatures follow]

**IN WITNESS WHEREOF,** the parties have executed this Amendment as of the day and year first above written.

<u>BORROWERS:</u>

**NKS RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper
Title:   Manager

**HR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper
Title:   Manager

**MR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper
Title:   Manager

**C UTAH, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper
Title:   Manager

[Signature Page to First Amendment]

**AZM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper

Title: Manager


**NDM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper

Title: Manager


**GUARANTORS:**

**LOVELOUD RESTAURANTS, L.C.,**
a Utah limited liability company

By: Meridian Restaurants Unlimited, LC, its
Manager

By: _____

Name: David Harper

Title: Manager


**MERIDIAN RESTAURANTS UNLIMITED,
LC,**
a Utah limited liability company

By: _____

Name: David Harper

Title: Manager


[Signature Page to First Amendment]

**CITY NATIONAL BANK,**
as Administrative Agent and a Lender

By: _Michelle Mason_

Name: Michelle Mason

Title: Vice President

[Signature Page to First Amendment]

**BRIDGE FUNDING GROUP, INC.,**
a Lender

By: _____

Name: Gregory Pinson

Title: SVP

[Signature Page to First Amendment]

## SECOND AMENDMENT TO CREDIT AGREEMENT AND WAIVER

This Second Amendment to Credit Agreement and Waiver (this "Amendment") is entered into as of March 13, 2019, by and among **NKS RESTAURANTS, L.C.,** a Utah limited liability company ("NKS"), **HR RESTAURANTS, L.C.,** a Utah limited liability company ("HR"), **MR RESTAURANTS, L.C.,** a Utah limited liability company ("MR"), **C UTAH, L.C.,** a Utah limited liability company ("C Utah"), **AZM RESTAURANTS, L.C.,** a Utah limited liability company ("AZM"), **NDM RESTAURANTS, L.C.,** a Utah limited liability company ("NDM"; NKS, HR, MR, C Utah, AZM, and NDM are sometimes individually referred to herein as a "Borrower" and collectively as "Borrowers"), **MERIDIAN RESTAURANTS UNLIMITED, LC,** a Utah limited liability company ("Meridian"), and **LOVELOUD RESTAURANTS, L.C.,** a Utah limited liability company ("Loveloud"; Meridian and Loveloud are sometimes individually referred to herein as a "Guarantor" and collectively as "Guarantors"), **CITY NATIONAL BANK,** as administrative agent (in such capacity, "Administrative Agent"), and the Lenders party hereto.

## RECITALS

A.    Borrowers, Guarantors, Administrative Agent and lenders from time to time party thereto (the "Lenders") are parties to that certain Credit Agreement, dated as of February 26, 2018 (as heretofore amended, supplemented or otherwise modified, the "Credit Agreement").

B.    As of the date hereof, the aggregate outstanding principal balance of (i) Term Loan A-1s was $37,573,564.40, (ii) Term Loan A-2s was $18,000,000.00, and (iii) Revolving Loans was $2,949,695.53.

C.    Borrowers have breached Section 2.03(b)(viii) of the Credit Agreement because Borrowers failed to repay the Total Revolving Outstandings in full on an Interest Payment Date selected by Borrower Agent in the twelve-month period following the Closing Date and failed to cause the Total Revolving Outstandings to remain $0.00 for a period of 30 consecutive days thereafter (the "Known Existing Default"). Such breach constitutes an "Event of Default" under the Credit Agreement.

D.    Borrowers have requested that (i) the Credit Agreement be amended in order to, among other things, (a) provide for additional term loans to be made by the Lenders on the date of this Amendment in an aggregate principal amount equal to $4,400,000.00 (each, a "Term Loan A-3"), (b) provide for the repayment of the outstanding principal balance of (x) Term Loan A-2s in an aggregate amount equal to $1,450,304.47 and (y) Revolving Loans in an aggregate amount equal to $2,949,695.53, in each case, using the proceeds of Term Loan A-3s, and (c) increase the aggregate Term Loan A-2 Commitments, which, immediately prior to the effectiveness of this Amendment was $0, to $1,450,304.47, and (ii) Known Existing Default be waived, and the Lenders are willing to agree to such amendments and waiver pursuant to the terms and conditions set forth in this Amendment.

**NOW, THEREFORE**, in consideration of the premises and the other mutual covenants contained herein, the receipt and sufficiency of which hereby are acknowledged, the parties hereto agree as follows:

1.  <u>**Definitions**</u>.  Capitalized terms used in this Amendment without definition shall have the meanings set forth in the Credit Agreement.

2.  <u>**Amendments to Credit Agreement**</u>.  In reliance upon the representations and warranties set forth in <u>Section 7</u> below and subject to the satisfaction of the conditions to effectiveness set forth in <u>Section 4</u> below, (a) the Credit Agreement (other than the Schedules and Exhibits thereto) is hereby amended to reflect the modifications set forth in the Credit Agreement attached as <u>Annex I</u> hereto, (b) <u>Schedule 2.01</u> of the Credit Agreement is hereby amended and restated in its entirety as set forth on <u>Annex II</u> attached hereto, and (c) a new <u>Schedule 2.05(d)</u> is hereby added to the Credit Agreement to read in its entirety as set forth on <u>Annex III</u> attached hereto.

3.  <u>**Waiver**</u>.  In reliance upon the representations and warranties set forth in <u>Section 7</u> below and subject to the satisfaction of the conditions to effectiveness set forth in <u>Section 4</u> below, Administrative Agent and the Lenders hereby waive the Known Existing Default. This waiver shall be effective only for the specific default comprising the Known Existing Default, and in no event shall this waiver be deemed to be a waiver of any other Defaults or Events of Default now existing or hereafter arising or enforcement of Administrative Agent's or any Lender's rights with respect thereto.

4.  <u>**Conditions Precedent**</u>.  This Amendment shall become effective upon the fulfillment of all of the following conditions to Administrative Agent's satisfaction:

    (a)  Administrative Agent shall have received this Amendment duly executed by Borrowers, Guarantors and Lenders;

    (b)  Administrative Agent shall have received a fee letter duly executed by Borrowers (the "<u>Second Amendment Fee Letter</u>");

    (c)  Administrative Agent shall have received a Term Loan A-3 Note (as defined after giving effect to this Amendment) executed by Borrowers in favor of each Lender requesting a Term Loan A-3 Note;

    (d)  Administrative Agent shall have received a Manager's Certificate of each Loan Party executed by the manager of such Loan Party and certifying as to (i) the resolutions of the managers and managing members, as applicable, of such Loan Party approving the execution and delivery of this Amendment, (ii) the Organization Documents of such Loan Party, and (iii) the incumbency of the managers of such Loan Party;

    (e)  Borrowers shall have paid to Administrative Agent the fees required pursuant to the terms of the Second Amendment Fee Letter;

(f)    At least five days prior to the effective date of this Amendment, any Borrower that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation (as defined after giving effect to this Amendment) shall deliver a Beneficial Ownership Certification (as defined after giving effect to this Amendment) in relation to such Borrower; and

(g)    All other documents and legal matters in connection with this Amendment shall be satisfactory in form and substance to Administrative Agent and its counsel.

5.    **Existing Agreements**.  Except as expressly amended herein, the Credit Agreement and the other Loan Documents shall remain in full force and effect, and in all other respects are affirmed.

6.    **General Amendments**.  This Amendment shall be deemed to be a "Loan Document."  All references to "Credit Agreement" in any of the Loan Documents shall mean the Credit Agreement as amended by this Amendment.  All references to "Loan Document" or "Loan Documents" in any of the Loan Documents shall mean the Loan Documents as amended by this Amendment.

7.    **Representations and Warranties**.  Each Loan Party hereby represents and warrants to Administrative Agent and Lenders that as of the date hereof, both before and after giving effect to this Amendment and the transactions contemplated hereby that:

(a)    The execution, delivery and performance by each Loan Party of this Amendment have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene in any material respect the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries (excluding the Specified Subsidiaries), except for any conflict, breach or contravention which could not reasonably be expected to have a Material Adverse Effect, or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate in any material respect any Law;

(b)    No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Amendment;

(c)    This Amendment has been duly executed and delivered by each Loan Party that is party thereto.  This Amendment constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the

enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law);

(d)     Other than the occurrence of the Known Existing Default, no Default or Event of Default under, and as defined in, each Loan Document is in existence immediately after giving effect to this Amendment or shall be caused by the transactions contemplated by this Amendment; and

(e)     The representations and warranties set forth in each Loan Document are true and correct in all material respects as of the date hereof (without duplication of any materiality qualifier set forth in such representation or warranty), except (i) to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date (without duplication of any materiality qualifier set forth in such representation or warranty), and (ii) the Known Existing Default has occurred.

8.     **General Release**.  A Borrower or Guarantor (each, a "Releasing Party", and collectively, the "Releasing Parties") may have certain Claims against the Released Parties, as those terms are defined below, regarding or relating to loans made or alleged to be promised to be made to a Releasing Party by Administrative Agent and/or a Lender or otherwise related to the Credit Agreement, the other Loan Documents, and the transactions related thereto.  Administrative Agent, Lenders, and the Releasing Parties desire to resolve each and every one of such Claims in conjunction with the execution of this Amendment and thus each Releasing Party makes the general release set forth herein ("General Release").  In consideration of Administrative Agent and the Lenders entering into this Amendment, effective immediately, each Releasing Party hereby releases and discharges Administrative Agent and Lenders and each of their respective directors, officers, employees, parent companies, subsidiaries and affiliates, attorneys, agents, representatives, successors and assigns, and each of them (collectively, the "Released Parties"), of and from any and all claims, causes of action, costs or demands and liabilities, of whatever kind or nature, whether known or unknown, liquidated or unliquidated, suspected or unsuspected, whether anticipated or unanticipated, which any Releasing Party has, claims to have or hereafter claims to have against the Released Parties by reason of any act or omission on the part of the Released Parties, or any of them, occurring prior to the effective date of this Amendment (collectively, "Claims").

(a)     Extinguish Claims.  Each Releasing Party agrees that the release by such Person is voluntarily and knowingly given with the express intention of effecting the legal consequences provided in section 1541 of the California Civil Code, which provides as follows:

An obligation is extinguished by a release therefrom given to the debtor or the released party by the creditor or releasing party, upon a new consideration, or in writing, with or without new consideration.

(b)     <u>Unknown and Future Claims</u>.  Each Releasing Party understands and acknowledges that there is a risk that after the execution of this Amendment, including this General Release:  (i) that the facts with respect to this General Release may be found to be other than or different from the facts now believed to be true; (ii) a Releasing Party may incur or sustain damages or losses that are in some way caused by the occurrences referred to above, including the Claims, but which are unknown and unanticipated at the time the parties sign this Amendment, including this General Release; (iii) that damages or losses presently known, if any, may be or may become more serious than any Releasing Party now anticipates.  Each Releasing Party agrees to release the Released Parties and assume all risks for releasing all Claims that may hereafter arise.   Each Releasing Party has read the entire section 1542 of the California Civil Code set forth below and, having had the opportunity to consult with legal counsel, such Releasing Party hereby expressly waives and relinquishes any and all rights and benefits available to such Person by section 1542 which provides as follows:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

9.      **Counterparts**.  This Amendment may be executed in any number of counterparts, and all such counterparts taken together shall be deemed to constitute one and the same instrument.

10.     **Governing Law**.  This Amendment and the rights and obligations of the parties hereto shall be construed in accordance with, and governed by the laws of the State of California.

[Signatures follow]

**IN WITNESS WHEREOF,** the parties have executed this Amendment as of the day and year first above written.

<u>BORROWERS:</u>

**NKS RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper
Title:   Manager

**HR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper
Title:   Manager

**MR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper
Title:   Manager

**C UTAH, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper
Title:   Manager

[Signature Page to Second Amendment]

**AZM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _David Harper_
Name: David Harper
Title: Manager


**NDM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _David Harper_
Name: David Harper
Title: Manager


**GUARANTORS:**

**LOVELOUD RESTAURANTS, L.C.,**
a Utah limited liability company

By: Meridian Restaurants Unlimited, LC, its
    Manager

    By: _David Harper_
    Name: David Harper
    Title: Manager


**MERIDIAN RESTAURANTS UNLIMITED, LC,**
a Utah limited liability company

By: _David Harper_
Name: David Harper
Title: Manager


[Signature Page to Second Amendment]

**CITY NATIONAL BANK,**
as Administrative Agent and a Lender

By: _____

Name: Jace Henricks
Title: Senior Vice President

[Signature Page to Second Amendment]

**BRIDGE FUNDING GROUP, INC.,**
a Lender

By: _____

Name: Gregory Faherty

Title: SVP

[Signature Page to Second Amendment]

# EXHIBIT 2

<u>FORBEARANCE AGREEMENT</u>

This Forbearance Agreement ("Agreement") is entered into as of the 1st day of June, 2020, and is made by and between: (i) CITY NATIONAL BANK, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); (ii) NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (individually a "Borrower" and collectively, "Borrowers"); (iii) MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"); and (iv) the Lenders signatory thereto.  For purposes of this Agreement, Administrative Agent, the Lenders, Borrowers and Guarantors are sometimes referred to herein collectively as "the Parties".

This Agreement is made with reference to the following facts:

A.      Borrowers made, executed and delivered to Administrative Agent that certain "Credit Agreement" dated as of February 26, 2018 (the "Original Agreement"), as amended and modified by that certain "First Amendment To Credit Agreement" dated as of February 1, 2019, and that certain "Second Amendment To Credit Agreement And Waiver" dated as of March 13, 2019 (collectively, the "Amendments" and, collectively with the Original Agreement, the "Credit Agreement").  All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement.

B.      In accordance with the Credit Agreement, Administrative Agent and the Lenders made extensions of credit and other Loans available to Borrowers in accordance with the Revolving Facility, the Term Loan A-1 Facility, the Term Loan A-2 Facility and the Term Loan A-3 Facility (collectively, the "Facilities").

C.      The Loans are further evidenced by the Revolving Note, the Term Loan A-1 Note, the Term Loan A-2 Note and the Term Loan A-3 Note (collectively and as amended, restated, supplemented and/or modified from time to time, the "Notes").

D.      In order to collateralize its obligations under the Credit Agreement and the Notes, Borrowers executed and delivered to Administrative Agent that certain "Security Agreement" dated as of February 26, 2018 (as amended, restated, supplemented and/or modified from time to time, the "Security Agreement").  Pursuant to the Security Agreement, Borrowers granted to Administrative Agent a security interest in all collateral described in the Security Agreement, including, among other things, all inventory, instruments, chattel paper, accounts, payment rights, licenses and general intangibles (each as defined in the Security Agreement), together with all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; and all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds) (collectively, the "Collateral").  Administrative Agent perfected its security interest in the Collateral by duly recording one or more UCC-1 Financing Statements with the Office of the Secretary of State of Utah (collectively, and as amended and/or continued from time to time, the "Financing Statements").

1

E.     In order to further collateralize its obligations under the Credit Agreement and the Notes, Meridian Restaurants Unlimited, LC, a Utah limited liability company ("Pledgor"), executed and delivered to Administrative Agent that certain "Pledge Agreement" dated as of February 26, 2018 (as amended, restated, supplemented and/or modified from time to time, the "Pledge Agreement").  Pursuant to the Pledge Agreement, Pledgor pledged to Administrative Agent a security interest in all capital stock, membership interests, partnership interests and all other "Pledged Collateral" (as defined in the Pledge Agreement).  Administrative Agent perfected its security interest in the Pledged Collateral by duly recording the Financing Statements and by taking possession of certain of the Pledged Collateral.

F.     In order to guaranty Borrowers' indebtedness and obligations under the Credit Agreement and the Notes, Guarantors executed and delivered to Administrative Agent that certain "Continuing Guaranty" contained in Article X of the Credit Agreement (as amended, restated, supplemented and/or modified from time to time, the "Guaranty"). Pursuant to the Guaranty, Guarantors jointly, severally and unconditionally guaranteed and promised to pay Administrative Agent, on demand, all obligations and indebtedness owed by Borrowers to Administrative Agent under the Credit Agreement, the Notes and the other Loan Documents.

G.     In addition to the Credit Agreement, the Notes, the Security Agreement, the Pledge Agreement, the Financing Statements and the Guaranty, the Loans are also evidenced by other documents, instruments and agreements executed by Borrowers and/or Guarantors (collectively, "Loan Parties") in connection with the Loans and the Facilities (collectively, with the Credit Agreement, the Notes, the Security Agreement, the Pledge Agreement, the Financing Statements, the Guaranty and this Agreement, the "Loan Documents").

H.     Administrative Agent has advanced funds to Borrowers pursuant to the Credit Agreement, the Notes and the other Loan Documents, and Administrative Agent has performed all other terms and conditions of the Notes and the other Loan Documents on its part to be performed.

I.     By letters dated July 26, 2019 and October 7, 2019 (collectively, the "Default Letters"), Administrative Agent provided formal notice to Loan Parties that multiple Events of Default (collectively, the "Existing Defaults") had occurred and were continuing under:

- Sections 2.03(b)(i) and 8.01(a) of the Credit Agreement due to Borrowers' failure to remit to Administrative Agent 100% of the Net Cash Proceeds (in the approximate amount of $7,010,000.00) received by Loan Parties from an Equity Issuance in July, 2019;

- Sections 6.04 and 8.01(c) of the Credit Agreement due to Borrowers' failure to timely pay past-due 2018 payroll and sales taxes to the proper Governmental Authorities;

- Sections 6.02(a) and 8.01(b) of the Credit Agreement due to Borrowers' failure to provide compliance Certificates for the Fiscal Quarter ended June 30, 2019 signed by a Responsible Officer;

- Sections 7.06 and 8.01(b) of the Credit Agreement due to Restricted Payments made by Borrowers to holders of Equity Interests during Borrowers' Fiscal

2

Quarters ending March 30, 2019 and June 30, 2019, when Defaults and Events of
Default had occurred and were continuing;

- Sections 7.11(a) and 8.01(b) of the Credit Agreement due to Borrowers' failure to
satisfy the Consolidated Pre-Compensation Fixed Charge Coverage Ratio for the
Fiscal Quarter ending June 30, 2019;

- Sections 7.11(c) and 8.01(b) of the Credit Agreement due to Borrowers' failure to
satisfy the minimum Current Ratio for the Fiscal Quarter ending June 30, 2019;

- Sections 7.11(d) and 8.01(b) of the Credit Agreement due to Borrowers' failure to
satisfy the maximum Consolidated Lease Adjusted Leverage Ratio for the Fiscal
Quarter ending June 30, 2019;

- Section 8.01(k) of the Credit Agreement due to the occurrence of a Change of
Control as a result of the failure of David Harper to maintain day-to-day operational
control of each Loan Party; and

- Section 8.01(d) of the Credit Agreement arising from inaccurate representations
and warranties about whether the Existing Defaults were in existence and known
to prior management of the Loan Parties at the time they executed the Amendments.

     J.     In addition to the Existing Defaults, the Parties acknowledge and agree that the
following new Events of Default (collectively, the "New Defaults") have occurred, or will occur
under:

- Sections 7.11(a) and 8.01(b) of the Credit Agreement due to Borrowers' failure to
satisfy the Consolidated Pre-Compensation Fixed Charge Coverage Ratio for the
Fiscal Quarters ending December 31, 2019, and March 31, 2020;

- Sections 7.11(b) and 8.01(b) of the Credit Agreement due to Borrowers' failure to
satisfy the Consolidated Post-Distribution Fixed Charge Coverage Ratio for the
Fiscal Quarters ending December 31, 2019, and March 31, 2020;

- Sections 7.11(c) and 8.01(b) of the Credit Agreement due to Borrowers' failure to
satisfy the minimum Current Ratio for the Fiscal Quarters ending December 31,
2019, and March 31, 2020;

- Sections 7.11(d) and 8.01(b) of the Credit Agreement due to Borrowers' failure to
satisfy the maximum Consolidated Lease Adjusted Leverage Ratio for the Fiscal
Quarters ending December 31, 2019, and March 31, 2020;

- Sections 2.03(b) and 8.01(a) of the Credit Agreement due to Borrowers' failure to
deliver 100% of Net Cash Proceeds received by Borrowers from a $3,000,000
issuance or Disposition of Equity Interests by Borrowers' sponsor;

- Section 8(d) of the Credit Agreement arising from incorrect and misleading
representations and warranties of Borrowers' financial performance to the

Administrative Agent and the Lenders during the time Borrowers made draws upon
the Term Loan A-2 Facility; and

- Sections 2.05(a), 2.05(b), 2.05(d), 2.06(c), and 8.01(a) of the Credit Agreement due
  to Borrowers' failure to pay principal and interest on April 1, 2020 and May 1, 2020
  on each of the Loans, which principal and interest payments will be deferred in
  accordance with Section VIII(A) of this Agreement.

K.      Loan Parties have requested that Administrative Agent formally and temporarily
forbear from exercising its legal rights and remedies as to the Existing Defaults and the New
Defaults (collectively, the "Ongoing Defaults"), and that Administrative Agent amend certain
terms and conditions of the Credit Agreement.

L.      Administrative Agent is willing to formally and temporarily forbear from
exercising its legal rights and remedies as to the Ongoing Defaults, and to amend certain terms and
conditions of the Credit Agreement, only in accordance with this Agreement.

M.      IT IS THE INTENT OF THE PARTIES THAT THIS AGREEMENT ADDRESS
THE DEBTS AND/OR OBLIGATIONS OF LOAN PARTIES TO ADMINISTRATIVE AGENT
AND THE LENDERS WHICH ARE FULLY DESCRIBED HEREIN AND REFLECTED IN
THE LOAN DOCUMENTS.  THIS AGREEMENT DOES NOT PERTAIN TO THE OTHER
FACILITIES OR ANY OTHER CREDIT FACILITIES, INDEBTEDNESS OR OBLIGATIONS
OF   BORROWERS   TO   ADMINISTRATIVE   AGENT   OR   THE   LENDERS   NOT
SPECIFICALLY ADDRESSED IN THIS AGREEMENT.  ALL TERMS AND PROVISIONS
OF THE CREDIT AGREEMENT, THE NOTES, THE SECURITY AGREEMENT, THE
PLEDGE AGREEMENT, THE GUARANTY AND THE OTHER LOAN DOCUMENTS NOT
SPECIFICALLY MODIFIED HEREIN SHALL REMAIN IN FULL FORCE AND EFFECT IN
ACCORDANCE WITH THEIR ORIGINAL TERMS.

**NOW, THEREFORE**, in consideration of: (i) the above recitals and the mutual promises
contained in this Agreement; (ii) the execution of this Agreement; (iii) the satisfaction of all
Conditions Precedent set forth in Section XI below; and (iii) for other and further valuable
consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed
as follows:

I.      Incorporation of Recitals.  Each of the foregoing Recitals is incorporated herein by this
reference, and the Parties each agree that each of such Recitals is true and correct in all respects.

II.     Effective Date of Agreement.  This Agreement shall be deemed effective as of the date all
of the Conditions Precedent set forth in Section XI below are satisfied (the "Effective Date").

III.    Acknowledgment of the Loan Documents and the Obligations.

A.      Execution of the Loan Documents.  Loan Parties each acknowledge and agree that
Loan Parties have executed, among others, the Credit Agreement, the Notes, the Security
Agreement, the Pledge Agreement, the Guaranty and the other Loan Documents.

B.      Enforceability of the Loan Documents.  Loan Parties each expressly acknowledge
and agree that: (i) Loan Parties each agreed to repay all amounts advanced by Administrative

4

Agent to Borrowers pursuant to the Loan Documents, together with interest thereon at the applicable rates set forth in the Loan Documents, together with all applicable fees and charges set forth in the Loan Documents; (ii) the Ongoing Defaults have occurred and as of the date hereof are continuing under the Loan Documents as set forth in the Recitals above; (iii) the Loan Documents have not been amended except as set forth herein; (iv) the Loan Documents constitute duly authorized, valid, binding and continuing agreements and obligations of Loan Parties to Administrative Agent, enforceable in accordance with their terms; and (v) as of the date hereof the Loan Parties have no claims, cross-claims, counterclaims, setoffs or defenses of any kind or nature which would in any way reduce or offset their respective joint and several obligations to Administrative Agent under the Loan Documents as of the date of execution of this Agreement.

C.    The Collateral.  Loan Parties each expressly acknowledge and agree that: (i) the Credit Agreement, the Notes, the Security Agreement, the Pledge Agreement, the Financing Statements and other Loan Documents provide Administrative Agent with duly authorized, valid, binding, continuing and perfected security interests in the Collateral and the Pledged Shares; (ii) such perfected security interests in the Collateral and the Pledged Shares were granted to Administrative Agent for purposes of securing the Obligations and Loan Parties' continuing obligations to Administrative Agent under the Loan Documents; and (iii) as of the date hereof the Loan Parties have no claims, counterclaims, cross-claims, setoffs or defenses of any kind or nature which would in any way invalidate, result in the subordination of, delay the execution of, or otherwise negatively impact the security interests granted to Administrative Agent in the Collateral and the Pledged Shares as of the date of execution of this Agreement.

D.    The Obligations.  Loan Parties each expressly acknowledge and agree that by virtue of the Loan Documents, there is presently a balance on the Loans outstanding from Loan Parties to Administrative Agent, jointly and severally, in the following amounts as of May 1, 2020 (the "Obligations"):

- Revolving Loan Principal:        $    875,000.00.

- Revolving Loan Interest:         $     11,248.41.

- Term Loan A-1 Principal:      $33,954,151.80.

- Term Loan A-1 Interest:         $    433,467.53.

- Term Loan A-2 Principal:      $16,697,490.00.

- Term Loan A-2 Interest:         $    214,651.87.

- Term Loan A-3 Principal:      $  4,053,707.00.

- Term Loan A-3 Interest:         $     52,111.77.

- Financial Advisor Fees & Costs:   $     75,000.00.

- Attorneys' Fees & Costs:         $     85,275.90.

5

E.     Loan Parties each expressly acknowledge and agree that interest on the Loans continues to accrue on and after May 1, 2020 until paid; as well as all other fees, costs and additional charges due under the terms of this Agreement, the Credit Agreement, the Notes, the Guaranty and any of the other Loan Documents, including but not limited to all of Administrative Agent's reasonable outside counsel's attorneys' fees and costs.

IV.     <u>Limited Scope of Agreement</u>.  Nothing contained in this Agreement shall be interpreted as or be deemed a release or a waiver by Administrative Agent of any of the terms or conditions of the Credit Agreement, the Notes, the Guaranty or any of the other Loan Documents, except as specifically provided in this Agreement.  This Agreement does not constitute a waiver or release by Administrative Agent of any obligations between any of the Loan Parties and Lenders or Administrative Agent, nor a waiver by Administrative Agent of any defaults by Loan Parties under any of the Loan Documents, nor between Administrative Agent and any other person or entity.

V.     <u>Administrative Agent's Agreement to Forbear During the Forbearance Period</u>.  Subject to Loan Parties' satisfaction of all Conditions Precedent set in Section XI below, and so long as no New Event of Default (as defined below) occurs:

A.     Administrative Agent hereby agrees to forbear from exercising its rights and remedies, including the imposition of Default Interest, solely as to the Ongoing Defaults through the Maturity Date of the Revolving Facility and the Maturity Date of the Term Loan Facilities, as applicable (the "<u>Forbearance Period</u>").

B.     Loan Parties each acknowledge and agree that immediately after the Forbearance Period expires or immediately upon the occurrence of a New Event of Default (as defined below), Administrative Agent may, without any further notice other than as required by the Loan Documents, exercise all of the rights and remedies contained in the Credit Agreement, the Notes, the Guaranty, the Security Agreement, the Pledge Agreement, this Agreement, any of the other Loan Documents and available under applicable law.

C.     Administrative Agent hereby agrees that the imposition of Default Interest with respect to any of the Ongoing Defaults prior to the Effective Date is hereby waived.

VI.     <u>No Waiver</u>.  The agreement of Administrative Agent under Section V of this Agreement to forbear as to the Ongoing Defaults shall not constitute a waiver of the Ongoing Defaults or any other Defaults or Events of Default that may exist under the Loan Documents.  Unless specifically modified herein, all terms and provisions of the Credit Agreement, the Notes and the other Loan Documents shall remain in full force and effect in accordance with their original terms.

VII.     <u>Amendments to the Credit Agreement</u>.  As additional consideration for Administrative Agent to enter into this Agreement, Administrative Agent and Loan Parties each agree that: (i) the following provisions of the Credit Agreement are hereby permanently modified; <u>provided</u>, <u>however</u>, that all terms and provisions of the Credit Agreement not specifically modified in this Agreement shall remain in full force and effect in accordance with their original terms; (ii) to the extent not already contained in the Credit Agreement, the following additional covenants are hereby added to the Credit Agreement; and (iii) all of the amendments, modifications and new covenants provided below shall survive the expiration of the Forbearance Period and shall remain in full force and effect until all of the Obligations are repaid in full, except as otherwise set forth below:

6

A.    <u>Additional Definitions</u>. The following additional definitions are hereby added to Section 1.01 of the Credit Agreement in their appropriate alphabetical order:

"*CARES Act*" has the meaning given for said term in Section 7.03(h) of this Agreement.

"*Deferred April Interest Payments*" has the meaning given for said term in Section VIII(A) below.

"*Deferred Interest*" has the meaning given for said term in the definition of "*Applicable Margin*".

"*Deferred Payments*" has the meaning given for said term in Section VIII(A) below.

"*Deferred Principal Payments*" has the meaning given for said term in Section VIII(A) below.

"*Forbearance Agreement*" means that certain "Forbearance Agreement" dated as of June 1, 2020, by and between Borrowers, Administrative Agent, the Lenders and the other Loan Parties signatory thereto, as amended, supplemented and/or modified from time to time.

"*Forbearance Period*" has the meaning given for said term in the Forbearance Agreement.

"*Increased Margin*" has the meaning provided for said term in the definition of "*Applicable Margin*".

"*PPP Loan*" has the meaning given for said term in Section 7.03(h) of this Agreement."

B.    <u>Amendment to Maturity Date</u>.  The definition of "*Maturity Date*" contained in Section 1.01 of the Credit Agreement is hereby amended and restated in its entirety as follows;

"*Maturity Date*" means (a) with respect to the Revolving Facility, September 30, 2020, (b) with respect to each of the Term Loan Facilities, February 26, 2023; <u>provided, however</u>, that, in each case, if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day."

C.    <u>Termination of Revolving Commitment</u>.   The Revolving Commitment is terminated as of the Effective Date, and all references in the Credit Agreement to the "Revolving Commitment" are hereby deleted.  For the avoidance of doubt, Borrowers shall no longer be entitled to any Revolving Loans, and any Revolving Loans that are repaid may not be reborrowed.

D.    <u>Increase in Interest Rate</u>.   The definition of "*Applicable Margin*" contained in Section 1.01 of the Credit Agreement is hereby amended by deleting the existing language immediately above the Pricing Level Table, and replacing it with the following new language:

"*Applicable Margin*" means, for any date, with respect to any Loan, the applicable rate per annum set forth in the table below opposite the Consolidated Lease

7

Adjusted Leverage Ratio, as determined as of the last day of the immediately preceding Fiscal Quarter; provided, however, that the applicable rates set forth in the table below shall be increased by the following amounts over the following time periods (the "Increased Margin"): (i) by an initial 100 bps from the Effective Date of the Forbearance Agreement through June 30, 2021; (ii) by an additional 100 bps on July 1, 2021; and (iii) by an additional 100 bps on July 1, 2022. The first cash-payment of interest based on the Increased Margin shall be due and payable on September 1, 2020. Additionally, Interest based on the Increased Margin shall be deferred for the five (5) monthly interest payments due on November 1st, December 1st, January 1st, February 1st and March 1st payment dates of each calendar year (the "Deferred Interest"). Said Deferred Interest for each such calendar month shall be due and payable six (6) months later with the applicable five (5) monthly interest payments due and payable on the following May 1st, June 1st, July 1st, August 1st and September 1st of each calendar year. All Deferred Interest must be completely repaid concurrently with a payoff of all other Obligations."

E.     Increase in Default Rate. The definition of "*Default Rate*" contained in Section 1.01 of the Credit Agreement is hereby amended by replacing the figure "2.0%" with the figure "3.0%".

F.     Amortization of Second Anniversary A-2s. Attached hereto as Exhibit "A" and incorporated herein by this reference is the amortization schedule with respect to the Second Anniversary Term Loan A-2s required by Section 2.05(b)(ii) of the Credit Agreement.

G.     Amendments Mandatory Prepayments. The following provisions of Section 2.03(b) of the Credit Agreement are hereby amended as follows:

- Section 2.03(b) of the Credit Agreement is hereby changed by adding the following new Sections 2.03(b)(v) and (vi), and re-numbering existing Sections 2.03(b)(v), (vi), (vii) and (viii) accordingly:

  "(v)     The Borrowers shall pay to Administrative Agent an amount equal to 100% of any Net Cash Proceeds existing at any time that the Borrowers' Consolidated Pre-Compensation Fixed Charge Coverage Ratio, measured as of the end of each Fiscal Quarter, is greater than 1.25 to 1.00.

  (vi)     The Borrowers shall pay to Administrative Agent an amount equal to 50% of any Distributions which the holders of Equity Interests elect to receive at any time that the Borrowers' Consolidated Post-Distribution Fixed Charge Coverage Ratio, measured as of the end of each Fiscal Quarter, is between 1.25 to 1.00 and 1.10 to 1.00."

- The introductory clause to Section 2.03(b)(vii) (as re-numbered from Section 2.03(b)(v) pursuant to this Agreement) is hereby amended and restated in its entirety as follows:

  "*Application*. All prepayments pursuant to the foregoing provisions of Section 2.03(b)(i) through (vi) shall be applied by the Administrative Agent, subject to

8

Section 2.12, in the following order (except as otherwise provided in Section 2.03(a)):"

      H.    <u>Additional Financial Reporting</u>.  Immediately following Section 6.01(d) of the Credit Agreement, the following new 6.01(e) is added as follows:

"(e)    within the time limits set forth below, the following financial reports:

- Internal interim reportings, including store level reconciliations, due: (i) quarterly within 45 days of period close through and including the quarter ending December 31, 2020; and (ii) monthly within 30 days of period close commencing with the January 1, 2021 reporting period.
- Internal interim non-quarterly 2020 reportings, without store level reconciliations, due monthly within 30 days of period close.
- CPA prepared consolidated and combining audited financials of the short Fiscal Year ending 2018, to be delivered by no later than June 30, 2020.
- CPA prepared consolidated and combining audited financials for Fiscal Year ending 2019, to be delivered by no later than July 31, 2020.
- CPA prepared consolidated and combining audited financials for Fiscal Year ending 2020, to be delivered by no later than April 30, 2021.
- Updated initial projections for the following Fiscal Year required by 12/10/XX of each applicable year, and final projections before 2/28/XX of each applicable Fiscal Year."

      I.    <u>Additional Reporting Regarding Taxes</u>.  Immediately following Section 6.02(d) of the Credit Agreement, the following new Sections 6.02(e), (f) and (g) are added as follows:

"(e)    concurrently with delivery of Borrowers' monthly financial statements and reporting, a written update on the status of accrual and payment of past-due federal and state income taxes.

(f)    by the close of business each Friday from the Effective Date until July 1, 2020: (i) a rolling 13-week cash flow report, in form acceptable to Administrative Agent in its sole and absolute discretion; and (ii) a weekly variance report showing Borrowers' actual to projected cash flow from the prior week (which cash flow report may be consolidated with the 13-week cash flow report).

(g)    promptly, copies of any and all correspondence, whether in letter or email form, from February, 2018, forward (until all Obligations are paid in full) that reference any breach or deviance from any of the Franchise Agreements including, but not limited to, all notices received in January 2020 regarding non-compliance under certain of the Franchise Agreements."

      J.    <u>No Investments in Loan Parties</u>.  Section 7.02(f) of the Credit Agreement is hereby eliminated. For the avoidance of doubt, unless otherwise permitted in the Credit Agreement or this Agreement, Borrowers shall make no Investments in any Loan Parties.

9

K.    <u>No Acquisitions</u>.  Sections 6.12 and 7.02(g) of the Credit Agreement are hereby eliminated.  For the avoidance of doubt, Borrowers shall make no Acquisitions or Investments in new Restaurants.

L.    <u>CAPEX Limitations</u>.  The figure "$2,500,000" contained in Section 7.03(e) of the Credit Agreement is hereby changed to "$2,400,000 per year".

M.    <u>Limited New Indebtedness Permitted</u>.  Immediately following Section 7.03(g) of the Credit Agreement, the following new Section 7.03(h) is added as follows:

"(h)    Indebtedness in the form of loans authorized pursuant to and in compliance with the Coronavirus Aid, Relief, and Economic Security Act, as in effect on the date hereof ("CARES Act"), under the Paycheck Protection Program of the U.S. Small Business Administration (the "PPP Loan"), and/or other government or government aided relief programs.  For avoidance of doubt, proceeds of any PPP Loan and/or other government or government aided relief programs shall not be considered Net Cash Proceeds or Indebtedness of the type specified in clause (a) of this definition."

N.    <u>Amendment to Restricted Payments</u>.  The following provisions of Section 7.06 of the Credit Agreement are hereby amended as follows:

- The title and very first clause of Section 7.06 of the Credit Agreement, immediately prior to the "(a)" are amended and restated as follows:

  "**Section 7.06 Restricted Payments**.  Subject to the final sentence of this Section 7.06, declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interest, except that (a) . . ."

- The following sentence is added immediately after the existing last sentence of Section 7.06 of the Credit Agreement:

  "Notwithstanding any other term or provision contained in this Section 7.06(a), no Restricted Payments or Distributions may be made, directly or indirectly, or any obligation to do so incurred (contingent or otherwise), or any Equity Interest Issued or sold, unless and until Administrative Agent shall have received Borrowers' Fiscal Year End 2020 reporting package and other Fiscal Year end financial statements."

O.    <u>Amendment to "Consolidated Pre-Compensation Fixed Charge Coverage Ratio"</u>.  The following new language is hereby added immediately following the last sentence of Section 7.11(a) of the Credit Agreement, as follows:

"Commencing with the Fiscal Quarter ending on or about June 30, 2021, and for all Fiscal Quarters thereafter, to be less than 1.10 to 1.00; <u>provided, however</u>, that notwithstanding any other term of this Agreement, no Distributions are permitted unless and until: (i) Administrative Agent shall have received Borrowers' Fiscal Year End 2020 reporting package and other Fiscal Year End financial statements;

10

and (ii) any performance above 1.25 to 1.00 on the Consolidated Pre-Compensation Fixed Charge Coverage Ratio shall constitute a mandatory prepayment, which shall be immediately remitted to Administrative Agent for application to the Loans, in Administrative Agent's sole and absolute discretion."

P.   Amendment to "Consolidated Post-Distribution Fixed Charge Coverage Ratio". The following new language is added immediately following the last sentence of Section 7.11(b) of the Credit Agreement, as follows:

"provided, however, that notwithstanding any other term of this Agreement, commencing with the Fiscal Quarter ending on June 30 2021, no Distributions are permitted unless and until: (i) Administrative Agent shall have received Borrowers' Fiscal Year End 2020 reporting package and other Fiscal Year End financial statements; (ii) the Consolidated Pre-Compensation Fixed Charge Coverage Ratio is at least 1.25 to 1.00; (iii) Borrower is in compliance with any mandatory prepayment subject to Section 7.11(a) of this Agreement; and (iv) fifty percent (50%) of any Distributions that holders of Equity Interests elect to receive resulting from performance between 1.25 to 1.00 and 1.10 to 1.0 on the Consolidated Post-Distribution Fixed Charge Coverage Ratio, shall constitute a mandatory prepayment, which shall be immediately remitted to Administrative Agent for application to the Loans, in Administrative Agent's sole and absolute discretion."

Q.   Amendment to "Consolidated Lease Adjusted Leverage Ratio". The grid contained in Section 7.11(d) of the Credit Agreement is hereby amended and restated in its entirety as follows:

| Fiscal Periods Ending | Maximum Consolidated Lease Adjusted Leverage Ratio |
| --- | --- |
| Each Fiscal Quarter ending on or about March 31, 2018, through and including the Fiscal Quarter ending on or about December 31, 2018 | 6.00x |
| Each Fiscal Quarter ending on or about March 31, 2019, through and including the Fiscal Quarter ending on or about December 31, 2019 | 5.75x |
| Each Fiscal Quarter ending on or about March 31, 2020, through and including the Fiscal Quarter ending on or about June 30, 2021 | 6.50x |
| Each Fiscal Quarter ending on or about September 30, 2021, through and including the Fiscal Quarter ending on or about March 30, 2022 | 6.25x |

11

| Each Fiscal Quarter ending on or about June 30, 2022, and each Fiscal Quarter thereafter | 6.00x |
|---|---|

R.   Additional Financial Covenants.   Immediately following Section 7.11(d), the following new Section 7.11(e) and (f) are added as follows:

"(e)   **Minimum Consolidated EBITDA.** Permit Consolidated EBITDA to be less than:

- $3,360,000 for the Fiscal Quarter ending September 30, 2020.
- $5,015,000 for the trailing six (6) months ending December 31, 2020.
- $7,500,000 for the trailing nine (9) months ending March 31, 2021.

(f)   **Minimum Trailing Twelve Months Consolidated EBITDA.** Permit trailing twelve month Consolidated EBITDA to be less than:
- $10,325,000 for the Fiscal Quarter ending June 30, 2021.
- $11,235,000 for the Fiscal Quarter ending September 30, 2021.
- $11,380,000 for the Fiscal Year ending December 31, 2021, and the Fiscal Quarter ending March 31, 2022.
- $12,000,000 for the Fiscal Quarter ending June 30, 2022 and the Fiscal Quarter ending September 30, 2022.
- $12,480,000 for Fiscal Year ending December 31, 2022."

VIII.   Other Covenants and Agreements.  As additional consideration for all Parties to enter into this Agreement, the Parties each agree as follows:

A.   Deferral of Certain Principal and Interest Payments.   Upon the Effective Date:

- The monthly payments of principal on each of the Term Loans otherwise due on April 1, 2020; May 1, 2020; and June 1, 2020, as required by Sections 2.05(a), 2.05(b) and 2.05(d) of the Credit Agreement (collectively, the "Deferred Principal Payments"), are hereby deferred until the Maturity Date (unless otherwise accelerated to an earlier date due to the occurrence of an Event of Default other than the Ongoing Defaults, pursuant to Section 8.02(b) of the Credit Agreement).

- The monthly payments of interest on the Revolving Loan and each of the Term Loans otherwise due on April 1, 2020, as required by Sections 2.06(c) and (d) of the Credit Agreement (the "Deferred April Interest Payments"), are hereby deferred until October 1, 2020 (unless otherwise accelerated to an earlier date due to the occurrence of an Event of Default other than the Ongoing Defaults, pursuant to Section 8.02(b) of the Credit Agreement).

- For the avoidance of doubt, Loan Parties each acknowledge and agree that: (i) the Deferred April Interest Payments and the Deferred Principal Payments (collectively, the "Deferred Payments") shall accrue interest at

12

the applicable rates set forth in the Credit Agreement; (ii) Administrative Agent will apply all payments with respect to Deferred Payments, first, to accrued interest until all accrued interest has been paid. Thereafter, all such payments will be applied to principal and accrued interest in accordance with the terms of the Credit Agreement, which will result in a final payment that is greater than anticipated at the time of execution of the Credit Agreement; and (iii) Borrowers' repayment of the Deferred Payments shall be in addition to—not in lieu of—all regularly scheduled payments of principal and interest due under the Credit Agreement.

- Nothing contained in this Section VIII(A) shall restrict, prohibit or limit Administrative Agent's rights and remedies, including the acceleration of all Obligations (including all Deferred Payments) if a New Event of Default (as defined below) occurs and is not timely cured under this Forbearance Agreement.

B. <u>Reaffirmation of Representations and Warranties</u>. By signing below, with the exception of the Ongoing Defaults, Borrowers reaffirm the truth, accuracy and completeness of all representations and warranties contained in Article V of the Credit Agreement, as of the Effective Date.

C. <u>Reaffirmation of Covenants</u>. Borrowers shall continue to comply with all affirmative covenants, negative covenants, financial covenants, terms and provisions contained in the Credit Agreement, the Notes, this Agreement and the other Loan Documents, as modified hereby, after the Effective Date.

D. <u>Creation and Use of Collection Accounts</u>. Borrowers covenant and agree to upgrade their treasury management/cash management systems within 180 days of the Effective Date such that each and every store-level depository account is automatically (<u>i.e.</u> not a manual process) aggregated at least once per week into consolidation accounts at Borrowers' three (3) major banks (collectively, the "<u>Consolidation Accounts</u>"). Borrowers shall provide Administrative Agent with a list of all depository account numbers for the Consolidation Accounts prior to the Effective Date, and Borrowers shall provide Administrative Agent with monthly electronic copies of all bank statements for each of the Consolidation Accounts within ten (10) days of statement dates.

E. <u>DACA's Governing the Consolidation Accounts</u>. Within sixty (60) days after the Effective Date, Borrowers covenant and agree to obtain Deposit Account Control Agreements ("<u>DACAS</u>") duly executed by Borrowers, Administrative Agent and each depository institution where the Consolidation Accounts are located. The DACAS must provide Administrative Agent with a duly perfected, first-priority security interest in each of the Consolidation Accounts.

F. <u>Retention of Advisor</u>. By no later than February 28, 2020, Borrowers shall: (i) retain a third-party financial advisor/consultant mutually acceptable to Borrowers and Administrative Agent, each in their reasonable discretion (an "<u>Advisor</u>"); and (ii) provide Administrative Agent with the engagement/retention agreement by and between Borrowers and Advisor. Borrowers and Administrative Agent each agree that: (i) Thomas Kim of R-2 Advisors is a mutually acceptable Advisor; and (ii) Advisor's retention shall continue throughout the entirety of the Forbearance Period; and (iii) that a New Event of Default will occur if Advisor is terminated

13

without Administrative Agent's prior written consent, or if the Scope of Services (as defined below) is modified without Administrative Agent's prior written consent.

      1.    Scope of Services.  The scope of the Advisor's services must also be mutually acceptable to Borrowers and Administrative Agent, each in their reasonable discretion (collectively, the "Scope of Services"), but shall include: (i) reviewing, vetting and evaluating the accuracy of Borrowers' monthly and quarterly financial reportings; (ii) advising regarding Borrowers' preparations of projected income statement, cash flows, financial covenant levels and MD&A reportings; (iii) assisting in the Borrowers' evaluation of the existing business model and assisting in the Borrowers' development of alternative models based on evaluation of key assumptions regarding revenue levels and operating margin; and (iv) assisting in the Borrowers' evaluation and development of restructuring strategies for addressing Borrowers' indebtedness to Administrative Agent, Franchisor, taxing authorities and other creditors.

      2.    Dialogue and Disclosure to Administrative Agent.  Borrowers hereby consent to Advisor engaging in verbal dialogue with Administrative Agent (only within the presence of Borrowers, unless Borrowers' consent otherwise in advance) regarding all aspects of Advisor's services to Borrowers; provided, however, that Borrowers covenant and agree to make themselves available for said dialogues with Advisor upon reasonable notice from Administrative Agent.

      G.    Verification of Franchisor Support.  It shall be a condition precedent to the effectiveness of this Agreement that Borrowers provide evidence reasonably satisfactory to Administrative Agent that Franchisor has been made aware of the principal terms of this Agreement and indicated its support of the transactions contemplated herein.

      H.    No Payment of Subordinated Debt.  Borrowers covenant and agree not to make any payments of principal, interest, fees or other amounts in connection with funded debt owed by any of Borrowers to any of Loan Parties ("Subordinated Debt") until all Obligations have been paid in full.

      I.    Continuing Cooperation with Administrative Agent.  Borrowers hereby covenant and agree to cooperate with all reasonable requests of Administrative Agent and its representatives for information, personnel and cooperation from Borrowers in connection with all field examinations, appraisals and audits commenced by Administrative Agent during the Forbearance Period.  Borrowers shall promptly reimburse Administrative Agent and its representatives for all fees and costs incurred for said field examinations, appraisals and audits as Ongoing Expenses (as defined in Section X below).

      J.    No Amendment to Swap Contract or Swap Obligations.  Nothing contained in this Agreement is intended to amend, alter, modify or otherwise impact any Swap Contracts or Swap Obligations.  Any breakage, fees, costs and Swap Termination Value shall remain the financial responsibility of each of the Loan Parties.

IX.    Forbearance Fee.  As consideration for entering into this Agreement, Borrowers shall pay to Administrative Agent, for the benefit of the Lenders, a one-time Forbearance Fee in the amount of $1,250,000.00 (the "Forbearance Fee").  The Forbearance Fee shall be fully earned as of the

14

Effective Date, and shall be payable in the following installments: (i) $50,000 to be paid on or before August 31, 2020; (ii) $50,000 to be paid on or before September 30, 2020; (iii) $200,000 to be paid on or before July 1, 2021; and (iv) $950,000 to be paid on or before July 1, 2022; provided, however, that $350,000 of the Forbearance Fee shall be waived by Administrative Agent if all indebtedness and other Obligations owed to Administrative Agent and the Lenders are paid in full by July 1, 2021, and that $100,000 of the Forbearance Fee shall be waived by Administrative Agent if all indebtedness and other Obligations owed to Administrative Agent and Lenders are paid in full between July 1, 2021, and July 1, 2022.

X.    Administrative Agent's Fees and Costs.  Borrowers shall reimburse Administrative Agent for all of Administrative Agent's invoiced costs and expenses, including reasonable attorneys' fees of Administrative Agent's outside counsel (Katten) and Administrative Agent's financial advisor (Sierra Constellation) incurred prior to the Effective Date in connection with the preparation, due diligence, negotiation, documentation and implementation of this Agreement (collectively, the "Transaction Costs") by no later than September 1, 2020.  In addition to the Transaction Costs, Borrowers shall also reimburse Administrative Agent for its ongoing audit fees, financial advisory fees, monitoring costs and other costs and expenses (including, but not limited to, reasonable attorneys' fees and expenses of Administrative Agent's outside counsel) incurred after the Effective Date hereof in connection with the ongoing negotiation, documentation, implementation, monitoring and enforcement of the Credit Agreement, the Notes, this Agreement and the other Loan Documents (collectively, the "Ongoing Expenses") within thirty (30) calendar days after receipt by Borrowers of an invoice from Administrative Agent or its agents.  All Transaction Costs and Ongoing Expenses may be auto-debited from Borrowers' accounts at Administrative Agent.

XI.    Conditions Precedent.  This Agreement shall not be binding upon Administrative Agent unless and until each of the following conditions precedent (each a "Condition Precedent") is met by no later than the close of business on June 1, 2020, or is waived in writing by Administrative Agent, at which time this Agreement shall become effective as of the Effective Date:

A.    Execution and Delivery of this Agreement.  Administrative Agent shall have received this Agreement, duly executed by an authorized officer of Borrowers;

B.    Consent of Guarantors.  Guarantors shall each have executed and delivered to Administrative Agent the "Consent and Reaffirmation of Guarantors" attached to the end of this Agreement (the "Guarantors Consent");

C.    Release of Claims.  Loan Parties shall have executed this Agreement and the Guarantors Consent, thereby indicating their consent to the Release of Claims ("Release") set forth below in Section XIV below, with such signatures indicating that Loan Parties have each read and accepted the terms of such Release;

D.    Account Numbers for the Consolidation Accounts.  Borrowers shall have provided Administrative Agent with a list of all depository account numbers for the Consolidation Accounts; and

E.    Verification of Franchisor Support.  Administrative Agent shall have received satisfactory verification of the Franchisor support required by Section VIII(G) above.

15

F.    Other Approvals.  Administrative Agent shall have received such other documents, instruments and agreements, and obtained all necessary internal approvals as Administrative Agent may require.

XII.    New Events of Default.  A "New Event of Default" shall occur under this Agreement if any Default or Event of Default, other than the Ongoing Defaults, shall occur in the performance of any term, condition, covenant or agreement contained in this Agreement, the Credit Agreement or in any of the other Loan Documents; provided, however, that any applicable notice and cure periods in the Credit Agreement, the Notes and the other Loan Documents will remain unchanged.

XIII.    Remedies.  If a New Event of Default occurs, Administrative Agent may exercise, at its election, and without notice, demand, protest or presentment (which notice, demand, protest and presentment are expressly waived), in addition to all rights and remedies granted to it in this Agreement, the Credit Agreement, any of the other Loan Documents any or all of the following:

A.    Administrative Agent's limited agreement to forbear under this Agreement shall immediately and automatically cease, and Administrative Agent may exercise all of its rights and remedies available under this Agreement, the Credit Agreement, any of the other Loan Documents and applicable law; and/or

B.    Administrative Agent may declare all of the Obligations to be immediately due and payable in full; and/or

C.    Administrative Agent may impose the Default Rate of interest on all Obligations;

D.    Administrative Agent may enforce any of its rights and remedies as to the Collateral and the Pledged Shares; and/or

E.    Administrative Agent may proceed to enforce this Agreement, the Credit Agreement and any of the other Loan Documents and exercise any or all of the rights and remedies afforded to Administrative Agent by the California Commercial Code, the California Civil Code, the California Code of Civil Procedure or otherwise possessed by Administrative Agent.

F.    Cumulative Rights and Remedies.  All rights and remedies granted to Administrative Agent hereunder are cumulative, and Administrative Agent shall have the right to exercise any one or more of such rights and remedies alternatively, successively or concurrently, subject to applicable law, as Administrative Agent may, in its sole and absolute discretion, deem advisable.

XIV.    Release of Claims.  Loan Parties each represent and agree that each has diligently and thoroughly investigated the existence of any Claim (as defined below), and, to its knowledge and belief, no Claim exists and no facts exist that could give rise to or support a Claim.  As additional consideration for Administrative Agent to enter into this Agreement, Loan Parties, and each of them, by their execution of this Agreement or the Guarantors Consent, and each of Loan Parties' respective agents, employees, directors, officers, attorneys, affiliates, subsidiaries, shareholders, trusts, owners, successors and assigns (each a "Releasing Party" and collectively, the "Releasing Parties"), hereby releases and forever discharges Administrative Agent and each of the Lenders, and each of their respective agents, direct and indirect shareholders, employees, directors, officers, attorneys, branches, affiliates, subsidiaries, predecessors, successors and assigns (each a "Released

16

Party" and collectively, the "Released Parties"), from all damages, losses, claims, demands, liabilities, obligations, actions and causes of action whatsoever from the beginning of time through and including the Effective Date (collectively, the "Claims") that the Releasing Parties or any of them may, as of the date hereof, have or claim to have against any or all of the Released Parties, in each case whether currently known or unknown or with respect to which the facts are known (or should have been known), that could give rise to or support a Claim and of every nature and extent whatsoever on account of or in any way relating to, arising out of or based upon: (a) the Loans; (b) the Credit Agreement, the Notes, the Security Agreement, the Pledge Agreement, the Guaranty and the other Loan Documents, and the obligations evidenced thereby, including, without implied limitation, the terms thereof; (c) any alleged oral or written agreements or understandings by and between any of Releasing Parties and any of Released Parties in any way arising out of or related to the Loans, any of the Loan Documents, the Collateral, the Obligations, or any amendments, modifications, representations or warranties in relation thereto; (d) the disbursement, administration and monitoring of the Loans and the Loan Documents; (e) actions of Administrative Agent with respect to Franchisor; (f) the Ongoing Defaults; and (g) the business relationships between Borrowers and Administrative Agent, and between Borrowers and the Lenders from the beginning of time through and including the Effective Date (collectively, the "Claims").

Loan Parties each further covenant and agree that each has not heretofore assigned, and will not hereafter sue any Released Party upon, any Claim released or purported to be released under this Section XIV, and Loan Parties each agree to indemnify and hold harmless the Released Parties against any loss or liability on account of any actions brought by any of Loan Parties or their respective assigns or prosecuted on behalf of said Loan Party relating to any Claim released or purported to be released under this Section XIV.  It is further understood and agreed that any and all rights under the provisions of Section 1542 of the California Civil Code, and other similar rights or laws in other states, are expressly waived by each of Loan Parties.  Section 1542 of the California Civil Code provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

XV.    Revival Clause.  If the incurring of any debt or the payment of money or transfer of property made to Administrative Agent by or on behalf of any Loan Party should for any reason subsequently be declared to be "fraudulent" or "preferential" within the meaning of any state or federal law relating to creditor's rights, including, without limitation, fraudulent conveyances, preferences or otherwise voidable or recoverable payments of money or transfers of property, in whole or in part, for any reason (collectively, "Voidable Transfers") under the Bankruptcy Code or any other federal or state law, and Administrative Agent is required to repay or restore any such Voidable Transfer or the amount or any portion thereof, or upon the advice of its in-house counsel or outside counsel is advised to do so, then, as to such Voidable Transfer or the amount repaid or restored (including all reasonable costs, expenses and attorneys' fees of Administrative Agent related thereto), the joint and several liability of Loan Parties under this Agreement, the Credit Agreement, the Notes, the Guaranty, the Security Agreement, the Pledge Agreement and the other Loan Documents, and all of Administrative Agent's rights and remedies under this Agreement,

17

the Credit Agreement, the Notes, the Guaranty, the Security Agreement, the Pledge Agreement and the other Loan Documents shall automatically be revived, reinstated and restored and shall exist as though such Voidable Transfer had never been made to the extent of any harm to Administrative Agent.

Loan Parties each represent and warrant that the execution, delivery and performance of this Agreement will not: (i) render any of Loan Parties insolvent as that term is defined below; (ii) leave any of Loan Parties with remaining assets which constitute unreasonably small capital given the nature of said Loan Parties' business; or (iii) result in the incurrence of Debts (as defined below) beyond any of Loan Parties' ability to pay them when and as they mature and become due and payable. For the purposes of this paragraph, "Insolvent" means that the present fair salable value of assets is less than the amount that will be required to pay the probable liability on existing Debts as they become absolute and matured. For the purposes of this paragraph, "Debts" includes any legal liability for indebtedness, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent. Loan Parties each hereby acknowledge and warrant that they have derived or expects to derive a financial or other benefit or advantage from this Agreement.

XVI.   Payment of Expenses.  In the event any action (whether or not in a court proceeding) shall be required to interpret, implement, modify, or enforce the terms and provisions of this Agreement and/or to declare rights under same, the prevailing party in such action shall recover from the losing party all of its reasonable fees and costs, including, but not limited to, the reasonable attorneys' fees and costs of Administrative Agent's outside counsel.

XVII.   Governing Law.  This Agreement shall be construed and interpreted in accordance with and shall be governed by the laws of the State of California.

XVIII.   Successors, Assignment.  This Agreement shall be binding on and inure to the benefit of all of the Parties, and upon the heirs, executors, administrators, legal representatives, successors and assigns of the Parties, and each of them. The terms and provisions of this Agreement are for the exclusive benefit of Loan Parties and Administrative Agent, and may not be transferred, assigned, pledged, set over or negotiated to any person or entity without the prior express written consent of Administrative Agent and in accordance with the Credit Agreement.

XIX.   Complete Agreement of Parties.  This Agreement constitutes the entire agreement between Administrative Agent and Loan Parties arising out of, related to or connected with the subject matter of this Agreement. Any supplements, modifications, waivers or terminations of this Agreement shall not be binding unless executed in writing by the parties to be bound thereby. No waiver of any provision of this Agreement shall constitute a waiver of any other provision of this Agreement (whether similar or not), nor shall such waiver constitute a continuing waiver unless otherwise expressly so provided.

XX.   Authority.  Loan Parties each represent and warrant that: (i) each has full authority to execute this Agreement; (ii) the execution, delivery and performance of this Agreement does not require the consent or approval of any person, entity, governmental body, trust, trustor or other authority; (iii) this Agreement is a valid, binding and legal obligation of all Loan Parties enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and general principles of equity, and does not contravene or conflict with any other agreement, indenture or undertaking to which any Loan Party is a party, except the Credit

18

Agreement, the Notes or any of the other Loan Documents; and (iv) Loan Parties are the sole and lawful owners of all right, title, and interest in and to every claim and other matter which Loan Parties purport to settle or compromise herein.

XXI.    Execution In Counterparts.    This Agreement may be executed in any number of counterparts each of which, when so executed and delivered, shall be deemed an original, and all of which together shall constitute but one and the same Agreement.

XXII.    Contradictory Terms/Severability.    In the event that any term or provision of this Agreement contradicts any term or provision of any other document, instrument or agreement between the Parties including, but not limited to, the Credit Agreement, the Notes or any of the other Loan Documents, the terms of this Agreement shall control.    If any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, such provision shall be severable from all other provisions of this Agreement, and the validity, legality and enforceability of the remaining provisions of this Agreement shall not be adversely affected or impaired, and shall thereby remain in full force and effect.

XXIII.    Headings.    All headings contained herein are for convenience purposes only, and shall not be considered when interpreting this Agreement.

XXIV.    Continuing Cooperation.    The Parties shall cooperate with each other in carrying out the terms and intent of this Agreement, and shall execute such other documents, instruments and Agreements as are reasonably required to effectuate the terms and intent of this Agreement.

XXV. Consultation With Counsel.    Each party hereto acknowledges that it is freely and voluntarily entering into this Agreement.    Moreover, each party hereto also acknowledges that it has been represented by counsel of its own choice at each stage in the negotiation of this Agreement, or has knowingly and voluntarily elected not to be represented by counsel at each stage in the negotiation of this Agreement.    To the extent any party was represented by counsel, and without waiving the attorney-client and attorney work product privileges, said party acknowledges that: (i) it has relied on such counsel's advice throughout all of the negotiations which preceded the execution of this Agreement, and in connection with the preparation and execution of this Agreement; (ii) such counsel has read and approved this Agreement; and (iii) such counsel has advised such party concerning the validity and effectiveness of this Agreement, and the transactions to be consummated in accordance therewith.

US_144639379v3_209145-00068 5/29/2020 9:17 AM

AGREED AND ACCEPTED:


ADMINISTRATIVE AGENT:          CITY NATIONAL BANK

                               By: *Raymond Forgette*
                               Name:   Raymond Forgette
                               Its:    ___Vice President_____


LENDER:                        CITY NATIONAL BANK

                               By: *Raymond Forgette*
                               Name: ___ Raymond Forgette
                               Its:    ___Vice President


LENDER:                        BRIDGE FUNDING GROUP, INC.

                               By: _____
                               Name: _____
                               Title:_____


BORROWER:                      NKS RESTAURANTS, L.C.

                               By: _____
                               Name: _____
                               Title:_____


BORROWER:                      HR RESTAURANTS, L.C.

                               By: _____
                               Name: _____
                               Title:_____


*[signatures continued on next page]*

BORROWER:                      AZM RESTAURANTS UNLIMITED, L.C.

                               By: _____
                               Name: _____
                               Title:_____


1

XXVI.  Notices.  All notices, payments, requests, information and demands which any party hereto may desire, or may be required to give or make to the other party shall be given or made to such party in accordance with the existing provisions of the Notes and the other Loan Documents.

AGREED AND ACCEPTED:

ADMINISTRATIVE AGENT:          CITY NATIONAL BANK

                                By:      _____
                                Name:    _____
                                Its:     _____

LENDER:                         CITY NATIONAL BANK

                                By:      _____
                                Name:    _____
                                Its:     _____

LENDER:                         BRIDGE FUNDING GROUP, INC.

                                By:   _Mary Stuart Kilmer_
                                Name: _Mary Stuart Kilmer_
                                Title: _Managing Senior Credit Officer_

BORROWER:                       NKS RESTAURANTS, L.C.

                                By:   _____
                                Name: _GARRETT CARTER_
                                Title: _CFO_

BORROWER:                       HR RESTAURANTS, L.C.

                                By:   _____
                                Name: _GARRETT CARTER_
                                Title: _CFO_

*[signatures continued on next page]*

20

BORROWER:  MR RESTAURANTS, L.C.

By: _____
Name: GARRETT CAZIER
Title: CFO

BORROWER:  C UTAH, L.C.

By: _____
Name: GARRETT CAZIER
Title: CFO

BORROWER:  AZM RESTAURANTS UNLIMITED, L.C.

By: _____
Name: GARRETT CAZIER
Title: CFO

BORROWER:  NDM RESTAURANTS, L.C.

By: _____
Name: GARRETT CAZIER
Title: CFO

21

SCHEDULE A—
AMORTIZATION SCHEDULE FOR SECOND ANNIVERSARY TERM LOAN A-2S

MR Restaurants - Modified 120m amort - $1,450,304.47 @ 5.00%

| Payment Date | Principal Payment Amount | Principal Balance |
|---|---|---|
| 3/1/2020 | | 1,450,304.47 |
| 4/1/2020 | 9,526.88 | 1,440,777.59 |
| 5/1/2020 | 9,526.88 | 1,431,250.72 |
| 6/1/2020 | 9,526.88 | 1,421,723.84 |
| 7/1/2020 | 9,526.88 | 1,412,196.97 |
| 8/1/2020 | 9,526.88 | 1,402,670.09 |
| 9/1/2020 | 9,526.88 | 1,393,143.21 |
| 10/1/2020 | 9,526.88 | 1,383,616.34 |
| 11/1/2020 | 9,526.88 | 1,374,089.46 |
| 12/1/2020 | 9,526.88 | 1,364,562.58 |
| 1/1/2021 | 9,526.88 | 1,355,035.71 |
| 2/1/2021 | 9,526.88 | 1,345,508.83 |
| 3/1/2021 | 9,526.88 | 1,335,981.96 |
| 4/1/2021 | 10,021.22 | 1,325,960.74 |
| 5/1/2021 | 10,021.22 | 1,315,939.52 |
| 6/1/2021 | 10,021.22 | 1,305,918.31 |
| 7/1/2021 | 10,021.22 | 1,295,897.09 |
| 8/1/2021 | 10,021.22 | 1,285,875.87 |
| 9/1/2021 | 10,021.22 | 1,275,854.66 |
| 10/1/2021 | 10,021.22 | 1,265,833.44 |
| 11/1/2021 | 10,021.22 | 1,255,812.23 |
| 12/1/2021 | 10,021.22 | 1,245,791.01 |
| 1/1/2022 | 10,021.22 | 1,235,769.79 |
| 2/1/2022 | 10,021.22 | 1,225,748.58 |
| 3/1/2022 | 10,021.22 | 1,215,727.36 |
| 4/1/2022 | 10,485.20 | 1,205,242.16 |
| 5/1/2022 | 10,485.20 | 1,194,756.97 |
| 6/1/2022 | 10,485.20 | 1,184,271.77 |
| 7/1/2022 | 10,485.20 | 1,173,786.57 |
| 8/1/2022 | 10,485.20 | 1,163,301.38 |
| 9/1/2022 | 10,485.20 | 1,152,816.18 |
| 10/1/2022 | 10,485.20 | 1,142,330.98 |
| 11/1/2022 | 10,485.20 | 1,131,845.78 |
| 12/1/2022 | 10,485.20 | 1,121,360.59 |
| 1/1/2023 | 10,485.20 | 1,110,875.39 |
| 2/1/2023 | 10,485.20 | 1,100,390.19 |
| 2/26/2023 | 1,100,390.19 | 0.00 |

## CONSENT AND REAFFIRMATION OF GUARANTORS

This Consent And Reaffirmation of Guarantors (this "Consent") is made with reference to that certain "Forbearance Agreement" dated as of June 1, 2020, by and between (i) CITY NATIONAL BANK, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); (ii) NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (individually, a "Borrowers" and collectively, "Borrowers"); (iii) MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"); and (iv) the Lenders signatory thereto (the "Forbearance Agreement"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Agreement.

In order to guaranty Borrowers' indebtedness and obligations under the Credit Agreement and the Notes, MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"), executed and delivered to Administrative Agent that certain "Continuing Guaranty" set forth in Article X of the Credit Agreement (as amended and modified from time to time, the "Guaranty"). Pursuant to the Guaranty, Guarantors jointly, severally and unconditionally guaranteed and promised to pay Administrative Agent, on demand, all Obligations and indebtedness owed by Borrowers to Administrative Agent under the Credit Agreement, the Notes and the other Loan Documents.

By executing below, Guarantors each hereby: (i) acknowledges and consents to Borrowers' execution of the Agreement: (ii) consents to all terms and conditions of the transactions contemplated in the Agreement; (iii) ratifies and affirms all of the terms, covenants, conditions and obligations contained in the Guaranty; (iv) reaffirms the continuing validity and enforceability of the Guaranty; (v) confirms that the Guaranty continues in full force and effect notwithstanding the execution of the Agreement; and (vi) knowingly and voluntarily agrees to join in and be bound to the terms of the Release of Claims contained in Section XIV of the Agreement.

AGREED AND ACCEPTED AS OF THIS 1ST DAY OF JUNE, 2020

GUARANTOR:          MERIDIAN RESTAURANTS UNLIMITED, LC

By:
Name: GARRETT CAZIER
Title: CFO

GUARANTOR:          LOVELOUD RESTAURANTS, L.C.

By:
Name: GARRETT CAZIER
Title: CFO

AMENDMENT TO FORBEARANCE AGREEMENT

This Amendment To Forbearance Agreement (this "Amendment") is entered into as of August 17, 2020, and is made by and between: (i) CITY NATIONAL BANK, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); (ii) NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (individually a "Borrower" and collectively, "Borrowers"); (iii) MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (individually a "Guarantor" and, collectively, "Guarantors"); and (iv) the Lenders signatory thereto. For purposes of this Amendment, Administrative Agent, the Lenders, Borrowers and Guarantors are sometimes referred to herein collectively as "the Parties". This Amendment is made with reference to the following facts:

A.     Borrower and Lender are parties to that certain "Forbearance Agreement" dated as of June 1, 2020 (as otherwise amended, supplemented and modified from time to time, the "Forbearance Agreement"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Forbearance Agreement.

B.     In accordance with the Forbearance Agreement, Administrative Agent agreed to forbear as to the Ongoing Defaults, but not as to any New Events of Default that arose after the Effective Date of the Forbearance Agreement.

C.     By letter dated August 12, 2020, Administrative Agent notified Loan Parties that the following New Events of Default have occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement (collectively, the "New Defaults"):

- A New Event of Default due to Borrowers' failure to deliver their CPA prepared consolidated and combining audited financials of the short Fiscal Year ending 2018, by no later than June 30, 2020, in violation of Section 6.01(e) of the Credit Agreement;
- A New Event of Default due to Borrowers' failure to deliver their CPA prepared consolidated and combining audited financials for Fiscal Year ending 2019, by no later than July 31, 2020, in violation of Section 6.01(e) of the Credit Agreement;
- A New Event of Default due to Borrowers' failure to deliver any of the following reports to Agent: (i) a rolling 13-week cash flow report, in form acceptable to Administrative Agent in its sole and absolute discretion; and (ii) a weekly variance report showing Borrowers' actual to projected cash flow from the prior week (which cash flow report may be consolidated with the 13-week cash flow report) from the close of business each Friday from the Effective Date of the Forbearance Agreement (June 9, 2020), until July 1, 2020, in violation of Section 6.02(f) of the Credit Agreement; and
- A New Event of Default due to Borrowers' failure to deliver executed DACAS within sixty (60) days after the Effective Date of the Forbearance Agreement (June 9. 2020), in violation of Section VIII(D) of the Forbearance Agreement.

1

D.    As a result of the occurrence and continuation of the New Defaults--and in accordance with Section 2.06(b)(iii) of the Credit Agreement and Section XIII(C) of the Forbearance Agreement--Agent and Required Lenders exercised their right to impose the Default Rate on all outstanding Obligations, effective as of August 12, 2020.

E.    In addition to the New Defaults, by letter dated July 7, 2020, Loan Parties were notified that a potential New Event of Default had occurred under Section XII of the Forbearance Agreement and Section 8.01(m) of the Credit Agreement (the "Franchise Default") because on June 16, 2020, Franchisor formally declared multiple defaults by Guarantor Loveloud Restaurants, L.C. ("Loveloud") under a "Development Agreement", which constitutes a "Franchise Agreement" (each as defined in the Credit Agreement).   In accordance with Section 8.01(m) of the Credit Agreement, the Franchise Default does not, at this time, constitute a New Event of Default because Borrowers and Franchisor are both working diligently to cure the Franchise Default, as demonstrated to Agent in Agent's sole and absolute discretion.

F.    Loan Parties have requested that Administrative Agent continue to forbear from exercising its legal rights and remedies as to the Ongoing Defaults, as well as the New Defaults. Loan Parties have also requested that Administrative Agent and the Lenders amend certain terms and provisions of the Credit Agreement and the Forbearance Agreement, as set forth more fully below.

G.    Administrative Agent is willing to continue to forbear from exercising its legal rights and remedies as to the Ongoing Defaults and the New Defaults, only in accordance with this Amendment.  Administrative Agent is also willing to amend certain terms and provisions of the Credit Agreement and the Forbearance Agreement, only in accordance with this Amendment.

H.    IT IS THE INTENT OF THE PARTIES THAT THIS AMENDMENT ADDRESS THE DEBTS AND/OR OBLIGATIONS OF LOAN PARTIES TO ADMINISTRATIVE AGENT AND THE LENDERS WHICH ARE FULLY DESCRIBED HEREIN AND REFLECTED IN THE LOAN DOCUMENTS.  THIS AMENDMENT DOES NOT PERTAIN TO THE OTHER FACILITIES OR ANY OTHER CREDIT FACILITIES, INDEBTEDNESS OR OBLIGATIONS OF LOAN PARTIES TO ADMINISTRATIVE AGENT OR THE LENDERS NOT SPECIFICALLY ADDRESSED IN THIS AMENDMENT.  ALL TERMS AND PROVISIONS OF THE CREDIT AGREEMENT, THE NOTES, THE SECURITY AGREEMENT, THE PLEDGE AGREEMENT, THE GUARANTY AND THE OTHER LOAN DOCUMENTS NOT SPECIFICALLY MODIFIED HEREIN SHALL REMAIN IN FULL FORCE AND EFFECT IN ACCORDANCE WITH THEIR ORIGINAL TERMS.

NOW, THEREFORE, in consideration of: (i) the above recitals and the mutual promises contained in this Amendment; (ii) the execution of this Amendment; (iii) the satisfaction of all Conditions Precedent set forth in Section X below; and (iv) for other and further valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

I.    Incorporation of Recitals.  Each of the foregoing Recitals is incorporated herein by this reference, and the Parties each agree that each of such Recitals is true and correct in all respects.

2

II.      Effective Date of Agreement.  This Amendment shall be deemed effective as of the date all of the Conditions Precedent set forth in Section X below are satisfied (the "Effective Date").

III.     Limited Scope of Amendment.  Nothing contained in this Amendment shall be interpreted as or be deemed a release or a waiver by Administrative Agent of any of the terms or conditions of the Forbearance Agreement, the Credit Agreement, the Notes, the Guaranty or any other Loan Documents, except as specifically provided in this Amendment.  Unless specifically modified herein, all other terms and provisions of the Forbearance Agreement, the Credit Agreement, the Notes, the Guaranty and the other Loan Documents shall remain in full force and effect in accordance with their original terms.

IV.     Reaffirmation of Recitals and Acknowledgements in the Forbearance Agreement.  All Recitals and Acknowledgements set forth in Sections I and III of the Forbearance Agreement are hereby validated and affirmed through the Effective Date of this Amendment.

V.      Revocation of Default Rate.  Subject to satisfaction of all Conditions Precedent set forth in Section X below, Administrative Agent hereby agrees to revoke the imposition of the Default Rate, effective as of August 12, 2020 (the day it was imposed).

VI.     Amendments to the Credit Agreement.  As additional consideration for Administrative Agent to enter into this Amendment, Administrative Agent and Loan Parties each agree that: (i) the following provisions of the Credit Agreement are hereby permanently modified; provided, however, that all terms and provisions of the Credit Agreement not specifically modified in this Amendment shall remain in full force and effect in accordance with their original terms; (ii) to the extent not already contained in the Credit Agreement, the following additional covenants are hereby added to the Credit Agreement, as set forth below; and (iii) all of the amendments, modifications and new covenants provided below shall survive the expiration of the Forbearance Period and shall remain in full force and effect until all of the Obligations are repaid in full, except as otherwise set forth below:

    A.      Change to Financial Reporting Requirements.  Section 6.01(e) of the Credit Agreement is hereby amended and restated as follows:

    "(e)     within the time limits set forth below, the following financial reports:

        • Internal interim reportings, including store level reconciliations, due: (i) quarterly within 45 days of period close, commencing with the quarter ending June 30, 2020 and continuing through the reporting period ending December 31, 2020; and (ii) monthly within 30 days of period close, commencing with the reporting period ending January 31, 2021 and continuing throughout the remainder of the Forbearance Period (collectively, the "Monthly Reports").
        • Internal interim non-quarterly 2020 reportings, without store level reconciliations, due monthly within 30 days of period close, commencing with the July 31, 2020 reporting period and continuing thereafter until the Monthly Reports (as defined immediately above) commence on January 31, 2021; provided, however, that said reports will not be due for the months ending June 30, September 30, December 31, and March 31.

3

- CPA prepared consolidated and combining audited financials of the short Fiscal Year ending 2018, to be delivered by no later than September 30, 2020.
- CPA prepared consolidated and combining audited financials for Fiscal Year ending 2019, to be delivered by no later than September 30, 2020.
- CPA prepared consolidated and combining audited financials for Fiscal Year ending 2020, to be delivered by no later than April 30, 2021.
- Updated initial projections for the following Fiscal Year required by 12/10/XX of each applicable year, and final projections before 2/28/XX of each applicable Fiscal Year."

B.    Amendment to 13-Week Cash Flow Reporting. Sections 6.02(f) of the Credit Agreement is hereby amended and restated in its entirety as follows:

"(f)    within one week after the close of each calendar month, commencing on the Effective Date and continuing until the end of the Forbearance Period: (i) a rolling 13-week cash flow report, in form acceptable to Administrative Agent in its sole and absolute discretion; and (ii) a monthly variance report showing Borrowers' actual to projected cash flow from the prior month (which cash flow report may be consolidated with the 13-week cash flow report)."

C.    Additional Reporting Regarding Franchisor.    Section 6.02(g) of the Credit Agreement is hereby amended and restated in its entirety as follows:

"(g)    (i) promptly, copies of any and all correspondence, whether in letter or email form, from February, 2018, forward (until all Obligations are paid in full) that reference any breach or deviance from any of the Franchise Agreements including, but not limited to, all notices received in January 2020, and June 2020, regarding non-compliance under certain of the Franchise Agreements; and (ii) concurrently with the delivery of the 13-week cash flow reporting required by Section 6.02(f) herein, a written report describing Borrowers' negotiations, discussions, settlements and agreements with Franchisor in connection with the Franchise Default."

D.    Amendment to Definition of "Events of Default".  So long as Borrowers timely and adequately cure the Franchise Default in accordance with Section 8.01(m) of the Credit Agreement to Administrative Agent's satisfaction (which "cure" may include termination of the "Loveloud Agreement", as defined immediately below), the Parties agree to add the following new proviso immediately after the last sentence of Section 8.01(m) of the Credit Agreement:

"provided; however, that that certain "Area Development and Remodeling Agreement" dated December 30, 2017, by and among Franchisor, Loveloud and Harper (the "Loveloud Agreement") shall not be considered a "Franchise Agreement" for purposes of this Section 8.01(m), and any default or event of default by the Loan Parties with respect to such Area Development Agreement arising after the Effective Date shall not constitute an Event of Default or potential Event of Default."

4

E.    Amendment to "Consolidated Lease Adjusted Leverage Ratio". Section 7.11(d) of the Credit Agreement is hereby amended and restated in its entirety, effective as of the Effective Date of the Forbearance Agreement, as follows:

"(d)    *Consolidated Lease Adjusted Leverage Ratio*.  Permit the Consolidated Lease Adjusted Leverage Ratio, measured as of the periods referenced below, commencing with the Fiscal Quarter ending on or about March 31, 2018, to exceed the following:

| Fiscal Periods Ending | Maximum Consolidated Lease Adjusted Leverage Ratio |
|---|---|
| Each Fiscal Quarter ending on or about March 31, 2018, through and including the Fiscal Quarter ending on or about December 31, 2018 | 6.00x |
| Each Fiscal Quarter ending on or about March 31, 2019, through and including the Fiscal Quarter ending on or about December 31, 2019 | 5.75x |
| For the trailing twelve months period ending on or about June 30, 2021 | 6.50x |
| For the trailing twelve months periods ending on or about September 30, 2021, December 31, 2021, and March 30, 2022 | 6.25x |
| For the trailing twelve months period ending on or about June 30, 2022, and each trailing twelve months period ending on each Fiscal Quarter thereafter | 6.00x |

VII.    Amendments to the Forbearance Agreement. As additional consideration for Administrative Agent to enter into this Amendment, Administrative Agent and Loan Parties each agree that: (i) the following provisions of the Forbearance Agreement are hereby permanently modified; provided, however, that all terms and provisions of the Forbearance Agreement not specifically modified in this Amendment shall remain in full force and effect in accordance with their original terms; (ii) to the extent not already contained in the Forbearance Agreement, the following additional covenants are hereby added to the Forbearance Agreement, as set forth below; and (iii) all of the amendments, modifications and new covenants provided below shall survive the

5

expiration of the Forbearance Period and shall remain in full force and effect until all of the Obligations are repaid in full, except as otherwise set forth below:

A.    Amendment to Definition of "Ongoing Defaults".  Recital "K" of the Forbearance Agreement is hereby amended and restated in its entirety as follows:

"K.    Loan Parties have requested that Administrative Agent formally and temporarily forbear from exercising its legal rights and remedies as to the Existing Defaults, the New Defaults and each of the Events of Default described immediately below (collectively with the Existing Defaults and the New Defaults, the "Ongoing Defaults"), and that Administrative Agent amend certain terms and conditions of the Credit Agreement:

- Borrowers' failure to deliver their CPA prepared consolidated and combining audited financials of the short Fiscal Year ending 2018, by no later than June 30, 2020, in violation of Section 6.01(e) of the Credit Agreement;

- Borrowers' failure to deliver their CPA prepared consolidated and combining audited financials for Fiscal Year ending 2019, by no later than July 31, 2020, in violation of Section 6.01(e) of the Credit Agreement;

- Borrowers' failure to deliver any of the following reports to Administrative Agent: (a) a rolling 13-week cash flow report, in form acceptable to Agent in its sole and absolute discretion; and (b) Borrowers' failure to deliver to Agent a weekly variance report showing Borrowers' actual to projected cash flow from the prior week (which cash flow report may be consolidated with the 13-week cash flow report), from the close of business each Friday from June 9, 2020, until July 1, 2020, in violation of Section 6.02(f) of the Credit Agreement; and

- Borrowers' failure to deliver executed DACAS within sixty (60) days after the Effective Date of the Forbearance Agreement (which Effective Date was June 9, 2020), in violation of Section VIII(D) of the Forbearance Agreement."

B.    Amendment to Definition of "Consolidation Accounts".  Section VIII(D) of the Forbearance Agreement is hereby amended by deleting the words "*Borrowers' three (3) major banks*", and replacing them with the words "*Borrowers' two (2) major banks, Wells Fargo Bank and Zions Bank*".

C.    Amendment to Timing of DACAS.  The first sentence of Section VIII(E) of the Forbearance Agreement is hereby amended by deleting the words "*Within sixty (60) days after the Effective Date*", and replacing them with the words "*By no later than October 1, 2020*".

VIII.    Amendment Fee.  As consideration for entering into this Amendment, Borrowers shall pay to Administrative Agent, for the benefit of the Lenders, a one-time Amendment Fee in the amount of $15,000 (the "Amendment Fee").  The Amendment Fee shall be fully earned as of the Effective Date, and shall be payable as a Condition Precedent to the effectiveness of this Amendment.  For

6

the avoidance of doubt, the Amendment Fee is separate and distinct from the Forbearance Fee which is due and payable in accordance with Section IX of the Forbearance Agreement.

IX.     <u>Administrative Agent's Fees and Costs.</u>  Borrowers shall reimburse Administrative Agent for all of Administrative Agent's invoiced costs and expenses, including reasonable attorneys' fees of Administrative Agent's outside counsel (Katten) incurred prior to the Effective Date in connection with the preparation, due diligence, negotiation, documentation and implementation of this Amendment (collectively, the "<u>Transaction Costs</u>") by no later than September 1, 2020.  In addition to the Transaction Costs, Borrowers shall also reimburse Administrative Agent for its ongoing audit fees, financial advisory fees, monitoring costs and other costs and expenses (including, but not limited to, reasonable attorneys' fees and expenses of Administrative Agent's outside counsel) incurred after the Effective Date hereof in connection with the ongoing negotiation, documentation, implementation, monitoring and enforcement of the Credit Agreement, the Notes, this Amendment and the other Loan Documents (collectively, the "<u>Ongoing Expenses</u>") within thirty (30) calendar days after receipt by Borrowers of an invoice from Administrative Agent or its agents.  The Amendment Fee and all Transaction Costs and Ongoing Expenses may be auto-debited from Borrowers' accounts at Administrative Agent.

X.     <u>Conditions Precedent.</u>  This Amendment shall not be binding upon Administrative Agent unless and until each of the following conditions precedent (each a "<u>Condition Precedent</u>") is met by no later than the close of business on September 11, 2020, or is waived in writing by Administrative Agent, at which time this Amendment shall become effective as of the Effective Date:

    A.     <u>Execution and Delivery of this Amendment.</u>  Administrative Agent shall have received this Amendment, duly executed by an authorized officer of Borrowers;

    B.     <u>Consent of Guarantors.</u>  Guarantors shall each have executed and delivered to Administrative Agent the "Consent and Reaffirmation of Guarantors" attached to the end of this Amendment (the "<u>Guarantors Consent</u>");

    C.     <u>Amendment Fee.</u>  Borrowers shall have paid the Amendment Fee to Administrative Agent; and

    D.     <u>Release of Claims.</u>  Loan Parties shall have executed this Amendment and the Guarantors Consent, thereby indicating their consent to the Release of Claims ("<u>Release</u>") set forth below in Section XI below, with such signatures indicating that Loan Parties have each read and accepted the terms of such Release;

    E.     <u>Other Approvals.</u>  Administrative Agent shall have received such other documents, instruments and agreements, and obtained all necessary internal approvals as Administrative Agent may require.

XI. <u>Release of Claims.</u>  Loan Parties each represent and agree that each has diligently and thoroughly investigated the existence of any Claim (as defined below), and, to its knowledge and belief, no Claim exists and no facts exist that could give rise to or support a Claim.  As additional consideration for Administrative Agent to enter into this Amendment, Loan Parties, and each of them, by their execution of this Amendment or the Guarantors Consent, and each of Loan Parties' respective agents, employees, directors, officers, attorneys, affiliates, subsidiaries, shareholders,

7

trusts, owners, successors and assigns (each a "<u>Releasing Party</u>" and collectively, the "<u>Releasing
Parties</u>"), hereby releases and forever discharges Administrative Agent and each of the Lenders,
and each of their respective agents, direct and indirect shareholders, employees, directors, officers,
attorneys, branches, affiliates, subsidiaries, predecessors, successors and assigns (each a "<u>Released
Party</u>" and collectively, the "<u>Released Parties</u>"), from all damages, losses, claims, demands,
liabilities, obligations, actions and causes of action whatsoever from the beginning of time through
and including the Effective Date (collectively, the "<u>Claims</u>") that the Releasing Parties or any of
them may, as of the date hereof, have or claim to have against any or all of the Released Parties,
in each case whether currently known or unknown or with respect to which the facts are known
(or should have been known), that could give rise to or support a Claim and of every nature and
extent whatsoever on account of or in any way relating to, arising out of or based upon: (a) the
Loans; (b) the Forbearance Agreement, the Credit Agreement, the Notes, the Security Agreement,
the Pledge Agreement, the Guaranty and the other Loan Documents, and the obligations evidenced
thereby, including, without implied limitation, the terms thereof; (c) any alleged oral or written
agreements or understandings by and between any of Releasing Parties and any of Released Parties
in any way arising out of or related to the Loans, the Forbearance Agreement, any of the Loan
Documents, the Collateral, the Obligations, or any amendments, modifications, representations or
warranties in relation thereto; (d) the disbursement, administration and monitoring of the Loans
and the Loan Documents; (e) actions of Administrative Agent with respect to Franchisor; (f) the
Ongoing Defaults, the New Defaults or the Franchise Default; and (g) the business relationships
between Borrowers and Administrative Agent, and between Borrowers and the Lenders from the
beginning of time through and including the Effective Date (collectively, the "<u>Claims</u>").

Loan Parties each further covenant and agree that each has not heretofore assigned, and will not
hereafter sue any Released Party upon, any Claim released or purported to be released under this
Section XI, and Loan Parties each agree to indemnify and hold harmless the Released Parties
against any loss or liability on account of any actions brought by any of Loan Parties or their
respective assigns or prosecuted on behalf of said Loan Party relating to any Claim released or
purported to be released under this Section XI. It is further understood and agreed that any and all
rights under the provisions of Section 1542 of the California Civil Code, and other similar rights
or laws in other states, are expressly waived by each of Loan Parties. Section 1542 of the
California Civil Code provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR
OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER
FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY
HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER
SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

XII.    <u>Revival Clause</u>. If the incurring of any debt or the payment of money or transfer of property
made to Administrative Agent by or on behalf of any Loan Party should for any reason
subsequently be declared to be "fraudulent" or "preferential" within the meaning of any state or
federal law relating to creditor's rights, including, without limitation, fraudulent conveyances,
preferences or otherwise voidable or recoverable payments of money or transfers of property, in
whole or in part, for any reason (collectively, "<u>Voidable Transfers</u>") under the Bankruptcy Code
or any other federal or state law, and Administrative Agent is required to repay or restore any such
Voidable Transfer or the amount or any portion thereof, or upon the advice of its in-house counsel
or outside counsel is advised to do so, then, as to such Voidable Transfer or the amount repaid or

8

restored (including all reasonable costs, expenses and attorneys' fees of Administrative Agent related thereto), the joint and several liability of Loan Parties under this Amendment, the Credit Agreement, the Notes, the Guaranty, the Security Agreement, the Pledge Agreement and the other Loan Documents, and all of Administrative Agent's rights and remedies under this Amendment, the Credit Agreement, the Notes, the Guaranty, the Security Agreement, the Pledge Agreement and the other Loan Documents shall automatically be revived, reinstated and restored and shall exist as though such Voidable Transfer had never been made to the extent of any harm to Administrative Agent.

Loan Parties each represent and warrant that the execution, delivery and performance of this Amendment will not: (i) render any of Loan Parties insolvent as that term is defined below; (ii) leave any of Loan Parties with remaining assets which constitute unreasonably small capital given the nature of said Loan Parties' business; or (iii) result in the incurrence of Debts (as defined below) beyond any of Loan Parties' ability to pay them when and as they mature and become due and payable. For the purposes of this paragraph, "Insolvent" means that the present fair salable value of assets is less than the amount that will be required to pay the probable liability on existing Debts as they become absolute and matured. For the purposes of this paragraph, "Debts" includes any legal liability for indebtedness, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent. Loan Parties each hereby acknowledge and warrant that they have derived or expects to derive a financial or other benefit or advantage from this Amendment.

XIII.   Payment of Expenses.  In the event any action (whether or not in a court proceeding) shall be required to interpret, implement, modify, or enforce the terms and provisions of this Amendment and/or to declare rights under same, the prevailing party in such action shall recover from the losing party all of its reasonable fees and costs, including, but not limited to, the reasonable attorneys' fees and costs of Administrative Agent's outside counsel.

XIV.   Governing Law.  This Amendment shall be construed and interpreted in accordance with and shall be governed by the laws of the State of California.

XV.   Successors, Assignment.  This Amendment shall be binding on and inure to the benefit of all of the Parties, and upon the heirs, executors, administrators, legal representatives, successors and assigns of the Parties, and each of them.  The terms and provisions of this Amendment are for the exclusive benefit of Loan Parties and Administrative Agent, and may not be transferred, assigned, pledged, set over or negotiated to any person or entity without the prior express written consent of Administrative Agent and in accordance with the Credit Agreement.

XVI.   Complete Agreement of Parties.  This Amendment constitutes the entire agreement between Administrative Agent and Loan Parties arising out of, related to or connected with the subject matter of this Amendment.  Any supplements, modifications, waivers or terminations of this Amendment shall not be binding unless executed in writing by the parties to be bound thereby. No waiver of any provision of this Amendment shall constitute a waiver of any other provision of this Amendment (whether similar or not), nor shall such waiver constitute a continuing waiver unless otherwise expressly so provided.

XVII.   Authority.  Loan Parties each represent and warrant that: (i) each has full authority to execute this Amendment; (ii) the execution, delivery and performance of this Amendment does not require the consent or approval of any person, entity, governmental body, trust, trustor or other authority; (iii) this Amendment is a valid, binding and legal obligation of all Loan Parties

9

enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and general principles of equity, and does not contravene or conflict with any other agreement, indenture or undertaking to which any Loan Party is a party, except the Credit Agreement, the Notes or any of the other Loan Documents; and (iv) Loan Parties are the sole and lawful owners of all right, title, and interest in and to every claim and other matter which Loan Parties purport to settle or compromise herein.

XVIII. <u>Execution In Counterparts</u>.  This Amendment may be executed in any number of counterparts each of which, when so executed and delivered, shall be deemed an original, and all of which together shall constitute but one and the same Agreement.

XIX. <u>Contradictory Terms/Severability</u>.  In the event that any term or provision of this Amendment contradicts any term or provision of any other document, instrument or agreement between the Parties including, but not limited to, the Credit Agreement, the Notes or any of the other Loan Documents, the terms of this Amendment shall control.  If any provision of this Amendment shall be invalid, illegal or otherwise unenforceable, such provision shall be severable from all other provisions of this Amendment, and the validity, legality and enforceability of the remaining provisions of this Amendment shall not be adversely affected or impaired, and shall thereby remain in full force and effect.

XX.    <u>Headings</u>. All headings contained herein are for convenience purposes only, and shall not be considered when interpreting this Amendment.

XXI. <u>Continuing Cooperation</u>.  The Parties shall cooperate with each other in carrying out the terms and intent of this Amendment, and shall execute such other documents, instruments and Agreements as are reasonably required to effectuate the terms and intent of this Amendment.

XXII. <u>Consultation With Counsel</u>.  Each party hereto acknowledges that it is freely and voluntarily entering into this Amendment.  Moreover, each party hereto also acknowledges that it has been represented by counsel of its own choice at each stage in the negotiation of this Amendment, or has knowingly and voluntarily elected not to be represented by counsel at each stage in the negotiation of this Amendment.  To the extent any party was represented by counsel, and without waiving the attorney-client and attorney work product privileges, said party acknowledges that: (i) it has relied on such counsel's advice throughout all of the negotiations which preceded the execution of this Amendment, and in connection with the preparation and execution of this Amendment; (ii) such counsel has read and approved this Amendment; and (iii) such counsel has advised such party concerning the validity and effectiveness of this Amendment, and the transactions to be consummated in accordance therewith.

XXIII.   Notices.  All notices, payments, requests, information and demands which any party hereto may desire, or may be required to give or make to the other party shall be given or made to such party in accordance with the existing provisions of the Notes and the other Loan Documents.

AGREED AND ACCEPTED:


ADMINISTRATIVE AGENT:            CITY NATIONAL BANK

                                 By:    _____
                                 Name: _____
                                 Its:    _____


LENDER:                          CITY NATIONAL BANK

                                 By:    _____
                                 Name: _____
                                 Its:    _____


LENDER:                          BRIDGE FUNDING GROUP, INC.

                                 By: _____
                                 Name: _____
                                 Title:_____


BORROWER:                        NKS RESTAURANTS, L.C.

                                 By: _____
                                 Name: GARRETT CAZIER
                                 Title: CFO


BORROWER:                        HR RESTAURANTS, L.C.

                                 By: _____
                                 Name: GARRETT CAZIER
                                 Title: CFO


*[signatures continued on next page]*

11

BORROWER:           MR RESTAURANTS, L.C.

By: _____
Name: GARNETT CAZIER
Title: CFO

BORROWER:           C UTAH, L.C.

By: _____
Name: GARNETT CAZIER
Title: CFO

BORROWER:           AZM RESTAURANTS UNLIMITED, L.C.

By: _____
Name: Garnett Cazier
Title: CFO

BORROWER:           NDM RESTAURANTS, L.C.

By: _____
Name: GARNETT CAZIER
Title: CFO

12

## CONSENT AND REAFFIRMATION OF GUARANTORS

This Consent And Reaffirmation of Guarantors (this "Consent") is made with reference to that certain "Amendment To Forbearance Agreement" dated as of August 17, 2020, by and between (i) CITY NATIONAL BANK, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); (ii) NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (individually, a "Borrower" and collectively, "Borrowers"); (iii) MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"); and (iv) the Lenders signatory thereto (the "Amendment"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Amendment.

In order to guaranty Borrowers' indebtedness and obligations under the Credit Agreement and the Notes, MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"), executed and delivered to Administrative Agent that certain "Continuing Guaranty" set forth in Article X of the Credit Agreement (as amended and modified from time to time, the "Guaranty"). Pursuant to the Guaranty, Guarantors jointly, severally and unconditionally guaranteed and promised to pay Administrative Agent, on demand, all Obligations and indebtedness owed by Borrowers to Administrative Agent under the Credit Agreement, the Notes and the other Loan Documents.

US_145511572v6_209145-00068 9/9/2020 11:20 AM

By executing below, Guarantors each hereby: (i) acknowledges and consents to Borrowers' execution of the Amendment; (ii) consents to all terms and conditions of the transactions contemplated in the Amendment; (iii) ratifies and affirms all of the terms, covenants, conditions and obligations contained in the Guaranty; (iv) reaffirms the continuing validity and enforceability of the Guaranty; (v) confirms that the Guaranty continues in full force and effect notwithstanding the execution of the Amendment; and (vi) knowingly and voluntarily agrees to join in and be bound to the terms of the Release of Claims contained in Section XI of the Amendment.

AGREED AND ACCEPTED AS OF THIS 17TH DAY OF AUGUST, 2020

GUARANTOR:          MERIDIAN RESTAURANTS UNLIMITED, LC

                    By:
                    Name: GARRETT CAZIER
                    Title: CFO

GUARANTOR:          LOVELOUD RESTAURANTS, L.C.

                    By:
                    Name: GARRETT CAZIER
                    Title: CFO

14

## SECOND AMENDMENT TO FORBEARANCE AGREEMENT

This Second Amendment to Forbearance Agreement (this "Amendment") is entered into as of January 20, 2022, and is made by and between: (i) CITY NATIONAL BANK, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); (ii) NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (individually a "Borrowers" and collectively, "Borrowers"); (iii) MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (individually a "Guarantor" and, collectively, "Guarantors"); and (iv) the Lenders signatory thereto (collectively, the "Lenders").   For purposes of this Amendment, Administrative Agent, the Lenders, Borrowers and Guarantors are sometimes referred to herein collectively as "the Parties".  This Amendment is made with reference to the following facts:

## RECITALS

A.      Borrowers made, executed and delivered to Administrative Agent that certain "Credit Agreement" dated as of February 26, 2018, as amended and modified by that certain "First Amendment To Credit Agreement" dated as of February 1, 2019, and that certain "Second Amendment To Credit Agreement And Waiver" dated as of March 13, 2019 (collectively, the "Credit Agreement").  All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement.

B.      In accordance with the Credit Agreement, Administrative Agent and the Lenders made extensions of credit and other Loans available to Borrowers in accordance with the Revolving Facility, the Term Loan A-1 Facility, the Term Loan A-2 Facility and the Term Loan A-3 Facility (collectively, the "Loans").

C.      The Loans are further evidenced by the Revolving Note, the Term Loan A-1 Note, the Term Loan A-2 Note and the Term Loan A-3 Note (collectively and as amended, restated, supplemented and/or modified from time to time, the "Notes").

D.      In order to collateralize its obligations under the Credit Agreement and the Notes, Borrowers executed and delivered to Administrative Agent that certain "Security Agreement" dated as of February 26, 2018 (as amended, restated, supplemented and/or modified from time to time, the "Security Agreement").  Pursuant to the Security Agreement, Borrowers granted to Administrative Agent a security interest in all collateral described in the Security Agreement, including, among other things, all inventory, instruments, chattel paper, accounts, payment rights, licenses and general intangibles (each as defined in the Security Agreement), together with all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; and all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds) (collectively, the "Collateral").  Administrative Agent perfected its security interest in the Collateral by duly recording multiple UCC-1 Financing Statements with the Office of the Secretary of State of Utah (collectively, and as amended and/or continued from time to time, the "Financing Statements").

1

E.    In order to further collateralize its obligations under the Credit Agreement and the Notes, Meridian Restaurants Unlimited, LC, a Utah limited liability company ("Pledgor"), executed and delivered to Administrative Agent that certain "Pledge Agreement" dated as of February 26, 2018 (as amended, restated, supplemented and/or modified from time to time, the "Pledge Agreement"). Pursuant to the Pledge Agreement, Pledgor pledged to Administrative Agent a security interest in all capital stock, membership interests, partnership interests and all other "Pledged Collateral" (as defined in the Pledge Agreement). Administrative Agent perfected its security interest in the Pledged Collateral by duly recording the Financing Statements and by taking possession of certain of the Pledged Collateral.

F.    In order to guaranty Borrowers' indebtedness and obligations under the Credit Agreement and the Notes, Guarantors executed and delivered to Administrative Agent that certain "Continuing Guaranty" contained in Article X of the Credit Agreement (as amended, restated, supplemented and/or modified from time to time, the "Guaranty"). Pursuant to the Guaranty, Guarantors jointly, severally and unconditionally guaranteed and promised to pay Administrative Agent, on demand, all obligations and indebtedness owed by Borrowers to Administrative Agent under the Credit Agreement, the Notes and the other Loan Documents.

G.    Borrowers, Administrative Agent and the Lenders are also parties to that certain "Forbearance Agreement" dated as of June 1, 2020; as amended by that certain "Amendment To Forbearance Agreement" dated as of August 17, 2020 (collectively, and as otherwise amended and/or modified from time to time, the "Forbearance Agreement"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement or in the Forbearance Agreement.

H.    In addition to the Credit Agreement, the Notes, the Security Agreement, the Pledge Agreement, the Financing Statements, the Guaranty and the Forbearance Agreement, the Loans are also evidenced by other documents, instruments and agreements executed by Borrowers and/or Guarantors (collectively, "Loan Parties") in connection with the Loans (collectively, with the Credit Agreement, the Notes, the Security Agreement, the Pledge Agreement, the Financing Statements, the Guaranty, the Forbearance Agreement and this Amendment, the "Loan Documents").

I.    By letters dated August 12, 2020, February 19, 2021, May 12, 2021, May 24, 2021, August 11, 2021, August 25, 2021, September 16, 2021, and November 10, 2021 (collectively, the "Default Letters"), Loan Parties were notified that each of the "New Events of Default" (as defined in the Forbearance Agreement) set forth on Schedule "A" attached hereto have occurred and are continuing under Section XII of the Forbearance Agreement (collectively, the "New Defaults").

J.    Loan Parties have requested that Administrative Agent forbear from exercising any further legal rights and remedies as to the New Defaults, and that Administrative Agent and the Lenders amend certain terms and provisions of the Forbearance Agreement, as set forth more fully below.

K.    Administrative Agent is willing to continue to forbear from exercising its legal rights and remedies as to the Cumulative Defaults and to amend certain terms and provisions of the Forbearance Agreement, only in accordance with this Amendment.

L.      IT IS THE INTENT OF THE PARTIES THAT THIS AMENDMENT ADDRESS
THE DEBTS AND/OR OBLIGATIONS OF LOAN PARTIES TO ADMINISTRATIVE AGENT
AND THE LENDERS WHICH ARE FULLY DESCRIBED HEREIN AND REFLECTED IN
THE LOAN DOCUMENTS. THIS AMENDMENT DOES NOT PERTAIN TO ANY OTHER
CREDIT FACILITIES, INDEBTEDNESS OR OBLIGATIONS OF LOAN PARTIES TO
ADMINISTRATIVE AGENT OR THE LENDERS NOT SPECIFICALLY ADDRESSED IN
THIS AMENDMENT. ALL TERMS AND PROVISIONS OF THE CREDIT AGREEMENT,
THE NOTES, THE SECURITY AGREEMENT, THE PLEDGE AGREEMENT, THE
GUARANTY, THE FORBEARANCE AGREEMENT AND THE OTHER LOAN
DOCUMENTS NOT SPECIFICALLY MODIFIED HEREIN SHALL REMAIN IN FULL
FORCE AND EFFECT IN ACCORDANCE WITH THEIR ORIGINAL TERMS.

AGREEMENT

NOW, THEREFORE, in consideration of: (i) the above recitals and the mutual promises
contained in this Amendment; (ii) the execution of this Amendment; (iii) the satisfaction of all
Conditions Precedent set forth in Section X below; and (iv) for other and further valuable
consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed
as follows:

I.      Incorporation of Recitals.  Each of the foregoing Recitals is incorporated herein by this
reference, and the Parties each agree that each of such Recitals is true and correct in all respects.

II.     Effective Date of Agreement.  This Amendment shall be deemed effective as of the date
all of the Conditions Precedent set forth in Section X below are satisfied (the "Effective Date").

III.    Acknowledgment of the Loan Documents and the Obligations.

A.      Execution of the Loan Documents.  Loan Parties each acknowledge and agree that
Loan Parties have executed, among others, the Forbearance Agreement, the Credit Agreement, the
Notes, the Security Agreement, the Pledge Agreement, the Guaranty and the other Loan
Documents.

B.      Enforceability of the Loan Documents.  Loan Parties each expressly acknowledge
and agree that: (i) Loan Parties each agreed to repay all amounts advanced by Administrative
Agent and the Lenders to Borrowers pursuant to the Loan Documents, together with interest
thereon at the applicable rates set forth in the Loan Documents, together with all applicable fees
and charges set forth in the Loan Documents; (ii) the New Defaults have occurred and as of the
date hereof are continuing under the Loan Documents as set forth in the Recitals above; (iii) the
Loan Documents have not been amended except as set forth herein; (iv) the Loan Documents
constitute duly authorized, valid, binding and continuing agreements and obligations of Loan
Parties to Administrative Agent, enforceable in accordance with their terms; and (v) as of the date
hereof the Loan Parties have no claims, cross-claims, counterclaims, setoffs or defenses of any
kind or nature which would in any way reduce or offset their respective joint and several
obligations to Administrative Agent under the Loan Documents as of the date of execution of this
Amendment.

C.      The Collateral.  Loan Parties each expressly acknowledge and agree that: (i) the
Credit Agreement, the Notes, the Security Agreement, the Pledge Agreement, the Financing

3

Statements and other Loan Documents provide Administrative Agent with duly authorized, valid, binding, continuing and perfected security interests in the Collateral and the Pledged Shares; (ii) such perfected security interests in the Collateral and the Pledged Shares were granted to Administrative Agent for purposes of securing the Obligations and Loan Parties' continuing obligations to Administrative Agent under the Loan Documents; and (iii) as of the date hereof the Loan Parties have no claims, counterclaims, cross-claims, setoffs or defenses of any kind or nature which would in any way invalidate, result in the subordination of, delay the execution of, or otherwise negatively impact the security interests granted to Administrative Agent in the Collateral and the Pledged Shares as of the date of execution of this Amendment.

IV.    <u>Limited Scope of Agreement</u>.  Nothing contained in this Amendment shall be interpreted as or be deemed a release or a waiver by Administrative Agent of any of the terms or conditions of the Forbearance Agreement, the Credit Agreement, the Notes, the Guaranty or any other Loan Documents, except as specifically provided in this Amendment.  Unless specifically modified herein, all other terms and provisions of the Forbearance Agreement, the Credit Agreement, the Notes, the Guaranty and the other Loan Documents shall remain in full force and effect in accordance with their original terms.

V.    <u>Administrative Agent's Limited Agreement to Forbear During the Forbearance Period</u>. Subject to Loan Parties' satisfaction of all Conditions Precedent set forth in Section X below, and so long as no New Event of Default (as defined below) occurs:

    A.    Administrative Agent hereby agrees to forbear from exercising its rights and remedies: (i) as to the New Defaults; and (ii) the "Ongoing Defaults" set forth in Recital "K" of the Forbearance Agreement, through and including February 28, 2022 (the "<u>Forbearance Period</u>").

    B.    Loan Parties each acknowledge and agree that immediately after the Forbearance Period expires or immediately upon the occurrence of a New Event of Default (as defined below), Administrative Agent may, without any further notice other than as required by the Loan Documents, exercise all of the rights and remedies contained in the Forbearance Agreement, the Credit Agreement, the Notes, the Guaranty, the Security Agreement, the Pledge Agreement, this Amendment, any of the other Loan Documents and available under applicable law.

VI.    <u>Deferral of Certain Principal and Interest Payments during the Forbearance Period</u>.  As additional consideration for the Parties to enter into this Amendment, each of the Parties hereby agree as follows:

    A.    <u>Principal Payments Deferred</u>.  The monthly principal installments on the Loans otherwise payable in January, 2022, and February, 2022 (collectively, the "<u>Deferred Principal Payments</u>"), are hereby deferred until the Maturity Date (unless otherwise accelerated to an earlier date due to the occurrence of an Event of Default other than the New Defaults, pursuant to Section 8.02(b) of the Credit Agreement); <u>provided, however</u>, that regularly scheduled principal payments required by the Credit Agreement and the other Loan Documents shall re-commence in March, 2022, without further notice.

    B.    <u>Required Interest Payments at the Contract Rate</u>.  Throughout the Forbearance period, Borrowers shall continue to timely pay the monthly accrued interest payments due on the Loans for January, 2022, and February, 2022, at the contract interest rate and in the manner set forth in the Forbearance Agreement.

4

C.     Deferral of Default Interest. The portion of interest payments accruing at the Default Rate otherwise payable in January, 2022, and February, 2022 (collectively, the "Deferred Default Interest") are hereby deferred until the Maturity Date (unless otherwise accelerated to an earlier date due to the occurrence of an Event of Default other than the New Defaults, pursuant to Section 8.02(b) of the Credit Agreement); provided, however, that interest will continue to accrue at the Default Rate throughout the Forbearance Period, and payments of interest at the Default Rate shall re-commence in March, 2022, without further notice.

D.     Acknowledgements Regarding the Deferred Payments. For the avoidance of doubt, Loan Parties each acknowledge and agree that: (i) the Deferred Principal Payments and the Deferred Default Interest (collectively, the "Deferred Payments") shall accrue interest at the applicable rates set forth in the Credit Agreement and the Forbearance Agreement; (ii) Administrative Agent will apply all payments with respect to Deferred Payments, first, to accrued interest until all accrued interest has been paid. Thereafter, all such payments will be applied to principal and accrued interest in accordance with the terms of the Credit Agreement, which will result in a final payment that is greater than anticipated at the time of execution of the Credit Agreement; (iii) Borrowers' repayment of the Deferred Payments shall be in addition to—not in lieu of—all regularly scheduled payments of principal and interest due under the Credit Agreement; and (iv) nothing contained in this Section VI shall restrict, prohibit or limit Administrative Agent's rights and remedies, including the acceleration of all Obligations (including all Deferred Payments) if a New Event of Default (as defined below) occurs and is not timely cured under this Amendment.

VII.    Payment of the Forbearance Fee During the Forbearance Period. One of the New Defaults is Borrowers' failure to pay the $200,000 installment of the "Forbearance Fee" (as defined in the Forbearance Agreement) on or before July 1, 2021, in violation of Section IX(iii) of the Forbearance Agreement (the "Forbearance Fee"). The Parties hereby agree that the Forbearance Fee will be paid to Administrative Agent, for the benefit of the Lenders, as follows: (i) on or before the Effective Date, a payment in the amount of $50,000.00; (ii) on or before March 1, 2022, a payment in the amount of $50,000; (iii) on or before April 1, 2022, a payment in the amount of $25,000; (iv) on or before May 1, 2022, a payment in the amount of $25,000; (v) on or before June 1, 2022, a payment in the amount of $25,000; and (vi) on or before July 1, 2022, a payment in the amount of $25,000.

VIII.   The Financial Review.

A.     Commencement of the Financial Review. As additional consideration for Administrative Agent to enter into this Amendment, and in accordance with Section 6.10 of the Credit Agreement and Section VIII(I) of the Forbearance Agreement, Loan Parties have consented and agreed to fully cooperate with a field examination, inspection, audit, valuation and financial review (collectively, the "Financial Review") to be commenced and completed by Administrative Agent's representative, Sierra Constellation Partners, LLC ("SCP"), during the Forbearance Period. The Financial Review may include, but will not be limited to: (i) visitation of Loan Parties' properties; (ii) inspection and copying of Loan Parties' corporate, financial and operating records; and (iii) discussion of Loan Parties' affairs, financials and accounts with Loan Parties' directors, officers, independent public accountants and the Advisor.

B.     Cooperation with SCP. In connection with the Financial Review: (i) Loan Parties each covenant and agree, at all times, to timely cooperate with all reasonable requests of Administrative Agent and SCP in connection with the Financial Review; (ii) Borrowers covenant

5

and agree to promptly reimburse Administrative Agent for all invoiced costs and expenses incurred in connection by SCP in connection with the Financial Review within ten (10) days after presentation of an invoice by Administrative Agent or SCP; and (iii) Loan Parties each acknowledge and agree that SCP was retained by counsel to Administrative Agent, and that all reports and work product prepared by SCP in connection with the Financial Review shall be attorney-client privileged and confidential, in Administrative Agent's sole discretion.

IX.    Administrative Agent's Fees and Costs.  Borrowers shall reimburse Administrative Agent for all of Administrative Agent's invoiced costs and expenses, including reasonable attorneys' fees of Administrative Agent's outside counsel (Katten) incurred prior to the Effective Date in connection with the preparation, due diligence, negotiation, documentation and implementation of this Amendment (collectively, the "Transaction Costs") on the Maturity Date.  In addition to the Transaction Costs, Borrowers shall also reimburse Administrative Agent for its ongoing audit fees, financial advisory fees, monitoring costs and other costs and expenses (including, but not limited to, reasonable attorneys' fees and expenses of Administrative Agent's outside counsel) incurred after the Effective Date hereof in connection with the ongoing negotiation, documentation, implementation, monitoring and enforcement of the Credit Agreement, the Notes, this Amendment and the other Loan Documents (collectively, the "Ongoing Expenses") on the Maturity Date.  The Forbearance Fee and all Transaction Costs and Ongoing Expenses may be auto-debited from Borrowers' accounts at Administrative Agent.

X.    Conditions Precedent.  This Amendment shall not be binding upon Administrative Agent unless and until each of the following conditions precedent (each a "Condition Precedent") is met by no later than the close of business on  February 4, 2022, or is waived in writing by Administrative Agent, at which time this Amendment shall become effective as of the Effective Date:

    A.    Execution and Delivery of this Amendment.  Administrative Agent shall have received this Amendment, duly executed by authorized officers of Borrowers and each of the Lenders;

    B.    Consent of Guarantors.  Administrative Agent shall have received the "Consent and Reaffirmation of Guarantors" attached to the end of this Amendment (the "Guarantors Consent"), duly executed by authorized officers of Guarantors;

    C.    Release of Claims.  Loan Parties shall have executed this Amendment and the Guarantors Consent, thereby indicating their consent to the Release of Claims ("Release") set forth below in Section XIII below, with such signatures indicating that Loan Parties have each read and accepted the terms of such Release;

    D.    Receipt of the First Installment of the Forbearance Fee.  Administrative Agent shall have received the initial $50,000 installment of the Forbearance Fee; and

    E.    Other Approvals.  Administrative Agent shall have received such other documents, instruments and agreements, and obtained all necessary internal approvals as Administrative Agent may require.

XI.    New Events of Default.  A "New Event of Default" shall occur under this Amendment if any Default or Event of Default, other than the New Defaults, shall occur in the performance of

6

any term, condition, covenant or agreement contained in this Amendment, the Forbearance Agreement, the Credit Agreement, the Notes or in any of the other Loan Documents; provided, however, that any applicable notice and cure periods in the Forbearance Agreement, the Credit Agreement, the Notes and the other Loan Documents will remain unchanged.

XII.    Remedies.  If a New Event of Default occurs, Administrative Agent may exercise, at its election, and without notice, demand, protest or presentment (which notice, demand, protest and presentment are expressly waived), in addition to all rights and remedies granted to it in this Amendment, the Credit Agreement, any of the other Loan Documents any or all of the following:

A.    Administrative Agent's limited agreement to forbear under this Amendment shall immediately and automatically cease, and Administrative Agent may exercise all of its rights and remedies available under this Amendment, the Forbearance Agreement, the Credit Agreement, the Notes, the Guaranty, any of the other Loan Documents and applicable law; and/or

B.    Administrative Agent may declare all of the Obligations to be immediately due and payable in full; and/or

C.    Administrative Agent may enforce any of its rights and remedies as to the Collateral and the Pledged Shares; and/or

D.    Administrative Agent may proceed to enforce this Amendment, the Forbearance Agreement, the Credit Agreement and any of the other Loan Documents and exercise any or all of the rights and remedies afforded to Administrative Agent by the California Commercial Code, the California Civil Code, the California Code of Civil Procedure or otherwise possessed by Administrative Agent.

E.    Cumulative Rights and Remedies. All rights and remedies granted to Administrative Agent hereunder are cumulative, and Administrative Agent shall have the right to exercise any one or more of such rights and remedies alternatively, successively or concurrently, subject to applicable law, as Administrative Agent may, in its sole and absolute discretion, deem advisable.

XIII.    Release of Claims.  Loan Parties each represent and agree that each has diligently and thoroughly investigated the existence of any Claim (as defined below), and, to its knowledge and belief, no Claim exists and no facts exist that could give rise to or support a Claim.  As additional consideration for Administrative Agent to enter into this Amendment, Loan Parties, and each of them, by their execution of this Amendment or the Guarantors Consent, and each of Loan Parties' respective agents, employees, directors, officers, attorneys, affiliates, subsidiaries, shareholders, trusts, owners, successors and assigns (each a "Releasing Party" and collectively, the "Releasing Parties"), hereby releases and forever discharges Administrative Agent and each of the Lenders, and each of their respective agents, direct and indirect shareholders, employees, directors, officers, attorneys, branches, affiliates, subsidiaries, predecessors, successors and assigns (each a "Released Party" and collectively, the "Released Parties"), from all damages, losses, claims, demands, liabilities, obligations, actions and causes of action whatsoever from the beginning of time through and including the Effective Date (collectively, the "Claims") that the Releasing Parties or any of them may, as of the date hereof, have or claim to have against any or all of the Released Parties, in each case whether currently known or unknown or with respect to which the facts are known (or should have been known), that could give rise to or support a Claim and of every nature and

7

extent whatsoever on account of or in any way relating to, arising out of or based upon: (a) the Loans; (b) the Forbearance Agreement, the Credit Agreement, the Notes, the Security Agreement, the Pledge Agreement, the Guaranty and the other Loan Documents, and the obligations evidenced thereby, including, without implied limitation, the terms thereof; (c) any alleged oral or written agreements or understandings by and between any of Releasing Parties and any of Released Parties in any way arising out of or related to the Loans, the Forbearance Agreement, any of the Loan Documents, the Collateral, the Obligations, or any amendments, modifications, representations or warranties in relation thereto; (d) the disbursement, administration and monitoring of the Loans and the Loan Documents; (e) actions of Administrative Agent with respect to Franchisor; (f) the New Defaults, the New Defaults or the Franchise Default; and (g) the business relationships between Borrowers and Administrative Agent, and between Borrowers and the Lenders from the beginning of time through and including the Effective Date (collectively, the "Claims").

Loan Parties each further covenant and agree that each has not heretofore assigned, and will not hereafter sue any Released Party upon, any Claim released or purported to be released under this Section XIII, and Loan Parties each agree to indemnify and hold harmless the Released Parties against any loss or liability on account of any actions brought by any of Loan Parties or their respective assigns or prosecuted on behalf of said Loan Party relating to any Claim released or purported to be released under this Section XIII. It is further understood and agreed that any and all rights under the provisions of Section 1542 of the California Civil Code, and other similar rights or laws in other states, are expressly waived by each of Loan Parties. Section 1542 of the California Civil Code provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

XIV. Revival Clause. If the incurring of any debt or the payment of money or transfer of property made to Administrative Agent by or on behalf of any Loan Party should for any reason subsequently be declared to be "fraudulent" or "preferential" within the meaning of any state or federal law relating to creditor's rights, including, without limitation, fraudulent conveyances, preferences or otherwise voidable or recoverable payments of money or transfers of property, in whole or in part, for any reason (collectively, "Voidable Transfers") under the Bankruptcy Code or any other federal or state law, and Administrative Agent is required to repay or restore any such Voidable Transfer or the amount or any portion thereof, or upon the advice of its in-house counsel or outside counsel is advised to do so, then, as to such Voidable Transfer or the amount repaid or restored (including all reasonable costs, expenses and attorneys' fees of Administrative Agent related thereto), the joint and several liability of Loan Parties under this Amendment, the Forbearance Agreement, the Credit Agreement, the Notes, the Guaranty, the Security Agreement, the Pledge Agreement and the other Loan Documents, and all of Administrative Agent's rights and remedies under this Amendment, the Forbearance Agreement, the Credit Agreement, the Notes, the Guaranty, the Security Agreement, the Pledge Agreement and the other Loan Documents shall automatically be revived, reinstated and restored and shall exist as though such Voidable Transfer had never been made to the extent of any harm to Administrative Agent.

Loan Parties each represent and warrant that the execution, delivery and performance of this Amendment will not: (i) render any of Loan Parties insolvent as that term is defined below;

8

(ii) leave any of Loan Parties with remaining assets which constitute unreasonably small capital given the nature of said Loan Parties' business; or (iii) result in the incurrence of Debts (as defined below) beyond any of Loan Parties' ability to pay them when and as they mature and become due and payable. For the purposes of this paragraph, "<u>Insolvent</u>" means that the present fair salable value of assets is less than the amount that will be required to pay the probable liability on existing Debts as they become absolute and matured. For the purposes of this paragraph, "<u>Debts</u>" includes any legal liability for indebtedness, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent. Loan Parties each hereby acknowledge and warrant that they have derived or expects to derive a financial or other benefit or advantage from this Amendment.

XV.     <u>Payment of Expenses</u>. In the event any action (whether or not in a court proceeding) shall be required to interpret, implement, modify, or enforce the terms and provisions of this Amendment and/or to declare rights under same, the prevailing party in such action shall recover from the losing party all of its reasonable fees and costs, including, but not limited to, the reasonable attorneys' fees and costs of Administrative Agent's outside counsel.

XVI.    <u>Governing Law</u>. This Amendment shall be construed and interpreted in accordance with and shall be governed by the laws of the State of California.

XVII.   <u>Successors, Assignment</u>. This Amendment shall be binding on and inure to the benefit of all of the Parties, and upon the heirs, executors, administrators, legal representatives, successors and assigns of the Parties, and each of them. The terms and provisions of this Amendment are for the exclusive benefit of Loan Parties and Administrative Agent, and may not be transferred, assigned, pledged, set over or negotiated to any person or entity without the prior express written consent of Administrative Agent and in accordance with the Credit Agreement.

XVIII.  <u>Complete Agreement of Parties</u>. This Amendment constitutes the entire agreement between Administrative Agent and Loan Parties arising out of, related to or connected with the subject matter of this Amendment. Any supplements, modifications, waivers or terminations of this Amendment shall not be binding unless executed in writing by the parties to be bound thereby. No waiver of any provision of this Amendment shall constitute a waiver of any other provision of this Amendment (whether similar or not), nor shall such waiver constitute a continuing waiver unless otherwise expressly so provided.

XIX.    <u>Authority</u>. Loan Parties each represent and warrant that: (i) each has full authority to execute this Amendment; (ii) the execution, delivery and performance of this Amendment does not require the consent or approval of any person, entity, governmental body, trust, trustor or other authority; (iii) this Amendment is a valid, binding and legal obligation of all Loan Parties enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and general principles of equity, and does not contravene or conflict with any other agreement, indenture or undertaking to which any Loan Party is a party, except the Credit Agreement, the Notes or any of the other Loan Documents; and (iv) Loan Parties are the sole and lawful owners of all right, title, and interest in and to every claim and other matter which Loan Parties purport to settle or compromise herein.

XX.     <u>Execution In Counterparts</u>. This Amendment may be executed in any number of counterparts each of which, when so executed and delivered, shall be deemed an original, and all

of which together shall constitute but one and the same Agreement. This Amendment may be executed electronically using PDF signature pages.

XXI.  <u>Contradictory Terms/Severability</u>.  In the event that any term or provision of this Amendment contradicts any term or provision of any other document, instrument or agreement between the Parties including, but not limited to, the Forbearance Agreement, the Credit Agreement, the Notes or any of the other Loan Documents, the terms of this Amendment shall control.  If any provision of this Amendment shall be invalid, illegal or otherwise unenforceable, such provision shall be severable from all other provisions of this Amendment, and the validity, legality and enforceability of the remaining provisions of this Amendment shall not be adversely affected or impaired, and shall thereby remain in full force and effect.

XXII.  <u>Headings</u>.  All headings contained herein are for convenience purposes only, and shall not be considered when interpreting this Amendment.

XXIII. <u>Continuing Cooperation</u>.  The Parties shall cooperate with each other in carrying out the terms and intent of this Amendment, and shall execute such other documents, instruments and Agreements as are reasonably required to effectuate the terms and intent of this Amendment.

XXIV. <u>Consultation With Counsel</u>.  Each party hereto acknowledges that it is freely and voluntarily entering into this Amendment.  Moreover, each party hereto also acknowledges that it has been represented by counsel of its own choice at each stage in the negotiation of this Amendment, or has knowingly and voluntarily elected not to be represented by counsel at each stage in the negotiation of this Amendment.  To the extent any party was represented by counsel, and without waiving the attorney-client and attorney work product privileges, said party acknowledges that: (i) it has relied on such counsel's advice throughout all of the negotiations which preceded the execution of this Amendment, and in connection with the preparation and execution of this Amendment; (ii) such counsel has read and approved this Amendment; and (iii) such counsel has advised such party concerning the validity and effectiveness of this Amendment, and the transactions to be consummated in accordance therewith.

**[REMAINDER OF PAGE IS BLANK]**

10

XXV.  Notices.  All notices, payments, requests, information and demands which any party hereto may desire, or may be required to give or make to the other party shall be given or made to such party in accordance with the existing provisions of the Notes and the other Loan Documents.

AGREED AND ACCEPTED:

ADMINISTRATIVE
 AGENT:                          CITY NATIONAL BANK

                                By: _Raymond Forgette_
                                Name: Raymond Forgette
                                Its:
                                    Vice President

LENDER:                         CITY NATIONAL BANK
                                    Raymond Forgette
                                By: _____
                                Name: Raymond Forgette
                                Its:
                                    Vice President

LENDER:                         BRIDGE FUNDING GROUP, INC.

                                By: _____
                                Name: _____

BORROWERS:                      NKS RESTAURANTS, L.C.

                                By: _____
                                Name: GARRETT CHZIER
                                Title: CEO

BORROWERS:                      HR RESTAURANTS, L.C.

                                By: _____
                                Name: GARRETT CAZIER
                                Title: CFO

*[signatures continued on next page]*

11

BORROWERS:

MR RESTAURANTS, L.C.

By: _____
Name: GARRETT Cazier
Title: CEO

BORROWERS:

C UTAH, L.C.

By: _____
Name: GARRETT Cazier
Title: CFO

BORROWERS:

AZM RESTAURANTS UNLIMITED, L.C.

By: _____
Name: GARRETT CAZIER
Title: CFO

BORROWERS:

NDM RESTAURANTS, L.C.

By: _____
Name: GARRETT CAZIER
Title: CFO

12

SCHEDULE "A"—
THE NEW DEFAULTS

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(i) of the Credit Agreement due to Borrowers' failure to pay principal payments on the Loans for the months of November, 2021, and December, 2021.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement due to Borrowers' failure to pay interest at the Default Rate for the months of September, 2021, October 2021, November, 2021, December, 2021, and January, 2022.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a) of the Credit Agreement due to Borrowers' failure to pay the $200,000 installment of the Forbearance Fee on or before July 1, 2021, in violation of Section IX(iii) of the Forbearance Agreement.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' failure to maintain Minimum Trailing Twelve Months Consolidated EBITDA: (i) of at least $10,325,000 for the Fiscal Quarter ending June 30, 2021; and (ii) of at least $11,235,000 for the Fiscal Quarter ending September 30, 2021— each in violation of Section 7.11(f) of the Credit Agreement.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Consolidated Pre-Compensation Fixed Charge Coverage Ratio to be less than 1.10 to 1.00, measured as of the Fiscal Quarters ending June 30, 2021, and September 30, 2021, in violation of Section 7.11(a) of the Credit Agreement.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Consolidated Post-Distribution Fixed Charge Coverage Ratio to be less than 1.10 to 1.00, measured as of the Fiscal Quarters ending June 30, 2021, and September 30, 2021, in violation of Section 7.11(b) of the Credit Agreement.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Current Ratio to be less than 0.50 to 1.00, measured as of the Fiscal Quarter ending September 30, 2021, in violation of Section 7.11(c) of the Credit Agreement.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Consolidated Lease Adjusted Leverage Ratio to exceed 6.25x, measured as of the Fiscal Quarters ending June 30, 2021, and September 30, 2021, in violation of Section 7.11(d) of the Credit Agreement.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' failure to deliver their internal interim

13

reportings, including store level reconciliations, for the month ending March 31, 2021, by no later than April 30, 2021, in violation of Section 6.01(e) of the Credit Agreement.

- A New Event of Default under Section XII of the Forbearance Agreement due to Borrowers' failure to deliver executed DACAS by no later than October 1, 2020, in violation of Section VIII(E) of the Forbearance Agreement.

- A New Event of Default under Section XII of the Forbearance Agreement due to Borrowers failure to consistently engage Advisor in accordance with the agreed "Scope of Services" between the months of August, 2020 until March, 2021—in violation of Sections VIII(F) and XII of the Forbearance Agreement.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement because Borrowers created, incurred and suffered to exist "Indebtedness" in the form of $3,286,448 in "Member draws" in violation of Section 7.03 of the Credit Agreement.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement because Borrowers declared and made, directly or indirectly, "Restricted Payments" in the form of the Member Draws, in violation of Section 7.06 of the Credit Agreement.

14

## CONSENT AND REAFFIRMATION OF GUARANTORS

This Consent And Reaffirmation of Guarantors (this "Consent") is made with reference to that certain "Second Amendment To Forbearance Agreement" dated as of January 20, 2022, by and between (i) CITY NATIONAL BANK, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); (ii) NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (individually, a "Borrower" and collectively, "Borrowers"); (iii) MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"); and (iv) the Lenders signatory thereto (the "Amendment"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Amendment.

In order to guaranty Borrowers' indebtedness and obligations under the Credit Agreement and the Notes, MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"), executed and delivered to Administrative Agent that certain "Continuing Guaranty" set forth in Article X of the Credit Agreement (as amended and modified from time to time, the "Guaranty"). Pursuant to the Guaranty, Guarantors jointly, severally and unconditionally guaranteed and promised to pay Administrative Agent, on demand, all Obligations and indebtedness owed by Borrowers to Administrative Agent under the Credit Agreement, the Notes and the other Loan Documents.

By executing below, Guarantors each hereby: (i) acknowledges and consents to Borrowers' execution of the Amendment: (ii) consents to all terms and conditions of the transactions contemplated in the Amendment; (iii) ratifies and affirms all of the terms, covenants, conditions and obligations contained in the Guaranty; (iv) reaffirms the continuing validity and enforceability of the Guaranty; (v) confirms that the Guaranty continues in full force and effect notwithstanding the execution of the Amendment; and (vi) knowingly and voluntarily agrees to join in and be bound to the terms of the Release of Claims contained in Section XIII of the Amendment.

AGREED AND ACCEPTED AS OF THIS 20TH DAY OF JANUARY, 2022

GUARANTOR:              MERIDIAN RESTAURANTS UNLIMITED, LC

                        By: _____
                        Name: Garret P Gazier
                        Title: CFO


GUARANTOR:              LOVELOUD RESTAURANTS, L.C.

                        By: _____
                        Name: Garrett Gazier
                        Title: CFO

15

16

EXHIBIT 3

July 26, 2019

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C
5929 Fashion Point Dr., Suite 501
South Ogden, Utah  84403
Attention:  Garrett Cazier

Re:    Notice of Events of Default and Reservation of Rights

Ladies and Gentlemen:

Reference is hereby made to that certain Credit Agreement, dated as of February 26, 2018 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), by and among NKS RESTAURANTS, L.C., a Utah limited liability company ("NKS"), HR RESTAURANTS, L.C., a Utah limited liability company ("HR"), MR RESTAURANTS, L.C., a Utah limited liability company ("MR"), C UTAH, L.C., a Utah limited liability company ("C Utah"), AZM RESTAURANTS, L.C., a Utah limited liability company ("AZM"), NDM RESTAURANTS, L.C., a Utah limited liability company ("NDM"; NKS, HR, MR, C Utah, AZM, and NDM are sometimes individually referred to herein as a "Borrower" and collectively as the "Borrowers"), MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company ("Meridian"), LOVELOUD RESTAURANTS, L.C., a Utah limited liability company ("Loveloud"), each Lender from time to time party thereto, and CITY NATIONAL BANK, as Administrative Agent.  Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Notice is hereby given to Borrowers that one or more Events of Default have occurred and are continuing under the Credit Agreement, including, without limitation, the Events of Default arising from Borrowers' failure to (a) provide the financial statements for the Fiscal Year ended December 31, 2018 within 120 days after the end of such Fiscal Year as required by Section 6.01(a) and (c) of the Credit Agreement, (b) provide the financial statements for the Fiscal Quarter ended March 31, 2019 within 45 days after the end of such Fiscal Quarter as required by Section 6.01(b) and (c) of the Credit Agreement, (c) provide the Compliance Certificates required to be delivered concurrently with the financial statements referred to in clauses (a) and (b) above as required by Section 6.02(a) of the Credit Agreement, (d) satisfy the

minimum Current Ratio for the Fiscal Quarter ended March 31, 2019 as required by Section 7.11(c) of the Credit Agreement, and (e) satisfy the maximum Consolidated Lease Adjusted Leverage Ratio for the Fiscal Quarter ended March 31, 2019 as required by Section 7.11(d) of the Credit Agreement (collectively, the "Known Existing Defaults").

There also may be other Defaults or Events of Default that have occurred and are continuing.  The fact that such other Defaults or Events of Default are not specified herein shall not be construed as a waiver thereof or a waiver of the right to exercise any rights and remedies with respect thereto.

As a result of the occurrence and continuation of the Known Existing Defaults, Administrative Agent and the Lenders may at any time exercise any or all of the rights and remedies provided under the Loan Documents and applicable law.  Each of Administrative Agent and the Lenders reserves the right to exercise, at any time, any of such rights and remedies as a result of the occurrence and continuation of the Known Existing Defaults, including, but not limited to (i) declaring the Obligations to be due and payable immediately, (ii) terminating Administrative Agent's and the Lenders' Commitments and obligations under the Credit Agreement, (iii) imposing the Default Rate from the initial date of occurrence of the Known Existing Defaults, and (iv) exercising any or all of the other rights and remedies provided under the Loan Documents or otherwise (collectively, "Remedies").  Further, as a result of the occurrence and continuation of the Known Existing Defaults, the conditions precedent to any Credit Extension cannot be satisfied and, therefore, any Borrowing requested by the Borrowers may be made or declined in the sole discretion of the applicable Lenders.  Any election by the applicable Lenders, in their sole discretion, to make any Borrowing requested by Borrowers shall not constitute a course of dealing by such Lenders that alters the terms of the Loan Documents or this letter.

Any participation by Administrative Agent or the Lenders in any discussions to restructure certain provisions of the Loan Documents and/or to forbear from exercising any Remedies and/or any failure by Administrative Agent or the Lenders to take immediate action as a result of the Known Existing Defaults or otherwise, including, without limitation, any election by the applicable Lenders, in their sole discretion, to make any Borrowings requested by Borrowers, shall not (and shall not be deemed to) constitute an agreement to forbear from the exercise of Administrative Agent's and the Lenders' respective Remedies.  As a reminder, pursuant to the terms of the Credit Agreement, Borrowers are responsible for the payment of all costs and expenses, including, without limitation, fees and disbursements of legal counsel to Administrative Agent, in connection with the Known Existing Defaults and Administrative Agent's and Lenders' exercise of Remedies.  The acceptance of any repayment of the Obligations, any election by the applicable Lenders, in their sole discretion, to make any Borrowing requested by Borrowers, or the participation by Administrative Agent or Lenders in any discussions or negotiations with the Loan Parties hereafter shall not (and shall not be deemed to) constitute a waiver of any Defaults or Events of Default or a waiver, release or modification of Administrative Agent's or the Lenders' Remedies.

Please note that Administrative Agent and the Lenders have not waived the Known Existing Defaults or any other Defaults or Events of Default that may have occurred or may

exist.  Administrative Agent and the Lenders are reserving all of their respective rights and remedies with respect to the Known Existing Defaults and any other Defaults or Events of Default that may have occurred or may exist.  Any delay by Administrative Agent and/or the Lenders in the enforcement or pursuit of any rights and remedies under the Loan Documents or under applicable law shall not constitute a waiver thereof or agreement to forbear with respect thereto, nor shall it be a bar to the exercise of Administrative Agent's and the Lenders' rights or remedies at a later date.  Nothing herein shall be deemed to limit, restrict, or constitute a waiver of any of the respective rights and remedies of Administrative Agent and Lenders under the Loan Documents, applicable law or otherwise (including, without limitation, against any guarantors), all of such rights and remedies being expressly reserved.

Very truly yours,

CITY NATIONAL BANK,
as Administrative Agent

By:    _____
Name: Allen W. Johnson
Title:   SVP, Relationship Manager



Ray Forgette | Vice President
                | Special Assets

August 12, 2020

VIA ELECTRONIC MAIL AND OVERNIGHT DELIVERY

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Oregon, UT 84403
Attention: Garrett Cazier
          Chief Financial Officer

Re:    Notice of Default under that certain "Credit Agreement" dated as of February 26, 2018 (as amended and/or modified from time to time, the "Credit Agreement"), by and between NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, "Borrowers"); MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"); City National Bank, a national banking association, as Administrative Agent for the Lenders ("Agent"); and the Lenders party thereto.

Dear Mr. Cazier:

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement" dated as of June 1, 2020, by and between Borrowers, Guarantors, Agent and the Lenders (the "Forbearance Agreement"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement or in the Forbearance Agreement.

Garrett Cazier
August 12, 2020
Page 2

## THE ONGOING DEFAULTS

By letter dated July 7, 2020 (the "July 7 Letter"), Loan Parties were notified that a default had occurred and is continuing under Section XII of the Forbearance Agreement and Section 8.01(m) of the Credit Agreement (the "Initial Default"). To Agent's knowledge, the Initial Default has not been cured and is continuing.

In addition to the Initial Default, Loan Parties are hereby notified that the following New Events of Default have occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement (collectively, the "New Defaults"):

- A New Event of Default due to Borrowers' failure to deliver their CPA prepared consolidated and combining audited financials of the short Fiscal Year ending 2018, by no later than June 30, 2020, in violation of Section 6.01(e) of the Credit Agreement;
- A New Event of Default due to Borrowers' failure to deliver their CPA prepared consolidated and combining audited financials for Fiscal Year ending 2019, by no later than June 30, 2020, in violation of Section 6.01(e) of the Credit Agreement;
- A New Event of Default due to Borrowers' failure to deliver any of the following reports to Agent: (i) a rolling 13-week cash flow report, in form acceptable to Agent in its sole and absolute discretion; and (ii) a weekly variance report showing Borrowers' actual to projected cash flow from the prior week (which cash flow report may be consolidated with the 13-week cash flow report) from the close of business each Friday from the Effective Date (June 9, 2020), until July 1, 2020, in violation of Section 6.02(f) of the Credit Agreement; and
- A New Event of Default has occurred due to Borrowers' failure to deliver executed DACAS within sixty (60) days after the Effective Date (which Effective Date was June 9, 2020), in violation of Section VIII(D) of the Forbearance Agreement.

## RESERVATION OF RIGHTS

The New Defaults have not been cured by Loan Parties, nor waived by Agent. Loan Parties are hereby advised that Agent reserves all of the rights and remedies available to it under the Credit Agreement, the Forbearance Agreement and the other Loan Documents, and at law and/or in equity as a result of the New Defaults. Agent also reserves all of its rights and remedies as to any other defaults and New Events of Default which may exist presently or arise in the future. Similarly, any delay by Agent in exercising any or all of its rights, remedies or powers shall not constitute a waiver of the New Defaults or of Agent's right to exercise such rights, remedies or powers at a future date.

In particular, Agent's reservation of rights is made with reference to James Winder's email to the undersigned on August 10, 2020, which email mischaracterizes statements by Agent and Agent's counsel. Rather than respond to the specific misstatements in that email, the July 7 Letter explicitly states Agent's position regarding the Initial Default.

Garrett Cazier
August 12, 2020
Page 3

**IMPOSITION OF DEFAULT INTEREST RATE**

As a result of the occurrence and continuation of the New Defaults--and in accordance with Section 2.06((b)(iii) of the Credit Agreement and Section XIII(C) of the Forbearance Agreement, Agent and Required Lenders have exercised their right to impose the Default Rate on all outstanding Obligations, effective as of August 12, 2020.

**NO WAIVER BY ACCEPTING PAYMENTS**

Loan Parties are further advised that Agent is willing to continue to accept payments under the Loan Documents and Agent will continue to apply any such payments against the balance owing under the Loan Documents. Please be advised that Agent's receipt and application of payments does not constitute a modification or extension of the Credit Agreement, the Forbearance Agreement, the Guaranty or any of the other Loan Documents, nor a waiver of any of Agent's rights under the Loan Documents. Acceptance by Agent of any payment does not waive Agent's rights with regard to the New Defaults. Any payments which you make to Agent must be made with this express understanding.

**PROCEDURES FOR ONGOING NEGOTIATIONS**

Finally, to the extent Agent participates in discussions with Loan Parties with respect to Loan Parties' repayment of the Obligations, you are advised that Agent's participation in said discussions is not intended to constitute a waiver of Agent's right to immediately exercise its rights and remedies as a result of the New Defaults. Moreover, any proposals for the restructure or other consensual disposition of the Obligations and the other amounts owing by Loan Parties to Agent shall not be binding upon Agent unless and until such proposals are reduced to writing and formally approved by Agent and the Lenders.

Please contact the undersigned at (213) 673-8951 to discuss these matters.

Sincerely,

*Raymond Forgette*

Ray Forgette
Sr. Special Assets Officer
City National Bank

cc      Meridian Restaurants Unlimited, LC (Guarantor)
Loveloud Restaurants, L.C. (Guarantor)
Bridge Funding Group, Inc. (Lender)
Brad W. Merrill, Esq. (Counsel to Loan Parties)
Amy Lerner-Hill, Esq. (City National Bank)
William B. Freeman, Esq. (Counsel to Agent)



|  | Ray Forgette | Vice President |
|  |  | Special Assets |

February 19, 2021

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Oregon, UT 84403
Attention: Garrett Cazier
Chief Financial Officer

> Re: Notice of Defaults under that certain "Credit Agreement" dated as of February 26, 2018 (as amended and/or modified from time to time, the "Credit Agreement"), by and between NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, "Borrowers"); MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"); City National Bank, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); and the Lenders party thereto.

Dear Mr. Cazier:

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement" dated as of June 1, 2020, by and between Borrowers, Guarantors, Administrative Agent and the Lenders (as amended and/or modified from time to time, the "Forbearance Agreement"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement or in the Forbearance Agreement.

Garrett Cazier
February 19, 2021
Page 2

## THE ONGOING DEFAULTS

By letter dated August 12, 2020 (the "August Letter"), Loan Parties were notified that
multiple New Events of Default had occurred and are continuing under Section XII of the
Forbearance Agreement and Section 8.01(b) of the Credit Agreement.  To Administrative
Agent's knowledge, the following New Event of Default cited in the August Letter still has
not been cured and is continuing: *Borrowers' failure to deliver executed DACAS by no later
than October 1, 2020, in violation of Section VIII(E) of the Forbearance Agreement (the
"DACA Default)"*.

In addition to the DACA Default, Loan Parties are hereby notified that the following New
Events of Default have occurred and are continuing under Section XII of the Forbearance
Agreement and Sections 8.01(b) of the Credit Agreement (collectively, the "Reporting
Defaults"):

- A New Event of Default due to Borrowers' failure to deliver their
  consolidated and consolidating balance sheet, income statement and the other
  financial statements set forth in Section 6.01(b) of the Credit Agreement, by
  no later than November 15, 2020, and February 15, 2021, in violation of
  Section 6.01(b) of the Credit Agreement;
- A New Event of Default due to Borrowers' failure to include a certification by
  a Responsible Officer of Borrower Agent for the financial reports delivered to
  Administrative Agent on or about November 15, 2020, and February 15,
  2021, in violation of Section 6.01(c) of the Credit Agreement;
- A New Event of Default due to Borrowers' failure to deliver their updated
  initial projections for the 2021 Fiscal Year, by no later than December 10,
  2020, in violation of Section 6.01(e) of the Credit Agreement;
- A New Event of Default due to Borrowers' failure to deliver a duly completed
  Compliance Certificate signed by a Responsible Officer of Borrower Agent
  concurrently with delivery of the financial statements set forth in Section
  6.01(b) of the Credit Agreement, by no later than November 15, 2020, and
  February 15, 2021, in violation of Section 6.02(a) of the Credit Agreement;
- A New Event of Default due to Borrowers' failure to deliver a written update
  on the status of accrual and payment of past-due federal and state income
  taxes concurrently with delivery of the financial statements set forth in
  Section 6.01(e) of the Credit Agreement, by no later than February 15, 2021,
  in violation of Section 6.02(e) of the Credit Agreement; and
- A New Event of Default due to Borrowers' failure to deliver any of the
  following reports to Administrative Agent: (i) a rolling 13-week cash flow
  report, in form acceptable to Administrative Agent in its sole and absolute
  discretion; and (ii) a monthly variance report showing Borrowers' actual to
  projected cash flow from the prior month (which cash flow report may be

Garrett Cazier
February 19, 2021
Page 3

consolidated with the 13-week cash flow report), by no later than February 8, 2021, in violation of Section 6.02(f) of the Credit Agreement.

## RESERVATION OF RIGHTS

The DACA Default and the Reporting Defaults (collectively, the "Ongoing Defaults") have not been cured by Loan Parties, nor waived by Administrative Agent. Loan Parties are hereby advised that Administrative Agent reserves all of the rights and remedies available to it under the Credit Agreement, the Forbearance Agreement and the other Loan Documents, and at law and/or in equity as a result of the Ongoing Defaults. Administrative Agent also reserves all of its rights and remedies as to any other defaults and New Events of Default which may exist presently or arise in the future. Similarly, any delay by Administrative Agent in exercising any or all of its rights, remedies or powers shall not constitute a waiver of the Ongoing Defaults or of Administrative Agent's right to exercise such rights, remedies or powers at a future date.

Finally, in accordance with Section 6.02(b) of the Credit Agreement, Administrative Agent hereby makes a formal request for verifications of payment of all royalty payments (under Franchise Agreements or otherwise), sales tax payments, payroll tax payments (or tax withholding payments), and any other tax payments required to be paid by any Loan Party. All of said verifications should be delivered to Administrative Agent within twenty (20) days of the date of this letter.

## FINAL OPPORTUNITY TO CURE THE ONGOING DEFAULTS.

Borrowers and the other Loan Parties are hereby advised that Administrative Agent will provide Borrowers twenty (20) days from the date of this letter to cure each of the Ongoing Defaults. Borrowers and Loan Parties are advised that Administrative Agent has no obligation to provide any further extensions of this twenty (20) day deadline.

## NO WAIVER BY ACCEPTING PAYMENTS

Loan Parties are further advised that Administrative Agent is willing to continue to accept payments under the Loan Documents and Administrative Agent will continue to apply any such payments against the balance owing under the Loan Documents. Please be advised that Administrative Agent's receipt and application of payments does not constitute a modification or extension of the Credit Agreement, the Forbearance Agreement, the Guaranty or any of the other Loan Documents, nor a waiver of any of Administrative Agent's rights under the Loan Documents. Acceptance by Administrative Agent of any payment does not waive Administrative Agent's rights with regard to the Ongoing Defaults. Any payments which you make to Administrative Agent must be made with this express understanding.

Garrett Cazier
February 19, 2021
Page 4

## PROCEDURES FOR ONGOING NEGOTIATIONS

Finally, to the extent Administrative Agent participates in discussions with Loan Parties with respect to Loan Parties' repayment of the Obligations, you are advised that Administrative Agent's participation in said discussions is not intended to constitute a waiver of Administrative Agent's right to immediately exercise its rights and remedies as a result of the Ongoing Defaults. Moreover, any proposals for the restructure or other consensual disposition of the Obligations and the other amounts owing by Loan Parties to Administrative Agent shall not be binding upon Administrative Agent unless and until such proposals are reduced to writing and formally approved by Administrative Agent and the Lenders.

Please contact the undersigned at (213) 673-8951 to discuss these matters.

Sincerely,

*Raymond Forgette*

Ray Forgette
Sr. Special Assets Officer
City National Bank

cc    Meridian Restaurants Unlimited, LC (Guarantor)
        Loveloud Restaurants, L.C. (Guarantor)
        Bridge Funding Group, Inc. (Lender)
        Brad W. Merrill, Esq. (Counsel to Loan Parties)
        Amy Lerner-Hill, Esq. (City National Bank)
        William B. Freeman, Esq. (Counsel to Administrative Agent)



Ray Forgette | Vice President
| Special Assets

May 12, 2021

VIA ELECTRONIC MAIL AND OVERNIGHT
DELIVERY

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Oregon, UT 84403
Attention: Garrett Cazier
          Chief Financial Officer

Re:        Notice of Defaults under that certain "Credit Agreement" dated as of
           February 26, 2018 (as amended and/or modified from time to
           time, the "Credit Agreement"), by and between NKS
           RESTAURANTS, L.C., a Utah limited liability company; HR
           RESTAURANTS, L.C., a Utah limited liability company; MR
           RESTAURANTS, L.C., a Utah limited liability company; C
           UTAH, L.C., a Utah limited liability company; AZM
           RESTAURANTS, L.C., a Utah limited liability company; and
           NDM RESTAURANTS, L.C., a Utah limited liability
           company (collectively, "Borrowers"); MERIDIAN
           RESTAURANTS UNLIMITED, LC, a Utah limited liability
           company; and LOVELOUD RESTAURANTS, L.C., a Utah
           limited liability company (collectively, "Guarantors"); City
           National Bank, a national banking association, as
           Administrative Agent for the Lenders ("Administrative
           Agent"); and the Lenders party thereto.

Garrett Cazier
May 12, 2021
Page 2

Dear Mr. Cazier:

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement"
dated as of June 1, 2020, by and between Borrowers, Guarantors, Administrative Agent and
the Lenders (as amended and/or modified from time to time, the "<u>Forbearance Agreement</u>").
All capitalized terms not otherwise defined herein have the meanings given for said terms in
the Credit Agreement or in the Forbearance Agreement.

## <u>THE ONGOING DEFAULTS</u>

By letters dated August 12, 2020, and February 19, 2021 (collectively, the "<u>Prior Default
Letters</u>"), Loan Parties were notified that multiple New Events of Default had occurred and
are continuing under Section XII of the Forbearance Agreement and Section 8.01(b) of the
Credit Agreement.
Despite multiple notices, the following New Event of Default cited in the Prior Default
Letters still has not been cured and is continuing: *Borrowers' failure to deliver executed
DACAS by no later than October 1, 2020, in violation of Section VIII(E) of the Forbearance
Agreement (the "<u>Existing Default</u>")*.

In addition to the Existing Default, Loan Parties are hereby notified that the following New
Event of Default has occurred and is continuing under Section XII of the Forbearance
Agreement and Section 8.01(b) of the Credit Agreement: *Borrowers' failure to deliver their
internal interim reportings, including store level reconciliations, for the month ending March
31, 2021, by no later than April 30, 2021, in violation of Section 6.01(e) of the Credit
Agreement (the "<u>New Default</u>")*.

## <u>RESERVATION OF RIGHTS</u>

The Existing Default and the New Default (collectively, the "<u>Ongoing Defaults</u>") have not
been cured by Loan Parties, nor waived by Administrative Agent.  Loan Parties are hereby
advised that Administrative Agent reserves all of the rights and remedies available to it under
the Credit Agreement, the Forbearance Agreement and the other Loan Documents, and at law
and/or in equity as a result of the Ongoing Defaults.  Administrative Agent also reserves all
of its rights and remedies as to any other defaults and New Events of Default which may
exist presently or arise in the future.  Similarly, any delay by Administrative Agent in
exercising any or all of its rights, remedies or powers shall not constitute a waiver of the
Ongoing Defaults or of Administrative Agent's right to exercise such rights, remedies or
powers at a future date.

Garrett Cazier
May 12, 2021
Page 3

**FINAL OPPORTUNITY TO CURE THE ONGOING DEFAULTS.**

Borrowers and the other Loan Parties are hereby advised that Administrative Agent will provide Borrowers twenty (20) days from the date of this letter to cure each of the Ongoing Defaults. Borrowers and Loan Parties are advised that Administrative Agent has no obligation to provide any further extensions of this twenty (20) day deadline. Moreover, given the length of time that has elapsed since the Existing Default has occurred, Loan Parties should consider this letter their final opportunity to cure the Existing Default before the Agent takes remedial action on behalf of the Lenders.

**DIALOGUE WITH THE ADVISOR**

In accordance with Sections VIII(F)(1) and (2) of the Forbearance Agreement, Administrative Agent hereby makes a formal request to meet with the Advisor, in the presence of Borrowers, to discuss the Scope of Services and all other aspects of Advisor's services to Borrowers.

Agent and the Lenders are available to meet telephonically with Borrowers and the Advisor next week on Monday, Tuesday or Wednesday (May 17, 18 or 19) at any time other than 1:00 P.M.—3:00 Pacific Time on Monday, May 17th. Accordingly, please contact the undersigned at your earliest convenience to schedule this meeting.

**NO WAIVER BY ACCEPTING PAYMENTS**

Loan Parties are further advised that Administrative Agent is willing to continue to accept payments under the Loan Documents and Administrative Agent will continue to apply any such payments against the balance owing under the Loan Documents. Please be advised that Administrative Agent's receipt and application of payments does not constitute a modification or extension of the Credit Agreement, the Forbearance Agreement, the Guaranty or any of the other Loan Documents, nor a waiver of any of Administrative Agent's rights under the Loan Documents. Acceptance by Administrative Agent of any payment does not waive Administrative Agent's rights with regard to the Ongoing Defaults. Any payments which you make to Administrative Agent must be made with this express understanding.

**PROCEDURES FOR ONGOING NEGOTIATIONS**

Finally, to the extent Administrative Agent participates in discussions with Loan Parties with respect to Loan Parties' repayment of the Obligations, you are advised that Administrative

Garrett Cazier
May 12, 2021
Page 4

Agent's participation in said discussions is not intended to constitute a waiver of Administrative Agent's right to immediately exercise its rights and remedies as a result of the Ongoing Defaults.    Moreover, any proposals for the restructure or other consensual disposition of the Obligations and the other amounts owing by Loan Parties to Administrative Agent shall not be binding upon Administrative Agent unless and until such proposals are reduced to writing and formally approved by Administrative Agent and the Lenders.

Please contact the undersigned at (213) 673-8951 to discuss these matters.

Sincerely,

*Raymond Forgette*

Raymond Forgette
Sr. Special Assets Officer
City National Bank


cc      Meridian Restaurants Unlimited, LC (Guarantor)
        Loveloud Restaurants, L.C. (Guarantor)
        Bridge Funding Group, Inc. (Lender)
        Brad W. Merrill, Esq. (Counsel to Loan Parties)
        Amy Lerner-Hill, Esq. (City National Bank)
        William B. Freeman, Esq. (Counsel to Administrative Agent)



|  | Ray Forgette | Vice President<br>Special Assets |

May 24, 2021

VIA ELECTRONIC MAIL AND OVERNIGHT DELIVERY

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Oregon, UT 84403
Attention: Garrett Cazier
            Chief Financial Officer

Re:  Defaults under that certain "Credit Agreement" dated as of February 26, 2018 (as amended and/or modified from time to time, the "Credit Agreement"), by and between NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, "Borrowers"); MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"); City National Bank, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); and the Lenders party thereto.

Dear Mr. Cazier:

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement" dated as of June 1, 2020, by and between Borrowers, Guarantors, Administrative Agent and the Lenders (as amended and/or modified from time to time, the "Forbearance Agreement").

Garrett Cazier
May 24, 2021
Page 2

All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement or in the Forbearance Agreement.

This letter is in response to the default/reservation of rights letter sent by Administrative Agent to Borrowers dated May 12, 2021 (the "Administrative Agent's Letter"), and James Winder's email response to Administrative Agent on May 14, 2021 ("Borrowers' Response").

## BORROWERS' FINANCIAL REPORTING

As you know, the Administrative Agent's Letter notified Loan Parties that a New Event of Default had occurred and is continuing under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' failure to deliver their internal interim reportings, including store level reconciliations, for the month ending March 31, 2021, by no later than April 30, 2021 (the "Past-Due Reports"), in violation of Section 6.01(e) of the Credit Agreement (the "Reporting Default").

Although the Borrowers' Response disputes the existence of the Reporting Default, on May 14, 2021, Borrowers delivered the Past-Due Reports to Administrative Agent—effectively curing the Reporting Default within the twenty (20) day cure period provided in Administrative Agent's Letter.

Borrowers are advised that Administrative Agent rejects Borrowers' interpretation of Section 6.01(e) of the Credit Agreement, as set forth in the Response Letter.  Although Borrowers' analysis is difficult to understand, it seems to rely upon: (i) alleged verbal statements from Administrative Agent's former employee, Ron Freed; and (ii) the existence of Section 6.01(b) of the Credit Agreement.

The Credit Agreement and the Forbearance Agreement make clear (as well as each and every default/reservation of rights letter sent by Administrative Agent) that "verbal" or "non-written" statements that contradict the Loan Documents are not enforceable.  So any alleged statements by Mr. Freed (who left CNB more than 12 months ago) are not relevant to the explicit financial reporting provisions set forth in the Credit Agreement and the Forbearance Agreement (which, as you know, were negotiated with management, advisors and counsel over several months).  Administrative Agent likewise disputes Borrower's recollection of Mr. Freed's statements; regardless, however, these statements are inapplicable to the express terms of the Loan Documents.

Secondly, Section 6.01(e) to the Credit Agreement (which was added by Section VII(H) of the Forbearance Agreement) requires that Borrowers deliver to Administrative Agent "*Internal interim reportings, including store level reconciliations, due: (i) quarterly within 45 days of period close through and including the quarter ending December 31, 2020; and (ii) monthly within 30 days of period close commencing with the January 1, 2021 reporting*

Garrett Cazier
May 24, 2021
Page 3

*period."* The plain meaning of Section VII of the Forbearance Agreement is that Section 6.01(e) contains a new, additional, set of reporting requirements that Borrowers consensually agreed to comply with. There is no confusion in the language of this provision, so Administrative Agent expects that Borrowers timely comply with all financial reporting requirements contained in the Loan Agreement, as amended by the Forbearance Agreement.

Finally, the fact that Borrowers are fully aware of their reporting obligations under Section 6.01(e) of the Credit Agreement is manifested by the fact that Borrowers: (i) previously complied with Section 6.01(e) by delivering their February, 2021 report to Administrative Agent on or about March 31, 2021; and (ii) just delivered their March, 2021 report to Administrative Agent on May 14, 2021 (which was fourteen (14) days late). Accordingly, Loan Parties are fully cognizant of precisely what is required under the Credit Agreement and the Forbearance Agreement. For this reason and others, Administrative Agent expects that Borrowers will timely comply with all future reporting requirements. Loan Parties should not expect any more grace periods for what has become an ongoing pattern of chronically late financial reporting.

## BORROWERS' FAILURE TO DELIVER EXECUTED DACAS

Borrowers' Response acknowledges that Borrowers failed to deliver executed DACAS by no later than October 1, 2020, thereby violating Section VIII(E) of the Forbearance Agreement and giving rise to a "New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement (the "DACA Default"). Borrowers then request that Administrative Agent waive the DACA Default because Zions Bank has apparently refused to execute any DACAS.

Please be advised that Administrative Agent and the Lenders are unwilling to waive the DACA Default. As an initial matter, Borrowers advised Administrative Agent of Zions' position over nine (9) months ago, and Administrative Agent has extended Borrowers multiple opportunities throughout this time period to address this issue. Borrowers apparently have not availed itself of this additional time to remedy the DACA Default.

Also, the absence of DACA's has a material impact on the Lenders' collateral position because a DACA (or possession) is the only way to perfect the Lenders' security interest in Borrowers' cash collateral. As such, this was a critical component of the June 1, 2020 Forbearance Agreement--which Borrowers agreed to almost one full year ago.

Finally, Administrative Agent does not have the visibility or enforcement rights it needs vis-à-vis Borrowers' cash collateral without an executed DACA. Accordingly, the DACA Default continues to constitute a New Event of Default which Administrative Agent has not waived and will no longer forbear on.

Garrett Cazier
May 24, 2021
Page 4

## BORROWERS' FAILURE TO CONSISTENTLY USE THE SERVICES OF ITS ADVISOR

During our conference call with the Advisor, Borrower and Lenders on May, 19, 2021, it was made known to Agent that Advisor was not consistently engaged to work with Borrowers in accordance with the agreed "Scope of Services" between the months of August, 2020 until March, 2021—all in violation of Section VIII(F) of the Forbearance Agreement.    This violation also gives rise to a New Event of Default under Section XII of the Forbearance Agreement.    Moreover, it seems Borrowers' consistent failure to deliver their financial reports on a timely and conforming basis is directly attributable to their violation of this important provision of the Forbearance Agreement.

## RESERVATION OF RIGHTS AND INTENTION TO IMPOSE DEFAULT RATE

Loan Parties are hereby advised that Administrative Agent reserves all of the rights and remedies available to it under the Credit Agreement, the Forbearance Agreement and the other Loan Documents, and at law and/or in equity as a result of the New Events of Default cited in this letter (collectively, the "Ongoing Defaults"), and Administrative Agent reserves the right to begin exercising its rights and remedies without further notice.

Please contact the undersigned at (213) 673-8951 to discuss these matters.


Sincerely,

*Raymond Forgette*

Ray Forgette
Senior Special Assets Officer

cc    Meridian Restaurants Unlimited, LC (Guarantor)
      Loveloud Restaurants, L.C. (Guarantor)
      Bridge Funding Group, Inc. (Lender)
      Brad W. Merrill, Esq. (Counsel to Loan Parties)
      Amy Lerner-Hill, Esq. (City National Bank)
      William B. Freeman, Esq. (Counsel to Administrative Agent)



Ray Forgette | Vice President
| Special Assets

August 11, 2021

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Oregon, UT 84403
Attention: Garrett Cazier
        Chief Financial Officer

Re:    Notice of Defaults under that certain "Credit Agreement" dated as of February 26, 2018 (as amended and/or modified from time to time, the "Credit Agreement"), by and between NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, "Borrowers"); MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors");  City National Bank, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); and the Lenders party thereto.

Dear Mr. Cazier:

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement" dated as of June 1, 2020, by and between Borrowers, Guarantors, Administrative Agent and the Lenders (as amended and/or modified from time to time, the "Forbearance Agreement"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement or in the Forbearance Agreement.

Garrett Cazier
August 11, 2021
Page 2

## THE EXISTING DEFAULTS

By letters dated August 12, 2020, February 19, 2021, May 12, 2021, and May 24, 2021 (collectively, the "Prior Default Letters"), Loan Parties were notified that multiple New Events of Default had occurred and were continuing under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement.  Despite multiple notices, the following New Events of Default cited in certain of the Prior Default Letters (collectively, the "Existing Defaults") still have not been cured and are continuing:

- Borrowers' failure to deliver executed DACAS by no later than October 1, 2020, in violation of Section VIII(E) of the Forbearance Agreement and giving rise to a New Event of Default under Section XII of the Forbearance Agreement (the "DACA Default"); and
- Borrowers' failure to consistently engage Advisor in accordance with the agreed "Scope of Services" between the months of August, 2020 until March, 2021—all in violation of Section VIII(F) of the Forbearance Agreement and giving rise to a New Event of Default under Section XII of the Forbearance Agreement (the "Advisor Default").

The May 12, 2021 letter makes clear that Administrative Agent and the Lenders are unwilling to waive the DACA Default for all of the reasons set forth in that letter.  Likewise, Administrative Agent and the Lenders are unwilling to waive the Advisor Default due to the negative impact on the timeliness and quality of Borrowers' financial reporting and the lack of progress in providing Borrowers with adequate restructuring strategies during the Forbearance Period.

## THE NEW DEFAULTS

In addition to the Existing Defaults, Borrowers' most recent financial reporting (for the Fiscal Quarter ending June 30, 2021) indicates that the following New Events of Default have occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement (collectively the "New Defaults"):

- Borrowers created, incurred and suffered to exist "Indebtedness" in the form of $3,286,448 in "Member draws" (collectively, the "Member Draws") in violation of Section 7.03 of the Credit Agreement;
- Borrowers declared and made, directly or indirectly, "Restricted Payments" in the form of the Member Draws, in violation of Section 7.06 of the Credit Agreement;
- Borrowers failed to maintain Minimum Trailing Twelve Months Consolidated EBITDA of at least $10,325,000 for the Fiscal Quarter ending June 30, 2021, in violation of Section 7.11(f) of the Credit Agreement;

Garrett Cazier
August 11, 2021
Page 3

- Borrowers permitted the Consolidated Pre-Consolidated Fixed Charge Coverage Ratio to be less than 1.10 to 1.00, measured as of the Fiscal Quarter ending June 30, 2021, in violation of Section 7.11(a) of the Credit Agreement;
- Borrowers permitted the Consolidated Post-Distribution Fixed Charge Coverage Ratio to be less than 1.10 to 1.00, measured as of the Fiscal Quarter ending June 30, 2021, in violation of Section 7.11(b) of the Credit Agreement; and
- Borrowers permitted the Current Ratio to be less than 0.50 to 1.00, measured as of the Fiscal Quarter ending June 30, 2021, in violation of Section 7.11(c) of the Credit Agreement;
- Borrowers permitted the Consolidated Lease Adjusted Leverage Ratio to exceed 6.50x, measured as of the Fiscal Quarter ending June 30, 2021, in violation of Section 7.11(d) of the Credit Agreement.

The New Defaults have no cure period and have not been waived by Administrative Agent nor the Lenders.

With respect to Borrowers' violation of the financial covenants contained in Sections 7.11(a), (b), (d) and (f) of the Credit Agreement, Administrative Agent notes that Borrowers' most recent Q2 Compliance Certificate was calculated improperly and is materially misleading due to its inclusion of the legally forgiven PPP Loan as a "non-recurring gain" within the definition of "Consolidated EBITDA". Administrative Agent does not necessarily agree with Borrowers' assertion that GAAP recognizes income of legally forgiven PPP loans, however, *this is irrelevant because non-recurring gains are specifically excluded in the definition of "Consolidated EBITDA" in the Credit Agreement. (See sub-headings b(i) and (ii) in the definition of "Consolidated EBITDA").* Also, note that during the last week of July, Mr. Cazier discussed with Mr. Forgette Borrowers' pending compliance certificate and the necessity of including PPP forgiveness in the calculation to demonstrate compliance, and in response Mr. Forgette cautioned Mr. Cazier that the definition of "Consolidated EBITDA" in the Loan Documents excludes non-recurring gains.

Finally, Administrative Agent is continuing its analysis of other potential discrepancies in Borrowers' Q2 financial statements, and Administrative Agent reserves it right to address any additional issues in the future.

## RESERVATION OF RIGHTS AND IMPOSITION OF DEFAULT RATE

Loan Parties are hereby advised that Administrative Agent reserves all of the rights and remedies available to it under the Credit Agreement, the Forbearance Agreement and the other Loan Documents, and at law and/or in equity as a result of the Existing Defaults and the New Defaults (collectively, the "Ongoing Defaults"), and Administrative Agent reserves the right to begin exercising its rights and remedies without further notice. Administrative

Garrett Cazier
August 11, 2021
Page 4

Agent also reserves all of its rights and remedies as to any other defaults and New Events of Default which may exist presently or arise in the future. Similarly, any delay by Administrative Agent in exercising any or all of its rights, remedies or powers shall not constitute a waiver of the Ongoing Defaults or of Administrative Agent's right to exercise such rights, remedies or powers at a future date.

Loan Parties are hereby notified that as a result of the existence and continuation of the Ongoing Defaults, Administrative Agent has imposed the "Default Rate" (equal to three percent (3%) above the existing interest rates set forth in the Credit Agreement), effective as of August 11, 2021.

**INSPECTION/AUDIT**

In accordance with Section 6.10 of the Credit Agreement and Section VIII(I) of the Forbearance Agreement, Administrative Agent hereby makes a formal request for Borrowers to permit representatives and independent contractors of Administrative Agent to conduct a field examination and collateral audit (collectively, the "Audit") of all Collateral. In connection with said Audit, Administrative Agent's representatives intend to examine Borrowers' books and records, and to discuss same with Borrowers' employees, officers, directors, financial advisors and representatives. We anticipate and expect full cooperation from Borrowers' officers, employees and representatives during the Audit.

Administrative Agent will contact you with the name of its lead representative for the Audit in order to make appropriate arrangements.

**NO WAIVER BY ACCEPTING PAYMENTS**

Loan Parties are further advised that Administrative Agent is willing to continue to accept payments under the Loan Documents and Administrative Agent will continue to apply any such payments against the balance owing under the Loan Documents. Please be advised that Administrative Agent's receipt and application of payments does not constitute a modification or extension of the Credit Agreement, the Forbearance Agreement, the Guaranty or any of the other Loan Documents, nor a waiver of any of Administrative Agent's rights under the Loan Documents. Acceptance by Administrative Agent of any payment does not waive Administrative Agent's rights with regard to the Ongoing Defaults. Any payments which you make to Administrative Agent must be made with this express understanding.

**PROCEDURES FOR ONGOING NEGOTIATIONS**

Finally, to the extent Administrative Agent participates in discussions with Loan Parties with respect to Loan Parties' repayment of the Obligations, you are advised that Administrative

Garrett Cazier
August 11, 2021
Page 5

Agent's participation in said discussions is not intended to constitute a waiver of Administrative Agent's right to immediately exercise its rights and remedies as a result of the Ongoing Defaults. Moreover, any proposals for the restructure or other consensual disposition of the Obligations and the other amounts owing by Loan Parties to Administrative Agent shall not be binding upon Administrative Agent unless and until such proposals are reduced to writing and formally approved by Administrative Agent and the Lenders.

Please contact the undersigned at (213) 673-8951 to discuss these matters.

Sincerely,

*Raymond Forgette*

Ray Forgette
Vice President

cc      Meridian Restaurants Unlimited, LC (Guarantor)
        Loveloud Restaurants, L.C. (Guarantor)
        Bridge Funding Group, Inc. (Lender)
        Brad W. Merrill, Esq. (Counsel to Loan Parties)
        Amy Lerner-Hill, Esq. (City National Bank)
        William B. Freeman, Esq. (Counsel to Administrative Agent)



|  | Ray Forgette | Vice President |
|--|--------------|----------------|
|  |  | Special Assets |

August 25, 2021


NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Oregon, UT 84403
Attention: Garrett Cazier
        Chief Financial Officer


Re:    Notice of Defaults under that certain "Credit Agreement" dated as of February 26, 2018 (as amended and/or modified from time to time, the "Credit Agreement"), by and between NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, "Borrowers"); MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors");  City National Bank, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); and the Lenders party thereto.

Dear Mr. Cazier:

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement" dated as of June 1, 2020, by and between Borrowers, Guarantors, Administrative Agent and the Lenders (as amended and/or modified from time to time, the "Forbearance Agreement"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement or in the Forbearance Agreement.

---

Garrett Cazier
August 25, 2021
Page 2

## THE EXISTING DEFAULTS

By letters dated August 12, 2020, February 19, 2021, May 12, 2021, May 24, 2021, and August 11, 2021 (collectively, the "Prior Default Letters"), Loan Parties were notified that multiple New Events of Default had occurred and were continuing under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement.  Despite multiple notices, several New Events of Default cited in certain of the Prior Default Letters (collectively, the "Existing Defaults") still have not been cured and are continuing.  As a result, the August 21, 2021 letter notified Loan Parties that Administrative Agent has imposed the "Default Rate" (equal to three percent (3%) above the existing interest rates set forth in the Credit Agreement), effective as of August 11, 2021.

## THE NEW DEFAULT

In addition to the Existing Defaults, Loan Parties are hereby notified that another New Event of Default has occurred and is continuing under Section XII of the Forbearance Agreement due to Borrower's failure to pay the $200,000 installment of the Forbearance Fee on or before July 1, 2021, in violation of Section IX(iii) of the Forbearance Agreement (the "New Default").  The New Default also constitutes a
"monetary default" under Section 8.01(a) of the Credit Agreement.

The New Default has no cure period and has not been waived by Administrative Agent nor the Lenders.

## RESERVATION OF RIGHTS

Loan Parties are hereby advised that Administrative Agent reserves all of the rights and remedies available to it under the Credit Agreement, the Forbearance Agreement and the other Loan Documents, and at law and/or in equity as a result of the Existing Defaults and the New Default (collectively, the "Ongoing Defaults"), and Administrative Agent reserves the right to begin exercising its rights and remedies without further notice.   Administrative Agent also reserves all of its rights and remedies as to any other defaults and New Events of Default which may exist presently or arise in the future.  Similarly, any delay by Administrative Agent in exercising any or all of its rights, remedies or powers shall not constitute a waiver of the Ongoing Defaults or of Administrative Agent's right to exercise such rights, remedies or powers at a future date.

## INSPECTION/AUDIT

In accordance with Section 6.10 of the Credit Agreement and Section VIII(I) of the Forbearance Agreement, Administrative Agent hereby reiterates its request for Loan Parties to permit representatives and independent contractors of Administrative Agent to conduct a

Garrett Cazier
August 25, 2021
Page 3

field examination and collateral audit (collectively, the "Audit") of all Collateral.  In
connection with said Audit, Administrative Agent's representatives intend to examine Loan
Parties' books and records, and to discuss same with Loan Parties' employees, officers,
directors, financial advisors and representatives.  We anticipate and expect full cooperation
from Loan Parties' officers, employees and representatives during the Audit.

Administrative Agent will contact you with the name of its lead representative for the Audit
in order to make appropriate arrangements.

**NO WAIVER BY ACCEPTING PAYMENTS**

Loan Parties are further advised that Administrative Agent is willing to continue to accept
payments under the Loan Documents and Administrative Agent will continue to apply any
such payments against the balance owing under the Loan Documents.  Please be advised that
Administrative Agent's receipt and application of payments does not constitute a
modification or extension of the Credit Agreement, the Forbearance Agreement, the
Guaranty or any of the other Loan Documents, nor a waiver of any of Administrative Agent's
rights under the Loan Documents.  Acceptance by Administrative Agent of any payment
does not waive Administrative Agent's rights with regard to the Ongoing Defaults.  Any
payments which you make to Administrative Agent must be made with this express
understanding.

**PROCEDURES FOR ONGOING NEGOTIATIONS**

Finally, to the extent Administrative Agent participates in discussions with Loan Parties with
respect to Loan Parties' repayment of the Obligations, you are advised that Administrative
Agent's participation in said discussions is not intended to constitute a waiver of
Administrative Agent's right to immediately exercise its rights and remedies as a result of the
Ongoing Defaults.  Moreover, any proposals for the restructure or other consensual
disposition of the Obligations and the other amounts owing by Loan Parties to
Administrative Agent shall not be binding upon Administrative Agent unless and until such
proposals are reduced to writing and formally approved by Administrative Agent and the
Lenders.

Please contact the undersigned at (213) 673-8951 if you have any questions regarding
Administrative Agent's position on these matters.

Sincerely,

*Raymond Forgette*

Ray Forgette
Vice President

Member FDIC

Garrett Cazier
August 25, 2021
Page 4


cc      Meridian Restaurants Unlimited, LC (Guarantor)
        Loveloud Restaurants, L.C. (Guarantor)
        Bridge Funding Group, Inc. (Lender)
        Brad W. Merrill, Esq. (Counsel to Loan Parties)
        Amy Lerner-Hill, Esq. (City National Bank)
        William B. Freeman, Esq. (Counsel to Administrative Agent)



Se

| Ray Forgette | Vice President |
|              | Special Assets |

September 16, 2021

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Oregon, UT 84403
Attention: Garrett Cazier
Chief Financial Officer

      Re:    Notice of Defaults under that certain "Credit Agreement" dated as of February 26, 2018 (as amended and/or modified from time to time, the "Credit Agreement"), by and between NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, "Borrowers"); MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"); City National Bank, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); and the Lenders party thereto.

Dear Mr. Cazier:

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement" dated as of June 1, 2020, by and between Borrowers, Guarantors, Administrative Agent and

Garrett Cazier
September 16, 2021
Page 2

the Lenders (as amended and/or modified from time to time, the "<u>Forbearance Agreement</u>").
All capitalized terms not otherwise defined herein have the meanings given for said terms in
the Credit Agreement or in the Forbearance Agreement.

## THE EXISTING DEFAULTS

By letters dated August 12, 2020, February 19, 2021, May 12, 2021, May 24, 2021, August
11, 2021, and August 25, 2021 (collectively, the "<u>Prior Default Letters</u>"), Loan Parties were
notified that multiple New Events of Default had occurred and were continuing under
Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement.
Despite multiple notices, several New Events of Default cited in the Prior Default Letters
(collectively, the "<u>Existing Defaults</u>") still have not been cured and are continuing.  As a
result, the August 21, 2021 default letter notified Loan Parties that Administrative Agent had
imposed the "Default Rate" (equal to three percent (3%) above the existing interest rates set
forth in the Credit Agreement), effective as of August 11, 2021.

## THE NEW DEFAULT

In addition to the Existing Defaults, Loan Parties are hereby notified that another New Event
of Default has occurred and is continuing under Section XII of the Forbearance Agreement
and Section 8.01(a)(ii) of the Credit Agreement (the "<u>New Default</u>") due to Borrower's
failure to pay $84,553.14 in interest at the Default Rate (collectively, the "<u>Default Interest</u>")
by no later than September 5, 2021--three (3) Business Days after the Default Interest
became due and payable on September 1, 2021.

The New Default constitutes a "monetary default" under Section 8.01(a)(ii) of the Credit
Agreement, which has no cure period and has not been waived by Administrative Agent nor
the Lenders.

## RESERVATION OF RIGHTS

Loan Parties are hereby advised that Administrative Agent reserves all of the rights and
remedies available to it under the Credit Agreement, the Forbearance Agreement and the
other Loan Documents, and at law and/or in equity as a result of the Existing Defaults and
the New Default (collectively, the "<u>Ongoing Defaults</u>"), and Administrative Agent reserves
the right to begin exercising its rights and remedies without further notice.  Administrative
Agent also reserves all of its rights and remedies as to any other defaults and New Events of
Default which may exist presently or arise in the future.  Similarly, any delay by
Administrative Agent in exercising any or all of its rights, remedies or powers shall not
constitute a waiver of the Ongoing Defaults or of Administrative Agent's right to exercise
such rights, remedies or powers at a future date.

Garrett Cazier
September 16, 2021
Page 3

In accordance with Section 8.02(b) of the Credit Agreement, Administrative Agent's remedies specifically include, but are not limited to, the right to declare the unpaid principal amount of all outstanding Loans, together with all accrued interest and other amounts owed, to be immediately due and payable in full without presentment, demand, protest or other notice of any kind. Administrative Agent specifically reserves the right to exercise this acceleration remedy without further notice to Loan Parties.

## NO WAIVER BY ACCEPTING PAYMENTS

Loan Parties are further advised that Administrative Agent is willing to continue to accept payments under the Loan Documents and Administrative Agent will continue to apply any such payments against the balance owing under the Loan Documents. Please be advised that Administrative Agent's receipt and application of payments does not constitute a modification or extension of the Credit Agreement, the Forbearance Agreement, the Guaranty or any of the other Loan Documents, nor a waiver of any of Administrative Agent's rights under the Loan Documents. Acceptance by Administrative Agent of any payment does not waive Administrative Agent's rights with regard to the Ongoing Defaults. Any payments which you make to Administrative Agent must be made with this express understanding.

## PROCEDURES FOR ONGOING NEGOTIATIONS

Finally, to the extent Administrative Agent participates in discussions with Loan Parties with respect to Loan Parties' repayment of the Obligations, you are advised that Administrative Agent's participation in said discussions is not intended to constitute a waiver of Administrative Agent's right to immediately exercise its rights and remedies as a result of the Ongoing Defaults. Moreover, any proposals for the restructure or other consensual disposition of the Obligations and the other amounts owing by Loan Parties to Administrative Agent shall not be binding upon Administrative Agent unless and until such proposals are reduced to writing and formally approved by Administrative Agent and the Lenders.

Please contact the undersigned at (213) 673-8951 if you have any questions regarding Administrative Agent's position on these matters.

Sincerely,

*Raymond Forgette*

Ray Forgette
Sr. Special Assets Officer
City National Bank

Garrett Cazier
September 16, 2021
Page 4


cc      Meridian Restaurants Unlimited, LC (Guarantor)
        Loveloud Restaurants, L.C. (Guarantor)
        Brad W. Merrill, Esq. (Counsel to Loan Parties)
        Barry Beldin (Bridge Funding Group, Inc.)
        Shaan Chima, Esq. (Bridge Funding Group, Inc.)
        Amy Lerner-Hill, Esq. (City National Bank)
        William B. Freeman, Esq. (Counsel to Administrative Agent)



Ray Forgette | Vice President
            | Special Assets

November 10, 2021

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Oregon, UT 84403
Attention: Garrett Cazier
Chief Financial Officer

       Re:    Notice of Defaults under that certain "Credit Agreement" dated as of February 26, 2018 (as amended and/or modified from time to time, the "Credit Agreement"), by and between NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, "Borrowers"); MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"); City National Bank, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); and the Lenders party thereto.

Dear Mr. Cazier:

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement" dated as of June 1, 2020, by and between Borrowers, Guarantors, Administrative Agent and the Lenders (as amended and/or modified from time to time, the "<u>Forbearance Agreement</u>"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement or in the Forbearance Agreement.

**<u>THE EXISTING DEFAULTS</u>**

---

Garrett Cazier
November 10, 2021
Page 2

By letters dated August 12, 2020, February 19, 2021, May 12, 2021, May 24, 2021, August 11, 2021, August 25, 2021, and September 16, 2021 (collectively, the "Prior Default Letters"), Loan Parties were notified that multiple New Events of Default had occurred and were continuing under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement. Despite multiple notices, several New Events of Default cited in the Prior Default Letters (collectively, the "Existing Defaults") still have not been cured and are continuing. As a result, the August 21, 2021 default letter notified Loan Parties that Administrative Agent had imposed the "Default Rate" (equal to three percent (3%) above the existing interest rates set forth in the Credit Agreement), effective as of August 11, 2021.

The Default Rate continues to accrue on all indebtedness and obligations owed by Loan Parties under the Credit Agreement.

## THE NEW DEFAULTS

In addition to the Existing Defaults, Loan Parties are hereby notified that the following New Events of Default have occurred and are continuing under Section XII of the Forbearance Agreement and Sections 8.01(a) and (c) of the Credit Agreement (collectively, the "New Defaults") as a result of the following:

- Borrower violated Section 8.01(a)(i) of the Credit Agreement and Section XII of the Forbearance Agreement, by failing to pay the following principal payments on the Loans by November 1, 2021: (i) $309,617.61 on Note No. 39851; (ii) $120,286.09 on Note No. 39856; (iii) $10,021.22 on Note No. 39861; and (iv) $30,402.42 on Note. No. 42245. Borrowers instead paid these amounts on November 9, 2021.

- Borrower violated Section 8.01(a)(ii) of the Credit Agreement and Section XII of the Forbearance Agreement, by failing to pay interest at the Default Rate on the following Loans by no later than November 4, 2021--three (3) Business Days after interest at the Default Rate became due and payable on November 1, 2021: (i) $201,352.54 on Note No. 39851; (ii) $92,274.81 on Note No. 39856; (iii) $8,817.82 on Note No. 39861; and (iv) $24,596.75 on Note. No. 42245.

- Borrowers failed to maintain Minimum Trailing Twelve Months Consolidated EBITDA of at least $11,235,000 for the Fiscal Quarter ending September 30, 2021, in violation of Section 7.11(f) of the Credit Agreement.

- Borrowers permitted the Consolidated Pre-Compensation Fixed Charge Coverage Ratio to be less than 1.10 to 1.00, measured as of the Fiscal Quarter

Garrett Cazier
November 10, 2021
Page 3

ending September 30, 2021, in violation of Section 7.11(a) of the Credit
Agreement.

• Borrowers permitted the Consolidated Post-Distribution Fixed Charge
Coverage Ratio to be less than 1.10 to 1.00, measured as of the Fiscal Quarter
ending September 30, 2021, in violation of Section 7.11(b) of the Credit
Agreement.

• Borrowers permitted the Current Ratio to be less than 0.50 to 1.00, measured
as of the Fiscal Quarter ending September 30, 2021, in violation of Section
7.11(c) of the Credit Agreement.

• Borrowers permitted the Consolidated Lease Adjusted Leverage Ratio to
exceed 6.25x, measured as of the Fiscal Quarter ending September 30, 2021,
in violation of Section 7.11(d) of the Credit Agreement.

The New Defaults have no cure period and have not been waived by Administrative Agent
nor the Lenders.

**BORROWERS ARE CONTINUING TO SUBMIT IMPROPER AND
MISLEADING FINANCIAL INFORMATION TO ADMINISTRATIVE
AGENT**

With respect to Borrowers' violation of the financial covenants contained in Sections 7.11(a),
(b), (c), (d) and (f) of the Credit Agreement, Administrative Agent notes that Borrowers'
most recent Q3 Compliance Certificate was calculated improperly and is materially
misleading for multiple reasons including, but not limited to, the following: (i) Borrowers did
not calculate the "Current Ratio" required by Section 7.11(c) of the Credit Agreement;
however, Borrowers' balance sheet makes clear that Borrowers are in violation of this
financial covenant; (ii) Borrowers included "legally forgiven PPP Loan" as "net income" in
the Compliance Certificate. As previously noted by Administrative Agent to Borrowers, this
is not acceptable to Administrative Agent; (iii) Borrowers improperly included "Covid
Related Losses" as a non-recurring expense which was added back to EBITDA. Once again,
Administrative Agent is unwilling to accept this as an addback. As a result, removal of this
item leads to Borrowers' violation of the EBITDA-based covenants *even if* Borrowers were
permitted to include PPP forgiveness in the calculation; (iv) In a similar vein, Borrowers
have improperly added back several improper forms of expenses without Administrative
Agent's consent; and (v) Borrowers are incorrectly calculating the ratios in their financial
covenants. Borrowers should be using the same interest expense in both the numerator and
denominator of the ratios. Instead, Borrowers are using only actual paid in cash interest, and
ignoring accrued unpaid interest, in the denominator—as a result, Borrowers are effectively

Garrett Cazier
November 10, 2021
Page 4

adding back a larger number in the top than they are using in the denominator--thereby inflating the result.

Finally, Administrative Agent is continuing its analysis of other potential discrepancies in Borrowers' Q3 financial statements, and Administrative Agent reserves it right to address any additional issues in the future.  In the meantime, Borrowers' misleading financial submissions continues to underscore Borrowers' ongoing lack of financial credibility with the Lenders.

## DEMAND FOR IMMEDIATE AUDIT AND INSPECTION

In accordance with the Prior Default Letters, Section 6.10 of the Credit Agreement and Section VIII(I) of the Forbearance Agreement, Administrative Agent hereby makes formal demand for Loan Parties full cooperation in connection with an enterprise valuation, field examination, inspection and audit (collectively, the "Audit") to be conducted by Administrative Agent's representatives in November, 2021.

The Audit will include, but will not be limited to: (i) visitation of Loan Parties' properties; (ii) inspection and copying of Loan Parties' corporate, financial and operating records; and (ii) discussion of Loan Parties' affairs, financials and accounts with Loan Parties' directors, officers, independent public accountants and the Advisor.

Administrative Agent anticipates and expects Loan Parties' full cooperation with all reasonable requests of Administrative Agent's representatives in connection with the Audit, and that Loan Parties will promptly reimburse Administrative Agent for all invoiced costs and expenses incurred in connection with the Audit.

## RESERVATION OF RIGHTS

Loan Parties are hereby advised that Administrative Agent reserves all of the rights and remedies available to it under the Credit Agreement, the Forbearance Agreement and the other Loan Documents, and at law and/or in equity as a result of the Existing Defaults and the New Defaults (collectively, the "Ongoing Defaults"), and Administrative Agent reserves the right to begin exercising its rights and remedies without further notice.   Administrative Agent also reserves all of its rights and remedies as to any other defaults and New Events of Default which may exist presently or arise in the future.   Similarly, any delay by Administrative Agent in exercising any or all of its rights, remedies or powers shall not constitute a waiver of the Ongoing Defaults or of Administrative Agent's right to exercise such rights, remedies or powers at a future date.

Garrett Cazier
November 10, 2021
Page 5

In accordance with Section 8.02(b) of the Credit Agreement, Administrative Agent's remedies specifically include, but are not limited to, the right to declare the unpaid principal amount of all outstanding Loans, together with all accrued interest and other amounts owed, to be immediately due and payable in full without presentment, demand, protest or other notice of any kind.  Administrative Agent specifically reserves the right to exercise this acceleration remedy without further notice to Loan Parties.

**NO WAIVER BY ACCEPTING PAYMENTS**

Loan Parties are advised that Administrative Agent's receipt and application of any payments received from Borrowers does not constitute a waiver or forbearance of the Ongoing Defaults, nor a modification or extension of the Credit Agreement, the Forbearance Agreement, the Guaranty or any of the other Loan Documents.  Any further payments which you make to Administrative Agent must be made with this express understanding.

**PROCEDURES FOR ONGOING NEGOTIATIONS**

Finally, to the extent Administrative Agent participates in discussions with Loan Parties with respect to Loan Parties' repayment of the Obligations, you are advised that Administrative Agent's participation in said discussions is not intended to constitute a waiver of Administrative Agent's right to immediately exercise its rights and remedies as a result of the Ongoing Defaults.  Moreover, any proposals for the restructure or other consensual disposition of the Obligations and the other amounts owing by Loan Parties to Administrative Agent shall not be binding upon Administrative Agent unless and until such proposals are reduced to writing <u>and</u> formally approved by Administrative Agent and the Lenders.

Please contact the undersigned at (213) 673-8951 if you have any questions regarding Administrative Agent's position on these matters.

Sincerely,

*Raymond Forgette*

Ray Forgette
Sr. Special Assets Officer
City National Bank

cc    Meridian Restaurants Unlimited, LC (Guarantor)
      Loveloud Restaurants, L.C. (Guarantor)
      Brad W. Merrill, Esq. (Counsel to Loan Parties)

Member FDIC

Garrett Cazier
November 10, 2021
Page 6

    Barry Beldin (Bridge Funding Group, Inc.)
    Shaan Chima, Esq. (Bridge Funding Group, Inc.)
    Amy Lerner-Hill, Esq. (City National Bank)
    William B. Freeman, Esq. (Counsel to Administrative Agent)



|  | Ray Forgette | Vice President |
|  |  | Special Assets |

February 16, 2022

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Oregon, UT 84403
Attention: Garrett Cazier
Chief Financial Officer

> Re:    Notice of Defaults under that certain "Credit Agreement" dated as of
> February 26, 2018 (as amended and/or modified from time to time, the
> "Credit Agreement"), by and between NKS RESTAURANTS, L.C., a
> Utah limited liability company; HR RESTAURANTS, L.C., a Utah
> limited liability company; MR RESTAURANTS, L.C., a Utah limited
> liability company; C UTAH, L.C., a Utah limited liability company;
> AZM RESTAURANTS, L.C., a Utah limited liability company; and
> NDM RESTAURANTS, L.C., a Utah limited liability company
> (collectively, "Borrowers"); MERIDIAN RESTAURANTS
> UNLIMITED, LC, a Utah limited liability company; and LOVELOUD
> RESTAURANTS, L.C., a Utah limited liability company (collectively,
> "Guarantors"); City National Bank, a national banking association, as
> Administrative Agent for the Lenders ("Administrative Agent"); and
> the Lenders party thereto.

Dear Mr. Cazier:

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement"
dated as of June 1, 2020, by and between Borrowers, Guarantors, Administrative Agent and
the Lenders (as amended and/or modified from time to time, the "Forbearance Agreement").
All capitalized terms not otherwise defined herein have the meanings given for said terms in
the Credit Agreement or in the Forbearance Agreement.

Garrett Cazier
February 16, 2022
Page 2

## THE EXISTING DEFAULTS

By letters dated August 12, 2020, February 19, 2021, May 12, 2021, May 24, 2021, August 11, 2021, August 25, 2021, September 16, 2021, and November 10, 2021 (collectively, the "Prior Default Letters"), Loan Parties were notified that multiple New Events of Default had occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement.  Despite multiple notices, several New Events of Default cited in the Prior Default Letters (collectively, the "Existing Defaults") still have not been cured and are continuing.  As a result, the August 21, 2021 default letter notified Loan Parties that Administrative Agent had imposed the "Default Rate" (equal to three percent (3%) above the existing interest rates set forth in the Credit Agreement), effective as of August 11, 2021.

The Default Rate continues to accrue on all indebtedness and obligations owed by Loan Parties under the Credit Agreement.

## THE NEW DEFAULTS

In addition to the Existing Defaults, Loan Parties are hereby notified that the following New Events of Default have occurred and are continuing under Section XII of the Forbearance Agreement and Sections 8.01(a) and (c) of the Credit Agreement (collectively, the "New Defaults") as a result of the following:

A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(i) of the Credit Agreement due to Borrowers' failure to pay principal payments on the Loans for the months of November, 2021, December, 2021, January, 2022, and February, 2022.

A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement due to Borrowers' failure to pay interest at the Default Rate for the months of September, 2021, October 2021, November, 2021, December, 2021, January, 2022, and February, 2022.

A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a) of the Credit Agreement due to Borrowers' failure to pay the $200,000 installment of the Forbearance Fee on or before July 1, 2021, in violation of Section IX(iii) of the Forbearance Agreement.

A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to the expiration of the following Leases, in violation of Section 7.13(b) of the Credit Agreement:

Garrett Cazier
February 16, 2022
Page 3


8655 - Wellsville
9661 - Tremonton
10570 - Logan II
12156 - East Fergus
3496 - So. Alexandria
12389 - Long Prairie
11534 - Redwood Falls
12473 - Columbia Falls
6677 - 17th St.
7906 - York, NE
13029 - O St.
10678 - Montevideo

The New Defaults have no cure period and have not been waived by Administrative Agent
nor the Lenders.

## RESERVATION OF RIGHTS

Loan Parties are hereby advised that Administrative Agent reserves all of the rights and
remedies available to it under the Credit Agreement, the Forbearance Agreement and the
other Loan Documents, and at law and/or in equity as a result of the Existing Defaults and
the New Defaults (collectively, the "Ongoing Defaults"), and Administrative Agent reserves
the right to begin exercising its rights and remedies without further notice.  In accordance
with Section 8.02(b) of the Credit Agreement, Administrative Agent's remedies specifically
include, but are not limited to, the right to declare the unpaid principal amount of all
outstanding Loans, together with all accrued interest and other amounts owed, to be
immediately due and payable in full without presentment, demand, protest or other notice of
any kind.  Administrative Agent specifically reserves the right to exercise this acceleration
remedy without further notice to Loan Parties, as well as all other rights and remedies
contained in the Loan Agreement, the Forbearance Agreement and the other Loan
Documents.

Administrative Agent also reserves all of its rights and remedies as to any other defaults and
New Events of Default which may exist presently or arise in the future.  Similarly, any delay
by Administrative Agent in exercising any or all of its rights, remedies or powers shall not
constitute a waiver of the Ongoing Defaults or of Administrative Agent's right to exercise
such rights, remedies or powers at a future date.   In particular, Administrative Agent and the
Lenders are presently reviewing the financial reports submitted by Borrowers in January,
2022, in order to ascertain Borrowers' compliance with all financial covenants contained in
Article VII of the Credit Agreement.  Administrative Agent specifically reserves the right to

Garrett Cazier
February 16, 2022
Page 4

declare additional New Events of Default arising from Administrative Agent's review of
Borrowers' recent financial reporting.

**NO WAIVER BY ACCEPTING PAYMENTS**

Loan Parties are advised that Administrative Agent's receipt and application of any payments
received from Borrowers does not constitute a waiver or forbearance of the Ongoing
Defaults, nor a modification or extension of the Credit Agreement, the Forbearance
Agreement, the Guaranty or any of the other Loan Documents. Any further payments which
you make to Administrative Agent must be made with this express understanding.

**PROCEDURES FOR ONGOING NEGOTIATIONS**

Finally, to the extent Administrative Agent participates in discussions with Loan Parties with
respect to Loan Parties' repayment of the Obligations, you are advised that Administrative
Agent's participation in said discussions is not intended to constitute a waiver of
Administrative Agent's right to immediately exercise its rights and remedies as a result of the
Ongoing Defaults. Moreover, any proposals for the restructure or other consensual
disposition of the Obligations and the other amounts owing by Loan Parties to
Administrative Agent shall not be binding upon Administrative Agent unless and until such
proposals are reduced to writing and formally approved by Administrative Agent and the
Lenders.

Please contact the undersigned at (213) 673-8951 if you have any questions regarding
Administrative Agent's position on these matters.

Sincerely,

*Raymond Forgette*

Ray Forgette
Sr. Special Assets Officer
City National Bank

cc    Meridian Restaurants Unlimited, LC (Guarantor)
      Loveloud Restaurants, L.C. (Guarantor)
      Brad W. Merrill, Esq. (Counsel to Loan Parties)
      Barry Beldin (Bridge Funding Group, Inc.)
      Shaan Chima, Esq. (Bridge Funding Group, Inc.)
      Amy Lerner-Hill, Esq. (City National Bank)
      William B. Freeman, Esq. (Counsel to Administrative Agent)



Ray Forgette | Vice President<br>Special Assets

March 25, 2022

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Oregon, UT 84403
Attention: Garrett Cazier
Chief Financial Officer

Re:     Notice of Defaults under that certain "Credit Agreement" dated as of February 26, 2018 (as amended and/or modified from time to time, the "Credit Agreement"), by and between NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, "Borrowers"); MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"); City National Bank, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); and the Lenders party thereto.

Dear Mr. Cazier:

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement" dated as of June 1, 2020, by and between Borrowers, Guarantors, Administrative Agent and the Lenders; as modified by that certain  (as amended and/or modified from time to time, the "Forbearance Agreement").  All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement or in the Forbearance Agreement.

Garrett Cazier
March 25, 2022
Page 2

**THE EXISTING DEFAULTS**

By letters dated August 12, 2020, February 19, 2021, May 12, 2021, May 24, 2021, August 11, 2021, August 25, 2021, September 16, 2021, November 10, 2021, and February 16, 2022 (collectively, the "Prior Default Letters"), Loan Parties were notified that multiple New Events of Default had occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement.  Despite multiple notices, several New Events of Default cited in the Prior Default Letters (collectively, the "Existing Defaults") still have not been cured and are continuing.  As a result, the August 21, 2021 default letter notified Loan Parties that Administrative Agent had imposed the "Default Rate" (equal to three percent (3%) above the existing interest rates set forth in the Credit Agreement), effective as of August 11, 2021.  The Default Rate continues to accrue on all indebtedness and obligations owed by Loan Parties under the Credit Agreement.

**EXPIRATION OF THE FORBEARANCE PERIOD**

The Forbearance Agreement was amended by that certain "Amendment To Forbearance Agreement" dated as of August 17, 2020, and most recently by that certain "Second Amendment To Forbearance Agreement" dated as of January 20, 2022 (the "Second Amendment").  In accordance with the Second Amendment, Administrative Agent and the Lenders agreed, inter alia, to forbear from exercising any rights or remedies as to the Existing Defaults throughout the "Forbearance Period" (as defined in the Second Amendment).  The Second Amendment also defers all January, 2022 and February, 2022 principal payments otherwise due on the Loans—as well as all  "Default Interest" accruing during these months—until the Maturity Date of the Loans.

The "Forbearance Period" set forth in the Second Amendment expired by its own terms on February 28, 2022, however, the Existing Defaults remain uncured and continuing.

**THE NEW DEFAULTS**

In addition to the Existing Defaults, Loan Parties are hereby notified that the following New Events of Default have occurred and are continuing under Section XII of the Forbearance Agreement and Sections 8.01(a) and (c) of the Credit Agreement (collectively, the "New Defaults") as a result of the following:

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(i) of the Credit Agreement due to Borrowers' failure to pay principal payments on the Loans for the month of March, 2022.


- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a) of the Credit Agreement due to Borrowers' failure to pay the $50,000.00 installment of the Forbearance Fee due on or before March 1, 2022, in violation of Section VII of the Second Amendment.


- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' failure to maintain Minimum Trailing Twelve Months Consolidated EBITDA of at least $11,380.00 for the Fiscal Quarter ending December 31, 2021, in violation of Section 7.11(f) of the Credit Agreement.


- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Consolidated Pre- Compensation Fixed Charge Coverage Ratio to be less than 1.10 to 1.00, measured as of the Fiscal Quarter ending December 31, 2021, in violation of Section 7.11(a) of the Credit Agreement.

Garrett Cazier
March 25, 2022
Page 3

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Consolidated Post- Distribution Fixed Charge Coverage Ratio to be less than 1.10 to 1.00, measured as of the Fiscal Quarter ending dated December 31, 2021, in violation of Section 7.11(b) of the Credit Agreement.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Current Ratio to be less than 0.50 to 1.00, measured as of the Fiscal Quarter ending December 31, 2021, in violation of Section 7.11(c) of the Credit Agreement.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Consolidated Lease Adjusted Leverage Ratio to exceed 6.25x, measured as of the Fiscal Quarter ending December 31, 2021, in violation of Section 7.11(d) of the Credit Agreement.

The New Defaults have no cure period and have not been waived by Administrative Agent nor the Lenders.

**RESERVATION OF RIGHTS**

Loan Parties are hereby advised that Administrative Agent reserves all of the rights and remedies available to it under the Credit Agreement, the Forbearance Agreement and the other Loan Documents, and at law and/or in equity as a result of the Existing Defaults and the New Defaults (collectively, the "Ongoing Defaults"), and Administrative Agent reserves the right to begin exercising its rights and remedies without further notice. In accordance with Section 8.02(b) of the Credit Agreement, Administrative Agent's remedies specifically include, but are not limited to, the right to declare the unpaid principal amount of all outstanding Loans, together with all accrued interest and other amounts owed, to be immediately due and payable in full without presentment, demand, protest or other notice of any kind. Administrative Agent specifically reserves the right to exercise this acceleration remedy without further notice to Loan Parties, as well as all other rights and remedies contained in the Loan Agreement, the Forbearance Agreement and the other Loan Documents.

Administrative Agent also reserves all of its rights and remedies as to any other defaults and New Events of Default which may exist presently or arise in the future. Similarly, any delay by Administrative Agent in exercising any or all of its rights, remedies or powers shall not constitute a waiver of the Ongoing Defaults or of Administrative Agent's right to exercise such rights, remedies or powers at a future date.

**NO WAIVER BY ACCEPTING PAYMENTS**

Loan Parties are advised that Administrative Agent's receipt and application of any payments received from Borrowers does not constitute a waiver or forbearance of the Ongoing Defaults, nor a modification or extension of the Credit Agreement, the Forbearance Agreement, the Guaranty or any of the other Loan Documents. Any further payments which you make to Administrative Agent must be made with this express understanding.

**PROCEDURES FOR ONGOING NEGOTIATIONS**

Finally, to the extent Administrative Agent participates in discussions with Loan Parties with respect to Loan Parties' repayment of the Obligations, you are advised that Administrative Agent's participation in said discussions is not intended to constitute a waiver of Administrative Agent's right to immediately exercise its rights and remedies as a result of the Ongoing Defaults. Moreover, any proposals for the restructure or other consensual disposition of the Obligations and the other amounts owing by Loan Parties to Administrative Agent

Garrett Cazier
March 25, 2022
Page 4

shall not be binding upon Administrative Agent unless and until such proposals are reduced to writing <u>and</u> formally approved by Administrative Agent and the Lenders.

Please contact the undersigned at (213) 673-8951 if you have any questions regarding Administrative Agent's position on these matters.

Sincerely,

*Raymond Forgette*

Ray Forgette
Sr. Special Assets Officer
City National Bank

cc      Meridian Restaurants Unlimited, LC (Guarantor), by overnight delivery and electronic mail
        Loveloud Restaurants, L.C. (Guarantor), by overnight delivery and electronic mail
        Brad W. Merrill, Esq. (Counsel to Loan Parties), by overnight delivery and electronic mail
        Barry Beldin (Bridge Funding Group, Inc.), by electronic mail
        Jackie Garuz (Bridge Funding Group, Inc.), by electronic mail
        Shaan Chima, Esq. (Bridge Funding Group, Inc.), by electronic mail
        Meagen E. Leary, Esq, (Counsel to Bridge Funding Group, Inc.), by electronic mail
        Amy Lerner-Hill, Esq. (City National Bank), by electronic mail
        William B. Freeman, Esq. (Counsel to Administrative Agent), by electronic mail



<table>
<tr><td>Ray Forgette</td><td>Vice President<br>Special Assets</td></tr>
</table>

April 22, 2022

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Oregon, UT 84403
Attention: Jed Jones
Chief Financial Officer

        Re:    Notice of Defaults under that certain "Credit Agreement" dated as of February 26, 2018 (as amended and/or modified from time to time, the "Credit Agreement"), by and between NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, "Borrowers"); MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors");  City National Bank, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); and the Lenders party thereto.

Dear Mr. Jones:

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement" dated as of June 1, 2020, by and between Borrowers, Guarantors, Administrative Agent and the Lenders; as modified by that certain  (as amended and/or modified from time to time, the "Forbearance Agreement").  All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement or in the Forbearance Agreement.

Jed Jones
April 22, 2022
Page 2

**THE EXISTING DEFAULTS**

By letters dated August 12, 2020, February 19, 2021, May 12, 2021, May 24, 2021, August 11, 2021, August 25, 2021, September 16, 2021, November 10, 2021, February 16, 2022, and March 25, 2022 (collectively, the "Prior Default Letters"), Loan Parties were notified that multiple New Events of Default had occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement.  Despite multiple notices, several New Events of Default cited in the Prior Default Letters (collectively, the "Existing Defaults") still have not been cured and are continuing.  As a result, the August 21, 2021 default letter notified Loan Parties that Administrative Agent had imposed the "Default Rate" (equal to three percent (3%) above the existing interest rates set forth in the Credit Agreement), effective as of August 11, 2021.  The Default Rate continues to accrue on all indebtedness and obligations owed by Loan Parties under the Credit Agreement.

Moreover, the Forbearance Agreement expired by its own terms on February 28, 2022, however, the Existing Defaults remain uncured and continuing.

**THE NEW DEFAULTS**

In addition to the Existing Defaults, Loan Parties are hereby notified that the following New Events of Default have occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01(a) of the Credit Agreement (collectively, the "New Defaults") as a result of the following:

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(i) of the Credit Agreement due to Borrowers' failure to pay principal payments on the Loans for the month of April, 2022.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement due to Borrowers' failure to pay interest at the Default Rate for the month of April, 2022.

The New Defaults have no cure period and have not been waived by Administrative Agent nor the Lenders.

**RESERVATION OF RIGHTS**

Loan Parties are hereby advised that Administrative Agent reserves all of the rights and remedies available to it under the Credit Agreement, the Forbearance Agreement and the

Jed Jones
April 22, 2022
Page 3

other Loan Documents, and at law and/or in equity as a result of the Existing Defaults and the New Defaults (collectively, the "Ongoing Defaults"), and Administrative Agent reserves the right to begin exercising its rights and remedies without further notice. In accordance with Section 8.02(b) of the Credit Agreement, Administrative Agent's remedies specifically include, but are not limited to, the right to declare the unpaid principal amount of all outstanding Loans, together with all accrued interest and other amounts owed, to be immediately due and payable in full without presentment, demand, protest or other notice of any kind. Administrative Agent specifically reserves the right to exercise this acceleration remedy without further notice to Loan Parties, as well as all other rights and remedies contained in the Loan Agreement, the Forbearance Agreement and the other Loan Documents.

Administrative Agent also reserves all of its rights and remedies as to any other defaults and New Events of Default which may exist presently or arise in the future. Similarly, any delay by Administrative Agent in exercising any or all of its rights, remedies or powers shall not constitute a waiver of the Ongoing Defaults or of Administrative Agent's right to exercise such rights, remedies or powers at a future date

## NO WAIVER BY ACCEPTING PAYMENTS

Loan Parties are advised that Administrative Agent's receipt and application of any payments received from Borrowers does not constitute a waiver or forbearance of the Ongoing Defaults, nor a modification or extension of the Credit Agreement, the Forbearance Agreement, the Guaranty or any of the other Loan Documents. Any further payments which you make to Administrative Agent must be made with this express understanding.

## PROCEDURES FOR ONGOING NEGOTIATIONS

Finally, to the extent Administrative Agent participates in discussions with Loan Parties with respect to Loan Parties' repayment of the Obligations, you are advised that Administrative Agent's participation in said discussions is not intended to constitute a waiver of Administrative Agent's right to immediately exercise its rights and remedies as a result of the Ongoing Defaults. Moreover, any proposals for the restructure or other consensual disposition of the Obligations and the other amounts owing by Loan Parties to Administrative Agent shall not be binding upon Administrative Agent unless and until such proposals are reduced to writing and formally approved by Administrative Agent and the Lenders.

Member FDIC

Jed Jones
April 22, 2022
Page 4

Please contact the undersigned at (213) 673-8951 if you have any questions regarding Administrative Agent's position on these matters.

Sincerely,

*Raymond Forgette*

Ray Forgette
Sr. Special Assets Officer
City National Bank

cc      Meridian Restaurants Unlimited, LC (Guarantor), by overnight delivery and electronic mail
        Loveloud Restaurants, L.C. (Guarantor), by overnight delivery and electronic mail
        Brad W. Merrill, Esq. (Counsel to Loan Parties), by overnight delivery and electronic mail
        Barry Beldin (Bridge Funding Group, Inc.), by electronic mail
        Jackie Garuz (Bridge Funding Group, Inc.), by electronic mail
        Shaan Chima, Esq. (Bridge Funding Group, Inc.), by electronic mail
        Meagen E. Leary, Esq, (Counsel to Bridge Funding Group, Inc.), by electronic mail
        Amy Lerner-Hill, Esq. (City National Bank), by electronic mail
        William B. Freeman, Esq. (Counsel to Administrative Agent), by electronic mail



**CITY NATIONAL BANK**

AN RBC COMPANY

Ray Forgette │ Vice President
              │ Special Assets

June 16, 2022

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Oregon, UT 84403
Attention: Jed Jones
Chief Financial Officer

      Re:    Notice of Defaults under that certain "Credit Agreement" dated as of
February 26, 2018 (as amended and/or modified from time to time, the
"Credit Agreement"), by and between NKS RESTAURANTS, L.C., a
Utah limited liability company; HR RESTAURANTS, L.C., a Utah
limited liability company; MR RESTAURANTS, L.C., a Utah limited
liability company; C UTAH, L.C., a Utah limited liability company;
AZM RESTAURANTS, L.C., a Utah limited liability company; and
NDM RESTAURANTS, L.C., a Utah limited liability company
(collectively, "Borrowers"); MERIDIAN RESTAURANTS
UNLIMITED, LC, a Utah limited liability company; and LOVELOUD
RESTAURANTS, L.C., a Utah limited liability company (collectively,
"Guarantors"); City National Bank, a national banking association, as
Administrative Agent for the Lenders ("Administrative Agent"); and
the Lenders party thereto.

Dear Mr. Jones:

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement"
dated as of June 1, 2020, by and between Borrowers, Guarantors, Administrative Agent and
the Lenders (as amended and/or modified from time to time, the "Forbearance Agreement").

Jed Jones
June 16, 2022
Page 2

All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement or in the Forbearance Agreement.

## THE ONGOING DEFAULTS

By letters dated August 12, 2020, February 19, 2021, May 12, 2021, May 24, 2021, August 11, 2021, August 25, 2021, September 16, 2021, November 10, 2021, February 16, 2022, March 25, 2022, and April 21, 2022 (collectively, the "Default Letters"), Loan Parties were notified that multiple Events of Default had occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01 of the Credit Agreement (collectively, the "Ongoing Defaults"). A list of the Ongoing Defaults is attached hereto as Exhibit "A".

Despite multiple notices, the Ongoing Defaults still have not been cured and are continuing. Moreover, the Forbearance Agreement expired by its own terms on February 28, 2022.

## DEMAND FOR PAYMENT OF PAST-DUE MONETARY OBLIGATIONS

As a result of the occurrence and continuation of the Ongoing Defaults, Administrative Agent hereby makes formal demand upon each of Loan Parties to immediately pay all past-due principal, default interest, forbearance fees and costs of collection owing to Administrative Agent and the Lenders under the Credit Agreement (collectively, the "Past-Due Obligations") within ten (10) calendar days of the date of this letter.

As of the date of this letter, the Past-Due Obligations consist of the following:

- Past-Due Principal on all Loans:       $1,523,655.42
- Past-Due Default Interest on all Loans:    $ 684,905.54
- Unpaid Fees & Costs of Administrative
  Agent's financial consultant:       $ 101,131.17
- Unpaid Fees & Costs of Administrative
  Agent's legal counsel:       $ 245,528.15

**Loan Parties are further notified that if Administrative Agent does not receive payment of the full amount of all Past-Due Obligations within ten (10) calendar days of the date of this letter, Administrative Agent intends to exercise additional rights and remedies under the Credit Agreement, the Forbearance Agreement and the other Loan Documents, without further notice.**

## CONTINUED RESERVATION OF RIGHTS/EXERCISE OF REMEDIES

Jed Jones
June 16, 2022
Page 3

Loan Parties are reminded that Administrative Agent continues to reserve all of the rights and remedies available to it under the Credit Agreement, the Forbearance Agreement and the other Loan Documents, and at law and/or in equity as a result of the Ongoing Defaults.

Administrative Agent reserves the right to begin exercising its rights and remedies without further notice. In accordance with Section 8.02(b) of the Credit Agreement, Administrative Agent's remedies specifically include, but are not limited to, the right to declare the unpaid principal amount of all outstanding Loans, together with all accrued interest and other amounts owed, to be immediately due and payable in full without presentment, demand, protest or other notice of any kind. Administrative Agent specifically reserves the right to exercise this acceleration remedy without further notice to Loan Parties, as well as all other rights and remedies contained in the Loan Agreement, the Forbearance Agreement and the other Loan Documents.

Administrative Agent also reserves all of its rights and remedies as to any other defaults and Events of Default which may exist presently or arise in the future. Similarly, any delay by Administrative Agent in exercising any or all of its rights, remedies or powers shall not constitute a waiver of the Ongoing Defaults or of Administrative Agent's right to exercise such rights, remedies or powers at a future date.

**NO WAIVER BY ACCEPTING PAYMENTS**

Loan Parties are advised that Administrative Agent's receipt and application of any payments received from Borrowers does not constitute a waiver or forbearance of the Ongoing Defaults, nor a modification or extension of the Credit Agreement, the Forbearance Agreement, the Guaranty or any of the other Loan Documents. Any further payments which you make to Administrative Agent must be made with this express understanding.

**PROCEDURES FOR ONGOING NEGOTIATIONS**

Finally, to the extent Administrative Agent participates in discussions with Loan Parties with respect to Loan Parties' repayment of the Obligations, you are advised that Administrative Agent's participation in said discussions is not intended to constitute a waiver of Administrative Agent's right to immediately exercise its rights and remedies as a result of the Ongoing Defaults. Moreover, any proposals for the restructure or other consensual disposition of the Obligations and the other amounts owing by Loan Parties to Administrative Agent shall not be binding upon Administrative Agent unless and until such proposals are reduced to writing and formally approved by Administrative Agent and the Lenders.

Jed Jones
June 16, 2022
Page 4


Please contact the undersigned at (213) 673-8951 if you have any questions regarding
Administrative Agent's position on these matters.


Sincerely,

*Raymond Forgette*

Ray Forgette
Team Leader
City National Bank


cc    Meridian Restaurants Unlimited, LC (Guarantor), by overnight delivery and
electronic mail
      Loveloud Restaurants, L.C. (Guarantor), by overnight delivery and electronic mail
      Brad W. Merrill, Esq. (Counsel to Loan Parties), by overnight delivery and electronic
mail
      Barry Beldin (Bridge Funding Group, Inc.), by electronic mail
      Jackie Garuz (Bridge Funding Group, Inc.), by electronic mail
      Shaan Chima, Esq. (Bridge Funding Group, Inc.), by electronic mail
      Meagen E. Leary, Esq, (Counsel to Bridge Funding Group, Inc.), by electronic mail
      Amy Lerner-Hill, Esq. (City National Bank), by electronic mail
      William B. Freeman, Esq. (Counsel to Administrative Agent), by electronic mail

Jed Jones
June 16, 2022
Page 5

SCHEDULE "A"—

THE ONGOING DEFAULTS

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(i) of the Credit Agreement due to Borrowers' failure to timely pay principal payments on the Loans for the months of March, 2022; April, 2022; May, 2022; and June, 2022.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement due to Borrowers' failure to pay interest at the Default Rate for the months of September, 2021; October 2021; November, 2021; December, 2021; March, 2022; April, 2022; May, 2022; and June, 2022.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a) of the Credit Agreement due to Borrowers' failure to timely pay the $25,000 installment of the Forbearance Fee on or before June 1, 2022, in violation of Section VII of the Second Amendment To Forbearance Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement due to Borrowers' failure to timely pay interest at the "contract rate" on the Loans for the month of June, 2022 (this payment was made late).

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(i) of the Credit Agreement due to Borrowers' failure to timely pay principal payments on the Loans for the months of November, 2021, and December, 2021 (both of these payments were paid late).

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' failure to maintain Minimum Trailing Twelve Months Consolidated EBITDA: (i) of at least $10,325,000 for the Fiscal Quarter ending June 30, 2021; and (ii) of at least $11,235,000 for the Fiscal Quarter ending September 30, 2021-- each in violation of Section 7.11(f) of the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Consolidated Pre-Compensation Fixed Charge Coverage Ratio to be less than 1.10 to 1.00, measured as of the Fiscal Quarters ending June 30, 2021, and September 30, 2021, in violation of Section 7.11(a) of the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Consolidated Post-Distribution Fixed Charge Coverage Ratio to be less than 1.10 to 1.00, measured as of the Fiscal Quarters ending June 30, 2021, and September 30, 2021, in violation of Section 7.11(b) of the Credit Agreement.

Jed Jones
June 16, 2022
Page 6

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Current Ratio to be less than 0.50 to 1.00, measured as of the Fiscal Quarter ending September 30, 2021, in violation of Section 7.11(c) of the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Consolidated Lease Adjusted Leverage Ratio to exceed 6.25x, measured as of the Fiscal Quarters ending June 30, 2021, and September 30, 2021, in violation of Section 7.11(d) of the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' failure to deliver their internal interim reportings, including store level reconciliations, for the month ending March 31, 2021, by no later than April 30, 2021, in violation of Section 6.01(e) of the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement due to Borrowers' failure to deliver executed DACAS by no later than October 1, 2020, in violation of Section VIII(E) of the Forbearance Agreement.

- An Event of Default under Section XII of the Forbearance Agreement due to Borrowers failure to consistently engage Advisor in accordance with the agreed "Scope of Services" between the months of August, 2020 until March, 2021—in violation of Sections VIII(F) and XII of the Forbearance Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement because Borrowers created, incurred and suffered to exist "Indebtedness" in the form of $3,286,448 in "Member draws" in violation of Section 7.03 of the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement because Borrowers declared and made, directly or indirectly, "Restricted Payments" in the form of the Member Draws, in violation of Section 7.06 of the Credit Agreement.



Ray Forgette | Vice President
| Special Assets

April 22, 2022

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Oregon, UT 84403
Attention: Richard Fankhauser
Chief Financial Officer

Re:    Notice of Defaults under that certain "Credit Agreement" dated as of February 26, 2018 (as amended and/or modified from time to time, the "Credit Agreement"), by and between NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, "Borrowers"); MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors");  City National Bank, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); and the Lenders party thereto.

Dear Mr. Fankhauser:

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement" dated as of June 1, 2020, by and between Borrowers, Guarantors, Administrative Agent and the Lenders (as amended and/or modified from time to time, the "Forbearance Agreement"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement or in the Forbearance Agreement.

Richard Fankhauser
August 9, 2022
Page 2

## THE EXISTING DEFAULTS

By letters dated August 12, 2020, February 19, 2021, May 12, 2021, May 24, 2021, August 11, 2021, August 25, 2021, September 16, 2021, November 10, 2021, February 16, 2022, March 25, 2022, April 21, 2022 and June 16, 2022 (collectively, the "Prior Default Letters"), Loan Parties were notified that multiple New Events of Default had occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01 of the Credit Agreement (collectively, the "Existing Defaults").

Despite multiple notices, the Existing Defaults still have not been cured and are continuing. As a result, the August 21, 2021 default letter notified Loan Parties that Administrative Agent had imposed the "Default Rate" (equal to three percent (3%) above the existing interest rates set forth in the Credit Agreement), effective as of August 11, 2021. The Default Rate continues to accrue on all indebtedness and obligations owed by Loan Parties under the Credit Agreement.

Moreover, Loan Parties each failed and refused to pay the past-due obligations set forth in the demand letter dated June 16, 2022 from Administrative Agent to Loan Parties.

## THE NEW DEFAULTS

In addition to the Existing Defaults, Loan Parties are hereby notified that the following New Events of Default have occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01(a) of the Credit Agreement (collectively, the "New Defaults") as a result of the following:

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(i) of the Credit Agreement due to Borrowers' failure to pay principal payments on the Loans for the month of July, 2022.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(i) of the Credit Agreement due to Borrowers' failure to pay principal payments on the Loans for the month of August, 2022.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement due to Borrowers' failure to pay interest on the Loans at the Default Rate for the month of July, 2022.

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement due to Borrowers' failure to pay interest on the Loans at the Default Rate for the month of August, 2022.

Richard Fankhauser
August 9, 2022
Page 3

- A New Event of Default under Section XII of the Forbearance Agreement and Section 8.01(a) of the Credit Agreement due to Borrowers' failure to pay the $950,000.00 installment of the Forbearance Fee due on or before July 1, 2022, as required by Section IX(iv) of the Forbearance Agreement.

The New Defaults have no cure period and have not been waived by Administrative Agent nor the Lenders.

## RESERVATION OF RIGHTS

Loan Parties are hereby advised that Administrative Agent reserves all of the rights and remedies available to it under the Credit Agreement, the Forbearance Agreement and the other Loan Documents, and at law and/or in equity as a result of the Existing Defaults and the New Defaults (collectively, the "Ongoing Defaults"), and Administrative Agent reserves the right to begin exercising its rights and remedies without further notice.  In accordance with Section 8.02(b) of the Credit Agreement, Administrative Agent's remedies specifically include, but are not limited to, the right to declare the unpaid principal amount of all outstanding Loans, together with all accrued interest and other amounts owed, to be immediately due and payable in full without presentment, demand, protest or other notice of any kind.  Administrative Agent specifically reserves the right to exercise this acceleration remedy without further notice to Loan Parties, as well as all other rights and remedies contained in the Loan Agreement, the Forbearance Agreement and the other Loan Documents.

Administrative Agent also reserves all of its rights and remedies as to any other defaults and New Events of Default which may exist presently or arise in the future.  Similarly, any delay by Administrative Agent in exercising any or all of its rights, remedies or powers shall not constitute a waiver of the Ongoing Defaults or of Administrative Agent's right to exercise such rights, remedies or powers at a future date.

## NO WAIVER BY ACCEPTING PAYMENTS

Loan Parties are advised that Administrative Agent's receipt and application of any payments received from Borrowers does not constitute a waiver or forbearance of the Ongoing Defaults, nor a modification or extension of the Credit Agreement, the Forbearance Agreement, the Guaranty or any of the other Loan Documents.  Any further payments which you make to Administrative Agent must be made with this express understanding.

## PROCEDURES FOR ONGOING NEGOTIATIONS

Finally, to the extent Administrative Agent participates in discussions with Loan Parties with respect to Loan Parties' repayment of the Obligations, you are advised that Administrative

Richard Fankhauser
August 9, 2022
Page 4

Agent's participation in said discussions is not intended to constitute a waiver of
Administrative Agent's right to immediately exercise its rights and remedies as a result of the
Ongoing Defaults.    Moreover, any proposals for the restructure or other consensual
disposition of the Obligations and the other amounts owing by Loan Parties to
Administrative Agent shall not be binding upon Administrative Agent unless and until such
proposals are reduced to writing and formally approved by Administrative Agent and the
Lenders.

Please contact the undersigned at (213) 673-8951 if you have any questions regarding
Administrative Agent's position on these matters.


Sincerely,

*Raymond Forgette*

Ray Forgette
Sr. Special Assets Officer
City National Bank


cc     Meridian Restaurants Unlimited, LC (Guarantor), by overnight delivery and
       electronic mail
       Loveloud Restaurants, L.C. (Guarantor), by overnight delivery and electronic mail
       Brad W. Merrill, Esq. (Counsel to Loan Parties), by overnight delivery and electronic
       mail
       Barry Beldin (Bridge Funding Group, Inc.), by electronic mail
       Jackie Garuz (Bridge Funding Group, Inc.), by electronic mail
       Shaan Chima, Esq. (Bridge Funding Group, Inc.), by electronic mail
       Meagen E. Leary, Esq, (Counsel to Bridge Funding Group, Inc.), by electronic mail
       Amy Lerner-Hill, Esq. (City National Bank), by electronic mail
       William B. Freeman, Esq. (Counsel to Administrative Agent), by electronic mail



Ray Forgette | Vice President
| Special Assets

September 23, 2022

VIA ELECTRONIC MAIL AND OVERNIGHT DELIVERY

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Oregon, UT 84403
Attn:  Richard Fankhauser
       Chief Financial Officer

Re:  Notice of defaults and exercise of remedies under that certain
     "Credit Agreement" dated as of February 26, 2018 (as amended
     and/or modified from time to time, the "Credit Agreement"), by and
     between NKS RESTAURANTS, L.C., a Utah limited liability
     company; HR RESTAURANTS, L.C., a Utah limited liability
     company; MR RESTAURANTS, L.C., a Utah limited liability
     company; C UTAH, L.C., a Utah limited liability company; AZM
     RESTAURANTS, L.C., a Utah limited liability company; and
     NDM RESTAURANTS, L.C., a Utah limited liability company
     (collectively, "Borrowers"); MERIDIAN RESTAURANTS
     UNLIMITED, LC, a Utah limited liability company; and
     LOVELOUD RESTAURANTS, L.C., a Utah limited liability
     company (collectively, "Guarantors");  City National Bank, a
     national banking association, as Administrative Agent for the
     Lenders ("Administrative Agent"); and the Lenders party thereto.

Dear Mr. Fankhauser:

Reference is made to the Credit Agreement, as well as that certain "Forbearance
Agreement" dated as of June 1, 2020, by and between Borrowers, Guarantors,

Richard Fankhauser
September 22, 2022
Page 2

Administrative Agent and the Lenders (as amended and/or modified from time to time, the "Forbearance Agreement"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement or in the Forbearance Agreement.

## THE EXISTING DEFAULTS

By letters dated August 12, 2020, February 19, 2021, May 12, 2021, May 24, 2021, August 11, 2021, August 25, 2021, September 16, 2021, November 10, 2021, February 16, 2022, March 25, 2022, April 21, 2022, June 16, 2022, and August 22, 2022 (collectively, the "Prior Default Letters"), Loan Parties were notified that multiple New Events of Default had occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01 of the Credit Agreement (collectively, the "Existing Defaults").

Despite multiple notices, the Existing Defaults still have not been cured and are continuing. As a result, the August 21, 2021 default letter notified Loan Parties that Administrative Agent had imposed the "Default Rate" (equal to three percent (3%) above the existing interest rates set forth in the Credit Agreement), effective as of August 11, 2021. The Default Rate continues to accrue on all indebtedness and obligations owed by Loan Parties under the Credit Agreement.

Moreover, Loan Parties each failed and refused to pay the past-due obligations set forth in the demand letter dated June 16, 2022 from Administrative Agent to Loan Parties.

## THE NEW DEFAULTS

In addition to the Existing Defaults, Loan Parties are hereby notified that the following New Events of Default have occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01(a) of the Credit Agreement (collectively, the "New Defaults") as a result of the following:

- A New Event of Default occurred under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement due to Borrowers' failure to pay the full amount of interest due on the Loans at the contractual interest rate on the September 1, 2022 Interest Payment Date. In particular, Borrowers "late paid" the contractual interest due on the Loans by the aggregate amount of $23,876.36.

- A New Event of Default occurred under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement due to

Richard Fankhauser
September 22, 2022
Page 3

Borrowers' failure to pay interest due on the Loans at the Default Rate on the September 1, 2022 Interest Payment Date.

- A New Event of Default occurred under Section XII of the Forbearance Agreement and Section 8.01(a)(i) of the Credit Agreement due to Borrowers' failure to pay principal payments on the Loans due on September 1, 2022.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' failure to maintain Minimum Trailing Twelve Months Consolidated EBITDA: (i) of at least $11,380,000 for the Fiscal Quarter ending March 31, 2022; and (ii) of at least $12,000,000 for the Fiscal Quarter ending June 30, 2022-- each in violation of Section 7.11(f) of the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Consolidated Pre-Compensation Fixed Charge Coverage Ratio to be less than 1.10 to 1.00, measured as of the Fiscal Quarters ending March 31, 2022, and June 30, 2022, in violation of Section 7.11(a) of the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Consolidated Post-Distribution Fixed Charge Coverage Ratio to be less than 1.10 to 1.00, measured as of the Fiscal Quarters ending March 31, 2022, and June 30, 2022, in violation of Section 7.11(b) of the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Current Ratio to be less than 0.50 to 1.00, measured as of the Fiscal Quarters ending March 31, 2022, and June 30, 2022, in violation of Section 7.11(c) of the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Consolidated Lease Adjusted Leverage Ratio to exceed: (i) 6.25x, measured as of the Fiscal Quarter ending March 31, 2022; and (ii) 6.00x,

Richard Fankhauser
September 22, 2022
Page 4

measured as of the Fiscal Quarter ending June 30, 2022--each in violation
of Section 7.11(d) of the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and
Section 8.01(b) of the Credit Agreement because Borrowers declared and
made, directly or indirectly, "Restricted Payments" in the form of the
management fees during the pendency of multiple Events of Default, in
violation of Section 7.06 of the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and
Section 8.01(b) of the Credit Agreement because Borrowers failed to
promptly deliver to Administrative Agent copies of any and all
correspondence that references any breach, deviance or non-compliance
with any of the Franchise Agreements, in violation of Section 6.02(g) of
the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and
Section 8.01(b) of the Credit Agreement due to the
termination/cancellation of certain of Borrowers' Franchise Agreements
and/or Leases of Restaurants located in Minnesota, prior to their stated
terms, in violation of Section 7.13 of the Credit Agreement.

The New Defaults have no cure period and have not been waived by Administrative
Agent nor the Lenders.

## RESERVATION OF RIGHTS

Loan Parties are hereby advised that Administrative Agent reserves all of the rights and
remedies available to it under the Credit Agreement, the Forbearance Agreement and the
other Loan Documents, and at law and/or in equity as a result of the Existing Defaults
and the New Defaults (collectively, the "Ongoing Defaults"), and Administrative Agent
reserves the right to begin exercising its rights and remedies without further notice. In
accordance with Section 8.02(b) of the Credit Agreement, Administrative Agent's
remedies specifically include, but are not limited to, the right to declare the unpaid
principal amount of all outstanding Loans, together with all accrued interest and other
amounts owed, to be immediately due and payable in full without presentment, demand,
protest or other notice of any kind. Administrative Agent specifically reserves the right
to exercise this acceleration remedy without further notice to Loan Parties, as well as all
other rights and remedies contained in the Loan Agreement, the Forbearance Agreement
and the other Loan Documents.

Richard Fankhauser
September 22, 2022
Page 5

Administrative Agent also reserves all of its rights and remedies as to any other defaults and New Events of Default which may exist presently or arise in the future. Similarly, any delay by Administrative Agent in exercising any or all of its rights, remedies or powers shall not constitute a waiver of the Ongoing Defaults or of Administrative Agent's right to exercise such rights, remedies or powers at a future date.

## NO FURTHER EURODOLLAR RATE LOANS, AND CONVERSION OF EXISTING EURODOLLAR RATE LOANS INTO BASE RATE LOANS

As a further result of the Ongoing Defaults and in accordance with Section 2.02(c) of the Credit Agreement, Loan Parties are hereby notified that no Loans may be requested as, converted to or continued as Eurodollar Rate Loans, effective as of the date of this letter. Loan Parties are further notified that Administrative Agent and the Required Lenders have exercised their rights under Section 2.02(c) of the Credit Agreement to convert all existing Eurodollar Rate Loans into Base Rate Loans at the end of each Interest Period applicable to such Eurodollar Rate Loans.

## NO WAIVER BY ACCEPTING PAYMENTS

Loan Parties are hereby advised that Administrative Agent's receipt and application of any payments received from Borrowers does not constitute a waiver or forbearance of the Ongoing Defaults, nor a modification or extension of the Credit Agreement, the Forbearance Agreement, the Guaranty or any of the other Loan Documents. Any further payments which you make to Administrative Agent must be made with this express understanding.

## PROCEDURES FOR ONGOING NEGOTIATIONS

Finally, to the extent Administrative Agent participates in discussions with Loan Parties with respect to Loan Parties' repayment of the Obligations, you are advised that Administrative Agent's participation in said discussions is not intended to constitute a waiver of Administrative Agent's right to immediately exercise its rights and remedies as a result of the Ongoing Defaults. Moreover, any proposals for the restructure or other consensual disposition of the Obligations and the other amounts owing by Loan Parties to Administrative Agent shall not be binding upon Administrative Agent unless and until such proposals are reduced to writing and formally approved by Administrative Agent and the Lenders.

Richard Fankhauser
September 22, 2022
Page 6

Please contact the undersigned at (213) 673-8951 if you have any questions regarding
Administrative Agent's position on these matters.

Sincerely,

*Raymond Forgette*
Ray Forgette
Sr. Special Assets Officer
City National Bank

cc      Meridian Restaurants Unlimited, LC (Guarantor), by overnight delivery and
electronic mail
        Loveloud Restaurants, L.C. (Guarantor), by overnight delivery and electronic mail
        Brad W. Merrill, Esq. (Counsel to Loan Parties), by overnight delivery and
electronic mail
        Barry Beldin (Bridge Funding Group, Inc.), by electronic mail
        Jackie Garuz (Bridge Funding Group, Inc.), by electronic mail
        Shaan Chima, Esq. (Bridge Funding Group, Inc.), by electronic mail
        Meagen E. Leary, Esq, (Counsel to Bridge Funding Group, Inc.), by electronic
mail
        Amy Lerner-Hill, Esq. (City National Bank), by electronic mail
        Andrew Gandara, Esq. (City National Bank), by electronic mail
        William B. Freeman, Esq. (Counsel to Administrative Agent), by electronic mail
        Noah Balch, Esq. (Counsel to Administrative Agent), by electronic mail

**Katten**

KattenMuchinRosenman LLP

**515 S. Flower Street**
**Suite 1000**
**Los Angeles, CA  90071-2212**
**213.443.9003 tel**
**www.kattenlaw.com**

**WILLIAM B. FREEMAN**
bill.freeman@kattenlaw.com
213.443.9003 direct
213.947.1705 fax

October 6, 2022

<u>VIA ELECTRONIC MAIL AND OVERNIGHT DELIVERY</u>

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Ogden, UT 84403
Attn:   Richard Fankhauser
         Chief Financial Officer

> Re:   Notice of Ongoing Defaults, Acceleration and Final Demand for Payment under "Credit Agreement" dated as of February 26, 2018 (as amended and/or modified from time to time, the "<u>Credit Agreement</u>"), by and between NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, "<u>Borrowers</u>"); MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "<u>Guarantors</u>");   City National Bank, a national banking association, as Administrative Agent for the Lenders ("<u>Administrative Agent</u>"); and the Lenders party thereto.

Dear Mr. Fankhauser:

We are counsel to Administrative Agent in connection with the ongoing indebtedness and obligations owing by Borrowers and Guarantors (collectively, "<u>Loan Parties</u>") to Administrative Agent and the Lenders.

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement" dated as of June 1, 2020, by and between Borrowers, Guarantors, Administrative Agent and the Lenders (as amended and/or modified from time to time, the "<u>Forbearance Agreement</u>"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement or in the Forbearance Agreement.



October 6, 2022
Page 2

## THE ONGOING DEFAULTS

By letters dated August 12, 2020, February 19, 2021, May 12, 2021, May 24, 2021, August 11, 2021, August 25, 2021, September 16, 2021, November 10, 2021, February 16, 2022, March 25, 2022, April 21, 2022, June 16, 2022, August 22, 2022, and September 23, 2022 (collectively, the "Default Letters"), Loan Parties were notified that multiple Events of Default had occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01 of the Credit Agreement (collectively, the "Ongoing Defaults"). A list of the Ongoing Defaults is attached hereto as Exhibit "A".

## ACCELERATION OF ALL OBLIGATIONS

Despite multiple notices and demands, the Ongoing Defaults still have not been cured and are continuing. Moreover, the Forbearance Agreement expired by its own terms on February 28, 2022, and Loan Parties failed and refused to pay the past-due obligations set forth in a prior demand letter from Administrative Agent dated June 16, 2022.

As a result of the foregoing, Loan Parties are hereby notified that Administrative Agent has exercised its right under Section 8.02(b) of the Credit Agreement to declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under the Credit Agreement and the other Loan Documents to be immediately due and payable in full (collectively, the "Accelerated Obligations").

## FINAL DEMAND FOR PAYMENT OF ALL ACCELERATED OBLIGATIONS

As a result of the foregoing, Administrative Agent hereby makes this final demand upon each of the Loan Parties to immediately pay all Accelerated Obligations to Administrative Agent within seven (7) calendar days of the date of this letter. The Accelerated Obligations consist of the following amounts as of October 5, 2022:

- Principal:                                                      $46,434,767.30
- Base Interest:[1]                                         $      42,565.20
- Deferred Interest:                                       $ 1,078,691.39
- Default Interest:                                          $    951,912.73
- Forbearance Fees:                                      $    975,000.00
- SWAP Termination, Breakage & Fees:     $            TBD
- Unpaid Fees & Cost of Administrative Agent's
  Financial Consultants:                                 $    192,739.45
- Unpaid Fees & Costs of Administrative Agent's
  Legal Counsel;[2]                                       $    425,852.82

---

[1] Base Interest is calculated through October 1, 2022.

[2] Fees & costs of Administrative Agent's counsel are from May 1, 2020, through October 5, 2022.



October 6, 2022
Page 3

Interest at the Default Rate will continue to accrue on the Accelerated Obligations on and after October 5, 2022, until paid in full, as well as all of Administrative Agent's costs of collection, including reasonable attorneys' fees and financial advisory fees.

The full payoff amount of all Accelerated Obligations due and owing from Loan Parties, jointly and severally, to Administrative Agent should be paid by wire transfer. Accordingly, Loan Parties are instructed to contact Administrative Agent prior to repaying the Accelerated Obligations in order to obtain the final payoff amount and wire instructions.

**Loan Parties are further notified that if Administrative Agent does not receive payment of the full amount of all Accelerated Obligations within seven (7) calendar days of the date of this letter, Administrative Agent intends to exercise additional rights and remedies under the Loan Agreement, the Forbearance Agreement, the other Loan Documents and applicable law, without further notice**. These rights and remedies include, among others, the right to commence legal proceedings against Loan Parties.

Finally, Administrative Agent hereby demands that Borrowers assemble and turnover to Administrative Agent--or Administrative Agent's agents or a court-appointed receiver—all Collateral and all proceeds thereof.

## CONTINUED RESERVATION OF RIGHTS

Loan Parties are reminded that Administrative Agent continues to reserve all of the rights and remedies available to it under the Credit Agreement, the Forbearance Agreement and the other Loan Documents, and at law and/or in equity as a result of the Ongoing Defaults.

Administrative Agent reserves the right to begin exercising its rights and remedies without further notice. Administrative Agent also reserves all of its rights and remedies as to any other defaults and Events of Default which may exist presently or arise in the future. Similarly, any delay by Administrative Agent in exercising any or all of its rights, remedies or powers shall not constitute a waiver of the Ongoing Defaults or of Administrative Agent's right to exercise such rights, remedies or powers at a future date.

## NO WAIVER BY ACCEPTING PAYMENTS

Loan Parties are advised that Administrative Agent's receipt and application of any payments received from Borrowers does not constitute a waiver or forbearance of the Ongoing Defaults, nor a modification or extension of the Credit Agreement, the Forbearance Agreement, the Guaranty or any of the other Loan Documents. Any further payments which you make to Administrative Agent must be made with this express understanding.

## COMMUNICATIONS BETWEEN LOAN PARTIES AND ADMINISTRATIVE AGENT

Finally, to the extent Administrative Agent participates in discussions with Loan Parties with respect to Loan Parties' repayment of the Obligations, you are advised that Administrative Agent's participation in said discussions is not intended to constitute a waiver of



October 6, 2022
Page 4


Administrative Agent's right to immediately exercise its rights and remedies as a result of the Ongoing Defaults. Moreover, any proposals for the restructure or other consensual disposition of the Obligations and the other amounts owing by Loan Parties to Administrative Agent shall not be binding upon Administrative Agent unless and until such proposals are reduced to writing and formally approved by Administrative Agent and the Lenders.

If you have any questions regarding Administrative Agent's position on these matters, please contact Ray Forgette at (213) 673-8951, or email: Ray.Forgette@cnb.com. Alternatively, your counsel may contact the undersigned at 213-443-9003, or email: bill.freeman@katten.com.


Sincerely,

William B. Freeman, Esq.


cc      Meridian Restaurants Unlimited, LC (Guarantor)
        Loveloud Restaurants, L.C. (Guarantor)
        Brad W. Merrill, Esq. (Counsel to Loan Parties)
        Ray Forgette (Administrative Agent, City National Bank), by electronic mail only
        Andrea Gandara, Esq. (City National Bank), by electronic mail
        Amy Lerner-Hill, Esq. (City National Bank), by electronic mail
        Jackie Garuz (Bridge Funding Group, Inc.), by electronic mail only
        Shaan Chima, Esq. (Bridge Funding Group, Inc.), by electronic mail only
        Jonathan Petrakis, Esq. (Counsel to Bridge Funding Group, Inc.), by electronic mail only
        Geoffrey Heaton, Esq. (Counsel to Bridge Funding Group, Inc.), by electronic mail only
        Noah Balch, Esq. (Counsel to Administrative Agent), by electronic mail



October 6, 2022
Page 5

SCHEDULE "A"—
THE ONGOING DEFAULTS

- Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(i) of the Credit Agreement due to Borrowers' failure to pay principal payments on the Loans for the months of March, 2022; April, 2022; May, 2022; June, 2022; July, 2022; and August, 2022.

- Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(i) of the Credit Agreement due to Borrowers' failure to timely pay principal payments on the Loans for the months of November, 2021, and December, 2021 (both of these payments were paid late).

- Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(i) of the Credit Agreement due to Borrowers' failure to pay interest at the Default Rate for the months of September, 2021; October 2021; November, 2021; December, 2021; March, 2022; April, 2022; May, 2022; June, 2022; July, 2022; and August, 2022.

- Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement due to Borrowers' failure to pay "Deferred Interest" for the months of May, 2022; June, 2022, July, 2022; August, 2022; and September, 2022, as required by Section VII(D) of the Forbearance Agreement.

- Multiple Events of Default occurred under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement due to Borrowers' failure to timely pay the full amount of interest due on the Loans at the contractual interest rate on the June 1, 2022, and September 1, 2022 Interest Payment Dates. In particular, Borrowers "late paid" the contractual interest due on the Loans on both occasions.

- Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(a)(ii) of the Credit Agreement due to Borrowers' failure to pay the $950,000 installment of the Forbearance Fee due on or before July 1, 2022, as required by Section IX(iv) of the Second Amendment To Forbearance Agreement.

- Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' failure to maintain Minimum Trailing Twelve Months Consolidated EBITDA: (i) of at least $10,325,000 for the Fiscal Quarter ending June 30, 2021; (ii) of at least $11,235,000 for the Fiscal Quarter ending September 30, 2021; (iii) of at least $11,380,000 for the Fiscal Quarter ending March 31, 2022; and (iv) of at least $12,000,000 for the Fiscal Quarter ending June 30, 2022-- each in violation of Section 7.11(f) of the Credit Agreement.

- Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Consolidated Pre-Compensation Fixed Charge Coverage Ratio to be less than 1.10 to 1.00, measured



October 6, 2022
Page 6

as of the Fiscal Quarters ending June 30, 2021; September 30, 2021; March 31, 2022; and June 30, 2022, in violation of Section 7.11(a) of the Credit Agreement.

- Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Consolidated Post-Distribution Fixed Charge Coverage Ratio to be less than 1.10 to 1.00, measured as of the Fiscal Quarters ending June 30, 2021; September 30, 2021; March 31, 2022; and June 30, 2022, in violation of Section 7.11(b) of the Credit Agreement.

- Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Current Ratio to be less than 0.50 to 1.00, measured as of the Fiscal Quarters ending September 30, 2021; March 31, 2022; and June 30, 2022, in violation of Section 7.11(c) of the Credit Agreement.

- Multiple Events of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' permitting the Consolidated Lease Adjusted Leverage Ratio to exceed: (i) 6.25x, measured as of the Fiscal Quarters ending June 30, 2021; September 30, 2021; and March 31, 2022, in violation of Section 7.11(d) of the Credit Agreement; and 6.00x, measured as of the Fiscal Quarter ending June 30, 2022.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to Borrowers' failure to deliver their internal interim reportings, including store level reconciliations, for the month ending March 31, 2021, by no later than April 30, 2021, in violation of Section 6.01(e) of the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement due to Borrowers' failure to deliver executed DACAS by no later than October 1, 2020, in violation of Section VIII(E) of the Forbearance Agreement.

- An Event of Default under Section XII of the Forbearance Agreement due to Borrowers failure to consistently engage Advisor in accordance with the agreed "Scope of Services" between the months of August, 2020 until March, 2021—in violation of Sections VIII(F) and XII of the Forbearance Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement because Borrowers created, incurred and suffered to exist "Accelerated Obligations" in the form of $3,286,448 in "Member draws" in violation of Section 7.03 of the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement because Borrowers declared and made, directly or indirectly, "Restricted Payments" in the form of the management fees during the pendency of multiple Events of Default, in violation of Section 7.06 of the Credit Agreement.



October 6, 2022
Page 7

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement because Borrowers failed to promptly deliver to Administrative Agent copies of any and all correspondence that references any breach, deviance or non-compliance with any of the Franchise Agreements, in violation of Section 6.02(g) of the Credit Agreement.

- An Event of Default under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement due to the termination/cancellation of certain of Borrowers' Franchise Agreements and/or Leases of Restaurants located in Minnesota, prior to their stated terms, in violation of Section 7.13 of the Credit Agreement.



**CITY NATIONAL BANK**

**AN RBC COMPANY**

Ray Forgette | Vice President<br>Special Assets

November 21, 2022

VIA ELECTRONIC MAIL AND OVERNIGHT DELIVERY

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Ogden, UT 84403
Attn:   Richard Fankhauser
        Chief Financial Officer

> Re:   Indebtedness and Obligations (collectively, the "Obligations") owed under that certain "Credit Agreement" dated as of February 26, 2018 (as amended and/or modified from time to time, the "Credit Agreement"), by and between NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, "Borrowers"); MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"); City National Bank, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); and the Lenders party thereto.

Dear Mr. Fankhauser:

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement" dated as of June 1, 2020, by and between Borrowers, Guarantors, Administrative Agent and the Lenders (as amended and/or modified from time to time, the "Forbearance Agreement").

---

Richard Fankhauser
November 21, 2022
Page 2

All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement or in the Forbearance Agreement.

## THE ONGOING DEFAULTS

By letters dated August 12, 2020, February 19, 2021, May 12, 2021, May 24, 2021, August 11, 2021, August 25, 2021, September 16, 2021, November 10, 2021, February 16, 2022, March 25, 2022, April 21, 2022, June 16, 2022, August 22, 2022, September 23, 2022, and October 6, 2022 (collectively, the "Prior Default Letters"), Loan Parties were notified that multiple New Events of Default had occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01 of the Credit Agreement (collectively, the "Ongoing Defaults").

Despite multiple notices, the Ongoing Defaults still have not been cured and are continuing.

Loan Parties are further reminded that: (i) the August 21, 2021 default letter notified Loan Parties that Administrative Agent had imposed the "Default Rate" (equal to three percent (3%) above the existing interest rates set forth in the Credit Agreement), effective as of August 11, 2021; and (ii) the October 6, 2022 default letter notified Loan Parties that all Obligations owed under the Loan Agreement and the other Loan Documents are due and payable in full, and Administrative Agent made formal demand for payment in full of all Obligations.

Loan Parties are hereby advised that Administrative Agent continues to reserve all of the rights and remedies available to it under the Credit Agreement, the Forbearance Agreement and the other Loan Documents, and at law and/or in equity as a result of the Ongoing Defaults, and Administrative Agent reserves the right to begin exercising its rights and remedies without further notice.

## NO WAIVER BY ACCEPTING THE PARTIAL NOVEMBER PAYMENT

On November 4, 2022, Borrowers made a partial interest payment to Lender in the amount of $223,420.35 (the "Partial Payment").[1]  The purpose of this letter is to notify you that Lender has applied the Partial Payment to reduce the Obligations.  Loan Parties are hereby advised that Lender's acceptance of the Partial Payment does not constitute a waiver or forbearance of the Ongoing Defaults, nor a modification or extension of the Credit Agreement, the Forbearance Agreement, the Guaranty or any of the other Loan Documents.  Any further

---

[1] Administrative Agent believes that Borrowers intend for the Partial Payment to constitute aggregate accrued interest at the "contract" interest rate for the month of October, 2022.  If this is the case, the Partial Payment was "short-paid" by the amount of $106,459.98—as the amount of accrued interest at the contract interest rate as of the November 1 Interest Payment Date was $329,880.33.

Richard Fankhauser
November 21, 2022
Page 3

payments which you make to Administrative Agent must be made with this express understanding.

## PROCEDURES FOR ONGOING NEGOTIATIONS

Finally, to the extent Administrative Agent participates in discussions with Loan Parties with respect to Loan Parties' repayment of the Obligations, you are advised that Administrative Agent's participation in said discussions is not intended to constitute a waiver of Administrative Agent's right to immediately exercise its rights and remedies as a result of the Ongoing Defaults.   Moreover, any proposals for the restructure or other consensual disposition of the Obligations and the other amounts owing by Loan Parties to Administrative Agent shall not be binding upon Administrative Agent unless and until such proposals are reduced to writing and formally approved by Administrative Agent and the Lenders.

Please contact the undersigned at (213) 673-8951 if you have any questions regarding Administrative Agent's position on these matters.

Sincerely,

*Raymond Forgette*

Ray Forgette
Sr. Special Assets Officer
City National Bank

cc    Meridian Restaurants Unlimited, LC (Guarantor), by overnight delivery and electronic mail
        Loveloud Restaurants, L.C. (Guarantor), by overnight delivery and electronic mail
        Brad W. Merrill, Esq. (Counsel to Loan Parties), by overnight delivery and electronic mail
        Jackie Garuz (Bridge Funding Group, Inc.), by electronic mail
        Shaan Chima, Esq. (Bridge Funding Group, Inc.), by electronic mail
        Jonathon Petrakis, Esq, (Counsel to Bridge Funding Group, Inc.), by electronic mail
        Geoffrey Heaton, Esq. (Counsel to Bridge Funding Group, Inc.), by electronic mail
        Matt Rudy (City National Bank), by electronic mail
        Amy Lerner-Hill, Esq. (City National Bank), by electronic mail
        Andrea Gandara, Esq. (City National Bank), by electronic mail
        William B. Freeman, Esq. (Counsel to Administrative Agent), by electronic mail
        Noah Balch, Esq. (Counsel to Administrative Agent), by electronic mail



Ray Forgette | Vice President<br>| Special Assets

December 15, 2022

VIA ELECTRONIC MAIL AND OVERNIGHT DELIVERY

NKS RESTAURANTS, L.C.
HR RESTAURANTS, L.C.
MR RESTAURANTS, L.C.
C UTAH, L.C.
AZM RESTAURANTS, L.C.
NDM RESTAURANTS, L.C.
5929 Fashion Point Dr. Suite 501
South Ogden, UT 84403
Attn:    Richard Fankhauser
         Chief Financial Officer

Re:    Indebtedness and Obligations (collectively, the "Obligations") owed under that certain "Credit Agreement" dated as of February 26, 2018 (as amended and/or modified from time to time, the "Credit Agreement"), by and between NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (collectively, "Borrowers"); MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"); City National Bank, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); and the Lenders party thereto.

Dear Mr. Fankhauser:

Reference is made to the Credit Agreement, as well as that certain "Forbearance Agreement" dated as of June 1, 2020 by and between Borrowers, Guarantors, Administrative Agent and the Lenders (as amended and/or modified from time to time, the "Forbearance Agreement").

---

555 South Flower Street Sixteenth Floor   Los Angeles, CA 90071
T: 213.673.8951   F: 213.673.8958   ray.forgette@cnb.com

Member FDIC

Richard Fankhauser
December 15, 2022
Page 2

All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement or in the Forbearance Agreement.

## THE ONGOING DEFAULTS

By letters dated August 12, 2020, February 19, 2021, May 12, 2021, May 24, 2021, August 11, 2021, August 25, 2021, September 16, 2021, November 10, 2021, February 16, 2022, March 25, 2022, April 21, 2022, June 16, 2022, August 22, 2022, September 23, 2022, October 6, 2022, and November 21, 2022 (collectively, the "Prior Default Letters"), Loan Parties were notified that multiple New Events of Default had occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01 of the Credit Agreement (collectively, the "Ongoing Defaults").

Despite multiple notices, the Ongoing Defaults still have not been cured and are continuing.

Loan Parties are further reminded that: (i) the August 21, 2021 default letter notified Loan Parties that Administrative Agent had imposed the "Default Rate" (equal to three percent (3%) above the existing interest rates set forth in the Credit Agreement), effective as of August 11, 2021; and (ii) the October 6, 2022 default letter notified Loan Parties that all Obligations owed under the Loan Agreement and the other Loan Documents are due and payable in full, and Administrative Agent made formal demand for payment in full of all Obligations.

Loan Parties are hereby advised that Administrative Agent continues to reserve all of the rights and remedies available to it under the Credit Agreement, the Forbearance Agreement and the other Loan Documents, and at law and/or in equity as a result of the Ongoing Defaults, and Administrative Agent reserves the right to begin exercising its rights and remedies without further notice.

## NO WAIVER BY ACCEPTING THE PARTIAL PAYMENT

On December 7, 2022, Borrowers made a partial interest payment to Lender in the amount of $ 223,420.39 (the "Partial Payment").[1]  The purpose of this letter is to notify you that Lender has applied the Partial Payment to reduce the Obligations.  Loan Parties are hereby advised that Lender's acceptance of the Partial Payment does not constitute a waiver or forbearance of the Ongoing Defaults, nor a modification or extension of the Credit Agreement, the Forbearance Agreement, the Guaranty or any of the other Loan Documents.  Any further

---

[1] Administrative Agent believes that Borrowers intend for the Partial Payment to constitute aggregate accrued interest at the "contract" interest rate for the month of November, 2022.  If this is the case, the Partial Payment was "short-paid" by the amount of $231,365.56—as the amount of accrued interest at the contract interest rate as of the December 1 Interest Payment Date was $454,785.95.

Richard Fankhauser
December 15, 2022
Page 3

payments which you make to Administrative Agent must be made with this express understanding.

**PROCEDURES FOR ONGOING NEGOTIATIONS**

Finally, to the extent Administrative Agent participates in discussions with Loan Parties with respect to Loan Parties' repayment of the Obligations, you are advised that Administrative Agent's participation in said discussions is not intended to constitute a waiver of Administrative Agent's right to immediately exercise its rights and remedies as a result of the Ongoing Defaults. Moreover, any proposals for the restructure or other consensual disposition of the Obligations and the other amounts owing by Loan Parties to Administrative Agent shall not be binding upon Administrative Agent unless and until such proposals are reduced to writing and formally approved by Administrative Agent and the Lenders.

Please contact the undersigned at (213) 673-8951 if you have any questions regarding Administrative Agent's position on these matters.

Sincerely,

*Raymond Forgette*

Ray Forgette
Senior Vice President
City National Bank

cc     Meridian Restaurants Unlimited, LC (Guarantor), by overnight delivery and electronic mail
Loveloud Restaurants, L.C. (Guarantor), by overnight delivery and electronic mail
Brad W. Merrill, Esq. (Counsel to Loan Parties), by overnight delivery and electronic mail
Jackie Garuz (Bridge Funding Group, Inc.), by electronic mail
Jonathon Petrakis, Esq, (Counsel to Bridge Funding Group, Inc.), by electronic mail
Geoffrey Heaton, Esq. (Counsel to Bridge Funding Group, Inc.), by electronic mail
Matt Rudy (City National Bank), by electronic mail
Amy Lerner-Hill, Esq. (City National Bank), by electronic mail
Andrea Gandara, Esq. (City National Bank), by electronic mail
William B. Freeman, Esq. (Counsel to Administrative Agent), by electronic mail
Chris Beatty, Esq. (Counsel to Administrative Agent), by electronic mail

# EXHIBIT 4

## REVOLVING NOTE

$1,292,682.93                                                    February 26, 2018

FOR VALUE RECEIVED, the undersigned (collectively, the "Borrowers"), hereby promises to pay, jointly and severally, to BRIDGE FUNDING GROUP, INC. or registered assigns (the "Lender"), in accordance with the provisions of the Agreement (as hereinafter defined), the principal amount of the Revolving Loans from time to time made by Lender to Borrowers (or acquired by Lender) under that certain Credit Agreement, dated as of February 26, 2018 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement;" the terms defined therein being used herein as therein defined), among the Borrowers, the Guarantors party thereto, Lenders from time to time party thereto, and City National Bank, as Administrative Agent.

Each Borrower promises to pay, jointly and severally, interest on the unpaid principal amount of the Revolving Loans from the date of such Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Agreement. All payments of principal and interest with respect to the Revolving Loans shall be made to Administrative Agent for the account of Lender in Dollars in immediately available funds at Administrative Agent's Office. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Agreement.

This Note is one of the Notes referred to in the Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. This Note is also entitled to the benefits of the Guaranty and is secured by the Collateral. Upon the occurrence and continuation of one or more of the Events of Default specified in the Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as provided in the Agreement. The Revolving Loans made by Lender shall be evidenced by one or more loan accounts or records maintained by Lender in the ordinary course of business. The Lender may also attach schedules to this Note and endorse thereon the date, amount and maturity of its Revolving Loans and payments with respect thereto.

Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note. Any person that is an accommodation party, co-maker, guarantor or other surety and each endorser of this Note hereby (i) waives all suretyship defenses, (ii) consents to any and all future releases of the Borrowers and other guarantors, releases of Collateral and amendments, modifications, extensions, renewals, restatements and supplements of Loan Documents, and (iii) agrees to make payment and that Lender may realize upon Collateral granted by the person without prior action by Lender against any other Loan Party or any Collateral granted by any other Loan Party.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA.

**NKS RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Managing Owner


**HR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Managing Owner


**MR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Managing Owner


**C UTAH, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Managing Owner


**AZM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Managing Owner


*Signature Page to Revolving Note*

**NDM RESTAURANTS, L.C.,**
a Utah limited liability company

By:

Name: David Harper
Title: Managing Owner

*Signature Page to Revolving Note*

## TERM LOAN A-1 NOTE

$17,451,219.51                                                    February 26, 2018

FOR VALUE RECEIVED, the undersigned (collectively, the "Borrowers"), hereby promises to pay, jointly and severally, to BRIDGE FUNDING GROUP, INC. or registered assigns (the "Lender"), in accordance with the provisions of the Agreement (as hereinafter defined), the principal amount of the Term Loan A-1 from time to time made by Lender to Borrowers (or acquired by Lender) under that certain Credit Agreement, dated as of February 26, 2018 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement;" the terms defined therein being used herein as therein defined), among the Borrowers, the Guarantors party thereto, Lenders from time to time party thereto, and City National Bank, as Administrative Agent.

Each Borrower promises to pay, jointly and severally, interest on the unpaid principal amount of the Term Loan A-1 from the date of such Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Agreement. All payments of principal and interest with respect to the Term Loan A-1 shall be made to Administrative Agent for the account of Lender in Dollars in immediately available funds at Administrative Agent's Office. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Agreement.

This Note is one of the Notes referred to in the Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. This Note is also entitled to the benefits of the Guaranty and is secured by the Collateral. Upon the occurrence and continuation of one or more of the Events of Default specified in the Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as provided in the Agreement. The Term Loan A-1 made by Lender shall be evidenced by one or more loan accounts or records maintained by Lender in the ordinary course of business. The Lender may also attach schedules to this Note and endorse thereon the date, amount and maturity of its Term Loan A-1 and payments with respect thereto.

Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note. Any person that is an accommodation party, co-maker, guarantor or other surety and each endorser of this Note hereby (i) waives all suretyship defenses, (ii) consents to any and all future releases of the Borrowers and other guarantors, releases of Collateral and amendments, modifications, extensions, renewals, restatements and supplements of Loan Documents, and (iii) agrees to make payment and that Lender may realize upon Collateral granted by the person without prior action by Lender against any other Loan Party or any Collateral granted by any other Loan Party.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA.

**NKS RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Managing Owner


**HR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Managing Owner


**MR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Managing Owner


**C UTAH, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Managing Owner


**AZM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Managing Owner


*Signature Page to Term Loan A-1 Note*

**NDM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper

Title: Managing Owner

*Signature Page to Term Loan A-1 Note*

## TERM LOAN A-2 NOTE

$7,756,097.56                                                           February 26, 2018

FOR VALUE RECEIVED, the undersigned (collectively, the "Borrowers"), hereby promises to pay, jointly and severally, to BRIDGE FUNDING GROUP, INC. or registered assigns (the "Lender"), in accordance with the provisions of the Agreement (as hereinafter defined), the principal amount of the Term Loan A-2 from time to time made by Lender to Borrowers (or acquired by Lender) under that certain Credit Agreement, dated as of February 26, 2018 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement;" the terms defined therein being used herein as therein defined), among the Borrowers, the Guarantors party thereto, Lenders from time to time party thereto, and City National Bank, as Administrative Agent.

Each Borrower promises to pay, jointly and severally, interest on the unpaid principal amount of the Term Loan A-2 from the date of such Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Agreement. All payments of principal and interest with respect to the Term Loan A-2 shall be made to Administrative Agent for the account of Lender in Dollars in immediately available funds at Administrative Agent's Office. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Agreement.

This Note is one of the Notes referred to in the Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. This Note is also entitled to the benefits of the Guaranty and is secured by the Collateral. Upon the occurrence and continuation of one or more of the Events of Default specified in the Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as provided in the Agreement. The Term Loan A-2 made by Lender shall be evidenced by one or more loan accounts or records maintained by Lender in the ordinary course of business. The Lender may also attach schedules to this Note and endorse thereon the date, amount and maturity of its Term Loan A-2 and payments with respect thereto.

Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note. Any person that is an accommodation party, co-maker, guarantor or other surety and each endorser of this Note hereby (i) waives all suretyship defenses, (ii) consents to any and all future releases of the Borrowers and other guarantors, releases of Collateral and amendments, modifications, extensions, renewals, restatements and supplements of Loan Documents, and (iii) agrees to make payment and that Lender may realize upon Collateral granted by the person without prior action by Lender against any other Loan Party or any Collateral granted by any other Loan Party.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA.

**NKS RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper

Title: Managing Owner


**HR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper

Title: Managing Owner


**MR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper

Title: Managing Owner


**C UTAH, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper

Title: Managing Owner


**AZM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper

Title: Managing Owner


*Signature Page to Term Loan A-2 Note*

**NDM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____

Name: David Harper
Title: Managing Owner

## TERM LOAN A-3 NOTE

$1,895,934.96                                                            March 13, 2019

     FOR VALUE RECEIVED, the undersigned (collectively, the "Borrowers"), hereby promises to pay, jointly and severally, to BRIDGE FUNDING GROUP, INC. or registered assigns (the "Lender"), in accordance with the provisions of the Agreement (as hereinafter defined), the principal amount of the Term Loan A-3 from time to time made by Lender to Borrowers (or acquired by Lender) under that certain Credit Agreement, dated as of February 26, 2018 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement;" the terms defined therein being used herein as therein defined), among the Borrowers, the Guarantors party thereto, Lenders from time to time party thereto, and City National Bank, as Administrative Agent.

     Each Borrower promises to pay, jointly and severally, interest on the unpaid principal amount of the Term Loan A-3 from the date of such Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Agreement. All payments of principal and interest with respect to the Term Loan A-3 shall be made to Administrative Agent for the account of Lender in Dollars in immediately available funds at Administrative Agent's Office. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Agreement.

     This Note is one of the Notes referred to in the Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. This Note is also entitled to the benefits of the Guaranty and is secured by the Collateral. Upon the occurrence and continuation of one or more of the Events of Default specified in the Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as provided in the Agreement. The Term Loan A-3 made by Lender shall be evidenced by one or more loan accounts or records maintained by Lender in the ordinary course of business. The Lender may also attach schedules to this Note and endorse thereon the date, amount and maturity of its Term Loan A-3 and payments with respect thereto.

     Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note. Any person that is an accommodation party, co-maker, guarantor or other surety and each endorser of this Note hereby (i) waives all suretyship defenses, (ii) consents to any and all future releases of the Borrowers and other guarantors, releases of Collateral and amendments, modifications, extensions, renewals, restatements and supplements of Loan Documents, and (iii) agrees to make payment and that Lender may realize upon Collateral granted by the person without prior action by Lender against any other Loan Party or any Collateral granted by any other Loan Party.

     THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA.

**NKS RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Manager


**HR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Manager


**MR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Manager


**C UTAH, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Manager


**AZM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Manager


[Signature Page to Term Loan A-3 Note]

**NDM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _David Harper_____
Name: David Harper
Title: Manager

# EXHIBIT 5

**SECURITY AGREEMENT**

As of February 26, 2018, in consideration of the execution and delivery of that certain Credit Agreement of even date herewith (as amended, extended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement") by and among NKS RESTAURANTS, L.C., a Utah limited liability company ("NKS"), HR RESTAURANTS, L.C., a Utah limited liability company ("HR"), MR RESTAURANTS, L.C., a Utah limited liability company ("MR"), C UTAH, L.C., a Utah limited liability company ("C Utah"), AZM RESTAURANTS, L.C., a Utah limited liability company ("AZM"), NDM RESTAURANTS, L.C., a Utah limited liability company ("NDM"; NKS, HR, MR, C Utah, AZM, and NDM are sometimes individually referred to herein as a "Borrower" and collectively as the "Borrowers"; the Borrowers together with Loveloud Restaurants, L.C., a Utah limited liability company, any other Person that from time to time may become a party to this Security Agreement (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement"), collectively, the "Debtors"), the other Loan Parties party thereto, the Lenders party thereto from time to time, and **CITY NATIONAL BANK**, as Administrative Agent for the benefit of the Secured Parties (as defined in the Credit Agreement), pursuant to which the Lenders have agreed, severally and not jointly, to make Loans (as defined in the Credit Agreement) to the Borrowers, the Debtors hereby unconditionally grant and assign to secure the prompt payment and performance in full when due, whether at stated maturity, by acceleration, by mandatory prepayment or otherwise, of the Obligations (as defined below) to the Administrative Agent, for itself and for the ratable benefit of the Secured Parties, a continuing security interest and lien in and to (hereinafter referred to as the "Security Interest") all of the Debtors' following described property and assets of whatever type or description, and all additions thereto and replacements thereof, and all other property whether now owned or hereafter created, acquired or reacquired by the Debtors:

Inventory

All inventory and supplies of whatsoever nature and kind (including, without limitation, (i) all food and paper inventory, supplies and all other raw materials, components, work in process, finished goods, goods in transit and packing and shipping materials, and (ii) all goods that are returned to or repossessed by any Debtor), together with all additions and accessions thereto, replacements therefor, products thereof and documents therefor (collectively, the "Inventory");

Accounts

All accounts (including healthcare insurance receivables), deposit accounts, letter of credit rights (whether or not the letter of credit is evidenced by a writing) and other rights to payment of money for goods and real property sold or leased or for services rendered, expressly including, without limitation, the provision of services, whether or not earned by performance, including, without limitation, all agreements with and sums due from customers and other Persons (as defined in the Credit Agreement), and all books and records recording, evidencing or relating to such rights or any part thereof (collectively, the "Accounts");

Equipment

All machinery, equipment and supplies not included in Inventory above (including, without limitation, food storage and preparation equipment, registers, communications equipment, and replacements therefor), together with all additions and accessions thereto (collectively, the "Equipment");

Licenses

All franchises, licenses, permits and operating rights granted to or held by any Debtor, including, without limitation, the Franchise Agreements, including any renewals or extensions of such Franchise Agreements (collectively, the "Licenses");

Contracts and Leases

All (a) (i) contracts and agreements for the purchase of real and personal property, easements and rights of way, (ii) customer, management, franchise and supplier contracts and agreements, (iii) Material Contracts and any rights thereunder, including the right to receive payments, (iv) security agreements, guarantees and other agreements evidencing, securing or otherwise relating to the Accounts or other rights to receive payment, (v) hedge agreements, and (vi) other agreements to which any Debtor is a party, whether now existing or hereafter arising (collectively, the "Contracts"); (b) lease agreements for real or personal property to which any Debtor is a party, whether now existing or hereafter arising (collectively, the "Leases"); and (c) all other contracts and contractual rights, indemnification rights, and other remedies or provisions now existing or hereafter arising in favor of any Debtor (collectively, the "Other Contracts");

General Intangibles

All general intangibles including personal property not included above, including, without limitation, (i) customer and supplier lists, books and records, computer programs and other intellectual property rights, insurance policies, tax refunds, (ii) all goodwill, trademarks, trademark applications, trade names, trade secrets, patents, copyrights, formulas, industrial designs, software, other intellectual property or rights therein, whether under license or otherwise, all rights to receive payment on property upon or in connection with any transfer of any License, and (iii) all payment intangibles (collectively, the "Intangibles");

Furniture and Fixtures

All furniture and fixtures (including all tables, seating, signage, decorations and other furniture and fixtures), together with all additions and accessions thereto and replacements therefor (collectively, the "Furniture and Fixtures");

Miscellaneous Items

All goods, chattel paper (whether tangible or electronic), documents, instruments (including promissory notes), supplies, choses in action, commercial tort claims, (including, without limitation, payments received with respect to termination, arbitration or litigation under

any Contract), money, deposits, certificates of deposit, stock or share certificates, certificated and uncertificated securities and all other investment property, supporting obligations, URL's, domain names and licenses, all books and records relating to the foregoing and all other property and assets of whatever type or description not included above (collectively, the "Miscellaneous Items");

Cash

All cash, money, cash equivalents, certificates of deposit or other assets of each Debtor that now or hereafter come into the possession, custody, or control of any Lender or the Administrative Agent (collectively, "Cash"); and

Proceeds

All proceeds of any of the above, and all proceeds of any loss of, damage to or destruction of the above, whether insured or not insured, and all other proceeds of any sale, lease or other disposition of any property or interest therein referred to above, together with all proceeds of any policies of insurance covering any or all of the above, the proceeds of any award in condemnation with respect to any of the property, any rebates or refunds, whether for taxes or otherwise, and together with all proceeds of any such proceeds (collectively, the "Proceeds").

The Inventory, Accounts, Equipment, Licenses, Contracts, Leases, Other Contracts, Intangibles, Furniture and Fixtures, Miscellaneous Items, Cash, and Proceeds, as described above, are hereinafter collectively referred to as the "Collateral." Notwithstanding the foregoing, the term "Collateral" shall not include any rights or interest in any capital stock, membership interests, partnership interests or any other equity interests in Specified Subsidiaries or any contract, lease, franchise agreement, permit, license, or license agreement covering real or personal property of any Debtor if under the terms of such contract, lease, franchise agreement, permit, license, or license agreement, or applicable law with respect thereto, the grant of a security interest or lien therein is prohibited as a matter of law or under the terms of such contract, lease, franchise agreement, permit, license, or license agreement and such prohibition or restriction has not been waived or the consent of the other party to such contract, lease, franchise agreement, permit, license, or license agreement has not been obtained (provided, that, (A) the foregoing exclusions shall in no way be construed (1) to apply to the extent that any described prohibition or restriction is unenforceable under Section 9-406, 9-407, 9-408, or 9-409 of the Uniform Commercial Code or other applicable law, or (2) to apply to the extent that any consent or waiver has been obtained that would permit Administrative Agent's security interest or lien notwithstanding the prohibition or restriction on the pledge of such contract, lease, franchise agreement, permit, license, or license agreement and (B) the foregoing exclusions shall in no way be construed to limit, impair, or otherwise affect any of Administrative Agent's continuing security interests in and liens upon any rights or interests of any Debtor in or to (1) monies due or to become due under or in connection with any described contract, lease, franchise agreement, permit, license, license agreement, or (2) any proceeds from the sale, license, lease or other dispositions of any such contract, lease, franchise agreement, permit, license, license agreement).

This Agreement and the Security Interest secure payment and performance of all

obligations of the Debtors to the Secured Parties, or any of them, under this Agreement (including, without limitation, the "Liabilities" hereinafter defined), the Credit Agreement, every other Loan Document, the Related Swap Contracts and Bank Product Agreements (as such terms are defined in the Credit Agreement), and any extensions, renewals or amendments thereto, however created, acquired, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, together with all other now existing or hereafter arising Obligations, as such term is defined in the Credit Agreement (all of the foregoing obligations being hereinafter collectively referred to as the "Obligations"); provided, that Obligations of any Loan Party shall not include any Excluded Swap Obligations solely of such Loan Party.

      1.   <u>Defined Terms</u>

      (a)   Capitalized terms used herein shall have the meanings ascribed to such terms in the Credit Agreement to the extent not otherwise defined or limited herein.  To the extent not inconsistent with this Agreement, the rules of construction and interpretation set forth in Article I of the Credit Agreement shall also be applicable to this Agreement and are incorporated herein by this reference.

      (b)   "Uniform Commercial Code" means the Uniform Commercial Code as in effect in the State of California and as required to enforce this Agreement, any other applicable jurisdiction in which the Collateral is located.

      (c)   All terms used to define or describe types of Collateral and rights therein shall have the meanings set forth in the Uniform Commercial Code to the extent not inconsistent with this Agreement.

      (d)   The words "hereof," "herein" and "hereunder" and words of like import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and paragraph references are to this Agreement unless otherwise specified.

      (e)   No reference to "proceeds" herein shall be deemed to authorize any sale, transfer or other disposition of any Collateral.

      2.   <u>Uniform Commercial Code Financing Statements</u>.  Each Debtor hereby irrevocably authorizes the Administrative Agent to file such financing statements, continuation statements, amendments to such financing statements and such other documents as the Administrative Agent may deem necessary or desirable to protect or perfect the interest of the Administrative Agent in the Collateral, including to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that indicate the Collateral (i) as all assets and/or personal property of the Debtors or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and provide any other information required by part 5 of Article 9 of the Uniform Commercial Code of such jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment thereto.  In addition, each Debtor agrees to

make, execute, furnish, deliver or cause to be done, furnished, executed and delivered all such further acts, information, documents and things as the Administrative Agent may require for the purpose of perfecting or protecting the rights of the Administrative Agent hereunder or otherwise giving effect to this Agreement, all promptly upon request therefor.

3.     <u>Related Swap Contracts and Bank Products Agreements</u>.  All obligations of any Debtor under any Related Swap Contracts or any Bank Products Agreements to which any Lender or its Affiliates are a party shall be deemed to be liabilities of such Debtor ("<u>Liabilities</u>"), and each Lender or Affiliate of a Lender party to any such Related Swap Contract or Bank Products Agreement shall be deemed to be a Secured Party hereunder with respect to such Liabilities; provided, however, that such obligations shall cease to be Liabilities at such time, prior to the Facility Termination Date (as defined below), as such Person (or Affiliate of such Person) shall cease to be a "Lender" under the Credit Agreement.

No Person who obtains the benefit of this Agreement by virtue of the provisions of this Section shall have, prior to the Facility Termination Date, any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Obligations (including the release or modification of any Obligations or security therefor) other than in its capacity as a Lender and only to the extent expressly provided in the Loan Documents.  Each Secured Party not a party to the Credit Agreement who obtains the benefit of this Agreement by virtue of the provisions of this Section shall be deemed to have acknowledged and accepted the appointment of the Administrative Agent pursuant to the terms of the Credit Agreement, and that with respect to the actions and omissions of the Administrative Agent hereunder or otherwise relating hereto that do or may affect such Secured Party, the Administrative Agent and each of its Related Parties shall be entitled to all the rights, benefits and immunities conferred under <u>Article IX</u> of the Credit Agreement.

"<u>Facility Termination Date</u>" means the date as of which all of the following shall have occurred:  (a) the Debtors shall have permanently terminated the credit facilities under the Loan Documents by final payment in full of all Outstanding Amounts, together with all accrued and unpaid interest and fees thereon; (b) all Commitments shall have terminated or expired; (c) the obligations and liabilities of the Debtors and each other Loan Party under all Related Swap Contracts and Bank Products Agreements shall have been fully, finally and irrevocably paid and satisfied in full and the Related Swap Contracts and Bank Products Agreements shall have expired or been terminated, or other arrangements satisfactory to the counterparties shall have been made with respect thereto; and (d) the Debtors and each other Loan Party shall have fully, finally and irrevocably paid and satisfied in full all of their respective obligations and liabilities arising under the Loan Documents, including the Obligations (except for future Obligations consisting of continuing indemnities and other contingent Obligations of the Debtors or any Loan Party that may be owing to the Administrative Agent, any of its Related Parties or any Lender pursuant to the Loan Documents and expressly survive termination of the Credit Agreement or any other Loan Document).

4.     <u>Representations and Warranties</u>.  Each Debtor, jointly and severally, represents and warrants to the Lenders and the Administrative Agent that Debtors are the owners of the

Collateral, free from any right or claim of any Person or any Lien, except for the Security Interest created by this Agreement and Permitted Liens.

5.    <u>Administrative Agent's Perfected First Priority Security Interest</u>.  Each Debtor further, jointly and severally, represents and warrants that, upon the filing of Uniform Commercial Code financing statements in the jurisdictions set forth on **Schedule 1** attached hereto, the Security Interest in the Collateral granted hereunder constitutes and, assuming timely filing of continuation statements, shall constitute at all times a valid first priority perfected security interest (except for Permitted Liens), with respect to all Collateral for which the filing of Uniform Commercial Code financing statements is a valid method of perfection.  Each Debtor shall take or cause to be taken such acts and actions as shall be necessary or appropriate to assure that the Security Interest in the Collateral shall not become subordinate or junior to the security interests, Liens or claims of any other Person, and that the Collateral shall not otherwise be or become subject to any Lien, except for Permitted Liens.

6.    <u>Location of Collateral and Records</u>.  Each Debtor further, jointly and severally, represents and warrants that it now keeps all records concerning the Accounts, Contracts, Leases, Other Contracts, Intangibles and other Collateral at the chief executive office of such Debtor which is at the address designated as such on **Schedule 2** attached hereto.  Each Debtor covenants and agrees that:  (a) without providing at least thirty (30) days prior written notice to the Administrative Agent, such Debtor will not keep any of such records at any other address or change its name, entity type, state of incorporation, chief executive office, places of business, mailing address, or organizational identification number.  Each Debtor shall advise the Administrative Agent, in writing at least thirty (30) days in advance of the opening of any new place of business, the closing of any existing place of business or any change in the location of the place where it keeps any of the Collateral.  Each Debtor represents and warrants that all addresses at which it operates and owns the Collateral as of the date of this Agreement are listed on **Schedule 2**.

7.    <u>Perfection</u>.

(a)    Each Debtor shall at any time, and from time to time, take such steps as the Administrative Agent may reasonably request for the Administrative Agent (1) to obtain an acknowledgment, in form and substance satisfactory to the Administrative Agent, of any bailee having possession of any of the Collateral that the bailee holds such Collateral for the Administrative Agent and that the bailee agrees to comply, without consent or notice to the Debtors with the Administrative Agent's instructions, (2) to obtain "control" of any investment property, deposit accounts, letter of credit rights or electronic chattel paper in accordance with Article 9 of the Uniform Commercial Code, with any agreements establishing control, to be in form and substance satisfactory to the Administrative Agent, and (3) otherwise to insure the continued perfection and priority of the Administrative Agent's Security Interest in any of the Collateral and of the preservation of its rights therein.  In furtherance of the foregoing, Debtors shall promptly notify the Administrative Agent in writing if any Debtor acquires any property or interest which constitutes Collateral, including without limitation any commercial tort claims, any promissory notes or any of the Collateral described in clause (2) above, or if any Collateral is at any time in the possession of a bailee, and shall endorse, assign and deliver to the Administrative Agent or cause the Administrative Agent to be the registered holder of, any

securities, financial assets or other investment property now owned or hereafter acquired by any Debtor. Each Debtor agrees that it shall not maintain any deposit accounts outside of City National Bank (other than accounts exclusively used for payroll, payroll taxes or other employee wage and benefit payments) unless such Debtor delivers a control agreement to the Administrative Agent in form and substance satisfactory to the Administrative Agent.

(b)    Other Acts as to Any and All Collateral.  Each Debtor agrees to comply with the covenants and agreements set forth in the Credit Agreement, including such covenants as pertain to the Collateral.  In addition, each Debtor agrees, at the request and option of the Administrative Agent, to take any and all other actions the Administrative Agent may determine to be necessary or useful for the attachment, perfection and first priority of, and the ability of the Administrative Agent to enforce, the Administrative Agent's Security Interest in any and all of the Collateral including, without limitation, (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Uniform Commercial Code, to the extent, if any, that such Debtor's signature thereon is required therefor, (ii) causing the Administrative Agent's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Administrative Agent to enforce, the Administrative Agent's Security Interest in such Collateral, (iii) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Administrative Agent to enforce, the Administrative Agent's Security Interest in such Collateral, (iv) obtaining governmental and, subject to the provisions of the Credit Agreement, other third party waivers, consents and approvals in form and substance satisfactory to Administrative Agent, including, without limitation, any consent of any licensor, lessor or other Person obligated on Collateral, and (v) subject to the provisions of the Credit Agreement, obtaining waivers from mortgagees and landlords in form and substance satisfactory to the Administrative Agent.

(c)    Savings Clause.  Nothing contained in this Section 7 shall be construed to narrow the scope of the Administrative Agent's or a Secured Party's security interest in any of the Collateral or the perfection or priority thereof or to impair or otherwise limit any of the rights, powers, privileges or remedies of the Administrative Agent or any other Secured Party hereunder.

8.    Personal Property.  The parties intend that, to the extent permitted by applicable law, the Collateral shall remain personal property irrespective of the manner of its attachment or affixation to realty.

9.    Risk of Loss.  Any and all injury to, or loss or destruction of, the Collateral shall be at the Debtors' risk and shall not release any Debtor from the Obligations.

10.    Insurance.  Each Debtor agrees to maintain insurance with financially sound and reputable insurers with respect to the Collateral and their businesses against such casualties and contingencies as required by the Credit Agreement and this Agreement.

11.    Event of Default.  Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent shall have, without any other notice or demand upon the

Debtor, (a) such rights and remedies as are set forth in the Credit Agreement and herein, (b) all the rights, powers and privileges of a secured party under the Uniform Commercial Code, (c) the right to obtain access to any Debtor's books and records, data processing equipment, computer hardware and software relating to the Collateral and use all of the foregoing and the information contained therein in any manner as Administrative Agent deems appropriate in furtherance of its rights under this Agreement and the other Loan Documents, and (d) all other rights and remedies available to the Administrative Agent at law or in equity.  Each Debtor covenants and agrees that any notification of intended disposition of any Collateral, if such notice is required by law, shall be deemed reasonably and properly given if given in the manner provided for below at least ten (10) calendar days (unless the Collateral is perishable or threatens to decline speedily in value or is of a type sold on a recognized market) prior to such disposition.  Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent shall have the right to the appointment of a receiver for the properties and assets of any Debtor, and each Debtor hereby consents to such appointment and except as prohibited by law, hereby waives any objection it may have thereto and the right to have a bond or other security posted by the Administrative Agent or any other Person in connection therewith.  Each Debtor agrees, after the occurrence and during the continuation of an Event of Default, promptly to take any actions at such Debtor's sole cost and expense that the Administrative Agent may request in order to enable the Administrative Agent to obtain and enjoy the full rights and benefits granted to the Administrative Agent under this Agreement and the other Loan Documents.  The Administrative Agent shall have the right, in connection with the issuance of any order for relief in a bankruptcy proceeding, to petition the bankruptcy court for the transfer of control or assignment of the Collateral to a receiver, trustee, transferee, or similar official or to any purchaser of the Collateral pursuant to any public or private sale, foreclosure or other exercise of remedies available to the Administrative Agent, all as permitted by applicable law.  All amounts realized or collected through the exercise of remedies hereunder shall be applied as provided in the Credit Agreement.

12.    <u>Attorney in Fact</u>.  Each Debtor hereby further irrevocably constitutes and appoints the Administrative Agent as its attorney-in-fact, with power of substitution, with authority, upon the occurrence and during the continuation of an Event of Default, to:  (a) collect all Accounts, endorse its name on any note, acceptance, check, draft, money order or other evidence of debt or of payment which constitutes a portion of the Collateral and which may come into the possession of the Administrative Agent; (b) take such action, execute such documents, and perform such work, as the Administrative Agent may deem appropriate in exercise of the rights and remedies granted the Administrative Agent herein or in any other Loan Document; (c) compromise and settle or to sell, assign or transfer or to ask, collect, receive or issue any and all claims possessed by such Debtor which constitute a portion of the Collateral, all in the name of such Debtor; and (d) generally to do such other things and acts in the name of such Debtor with respect to the Collateral as are necessary or appropriate to protect or enforce the rights of the Administrative Agent hereunder or under any other Loan Document.  The powers of attorney granted herein are coupled with an interest and shall be irrevocable.  To the extent permitted by law, each Debtor hereby ratifies all that said attorney-in-fact shall lawfully do or cause to be done.  The powers conferred on the Administrative Agent hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers.  The Administrative Agent shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to any Debtor for any act or failure to act, except for the

Administrative Agent's own willful misconduct, as determined by a final, non-appealable order of a court having jurisdiction over the subject matter. To the extent that the Administrative Agent shall incur any costs or pay any expenses in connection with its rights hereunder, including any costs or expenses of litigation associated therewith, such costs, expenses or payments shall be included in the Obligations secured hereby and shall bear interest from the payment of such costs or expenses at the Default Rate.

13. <u>Remedies Cumulative</u>. Each Debtor agrees that the rights of the Administrative Agent, the Secured Parties, or any of them, under this Agreement, the Credit Agreement, any other Loan Document or any other contract or agreement now or hereafter in existence between the Administrative Agent and such Debtor and the other obligors thereunder, or any of them, shall be cumulative, and that the Administrative Agent may from time to time exercise such rights and such remedies as such Person or Persons may have thereunder and under the laws of the United States or any state, as applicable, in the manner and at the time that the Person or Persons in its or their sole discretion desire, subject to the terms of such agreements. Each Debtor further expressly agrees that the Administrative Agent shall in no event be under any obligation to resort to any Collateral secured hereby prior to exercising any other rights that the Administrative Agent, the Secured Parties, or any of them, may have against such Debtor or its property, nor shall the Administrative Agent be required to resort to any other collateral or security for the Obligations, prior to any exercise of the Administrative Agent's rights against such Debtor and its property hereunder.

14. <u>Administrative Agent's Right to Immediate Possession and Disposition of Collateral</u>. Each Debtor hereby acknowledges that the Obligations arose out of a commercial transaction and agrees that if an Event of Default shall be continuing, the Administrative Agent shall have the right to immediate possession without notice or a hearing, and, to the extent permitted by law, hereby knowingly and intelligently waive any and all rights they may have to any notice and posting of a bond by the Administrative Agent, the other Secured Parties, or any of them, prior to seizure by the Administrative Agent, or any of its transferees, assigns or successors in interest, of the Collateral or any portion thereof. Immediately upon the occurrence of an Event of Default and thereafter from time to time during the continuance thereof, the Administrative Agent may, so far as Debtors can give authority therefor, enter upon any premises on which the Collateral may be situated and render the Collateral useable or saleable and/or remove the Collateral or any part thereof in order to effectively liquidate the Collateral. The Administrative Agent's sole duty with respect to the custody, safe keeping and physical preservation of the Collateral in its possession, shall be to deal with such Collateral in substantially the same manner as the Administrative Agent deals with similar property for its own account. Immediately upon the occurrence of an Event of Default and thereafter from time to time during the continuance thereof, the Administrative Agent may in its discretion (a) require each Debtor to assemble all or any part of the Collateral at such location or locations within the jurisdiction(s) of such Debtor's chief executive office(s) or at such other locations as the Administrative Agent may reasonably designate, in which event Debtors shall at their own expense (i) forthwith cause the same to be moved to the place or places so designated by Administrative Agent, (ii) store and keep any Collateral so delivered to Administrative Agent at such place or places pending further action by Administrative Agent, and (iii) while Collateral shall be so stored and kept, provide such security and maintenance services as shall be necessary to protect the same and to preserve and maintain the Collateral in good condition; and (b)

without notice, except as specified above, sell, lease, license or otherwise dispose of the Collateral or any part thereof by one or more contracts, in one or more parcels at public or private sale, and without the necessity of gathering at the place of sale of the property to be sold, at any of Administrative Agent's offices or elsewhere, at such time or times, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as Administrative Agent may deem commercially reasonable. In addition, each Debtor waives any and all rights that they may have to a judicial hearing in advance of the enforcement of any of the Administrative Agent's rights and remedies hereunder.

15. <u>Marshalling</u>. The Administrative Agent shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and each Debtor hereby irrevocably waives the benefits of all such laws in connection with the enforcement of this Agreement and the other Loan Documents.

16. <u>No Release or Waiver</u>. No transfer or renewal, extension, assignment or termination of this Agreement or of the Credit Agreement or of any other Loan Document, or additional Borrowings or Loans made by the Administrative Agent to any Debtor, or the taking of further security, nor the retaking or re-delivery of the Collateral by the Administrative Agent, or any other act of the Administrative Agent, shall release such Debtor from, or waive any Obligation, except a release or waiver executed in writing by the Administrative Agent in accordance with the Credit Agreement with respect to such Obligation or until the Facility Termination Date.

17. <u>Assignment</u>. Each Debtor agrees that this Agreement and the rights hereunder may, in the discretion of the Administrative Agent, be assigned in whole or in part in connection with any assignment of the Credit Agreement or the Obligations evidenced thereby. In the event this Agreement or the rights hereunder are so assigned by any of the Secured Parties or the Administrative Agent, the terms "Lenders," "Secured Parties" or "Administrative Agent," wherever used herein, shall be deemed, as applicable, to refer to and include any such assignee. No Debtor shall assign its rights in this Agreement or any of its obligations under this Agreement.

18. <u>Joint and Several Liability</u>. The undersigned Debtors are jointly and severally liable for all obligations, covenants and agreements herein. Suit may be brought against the Debtors, jointly and severally, and against any one or more of them, or less than all of them, without impairing the rights of the Administrative Agent and Secured Parties, or its successors or assigns, against the other of the undersigned; and the Administrative Agent and Secured Parties may agree with any one of the undersigned that such party shall be liable for such sum or sums as the Secured Party may see fit and may release any such party from all further liability to the Administrative Agent and Secured Parties for any obligations herein without impairing the right of the Administrative Agent and Secured Parties to demand and collect the balance of such obligations from the other Debtors not so released. Any reference to the "Debtors" or a "Debtor" herein shall mean, unless the context requires otherwise, any one of the Debtors or any combination of Debtors.

19.     <u>Successors</u>.  This Agreement shall apply to and bind the respective successors and permitted assigns of each Debtor and inure to the benefit of the Secured Parties and the successors and permitted assigns of the Secured Parties.

20.     <u>Notices</u>.  All notices and other communications required or permitted hereunder shall be in writing and shall be given in a fashion prescribed in the Credit Agreement.

21.     <u>General Terms and Conditions</u>.  In addition to and without limitation of any of the foregoing, this Agreement shall be deemed to be a Loan Document and shall otherwise be subject to all of the general terms and conditions contained in <u>Section 11</u> of the Credit Agreement, *mutatis mutandi*.

22.     <u>Entire Agreement</u>.  This Agreement, together with the Credit Agreement and all other Loan Documents and all documents and agreements referred to herein and therein, constitute the entire agreement among the Debtors, the Lenders and the Administrative Agent with respect to the matters addressed herein and may not be modified except by a writing executed by the Administrative Agent and delivered to the Debtors.

23.     <u>Severability</u>.  If any paragraph or part thereof of this Agreement shall for any reason be held or adjudged to be invalid, illegal or unenforceable by any court of competent jurisdiction, such paragraph or part thereof so adjudicated invalid, illegal or unenforceable shall be deemed separate, distinct and independent, and the remainder of this Agreement shall remain in full force and effect and shall not be affected by such holding or adjudication.

24.     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.

25.     <u>Administrative Agent</u>.  Each reference herein to any right granted to, benefit conferred upon or power exercisable by the "Administrative Agent" shall be a reference to the Administrative Agent for the Secured Parties, and each action taken or right exercised hereunder shall be deemed to have been so taken or exercised by the Administrative Agent for the benefit of and on behalf of the Secured Parties.

(Signatures begin on the following page.)

IN WITNESS WHEREOF, the undersigned parties hereunto have executed this Agreement by and through their duly authorized officers, as of the day and year first above written.

**DEBTORS:**

**NKS RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Manager

**HR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Manager

**MR RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Manager

**C UTAH, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Manager

**AZM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Manager

[Signature Page to Security Agreement]

DB2/32714721

**NDM RESTAURANTS, L.C.,**
a Utah limited liability company

By: _____
Name: David Harper
Title: Manager


**LOVELOUD RESTAURANTS, L.C.,**
a Utah limited liability company

By: Meridian Restaurants Unlimited, LC, its
Manager

   By: _____
   Name: David Harper
   Title: Manager

[Signature Page to Security Agreement]

**ADMINISTRATIVE AGENT**:

**CITY NATIONAL BANK**

By:_____
Name:  Chris Poppe
Title:    Senior Vice President

[Signature Page to Security Agreement]

*EXECUTION VERSION*

## SCHEDULE 1

LIST OF UNIFORM COMMERCIAL CODE FINANCING STATEMENT
FILING JURISDICTIONS

Utah Division of Corporations and Commercial Code

*EXECUTION VERSION*

## SCHEDULE 2

LIST OF NAMES AND ADDRESSES

**Chief Executive:**   David Harper
**Address**:   5929 S. Fashion Point Drive, Suite 501
So. Ogden, Utah 84403

1.   #14035 – Logan 1
1080 N Main Street
Logan, UT 84341-2216

2.   #10570 – Logan 2
202 N Main Street
Logan, UT 84321

3.   #9601 – Brigham City
995 S Main Street
Brigham City, UT 84302-3145

4.   #10706 – 12th Street
368 E 12th Street
Ogden, UT 84404-5713

5.   #10519 – Harrison
4168 Harrison Blvd
Ogden, UT 84403

6.   #10511 – Antelope
2025 N Main Street
Layton, UT 84041

7.   #7837 – Layton
803 N Main Street
Layton, UT 84041-2232

8.   #10625 – 72nd South
705 E 7200 S
Midvale, UT 84047-5113

9.   #10484 – 47th South
3975 W 4700 S
Salt Lake City, UT 84118

10.   #10457 – Park City
1720 Park Ave

*EXECUTION VERSION*

Park City, UT 84060

11.  #9661 – Tremonton
2267 West Main
Tremonton, UT 84337-9333

12. #20507 - AF Walmart
949 W. Grassland Dr.
American Fork, UT 84003

13.  #22530 - Farr West
1655 West 2700 North
Farr West, UT 84404

14.  #20352 – Clearfield
729 N Main Street.
Clearfield, UT 84015

15.  #6138 – Farmington
1252 North Hwy 89
Farmington, UT 84025

16.  #6069 - North Temple
1660 W.- North Temple
Salt Lake City, UT 84116

17.  #3428 – Taylorsville
5682 S. Redwood Rd.
Salt Lake City, UT 84123

18.  #9752 – Fort Union
7810 S 1300 E
Sandy, UT  84094-0746

19.  #10339 – South Towne
10235 S. State St
Sandy, UT  84070

20.  #9949 - West Jordan
1590 West 9000 South
West Jordan, UT 84088

21.  #17146 – Draper
147 East Bangerter Highway
Draper, UT 84020

*EXECUTION VERSION*

22.   #17878 – Lehi
1466 E. SR 92
Lehi, UT 84043

23.   #17830 – Saratoga
119 E Crossroads Blvd.
Saratoga Springs, UT   84045-5556

24.   #7980 - American Fork
215 East State St.
American Fork, UT  84003

25.   #23274 – Heber
171 E Gateway Dr.
Heber, UT  84032

26.   #7233 – Provo
1080 S. University Ave.
Provo, UT 84601

27.   #24378 - West Haven
1888 W 2550 S
West Haven, UT 84401

28.   #22687 - Devils Lake
Gouldings Rd
Devils Lake, ND 58301

29.   #4290 - GATEWAY
3765 Gateway Drive.
Grand Forks, ND 58203

30.   #11142 - 32nd AVENUE
3151 32nd Ave. So.
Grand Forks, ND 58201

31.   #5684 - NORTH FARGO
1333 19th Ave. N.
Fargo, ND 58102

32.   #23092 - WEST FARGO
840 26th Ave. E
West Fargo, ND 58078

33.   #7961 - NORTH MOORHEAD
100 21st. St. N.,

*EXECUTION VERSION*

Moorhead, MN 56560

34.   #22109 - SOUTH FARGO
      5200 31st St.
      So. Fargo, ND 58104

35.   #2209 - BISMARCK
      315 South 3rd St
      Bismarck, ND 58504-5520

36.   #8836 - DICKINSON
      321 15th Street W
      Dickinson, ND 58601-3017

37.   #12156 - EAST FERGUS
      705 East Vernon Ave.,
      Fergus Falls, MN 56537

38.   #12389 - LONG PRAIRIE
      205 Lake St.
      Long Prairie, MN 56347

39.   #11071 - NORTHSIDE
      209 Nokomis
      Alexandria, MN 56308

40.   #14060 - EASTGATE
      1611 E. Hwy. 12
      Willmar, MN 56201

41.   #11534 - REDWOOD FALLS
      516 E Bridge St.
      Redwood Falls, MN 56283

42.   #8196 - HUTCHINSON
      1185 Hwy. 7 W.
      Hutchinson, MN 55350

43.   #13377 - EAST GRAND FORKS
      926 Central Ave N.E.,
      East Grand Forks, MN 56721

44.   #1589 - SOUTH WASHINGTON
      1416 S. Washington St
      Grand Forks, ND  58201

*EXECUTION VERSION*

45.  #10203 - HILLSBORO
     105 6th St. SW.,
     Hillsboro, ND 58045

46.  #1663 - WEST ACRES
     1212 36th St. S.
     Fargo, ND 58103

47.  #4934 - SOUTH MOORHEAD
     2412 8th St. So.
     Moorhead, MN 56560

48.  #1908 - SOUTH UNIVERSITY
     2253 University Dr. S.
     Fargo, ND 58103

49.  #9915 - JAMESTOWN
     2314 Highway 281 S.,
     Jamestown, ND 58401

50.  #11084 - MANDAN
     1400 East Main
     Mandan, ND 58554-3770

51.  #11345 - PARK RAPIDS
     310 First St. East
     Park Rapids, MN 56470

52.  #12139 - WEST FERGUS
     528 Western Ave. North
     Fergus Falls, MN 56537

53.  #3496 - SOUTHSIDE
     303 30th Ave.
     Alexandria, MN 56308

54.  #4167 - WILLMAR
     1201 S. 1st St.
     Willmar, MN 56201

55.  #12317 - LITCHFIELD
     21 W Depot St.
     Litchfield, MN 55355

56.  #10678 - MONTEVIDEO
     586 SW 1st St.

*EXECUTION VERSION*

Montevideo, MN 56265

57.  #14134 - NEW ULM
     1922 S. Broadway
     New Ulm, MN 56073

58.  #12473 - COLUMBIA FALLS
     1211 9th St. West
     Columbia Falls, MT 59912

59.  #9036 - RESERVE
     2601 North Reserve St.
     Missoula, MT 59808

60.  #22961 - HAMILTON
     1341 N 1st St
     Hamilton, MT 59840

61.  #13293 - NORTHWEST
     315 Northwest Bypass
     Great Falls, MT  59404

62.  #17433 - SANDERS
     3130 N. Sanders
     Helena, MT  59601

63.  #11413 - BELGRADE
     6915 Jackrabbit Lane
     Belgrade, MT  59714

64.  #5165 - KING PARK
     790 King Park Drive
     Billings, MT 59102

65.  #8411 - HEIGHTS
     820 Main St.
     Billings, MT 59105

66.  #9084 - LOCKWOOD
     2813 Old Hardin Rd.
     Billings, MT 59101

67.  #9507 - RIVERTON
     2150 N Federal Blvd
     Riverton WY   82501-5206

68.  #2178 - LARAMIE
     3001 East Grand Ave
     Laramie WY  82070-5104

69.  #13158 - KALISPELL
     1363 US Hwy. 2 East
     Kalispell, MT 59901

70.  #7518 - BROADWAY
     701 East Broadway
     Missoula, MT 59802

71.  #1666 - GREAT FALLS
     1605 10th Ave. So.
     Great Falls, MT  59405

72.  #9257 - PROSPECT
     2820 Prospect Ave.
     Helena, MT  59601

73.  #6608 - BUTTE
     1955 Dewey Blvd.
     Butte, MT  59701

74.  #2195 - BOZEMAN
     1922 W Main St.
     Bozeman, MT  59718

75.  #11036 - SOUTH BILLINGS
     4780 King Ave. East
     Billings, MT 59102

76.  #7485 - DOWNTOWN
     520 North 27th St.
     Billings, MT 59101

77.  #6118- CODY
     1902 Mountainview Drive
     Cody, WY  82414-4931

78.  #17794 - RAWLINS
     2510 E Cedar Street
     Rawlins, WY  82301-6022

79.  #23819 - SAPPHIRE
     4002 Montana Sapphire Rd

*EXECUTION VERSION*

Billings, MT  59106

80.   #9644  - TUCSON
       3485 E. Ajo Way
       Tucson, AZ 85713

81.   #2982 - THATCHER
       2103 W. Hwy. 70
       Thatcher, AZ 85552

82.   #6879 - SIERRA VISTA
       415 Hwy. 90 Bypass
       Sierra Vista, AZ 85635

83.   #14184 - DOUGLAS
       99 E 5th St.
       Douglas, AZ 85607

84.  #6787 - WILLCOX
       1205 Rex Allen Dr.
       Willcox, AZ 85643

85.  #11383 - GREEN VALLEY
       19110 S I-19 Frontage Rd.
       Green Valley, AZ 85629

86.  #6315 - BISBEE
       101 Naco Hwy.
       Bisbee, AZ 85603

87.  #10218 – HOLTON
       403 Arizona Ave.
       Holton, KS 66436

88.  #10415 – LINCOLN
       5940 Havelock Ave.
       Lincoln, NE 68507

89.  #10579 – HASTINGS
       927 West 14th Street
       Hastings, NE 68901

90.  #10701 – SALINA
       2650 South 9th Street

*EXECUTION VERSION*

Salina, KS 67401

91. #12128 – LINCOLN
3810 Old Cheney
Lincoln, NE 68516

92. #13029 – LINCOLN
2504 O Street
Lincoln, NE 68510

93. #14234 – JUNCTION CITY
1802 North Washington Street
Junction City, KS 66441

94. #17904 – LINCOLN
201 North 84th Street
Lincoln, NE 68505

95. #1988 – ABERDEEN
908 Sixth Ave., S.E.
Aberdeen, SD 57401

96. #2082 – MITCHELL
1617 North Main Street
Mitchell, SD 57301

97. #21514 – MANHATTAN
401 McCall Rd.
Manhattan, KS 66502

98. #23634 – MCPHERSON
2201 East Kansas
McPherson, KS 67460

99. #3597 – SALINA
316 E. Iron Ave.
Salina, KS 67401

100. #3909 – LINCOLN
1448 North 48th Street
Lincoln, NE 68504

101. #4247 – LINCOLN

*EXECUTION VERSION*

2500 North 11th Street
Lincoln, NE 68521

102.  #4582 – TOPEKA
6002 S.W. 10th Street
Topeka, KS 66615

103.  #4930 – LINCOLN
2805 South 48th Street
Lincoln, NE 68506

104.  #5167 – BEATRICE
501 North 6th Street
Beatrice, NE 68310

105.  #5492 – TOPEKA
2817 S.E. California
Topeka, KS 66605

106.  #5880 – TOPEKA
3690 S.W. Topeka Blvd.
Topeka, KS 66611

107.  #5957 – MANHATTAN
1328 Laramie,
Manhattan, KS 66502

108.  #6677 – LINCOLN
2045 South 17th Street
Lincoln, NE 68502

109.  #7061 – TOPEKA
1800 S.W. 10th Avenue
Topeka, KS 66604

110.  #7906 – YORK
3627 South Lincoln Ave.
York, NE 68467

111. #8511 - LINCOLN
4230 North 27th Street
Lincoln, NE 68521

*EXECUTION VERSION*

112. 24915 - YORKTOWN
3102 Yorktown Drive,
Bismarck, ND 58503

# EXHIBIT 6



**SPENCER COX**
*Governor*

**DEIDRE HENDERSON**
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE          LEIGH VEILLETTE
*Executive Director*        *Director, Division of Corporations and Commercial Code*

## December 27, 2021

UCC eZFILE
2020 Hurley Way
Sacramento, CA 95825  USA

## UCC-11 Information Request

Your Request for Information has been processed by the Utah Division of Corporations and Commercial Code matching filing(s) in the Division's computerized database with the following search parameter(s) and the "Exact" filter:

**Search Number :** 211227832052-9

|  |  |
|---|---|
| **Debtor Name:** NKS RESTAURANTS, L.C. | **Search Response:** All (Lapsed and Unlapsed) |
| **Debtor Type:** Organization | **Copies:** No Copies |
| **Date Range:** All Available Filings | **City:** |

The Utah Division of Corporations and Commercial Code herby certifies that the attached information is filed and of Record in the Offices of the Division as of 12/21/2021 at 18:00 MST.

Sincerely,
FILING OFFICER



**LEIGH VEILLETTE, Director**
Utah Division of Corporations and Commercial Code





SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

### Liens Filing Search Report

> The Utah Division of Corporations and Commercial Code hereby certifies that the attached list is a true and exact list of all financing statements or CFS liens and related subsequent documentation for the debtor below as filed with the Division of Corporations and Commercial Code office, Uniform Commercial Code Division, as of the Through Date below.

**Date Searched:** 12/27/2021 4:31:03 PM   **Search Criteria:**
**Searched by:**
**Filing Chains:** 1

**Good Through Filing Date:** 12/21/2021

**Cities:**
**Date Range:** All Available Filings
**Include Filings Outside Range?:** All Available Filings

December 27, 2021
**Filing Status:** ALL(Lapsed and Unlapsed)
**Include Records:** N/A

**Organization Name:** NKS RESTAURANTS, L.C.

---

**Filing Chain#:** 1
**Original File#:** 537684201840

**Lapse Date:** 02/23/2023
**Lien Type:** UCC Lien

---

**Filing #:** 537684201840   **Filing Date:** 02/23/2018   **Filing Type:** Initial Financing Statement UCC-1   **Page Count:** 1

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| NKS RESTAURANTS, L.C. | Organization | N/A | 5929 FASHION POINT DR., SUITE 501 SOUTH OGDEN, UT 84403, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|---|---|---|---|
| CITY NATIONAL BANK, AS ADMINISTRATIVE AGENT | Organization | N/A | 555 SOUTH FLOWER STREET, 24TH FLOOR LOS ANGELES, CA 90071, USA |

**Collateral**
ALL ASSETS OF DEBTOR, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER NOW OWNED OR HEREAFTER ACQUIRED.

---

Search Date: December 27, 2021



2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

**Ask us about UCC eZFILE®**

## UCC Search Report

| | |
|---|---|
| **Type of Search** | UCCs |
| **Jurisdiction/Filing Office** | State of Utah, Secretary of State Uniform Commercial Code Division |
| **Estimated Currency Date** | Nov. 09, 2021 |
| **Last File Date** | Nov 14 2021 |
| **Subject Search Name** | NKS RESTAURANTS, L.C. |
| **Search Key Entered** | NKS* RES* |

## Results

Based on a search of the indices of the Uniform Commercial Code Division of the Secretary of State of Utah, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well as the searcher's choice of the liens ultimately included or excluded herein. Certification can only be obtained through the office of the Utah Secretary of State.

### 1. UCC Lien

| | | |
|---|---|---|
| **Document No.** | 537684201840 | Lapses 2/23/2023 |
| **Filed** | 2/23/2018 | |
| **Debtor** | NKS RESTAURANTS L.C.<br>5929 FASHION POINT DR. SUITE 501<br>SOUTH OGDEN Utah 84403 | |
| **Secured Party** | CITY NATIONAL BANK AS ADMINISTRATIVE AGENT<br>555 SOUTH FLOWER STREET 24TH FLOOR<br>LOS ANGELES California 90071 | |
| **Collateral Date** | Collateral<br>2/23/2018 3:25:00 PM | |

We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as provided by government and other sources, do we make any guaranty or representation as to its accuracy.

---------- END OF REPORT ----------

## Report Parameters

The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.

Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in

the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.

Receipt Number: 7254468
Amount Paid: $410.00

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|

| B. E-MAIL CONTACT AT FILER (optional) |
|---|

Quick Data Services, Inc.
2005 East 2700 South, Suite 200
Salt Lake City, Utah 84109

RECEIVED

FEB 23 2018

Utah Div. Of Corp. & Comm. Code

537684201840

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| NKS RESTAURANTS, L.C. | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 5929 Fashion Point Dr., Suite 501 | South Ogden | UT | 84403 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| City National Bank, as Administrative Agent | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 555 South Flower Street, 24th Floor | Los Angeles | CA | 90071 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of Debtor, whether now existing or hereafter arising, and whether now owned or hereafter acquired.

FEB 23 '18 PM3:25

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
|---|---|

| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: |
|---|---|
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing |

| 7. ALTERNATIVE DESIGNATION (if applicable): | ☐ Lessee/Lessor | ☐ Consignee/Consignor | ☐ Seller/Buyer | ☐ Bailee/Bailor | ☐ Licensee/Licensor |
|---|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA:
Utah SOS (CNB/Meridian - 018450-0086)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)



# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

## December 27, 2021

UCC eZFILE
2020 Hurley Way
Sacramento, CA 95825  USA

### UCC-11 Information Request

Your Request for Information has been processed by the Utah Division of Corporations and Commercial Code matching filing(s) in the Division's computerized database with the following search parameter(s) and the "Exact" filter:

**Search Number :** 211227832053-6

| | |
|---|---|
| **Debtor Name:** HR RESTAURANTS, L.C. | **Search Response:** All (Lapsed and Unlapsed) |
| **Debtor Type:** Organization | **Copies:** No Copies |
| **Date Range:** All Available Filings | **City:** |

The Utah Division of Corporations and Commercial Code herby certifies that the attached information is filed and of Record in the Offices of the Division as of 12/21/2021 at 18:00 MST.

Sincerely,
FILING OFFICER



*L. Veillette*

**LEIGH VEILLETTE, Director**
Utah Division of Corporations and Commercial Code

160 E 300 S - PO Box 146705 - Salt Lake City, Utah 84114-6705
PHONE: (801) 530-4849 - FAX: (801) 530-6438
HTTPS://WWW.CORPORATIONS.UTAH.GOV





SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

## Liens Filing Search Report

The Utah Division of Corporations and Commercial Code hereby certifies that the attached list is a true and exact list of all financing statements or CFS liens and related subsequent documentation for the debtor below as filed with the Division of Corporations and Commercial Code office, Uniform Commercial Code Division, as of the Through Date below.

December 27, 2021

**Date Searched:** 12/27/2021 4:31:11 PM    **Search Criteria:**
**Searched by:**
**Filing Chains:** 2

**Good Through Filing Date:** 12/21/2021

**Cities:**
**Date Range:** All Available Filings
**Include Filings Outside Range?:** All Available Filings

**Filing Status:**ALL(Lapsed and Unlapsed)
**Include Records:** N/A

**Organization Name:** HR RESTAURANTS, L.C.

---

**Filing Chain#:** 1
**Original File#:** 536205201828

**Lapse Date:** 01/29/2023
**Lien Type:**UCC Lien

---

**Filing #:** 536205201828    **Filing Date:** 01/29/2018    **Filing Type:** Initial Financing Statement UCC-1    **Page Count:**22

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| BURGER KING #12473 | Organization | N/A | 1211 9TH ST. WEST COLUMBIA FALLS, MT 59912, USA |
| HR RESTAURANTS, L.C. | Organization | N/A | 5929 FASHION POINT DR. STE 501 SOUTH OGDEN, UT 84403, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|---|---|---|---|
| COFACTOR, LLC | Organization | N/A | 2711 CENTERVILLE ROAD, SUITE 400, WILMINGTON, DE 19808, USA |

**Collateral**
ALL PERSONAL PROPERTY NOW OWNED OR HEREAFTER ACQUIRED, INCLUDING BUT NOT LIMITED TO ALL MACHINERY, EQUIPMENT, INVENTORY, ACCOUNT RECEIVABLES, BOOKS AND RECORDS, FURNITURE, FIXTURES, GENERAL INTANGIBLES. DEBTOR CANNOT FURTHER ENCUMBER ANY OF ITS PERSO



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing #:** 536205201828-2    **Filing Date:** 01/29/2018    **Filing Type:** UCC-1 Addendum    **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| BURGER KING #1666 | Organization | N/A | 1605 10TH AVE. SO. GREAT FALLS, MT 59405, USA |

---

**Filing #:** 536205201828-3    **Filing Date:** 01/29/2018    **Filing Type:** UCC-1 Addendum    **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| BURGER KING #9257 | Organization | N/A | 2820 PROSPECT AVE. HELENA, MT 59601, USA |

---

**Filing #:** 536205201828-4    **Filing Date:** 01/29/2018    **Filing Type:** UCC-1 Addendum    **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| BURGER KING #9036 | Organization | N/A | 2601 NORTH RESERVE ST. MISSOULA, MT 59808, USA |

---

**Filing #:** 536205201828-5    **Filing Date:** 01/29/2018    **Filing Type:** UCC-1 Addendum    **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| BURGER KING #22961 | Organization | N/A | 1341 N 1ST ST HAMILTON, MT 59840, USA |



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing #:** 536205201828-6    **Filing Date:** 01/29/2018    **Filing Type:** UCC-1 Addendum    **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #6608 | Organization | N/A | 1955 DEWEY BLVD. BUTTE, MT 59701, USA |

---

**Filing #:** 536205201828-7    **Filing Date:** 01/29/2018    **Filing Type:** UCC-1 Addendum    **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #5165 | Organization | N/A | 790 KING PARK DRIVE BILLINGS, MT 59102, USA |

---

**Filing #:** 536205201828-8    **Filing Date:** 01/29/2018    **Filing Type:** UCC-1 Addendum    **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #8411 | Organization | N/A | 820 MAIN ST. BILLINGS, MT 59105, USA |

---

**Filing #:** 536205201828-9    **Filing Date:** 01/29/2018    **Filing Type:** UCC-1 Addendum    **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #9084 | Organization | N/A | 2813 OLD HARDIN RD BILLINGS, MT 59102, USA |



**SPENCER COX**
*Governor*

**DEIDRE HENDERSON**
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE          LEIGH VEILLETTE
*Executive Director*      *Director, Division of Corporations and Commercial Code*

---

**Filing #:** 536205201828-10     **Filing Date:** 01/29/2018     **Filing Type:** UCC-1 Addendum     **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #6118 | Organization | N/A | 1902 MOUNTAINVIEW DRIVE CODY, WY 82414, USA |

---

**Filing #:** 536205201828-11     **Filing Date:** 01/29/2018     **Filing Type:** UCC-1 Addendum     **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #2178 | Organization | N/A | 3001 EAST GRAND AVE LARAMIE, WY 82070, USA |

---

**Filing #:** 536205201828-12     **Filing Date:** 01/29/2018     **Filing Type:** UCC-1 Addendum     **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #17794 | Organization | N/A | 2510 E CEDAR STREET RAWLINS, WY 82301, USA |

---

**Filing #:** 536205201828-13     **Filing Date:** 01/29/2018     **Filing Type:** UCC-1 Addendum     **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #13158 | Organization | N/A | 1363 US HWY. 2 EAST KALISPELL, MT 59901, USA |

---



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing #:** 536205201828-14   **Filing Date:** 01/29/2018   **Filing Type:** UCC-1 Addendum   **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #13293 | Organization | N/A | 315 NORTHWEST BYPASS GREAT FALLS, MT 59404, USA |

---

**Filing #:** 536205201828-15   **Filing Date:** 01/29/2018   **Filing Type:** UCC-1 Addendum   **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #17433 | Organization | N/A | 3130 N. SANDERS HELENA, MT 59601, USA |

---

**Filing #:** 536205201828-16   **Filing Date:** 01/29/2018   **Filing Type:** UCC-1 Addendum   **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #7518 | Organization | N/A | 701 EAST BROADWAY MISSOULA, MT 59802, USA |

---

**Filing #:** 536205201828-17   **Filing Date:** 01/29/2018   **Filing Type:** UCC-1 Addendum   **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #2195 | Organization | N/A | 1922 W MAIN ST. BOZEMAN, MT 59718, USA |

---



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing #:** 536205201828-18    **Filing Date:** 01/29/2018    **Filing Type:** UCC-1 Addendum    **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #11413 | Organization | N/A | 6915 JACKRABBIT LANE BELGRADE, MT 59714, USA |

---

**Filing #:** 536205201828-19    **Filing Date:** 01/29/2018    **Filing Type:** UCC-1 Addendum    **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #11036 | Organization | N/A | 4780 KING AVE. EAST BILLINGS, MT 59102, USA |

---

**Filing #:** 536205201828-20    **Filing Date:** 01/29/2018    **Filing Type:** UCC-1 Addendum    **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #7485 | Organization | N/A | 520 NORTH 27TH ST. BILLINGS, MT 59101, USA |

---

**Filing #:** 536205201828-21    **Filing Date:** 01/29/2018    **Filing Type:** UCC-1 Addendum    **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BURGER KING #23819 | Organization | N/A | 4002 MONTANA SAPHIRE RD BILLINGS, MT 59106, USA |



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing #:** 536205201828-22    **Filing Date:** 01/29/2018    **Filing Type:** UCC-1 Addendum    **Page Count:** 22

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| BURGER KING #9507 | Organization | N/A | 2150 N FEDERAL BLVD RIVERTON, WY 82501, USA |

---

**Filing #:** 536205201828-23    **Filing Date:** 03/09/2018    **Filing Type:** Termination UCC-3    **Page Count:** 1



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE          LEIGH VEILLETTE
*Executive Director*    *Director, Division of Corporations and Commercial Code*

---

**Filing Chain#:** 2                              **Lapse Date:** 02/23/2023
**Original File#:** 537683201839                  **Lien Type:** UCC Lien

---

**Filing #:** 537683201839    **Filing Date:** 02/23/2018    **Filing Type:** Initial Financing    **Page Count:** 1
                                                              Statement UCC-1

### Debtors

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| HR RESTAURANTS, L.C. | Organization | N/A | 5929 FASHION POINT DR., SUITE 501 SOUTH OGDEN, UT 84403, USA |

### Secured Parties

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| CITY NATIONAL BANK, AS ADMINISTRATIVE AGENT | Organization | N/A | 555 SOUTH FLOWER STREET, 24TH FLOOR LOS ANGELES, CA 90071, USA |

### Collateral

ALL ASSETS OF DEBTOR, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER NOW OWNED OR HEREAFTER ACQUIRED.

---

Search Date: December 27, 2021



2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

**Ask us about UCC eZFILE®**

# UCC Search Report

| | |
|---|---|
| **Type of Search** | UCCs |
| **Jurisdiction/Filing Office** | State of Utah, Secretary of State Uniform Commercial Code Division |
| **Estimated Currency Date** | Nov. 09, 2021 |
| **Last File Date** | Nov 14 2021 |
| **Subject Search Name** | HR RESTAURANTS, L.C. |
| **Search Key Entered** | HR* RES* |

# Results

Based on a search of the indices of the Uniform Commercial Code Division of the Secretary of State of Utah, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well as the searcher's choice of the liens ultimately included or excluded herein. Certification can only be obtained through the office of the Utah Secretary of State.

**1. UCC Lien**

| | | |
|---|---|---|
| **Document No.** | 536205201828 | Lapses 1/29/2023 |
| **Filed** | 1/29/2018 | |
| **Debtor** | BURGER KING #11036 4780 KING AVE. EAST BILLINGS Montana 59102 | |
| **Debtor** | BURGER KING #11413 6915 JACKRABBIT LANE BELGRADE Montana 59714 | |
| **Debtor** | BURGER KING #12473 1211 9TH ST. WEST COLUMBIA FALLS Montana 59912 | |
| **Debtor** | BURGER KING #13158 1363 US HWY. 2 EAST KALISPELL Montana 59901 | |
| **Debtor** | BURGER KING #13293 315 NORTHWEST BYPASS GREAT FALLS Montana 59404 | |
| **Debtor** | BURGER KING #1666 1605 10TH AVE. SO. GREAT FALLS Montana 59405 | |
| **Debtor** | BURGER KING #17433 3130 N. SANDERS HELENA Montana 59601 | |
| **Debtor** | BURGER KING #17794 2510 E CEDAR STREET RAWLINS Wyoming 82301 | |

**Debtor**  BURGER KING #2178
3001 EAST GRAND AVE
LARAMIE Wyoming 82070

**Debtor**  BURGER KING #2195
1922 W MAIN ST.
BOZEMAN Montana 59718

**Debtor**  BURGER KING #22961
1341 N 1ST ST
HAMILTON Montana 59840

**Debtor**  BURGER KING #23819
4002 MONTANA SAPHIRE RD
BILLINGS Montana 59106

**Debtor**  BURGER KING #5165
790 KING PARK DRIVE
BILLINGS Montana 59102

**Debtor**  BURGER KING #6118
1902 MOUNTAINVIEW DRIVE
CODY Wyoming 82414

**Debtor**  BURGER KING #6608
1955 DEWEY BLVD.
BUTTE Montana 59701

**Debtor**  BURGER KING #7485
520 NORTH 27TH ST.
BILLINGS Montana 59101

**Debtor**  BURGER KING #7518
701 EAST BROADWAY
MISSOULA Montana 59802

**Debtor**  BURGER KING #8411
820 MAIN ST.
BILLINGS Montana 59105

**Debtor**  BURGER KING #9036
2601 NORTH RESERVE ST.
MISSOULA Montana 59808

**Debtor**  BURGER KING #9084
2813 OLD HARDIN RD
BILLINGS Montana 59102

**Debtor**  BURGER KING #9257
2820 PROSPECT AVE.
HELENA Montana 59601

**Debtor**  BURGER KING #9507
2150 N FEDERAL BLVD
RIVERTON Wyoming 82501

**Debtor**  HR RESTAURANTS L.C.
5929 FASHION POINT DR. STE 501
SOUTH OGDEN Utah 84403

**Secured Party**  COFACTOR LLC
2711 CENTERVILLE ROAD SUITE 400
WILMINGTON Delaware 19808

**Amendment Type**  UCC-1 Addendum
**File No.**  536205201828-12
**Filed**  1/29/2018 9:55:00 AM

**Amendment Type**  UCC-1 Addendum
**File No.**  536205201828-14
**Filed**  1/29/2018 9:55:00 AM

**Amendment Type**  UCC-1 Addendum
**File No.**  536205201828-15
**Filed**  1/29/2018 9:55:00 AM

**Amendment Type**  UCC-1 Addendum
**File No.**  536205201828-17
**Filed**  1/29/2018 9:55:00 AM

**Amendment Type**  UCC-1 Addendum

|  |  |
|---|---|
| **File No.** | 536205201828-2 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-20 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-22 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-3 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-8 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-9 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-10 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-11 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-13 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-16 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-18 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-19 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-21 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-4 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-5 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-6 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | UCC-1 Addendum |
|---|---|
| **File No.** | 536205201828-7 |
| **Filed** | 1/29/2018 9:55:00 AM |

| **Amendment Type** | Termination |
|---|---|
| **File No.** | 536205201828-23 |
| **Filed** | 3/9/2018 9:41:00 AM |

| **Collateral** | Collateral |
|---|---|
| **Date** | 1/29/2018 9:55:00 AM |

**2. UCC Lien**

| **Document No.** | 537683201839 | **Lapses 2/23/2023** |
|---|---|---|
| **Filed** | 2/23/2018 | |
| **Debtor** | HR RESTAURANTS L.C. | |

5929 FASHION POINT DR. Suite 501
SOUTH OGDEN Utah 84403

**Secured Party** CITY NATIONAL BANK AS ADMINISTRATIVE AGENT
555 SOUTH FLOWER STREET 24TH FLOOR
LOS ANGELES California 90071

**Collateral** Collateral
**Date** 2/23/2018 3:25:00 PM

We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as provided by government and other sources, do we make any guaranty or representation as to its accuracy.

---------- END OF REPORT ----------

## Report Parameters

The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.

Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Corporation Service Company   1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscinfo.com

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

1418 23039

Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Utah
(S.O.S.)

Date: 01/29/2018
Receipt Number: 7221474
Amount Paid: $264.00

536205201828

21-AD   LAL

JAN 29 '18 AM 9:55

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| HR Restaurants, L.C. | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5929 Fashion Point Drive Suite 501 | South Ogden | UT | 84403 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Burger King #12473 | | | |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1211 9th St. West | Columbia Falls | MT | 59912 | USA |

**3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):** Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Cofactor, LLC | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2711 Centerville Road, Suite 400, | Wilmington | DE | 19808 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
All personal property now owned or hereafter acquired, including but not limited to all machinery, equipment, inventory, account receivables, books and records, furniture, fixtures, general intangibles. Debtor cannot further encumber any of its personal property without Secured Party written authorization.

| 5. Check only if applicable and check only one box: Collateral is | ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
|---|---|---|
| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: |
| ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien   ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor | | |

**8. OPTIONAL FILER REFERENCE DATA:**

1418 23039

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd., Ste. 400
Wilmington, DE 19808

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

HR Restaurants, L.C.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)                            SUFFIX

(LAL)

JAN 29 '18 AM 9:55

536205201828

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

Date: 01/29/2018
Receipt Number 7221474
Amount Paid: $264.00

**10. DEBTOR'S NAME:** Provide (10a or 10b) only **one** additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME  Burger King #1666

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                            SUFFIX

| 10c. MAILING ADDRESS 1605 10th Ave. So. | CITY Great Falls | STATE MT | POSTAL CODE 59405 | COUNTRY USA |
|---|---|---|---|---|

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME **or** ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only **one** name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR:  Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| HR Restaurants, L.C. |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| |

| FIRST PERSONAL NAME | |
|---|---|
| | |

| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|
| | |

LAL

JAN 29 '18 AM 9:55

536205201828

Date: 01/29/2018
Receipt Number 7221474
Amount Paid: $284.00

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME Burger King #9257 |
|---|
| |

OR

| 10b. INDIVIDUAL'S SURNAME |
|---|
| |

| INDIVIDUAL'S FIRST PERSONAL NAME |
|---|
| |

| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|
| | |

| 10c. MAILING ADDRESS 2820 Prospect Ave. | CITY Helena | STATE MT | POSTAL CODE 59601 | COUNTRY USA |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
|---|
| |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT:  ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

HR Restaurants, L.C.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)     SUFFIX

Date: 01/29/2018
Receipt Number 7221474
Amount Paid $264.00

LAL

JAN 29 '18 AM 9:55

536205201828

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME     Burger King #9036

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)     SUFFIX

| 10c. MAILING ADDRESS 2601 North Reserve St. | CITY Missoula | STATE MT | POSTAL CODE 59808 | COUNTRY USA |
|---|---|---|---|---|

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: |
|---|---|
| | ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing |
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

01/29/2018
Receipt Number 7221474
$284.00
Date
Amount Paid:

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| **9a. ORGANIZATION'S NAME** | |
| HR Restaurants, L.C. | |
| **OR** **9b. INDIVIDUAL'S SURNAME** | |
| **FIRST PERSONAL NAME** | |
| **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** |

LAL

JAN 29 '18 AM 9:55

5362052O1828

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | |
|---|---|
| **10a. ORGANIZATION'S NAME** Burger King #22961 | |
| **OR** **10b. INDIVIDUAL'S SURNAME** | |
| **INDIVIDUAL'S FIRST PERSONAL NAME** | |
| **INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** |

| 10c. MAILING ADDRESS 1341 N 1st St | CITY Hamilton | STATE MT | POSTAL CODE 59840 | COUNTRY USA |
|---|---|---|---|---|

**11.** ☐ **ADDITIONAL SECURED PARTY'S NAME** or ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only one name (11a or 11b)

| | | | |
|---|---|---|---|
| **11a. ORGANIZATION'S NAME** | | | |
| **OR** **11b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** |
| **11c. MAILING ADDRESS** | **CITY** | **STATE** **POSTAL CODE** | **COUNTRY** |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

**FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)**

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| HR Restaurants, L.C. |

OR

| 9b. INDIVIDUAL'S SURNAME | |
|---|---|
| FIRST PERSONAL NAME | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

01/29/2018
Date
Receipt Number 7221474
Amount Paid $264.00

(LAL)

5362052018 28

JAN 29 '18 AM 9:55

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only _one_ additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME Burger King #6608 |
|---|

OR

| 10b. INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 10c. MAILING ADDRESS 1955 Dewey Blvd. | CITY Butte | STATE MT | POSTAL CODE 59701 | COUNTRY USA |
|---|---|---|---|---|

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME _or_ ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only _one_ name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

**9a. ORGANIZATION'S NAME**
HR Restaurants, L.C.

OR

**9b. INDIVIDUAL'S SURNAME**

**FIRST PERSONAL NAME**

**ADDITIONAL NAME(S)/INITIAL(S)**    **SUFFIX**

Date: 01/29/2018
Receipt Number: 7221474
Amount Paid: $264.00

LAL

5362052 01828

JAN 29 '18 AM 9:55

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

**10a. ORGANIZATION'S NAME** Burger King #5165

OR

**10b. INDIVIDUAL'S SURNAME**

**INDIVIDUAL'S FIRST PERSONAL NAME**

**INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)**    SUFFIX

| 10c. MAILING ADDRESS 790 King Park Drive | CITY Billings | STATE MT | POSTAL CODE 59102 | COUNTRY USA |
|---|---|---|---|---|

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

**11a. ORGANIZATION'S NAME**

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

01/29/2018
Date:
Receipt Number: 7221474
Amount Paid: $264.00

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| 9a. ORGANIZATION'S NAME | |
| HR Restaurants, L.C. | |
| OR 9b. INDIVIDUAL'S SURNAME | |
| FIRST PERSONAL NAME | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

LAL

JAN 29 '18 AM 9:55

536205201828

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | | | | |
|---|---|---|---|---|
| 10a. ORGANIZATION'S NAME Burger King #8411 | | | | |
| OR 10b. INDIVIDUAL'S SURNAME | | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |

| 10c. MAILING ADDRESS 820 Main St. | CITY Billings | STATE MT | POSTAL CODE 59105 | COUNTRY USA |
|---|---|---|---|---|

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| | | | |
|---|---|---|---|
| 11a. ORGANIZATION'S NAME | | | |
| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9 NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| HR Restaurants, L.C. |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| |
| FIRST PERSONAL NAME |
| |
| ADDITIONAL NAME(S)/INITIAL(S)    SUFFIX |

01/29/2018
Date:
Receipt Number 7221474
Amount Paid $264.00

LAL

JAN 29 '18 AM 9:55

5362205201828

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | Burger King #9084 |
|---|---|

OR

| 10b. INDIVIDUAL'S SURNAME | |
|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2813 Old Hardin Rd | Billings | MT | 59102 | USA |

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut    ☐ covers as-extracted collateral    ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
HR Restaurants, L.C.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)                                    SUFFIX

Date 01/29/2018
Receipt Number 7221474
Amount Paid $264.00

(LAL)

JAN 29 '18 AM 9:55

5362052018 28

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only **one** additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME  Burger King #6118

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                                    SUFFIX

| 10c. MAILING ADDRESS 1902 Mountainview Drive | CITY Cody | STATE WY | POSTAL CODE 82414 | COUNTRY USA |
|---|---|---|---|---|

**11.** ☐ **ADDITIONAL SECURED PARTY'S NAME** or ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only **one** name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd. Ste. 400
Wilmington, DE 19808

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| **9a. ORGANIZATION'S NAME** | |
| | HR Restaurants, L.C. |
| **OR** **9b. INDIVIDUAL'S SURNAME** | |
| **FIRST PERSONAL NAME** | |
| **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** |

01/29/2018
Receipt Number 7221474
Amount Paid: $284.00

(LAL)

5 3 6 2 0 5 2 0 1 8 2 8

JAN 29 '18 AM 9:55

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only **one** additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | | | | |
|---|---|---|---|---|
| **10a. ORGANIZATION'S NAME** Burger King #2178 | | | | |
| **OR** **10b. INDIVIDUAL'S SURNAME** | | | | |
| **INDIVIDUAL'S FIRST PERSONAL NAME** | | | | |
| **INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)** | | | | **SUFFIX** |
| **10c.** MAILING ADDRESS 3001 East Grand Ave | **CITY** Laramie | **STATE** WY | **POSTAL CODE** 82070 | **COUNTRY** USA |

**11.** ☐ **ADDITIONAL SECURED PARTY'S NAME** _or_ ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only **one** name (11a or 11b)

| | | | | |
|---|---|---|---|---|
| **11a. ORGANIZATION'S NAME** | | | | |
| **OR** **11b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | | **SUFFIX** |
| **11c.** MAILING ADDRESS | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

| | |
|---|---|
| **13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | **14.** This FINANCING STATEMENT: ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing |
| **15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | **16.** Description of real estate: |

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| HR Restaurants, L.C. |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX |

01/29/2018
Receipt Number 7221474
Amount Paid: $264.00
Date:

536 205 201828

JAN 29 '18 AM 9:55

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only **one** additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME  Burger King # 17794 |
|---|

OR

| 10b. INDIVIDUAL'S SURNAME |
|---|
| INDIVIDUAL'S FIRST PERSONAL NAME |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX |

| 10c. MAILING ADDRESS 2510 E Cedar Street | CITY Rawlins | STATE WY | POSTAL CODE 82301 | COUNTRY USA |
|---|---|---|---|---|

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME _or_ ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only **one** name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**12.** ADDITIONAL SPACE FOR ITEM 4 (Collateral):

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

**17.** MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
HR Restaurants, L.C.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)                                    SUFFIX

**Date** 01/29/2018
**Receipt Number:** 7221474
**Amount Paid** $264.00

(LAL)

JAN 29 '18 AM 9:56

536 205 201 828

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME Burger King #13158 | | | | | |
|---|---|---|---|---|---|
| OR 10b. INDIVIDUAL'S SURNAME | | | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | | SUFFIX |
| 10c. MAILING ADDRESS 1363 US Hwy. 2 East | CITY Kalispell | | STATE MT | POSTAL CODE 59901 | COUNTRY USA |

**11.** ☐ **ADDITIONAL SECURED PARTY'S NAME** or ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 11c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: |
|---|---|
| | ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing |
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

**9a. ORGANIZATION'S NAME**

HR Restaurants, L.C.

OR

**9b. INDIVIDUAL'S SURNAME**

**FIRST PERSONAL NAME**

**ADDITIONAL NAME(S)/INITIAL(S)**    **SUFFIX**

01/29/2018
Receipt Number 7221474
Amount Paid: $284.00
Date

(LAL)

JAN 29 '18 AM 9:56

536 205 201828

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

**10a. ORGANIZATION'S NAME** Burger King #13293

OR

**10b. INDIVIDUAL'S SURNAME**

**INDIVIDUAL'S FIRST PERSONAL NAME**

**INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)**    **SUFFIX**

| 10c. MAILING ADDRESS 315 Northwest Bypass | CITY Great Falls | STATE MT | POSTAL CODE 59404 | COUNTRY USA |
|---|---|---|---|---|

**11.** ☐ **ADDITIONAL SECURED PARTY'S NAME** or ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only one name (11a or 11b)

**11a. ORGANIZATION'S NAME**

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd., Ste. 400
Wilmington, DE 19808

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

01/29/2018
Date: Receipt Number: 7221474
Amount Paid: $284.00

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | | |
|---|---|---|
| | 9a. ORGANIZATION'S NAME | |
| | HR Restaurants, L.C. | |
| OR | 9b. INDIVIDUAL'S SURNAME | |
| | FIRST PERSONAL NAME | |
| | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

(LAL)

JAN 29 '18 AM 9:56

5362052018 28

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | | |
|---|---|---|
| | 10a. ORGANIZATION'S NAME Burger King #17433 | |
| OR | 10b. INDIVIDUAL'S SURNAME | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 10c. MAILING ADDRESS 3130 N. Sanders | CITY Helena | STATE MT | POSTAL CODE 59601 | COUNTRY USA |
|---|---|---|---|---|

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| | | | | |
|---|---|---|---|---|
| | 11a. ORGANIZATION'S NAME | | | |
| OR | 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

| **13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | **14.** This FINANCING STATEMENT: ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing |
|---|---|
| **15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | **16.** Description of real estate: |

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste 400
Wilmington, DE 19808

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

Date 01/29/2018
Receipt Number 7221474
Amount Paid $264.00

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| 9a. ORGANIZATION'S NAME | |
| HR Restaurants, L.C. | |
| OR 9b. INDIVIDUAL'S SURNAME | |
| FIRST PERSONAL NAME | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

LAL

JAN 29 '18 AM 9:56
536 205201828

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | | | |
|---|---|---|---|
| 10a. ORGANIZATION'S NAME Burger King #7518 | | | |
| OR 10b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 10c. MAILING ADDRESS 701 East Broadway | CITY Missoula | STATE MT | POSTAL CODE 59802 | COUNTRY USA |
|---|---|---|---|---|

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| | | | |
|---|---|---|---|
| 11a. ORGANIZATION'S NAME | | | |
| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: <br> ☐ covers timber to be cut    ☐ covers as-extracted collateral    ☐ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in Item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| HR Restaurants, L.C. |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| |

| FIRST PERSONAL NAME | |
|---|---|
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

LAL

5362052O1 828

JAN 29 '18 AM 9:56

01/29/2018
Receipt Number 7221474
Date:
Amount Paid: $264.00

THE ABOVE SPACE IS FOR FILING **OFFICE USE ONLY**

10. DEBTOR'S NAME: Provide (10a or 10b) only _one_ additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME Burger King #2195 |
|---|
| |

OR

| 10b. INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 10c. MAILING ADDRESS 1922 W Main St. | CITY Bozeman | STATE MT | POSTAL CODE 59718 | COUNTRY USA |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME _or_ ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only _one_ name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
|---|
| |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT:<br>☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

| 9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐ | |
|---|---|
| **9a. ORGANIZATION'S NAME** | |
| HR Restaurants, L.C. | |

OR

| 9b. INDIVIDUAL'S SURNAME | |
|---|---|
| FIRST PERSONAL NAME | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

Date: 01/29/2018
Receipt Number: 7221474
Amount Paid: $264.00

536205 201 828

(LAL) JAN 29 '18 AM 9:56

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME Burger King #11413 | | | | |
|---|---|---|---|---|

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
|---|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |

| 10c. MAILING ADDRESS 6915 Jackrabbit Lane | CITY Belgrade | STATE MT | POSTAL CODE 59714 | COUNTRY USA |
|---|---|---|---|---|

| 11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b) | | | | |
|---|---|---|---|---|
| 11a. ORGANIZATION'S NAME | | | | |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in Item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

Date: 01/29/2018
Receipt Number: 7221474
Amount Paid: $264.00

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| **9a. ORGANIZATION'S NAME** | |
| HR Restaurants, L.C. | |
| OR **9b. INDIVIDUAL'S SURNAME** | |
| **FIRST PERSONAL NAME** | |
| **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** |

536 205 201828

(LAL)   JAN 29 '18 AM 9:56

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | | | |
|---|---|---|---|
| **10a. ORGANIZATION'S NAME** Burger King #11036 | | | |
| OR **10b. INDIVIDUAL'S SURNAME** | | | |
| **INDIVIDUAL'S FIRST PERSONAL NAME** | | | |
| **INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)** | | | **SUFFIX** |

| **10c. MAILING ADDRESS** 4780 King Ave. East | **CITY** Billings | **STATE** MT | **POSTAL CODE** 59102 | **COUNTRY** USA |
|---|---|---|---|---|

**11.** ☐ **ADDITIONAL SECURED PARTY'S NAME** or ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only one name (11a or 11b)

| | | | |
|---|---|---|---|
| **11a. ORGANIZATION'S NAME** | | | |
| OR **11b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** |
| **11c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

| | |
|---|---|
| **13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | **14.** This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing |
| **15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | **16.** Description of real estate: |

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd. Ste. 400
Wilmington, DE 19808

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

Date 01/29/2018
Receipt Number 7221474
Amount Paid $264.00

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| **9a. ORGANIZATION'S NAME** | |
| HR Restaurants, L.C. | |
| **OR** | |
| **9b. INDIVIDUAL'S SURNAME** | |
| **FIRST PERSONAL NAME** | |
| **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** |

536205201828

(LAL)    JAN 29 '13 AM 9:56

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | | | | |
|---|---|---|---|---|
| **10a. ORGANIZATION'S NAME** Burger King #7485 | | | | |
| **OR** | | | | |
| **10b. INDIVIDUAL'S SURNAME** | | | | |
| **INDIVIDUAL'S FIRST PERSONAL NAME** | | | | |
| **INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)** | | | | **SUFFIX** |
| **10c. MAILING ADDRESS** 520 North 27th St. | **CITY** Billings | **STATE** MT | **POSTAL CODE** 59101 | **COUNTRY** USA |

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| | | | | |
|---|---|---|---|---|
| **11a. ORGANIZATION'S NAME** | | | | |
| **OR** | | | | |
| **11b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | | **SUFFIX** |
| **11c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

| | |
|---|---|
| **13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | **14.** This FINANCING STATEMENT: ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing |
| **15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | **16.** Description of real estate: |

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement, if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| HR Restaurants, L.C. |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| |
| FIRST PERSONAL NAME |
| |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

Date 01/29/2018
Receipt Number 7221474
Amount Paid $204.00

(LAL)

536205 201828

JAN 29 '18 AM 9:56

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | Burger King #23819 |
|---|---|

OR

| 10b. INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 10c. MAILING ADDRESS 4002 Montana Saphire Rd | CITY Billings | STATE MT | POSTAL CODE 59106 | COUNTRY USA |
|---|---|---|---|---|

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

**13** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut    ☐ covers as-extracted collateral    ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

Date 01/29/2018
Receipt Number 7221474
Amount Paid $264.00

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| HR Restaurants, L.C. |

OR

| 9b. INDIVIDUAL'S SURNAME | | |
|---|---|---|
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

536205201 828

JAN 29 '18 AM 9:56

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME  Burger King #9507 | | | | |
|---|---|---|---|---|

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
|---|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |

| 10c. MAILING ADDRESS 2150 N Federal Blvd | CITY Riverton | STATE WY | POSTAL CODE 82501 | COUNTRY USA |
|---|---|---|---|---|

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC   1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscglobal.com

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

1436 48622
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Utah
(S.O.S.)

536205201828

LAL

MAR 9 '18 AM 9:41

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| 536205201828 01/29/2018 | (or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:   **AND**   Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record   ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c   ☐ ADD name: Complete item 7a or 7b, and item 7c   ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME HR Restaurants, L.C. | | | |
|---|---|---|---|
| OR **6b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR **7b. INDIVIDUAL'S SURNAME** | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME Cofactor, LLC | | | |
|---|---|---|---|
| OR **9b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA: Debtor:HR Restaurants, L.C.

1436 48622

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Receipt Number: 7254466
Amount Paid:    $410.00

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |

5376832018391

RECEIVED
FEB 23 2018
Utah Div. Of Corp. & Comm. Code

Quick Data Services, Inc.
2005 East 2700 South, Suite 200
Salt Lake City, Utah 84109

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| HR RESTAURANTS, L.C. | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 5929 Fashion Point Dr., Suite 501 | South Ogden | UT | 84403 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| City National Bank, as Administrative Agent | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 555 South Flower Street, 24th Floor | Los Angeles | CA | 90071 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
All assets of Debtor, whether now existing or hereafter arising, and whether now owned or hereafter acquired.

FEB 23 '18 PM 3:25

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:
Utah SOS (CNB/Meridian - 018450-0086)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)



# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

## December 27, 2021

UCC eZFILE
2020 Hurley Way
Sacramento, CA 95825  USA

## UCC-11 Information Request

Your Request for Information has been processed by the Utah Division of Corporations and Commercial Code matching filing(s) in the Division's computerized database with the following search parameter(s) and the "Exact" filter:

**Search Number :** 211227832054-3

| | |
|---|---|
| **Debtor Name:** MR RESTAURANTS, L.C. | **Search Response:** All (Lapsed and Unlapsed) |
| **Debtor Type:** Organization | **Copies:** No Copies |
| **Date Range:** All Available Filings | **City:** |

The Utah Division of Corporations and Commercial Code herby certifies that the attached information is filed and of Record in the Offices of the Division as of 12/21/2021 at 18:00 MST.

Sincerely,
FILING OFFICER



*L. Veillette*

**LEIGH VEILLETTE, Director**
Utah Division of Corporations and Commercial Code





SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

## Liens Filing Search Report

The Utah Division of Corporations and Commercial Code hereby certifies that the attached list is a true and exact list of all financing statements or CFS liens and related subsequent documentation for the debtor below as filed with the Division of Corporations and Commercial Code office, Uniform Commercial Code Division, as of the Through Date below.

**Date Searched:** 12/27/2021 4:31:21 PM    **Search Criteria:**
**Searched by:**
**Filing Chains:** 4

**Good Through Filing Date:** 12/21/2021

**Cities:**
**Date Range:** All Available Filings
**Include Filings Outside Range?:** All Available Filings

December 27, 2021
**Filing Status:** ALL(Lapsed and Unlapsed)
**Include Records:** N/A

**Organization Name:** MR RESTAURANTS, L.C.

---

**Filing Chain#:** 1                          **Lapse Date:** 06/23/2022
**Original File#:** 521159201729              **Lien Type:** UCC Lien

---

**Filing #:** 521159201729    **Filing Date:** 06/23/2017    **Filing Type:** Initial Financing Statement UCC-1    **Page Count:** 1

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| MR RESTAURANTS, L.C. | Organization | N/A | 1466 E 3500 N LEHI, UT 84042, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| SECURED LENDER SOLUTIONS | Organization | N/A | P.O. BOX 2576 SPRINGFIELD, IL 62708, USA |

**Collateral**
ALL PRESENTLY EXISTING OR HEREAFTER ARISING, NOW OWNED OR HEREAFTER ACQUIRED ASSETS OF THE DEBTOR. THE SECURED PARTY NAMED IN THIS RECORD IS ACTING IN A REPRESENTATIVE CAPACITY FOR PURPOSES OF FORWARDING NOTICES AND INQUIRIES REGARDING THIS RECORD. FOR MORE INFORMATION, PLEASE CONTACT THE SECURED PARTY AT THE ADDRESS LISTED ABOVE OR AT UCCSPREP@CSCINFO.COM.

---



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing #:** 521159201729-2    **Filing Date:** 02/20/2018    **Filing Type:** Termination UCC-3    **Page Count:** 1



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing Chain#:** 2
**Original File#:** 535943201839

**Lapse Date:** 01/26/2023
**Lien Type:** UCC Lien

---

**Filing #:** 535943201839      **Filing Date:** 01/26/2018      **Filing Type:** Initial Financing Statement UCC-1      **Page Count:** 1

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| MR RESTAURANTS, L.C. | Organization | N/A | 5929 FASHION POINT DR. STE 501 SOUTH OGDEN, UT 84403, USA |
| MERIDIAN RESTAURANTS UNLIMITED | Organization | N/A | 5929 FASHION POINT DR. STE 501 SOUTH OGDEN, UT 84403, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | Organization | N/A | P.O. BOX 2576 UCCSPREP@CSCINFO.COM SPRINGFIELD, IL 62708, USA |

**Collateral**

SECURITY INTEREST IN AND TO ALL OF MERCHANT'S PRESENT AND FUTURE ACCOUNTS, CHATTEL PAPER, DEPOSIT ACCOUNTS, PERSONAL PROPERTY, ASSETS AND FIXTURES, GENERAL INTANGIBLES, INSTRUMENTS, EQUIPMENT, INVENTORY WHEREVER LOCATED, AND PROCEEDS NOW OR HEREAFTER

---

**Filing #:** 535943201839-2      **Filing Date:** 03/07/2018      **Filing Type:** Termination UCC-3      **Page Count:** 1



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

**Filing Chain#:** 3

**Original File#:** 537682201838

**Lapse Date:** 02/23/2023

**Lien Type:** UCC Lien

---

**Filing #:** 537682201838    **Filing Date:** 02/23/2018    **Filing Type:** Initial Financing Statement UCC-1    **Page Count:** 1

### Debtors

| Name | Type | Action Type | Address |
|---|---|---|---|
| MR RESTAURANTS, L.C. | Organization | N/A | 5929 FASHION POINT DR., SUITE 501 SOUTH OGDEN, UT 84403, USA |

### Secured Parties

| Name | Type | Action Type | Address |
|---|---|---|---|
| CITY NATIONAL BANK, AS ADMINISTRATIVE AGENT | Organization | N/A | 555 SOUTH FLOWER STREET, 24TH FLOOR LOS ANGELES, CA 90071, USA |

### Collateral

ALL ASSETS OF DEBTOR, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER NOW OWNED OR HEREAFTER ACQUIRED.



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing Chain#:** 4
**Original File#:** 2020688352-0

**Lapse Date:** 06/26/2025
**Lien Type:**UCC Lien

---

**Filing #:** 2020688352-0       **Filing Date:** 06/26/2020       **Filing Type:** Initial Financing **Page Count:**1
Statement UCC-1

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| MR RESTAURANTS, L.C. | Organization | N/A | 5929 FASHION POINT DRIVE, STE. 501 OGDEN, UT 84403, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| HITACHI CAPITAL AMERICA CORP. | Organization | N/A | 7808 CREEKRIDGE CIRCLE, STE 250 EDINA, MN 55439, USA |

**Collateral**

All rights to and interest in the Equipment, together with all proceeds, attachments, accessories, parts, additions and any substitutions thereto, under Equipment Finance Agreement No. 6215900-001

---

**Filing #:** 200701691402-8       **Filing Date:** 07/01/2020       **Filing Type:** Amendment Party **Page Count:**1
UCC-3

**Secured Parties**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| BANCLEASE ACCEPTANCE CORP | Organization | N/A | 7808 CREEKRIDGE CIRCLE, SUITE 250 EDINA, MN 55439, USA |

---

Search Date: December 27, 2021



CLAS
WORLDWIDE INFORMATION SERVICES

Better
Intelligence
Better
Decisions™

2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

**Ask us about UCC eZFILE®**

## UCC Search Report

| | |
|---|---|
| **Type of Search** | UCCs |
| **Jurisdiction/Filing Office** | State of Utah, Secretary of State Uniform Commercial Code Division |
| **Estimated Currency Date** | Nov. 09, 2021 |
| **Last File Date** | Nov 14 2021 |
| **Subject Search Name** | MR RESTAURANTS, L.C. |
| **Search Key Entered** | MR* RES* |

## Results

Based on a search of the indices of the Uniform Commercial Code Division of the Secretary of State of Utah, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well as the searcher's choice of the liens ultimately included or excluded herein. Certification can only be obtained through the office of the Utah Secretary of State.

### 1. UCC Lien

| | | |
|---|---|---|
| **Document No.** | 521159201729 | Lapses 6/23/2022 |
| **Filed** | 6/23/2017 | |
| **Debtor** | MR RESTAURANTS L.C.<br>1466 E 3500 N<br>LEHI Utah 84042 | |
| **Secured Party** | SECURED LENDER SOLUTIONS<br>P.O. BOX 2576<br>SPRINGFIELD Illinois 62708 | |
| **Amendment Type** | Termination | |
| **File No.** | 521159201729-2 | |
| **Filed** | 2/20/2018 2:16:00 PM | |
| **Collateral** | Collateral | |
| **Date** | 6/23/2017 7:03:00 AM | |

### 2. UCC Lien

| | | |
|---|---|---|
| **Document No.** | 535943201839 | Lapses 1/26/2023 |
| **Filed** | 1/26/2018 | |
| **Debtor** | MERIDIAN RESTAURANTS UNLIMITED<br>5929 FASHION POINT DR. STE 501<br>SOUTH OGDEN Utah 84403 | |
| **Debtor** | MR RESTAURANTS L.C.<br>5929 FASHION POINT DR. STE 501<br>SOUTH OGDEN Utah 84403 | |
| **Secured Party** | CORPORATION SERVICE COMPANY AS REPRESENTATIVE<br>P.O. BOX 2576 UCCSPREP@CSCINFO.COM<br>SPRINGFIELD Illinois 62708 | |

**Amendment Type** Termination
**File No.** 535943201839-2
**Filed** 3/7/2018 6:41:00 AM

**Collateral** Collateral
**Date** 1/26/2018 9:51:00 AM

### 3. UCC Lien

**Document No.** 537682201838                    Lapses 2/23/2023
**Filed** 2/23/2018

**Debtor** MR RESTAURANTS L.C.
5929 FASHION POINT DR. SUITE 501
SOUTH OGDEN Utah 84403

**Secured Party** CITY NATIONAL BANK AS ADMINISTRATIVE AGENT
555 SOUTH FLOWER STREET 24TH FLOOR
LOS ANGELES California 90071

**Collateral** Collateral
**Date** 2/23/2018 3:25:00 PM

### 4. UCC Lien

**Document No.** 2020688352-0                    Lapses 6/26/2025
**Filed** 6/26/2020

**Debtor** MR RESTAURANTS L.C.
5929 Fashion Point Drive Ste. 501
Ogden Utah 84403

**Secured Party** BANCLEASE ACCEPTANCE CORP
7808 CREEKRIDGE CIRCLE SUITE 250
EDINA Minnesota 55439

**Secured Party** HITACHI CAPITAL AMERICA CORP.
7808 Creekridge Circle Ste 250
Edina Minnesota 55439

**Amendment Type** Amendment Party Secured Party Change
**File No.** 200701691402-8
**Filed** 7/1/2020 11:53:00 AM

**Collateral** Collateral
**Date** 6/26/2020 9:21:00 AM

We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as provided by government and other sources, do we make any guaranty or representation as to its accuracy.

**---------- END OF REPORT ----------**

## Report Parameters

The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.

Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGEMENT TO:  (Name and Address) | |

| Filed in the Office of | Initial Filing Number |
|---|---|
| | **521159201729** |
| *[signature]* | Filed On |
| Director, Division of | **6/23/2017 7:03:00 AM** |
| Corporations and | Lapse Date |
| Commercial Code | **6/23/2022** |
| | Number of Pages |
| | **1** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| **MR RESTAURANTS, L.C.** | | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| **1466 E 3500 N** | **LEHI** | | **UT** | **84042** | **USA** |

2. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| **SECURED LENDER SOLUTIONS** | | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| **P.O. BOX 2576** | **SPRINGFIELD** | | **IL** | **62708** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
**ALL PRESENTLY EXISTING OR HEREAFTER ARISING, NOW OWNED OR HEREAFTER ACQUIRED ASSETS OF THE DEBTOR. THE SECURED PARTY NAMED IN THIS RECORD IS ACTING IN A REPRESENTATIVE CAPACITY FOR PURPOSES OF FORWARDING NOTICES AND INQUIRIES REGARDING THIS RECORD. FOR MORE INFORMATION, PLEASE CONTACT THE SECURED PARTY AT THE ADDRESS LISTED ABOVE OR AT UCCSPREP@CSCINFO.COM.**

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) | | |
|---|---|---|
| B. E-MAIL CONTACT AT FILER (optional) | | |
| C. SEND ACKNOWLEDGEMENT TO:  (Name and Address) | | |

| Filed in the Office of | Document Number |
|---|---|
| | **521159201729-2** |
| Director, Division of Corporations and Commercial Code | Filed Date and Time |
| | **2/20/2018 2:16:00 PM** |
| | Number of Pages |
| | **1** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER<br>**521159201729** | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]<br>(or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|

2. ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
   For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:       AND Check one of these three boxes to:

This Change affects   ☐ Debtor or   ☐ Party of record      ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b, and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral
   Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
   If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME<br>**SECURED LENDER SOLUTIONS** | | | |
|---|---|---|---|---|
| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
**142960206**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Receipt Number: 7218214

Amount Paid: $12.00

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Corporation Service Company    1-800-858-5294 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| SPRFiling@cscinfo.com |

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

1417 70606
Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703-4261

Filed In: Utah
(S.O.S.)

535943201839

LAL

JAN 26 '18 AM 9:51

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME MR Restaurants, L.C. | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 5929 Fashion Point Dr. Ste 501 | CITY South Ogden | STATE UT | POSTAL CODE 84403 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME Meridian Restaurants Unlimited | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS 5929 Fashion Point Dr. Ste 501 | CITY South Ogden | STATE UT | POSTAL CODE 84403 | COUNTRY USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME CORPORATION SERVICE COMPANY,  as REPRESENTATIVE | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS P.O. Box 2576 uccsprep@cscinfo.com | CITY Springfield | STATE IL | POSTAL CODE 62708 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:

Security interest in and to all of Merchant's present and future accounts, chattel paper, deposit accounts, personal property, assets and fixtures, general intangibles, instruments, equipment, inventory wherever located, and proceeds now or hereafter owned or acquired by Merchant.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative |
|---|
| 6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | 6b. Check only if applicable and check only one box. ☐ Agricultural Lien ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor |
| 8. OPTIONAL FILER REFERENCE DATA: UCC |

1417 70606

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

## UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGEMENT TO:  (Name and Address) | |

| Filed in the Office of | Document Number |
|---|---|
| *[signature]* | **535943201839-2** |
| Director, Division of | Filed Date and Time |
| Corporations and | **3/7/2018 6:41:00 AM** |
| Commercial Code | Number of Pages |
| | **1** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER<br>**535943201839** | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]<br>(or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|

2. ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
   For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                    AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Party of record      ☐ CHANGE name and/or address: Complete      ☐ ADD name: Complete item      ☐ DELETE name: Give record name
                                                      item 6a or 6b; and item 7a or 7b and item 7c      7a or 7b, and item 7c      to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION:  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
   Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:  Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
   If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME<br>**CORPORATION SERVICE COMPANY, AS REPRESENTATIVE** | | | |
|---|---|---|---|---|
| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
    **UCC**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Receipt Number: 7254466
Amount Paid:    $410.00

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**RECEIVED**

**FEB 2 3 2018**

Utah Div. Of Corp. & Comm. Code

5376822O1838

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Quick Data Services, Inc.
2005 East 2700 South, Suite 200
Salt Lake City, Utah 84109

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| MR RESTAURANTS, L.C. | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 5929 Fashion Point Dr., Suite 501 | South Ogden | UT | 84403 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| City National Bank, as Administrative Agent | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 555 South Flower Street, 24th Floor | Los Angeles | CA | 90071 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of Debtor, whether now existing or hereafter arising, and whether now owned or hereafter acquired.

FEB 23 '18 PM 3:25

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
| --- | --- |
| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: |
| ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien  ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor | |

8. OPTIONAL FILER REFERENCE DATA:
Utah SOS (CNB/Meridian - 018450-0086)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| **Wolters Kluwer Lien Solutions   800-331-3282** |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| **uccfilingreturn@wolterskluwer.com** |

C. SEND ACKNOWLEDGEMENT TO:  (Name and Address)

**Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071 USA**

| Filed in the Office of | Initial Filing Number |
|---|---|
| *[signature]* | **2020688352-0** |
| Director, Division of | Filed On |
| Corporations and | **6/26/2020 9:21:57 AM** |
| Commercial Code | Lapse Date |
| | **6/26/2025** |
| | Number of Pages |
| | **1** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **MR RESTAURANTS, L.C.** | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **5929 Fashion Point Drive, Ste. 501** | **Ogden** | **UT** | **84403** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **HITACHI CAPITAL AMERICA CORP.** | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **7808 Creekridge Circle, Ste 250** | **Edina** | **MN** | **55439** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**All rights to and interest in the Equipment, together with all proceeds, attachments, accessories, parts, additions and any substitutions thereto, under Equipment Finance Agreement No. 6215900-001**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**75647559**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Date:          07/01/2020
Receipt Number: 8409818
Amount Paid:   $12.00

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| uccfilingreturn@wolterskluwer.com |

| C. SEND ACKNOWLEDGMENT TO: (Name and Address)    47146 - HVSG |
|---|
| Lien Solutions          75702432 |
| P.O. Box 29071 |
| Glendale, CA  91209-9071        UTUT |

File with: Div of Corp and Commercial, UT

| Filed in the Office of | Filing Number |
|---|---|
| [signature] | **200701691402-8** |
| | Initial Filing Number |
| Director, Division of | **2020688352-0** |
| Corporations and | Filed On |
| Commercial Code | **July 1, 2020 11:53 AM** |
| | Lapse Date |
| | **06/26/2025** |
| | Number of Pages |
| | **1** |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
202206883520   6/26/2020   SS UT

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☒ PARTY INFORMATION CHANGE:

Check one of these two boxes:
☐ This Change affects  ☐ Debtor or  ☒ Secured Party of record

AND Check one of these three boxes:
☒ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME |
|---|
| HITACHI CAPITAL AMERICA CORP. |

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME |
|---|
| BANCLEASE ACCEPTANCE CORP |

OR

| 7b. INDIVIDUAL'S SURNAME |
|---|
| |
| INDIVIDUAL'S FIRST PERSONAL NAME |
| |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                           SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7808 Creekridge Circle, Suite 250 | Edina | MN | 55439 | USA |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:
All rights to and interest in the Equipment, together with all proceeds, attachments, accessories, parts, additions and any substitutions thereto, under Equipment Finance Agreement No. 6215900-001

JUL 1 '20 AM 11:53

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME |
|---|
| HITACHI CAPITAL AMERICA CORP. |

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

10. OPTIONAL FILER REFERENCE DATA: Debtor Name: MR RESTAURANTS, L.C.
75702432                043-6215900-001

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282



# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

## December 27, 2021

UCC eZFILE
2020 Hurley Way
Sacramento, CA 95825  USA

### UCC-11 Information Request

Your Request for Information has been processed by the Utah Division of Corporations and Commercial Code matching filing(s) in the Division's computerized database with the following search parameter(s) and the "Exact" filter:

**Search Number :** 211227832055-0

**Debtor Name:** C UTAH, L.C.

**Debtor Type:** Organization

**Date Range:** All Available Filings

**Search Response:** All (Lapsed and Unlapsed)

**Copies:** No Copies

**City:**

The Utah Division of Corporations and Commercial Code herby certifies that the attached information is filed and of Record in the Offices of the Division as of 12/23/2021 at 18:00 MST.

Sincerely,
FILING OFFICER



**LEIGH VEILLETTE, Director**
Utah Division of Corporations and Commercial Code





SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

### Liens Filing Search Report

The Utah Division of Corporations and Commercial Code hereby certifies that the attached list is a true and exact list of all financing statements or CFS liens and related subsequent documentation for the debtor below as filed with the Division of Corporations and Commercial Code office, Uniform Commercial Code Division, as of the Through Date below.

**Date Searched:** 12/27/2021 4:31:29 PM   **Search Criteria:**
**Searched by:**
**Filing Chains:** 1
**Good Through Filing Date:** 12/23/2021
**Cities:**
**Date Range:** All Available Filings
**Include Filings Outside Range?:** All Available Filings

December 27, 2021
**Filing Status:** ALL(Lapsed and Unlapsed)
**Include Records:** N/A

**Organization Name:** C UTAH, L.C.

---

**Filing Chain#:** 1                                    **Lapse Date:** 02/23/2023
**Original File#:** 537680201836                        **Lien Type:** UCC Lien

---

**Filing #:** 537680201836   **Filing Date:** 02/23/2018   **Filing Type:** Initial Financing   **Page Count:** 1
Statement UCC-1

#### Debtors

| Name | Type | Action Type | Address |
|---|---|---|---|
| C UTAH, L.C. | Organization | N/A | 5929 FASHION POINT DR., SUITE 501 SOUTH OGDEN, UT 84403, USA |

#### Secured Parties

| Name | Type | Action Type | Address |
|---|---|---|---|
| CITY NATIONAL BANK, AS ADMINISTRATIVE AGENT | Organization | N/A | 555 SOUTH FLOWER STREET, 24TH FLOOR LOS ANGELES, CA 90071, USA |

#### Collateral

ALL ASSETS OF DEBTOR, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER NOW OWNED OR HEREAFTER ACQUIRED.

---

Search Date: December 27, 2021



2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

**Ask us about UCC eZFILE®**

## UCC Search Report

| | |
|---|---|
| **Type of Search** | UCCs |
| **Jurisdiction/Filing Office** | State of Utah, Secretary of State Uniform Commercial Code Division |
| **Estimated Currency Date** | Nov. 09, 2021 |
| **Last File Date** | Nov 14 2021 |
| **Subject Search Name** | C UTAH, L.C. |
| **Search Key Entered** | C UT* |

## Results

Based on a search of the indices of the Uniform Commercial Code Division of the Secretary of State of Utah, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well as the searcher's choice of the liens ultimately included or excluded herein. Certification can only be obtained through the office of the Utah Secretary of State.

**1. UCC Lien**

| | | |
|---|---|---|
| **Document No.** | 537680201836 | Lapses 2/23/2023 |
| **Filed** | 2/23/2018 | |
| **Debtor** | C UTAH L.C. | |
| | 5929 FASHION POINT DR. SUITE 501 | |
| | SOUTH OGDEN Utah 84403 | |
| **Secured Party** | CITY NATIONAL BANK AS ADMINISTRATIVE AGENT | |
| | 555 SOUTH FLOWER STREET 24TH FLOOR | |
| | LOS ANGELES California 90071 | |
| **Collateral** | Collateral | |
| **Date** | 2/23/2018 3:25:00 PM | |

We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as provided by government and other sources, do we make any guaranty or representation as to its accuracy.

---------- **END OF REPORT** ----------

## Report Parameters

The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.

Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in

the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.

Search Date: December 27, 2021



2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

**Ask us about UCC eZFILE®**

## Utah Similar Name Report

| | |
|---|---|
| **Subject Search Name** | C UTAH, L.C. |
| **Truncated Search Name** | C UT* |
| **Estimated Currency Date** | November 09, 2021 |
| **Last File Date** | Nov 14 2021 |
| | Contains all debtor names not included on the final results report. |

| Filing # | Debtor Name | Address | City | State | Zip | Type |
|---|---|---|---|---|---|---|
| 174844200142 | DBA CUTRUBUS MOTORS | 1234 N MAIN | LAYTON | Utah | 84041 | UCC |
| 191107634251-8 | CUTLER, COREY | 2073 NORTH 4725 WEST | PLAIN CITY | Utah | 84404 | UCC |
| 191129638712-2 | CUTTING EDGE PRECISION LLC | 1805 W. 2900 SOUTH | OGDEN | Utah | 84401 | UCC |
| 200113648285-6 | CUTTERPILLAR LLC | 14725 S PORTER ROCKWELL BLVD | BLUFFDALE | Utah | 84065 | UCC |
| 200310662421-9 | CUTRIGHT, JACOB WOOLF | 13226 SOUTH SUFFOLK VIEW COVE | HERRIMAN | Utah | 84096 | UCC |
| 200403667724-5 | CUTLER LLC | 879 WEST PLEASANT VIEW DRIVE | PLEASANT VIEW | Utah | 84414 | UCC |
| 200521677122-1 | CUT - TO - SIZE TECHNOLOGY INC. | 345 FAIRBANK ST. | ADDISON | Illinois | 60101 | UCC |
| 200603680781-7 | CUTLER, CARL | 2424 W CHARDONNAY LN | SAINT GEORGE | Utah | 84770 | UCC |
| 200610682889-8 | CUTTING EDGE PRECISION LLC | 1805 WEST 2900 SOUTH UNIT 4 | OGDEN | Utah | 84401 | UCC |
| 200811704180-4 | CUTTING EDGE LAWN MAINTENANCE LLC | 10592 5600 S | PAYSON | Utah | 84651 | UCC |
| 200903710047-1 | CUTLER, GREG | 515 N 100 E | CENTERVILLE | Utah | 84014 | UCC |
| 2020667077-0 | CUTTING EDGE CNC LLC | 2898 COMMERCE WAY STE 2 | OGDEN | Utah | 84401 | UCC |
| 2020667085-9 | CUTTING EDGE PRECISION LLC | 1805 WEST 2900 SOUTH UNIT 4 | Ogden | Utah | 84401 | UCC |
| 2020684191-1 | Cutie V Salon | 7499 S PARK MAPLE DR | WEST JORDAN | Utah | 84081 | UCC |

| 2020684331-7 | Cutterpillar | 14725 S. Porter Rockwell Blvd. Suite C | Bluffdale | Utah | 84065 | UCC |
|---|---|---|---|---|---|---|
| 2020688808-3 | Cutting edge painting inc. | 9445 south silver spring circle | South Jordan | Utah | 84095 | UCC |
| 2020688809-2 | Cutting Edge Window Services | 7400 S. State st. APT#3203 | Midvale | Utah | 84047 | UCC |
| 2020692259-9 | CUTTING EDGE PRECISION LLC | 1805 W 2900 S UNIT 4 | OGDEN | Utah | 84401 | UCC |
| 2020692426-8 | Cutting Edge Closets & Design Inc. | 1015 South 1680 West | Orem | Utah | 84059 | UCC |
| 2020699625-8 | Cutting Edge Print Service LLC | 1415 South 700 West #5 | Salt Lake City | Utah | 84104 | UCC |
| 2020704919-0 | Cutler Riley PLLC | 668 E 12225 S STE 204 | DRAPER | Utah | 84020 | UCC |
| 2020707451-7 | Cutt, David A | 4817 Holladay Blvd | Holladay | Utah | 84117 | UCC |
| 2020710415-9 | Cutting Edge Auto Care LLC | 405 N 1000 W | CLEARFIELD | Utah | 84015 | UCC |
| 2020716704-9 | CUTTERPILLAR LLC | 14725 S. Porter Rockwell Blvd. Suite C | Bluffdale | Utah | 84065 | UCC |
| 2020718848-3 | CUTLER'S INCORPORATED | 271 N STATE ST | Orem | Utah | 84057 | UCC |
| 2020722707-7 | CUTTING EDGE HOLDINGS LLC | 1483 EAST 3850 SOUTH | SAINT GEORGE | Utah | 84790 | UCC |
| 2020733622-9 | CUTTING EDGE EXCAVATING LLC | 138 E 12300 S # 695 | Draper | Utah | 84020 | UCC |
| 2021745680-4 | Cutting Edge Self Storage Management & Consulting L.C. | 7711 S MAIN ST | MIDVALE | Utah | 84047 | UCC |
| 2021747311-7 | CUTTING EDGE CNC LLC | 2898 COMMERCE WAY STE 2 | OGDEN | Utah | 84401 | UCC |
| 2021747311-7 | CUTTING EDGE CNC LLC | 2898 COMMERCE WAY STE 2 | OGDEN | Utah | 84401 | UCC |
| 2021748969-6 | Cutler, Corey Lamar | 2073 North 4725 West | Plain City | Utah | 84404 | UCC |
| 2021758892-8 | CUTTING EDGE LAWN MAINTENANCE LLC | 10592 S 5600 W | PAYSON | Utah | 84651 | UCC |
| 2021759850-6 | CUTLER, TRAVIS BRENT | 3455 W 550 N | WEST POINT | Utah | 84015 | UCC |
| 2021762443-5 | Cutter, David Henry | 7495 North Whileaway Road | Park City | Utah | 84098 | UCC |
| 2021764160-9 | Cutting Edge Stone and Granite L.L.C. | 5205 S Commerce Dr | Salt Lake City | Utah | 84107 | UCC |
| 2021765665-0 | Cutting Edge Stone and Granite L.L.C. | 5205 South Commerce Drive | Murray | Utah | 84107 | UCC |
| 2021788627-1 | CUTLER, THOMAS ALBA | 6681 W NORMANDY WAY | HIGHLAND | Utah | 84003 | UCC |
| 2021788627-1 | CUTLER, THOMAS ALBA | 77 W LUND LANE | CENTERVILLE | Utah | 84014 | UCC |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2021789268-8 | CUTTING EDGE PRECISION LLC | 1805 West 2900 South Unit 4 | Ogden | Utah | 84401 | UCC |
| 2021815653-6 | Cutz Treez LLC | 1170 West 4200 North | Plesant View | Utah | 84414 | UCC |
| 210118741925-1 | CUTLER, BRIANA | 3067 S LONDON LN | MAGNA | Utah | 84044 | UCC |
| 210225752468-8 | CUTLER, BENTON | 628 S CREEKSIDE DR | LEHI | Utah | 84043 | UCC |
| 210611780307-6 | THE CUTLER FAMILY TRUST | 450 E 300 S | KANAB | Utah | 84741 | UCC |
| 211731200328 | CUTLER'S INCORPORATED | 255 NORTH STATE | OREM | Utah | 84057 | UCC |
| 243454200431 | CUTLER, CURTIS | 115 SOUTH 100 EAST | KANAB | Utah | 84741 | UCC |
| 284803200540 | CUTLER INVESTMENT PROPERTIES LLC | 255 NORTH STATE STREET | OREM | Utah | 84057 | UCC |
| 367336200945 | CUTLER'S INCORPORATED | 271 N STATE ST | OREM | Utah | 84057 | UCC |
| 369553200943 | CUTLER'S INCORPORATED | 271 N STATE | OREM | Utah | 84057 | UCC |
| 370187200941 | CUTLER'S INCORPORATED | 271 N. STATE | OREM | Utah | 84057 | UCC |
| 389535201146 | CUTE CAR AUTO INC. | 556 W. 3560 S. | SALT LAKE CITY | Utah | 84115 | UCC |
| 391783201141 | CUTLER'S INCORPORATED | 271 NORTH STATE STREET | OREM | Utah | 84057 | UCC |
| 399736201150 | CUTRUBUS, C. NINA | 1159 SECOND AVENUE P.O. BOX 58247 | SALT LAKE CITY | Utah | 84158 | UCC |
| 402626201135 | CUTTHROAT HOLDINGS LLC | 618 NORTH MAIN STREET | LOGAN | Utah | 84321-2937 | UCC |
| 405396201134 | CUT EQUIPMENT HOLDINGS LLC | 775 SOUTH UNIVERSITY AVENUE | PROVO | Utah | 84601 | UCC |
| 405399201137 | CUT EQUIPMENT HOLDINGS LLC | 775 SOUTH UNIVERSITY AVENUE | PROVO | Utah | 84601 | UCC |
| 410035201228 | CUTLER EXPRESS LLC | 1961 RIDGE ROAD | LAYTON | Utah | 84040 | UCC |
| 415235201231 | CUTRUBUS AUTOMOTIVE LLC | 1230 N. MAIN | LAYTON | Utah | 84041 | UCC |
| 435181201330 | CUTTING EDGE TREE PROFESSIONALS LLC | 2717 COUNTRY OAKS DRIVE | LAYTON | Utah | 84040 | UCC |
| 474225201545 | CUTLER ELECTRIC INC | 1417 E. 150 SOUTH | SPRINGVILLE | Utah | 84663 | UCC |
| 476514201540 | CUTTING EDGE PRECISION LLC | 1805 W. 2900 S UNIT 4 | OGDEN | Utah | 84401 | UCC |
| 482360201537 | CUTLER, JUSTIN | 11208 STAR CIRCLE | SANDY | Utah | 84092 | UCC |
| 484495201654 | CUT EQUIPMENT HOLDINGS LLC | 775 S UNIVERSITY AVE | PROVO | Utah | 84601 | UCC |
| 484683201652 | CUTLER, GORDON W | 10930 N. 8400 W. | TREMONTON | Utah | 84337 | UCC |

| | | | | | | |
|---|---|---|---|---|---|---|
| 484980201652 | CUTLERS TOO INC. | 2785 EAST 1700 NORTH | LAYTON | Utah | 84041 | UCC |
| 489034201647 | CUTLER, COREY | 2486 DESERT MNT RD | PEOA | Utah | 84061 | UCC |
| 490212201635 | CUTHBERT, JARED | 690 E 900 S | MAPLETON | Utah | 84664 | UCC |
| 490621201640 | CUTTING EDGE PRECISION LLC | 1805 W. 2900 S UNIT 4 | OGDEN | Utah | 84401 | UCC |
| 492094201646 | CUTRIGHT, JACOB | 5734 WEST SORREL CT | HERMAN | Utah | 84096 | UCC |
| 492763201646 | CUTLER, JAMES | 3383 S. 8070 W. | MAGNA | Utah | 84044 | UCC |
| 494205201644 | CUTING EDGE HOLDINGS LLC | 1483 E 3850 S STE.B | ST. GEORGE | Utah | 84790 | UCC |
| 495866201647 | CUTTING EDGE CLOSETS & DESIGN INC | 1015 SOUTH 1680 WEST | OREM | Utah | 84058 | UCC |
| 499368201652 | CUTTING EDGE CABINETRY INC. | 2675 INDUSTRIAL DR STE 101 | OGDEN | Utah | 84401 | UCC |
| 500681201627 | CUTTING EDGE EXCAVATING LLC | 525 E. 100 ST. | PLEASANT GROVE | Utah | 84062 | UCC |
| 501716201630 | CUTTING EDGE PRECISION LLC | 1805 W 2900 S UNIT 4 | OGDEN | Utah | 84401 | UCC |
| 501716201630 | CUTTING EDGE PRECISION LLC | 1805 W 2900 S UNIT 4 | OGDEN | Utah | 84401 | UCC |
| 502583201632 | CUTTHROAT ROLLOFF DUMPSTERS INC | 772 E. PARK SCHOOL ROAD | DRAPER | Utah | 84020 | UCC |
| 503258201630 | CUTTING EDGE STONE AND GRANITE L.L.C. | 5205 SOUTH COMMERCE DR. | MURRAY | Utah | 84107 | UCC |
| 504099201639 | CUTLER FAMILY REAL ESTATE LLC | 284 SOUTH 1375 EAST | BOUNTIFUL | Utah | 84010 | UCC |
| 504361201628 | CUTHBERT, JARED | 690 E 900 S | MAPLETON | Utah | 84664 | UCC |
| 506511201624 | CUTTING EDGE CNC LLC | 2898 COMMERCE WAY SUITE #2 | OGDEN | Utah | 84401 | UCC |
| 507028201630 | CUTTING EDGE TREE PROFESSIONALS LLC | 2717 COUNTRY OAKS DRIVE | LAYTON | Utah | 84040 | UCC |
| 508276201633 | CUTS BY COOP INC | 4643 W. MOOSE HORN COURT | WEST JORDAN | Utah | 84088 | UCC |
| 509661201733 | CUTLER, ROBERT | 2159 W WORWOOD CIR | TAYLORSVILLE | Utah | 84129 | UCC |
| 511630201729 | CUTTING EDGE CNC LLC | 2898 COMMERCE WAY SUITE #2 | OGDEN | Utah | 84401 | UCC |
| 511853201729 | CUTLER, RANDY DEVON | 12 S 6800 W | CORRINNE | Utah | 84307 | UCC |
| 512419201734 | CUTTING EDGE HOLDINGS LLC | 1483 E 3850 S STE B | ST GEORGE | Utah | 84790 | UCC |
| 513231201730 | CUTLER, CRAIG | 3020 THACKERAY PL | SALT LAKE CITY | Utah | 84108 | UCC |
| 513613201732 | CUTTING EDGE HOLDINGS LLC | 1483 EAST 3850 SOUTH | SAINT GEORGE | Utah | 84790 | UCC |

| 514446201741 | CUTTING EDGE CNC | 786 W 2ND STREET N 7 | OGDEN | Utah | 84404 | UCC |
|---|---|---|---|---|---|---|
| 516685201736 | CUTZ TREEZ LLC | 4836 SOUTH 525 WEST | RIVERDALE | Utah | 84405 | UCC |
| 521193201731 | CUTLER, JERRY | 2651 NORTH 475 WEST | CEDAR CITY | Utah | 84721 | UCC |
| 523576201738 | CUTTING EDGE PRECISION LLC | 1805 WEST 2900 SOUTH UNIT 4 | OGDEN | Utah | 84401 | UCC |
| 525171201724 | CUTTING EDGE CABINETRY | 2675 INDUSTRIAL DR STE 101 | OGDEN | Utah | 84401 | UCC |
| 526669201737 | CUTLERS INC. | 271 NORTH STATE | OREM | Utah | 84057 | UCC |
| 527684201738 | CUT EQUIPMENT HOLDINGS LLC | 775 S UNIVERSITY AVE | PROVO | Utah | 84601 | UCC |
| 529389201744 | CUTIE V SALON LLC | 7499 SOUTH PARK MAPLE DRIVE | WEST JORDAN | Utah | 84081 | UCC |
| 529545201743 | CUTIE V SALON LLC | 7499 PARK MAPLE DRIVE | WEST JORDAN | Utah | 84081 | UCC |
| 530308201728 | CUTTING EDGE STONE AND GRANITE L.L.C. | 5205 S COMMERCE DR | SALT LAKE CITY | Utah | 84107 | UCC |
| 531466201732 | CUTZ TREEZ LLC | 4836 SOUTH 525 WEST | RIVERDALE | Utah | 84405 | UCC |
| 53261200120 | CUTLERS | 255 NORTH STATE | OREM U | Alabama | 84057 | UCC |
| 53261200120 | CUTLER'S INCORPORATED | 271 NORTH STATE STREET | OREM | Utah | 84057 | UCC |
| 533543201739 | CUTTING EDGE PRECISION LLC | 1805 W. 2900 S UNIT 4 | OGDEN | Utah | 84401 | UCC |
| 533576201739 | CUTTERS WIRELINE SERVICE INCORPORATED | 632 S 1500 E BOX 727 | VERNAL | Utah | 84078 | UCC |
| 537686201842 | CUTTING EDGE AUTO CARE LLC | 405 NORTH 1000 WEST | CLEARFIELD | Utah | 84015 | UCC |
| 537771201836 | CUTTING EDGE PRECISION LLC | 1805 WEST 2900 SOUTH | OGDEN | Utah | 84401 | UCC |
| 537803201834 | CUTTING EDGE PRECISION LLC | 1805 W. 2900 S UNIT 4 | OGDEN | Utah | 84401 | UCC |
| 539327201841 | CUTHBERT, JESSE | 814 N SILVER WOLF RD | ELK RIDGE | Utah | 84651 | UCC |
| 539433201840 | CUTTING EDGE PRECISION LLC | 1805 WEST 2900 SOUTH UNIT 4 | OGDEN | Utah | 84401 | UCC |
| 542639201844 | CUTTING EDGE CNC LLC | 2898 COMMERCE WAY #2 | OGDEN | Utah | 84401 | UCC |
| 543102201828 | CUTTERS WIRELINE SERVICE INCORPORATED | P. O BOX 727 | VERNAL | Utah | 84078 | UCC |
| 54378200129 | CUTRUBUS MOTORS | 895 W RIVERDALE RD | OGDEN | Utah | 84405 | UCC |
| 54378200129 | CUTRUBUS MOTORS INC. | 895 W RIVERDALE RD | OGDEN | Utah | 84405 | UCC |

| 549537201846 | CUTSHALL, RICHARD | 1338 S FOOTHILL DR | SALT LAKE CITY | Utah | 84108 | UCC |
|---|---|---|---|---|---|---|
| 550563201831 | CUTTING EDGE HOLDINGS LLC | 1483 E 3850 S STE. B | ST. GEORGE | Utah | 84790 | UCC |
| 551092201833 | CUTALONG VIRGINIA LLC | 160 W CANYON CREST RD | ALPINE | Utah | 84004 | UCC |
| 55352200125 | CUTLER'S INCORPORATED | 271 NORTH STATE STREET | OREM | Utah | 84057 | UCC |
| 55352200125 | CUTLERS | 255 N STATE | OREM | Utah | 84057 | UCC |
| 554485201844 | CUTTERS LAWN CARE LLC | PO BOX 970021 | OREM | Utah | 84097 | UCC |
| 555100201822 | CUTTERS WIRELINE SERVICE INCORPORATED | 11700 KATY FREEWAY SUITE 330 | HOUSTON | Texas | 77079 | UCC |
| 556037201836 | CUTTITTA, ERICA | 10352 N BASIN CANYON ROAD | PARK CITY | Utah | 84098 | UCC |
| 556037201836 | CUTTITTA, ERICA LEIGH | 10352 N BASIN CANYON ROAD | PARK CITY | Utah | 84098 | UCC |
| 556833201840 | CUT EQUIPMENT HOLDINGS LLC | 775 S UNIVERSITY AVE | PROVO | Utah | 84601 | UCC |
| 563461201936 | CUT EQUIPMENT HOLDINGS LLC | 775 S UNIVERSITY AVE | PROVO | Utah | 84601 | UCC |
| 564362201938 | CUTLER, CHARLES | 10961 S GRESHAM DR | SOUTH JORDAN | Utah | 84009 | UCC |
| 567804201939 | CUTTING EDGE STONE AND GRANITE LLC | 5205 COMMERCE DR S | MURRAY | Utah | 84107 | UCC |
| 567918201946 | CUTTING EDGE PRINT SERVICES LLC | 1415 SOUTH 700 WEST SUITE 5 | SALT LAKE CITY | Utah | 84104 | UCC |
| 570575201938 | CUTTING EDGE CNC LLC | 2898 COMMERCE WAY #2 | OGDEN | Utah | 84401 | UCC |
| 574595201950 | CUTLER, PRESTON | 10961 SOUTH GRESHAM DRIVE | SOUTH JORDAN | Utah | 84009 | UCC |
| 574937201953 | CUTLER, GARY BRENT | 6791 W 1425 N | CEDAR CITY | Utah | 84721 | UCC |
| 575874201941 | CUTTER COOKIES LLC | 222 W CENTER ST UNIT 413 | OREM | Utah | 84059 | UCC |
| 575903201936 | CUTZ TREEZ LLC | 4836 SOUTH 525 WEST | RIVERDALE | Utah | 84405 | UCC |
| 578022201936 | CUTTING EDGE PRECISION LLC | 1805 WEST 2900 SOUTH UNIT 4 | OGDEN | Utah | 84401 | UCC |
| 578553201939 | CUTTING EDGE PRECISION LLC | 1805 W. 2900 SOUTH | OGDEN | Utah | 84401 | UCC |
| 578676201947 | CUTLER, THOMAS ALBA | 6681 W NORMANDY WAY | HIGHLAND | Utah | 84003 | UCC |
| 61406200119 | CUTLERS | 255 N STATE | OREM | Utah | 84057 | UCC |

Date: 02/23/2018
Receipt Number: 7254468
Amount Paid:    $410.00

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|

| B. E-MAIL CONTACT AT FILER (optional) |
|---|

C                                )

Quick Data Services, Inc.
2005 East 2700 South, Suite 200
Salt Lake City, Utah 84109

RECEIVED

TMM

FEB 23 2018

Utah Div. Of Corp. & Comm. Code

5376080201836

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| C UTAH, L.C. | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 5929 Fashion Point Dr., Suite 501 | South Ogden | UT | 84403 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| City National Bank, as Administrative Agent | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 555 South Flower Street, 24th Floor | Los Angeles | CA | 90071 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of Debtor, whether now existing or hereafter arising, and whether now owned or hereafter acquired.

FEB 23 '18 PM3:25

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative | |
|---|---|---|
| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: |
| ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien  ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor | | |

8. OPTIONAL FILER REFERENCE DATA:
Utah SOS (CNB/Meridian - 018450-0086)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE          LEIGH VEILLETTE
*Executive Director*      *Director, Division of Corporations and Commercial Code*

**December 27, 2021**

UCC eZFILE
2020 Hurley Way
Sacramento, CA 95825  USA

## UCC-11 Information Request

Your Request for Information has been processed by the Utah Division of Corporations and Commercial Code matching filing(s) in the Division's computerized database with the following search parameter(s) and the "Exact" filter:

**Search Number :** 211227832056-7

| | | | |
|---|---|---|---|
| **Debtor Name:** | AZM RESTAURANTS, L.C. | **Search Response:** | All (Lapsed and Unlapsed) |
| **Debtor Type:** | Organization | **Copies:** | No Copies |
| **Date Range:** | All Available Filings | **City:** | |

The Utah Division of Corporations and Commercial Code herby certifies that the attached information is filed and of Record in the Offices of the Division as of 12/23/2021 at 18:00 MST.

Sincerely,
FILING OFFICER



*L. Veillette*

**LEIGH VEILLETTE, Director**
Utah Division of Corporations and Commercial Code

160 E 300 S - PO Box 146705 - Salt Lake City, Utah 84114-6705
PHONE: (801) 530-4849 - FAX: (801) 530-6438
HTTPS://WWW.CORPORATIONS.UTAH.GOV





SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

### Liens Filing Search Report

> The Utah Division of Corporations and Commercial Code hereby certifies that the attached list is a true and exact list of all financing statements or CFS liens and related subsequent documentation for the debtor below as filed with the Division of Corporations and Commercial Code office, Uniform Commercial Code Division, as of the Through Date below.

**Date Searched:** 12/27/2021 4:31:36 PM    **Search Criteria:**
**Searched by:**
**Filing Chains:** 6

**Good Through Filing Date:** 12/23/2021

**Cities:**
**Date Range:** All Available Filings
**Include Filings Outside Range?:** All Available Filings

December 27, 2021
**Filing Status:** ALL(Lapsed and Unlapsed)
**Include Records:** N/A

**Organization Name:** AZM RESTAURANTS, L.C.

---

**Filing Chain#:** 1                                    **Lapse Date:** 07/07/2021
**Original File#:** 495766201646                        **Lien Type:** UCC Lien

---

**Filing #:** 495766201646    **Filing Date:** 07/05/2016    **Filing Type:** Initial Financing    **Page Count:** 7
                                                              Statement UCC-1

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| AZM RESTAURANTS, L.C. | Organization | N/A | 1185 W. 3050 SOUTH OGDEN, UT 84401, USA |
| NDM RESTAURANTS, L.C. | Organization | N/A | 1185 W. 3050 SOUTH OGDEN, UT 84401, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| CITY NATIONAL BANK | Organization | N/A | 555 SOUTH FLOWER ST., 18TH FLOOR LOS ANGELES, CA 90071, USA |



# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

**Collateral**

ANY AND ALL RIGHT, TITLE, AND INTEREST IN AND TO ANY AND ALL OF THE FOLLOWING PROPERTY AND INTERESTS IN PROPERTY OF DEBTOR, WHEREVER LOCATED, WHETHER NOW OWNED OR EXISTING OR HEREAFTER CREATED, ACQUIRED OR ARISING (ALL BEING COLLECTIVELY REFERRED TO HEREIN AS THE "COLLATERAL"): (A) ALL INVENTORY AND SUPPLIES OF WHATSOEVER NATURE AND KIND (INCLUDING, WITHOUT LIMITATION, (I) ALL FOOD AND PAPER INVENTORY, SUPPLIES AND ALL OTHER RAW MATERIALS, COMPONENTS, WORK IN PROCESS, FINISHED GOODS, GOODS IN TRANSIT AND PACKING AND SHIPPING MATERIALS, AND (II) ALL GOODS THAT ARE RETURNED TO OR REPOSSESSED BY DEBTOR), TOGETHER WITH ALL ADDITIONS AND ACCESSIONS THERETO, REPLACEMENTS THEREFOR, PRODUCTS THEREOF AND DOCUMENTS THEREFOR (COLLECTIVELY, THE "INVENTORY"); (B) ALL ACCOUNTS, ACCOUNTS RECEIVABLE, BANK ACCOUNTS, DEPOSIT ACCOUNTS, LETTER OF CREDIT RIGHTS (WHETHER OR NOT THE LETTER OF CREDIT IS EVIDENCED BY A WRITING) AND OTHER RIGHTS TO PAYMENT OF MONEY FOR GOODS AND REAL PROPERTY SOLD OR LEASED OR FOR SERVICES RENDERED, EXPRESSLY INCLUDING, WITHOUT LIMITATION, THE PROVISION OF SERVICES, WHETHER OR NOT EARNED BY PERFORMANCE, INCLUDING, WITHOUT LIMITATION, ALL AGREEMENTS WITH AND SUMS DUE FROM CUSTOMERS AND OTHER PERSONS, AND ALL BOOKS AND RECORDS RECORDING, EVIDENCING OR RELATING TO SUCH RIGHTS OR ANY PART THEREOF (COLLECTIVELY, THE "ACCOUNTS"); (C) ALL MACHINERY, EQUIPMENT AND SUPPLIES NOT INCLUDED IN INVENTORY ABOVE (INCLUDING, WITHOUT LIMITATION, FOOD STORAGE AND PREPARATION EQUIPMENT, REGISTERS, COMMUNICATIONS EQUIPMENT, AND REPLACEMENTS THEREFOR), TOGETHER WITH ALL ADDITIONS AND ACCESSIONS THERETO (COLLECTIVELY, THE "EQUIPMENT"); (D) ALL FRANCHISES, LICENSES, PERMITS AND OPERATING RIGHTS GRANTED TO OR HELD BY DEBTOR (COLLECTIVELY, THE "LICENSES"); (E) ALL OF THE FOLLOWING: (I) (1) CONTRACTS AND AGREEMENTS FOR THE PURCHASE OF REAL AND PERSONAL PROPERTY, EASEMENTS AND RIGHTS OF WAY, (2) CUSTOMER, MANAGEMENT AND SUPPLIER CONTRACTS AND AGREEMENTS, (3) MATERIAL CONTRACTS AND ANY RIGHTS THEREUNDER, INCLUDING THE RIGHT TO RECEIVE PAYMENTS, (4) SECURITY AGREEMENTS, GUARANTEES AND OTHER AGREEMENTS EVIDENCING, SECURING OR OTHERWISE RELATING TO THE ACCOUNTS OR OTHER RIGHTS TO RECEIVE PAYMENT, (5) HEDGE AGREEMENTS, AND (6) OTHER AGREEMENTS TO WHICH DEBTOR IS A PARTY, WHETHER NOW EXISTING OR HEREAFTER ARISING (COLLECTIVELY, THE "CONTRACTS"); (II) LEASE AGREEMENTS FOR REAL OR PERSONAL PROPERTY TO WHICH DEBTOR IS A PARTY, WHETHER NOW EXISTING OR HEREAFTER ARISING (COLLECTIVELY, THE "LEASES"); AND (III) ALL OTHER CONTRACTS AND CONTRACTUAL RIGHTS, INDEMNIFICATION RIGHTS, AND OTHER REMEDIES OR PROVISIONS NOW EXISTING OR HEREAFTER ARISING IN FAVOR OF DEBTOR (COLLECTIVELY, THE "OTHER CONTRACTS"); (F) ALL GENERAL INTANGIBLES INCLUDING PERSONAL PROPERTY NOT INCLUDED ABOVE, INCLUDING, WITHOUT LIMITATION, (I) CUSTOMER AND SUPPLIER LISTS, BOOKS AND RECORDS, COMPUTER PROGRAMS AND OTHER INTELLECTUAL PROPERTY RIGHTS, INSURANCE POLICIES, TAX REFUNDS, (II) ALL GOODWILL, TRADEMARKS, TRADEMARK APPLICATIONS, TRADE NAMES, TRADE SECRETS, PATENTS, COPYRIGHTS, FORMULAS, INDUSTRIAL DESIGNS, SOFTWARE, OTHER INTELLECTUAL PROPERTY OR RIGHTS THEREIN, WHETHER UNDER LICENSE OR OTHERWISE, ALL RIGHTS TO RECEIVE PAYMENT ON PROPERTY UPON OR IN CONNECTION WITH ANY TRANSFER OF ANY LICENSE, AND (III) ALL PAYMENT INTANGIBLES (COLLECTIVELY, THE "INTANGIBLES"); (G) ALL FURNITURE AND FIXTURES (INCLUDING ALL TABLES, SEATING, SIGNAGE, DECORATIONS AND OTHER FURNITURE AND FIXTURES), TOGETHER WITH ALL ADDITIONS AND



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

ACCESSIONS THERETO AND REPLACEMENTS THEREFOR (COLLECTIVELY, THE "FURNITURE AND
FIXTURES"); (H) ALL OF THE FOLLOWING: GOODS, CHATTEL PAPER (WHETHER TANGIBLE OR
ELECTRONIC), DOCUMENTS, INSTRUMENTS (INCLUDING PROMISSORY NOTES), SUPPLIES, CHOSES IN
ACTION, COMMERCIAL TORT CLAIMS, (INCLUDING, WITHOUT LIMITATION, PAYMENTS RECEIVED
WITH RESPECT TO TERMINATION, ARBITRATION OR LITIGATION UNDER

ANY CONTRACT), MONEY, DEPOSITS, CERTIFICATES OF DEPOSIT, STOCK OR SHARE CERTIFICATES,
CERTIFICATED AND UNCERTIFICATED SECURITIES AND ALL OTHER INVESTMENT PROPERTY,
SUPPORTING OBLIGATIONS, URL'S, DOMAIN NAMES AND LICENSES, AND ALL OTHER PROPERTY AND
ASSETS OF WHATEVER TYPE OR DESCRIPTION NOT INCLUDED ABOVE (COLLECTIVELY, THE
"MISCELLANEOUS ITEMS"); (I) ALL OF DEBTOR'S CASH, MONEY, CERTIFICATES OF DEPOSIT, FINANCIAL
ASSETS OR OTHER ASSETS OF DEBTOR THAT NOW OR HEREAFTER COME INTO THE POSSESSION,
CUSTODY, OR CONTROL OF LENDER (COLLECTIVELY, THE "CASH"); (J) ALL PROCEEDS AND PRODUCTS
OF ANY OF THE ABOVE, AND ALL PROCEEDS OF ANY LOSS OF, DAMAGE TO OR DESTRUCTION OF THE
ABOVE, WHETHER INSURED OR NOT INSURED, AND ALL OTHER PROCEEDS OF ANY SALE, LEASE OR
OTHER DISPOSITION OF ANY PROPERTY OR INTEREST THEREIN REFERRED TO ABOVE, TOGETHER WITH
ALL PROCEEDS OF ANY POLICIES OF INSURANCE COVERING ANY OR ALL OF THE ABOVE, THE
PROCEEDS OF ANY AWARD IN CONDEMNATION WITH RESPECT TO ANY OF THE PROPERTY, ANY
REBATES OR REFUNDS, WHETHER FOR TAXES OR OTHERWISE, AND TOGETHER WITH ALL PROCEEDS OF
ANY SUCH PROCEEDS (COLLECTIVELY, THE "PROCEEDS").



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing Chain#:** 2
**Original File#:** 495785201649

**Lapse Date:** 07/07/2021
**Lien Type:** UCC Lien

---

**Filing #:** 495785201649     **Filing Date:** 07/05/2016     **Filing Type:** Initial Financing Statement UCC-1     **Page Count:** 7

### Debtors

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| AZM RESTAURANTS, L.C. | Organization | N/A | 1185 W. 3050 SOUTH OGDEN, UT 84401, USA |

### Secured Parties

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| CITY NATIONAL BANK | Organization | N/A | 555 SOUTH FLOWER ST., 18TH FLOOR LOS ANGELES, CA 90071, USA |



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

**Collateral**

ANY AND ALL RIGHT, TITLE, AND INTEREST IN AND TO ANY AND ALL OF THE FOLLOWING PROPERTY AND INTERESTS IN PROPERTY OF DEBTOR, WHEREVER LOCATED, WHETHER NOW OWNED OR EXISTING OR HEREAFTER CREATED, ACQUIRED OR ARISING (ALL BEING COLLECTIVELY REFERRED TO HEREIN AS THE "COLLATERAL": (A) ALL INVENTORY AND SUPPLIES OF WHATSOEVER NATURE AND KIND (INCLUDING, WITHOUT LIMITATION, (I) ALL FOOD AND PAPER INVENTORY, SUPPLIES AND ALL OTHER RAW MATERIALS, COMPONENTS, WORK IN PROCESS, FINISHED GOODS, GOODS IN TRANSIT AND PACKING AND SHIPPING MATERIALS, AND (II) ALL GOODS THAT ARE RETURNED TO OR REPOSSESSED BY DEBTOR), TOGETHER WITH ALL ADDITIONS AND ACCESSIONS THERETO, REPLACEMENTS THEREFOR, PRODUCTS THEREOF AND DOCUMENTS THEREFOR (COLLECTIVELY, THE "INVENTORY"); (B) ALL ACCOUNTS, ACCOUNTS RECEIVABLE, BANK ACCOUNTS, DEPOSIT ACCOUNTS, LETTER OF CREDIT RIGHTS (WHETHER OR NOT THE LETTER OF CREDIT IS EVIDENCED BY A WRITING) AND OTHER RIGHTS TO PAYMENT OF MONEY FOR GOODS AND REAL PROPERTY SOLD OR LEASED OR FOR SERVICES RENDERED, EXPRESSLY INCLUDING, WITHOUT LIMITATION, THE PROVISION OF SERVICES, WHETHER OR NOT EARNED BY PERFORMANCE, INCLUDING, WITHOUT LIMITATION, ALL AGREEMENTS WITH AND SUMS DUE FROM CUSTOMERS AND OTHER PERSONS, AND ALL BOOKS AND RECORDS RECORDING, EVIDENCING OR RELATING TO SUCH RIGHTS OR ANY PART THEREOF (COLLECTIVELY, THE "ACCOUNTS"); (C) ALL MACHINERY, EQUIPMENT AND SUPPLIES NOT INCLUDED IN INVENTORY ABOVE (INCLUDING, WITHOUT LIMITATION, FOOD STORAGE AND PREPARATION EQUIPMENT, REGISTERS, COMMUNICATIONS EQUIPMENT, AND REPLACEMENTS THEREFOR), TOGETHER WITH ALL ADDITIONS AND ACCESSIONS THERETO (COLLECTIVELY, THE "EQUIPMENT"); (D) ALL FRANCHISES, LICENSES, PERMITS AND OPERATING RIGHTS GRANTED TO OR HELD BY DEBTOR (COLLECTIVELY, THE "LICENSES"); (E) ALL OF THE FOLLOWING: (I) (1) CONTRACTS AND AGREEMENTS FOR THE PURCHASE OF REAL AND PERSONAL PROPERTY, EASEMENTS AND RIGHTS OF WAY, (2) CUSTOMER, MANAGEMENT AND SUPPLIER CONTRACTS AND AGREEMENTS, (3) MATERIAL CONTRACTS AND ANY RIGHTS THEREUNDER, INCLUDING THE RIGHT TO RECEIVE PAYMENTS, (4) SECURITY AGREEMENTS, GUARANTEES AND OTHER AGREEMENTS EVIDENCING, SECURING OR OTHERWISE RELATING TO THE ACCOUNTS OR OTHER RIGHTS TO RECEIVE PAYMENT, (5) HEDGE AGREEMENTS, AND (6) OTHER AGREEMENTS TO WHICH DEBTOR IS A PARTY, WHETHER NOW EXISTING OR HEREAFTER ARISING (COLLECTIVELY, THE "CONTRACTS"); (II) LEASE AGREEMENTS FOR REAL OR PERSONAL PROPERTY TO WHICH DEBTOR IS A PARTY, WHETHER NOW EXISTING OR HEREAFTER ARISING (COLLECTIVELY, THE "LEASES"); AND (III) ALL OTHER CONTRACTS AND CONTRACTUAL RIGHTS, INDEMNIFICATION RIGHTS, AND OTHER REMEDIES OR PROVISIONS NOW EXISTING OR HEREAFTER ARISING IN FAVOR OF DEBTOR (COLLECTIVELY, THE "OTHER CONTRACTS"); (F) ALL GENERAL INTANGIBLES INCLUDING PERSONAL PROPERTY NOT INCLUDED ABOVE, INCLUDING, WITHOUT LIMITATION, (I) CUSTOMER AND SUPPLIER LISTS, BOOKS AND RECORDS, COMPUTER PROGRAMS AND OTHER INTELLECTUAL PROPERTY RIGHTS, INSURANCE POLICIES, TAX REFUNDS, (II) ALL GOODWILL, TRADEMARKS, TRADEMARK APPLICATIONS, TRADE NAMES, TRADE SECRETS, PATENTS, COPYRIGHTS, FORMULAS, INDUSTRIAL DESIGNS, SOFTWARE, OTHER INTELLECTUAL PROPERTY OR RIGHTS THEREIN, WHETHER UNDER LICENSE OR OTHERWISE, ALL RIGHTS TO RECEIVE PAYMENT ON PROPERTY UPON OR IN CONNECTION WITH ANY TRANSFER OF ANY LICENSE, AND (III) ALL PAYMENT INTANGIBLES (COLLECTIVELY, THE "INTANGIBLES"); (G) ALL FURNITURE AND FIXTURES (INCLUDING ALL TABLES, SEATING, SIGNAGE, DECORATIONS AND OTHER FURNITURE AND FIXTURES), TOGETHER WITH ALL ADDITIONS AND ACCESSIONS THERETO AND



# State of Utah
# Department of Commerce

SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

REPLACEMENTS THEREFOR (COLLECTIVELY, THE "FURNITURE AND FIXTURES"); (H) ALL OF THE FOLLOWING: GOODS, CHATTEL PAPER (WHETHER TANGIBLE OR ELECTRONIC), DOCUMENTS, INSTRUMENTS (INCLUDING PROMISSORY NOTES), SUPPLIES, CHOSES IN ACTION, COMMERCIAL TORT CLAIMS, (INCLUDING, WITHOUT LIMITATION, PAYMENTS RECEIVED WITH RESPECT TO TERMINATION, ARBITRATION OR LITIGATION UNDER

ANY CONTRACT), MONEY, DEPOSITS, CERTIFICATES OF DEPOSIT, STOCK OR SHARE CERTIFICATES, CERTIFICATED AND UNCERTIFICATED SECURITIES AND ALL OTHER INVESTMENT PROPERTY, SUPPORTING OBLIGATIONS, URL'S, DOMAIN NAMES AND LICENSES, AND ALL OTHER PROPERTY AND ASSETS OF WHATEVER TYPE OR DESCRIPTION NOT INCLUDED ABOVE (COLLECTIVELY, THE "MISCELLANEOUS ITEMS"); (I) ALL OF DEBTOR'S CASH, MONEY, CERTIFICATES OF DEPOSIT, FINANCIAL ASSETS OR OTHER ASSETS OF DEBTOR THAT NOW OR HEREAFTER COME INTO THE POSSESSION, CUSTODY, OR CONTROL OF LENDER (COLLECTIVELY, THE "CASH"); (J) ALL PROCEEDS AND PRODUCTS OF ANY OF THE ABOVE, AND ALL PROCEEDS OF ANY LOSS OF, DAMAGE TO OR DESTRUCTION OF THE ABOVE, WHETHER INSURED OR NOT INSURED, AND ALL OTHER PROCEEDS OF ANY SALE, LEASE OR OTHER DISPOSITION OF ANY PROPERTY OR INTEREST THEREIN REFERRED TO ABOVE, TOGETHER WITH ALL PROCEEDS OF ANY POLICIES OF INSURANCE COVERING ANY OR ALL OF THE ABOVE, THE PROCEEDS OF ANY AWARD IN CONDEMNATION WITH RESPECT TO ANY OF THE PROPERTY, ANY REBATES OR REFUNDS, WHETHER FOR TAXES OR OTHERWISE, AND TOGETHER WITH ALL PROCEEDS OF ANY SUCH PROCEEDS (COLLECTIVELY, THE "PROCEEDS").



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing Chain#:** 3
**Original File#:** 531185201732

**Lapse Date:** 11/20/2022
**Lien Type:**UCC Lien

---

**Filing #:** 531185201732    **Filing Date:** 11/20/2017    **Filing Type:** Initial Financing Statement UCC-1    **Page Count:**1

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| AZM RESTAURANTS, L.C. | Organization | N/A | 99TH EAST 5TH AVENUE DOUGLAS, AZ 85607, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|---|---|---|---|
| AMERICAN EXPRESS BANK, FSB | Organization | N/A | 4315 SOUTH 2700 WEST SALT LAKE CITY, UT 84184, USA |

**Collateral**

ALL ASSETS OF THE DEBTOR, WHETHER NOW OWNED OR HEREAFTER ACQUIRED OR ARISING

---

**Filing #:** 531185201732-2    **Filing Date:** 03/07/2018    **Filing Type:** Termination UCC-3    **Page Count:**1

---



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing Chain#:** 4
**Original File#:** 531731201733

**Lapse Date:** 11/28/2022
**Lien Type:**UCC Lien

---

**Filing #:** 531731201733    **Filing Date:** 11/28/2017    **Filing Type:** Initial Financing Statement UCC-1    **Page Count:**1

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| AZM RESTAURANTS, L.C. | Organization | N/A | 1185 WEST 3050 SOUTH OGDEN, UT 84401, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|---|---|---|---|
| TFG-UTAH, L.P. | Organization | N/A | 6995 UNION PARK CENTER, SUITE 400 COTTONWOOD HEIGHTS, UT 84047, USA |

**Collateral**
ALL EQUIPMENT, MACHINERY, GOODS, PERSONAL AND OTHER PROPERTY, HOWEVER DESCRIBED, LEASED PURSUANT TO LEASE SCHEDULE NO. AZMR_001 TO MASTER LEASE AGREEMENT NO. 2050501, BETWEEN TFG- UTAH, L.P. AND DEBTOR, AS AMENDED, WHETHER NOW OR HEREAFTER EXISTING, AND WHEREVER NOW OR HEREAFTER LOCATED, TOGETHER WITH ALL ACCESSORIES, ATTACHMENTS, ACCESSIONS, PARTS, COMPONENTS, FIXTURES, REPAIRS, MODIFICATIONS, ADDITIONS, SUBSTITUTIONS, REPLACEMENTS AND EXCHANGES THEREOF, AND ALL RELATED DELIVERABLES, INTANGIBLE PROPERTY, SOFTWARE (EMBEDDED OR OTHERWISE), GENERAL INTANGIBLES, INTELLECTUAL PROPERTY, LICENSE, CONTRACT RIGHTS, INVENTORY, COLLATERAL AND OTHER RIGHTS INCORPORATED THEREIN, ATTACHED THERETO, ASSOCIATED THEREWITH OR ARISING THEREFROM, ALL WHETHER OR NOT FURNISHED BY THE SUPPLIER THEREOF, AND ANY AND ALL PROCEEDS, INCLUDING PROCEEDS OF PROCEEDS, AND PRODUCTS THEREOF. THIS FILING IS MADE FOR INFORMATIONAL PURPOSES AND NOT TO SUGGEST SECURED PARTY'S INTEREST IS LIMITED TO A SECURITY INTEREST ONLY. DEBTOR HAS NO INDEPENDENT RIGHT OR AUTHORITY TO SELL, SUBLEASE, TRANSFER, ASSIGN, PLEDGE, ENCUMBER OR DISPOSE OF ANY OF THE FOREGOING OR ANY INTEREST THEREIN.

---

**Filing #:** 531731201733-2    **Filing Date:** 02/22/2018    **Filing Type:** Termination UCC-3    **Page Count:**1

---



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing Chain#:** 5
**Original File#:** 537679201843

**Lapse Date:** 02/23/2023
**Lien Type:** UCC Lien

---

**Filing #:** 537679201843    **Filing Date:** 02/23/2018    **Filing Type:** Initial Financing Statement UCC-1    **Page Count:** 1

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| AZM RESTAURANTS, L.C. | Organization | N/A | 5929 FASHION POINT DR., SUITE 501 SOUTH OGDEN, UT 84403, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|---|---|---|---|
| CITY NATIONAL BANK, AS ADMINISTRATIVE AGENT | Organization | N/A | 555 SOUTH FLOWER STREET, 24TH FLOOR LOS ANGELES, CA 90071, USA |

**Collateral**

ALL ASSETS OF DEBTOR, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER NOW OWNED OR HEREAFTER ACQUIRED.



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing Chain#:** 6
**Original File#:** 2020699455-2

**Lapse Date:** 07/25/2025
**Lien Type:** UCC Lien

---

**Filing #:** 2020699455-2    **Filing Date:** 07/25/2020    **Filing Type:** Initial Financing Statement UCC-1    **Page Count:** 1

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| AZM RESTAURANTS LC | Organization | N/A | 5929 FASHION POINT DR STE 501 SOUTH OGDEN, UT 84403, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| U.S. SMALL BUSINESS ADMINISTRATION | Organization | N/A | 1545 HAWKINS BLVD, SUITE 202 EL PASO, TX 79925, USA |

**Collateral**

All tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto. 426231 8107

Search Date: December 27, 2021



2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

**Ask us about UCC eZFILE®**

## UCC Search Report

| | |
|---|---|
| **Type of Search** | UCCs |
| **Jurisdiction/Filing Office** | State of Utah, Secretary of State Uniform Commercial Code Division |
| **Estimated Currency Date** | Nov. 09, 2021 |
| **Last File Date** | Nov 14 2021 |
| **Subject Search Name** | AZM RESTAURANTS, L.C. |
| **Search Key Entered** | AZM* RES* |

## Results

Based on a search of the indices of the Uniform Commercial Code Division of the Secretary of State of Utah, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well as the searcher's choice of the liens ultimately included or excluded herein. Certification can only be obtained through the office of the Utah Secretary of State.

#### 1. UCC Lien

| | | |
|---|---|---|
| **Document No.** | 495766201646 | **Lapsed 7/7/2021** |
| **Filed** | 7/5/2016 | |
| **Debtor** | AZM RESTAURANTS L.C.<br>1185 W. 3050 SOUTH<br>OGDEN Utah 84401 | |
| **Debtor** | NDM RESTAURANTS L.C.<br>1185 W. 3050 SOUTH<br>OGDEN Utah 84401 | |
| **Secured Party** | CITY NATIONAL BANK<br>555 SOUTH FLOWER ST. 18TH FLOOR<br>LOS ANGELES California 90071 | |
| **Collateral** | Collateral | |
| **Date** | 7/5/2016 8:24:00 PM | |

#### 2. UCC Lien

| | | |
|---|---|---|
| **Document No.** | 495785201649 | **Lapsed 7/7/2021** |
| **Filed** | 7/5/2016 | |
| **Debtor** | AZM RESTAURANTS L.C.<br>1185 W. 3050 SOUTH<br>OGDEN Utah 84401 | |
| **Secured Party** | CITY NATIONAL BANK<br>555 SOUTH FLOWER ST. 18TH FLOOR<br>LOS ANGELES California 90071 | |
| **Collateral** | Collateral | |
| **Date** | 7/5/2016 9:09:00 PM | |

**3. UCC Lien**

| | | |
|---|---|---|
| **Document No.** | 531185201732 | Lapses 11/20/2022 |
| **Filed** | 11/20/2017 | |
| **Debtor** | AZM RESTAURANTS L.C.<br>99TH EAST 5TH AVENUE<br>DOUGLAS Arizona 85607 | |
| **Secured Party** | AMERICAN EXPRESS BANK FSB<br>4315 SOUTH 2700 WEST<br>SALT LAKE CITY Utah 84184 | |
| **Amendment Type** | Termination | |
| **File No.** | 531185201732-2 | |
| **Filed** | 3/7/2018 4:15:00 PM | |
| **Collateral** | Collateral | |
| **Date** | 11/20/2017 9:28:00 AM | |

**4. UCC Lien**

| | | |
|---|---|---|
| **Document No.** | 531731201733 | Lapses 11/28/2022 |
| **Filed** | 11/28/2017 | |
| **Debtor** | AZM RESTAURANTS L.C.<br>1185 WEST 3050 SOUTH<br>OGDEN Utah 84401 | |
| **Secured Party** | TFG-UTAH L.P.<br>6995 UNION PARK CENTER SUITE 400<br>COTTONWOOD HEIGHTS Utah 84047 | |
| **Amendment Type** | Termination | |
| **File No.** | 531731201733-2 | |
| **Filed** | 2/22/2018 10:54:00 AM | |
| **Collateral** | Collateral | |
| **Date** | 11/28/2017 3:03:00 PM | |

**5. UCC Lien**

| | | |
|---|---|---|
| **Document No.** | 537679201843 | Lapses 2/23/2023 |
| **Filed** | 2/23/2018 | |
| **Debtor** | AZM RESTAURANTS L.C.<br>5929 FASHION POINT DR. SUITE 501<br>SOUTH OGDEN Utah 84403 | |
| **Secured Party** | CITY NATIONAL BANK AS ADMINISTRATIVE AGENT<br>555 SOUTH FLOWER STREET 24TH FLOOR<br>LOS ANGELES California 90071 | |
| **Collateral** | Collateral | |
| **Date** | 2/23/2018 3:25:00 PM | |

**6. UCC Lien**

| | | |
|---|---|---|
| **Document No.** | 2020699455-2 | Lapses 7/25/2025 |
| **Filed** | 7/25/2020 | |
| **Debtor** | AZM RESTAURANTS LC<br>5929 Fashion Point Dr STE 501<br>South Ogden Utah 84403 | |
| **Secured Party** | U.S. Small Business Administration<br>1545 Hawkins Blvd Suite 202<br>El Paso Texas 79925 | |
| **Collateral** | Collateral | |
| **Date** | 7/25/2020 5:39:00 PM | |

We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as

provided by government and other sources, do we make any guaranty or representation as to its accuracy.

---------- **END OF REPORT** ----------

## Report Parameters

The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.

Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGEMENT TO:  (Name and Address)

| Filed in the Office of | Initial Filing Number |
|---|---|
| | **531185201732** |
| *[signature]* | Filed On |
| Director, Division of | **11/20/2017 9:28:00 AM** |
| Corporations and | Lapse Date |
| Commercial Code | **11/20/2022** |
| | Number of Pages |
| | **1** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME  **AZM RESTAURANTS, L.C.**

OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

1c. MAILING ADDRESS **99TH EAST 5TH AVENUE** | CITY **DOUGLAS** | STATE **AZ** | POSTAL CODE **85607** | COUNTRY **USA**

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME

OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME **AMERICAN EXPRESS BANK, FSB**

OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

3c. MAILING ADDRESS **4315 SOUTH 2700 WEST** | CITY **SALT LAKE CITY** | STATE **UT** | POSTAL CODE **84184** | COUNTRY **USA**

4. COLLATERAL:  This financing statement covers the following collateral:
**ALL ASSETS OF THE DEBTOR, WHETHER NOW OWNED OR HEREAFTER ACQUIRED OR ARISING**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:  ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility   6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:  **UT-0-61611974**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGEMENT TO:  (Name and Address) | |

| Filed in the Office of | Document Number |
|---|---|
| *[signature]* | **531185201732-2** |
| Director, Division of | Filed Date and Time |
| Corporations and | **3/7/2018 4:15:00 PM** |
| Commercial Code | Number of Pages |
| | **1** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| **531185201732** | (or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes:                                    AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Party of record     ☐ CHANGE name and/or address: Complete    ☐ ADD name: Complete item    ☐ DELETE name: Give record name
                                                       item 6a or 6b; and item 6a or 6b; and item 7c    7a or 7b, and item 7c    to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION:  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | |
|---|---|
| 7b. INDIVIDUAL'S SURNAME | |
| INDIVIDUAL'S FIRST PERSONAL NAME | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes:  ☐ ADD collateral    ☐ DELETE collateral    ☐ RESTATE covered collateral    ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:  Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here  ☐  and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **AMERICAN EXPRESS BANK, FSB** | | | |
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
**UT-0-62982190**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGEMENT TO:  (Name and Address) | |

| Filed in the Office of | Initial Filing Number **531731201733** |
|---|---|
| Director, Division of Corporations and Commercial Code | Filed On **11/28/2017 3:03:00 PM** |
| | Lapse Date **11/28/2022** |
| | Number of Pages **1** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME **AZM RESTAURANTS, L.C.** | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS **1185 WEST 3050 SOUTH** | CITY **OGDEN** | STATE **UT** POSTAL CODE **84401** | COUNTRY **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME **TFG-UTAH, L.P.** | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS **6995 UNION PARK CENTER, SUITE 400** | CITY **COTTONWOOD HEIGHTS** | STATE **UT** POSTAL CODE **84047** | COUNTRY **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**ALL EQUIPMENT, MACHINERY, GOODS, PERSONAL AND OTHER PROPERTY, HOWEVER DESCRIBED, LEASED PURSUANT TO LEASE SCHEDULE NO. AZMR_001 TO MASTER LEASE AGREEMENT NO. 2050501, BETWEEN TFG- UTAH, L.P. AND DEBTOR, AS AMENDED, WHETHER NOW OR HEREAFTER EXISTING, AND WHEREVER NOW OR HEREAFTER LOCATED, TOGETHER WITH ALL ACCESSORIES, ATTACHMENTS, ACCESSIONS, PARTS, COMPONENTS, FIXTURES, REPAIRS, MODIFICATIONS, ADDITIONS, SUBSTITUTIONS, REPLACEMENTS AND EXCHANGES THEREOF, AND ALL RELATED DELIVERABLES, INTANGIBLE PROPERTY, SOFTWARE (EMBEDDED OR OTHERWISE), GENERAL INTANGIBLES, INTELLECTUAL PROPERTY, LICENSE, CONTRACT RIGHTS, INVENTORY, COLLATERAL AND OTHER RIGHTS INCORPORATED THEREIN, ATTACHED THERETO, ASSOCIATED THEREWITH OR ARISING THEREFROM, ALL WHETHER OR NOT FURNISHED BY THE SUPPLIER THEREOF, AND ANY AND ALL PROCEEDS, INCLUDING PROCEEDS OF PROCEEDS, AND PRODUCTS THEREOF. THIS FILING IS MADE FOR INFORMATIONAL PURPOSES ONLY AND NOT TO SUGGEST SECURED PARTY'S INTEREST IS LIMITED TO A SECURITY INTEREST ONLY. DEBTOR HAS NO INDEPENDENT RIGHT OR AUTHORITY TO SELL, SUBLEASE, TRANSFER, ASSIGN, PLEDGE, ENCUMBER OR DISPOSE OF ANY OF THE FOREGOING OR ANY INTEREST THEREIN.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | 6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing |
|---|---|

7. ALTERNATIVE DESIGNATION (if applicable): ☑ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

531731201733

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

LCL

**A. NAME & PHONE OF CONTACT AT FILER** (optional)
Corporation Service Company    1-800-858-5294

**B. E-MAIL CONTACT AT FILER** (optional)
SPRFiling@cscinfo.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

1429 73667

Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Utah
(S.O.S.)

FEB 22 '18 AM 10:54

THE ABOVE SPACE IS **FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| 531731201733  11/28/2017 | Filer: _attach_ Amendment Addendum (Form UCC3Ad) _and_ provide Debtor's name in item 13 |

**2.** ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, _and_ address of Assignee in item 7c _and_ name of Assignor in item 9
For partial assignment, complete items 7 and 9 _and_ also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check _one_ of these two boxes:    AND    Check _one_ of these three boxes:

This Change affects ☐ Debtor _or_ ☐ Secured Party of record

☐ CHANGE name and/or address: Complete item 6a or 6b; _and_ item 7a or 7b _and_ item 7c
☐ ADD name: Complete item 7a or 7b, _and_ item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only _one_ name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| AZM Restaurants, L.C. | | | |

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only _one_ name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME |
|---|
| |

OR

| 7b. INDIVIDUAL'S SURNAME |
|---|
| |
| INDIVIDUAL'S FIRST PERSONAL NAME |
| |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)        SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:** Also check _one_ of these four boxes: ☐ ADD collateral    ☐ DELETE collateral    ☐ RESTATE covered collateral    ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only _one_ name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| TFG-Utah, L.P. | | | |

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**10. OPTIONAL FILER REFERENCE DATA:** Debtor:AZM Restaurants, L.C.

1429 73667

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd. Ste 400
Wilmington, DE 19808

Receipt Number: 7254456
Amount Paid:    $410.00

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |

Quick Data Services, Inc.
2005 East 2700 South, Suite 200
Salt Lake City, Utah 84109

537C619201843

RECEIVED

FEB 23 2018

TMM

Utah Div. Of Corp. & Comm. Code

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| AZM RESTAURANTS, L.C. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 5929 Fashion Point Dr., Suite 501 | South Ogden | UT | 84403 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| City National Bank, as Administrative Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 555 South Flower Street, 24th Floor | Los Angeles | CA | 90071 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of Debtor, whether now existing or hereafter arising, and whether now owned or hereafter acquired.

FEB 23 '18 PM 3:25

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
| --- | --- |
| 6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | 6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor | |
| 8. OPTIONAL FILER REFERENCE DATA: Utah SOS (CNB/Meridian – 018450-0086) | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) <br> **Corporation Service Company   1-800-858-5294** | |
| B. E-MAIL CONTACT AT FILER (optional) <br> **SPRFiling@cscglobal.com** | |
| C. SEND ACKNOWLEDGEMENT TO:  (Name and Address) <br> **Corporation Service Company <br> 801 Adlai Stevenson Drive <br> Springfield, IL 62703 USA** | |

| Filed in the Office of | Initial Filing Number |
|---|---|
| *[signature]* <br> Director, Division of Corporations and Commercial Code | **2020699455-2** |
| | Filed On <br> **7/25/2020 5:39:17 PM** |
| | Lapse Date <br> **7/25/2025** |
| | Number of Pages <br> **1** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **AZM RESTAURANTS LC** | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **5929 Fashion Point Dr STE 501** | **South Ogden** | **UT** | **84403** | **USA** |

2. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **U.S. Small Business Administration** | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **1545 Hawkins Blvd, Suite 202** | **El Paso** | **TX** | **79925** | **USA** |

4. COLLATERAL:  This financing statement covers the following collateral:

**All tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto. 42623 1 8107**

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check <u>only</u> if applicable and check <u>only</u> one box: <br> ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | 6b. Check <u>only</u> if applicable and check <u>only</u> one box: <br> ☐ Agricultural Lien ☐ Non-UCC Filing |
|---|---|

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**1939 47792:193947792**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)



# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

**December 27, 2021**

UCC eZFILE
2020 Hurley Way
Sacramento, CA 95825  USA

## UCC-11 Information Request

Your Request for Information has been processed by the Utah Division of Corporations and Commercial Code matching filing(s) in the Division's computerized database with the following search parameter(s) and the "Exact" filter:

**Search Number :** 211227832057-4

**Debtor Name:** NDM RESTAURANTS, L.C.

**Debtor Type:** Organization

**Date Range:** All Available Filings

**Search Response:** All (Lapsed and Unlapsed)

**Copies:** No Copies

**City:**

The Utah Division of Corporations and Commercial Code herby certifies that the attached information is filed and of Record in the Offices of the Division as of 12/23/2021 at 18:00 MST.

Sincerely,
FILING OFFICER



*L. Veillette*

**LEIGH VEILLETTE, Director**
Utah Division of Corporations and Commercial Code

160 E 300 S - PO Box 146705 - Salt Lake City, Utah 84114-6705
PHONE: (801) 530-4849 - FAX: (801) 530-6438
HTTPS://WWW.CORPORATIONS.UTAH.GOV





SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

### Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

## Liens Filing Search Report

The Utah Division of Corporations and Commercial Code hereby certifies that the attached list is a true and exact list of all financing statements or CFS liens and related subsequent documentation for the debtor below as filed with the Division of Corporations and Commercial Code office, Uniform Commercial Code Division, as of the Through Date below.

**Date Searched:** 12/27/2021 4:31:43 PM     **Search Criteria:**
**Searched by:**
**Filing Chains:** 5

**Good Through Filing Date:** 12/23/2021

**Cities:**
**Date Range:** All Available Filings
**Include Filings Outside Range?:** All Available Filings

December 27, 2021
**Filing Status:** ALL(Lapsed and Unlapsed)
**Include Records:** N/A

**Organization Name:** NDM RESTAURANTS, L.C.

---

**Filing Chain#:** 1                                  **Lapse Date:** 12/31/2020
**Original File#:** 482807201647                      **Lien Type:** UCC Lien

---

**Filing #:** 482807201647     **Filing Date:** 12/30/2015     **Filing Type:** Initial Financing Statement UCC-1     **Page Count:** 4

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| NDM RESTAURANTS, L.C. | Organization | N/A | 1185 W 3050 S OGDEN, UT 84401, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| SIGNATURE FINANCIAL LLC | Organization | N/A | 10545 WILLOWS ROAD NE, STE 120 REDMOND, WA 98052, USA |

**Collateral**

ALL GOOD, ACCOUNTS, DOCUMENTS, INSTRUMENTS, MONEY, CHATTEL PAPER, DEPOSIT ACCOUNTS, LETTER OF CREDIT RIGHTS, INVESTMENT PROPERTY, EQUIPMENT AND GENERAL INTANGIBLES ARISING FROM OR USED IN CONNECTION WITH THE BURGER KING LOCATION(S)

---



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing #:** 482807201647-2    **Filing Date:** 12/30/2015    **Filing Type:** UCC-1 Addendum    **Page Count:** 4

**Collateral**
DESCRIBED ON SCHEDULE X ATTACHED HERETO; ALL AS MORE FULLY DESCRIBED ON SCHEDULE X WHICH IS INCORPORATED HEREIN AND MADE A PART HEREOF.

---

**Filing #:** 482807201647-3    **Filing Date:** 07/07/2016    **Filing Type:** Termination UCC-3    **Page Count:** 1



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

### Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing Chain#:** 2
**Original File#:** 495766201646

**Lapse Date:** 07/07/2021
**Lien Type:**UCC Lien

---

**Filing #:** 495766201646          **Filing Date:** 07/05/2016          **Filing Type:** Initial Financing          **Page Count:**7
Statement UCC-1

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| AZM RESTAURANTS, L.C. | Organization | N/A | 1185 W. 3050 SOUTH OGDEN, UT 84401, USA |
| NDM RESTAURANTS, L.C. | Organization | N/A | 1185 W. 3050 SOUTH OGDEN, UT 84401, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|---|---|---|---|
| CITY NATIONAL BANK | Organization | N/A | 555 SOUTH FLOWER ST., 18TH FLOOR LOS ANGELES, CA 90071, USA |



# State of Utah
# Department of Commerce

SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

**Collateral**

ANY AND ALL RIGHT, TITLE, AND INTEREST IN AND TO ANY AND ALL OF THE FOLLOWING PROPERTY AND INTERESTS IN PROPERTY OF DEBTOR, WHEREVER LOCATED, WHETHER NOW OWNED OR EXISTING OR HEREAFTER CREATED, ACQUIRED OR ARISING (ALL BEING COLLECTIVELY REFERRED TO HEREIN AS THE "COLLATERAL"): (A) ALL INVENTORY AND SUPPLIES OF WHATSOEVER NATURE AND KIND (INCLUDING, WITHOUT LIMITATION, (I) ALL FOOD AND PAPER INVENTORY, SUPPLIES AND ALL OTHER RAW MATERIALS, COMPONENTS, WORK IN PROCESS, FINISHED GOODS, GOODS IN TRANSIT AND PACKING AND SHIPPING MATERIALS, AND (II) ALL GOODS THAT ARE RETURNED TO OR REPOSSESSED BY DEBTOR), TOGETHER WITH ALL ADDITIONS AND ACCESSIONS THERETO, REPLACEMENTS THEREFOR, PRODUCTS THEREOF AND DOCUMENTS THEREFOR (COLLECTIVELY, THE "INVENTORY"); (B) ALL ACCOUNTS, ACCOUNTS RECEIVABLE, BANK ACCOUNTS, DEPOSIT ACCOUNTS, LETTER OF CREDIT RIGHTS (WHETHER OR NOT THE LETTER OF CREDIT IS EVIDENCED BY A WRITING) AND OTHER RIGHTS TO PAYMENT OF MONEY FOR GOODS AND REAL PROPERTY SOLD OR LEASED OR FOR SERVICES RENDERED, EXPRESSLY INCLUDING, WITHOUT LIMITATION, THE PROVISION OF SERVICES, WHETHER OR NOT EARNED BY PERFORMANCE, INCLUDING, WITHOUT LIMITATION, ALL AGREEMENTS WITH AND SUMS DUE FROM CUSTOMERS AND OTHER PERSONS, AND ALL BOOKS AND RECORDS RECORDING, EVIDENCING OR RELATING TO SUCH RIGHTS OR ANY PART THEREOF (COLLECTIVELY, THE "ACCOUNTS"); (C) ALL MACHINERY, EQUIPMENT AND SUPPLIES NOT INCLUDED IN INVENTORY ABOVE (INCLUDING, WITHOUT LIMITATION, FOOD STORAGE AND PREPARATION EQUIPMENT, REGISTERS, COMMUNICATIONS EQUIPMENT, AND REPLACEMENTS THEREFOR), TOGETHER WITH ALL ADDITIONS AND ACCESSIONS THERETO (COLLECTIVELY, THE "EQUIPMENT"); (D) ALL FRANCHISES, LICENSES, PERMITS AND OPERATING RIGHTS GRANTED TO OR HELD BY DEBTOR (COLLECTIVELY, THE "LICENSES"); (E) ALL OF THE FOLLOWING: (I) (1) CONTRACTS AND AGREEMENTS FOR THE PURCHASE OF REAL AND PERSONAL PROPERTY, EASEMENTS AND RIGHTS OF WAY, (2) CUSTOMER, MANAGEMENT AND SUPPLIER CONTRACTS AND AGREEMENTS, (3) MATERIAL CONTRACTS AND ANY RIGHTS THEREUNDER, INCLUDING THE RIGHT TO RECEIVE PAYMENTS, (4) SECURITY AGREEMENTS, GUARANTEES AND OTHER AGREEMENTS EVIDENCING, SECURING OR OTHERWISE RELATING TO THE ACCOUNTS OR OTHER RIGHTS TO RECEIVE PAYMENT, (5) HEDGE AGREEMENTS, AND (6) OTHER AGREEMENTS TO WHICH DEBTOR IS A PARTY, WHETHER NOW EXISTING OR HEREAFTER ARISING (COLLECTIVELY, THE "CONTRACTS"); (II) LEASE AGREEMENTS FOR REAL OR PERSONAL PROPERTY TO WHICH DEBTOR IS A PARTY, WHETHER NOW EXISTING OR HEREAFTER ARISING (COLLECTIVELY, THE "LEASES"); AND (III) ALL OTHER CONTRACTS AND CONTRACTUAL RIGHTS, INDEMNIFICATION RIGHTS, AND OTHER REMEDIES OR PROVISIONS NOW EXISTING OR HEREAFTER ARISING IN FAVOR OF DEBTOR (COLLECTIVELY, THE "OTHER CONTRACTS"); (F) ALL GENERAL INTANGIBLES INCLUDING PERSONAL PROPERTY NOT INCLUDED ABOVE, INCLUDING, WITHOUT LIMITATION, (I) CUSTOMER AND SUPPLIER LISTS, BOOKS AND RECORDS, COMPUTER PROGRAMS AND OTHER INTELLECTUAL PROPERTY RIGHTS, INSURANCE POLICIES, TAX REFUNDS, (II) ALL GOODWILL, TRADEMARKS, TRADEMARK APPLICATIONS, TRADE NAMES, TRADE SECRETS, PATENTS, COPYRIGHTS, FORMULAS, INDUSTRIAL DESIGNS, SOFTWARE, OTHER INTELLECTUAL PROPERTY OR RIGHTS THEREIN, WHETHER UNDER LICENSE OR OTHERWISE, ALL RIGHTS TO RECEIVE PAYMENT ON PROPERTY UPON OR IN CONNECTION WITH ANY TRANSFER OF ANY LICENSE, AND (III) ALL PAYMENT INTANGIBLES (COLLECTIVELY, THE "INTANGIBLES"); (G) ALL FURNITURE AND FIXTURES (INCLUDING ALL TABLES, SEATING, SIGNAGE, DECORATIONS AND OTHER FURNITURE AND FIXTURES), TOGETHER WITH ALL ADDITIONS AND ACCESSIONS THERETO AND



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

REPLACEMENTS THEREFOR (COLLECTIVELY, THE "FURNITURE AND FIXTURES"); (H) ALL OF THE FOLLOWING: GOODS, CHATTEL PAPER (WHETHER TANGIBLE OR ELECTRONIC), DOCUMENTS, INSTRUMENTS (INCLUDING PROMISSORY NOTES), SUPPLIES, CHOSES IN ACTION, COMMERCIAL TORT CLAIMS, (INCLUDING, WITHOUT LIMITATION, PAYMENTS RECEIVED WITH RESPECT TO TERMINATION, ARBITRATION OR LITIGATION UNDER

ANY CONTRACT), MONEY, DEPOSITS, CERTIFICATES OF DEPOSIT, STOCK OR SHARE CERTIFICATES, CERTIFICATED AND UNCERTIFICATED SECURITIES AND ALL OTHER INVESTMENT PROPERTY, SUPPORTING OBLIGATIONS, URL'S, DOMAIN NAMES AND LICENSES, AND ALL OTHER PROPERTY AND ASSETS OF WHATEVER TYPE OR DESCRIPTION NOT INCLUDED ABOVE (COLLECTIVELY, THE "MISCELLANEOUS ITEMS"); (I) ALL OF DEBTOR'S CASH, MONEY, CERTIFICATES OF DEPOSIT, FINANCIAL ASSETS OR OTHER ASSETS OF DEBTOR THAT NOW OR HEREAFTER COME INTO THE POSSESSION, CUSTODY, OR CONTROL OF LENDER (COLLECTIVELY, THE "CASH"); (J) ALL PROCEEDS AND PRODUCTS OF ANY OF THE ABOVE, AND ALL PROCEEDS OF ANY LOSS OF, DAMAGE TO OR DESTRUCTION OF THE ABOVE, WHETHER INSURED OR NOT INSURED, AND ALL OTHER PROCEEDS OF ANY SALE, LEASE OR OTHER DISPOSITION OF ANY PROPERTY OR INTEREST THEREIN REFERRED TO ABOVE, TOGETHER WITH ALL PROCEEDS OF ANY POLICIES OF INSURANCE COVERING ANY OR ALL OF THE ABOVE, THE PROCEEDS OF ANY AWARD IN CONDEMNATION WITH RESPECT TO ANY OF THE PROPERTY, ANY REBATES OR REFUNDS, WHETHER FOR TAXES OR OTHERWISE, AND TOGETHER WITH ALL PROCEEDS OF ANY SUCH PROCEEDS (COLLECTIVELY, THE "PROCEEDS").



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing Chain#:** 3
**Original File#:** 495776201648

**Lapse Date:** 07/07/2021
**Lien Type:** UCC Lien

---

**Filing #:** 495776201648    **Filing Date:** 07/05/2016    **Filing Type:** Initial Financing Statement UCC-1    **Page Count:** 7

### Debtors

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| NDM RESTAURANTS, L.C. | Organization | N/A | 1185 W. 3050 SOUTH OGDEN, UT 84401, USA |

### Secured Parties

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| CITY NATIONAL BANK | Organization | N/A | 555 SOUTH FLOWER ST., 18TH FLOOR LOS ANGELES, CA 90071, USA |



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Collateral**

ANY CONTRACT), MONEY, DEPOSITS, CERTIFICATES OF DEPOSIT, STOCK OR SHARE CERTIFICATES, CERTIFICATED AND UNCERTIFICATED SECURITIES AND ALL OTHER INVESTMENT PROPERTY, SUPPORTING OBLIGATIONS, URL'S, DOMAIN NAMES AND LICENSES, AND ALL OTHER PROPERTY AND ASSETS OF WHATEVER TYPE OR DESCRIPTION NOT INCLUDED ABOVE (COLLECTIVELY, THE "MISCELLANEOUS ITEMS"); (I) ALL OF DEBTOR'S CASH, MONEY, CERTIFICATES OF DEPOSIT, FINANCIAL ASSETS OR OTHER ASSETS OF DEBTOR THAT NOW OR HEREAFTER COME INTO THE POSSESSION, CUSTODY, OR CONTROL OF LENDER (COLLECTIVELY, THE "CASH"); (J) ALL PROCEEDS AND PRODUCTS OF ANY OF THE ABOVE, AND ALL PROCEEDS OF ANY LOSS OF, DAMAGE TO OR DESTRUCTION OF THE ABOVE, WHETHER INSURED OR NOT INSURED, AND ALL OTHER PROCEEDS OF ANY SALE, LEASE OR OTHER DISPOSITION OF ANY PROPERTY OR INTEREST THEREIN REFERRED TO ABOVE, TOGETHER WITH ALL PROCEEDS OF ANY POLICIES OF INSURANCE COVERING ANY OR ALL OF THE ABOVE, THE PROCEEDS OF ANY AWARD IN CONDEMNATION WITH RESPECT TO ANY OF THE PROPERTY, ANY REBATES OR REFUNDS, WHETHER FOR TAXES OR OTHERWISE, AND TOGETHER WITH ALL PROCEEDS OF ANY SUCH PROCEEDS (COLLECTIVELY, THE "PROCEEDS").

ANY AND ALL RIGHT, TITLE, AND INTEREST IN AND TO ANY AND ALL OF THE FOLLOWING PROPERTY AND INTERESTS IN PROPERTY OF DEBTOR, WHEREVER LOCATED, WHETHER NOW OWNED OR EXISTING OR HEREAFTER CREATED, ACQUIRED OR ARISING (ALL BEING COLLECTIVELY REFERRED TO HEREIN AS THE "COLLATERAL"): (A) ALL INVENTORY AND SUPPLIES OF WHATSOEVER NATURE AND KIND (INCLUDING, WITHOUT LIMITATION, (I) ALL FOOD AND PAPER INVENTORY, SUPPLIES AND ALL OTHER RAW MATERIALS, COMPONENTS, WORK IN PROCESS, FINISHED GOODS, GOODS IN TRANSIT AND PACKING AND SHIPPING MATERIALS, AND (II) ALL GOODS THAT ARE RETURNED TO OR REPOSSESSED BY DEBTOR), TOGETHER WITH ALL ADDITIONS AND ACCESSIONS THERETO, REPLACEMENTS THEREFOR, PRODUCTS THEREOF AND DOCUMENTS THEREFOR (COLLECTIVELY, THE "INVENTORY"); (B) ALL ACCOUNTS, ACCOUNTS RECEIVABLE, BANK ACCOUNTS, DEPOSIT ACCOUNTS, LETTER OF CREDIT RIGHTS (WHETHER OR NOT THE LETTER OF CREDIT IS EVIDENCED BY A WRITING) AND OTHER RIGHTS TO PAYMENT OF MONEY FOR GOODS AND REAL PROPERTY SOLD OR LEASED OR FOR SERVICES RENDERED, EXPRESSLY INCLUDING, WITHOUT LIMITATION, THE PROVISION OF SERVICES, WHETHER OR NOT EARNED BY PERFORMANCE, INCLUDING, WITHOUT LIMITATION, ALL AGREEMENTS WITH AND SUMS DUE FROM CUSTOMERS AND OTHER PERSONS, AND ALL BOOKS AND RECORDS RECORDING, EVIDENCING OR RELATING TO SUCH RIGHTS OR ANY PART THEREOF (COLLECTIVELY, THE "ACCOUNTS"); (C) ALL MACHINERY, EQUIPMENT AND SUPPLIES NOT INCLUDED IN INVENTORY ABOVE (INCLUDING, WITHOUT LIMITATION, FOOD STORAGE AND PREPARATION EQUIPMENT, REGISTERS, COMMUNICATIONS EQUIPMENT, AND REPLACEMENTS THEREFOR), TOGETHER WITH ALL ADDITIONS AND ACCESSIONS THERETO (COLLECTIVELY, THE "EQUIPMENT"); (D) ALL FRANCHISES, LICENSES, PERMITS AND OPERATING RIGHTS GRANTED TO OR HELD BY DEBTOR (COLLECTIVELY, THE "LICENSES"); (E) ALL OF THE FOLLOWING: (I) (1) CONTRACTS AND AGREEMENTS FOR THE PURCHASE OF REAL AND PERSONAL PROPERTY, EASEMENTS AND RIGHTS OF WAY, (2) CUSTOMER, MANAGEMENT AND SUPPLIER CONTRACTS AND AGREEMENTS, (3) MATERIAL CONTRACTS AND ANY RIGHTS THEREUNDER, INCLUDING THE RIGHT TO RECEIVE PAYMENTS, (4) SECURITY AGREEMENTS, GUARANTEES AND OTHER AGREEMENTS EVIDENCING, SECURING OR OTHERWISE RELATING TO THE ACCOUNTS OR OTHER RIGHTS TO RECEIVE PAYMENT, (5) HEDGE AGREEMENTS, AND (6) OTHER AGREEMENTS TO WHICH DEBTOR IS A



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

PARTY, WHETHER NOW EXISTING OR HEREAFTER ARISING (COLLECTIVELY, THE "CONTRACTS"); (II) LEASE AGREEMENTS FOR REAL OR PERSONAL PROPERTY TO WHICH DEBTOR IS A PARTY, WHETHER NOW EXISTING OR HEREAFTER ARISING (COLLECTIVELY, THE "LEASES"); AND (III) ALL OTHER CONTRACTS AND CONTRACTUAL RIGHTS, INDEMNIFICATION RIGHTS, AND OTHER REMEDIES OR PROVISIONS NOW EXISTING OR HEREAFTER ARISING IN FAVOR OF DEBTOR (COLLECTIVELY, THE "OTHER CONTRACTS"); (F) ALL GENERAL INTANGIBLES INCLUDING PERSONAL PROPERTY NOT INCLUDED ABOVE, INCLUDING, WITHOUT LIMITATION, (I) CUSTOMER AND SUPPLIER LISTS, BOOKS AND RECORDS, COMPUTER PROGRAMS AND OTHER INTELLECTUAL PROPERTY RIGHTS, INSURANCE POLICIES, TAX REFUNDS, (II) ALL GOODWILL, TRADEMARKS, TRADEMARK APPLICATIONS, TRADE NAMES, TRADE SECRETS, PATENTS, COPYRIGHTS, FORMULAS, INDUSTRIAL DESIGNS, SOFTWARE, OTHER INTELLECTUAL PROPERTY OR RIGHTS THEREIN, WHETHER UNDER LICENSE OR OTHERWISE, ALL RIGHTS TO RECEIVE PAYMENT ON PROPERTY UPON OR IN CONNECTION WITH ANY TRANSFER OF ANY LICENSE, AND (III) ALL PAYMENT INTANGIBLES (COLLECTIVELY, THE "INTANGIBLES"); (G) ALL FURNITURE AND FIXTURES (INCLUDING ALL TABLES, SEATING, SIGNAGE, DECORATIONS AND OTHER FURNITURE AND FIXTURES), TOGETHER WITH ALL ADDITIONS AND ACCESSIONS THERETO AND REPLACEMENTS THEREFOR (COLLECTIVELY, THE "FURNITURE AND FIXTURES"); (H) ALL OF THE FOLLOWING: GOODS, CHATTEL PAPER (WHETHER TANGIBLE OR ELECTRONIC), DOCUMENTS, INSTRUMENTS (INCLUDING PROMISSORY NOTES), SUPPLIES, CHOSES IN ACTION, COMMERCIAL TORT CLAIMS, (INCLUDING, WITHOUT LIMITATION, PAYMENTS RECEIVED WITH RESPECT TO TERMINATION, ARBITRATION OR LITIGATION UNDER



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing Chain#:** 4
**Original File#:** 520461201724

**Lapse Date:** 06/14/2022
**Lien Type:** UCC Lien

---

**Filing #:** 520461201724    **Filing Date:** 06/14/2017    **Filing Type:** Initial Financing Statement UCC-1    **Page Count:** 1

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| NDM RESTAURANTS , L.C. | Organization | N/A | 315 S 3RD ST. BISMARCK, ND 58504, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|---|---|---|---|
| ASSN COMPANY | Organization | N/A | P.O. BOX 2576 SPRINGFIELD, IL 62708, USA |

**Collateral**

ANY AND ALL ASSETS OF THE DEBTOR WHETHER NOW OWNED OR HEREAFTER ACQUIRED OR ARISING. THE SECURED PARTY NAMED IN THIS RECORD IS ACTING IN A REPRESENTATIVE CAPACITY FOR PURPOSES OF FORWARDING NOTICES AND INQUIRIES REGARDING THIS RECORD. FOR MORE INFORMATION, PLEASE CONTACT THE SECURED PARTY AT THE ADDRESS LISTED ABOVE OR AT UCCSPREP@CSCINFO.COM.

---

**Filing #:** 520461201724-2    **Filing Date:** 10/05/2017    **Filing Type:** Termination UCC-3    **Page Count:** 1



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

**Filing Chain#:** 5
**Original File#:** 537677201841

**Lapse Date:** 02/23/2023
**Lien Type:**UCC Lien

---

**Filing #:** 537677201841    **Filing Date:** 02/23/2018    **Filing Type:** Initial Financing    **Page Count:**1
Statement UCC-1

**Debtors**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| NDM RESTAURANTS, L.C. | Organization | N/A | 5929 FASHION POINT DR., SUITE 501 SOUTH OGDEN, UT 84403, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| CITY NATIONAL BANK, AS ADMINISTRATIVE AGENT | Organization | N/A | 555 SOUTH FLOWER STREET, 24TH FLOOR LOS ANGELES, CA 90071, USA |

**Collateral**

ALL ASSETS OF DEBTOR, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER NOW OWNED OR HEREAFTER ACQUIRED.

Search Date: December 27, 2021



2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

**Ask us about UCC eZFILE®**

## UCC Search Report

| | |
|---|---|
| **Type of Search** | UCCs |
| **Jurisdiction/Filing Office** | State of Utah, Secretary of State Uniform Commercial Code Division |
| **Estimated Currency Date** | Nov. 09, 2021 |
| **Last File Date** | Nov 14 2021 |
| **Subject Search Name** | NDM RESTAURANTS, L.C. |
| **Search Key Entered** | NDM* RES* |

## Results

Based on a search of the indices of the Uniform Commercial Code Division of the Secretary of State of Utah, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well as the searcher's choice of the liens ultimately included or excluded herein. Certification can only be obtained through the office of the Utah Secretary of State.

### 1. UCC Lien

| | | |
|---|---|---|
| **Document No.** | 482807201647 | **Lapsed 12/31/2020** |
| **Filed** | 12/30/2015 | |
| **Debtor** | NDM RESTAURANTS L.C. | |
| | 1185 W 3050 S | |
| | OGDEN Utah 84401 | |
| **Secured Party** | SIGNATURE FINANCIAL LLC | |
| | 10545 WILLOWS ROAD NE STE 120 | |
| | REDMOND Washington 98052 | |
| **Amendment Type** | UCC-1 Addendum | |
| **File No.** | 482807201647-2 | |
| **Filed** | 12/30/2015 9:53:00 AM | |
| **Amendment Type** | Termination | |
| **File No.** | 482807201647-3 | |
| **Filed** | 7/7/2016 3:29:00 PM | |
| **Collateral** | Collateral | |
| **Date** | 12/30/2015 9:53:00 AM | |

### 2. UCC Lien

| | | |
|---|---|---|
| **Document No.** | 487778201653 | **Lapsed 3/19/2021** |
| **Filed** | 3/17/2016 | |
| **Debtor** | NDM RESTAUTRANTS L.C. | |
| | 1185 WEST 3050 S | |
| | OGDEN Utah 84401 | |
| **Secured Party** | SIGNATURE FINANCIAL LLC | |
| | 10545 WILLIOWS ROAD NE STE 120 | |
| | REDMOND Washington 98052 | |

|  |  |
|---|---|
| **Amendment Type** | UCC-1 Addendum |
| **File No.** | 487778201653-2 |
| **Filed** | 3/17/2016 9:56:00 AM |

|  |  |
|---|---|
| **Amendment Type** | Termination |
| **File No.** | 487778201653-3 |
| **Filed** | 7/7/2016 2:56:00 PM |

|  |  |
|---|---|
| **Collateral** | Collateral |
| **Date** | 3/17/2016 9:56:00 AM |

### 3. UCC Lien

| | | |
|---|---|---|
| **Document No.** | 495766201646 | **Lapsed 7/7/2021** |
| **Filed** | 7/5/2016 | |

|  |  |
|---|---|
| **Debtor** | AZM RESTAURANTS L.C. |
| | 1185 W. 3050 SOUTH |
| | OGDEN Utah 84401 |

|  |  |
|---|---|
| **Debtor** | NDM RESTAURANTS L.C. |
| | 1185 W. 3050 SOUTH |
| | OGDEN Utah 84401 |

|  |  |
|---|---|
| **Secured Party** | CITY NATIONAL BANK |
| | 555 SOUTH FLOWER ST. 18TH FLOOR |
| | LOS ANGELES California 90071 |

|  |  |
|---|---|
| **Collateral** | Collateral |
| **Date** | 7/5/2016 8:24:00 PM |

### 4. UCC Lien

| | | |
|---|---|---|
| **Document No.** | 495776201648 | **Lapsed 7/7/2021** |
| **Filed** | 7/5/2016 | |

|  |  |
|---|---|
| **Debtor** | NDM RESTAURANTS L.C. |
| | 1185 W. 3050 SOUTH |
| | OGDEN Utah 84401 |

|  |  |
|---|---|
| **Secured Party** | CITY NATIONAL BANK |
| | 555 SOUTH FLOWER ST. 18TH FLOOR |
| | LOS ANGELES California 90071 |

|  |  |
|---|---|
| **Collateral** | Collateral |
| **Date** | 7/5/2016 8:47:00 PM |

### 5. UCC Lien

| | | |
|---|---|---|
| **Document No.** | 520461201724 | Lapses 6/14/2022 |
| **Filed** | 6/14/2017 | |

|  |  |
|---|---|
| **Debtor** | NDM RESTAURANTS L.C. |
| | 315 S 3RD ST. |
| | BISMARCK North Dakota 58504 |

|  |  |
|---|---|
| **Secured Party** | ASSN COMPANY |
| | P.O. BOX 2576 |
| | SPRINGFIELD Illinois 62708 |

|  |  |
|---|---|
| **Amendment Type** | Termination |
| **File No.** | 520461201724-2 |
| **Filed** | 10/5/2017 3:10:00 PM |

|  |  |
|---|---|
| **Collateral** | Collateral |
| **Date** | 6/14/2017 6:21:00 AM |

### 6. UCC Lien

| | | |
|---|---|---|
| **Document No.** | 537677201841 | Lapses 2/23/2023 |
| **Filed** | 2/23/2018 | |

|  |  |
|---|---|
| **Debtor** | NDM RESTAURANTS L.C. |
| | 5929 FASHION POINT DR. SUITE 501 |
| | SOUTH OGDEN Utah 84403 |

**Secured Party**  CITY NATIONAL BANK AS ADMINISTRATIVE AGENT
555 SOUTH FLOWER STREET 24TH FLOOR
LOS ANGELES California 90071

**Collateral**  Collateral
**Date**  2/23/2018 3:25:00 PM

We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as provided by government and other sources, do we make any guaranty or representation as to its accuracy.

---------- END OF REPORT ----------

## Report Parameters

The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.

Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGEMENT TO:  (Name and Address) | |

| Filed in the Office of | Initial Filing Number |
|---|---|
| | **520461201724** |
| | Filed On |
| Director, Division of | **6/14/2017 6:21:00 AM** |
| Corporations and | Lapse Date |
| Commercial Code | **6/14/2022** |
| | Number of Pages |
| | **1** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **NDM RESTAURANTS , L.C.** | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **315 S 3RD ST.** | **BISMARCK** | **ND** | **58504** | **USA** |

2. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **ASSN COMPANY** | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **P.O. BOX 2576** | **SPRINGFIELD** | **IL** | **62708** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
   **ANY AND ALL ASSETS OF THE DEBTOR WHETHER NOW OWNED OR HEREAFTER ACQUIRED OR ARISING. THE SECURED PARTY NAMED IN THIS RECORD IS ACTING IN A REPRESENTATIVE CAPACITY FOR PURPOSES OF FORWARDING NOTICES AND INQUIRIES REGARDING THIS RECORD. FOR MORE INFORMATION, PLEASE CONTACT THE SECURED PARTY AT THE ADDRESS LISTED ABOVE OR AT UCCSPREP@CSCINFO.COM.**

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check <u>only</u> if applicable and check <u>only</u> one box:
   ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check <u>only</u> if applicable and check <u>only</u> one box:
   ☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGEMENT TO:  (Name and Address) | |

| Filed in the Office of | Document Number |
|---|---|
| *Don Stagg* | **520461201724-2** |
| Director, Division of Corporations and Commercial Code | Filed Date and Time |
| | **10/5/2017 3:10:00 PM** |
| | Number of Pages |
| | **1** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| **520461201724** | (or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
    For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:          AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Party of record    ☐ CHANGE name and/or address: Complete    ☐ ADD name: Complete item    ☐ DELETE name: Give record name
                                                        item 6a or 6b; and item 7a or 7b and item 7c    7a or 7b, and item 7c    to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION:  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes:    ☐ ADD collateral    ☐ DELETE collateral    ☐ RESTATE covered collateral    ☐ ASSIGN collateral
Indicate collateral:

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT:  Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
   If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | **ASSN COMPANY** | | | |
| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
    **137143262**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Receipt Number: 7254468
Amount Paid:    $410.00

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |

C.

Quick Data Services, Inc.
2005 East 2700 South, Suite 200
Salt Lake City, Utah 84109

RECEIVED
LAL
FEB 23 2018
Utah Div. Of Corp. & Comm. Code

537677 201841

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| NDM RESTAURANTS, L.C. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 5929 Fashion Point Dr., Suite 501 | South Ogden | UT | 84403 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| City National Bank, as Administrative Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 555 South Flower Street, 24th Floor | Los Angeles | CA | 90071 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of Debtor, whether now existing or hereafter arising, and whether now owned or hereafter acquired.

FEB 23 '18 PM3:25

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Utah SOS (CNB/Meridian - 018450-0086)

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)



**SPENCER COX**
*Governor*

**DEIDRE HENDERSON**
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

**MARGARET BUSSE**          **LEIGH VEILLETTE**
*Executive Director*          *Director, Division of Corporations and Commercial Code*

**December 27, 2021**

UCC eZFILE
2020 Hurley Way
Sacramento, CA 95825  USA

## UCC-11 Information Request

Your Request for Information has been processed by the Utah Division of Corporations and Commercial Code matching filing(s) in the Division's computerized database with the following search parameter(s) and the "Exact" filter:

**Search Number :** 211227832065-9

| | | | |
|---|---|---|---|
| **Debtor Name:** | MERIDIAN RESTAURANTS UNLIMITED, LC | **Search Response:** | All (Lapsed and Unlapsed) |
| **Debtor Type:** | Organization | **Copies:** | No Copies |
| **Date Range:** | All Available Filings | **City:** | |

The Utah Division of Corporations and Commercial Code herby certifies that the attached information is filed and of Record in the Offices of the Division as of 12/23/2021 at 18:00 MST.

Sincerely,
FILING OFFICER



*L. Veillette*

**LEIGH VEILLETTE, Director**
Utah Division of Corporations and Commercial Code

160 E 300 S - PO Box 146705 - Salt Lake City, Utah 84114-6705
PHONE: (801) 530-4849 - FAX: (801) 530-6438
HTTPS://WWW.CORPORATIONS.UTAH.GOV





SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

### Liens Filing Search Report

The Utah Division of Corporations and Commercial Code hereby certifies that the attached list is a true and exact list of all financing statements or CFS liens and related subsequent documentation for the debtor below as filed with the Division of Corporations and Commercial Code office, Uniform Commercial Code Division, as of the Through Date below.

**Date Searched:** 12/27/2021 4:36:07 PM    **Search Criteria:**
**Searched by:**
**Filing Chains:** 4

**Good Through Filing Date:** 12/23/2021

**Cities:**
**Date Range:** All Available Filings
**Include Filings Outside Range?:** All Available Filings

December 27, 2021

**Filing Status:** ALL(Lapsed and Unlapsed)
**Include Records:** N/A

**Organization Name:** MERIDIAN RESTAURANTS UNLIMITED, LC

---

**Filing Chain#:** 1                        **Lapse Date:** 08/18/2021
**Original File#:** 499076201649             **Lien Type:** UCC Lien

---

**Filing #:** 499076201649    **Filing Date:** 08/17/2016    **Filing Type:** Initial Financing Statement UCC-1    **Page Count:** 4

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| MERIDIAN RESTAURANTS UNLIMITED, LC | Organization | N/A | 1185 W 3050 S OGDEN, UT 84401, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|---|---|---|---|
| WESTERN EQUIPMENT FINANCE, INC. | Organization | N/A | P.O. BOX 640 DEVILS LAKE, ND 58301, USA |

**Collateral**

THE FOLLOWING EQUIPMENT OR INVENTORY: OFFICE FURNITURE AND EQUIPMENT, SEE ATTACHMENT TOGETHER WITH ALL PRESENT AND FUTURE ATTACHMENTS, ACCESSORIES, REPLACEMENT PARTS, ADDITIONS AND ALL CASH AND NON-CASH PROCEEDS THEREOF.

---



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

**Filing #:** 499076201649-2    **Filing Date:** 03/05/2018    **Filing Type:** Termination UCC-3    **Page Count:** 1



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing Chain#:** 2
**Original File#:** 510367201728

**Lapse Date:** 01/31/2022
**Lien Type:**UCC Lien

---

**Filing #:** 510367201728     **Filing Date:** 01/31/2017     **Filing Type:** Initial Financing     **Page Count:**1
Statement UCC-1

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| MERIDIAN RESTAURANTS UNLIMITED, LC | Organization | N/A | 1185 W 3050 S OGDEN, UT 84401, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|---|---|---|---|
| WEBBANK | Organization | N/A | 6440 S. WASATCH BLVD., STE 300 SALT LAKE CITY, UT 84121, USA |

**Collateral**

ALL COMPUTER EQUIPMENT, PERIPHERALS, AND OTHER EQUIPMENT, (COLLECTIVELY "EQUIPMENT"),
WHEREVER LOCATED, HERETOFORE OR HEREAFTER FINANCED TO MERIDIAN RESTAURANTS
UNLIMITED, LC BY CREDITOR PURSUANT TO THAT CERTAIN REVOLVING CREDIT ACCOUNT #
687945021200419XXXX, DATED JANUARY 27, 2017, (THE "ACCOUNT") AND ALL OF LESSEE'S RIGHTS, TITLE
AND INTEREST IN AND TO USE ANY SOFTWARE AND SERVICES (COLLECTIVELY "SOFTWARE") FINANCED
UNDER AND DESCRIBED IN THE ACCOUNT, ALONG WITH ANY ADDITIONS, FINANCED AMOUNTS,
MODIFICATIONS OR SUPPLEMENTS TO THE ACCOUNT, AND ALL SUBSTITUTIONS, ADDITIONS,
ACCESSIONS AND REPLACEMENTS TO THE EQUIPMENT AND SOFTWARE, NOW OR HEREAFTER
INSTALLED IN, AFFIXED TO, OR USED IN, CONJUNCTION WITH THE EQUIPMENT AND SOFTWARE AND
THE PROCEEDS THEREOF TOGETHER WITH ALL PAYMENTS, INSURANCE PROCEEDS, ANY REFUNDS OR
CREDITS OBTAINED BY DEBTOR FROM A MANUFACTURER, LICENSOR OR SERVICE PROVIDER, OR OTHER
PROCEEDS AND PAYMENTS DUE AND TO BECOME DUE AND ARISING FROM OR RELATING TO SAID
EQUIPMENT, SOFTWARE OR THE ACCOUNT.

---

**Filing #:** 510367201728-2     **Filing Date:** 04/23/2018     **Filing Type:** Termination     **Page Count:**1
UCC-3

---



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

---

**Filing Chain#:** 3
**Original File#:** 535943201839

**Lapse Date:** 01/26/2023
**Lien Type:** UCC Lien

---

**Filing #:** 535943201839    **Filing Date:** 01/26/2018    **Filing Type:** Initial Financing Statement UCC-1    **Page Count:** 1

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| MR RESTAURANTS, L.C. | Organization | N/A | 5929 FASHION POINT DR. STE 501 SOUTH OGDEN, UT 84403, USA |
| Name | Type | Action Type | Address |
| MERIDIAN RESTAURANTS UNLIMITED | Organization | N/A | 5929 FASHION POINT DR. STE 501 SOUTH OGDEN, UT 84403, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|---|---|---|---|
| CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | Organization | N/A | P.O. BOX 2576 UCCSPREP@CSCINFO.COM SPRINGFIELD, IL 62708, USA |

**Collateral**

SECURITY INTEREST IN AND TO ALL OF MERCHANT'S PRESENT AND FUTURE ACCOUNTS, CHATTEL PAPER, DEPOSIT ACCOUNTS, PERSONAL PROPERTY, ASSETS AND FIXTURES, GENERAL INTANGIBLES, INSTRUMENTS, EQUIPMENT, INVENTORY WHEREVER LOCATED, AND PROCEEDS NOW OR HEREAFTER

---

**Filing #:** 535943201839-2    **Filing Date:** 03/07/2018    **Filing Type:** Termination UCC-3    **Page Count:** 1

---



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

**Filing Chain#:** 4
**Original File#:** 537681201837

**Lapse Date:** 02/23/2023
**Lien Type:** UCC Lien

---

**Filing #:** 537681201837    **Filing Date:** 02/23/2018    **Filing Type:** Initial Financing Statement UCC-1    **Page Count:** 3

**Debtors**

| Name | Type | Action Type | Address |
|---|---|---|---|
| MERIDIAN RESTAURANTS UNLIMITED, LC | Organization | N/A | 5929 FASHION POINT DR., SUITE 501 SOUTH OGDEN, UT 84403, USA |

**Secured Parties**

| Name | Type | Action Type | Address |
|---|---|---|---|
| CITY NATIONAL BANK, AS ADMINISTRATIVE AGENT | Organization | N/A | 555 SOUTH FLOWER STREET, 24TH FLOOR LOS ANGELES, CA 90071, USA |

**Collateral**

ALL OF DEBTOR'S RIGHT, TITLE AND INTEREST IN AND TO THE ASSETS DESCRIBED ON "EXHIBIT A" ATTACHED HERETO (CONSISTING OF 2 PAGES) AS "PLEDGED COLLATERAL" AND INCORPORATED HEREIN BY REFERENCE.

Search Date: December 27, 2021



2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

**Ask us about UCC eZFILE®**

## UCC Search Report

| | |
|---|---|
| **Type of Search** | UCCs |
| **Jurisdiction/Filing Office** | State of Utah, Secretary of State Uniform Commercial Code Division |
| **Estimated Currency Date** | Nov. 09, 2021 |
| **Last File Date** | Nov 14 2021 |
| **Subject Search Name** | MERIDIAN RESTAURANTS UNLIMITED, LC |
| **Search Key Entered** | MERID* RES* |

## Results

Based on a search of the indices of the Uniform Commercial Code Division of the Secretary of State of Utah, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well as the searcher's choice of the liens ultimately included or excluded herein. Certification can only be obtained through the office of the Utah Secretary of State.

### 1. UCC Lien

| | | |
|---|---|---|
| **Document No.** | 499076201649 | **Lapsed 8/18/2021** |
| **Filed** | 8/17/2016 | |
| **Debtor** | MERIDIAN RESTAURANTS UNLIMITED LC 1185 W 3050 S OGDEN Utah 84401 | |
| **Secured Party** | WESTERN EQUIPMENT FINANCE INC. P.O. BOX 640 DEVILS LAKE North Dakota 58301 | |
| **Amendment Type** | Termination | |
| **File No.** | 499076201649-2 | |
| **Filed** | 3/5/2018 10:47:00 AM | |
| **Collateral** | Collateral | |
| **Date** | 8/17/2016 10:19:00 AM | |

### 2. UCC Lien

| | | |
|---|---|---|
| **Document No.** | 510367201728 | Lapses 1/31/2022 |
| **Filed** | 1/31/2017 | |
| **Debtor** | MERIDIAN RESTAURANTS UNLIMITED LC 1185 W 3050 S OGDEN Utah 84401 | |
| **Secured Party** | WEBBANK 6440 S. WASATCH BLVD. STE 300 SALT LAKE CITY Utah 84121 | |
| **Amendment Type** | Termination | |
| **File No.** | 510367201728-2 | |
| **Filed** | 4/23/2018 8:15:00 AM | |

|  |  |
|---|---|
| **Collateral** | Collateral |
| **Date** | 1/31/2017 1:26:00 PM |

### 3. UCC Lien

| | | |
|---|---|---|
| **Document No.** | 535943201839 | Lapses 1/26/2023 |
| **Filed** | 1/26/2018 | |
| **Debtor** | MERIDIAN RESTAURANTS UNLIMITED<br>5929 FASHION POINT DR. STE 501<br>SOUTH OGDEN Utah 84403 | |
| **Debtor** | MR RESTAURANTS L.C.<br>5929 FASHION POINT DR. STE 501<br>SOUTH OGDEN Utah 84403 | |
| **Secured Party** | CORPORATION SERVICE COMPANY AS REPRESENTATIVE<br>P.O. BOX 2576 UCCSPREP@CSCINFO.COM<br>SPRINGFIELD Illinois 62708 | |
| **Amendment Type** | Termination | |
| **File No.** | 535943201839-2 | |
| **Filed** | 3/7/2018 6:41:00 AM | |
| **Collateral** | Collateral | |
| **Date** | 1/26/2018 9:51:00 AM | |

### 4. UCC Lien

| | | |
|---|---|---|
| **Document No.** | 537681201837 | Lapses 2/23/2023 |
| **Filed** | 2/23/2018 | |
| **Debtor** | MERIDIAN RESTAURANTS UNLIMITED LC<br>5929 FASHION POINT DR. SUITE 501<br>SOUTH OGDEN Utah 84403 | |
| **Secured Party** | CITY NATIONAL BANK AS ADMINISTRATIVE AGENT<br>555 SOUTH FLOWER STREET 24TH FLOOR<br>LOS ANGELES California 90071 | |
| **Collateral** | Collateral | |
| **Date** | 2/23/2018 3:25:00 PM | |

We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as provided by government and other sources, do we make any guaranty or representation as to its accuracy.

---------- **END OF REPORT** ----------

## Report Parameters

The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.

Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGEMENT TO:  (Name and Address) | |

| Filed in the Office of | Initial Filing Number |
|---|---|
| *(signature)* | **510367201728** |
| Director, Division of | Filed On |
| Corporations and | **1/31/2017 1:26:00 PM** |
| Commercial Code | Lapse Date |
| | **1/31/2022** |
| | Number of Pages |
| | **1** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **MERIDIAN RESTAURANTS UNLIMITED, LC** | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **1185 W 3050 S** | **OGDEN** | **UT** | **84401** | **USA** |

2. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **WEBBANK** | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **6440 S. WASATCH BLVD., STE 300** | **SALT LAKE CITY** | **UT** | **84121** | **USA** |

4. COLLATERAL:  This financing statement covers the following collateral:
**ALL COMPUTER EQUIPMENT, PERIPHERALS, AND OTHER EQUIPMENT, (COLLECTIVELY "EQUIPMENT"), WHEREVER LOCATED, HERETOFORE OR HEREAFTER FINANCED TO MERIDIAN RESTAURANTS UNLIMITED, LC BY CREDITOR PURSUANT TO THAT CERTAIN REVOLVING CREDIT ACCOUNT # 68794502120041 9XXXX, DATED JANUARY 27, 2017, (THE "ACCOUNT") AND ALL OF LESSEE'S RIGHTS, TITLE AND INTEREST IN AND TO USE ANY SOFTWARE AND SERVICES (COLLECTIVELY "SOFTWARE") FINANCED UNDER AND DESCRIBED IN THE ACCOUNT, ALONG WITH ANY ADDITIONS, FINANCED AMOUNTS, MODIFICATIONS OR SUPPLEMENTS TO THE ACCOUNT, AND ALL SUBSTITUTIONS, ADDITIONS, ACCESSIONS AND REPLACEMENTS TO THE EQUIPMENT AND SOFTWARE, NOW OR HEREAFTER INSTALLED IN, AFFIXED TO, OR USED IN, CONJUNCTION WITH THE EQUIPMENT AND SOFTWARE AND THE PROCEEDS THEREOF TOGETHER WITH ALL PAYMENTS, INSURANCE PROCEEDS, ANY REFUNDS OR CREDITS OBTAINED BY DEBTOR FROM A MANUFACTURER, LICENSOR OR SERVICE PROVIDER, OR OTHER PROCEEDS AND PAYMENTS DUE AND TO BECOME DUE AND ARISING FROM OR RELATING TO SAID EQUIPMENT, SOFTWARE OR THE ACCOUNT.**

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)  ☐ being administered by a Decedent's Personal Representative

| 6a. Check <u>only</u> if applicable and check <u>only</u> one box: | 6b. Check <u>only</u> if applicable and check <u>only</u> one box: |
|---|---|
| ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien  ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☑ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**UT-0-57444629**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGEMENT TO:  (Name and Address) | |

| Filed in the Office of | Document Number |
|---|---|
| *[signature]* | **510367201728-2** |
| Director, Division of Corporations and Commercial Code | Filed Date and Time **4/23/2018 8:15:00 AM** |
| | Number of Pages **1** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER **510367201728** | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|

2. ☑ **TERMINATION**: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9 For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION**: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:

Check one of these two boxes:       AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Party of record     ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

| OR | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION:  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| OR | 7a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| | 7b. INDIVIDUAL'S SURNAME | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ COLLATERAL CHANGE:  Also check one of these four boxes:  ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:  Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| OR | 9a. ORGANIZATION'S NAME **WEBBANK** | | | |
|---|---|---|---|---|
| | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
**UT-0-63795416**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Receipt Number: 7218214
Amount Paid: $12.00

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| Corporation Service Company    1-800-858-5294 |
| B. E-MAIL CONTACT AT FILER (optional) |
| SPRFiling@cscinfo.com |
| C. SEND ACKNOWLEDGMENT TO:    (Name and Address) |

1417 70606
Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703-4261
Filed In: Utah
(S.O.S.)

535943201839

LAL

JAN 26 '18 AM 9:51

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME MR Restaurants, L.C. | | | |
|---|---|---|---|
| OR | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 5929 Fashion Point Dr. Ste 501 | CITY South Ogden | STATE UT | POSTAL CODE 84403 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME Meridian Restaurants Unlimited | | | |
|---|---|---|---|
| OR | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS 5929 Fashion Point Dr. Ste 501 | CITY South Ogden | STATE UT | POSTAL CODE 84403 | COUNTRY USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME CORPORATION SERVICE COMPANY, as REPRESENTATIVE | | | |
|---|---|---|---|
| OR | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS P.O. Box 2576 uccsprep@cscinfo.com | CITY Springfield | STATE IL | POSTAL CODE 62708 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
Security interest in and to all of Merchant's present and future accounts, chattel paper, deposit accounts, personal property, assets and fixtures, general intangibles, instruments, equipment, inventory wherever located, and proceeds now or hereafter owned or acquired by Merchant.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative |
|---|
| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: |
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor |
| 8. OPTIONAL FILER REFERENCE DATA: UCC |

1417 70606

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Corporation Service Company
2711 Centerville Rd, Ste 400
Wilmington, DE 19808

## UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGEMENT TO:  (Name and Address) | |

| Filed in the Office of | Document Number<br>**535943201839-2** |
|---|---|
| Director, Division of Corporations and Commercial Code | Filed Date and Time<br>**3/7/2018 6:41:00 AM** |
| | Number of Pages<br>**1** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**535943201839**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:

Check one of these two boxes:                    AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

OR | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION:  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

OR | 7a. ORGANIZATION'S NAME | | |
|---|---|---|
| 7b. INDIVIDUAL'S SURNAME | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT:  Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

OR | 9a. ORGANIZATION'S NAME<br>**CORPORATION SERVICE COMPANY, AS REPRESENTATIVE** | | | |
|---|---|---|---|
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
**UCC**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Receipt Number: 7254468
Amount Paid: $410.00

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |

C

Quick Data Services, Inc.
2005 East 2700 South, Suite 200
Salt Lake City, Utah 84109

5370281201837

RECEIVED

FEB 23 2018

Utah Div. Of Corp. & Comm. Code

2-A

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| MERIDIAN RESTAURANTS UNLIMITED, LC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 5929 Fashion Point Dr., Suite 501 | South Ogden | UT / 84403 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| City National Bank, as Administrative Agent | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 555 South Flower Street, 24th Floor | Los Angeles | CA / 90071 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All of Debtor's right, title and interest in and to the assets described on "Exhibit A" attached hereto (consisting of 2 pages) as "Pledged Collateral" and incorporated herein by reference.

FEB 23 '18 PM 3:25

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility    6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:
Utah SOS (CNB/Meridian - 018450-0086)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

Receipt Number: 7254458
Amount Paid:    $410.00

EXHIBIT A

TO

UCC FINANCING STATEMENT

Debtor:      MERIDIAN RESTAURANTS UNLIMITED, LC

Secured Party: CITY NATIONAL BANK, as Administrative Agent

Item 4 (continued) Collateral Description

All of Debtor's right, title and interest in the below listed property and interests in property, whether now
owned or existing or hereafter created, acquired or arising (the "Pledged Collateral"):

        (a)    all of the shares of the capital stock, membership interests, partnership interests
and all other equity interests of each corporation, limited liability company, limited partnership or other
legal entity (collectively, the "Issuers" and each, an "Issuer") identified on Schedule 1 attached hereto held
by the Debtor, which, for clarity, shall not include any rights or interest in any capital stock, membership
interests, partnership interests or any other equity interests in Specified Subsidiaries (as defined in the Credit
Agreement) (the "Pledged Securities") and the certificates (if any) representing the Pledged Securities, all
options, warrants and other rights to acquire additional shares of capital stock, membership interests,
partnership interests and all other equity interests of each Issuer, and the shares, membership interests,
partnership interests and other equity interests underlying such rights and all distributions, dividends (in the
form of cash, securities or otherwise), cash, instruments, chattel paper and other rights, property or proceeds
and products from time to time received, receivable or otherwise distributed in respect of or in exchange
for any or all of the Pledged Securities;

        (b)    all additional shares of the capital stock, membership interests, partnership
interests and all other equity interests of each Issuer at any time acquired by the Debtor in any manner, and
the certificates (if any) representing such additional shares, membership interests, partnership interests and
other equity interests (and any such additional shares, membership interests, partnership interests and other
equity interests, with respect to which the Debtor shall execute and deliver to the Secured Party a pledge
supplement, shall constitute part of the Pledged Securities), together with all distributions, dividends (in the
form of cash, securities or otherwise), cash, instruments, chattel paper and other rights, property or proceeds
and products from time to time received, receivable or otherwise distributed in respect of or in exchange
for any or all of such additional shares, membership interests, partnership interests and other equity
interests; and

        (c)    all proceeds of any of the foregoing.

    As used herein:

    "Credit Agreement" means that certain Credit Agreement to be entered into on or about February
26, 2018 (as it may be amended, restated, supplemented extended or renewed from time to time) by and
among NKS RESTAURANTS, L.C., a Utah limited liability company, HR RESTAURANTS, L.C., a Utah
limited liability company, MR RESTAURANTS, L.C., a Utah limited liability company, C UTAH, L.C., a
Utah limited liability company, AZM RESTAURANTS, L.C., a Utah limited liability company, NDM
RESTAURANTS, L.C., a Utah limited liability company, Debtor, and LOVELOUD RESTAURANTS,
L.C., a Utah limited liability company, each lender from time to time party thereto, and Secured Party, as
Administrative Agent.

1 of 2

FEB 23 '18 PM 3:25

Date:
Receipt Number: 7254456
Amount Paid:     $410.00

Schedule 1

**Identification of Pledged Securities**

| Issuer | Class or Other Description of Pledged Securities | Certificate Number (if applicable) | Percentage of Pledged Securities | Total Outstanding Securities | Percentage of Total Outstanding Securities Pledged |
|---|---|---|---|---|---|
| Loveloud Restaurants, L.C., a Utah limited liability company | Membership Interests | N/A | 100% | N/A | 100% |

*2 of 2*

FEB 23 '18 PM 3:26



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

## Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

**December 27, 2021**

UCC eZFILE
2020 Hurley Way
Sacramento, CA 95825  USA

## UCC-11 Information Request

Your Request for Information has been processed by the Utah Division of Corporations and Commercial Code matching filing(s) in the Division's computerized database with the following search parameter(s) and the "Exact" filter:

**Search Number : 211227832058-1**

| | | | |
|---|---|---|---|
| **Debtor Name:** | LOVELOUD RESTAURANTS, L.C. | **Search Response:** | All (Lapsed and Unlapsed) |
| **Debtor Type:** | Organization | **Copies:** | No Copies |
| **Date Range:** | All Available Filings | **City:** | |

The Utah Division of Corporations and Commercial Code herby certifies that the attached information is filed and of Record in the Offices of the Division as of 12/23/2021 at 18:00 MST.

Sincerely,
FILING OFFICER



**LEIGH VEILLETTE, Director**
Utah Division of Corporations and Commercial Code



SPENCER COX
*Governor*

DEIDRE HENDERSON
*Lieutenant Governor*

# State of Utah
# Department of Commerce

### Division of Corporations and Commercial Code

MARGARET BUSSE
*Executive Director*

LEIGH VEILLETTE
*Director, Division of Corporations and Commercial Code*

## Liens Filing Search Report

The Utah Division of Corporations and Commercial Code hereby certifies that the attached list is a true and exact list of all financing statements or CFS liens and related subsequent documentation for the debtor below as filed with the Division of Corporations and Commercial Code office, Uniform Commercial Code Division, as of the Through Date below.

**Date Searched:** 12/27/2021 4:31:51 PM    **Search Criteria:**
**Searched by:**
**Filing Chains:** 1

**Good Through Filing Date:** 12/23/2021

**Cities:**
**Date Range:** All Available Filings
**Include Filings Outside Range?:** All Available Filings

December 27, 2021
**Filing Status:** ALL(Lapsed and Unlapsed)
**Include Records:** N/A

**Organization Name:** LOVELOUD RESTAURANTS, L.C.

---

**Filing Chain#:** 1
**Original File#:** 537676201840

**Lapse Date:** 02/23/2023
**Lien Type:** UCC Lien

---

**Filing #:** 537676201840    **Filing Date:** 02/23/2018    **Filing Type:** Initial Financing Statement UCC-1    **Page Count:** 1

### Debtors

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| LOVELOUD RESTAURANTS, L.C. | Organization | N/A | 5929 FASHION POINT DR., SUITE 501 SOUTH OGDEN, UT 84403, USA |

### Secured Parties

| Name | Type | Action Type | Address |
|------|------|-------------|---------|
| CITY NATIONAL BANK, AS ADMINISTRATIVE AGENT | Organization | N/A | 555 SOUTH FLOWER STREET, 24TH FLOOR LOS ANGELES, CA 90071, USA |

### Collateral

ALL ASSETS OF DEBTOR, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER NOW OWNED OR HEREAFTER ACQUIRED.

---

Search Date: December 27, 2021



2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

**Ask us about UCC eZFILE®**

## UCC Search Report

|  |  |
|---|---|
| **Type of Search** | UCCs |
| **Jurisdiction/Filing Office** | State of Utah, Secretary of State Uniform Commercial Code Division |
| **Estimated Currency Date** | Nov. 09, 2021 |
| **Last File Date** | Nov 14 2021 |
| **Subject Search Name** | LOVELOUD RESTAURANTS, L.C. |
| **Search Key Entered** | LOVE* RES* |

## Results

Based on a search of the indices of the Uniform Commercial Code Division of the Secretary of State of Utah, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well as the searcher's choice of the liens ultimately included or excluded herein. Certification can only be obtained through the office of the Utah Secretary of State.

1. **UCC Lien**

|  |  |  |
|---|---|---|
| **Document No.** | 537676201840 | Lapses 2/23/2023 |
| **Filed** | 2/23/2018 |  |
| **Debtor** | LOVELOUD RESTAURANTS L.C. | |
|  | 5929 FASHION POINT DR. SUITE 501 | |
|  | SOUTH OGDEN Utah 84403 | |
| **Secured Party** | CITY NATIONAL BANK AS ADMINISTRATIVE AGENT | |
|  | 555 SOUTH FLOWER STREET 24TH FLOOR | |
|  | LOS ANGELES California 90071 | |
| **Collateral** | Collateral | |
| **Date** | 2/23/2018 3:24:00 PM | |

We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as provided by government and other sources, do we make any guaranty or representation as to its accuracy.

---------- **END OF REPORT** ----------

## Report Parameters

The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.

Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in

the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.

Search Date: December 27, 2021



2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

**Ask us about UCC eZFILE®**

## Utah Similar Name Report

| | |
|---|---|
| **Subject Search Name** | LOVELOUD RESTAURANTS, L.C. |
| **Truncated Search Name** | LOVE* RES* |
| **Estimated Currency Date** | November 09, 2021 |
| **Last File Date** | Nov 14 2021 |

Contains all debtor names not included on the final results report.

| Filing # | Debtor Name | Address | City | State | Zip | Type |
|---|---|---|---|---|---|---|
| 135581200124 | LOVE & SUNSHINE PRESCHOOL | 340 W CENTER | BOUNTIFUL | Utah | 84010 | UCC |

Receipt Number: 7254468
Amount Paid:    $410.00

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |

C

Quick Data Services, Inc.
2005 East 2700 South, Suite 200
Salt Lake City, Utah 84109

537676 2017840

RECEIVED

(TMM)          FEB 23 2018

Utah Div. Of Corp. & Comm. Code

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME |  |  |  |
| --- | --- | --- | --- |
| LOVELOUD RESTAURANTS, L.C. |  |  |  |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 5929 Fashion Point Dr., Suite 501 | South Ogden | UT | 84403 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME |  |  |  |
| --- | --- | --- | --- |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |  |  |  |
| --- | --- | --- | --- |
| City National Bank, as Administrative Agent |  |  |  |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 555 South Flower Street, 24th Floor | Los Angeles | CA | 90071 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of Debtor, whether now existing or hereafter arising, and whether now owned or hereafter acquired.

FEB 23 '18 PM 3:24

| 5. Check only if applicable and check only one box: Collateral is | ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
| --- | --- | --- |
| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: |
| ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien  ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor | | |

8. OPTIONAL FILER REFERENCE DATA:
Utah SOS (CNB/Meridian – 018450-0086)

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)